```
 1            IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION


 3
       UNITED STATES OF AMERICA,    :
 4                                  :
            Plaintiff,              :
 5                                  :
                                    : CASE    8:17-cr-445
 6     vs.                          : NO.:
                                    :
 7                                  : DATE:   12/11/2017
       GUSTAVO ENRIQUE LLANOS       :
 8     MIRANDA and JAIR MENDOZA     : TIME:   12:23 p.m.
       MONTOYA,                     :
 9                                  : PAGES:  1 - 139
            Defendants.            :
10     ------------------------     :

11                 TRANSCRIPT OF TRIAL DAY 1
                   [Excluding jury selection]
12          BEFORE THE HONORABLE SUSAN C. BUCKLEW
                 UNITED STATES DISTRICT JUDGE
13
       For the Government:
14
                   TAYLOR G. STOUT, ESQ.
15                 CARLTON GAMMONS, ESQ.
                   U.S. Attorney's Office
16                 Suite 3200
                   400 N. Tampa Street
17                 Tampa, Florida 33602

18
       For Defendant Gustavo Llanos Miranda:
19
                   DANIEL L. CASTILLO, ESQ.
20                 3900 North Boulevard
                   Tampa, Florida 33603

21

22     For Defendant Jair Mendoza Montoya:

23                 VICTOR D. MARTINEZ, ESQ.
                   423 S. Hyde Park Avenue
24                 Tampa, Florida  33606

25
       Court Reporter:  Lynann Nicely, RPR, RMR, CRR
```

```
 1                    I N D E X

 2    WITNESS                              PAGE

 3

 4    GREGORY ALEXANDER

 5    Direct examination by Mr. Stout           47

 6    Cross examination by Mr. Castillo         89

 7    Cross examination by Mr. Martinez         106

 8    Redirect by Mr. Stout                     120

 9

10    LT. JEFFREY JURIN

11    Direct examination by Mr. Gammons         122

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              [Jury sworn in.]

3         THE COURT:  Would you have a seat for just a

4    moment and then I promise you I'll send you to

5    lunch.  I would just like to talk to you just a

6    minute about what's going to happen the rest of the

7    day.

8         First, when you go back to the jury room,

9    which is immediately outside of this courtroom,

10   Ms. Saylor is going to talk to you about cell phones

11   and if you want to bring a cell phone in, you're

12   welcome to do that.  We ask you to leave it down on

13   the third floor in one of those lockers and

14   certainly at every break or lunch break or

15   something, you're welcome to go get it and use it if

16   you need to do that.  But you don't take it in the

17   jury room with you.  But you can leave it down on

18   the third floor and you can bring it in every day

19   and go down there and use it as you need to use it.

20        The second thing is that in just a few minutes

21   we will take an hour and 15 minute lunch break and

22   you're welcome to walk around and go get some lunch

23   or just walk around if you want to do that.  For

24   tomorrow's purposes you'll see that the jury room

25   has a microwave, it has a refrigerator, has a coffee

1     maker, has a water thing.  So if you want to bring

2     something in, you're welcome to bring it in as well.

3          I anticipate that we will go until about 5:00

4     this afternoon and then we'll recess for the day.

5     The order of what's going to happen when you come

6     back is that I'm going to give you some what we call

7     preliminary instructions in the law and then we're

8     going to start with the opening statements by the

9     attorneys and then after the opening statements

10    we'll actually start with the evidentiary portion of

11    the trial.

12         The government, as you know, has the burden of

13    proof, so the government goes first.  So after the

14    opening statements I will call on the government to

15    call their first witness.  That witness will take

16    the stand and will be examined and cross-examined by

17    the attorneys.  And I anticipate that we will

18    proceed to hear from witnesses the remainder of the

19    afternoon.

20         Tomorrow morning -- I need to look at my

21    schedule, I think I have two sentencings, I just

22    need to see how long those are going to be, but

23    we'll probably start -- we'll start at either 9:00

24    or 9:30 and I'll take a look at that, I don't want

25    you to sit back in the jury room while I'm out here

1    doing sentencings.  But we will then follow a

2    similar schedule in that we will start about 9:00 or

3    9:30, recess mid morning, recess an hour and

4    15 minutes at lunch, recess mid afternoon, and

5    recess about 5:00.  So I anticipate we will follow

6    that schedule every day.

7         I will tell you again we will be mindful of

8    your time, we won't waste your time, and we'll try

9    to have all the witnesses here to be called and I'm

10   sure the attorneys are very mindful just as I am as

11   well.

12        We appreciate your service, we're glad that

13   you're here, and you're going to be with us for the

14   next few days.

15        So with that said, it's 20 minutes of 1.  So

16   we're going to be in recess until about 5 minutes of

17   2.  We will start again at 5 minutes of 2.  You'll

18   need to be in this jury room -- we're on the 10th

19   floor.  You'll come back up here, you won't need to

20   go to the jury assembly room on the third floor

21   unless it has something to do with your phone.  You

22   can come directly up here.  But it's from this jury

23   room that you will be brought into the courtroom.

24   And we will start promptly.  So we will be in recess

25   until, what did I just say, five minutes of 2.  Have

1    a good lunch.

2         (The jury retired to the jury room.)

3         THE COURT:  Have a seat just a minute and

4    let's talk about briefly about the United States

5    motion for a pretrial determination of the

6    admissibility of defendant's prior conviction and

7    the motion in limine filed by Mr. Castillo to

8    exclude certain alleged 404(b) evidence and his

9    memorandum.  And specifically -- I've read both and

10   specifically Mr. Llanos Miranda has a prior

11   conviction and the copy of the conviction or the

12   judgment has been attached to the government's

13   filing and I realize it was for importation of

14   cocaine.  The conviction was on April 22nd, 2002,

15   and the sentence was a sentence of 51 months.  So I

16   have read the motions and I have looked at the prior

17   conviction.

18        It's my understanding that the government

19   wishes to offer this as 404(b) evidence and it would

20   be their intent to offer a certified copy of the

21   conviction.  Is that correct?

22        MR. STOUT:  That's correct, Your Honor.

23        THE COURT:  Okay.  Could I ask you a few

24   additional questions?

25        MR. STOUT:  Certainly, Your Honor.

1          THE COURT:  You have stated in your motion

2     that you have filed that -- let me see if I can find

3     it.  You have said that law enforcement officials

4     took the defendant's fingerprints upon his entry

5     into the United States in connection with this case.

6     They ran those fingerprints through a Department of

7     Justice database and it matched a man named Gustavo

8     Llanos who was convicted in 01834, United States

9     District Court, the Eastern District of New York.

10          You've also said that those agents compared

11     the defendant's booking photograph to that from the

12     prior conviction and they show the same person.

13          You've also said that they also discovered

14     that the passport number on the defendant's passport

15     when detained in this case matches the passport

16     number from Gustavo Llanos's alien file.

17          So in addition to having a similar name, you

18     have matched fingerprints, passport numbers as well;

19     is that correct?

20          MR. STOUT:  That's all correct, Your Honor.

21          THE COURT:  Okay.  And the one thing I didn't

22     say is that he was released from prison I'm assuming

23     sometime in 2005.  March 25, 2005.  Is there

24     anything else you want to tell me?

25          MR. STOUT:  Your Honor, the one issue that I

1          addressed in here is the temporal proximity of that

2          prior conviction.  The *Lampley* case that I cite here

3          is the oldest case, has the longest period of time

4          that I'm aware of that I could find is 15 years.

5          And I believe in my motion I said that there was a

6          16-year gap in this case.  I think -- in rethinking

7          that, I think it's more like 15 and a half if we

8          think about it.

9              He was convicted in October of 2001, that's

10         when he pled guilty in the prior case.  He joined

11         this conspiracy, as best as I can tell,

12         approximately in April of this year, 2017.  That

13         wouldn't be quite 16 years, it would be 16 years

14         until now when we introduce it in trial, but it

15         would about 15 and a half, and I think that's close

16         enough to Lampley.  Lampley was an approximately

17         15-year gap.  So I think it's within -- I think for

18         all the other reasons I lay out in my motion, I

19         think it's relevant, I think we've established it's

20         the same person.  And as far as the last prong of

21         the 404(b) test, which is really a 403 balancing, in

22         as much as the temporal distance from the prior

23         conviction is important to Your Honor, I think it's

24         close enough to the Lampley case, no bright line

25         rule in the Eleventh Circuit about if you're outside

1       of 15 years, you can't use it or anything like that.

2               THE COURT:  Well, he also was not released

3       from prison until November of 2005, right?

4               MR. STOUT:  That's also correct, Your Honor.

5               THE COURT:  And you're offering it for the

6       purpose of showing his intent?

7               MR. STOUT:  Knowledge and intent, Your Honor,

8       I think that's going to be the central issue in the

9       case.

10              THE COURT:  Okay.  Mr. Castillo?

11              MR. CASTILLO:  Your Honor, I responded in my

12      materials.  I think they're using it to establish

13      propensity to commit a crime.  I don't see any

14      relevance in the attachment.  This is a boat case,

15      what we call a boat case in the Middle District.

16      That was not a boat case, it was a totally separate

17      set of facts and circumstances.  There is no

18      relation between that incident and this conspiracy

19      whatsoever other than it's the same individual and

20      he has a prior conviction.

21              Obviously if he were to testify, it's

22      difficult.  But for the government to introduce it

23      in their case as 404(b) evidence, I think it's

24      unfairly prejudicial and I think that it doesn't

25      meet the 403 balancing test compared to the other

1    evidence that they have.  And I don't have any

2    additional case law other than what's in the

3    materials.  I just think it's just we're stretching

4    that rubber band way too far for this issue if the

5    defendant doesn't testify.

6         THE COURT:  And just so -- I didn't ask that

7    question, I made an assumption, but perhaps I should

8    ask it.  It is your intent to introduce this in your

9    case-in-chief.

10        MR. STOUT:  That's correct, Your Honor.  And

11   if the defendant were to testify, we would also

12   intend to cross-examine him on it.

13        THE COURT:  Okay.  Well, and you've stated it

14   in your -- I think you probably both stated it --

15   the test is the evidence must be relevant to an

16   issue other than the defendant's character.  The

17   government has said it's relevant to his intent and

18   knowledge.  He has put that at issue by pleading not

19   guilty and going to trial.  There must be sufficient

20   proof so that the jury could find the defendant

21   committed the act.

22        We have a certified copy of a conviction

23   apparently, the fingerprints match, the passport

24   number matches, and the photographs they have

25   compared there does seem to be sufficient proof that

1          the defendant committed the prior act.

2          And then finally, the evidence must possess

3    probative value that is not substantially outweighed

4    by its undue prejudice.  And that's probably the

5    biggest issue in this case, but generally the cases

6    are that if the defendant goes to trial, he has a

7    prior conviction and it is for a similar type crime

8    and even though this is not, quote, a boat case, it

9    is for the importation of cocaine.  Here we have

10   possession with the intent to distribute cocaine

11   while on board a vessel subject to the jurisdiction

12   of the United States, which meant that the vessel

13   was taking the drugs from one place to another and I

14   think it's sufficiently similar.

15         The time, admittedly, it is a lengthy period

16   of time.  However, part of that time the defendant

17   was incarcerated.  He was sentenced in April of

18   2002, but he didn't get out until March 25th of

19   2005, so I'm looking at -- that's probably about

20   12 years apart from that date.

21         In addition, because he has pled not guilty

22   and because of the fact that as was stated before

23   that the defendant has indicated that there was a

24   big boat and that he has no knowledge of the cocaine

25   on the boat, there is a prosecutorial need, so I'm

1          going to overrule the objection.

2              If the United States wants to admit the prior

3      conviction for 404(b) purposes, you may do that and

4      I'll give the appropriate instruction at the time.

5              Okay, let's recess for lunch.  It is

6      10 minutes of 1 and I said what, 5 of 2.

7              (Lunch break.)

8          MR. CASTILLO:  Judge, what's your thinking

9      about note taking?  It hasn't come up, but if they

10     want to keep track of dates, are you going to bring

11     it up or do you wait for them to ask or how do you

12     want to handle that?

13         THE COURT:  Say that again?

14         MR. CASTILLO:  Note taking.  Do we let them,

15     do we wait for them to ask?

16         THE COURT:  No, I let them take notes.

17         MR. CASTILLO:  Also, I guess you're going to

18     do their preliminary instructions.  If they run into

19     us in the hallway, we're not being rude if we don't

20     say good morning and stuff like that.  And I think

21     Mr. Stout has something with one of his --

22         MR. STOUT:  Your Honor, I wanted to add two

23     preliminary issues before the jury came back in.

24     The first was a similar issue to what Mr. Castillo

25     just brought up.  Two of my colleagues who were

1    sitting in the back here and were coming up the

2    elevator to watch the opening and they were talking

3    to each other and apparently one of the jurors, they

4    didn't realize until that person got off on this

5    floor that it was probably a juror, was in the

6    elevator with them.  They told me that all they said

7    was they were talking about how long the trial might

8    last and the upshot of the conversation was it may

9    last several days because there's Spanish speakers

10   and an interpreter, takes a longer time to do a

11   trial that way.  I wanted to let the court know

12   that.  I don't think anything improper at all

13   happened.

14           THE COURT:  Okay.  Thank you.

15           MR. STOUT:  I had one other preliminary issue,

16   Your Honor.  I just didn't want anybody to be

17   blindsided by this.  I anticipate that one of the

18   cooperating witnesses that will testify will say

19   something along the lines of Mr. Castillo's client,

20   Llanos Miranda, told me to ask for a certain amount

21   of money as part of the conspiracy because he had

22   been -- he had served that prior time in the United

23   States and it was a big risk to him, or something

24   like that, to go on the trip.

25           It's related to the 404(b) issue.  I don't

1      think it actually is 404(b).  It's an admission by

2      his client, could also be a co-conspirator

3      statement.  And I just wanted to make sure the court

4      was okay with that statement coming in before it

5      came in.

6              MR. CASTILLO:  Do I have this statement?

7              MR. STOUT:  It's the statement of Chacin

8      Villarroel.

9              MR. CASTILLO:  I've got it.

10             MR. STOUT:  You'll have it whenever he says it

11     there.  I can't remember whether it's in his report

12     or not.

13             THE COURT:  What witness is that?

14             MR. STOUT:  That's Chacin Villarroel.

15             THE COURT:  And when is he testifying?

16             MR. STOUT:  I anticipate he would start to

17     testify this afternoon, late this afternoon.

18             MR. CASTILLO:  Judge, can I get my Jencks

19     stuff ahead of time so at least I'm not totally

20     blindsided like I am now?

21             MR. STOUT:  Your Honor, I turned over all

22     statements by the co-conspirators that I had at

23     least 10 days before trial.

24             THE COURT:  Okay.  And among them that was in

25     there?

1          MR. CASTILLO:  No.

2          MR. STOUT:  I don't recall whether that

3     statement is in there or not.  If it's not, then the

4     first time he says it will be up here.  He said that

5     in trial prep last week.

6          MR. CASTILLO:  And I'm just finding out about

7     it now.

8          THE COURT:  Okay.  That was a statement that

9     he made to you.

10         MR. STOUT:  He made to me, Your Honor.  I can

11    check and see if it's in the reports real quick, if

12    you want me to.  If it's in the reports that

13    Mr. Castillo had, I can confirm that very quickly.

14         THE COURT:  This is not going to come up

15    until --

16         MR. STOUT:  Probably 3:30, 4:00.

17         THE COURT:  I would rather go ahead and get

18    started so that at least this jury thinks we're

19    somewhat timely.  All right.  Would you bring the

20    jury in?

21         (The jury returned to the courtroom.)

22         THE COURT:  Ladies and gentlemen, you have in

23    front of you a seating chart which tells you who the

24    jurors are that are seated around you.  It also

25    identifies the attorneys who are seated at counsel

1      table as well as the defendants in the case.

2          I'm also going to ask Mr. Fitchett to pass out

3      legal pads and pens or pencils.  You're welcome to

4      take notes during the course of the trial and that's

5      why we're handing these out.  If I can ask that you

6      put your name on the first page of the legal pad, it

7      identifies that pad as belonging to you.  And then

8      when you recess in the evening, just ask you to turn

9      the pad face down on your chair and you'll leave it

10     there for the evening hours.

11         When you finally go back to deliberate in this

12     case you can take your notes back with you, but

13     until that time you'll need to leave them on your

14     chair or in your hands, not in the jury room.

15         Okay.  As I said before we recessed for lunch,

16     I'm going to give you a few preliminary

17     instructions.  At the end of the trial I will give

18     you a set of written jury instructions which set out

19     the elements of the crimes that the defendants are

20     charged with and what it is that the government must

21     prove.  Right now these instructions are just

22     general instructions about your responsibility as a

23     juror, what's going to be happening throughout the

24     trial, no case-specific information other than I'm

25     going to read the indictment to you.

1          You've now been selected and you've been sworn

2     to try this case and I'm now going to explain some

3     basic principles about a criminal trial and what

4     your duty is as jurors.  As I said, I will give you

5     a written set of jury instructions at the close of

6     the trial.

7          It will be your job, your duty, to determine

8     what happened in this case and decide if each of the

9     defendants is guilty or not guilty of the crimes

10    they're charged with.  At the end of the trial I'm

11    going to explain the law to you and tell you what it

12    is that you must follow to reach your verdict.  You

13    must follow the law as I give it to you, whether you

14    agree with the law or not.

15         You must decide the case solely on the

16    evidence presented here in the courtroom and the

17    evidence will come in several forms.  It can be

18    testimony from the witnesses -- and you're going to

19    hear a lot of testimony from the witnesses.  They

20    might testify about what they saw, sometimes what

21    they heard, sometimes even what they smelled.

22         It can also be documentary evidence such as an

23    exhibit that's admitted into evidence.  Sometimes it

24    can be someone's opinion.

25         Some evidence proves a fact directly and some

1     evidence proves a fact indirectly.  Indirectly we

2     sometimes call circumstantial evidence and it's

3     simply a chain of circumstances that proves a fact.

4     And as far as the law is concerned it makes no

5     difference whether evidence is direct -- something

6     somebody saw, for example -- or circumstantial

7     evidence.  You may choose to believe or disbelieve

8     either kind and you should give every piece of

9     evidence whatever weight you think it deserves.

10          Certain things are not evidence and you ought

11    to know what those are as well.  Statements and

12    arguments by the lawyers are not evidence.  They're

13    going to make an opening statement in just a minute.

14    They're going to make a closing argument at the end

15    of trial.  That's not evidence.

16          Questions by the lawyers, that's not evidence.

17    Objections to maybe a question the opposing counsel

18    has asked -- that's not evidence.  The lawyer's

19    questions or objections are not evidence.  Only the

20    witness's answers are the evidence in the case.  And

21    you shouldn't think something is true just because a

22    lawyer's question suggests that it's true.

23          For instance, if a lawyer asks a question such

24    as, "You saw the defendant hit his sister, didn't

25    you?"  That question is not evidence that the

1    defendant hits his sister, unless the defendant

2    agrees with it.

3         There are rules of evidence that control what

4    can be received into evidence and when a lawyer asks

5    a question or offers an exhibit and the lawyer on

6    the other side thinks it's not permitted by the

7    rules of evidence, that lawyer may object.  If I

8    overrule the objection, then the question may be

9    answered and the exhibit may come in.  Whenever I

10   sustain an objection, then the witness can't answer

11   the question and the exhibit doesn't come in.

12        Occasionally I may turn to you and ask you to

13   disregard a certain piece of evidence and that means

14   you can't consider that piece of evidence in

15   deciding the case.  That usually happens when a

16   witness blurts out an answer before the attorney can

17   object to the question or the answer and in that

18   case I might sustain the objection, just turn to you

19   and tell you to disregard that answer.  That may not

20   happen, but just in case it does, that's

21   permissible.

22        Occasionally evidence will be admitted for a

23   limited purpose and I'll turn to you and instruct

24   you what purpose that limited purpose is for.  And

25   you can only consider it for that limited purpose.

1        As far as the witnesses are concerned, you

2   have to decide what testimony to believe and what

3   testimony not to believe.  You may believe

4   everything a witness says, or part of it, or none of

5   it.  That's strictly up to you as a juror.

6        In considering the testimony of any evidence,

7   you may take into consideration the opportunity and

8   the ability the witness had to see or hear or know

9   the things a witness testified to, the witness's

10  memory, the witness's manner when testifying, the

11  witness's interest in the outcome of the case, any

12  bias or any prejudice the witness might have,

13  whether other evidence contradicts the witness's

14  testimony, the reasonableness of the witness's

15  testimony in light of the other evidence, and any

16  other factors that you think bear on that witness's

17  believability.

18       As you know, this is a criminal case and there

19  are some basic rules about a criminal case that you

20  should keep in mind and we've actually discussed

21  these.  First, the defendant is presumed innocent

22  until proven guilty.  The indictment against the

23  defendant brought by the government is only an

24  accusation, nothing more; it's not proof of guilt.

25  And the defendant therefore starts out with a clean

1     slate; he is presumed to be innocent.

2          Second, the burden of proof is on the

3     government until the very end of the case.  The

4     defendant has no burden of proof, doesn't have to

5     prove his innocence or present any evidence or even

6     to testify.  Since the defendant has the right to

7     remain silent, it may choose whether to testify.

8     You cannot legally put any weight on a defendant's

9     choice not to testify; it is simply not evidence.

10         Third, the plaintiff must prove the

11    defendant's guilt beyond a reasonable doubt, and I

12    will instruct you on that later on, but the words

13    mean exactly what they say, beyond a reasonable

14    doubt.  It's a high level of proof.

15         Our law requires jurors to follow certain

16    other instructions regarding their personal conduct

17    in order to help assure a just and a fair trial.

18    First of all, you should not talk about the case or

19    with anyone else about anything related to this

20    case.  You may tell someone that you are on a jury,

21    your employer or friend or your family member, and

22    you can tell them that you're on a federal jury, but

23    you can't talk to them about the kind of case,

24    what's happening in the courtroom, the testimony in

25    the case, or anything else.

1          And you should also not talk to anyone here;

2     in other words, you shouldn't talk to anybody that

3     might be in the courtroom such as the attorneys or

4     the agent who is seated at counsel table or the

5     defendants, anybody you might run into in the

6     hallway, you should not talk with them about

7     anything related to the case.

8          The attorneys are under instructions not to

9     speak with you in any way and they will not do it.

10     Even if they get on an elevator with you, they won't

11     talk to you because they're not supposed to talk to

12     you.

13          But in turn, you shouldn't talk about anything

14     with the attorneys or the witnesses either.  And I

15     said you shouldn't discuss the case, but really as

16     far as the attorneys and the witnesses are

17     concerned, you shouldn't talk with them, period,

18     because sometimes it's the appearance that's the

19     problem.  I mean, you may be talking about the

20     weather, but it's still the appearance that's the

21     problem.  So they won't talk to you and you

22     shouldn't talk with them either.

23          If anything happens that you think is

24     inappropriate or improper, then you need to report

25     the matter to Mr. Fitchett who will be with you

1    throughout the trial and he in turn will report it

2    to me.

3         You should not attempt to do any kind of

4    investigation on your own.  You shouldn't attempt to

5    visit any of the scenes that you may here described

6    in the evidence.  I don't think that's going to

7    happen here.

8         But you should also not attempt to do any kind

9    of computer investigation.  For example, you

10   shouldn't Google any of the locations or any of the

11   people involved in this case.  Simply do not do any

12   investigation.  You should rely on what you hear in

13   the courtroom.

14        I don't anticipate there being any accounts of

15   this trial in the newspaper or on television, but

16   should there be anything in the news media I would

17   instruct you not to listen or read that either.

18   Again, it's important that you decide the case on

19   what you hear in this courtroom, so don't attempt to

20   research in any way anything having to do with this

21   case.

22        In addition, I normally or used to instruct

23   jurors not to have any conversations with other

24   people about the case, don't talk about the case

25   with anybody at home, don't talk about the case with

1    anybody at work, don't talk about the case with

2    friends, don't talk about the case between or among

3    yourselves, not until you actually go back to the

4    jury room to begin your deliberations.  Simply don't

5    talk about the case until I give you the case to

6    decide.

7         However, today, you know, we need to probably

8    add to that instruction.  So you shouldn't talk

9    about the case not only face-to-face or over the

10   telephone, but you shouldn't text about the case,

11   you shouldn't email about the case, you shouldn't

12   blog about the case, you shouldn't put it on

13   Facebook, you shouldn't Twitter about the case or --

14   nothing like that.  No Snapchats, no nothing.

15        You must not provide any information about the

16   case to anyone by any means whatsoever and that

17   includes the posting of information about the case,

18   what you're doing, what you heard, on any device

19   that you might have.  And as I said, you also should

20   not Google or research anything over the internet.

21   And not only locations and testimony or witnesses,

22   but the lawyers and the judge as well.

23        It's important that you understand that these

24   rules exist because we want you to decide the case

25   on what you hear in this courtroom and that's the

1    only way I think we can assure that these defendants

2    and the government get a fair trial.

3         Our law does not permit jurors to talk among

4    themselves about the case until you actually go back

5    to the jury room to deliberate.  So any discussions

6    prior to that are premature.  You need to wait until

7    you hear all of the evidence before you actually go

8    back to the jury room and discuss the evidence.

9    That will be after I give you the law that applies

10   to the case.

11        Finally, as I said, any type of conversations

12   in whatever manner or fashion during the course of

13   the trial are simply not permitted and this is

14   because we are trying to guarantee that both sides

15   get a fair trial in this case.

16        Now, as far as your notes are concerned, as I

17   said before, you're welcome to take notes throughout

18   the trial, but you'll have to leave those notes in

19   the courtroom and when you exit the courtroom those

20   notes stay on your chair until you take them back

21   into the jury room for your deliberations.

22        Two defendants are on trial here and you're

23   going to have to make a decision as to each of the

24   defendants.  I'll give you verdict forms for both of

25   the defendants.  So please keep that in mind as you

1          listen to the evidence in this case.

2              I would like to read to you the indictment at

3          this time.  This is what I call the charging

4          document.  And I will tell you that you'll have a

5          copy of this back in the jury room when you go back

6          to deliberate.  But this tells you what the

7          defendants are charged with and what it is that the

8          government must prove.  And it reads as follows:

9          United States of America vs. Gustavo Enrique Llanos

10         Miranda and Jair Mendoza Montoya.

11             And this is a criminal case, the criminal case

12         number is 17-445.  The indictment reads as follows:

13         Beginning on an unknown date and continuing through

14         on or about August 24, 2017, while aboard a vessel

15         subject to the jurisdiction of the United States,

16         the defendants, each of whom will be brought or were

17         brought into the United States at a point in the

18         Middle District of Florida, did knowingly and

19         willfully combine, conspire and agree with each

20         other and with other persons unknown to the grand

21         jury, to distribute and possess with the intent to

22         distribute 5 kilograms or more of a mixture or

23         substance containing a detectible amount of cocaine,

24         a Schedule II controlled substance.

25             Count Two says beginning on or about an

1    unknown date and continuing through on or about

2    August 24, 2017, while aboard a vessel the subject

3    to the jurisdiction of the United States, the

4    defendants, each of whom were brought into the

5    United States at a point in the Middle District of

6    Florida, did knowingly and intentionally while

7    aiding and abetting each other and other persons

8    unknown to the grand jury, possessed with the intent

9    to distribute 5 kilograms or more of cocaine -- it

10   actually says 5 kilograms or more of a mixture or

11   substance containing a detectible amount of cocaine,

12   a Schedule II controlled substance.

13        Now, I will tell you that there are others

14   charged in the indictment.  I have only read you the

15   two defendants that are on trial here, but you will

16   see when you hear the evidence and you also see the

17   indictment there were other people that were

18   originally charged in the indictment, but your

19   decision is only going to be as to each of these two

20   defendants.

21        So as I said, the indictment is simply a

22   charging document, it's not evidence, it's not proof

23   of guilt and you should not consider it as such.

24   The government's responsibility is to prove beyond a

25   reasonable doubt what it is that they have alleged

1    in this indictment.

2         Now, I think I briefly talked to you about

3    what's going to happen during the course of the

4    trial, but let me go through it once again.  At the

5    beginning of the trial the attorneys will make an

6    opening statement.  An opening statement tells you

7    what evidence they believe will be presented during

8    the course of the trial.  What they say is not

9    evidence.  I don't mean to suggest you shouldn't

10   listen to it, but it is not evidence.  I already

11   told you what the evidence in the trial is.

12        After the opening statement, the government

13   will call witnesses, they will be examined and

14   cross-examined.  After the government has presented

15   all of their witnesses and all of their evidence,

16   the defendants will have an opportunity if they wish

17   to present evidence.  They don't have to, you will

18   recall.  But if they want to, they can.

19        We will then have closing arguments, then

20   instructions in the law, and then you'll go back to

21   the jury room to deliberate.  So that's the order of

22   presentation, that's how the trial will be

23   conducted.  Let me just again remind you as you

24   listen to the evidence presented it's going to be

25   your job to determine if each of the defendants is

1    guilty or not guilty of the crimes that they're

2    charged with in the indictment and it is the

3    government that has the burden of proving what's

4    alleged in the indictment.

5         Okay.  I'm going to now turn it over to the

6    attorneys to make an opening statement if they wish

7    to do that.  An opening statement is sort an

8    opportunity for the attorney to tell you what

9    evidence they believe will be presented during the

10   course of the trial.  It's not a time when they will

11   argue their evidence because they're not going to do

12   that.  They're simply going to tell you what they

13   believe will be presented.  What they say is not

14   evidence.  Evidence comes from the witnesses and the

15   exhibits.

16        So Mr. Stout, at this time you may make an

17   opening statement on behalf of the United States.

18   Mr. Gammons, at this time you may make an opening

19   statement on behalf of the United States.

20        MR. GAMMONS:  May I proceed, Your Honor?

21        THE COURT:  You may.

22        MR. GAMMONS:  Ladies and gentlemen, about four

23   months ago, in August 2017, the United States Coast

24   Guard spotted an oil tanker named Fat Crow in the

25   Caribbean Sea.

1          Now, the Fat Crow is difficult to miss.  It's

2     a blue and white freighter that's approximately a

3     football field in length.  Additionally, the Fat

4     Crow was in the middle of nowhere, approximately

5     200 miles southeast of Jamaica.

6          And there were several things about the Fat

7     Crow that caught the attention of the United States

8     Coast Guard.  First, it was traveling along a known

9     smuggling route.  Second, it had its transponder

10    turned off so it could not communicate with the

11    outside world.  Third, the freighter was making

12    speed and directional changes which were

13    inconsistent with merchant traffic.

14         Ladies and gentlemen, you'll learn during the

15    course of this trial that the United States Coast

16    Guard ultimately boarded Fat Crow and conducted an

17    exhaustive search.  And you'll hear from one witness

18    in particular that used his experience as a welder

19    and as an engineer which brought him to the front of

20    the ship.  And as he was in that room looking

21    around, he discovered what he saw to be in a room

22    that's covered with grease and a room that's

23    essentially a rust bucket, you'll see that he saw

24    brand new welds which were strange for a ship as old

25    as the Fat Crow.

1          Soon he discovered a hatch.  And then a

2     handle.  And behind that door was what the crew of

3     the Fat Crow had tried so desperately to hide:

4     1,504 kilograms of cocaine, that has a wholesale

5     value of approximately $45 million.

6          Ladies and gentlemen, this case is about a

7     plan to smuggle a massive amount of cocaine at sea.

8     And the first officer of the ship, Mr. Mendoza

9     Montoya, and the helmsman of the ship, Mr. Llanos

10    Miranda, were a part of that plan.  Because of that,

11    these two defendants are charged in this case with

12    conspiracy and possession with intent to distribute

13    cocaine.

14         And the judge will tell you that a conspiracy

15    is simply an unlawful agreement between two or more

16    people.  And you'll learn during the course of this

17    trial before a single kilogram of cocaine made it

18    aboard Fat Crow, these two defendants had joined in

19    that unlawful plan.

20         You've heard it before, but I'll tell you it

21    again:  It's the United States's burden to prove

22    this case beyond a reasonable doubt and over the

23    next few days we will establish beyond a reasonable

24    doubt that the two defendants are guilty of the

25    crimes charged.

1          Now, I would like to give you a brief overview

2     of the two types of witnesses that I believe will

3     testify during the course of this trial.  The first

4     group are members of the United States Coast Guard.

5     You'll hear that the United States Coast Guard used

6     a large boat known as a Coast Guard cutter, several

7     smaller boats, and a helicopter to interdict Fat

8     Crow.

9          You'll hear from the helicopter pilot, he'll

10    tell you about the two sightings that he had of the

11    Fat Crow, the first when it was sailing in the

12    middle of the Caribbean Sea.  He'll tell you how he

13    conducted a second fly-over when the members of the

14    United States Coast Guard boarding team took over

15    that vessel.

16          The second group of witnesses you'll hear from

17    are crew members of the Fat Crow.  These are men who

18    have pled guilty and accepted responsibility with

19    regard to this offense and these are men who are

20    going to testify in hopes of receiving a lighter

21    sentence in this case.  And I expect that these men

22    will give you an insider's view of this conspiracy.

23    So when they testify, please listen carefully.

24          I expect that these men will tell you that

25    each were legitimately hired and salaried to work on

1    board Fat Crow.  I expect that these men will tell

2    you that Fat Crow was to transport fuel to

3    Guatemala.

4         But one thing they will also tell you is that

5    over the course of several meetings they

6    individually negotiated, separate and apart from

7    their legitimate salaries, how much they would be

8    paid for transporting the cocaine.

9         They will tell you that they were each aware

10   of the small room on the front of the ship that had

11   been constructed recently for the sole purpose of

12   transporting that ton and a half of cocaine.  And

13   each of these men will tell you that they were

14   present early one morning when a small fishing boat

15   with 1,500 kilos of cocaine pulled alongside Fat

16   Crow and each of the men including these two

17   defendants helped bring the cocaine aboard.

18        Ladies and gentlemen, I expect that the

19   testimony will show that everybody on board Fat Crow

20   from the captain all the way down to the cook were

21   aware that they were part of a plan to smuggle a

22   massive amount of cocaine.

23        So ladies and gentlemen, I think that's the

24   evidence that's going to be presented over the next

25   few days.  The government will do its best to

1    present this evidence in an organized and efficient

2    manner.  After you've heard all the evidence, we

3    will return and ask you to render the only verdict

4    supported by the evidence and that is a verdict of

5    guilty.  Thank you.

6         THE COURT:  Mr. Castillo?

7         MR. CASTILLO:  Yes, Your Honor, thank you.

8    May it please the court.

9         Ladies and gentlemen, my role here right now

10   is to give you an opening statement and I'm going to

11   share with you what I believe the evidence will show

12   as it relates to Mr. Llanos Miranda.  The facts are

13   very important in this case.  And one thing even

14   more important than that is there are two trials

15   going on at the same time:  Mr. Llanos Miranda is on

16   trial and the other defendant is on trial as well.

17   Whatever you might hear as it comes in to one

18   defendant or the other does not automatically go to

19   the other one.  That's for you to decide.  So keep

20   it straight.  If they're talking about something

21   that one defendant might have said, you're going to

22   be instructed that that goes to that defendant and

23   likewise, whatever, to the other, the same, you've

24   got to keep them separate because you've got two

25   trials going on at the same time.  The judge is

1    going to instruct you at the end that whatever you

2    decide has to be unique to each individual

3    defendant.  Your decision has to be unanimous to

4    each defendant.

5        Now, certain facts are not going to be

6    contested by me as relates to Mr. Llanos Miranda.

7    There is no question that a large quantity of drugs

8    was found aboard the Fat Crow.  There is no question

9    the drugs were found in a secret compartment in the

10    front end of the Fat Crow.  There is no question

11    that Mr. Llanos Miranda, my client, was present

12    aboard the Fat Crow.  There is no denying that

13    Mr. Llanos Miranda, my client, was the helmsman.  In

14    other words, he's the one that drives the boat.

15        Now, that's about where all the agreement ends

16    in this case because your job is to determine,

17    number one, did a crime occur and if so, who

18    committed it.  Several defendants I anticipate are

19    going to come in and they're going to say yeah, I

20    knew, I did this, I participated in a smuggling

21    venture and I knew what was going on.  You're going

22    to have to evaluate their credibility as to what

23    they said.

24        Now, you're also going to learn something

25    else.  We've talked about law, we've talked about

1      federal criminal law, we've talked about rules of

2      procedure.  You're also going to hear evidence about

3      another law, it's a law of the sea.  What that is is

4      when you're aboard a ship, you're working on a ship

5      under the control of a captain who's in charge of

6      the vessel, you pretty much do what you're told.

7      You don't have much of a choice.  Your role -- the

8      captain says you need to work eight hours steering

9      the ship, you work eight hours steering the ship.

10     You get paid, you don't get paid, that's how that

11     works.  And the captain is responsible for what's

12     aboard the ship.

13          Now, what you're going to hear is there is

14     going to be evidence coming forth about drugs aboard

15     the ship, how it got there, who put it there and who

16     was involved.  Some people are going to admit they

17     knew.  Now, my client, he's entered a plea of not

18     guilty.  He says Mr. Stout, Mr. Gammons, you need to

19     prove to this jury, you all, that he is guilty of

20     something and what that is.

21          And you're also going to be instructed later

22     that simply being aboard the vessel doesn't make you

23     guilty; there has not to be more to it.  That

24     evidence is going to come in through cooperating

25     defendants, people who already pled guilty, they're

1    going to say this is what we did, this is what

2    happened.  And you'll also going to learn that

3    they're hoping to strike a deal and get a lesser

4    sentence, that the penalties are pretty strong and

5    that they're trying to cooperate with the government

6    in hopes to get a lesser sentence.  And you're going

7    to have to evaluate their credibility you have to

8    view their testimony with caution.  That's the law.

9         And then you're going to have to determine

10   whether there is sufficient evidence that my client,

11   Mr. Llanos Miranda, knowingly engaged in a

12   conspiracy, an agreement to commit an unlawful act

13   on the high seas.  Not that he was there, but that

14   he somehow participated and knew what was going on.

15   And that's for them to prove, and that he possessed

16   these drugs.

17        Now, when all the evidence is in and all the

18   exhibits are shown and all the testimony is given,

19   you need to decide if there is sufficient evidence

20   to convict my client of the charges they claim he

21   did -- the prosecutors say he did.  And you're going

22   to have to realize we're talking about an immense

23   vessel.  This is huge.  You're going to see

24   photographs and videos of this vessel.  This is a

25   huge freighter with several crew members and their

1       goal or their job was to transport fuel.  That's

2       what the evidence is going to show, that's initially

3       what all these people were on this boat for.  And

4       somehow those drugs got on the boat and somebody

5       made the decision to put them on the boat and engage

6       in that activity.

7            But that is for you to decide, whether or not

8       they can prove that my client, Mr. Llanos Miranda,

9       had anything to do with that agreement or any way

10      participated knowingly and voluntarily on his own.

11           And I'll have an opportunity at the end of the

12      case to sum it all up for you, but I wanted to give

13      you at least an outline.  And you have note pads,

14      just keep it straight, just to keep the facts

15      straight.  Nobody is making anything up, but it's

16      going to get a little bit conflicting or confusing

17      as to what said what to whom and who did what and

18      that kind of thing.  So that's why you have notes

19      and just keep track of what was said and remember,

20      my client is entitled to consideration for his own

21      conduct, just as the other defendant is.

22           Thank you for your time and I hope to make it

23      efficient and I hope that you end up getting enough

24      evidence in this case to make your decision after

25      all is said and done.  Thank you.

1              THE COURT:  Mr. Martinez?

2              MR. MARTINEZ:  Thank you, Your Honor.

3              Good afternoon, members of the jury.  The

4    Colombian drug cartels, and indeed the South

5    American drug cartels, do not have an HR department.

6    They do not have a health plan.  They do not have a

7    401(k).  But they have a mission statement and there

8    is two parts to that mission statement:  Protect the

9    drugs and sell as much of it as you can to make as

10   much money as you can.  And those two interests

11   sometimes coincide and sometimes they are in

12   conflict with each other.

13             And it is true there are going to be two

14   categories of witnesses in this case, mainly, to

15   speak of.  There may be a records custodian, but in

16   general as the government indicated you'll have

17   Coast Guard personnel and you'll have cooperators.

18   The Coast Guard personnel are those individuals that

19   deal with interdicting vessels on the high seas that

20   they suspect are engaged in drug trafficking.  And

21   for the suspect reasons that were explained by

22   Mr. Gammons, this vessel in particular was targeted

23   for interdiction and subsequent search.  And the

24   search of that vessel yielded that cocaine which was

25   found in a secreted, hidden, welded-shut compartment

1      in the front of a freighter.

2           Now, I don't expect that I have any reason to

3      take issue with the veracity of the forthcoming

4      statements as testified to from that witness stand

5      from the U.S. Coast Guard personnel.  No reason to

6      expect that they're going to do anything other than

7      tell you the truth.  And they're going to tell you

8      what they do out there, they're going to tell you

9      how they do it, they're going to tell you what makes

10     a vessel suspect, they're going to tell you how they

11     interdict that vessel, how they search it, how they

12     do space accountability to make sure that no cocaine

13     is hidden in there.

14          They're going to tell you how they take the

15     persons in custody on board to the Coast Guard

16     vessel, how they transport them from the

17     international high seas to the Middle District of

18     Florida here in Tampa and bring them to this

19     courthouse for prosecution.

20          That's what they're going to testify about.

21     It's all very helpful, it's all very educational,

22     it's all very informative, but it doesn't tell you

23     what you need to know.  What you need to know is who

24     on that board -- who on board that freighter knew

25     that there was a quantity of cocaine in a hidden

1    compartment in the front of the ship because that's

2    what you need to know to find someone accused with

3    being a drug trafficker guilty.

4         So they can't help with that.  They were not

5    in Colombia.  They didn't hire drug traffickers.

6    They didn't give them the speech about what to do or

7    not to do and how to traffic in cocaine.  All they

8    did was act like police on the high seas.

9         So where does the testimony that you really

10   need to know come from?  It comes from drug

11   traffickers and that's the problem because that

12   places their credibility at issue.

13        Now, you'll learn from these Coast Guard

14   personnel that this interdiction isn't the first

15   one.  It's been going on for a long time.  Cocaine

16   has been coming to the United States from Colombia

17   and other South American countries for a long time.

18   And they can tell you how long they have been doing

19   this and how many interdictions that they have made

20   and how many prosecutions there have been

21   historically.  And you're going to come to learn

22   that a couple of things are generally universal.

23        First let's talk about the persons that sign

24   up.  The Colombian and other drug cartels need

25   people to transport that cocaine on a vessel.  It

1      might be a freighter, it might be a small Panga

2      boat, it might be a semi-submersible, who knows.

3      There is no end to the way that drug traffickers

4      will look to get drugs out of Colombia and into the

5      United States and other countries.

6          Who signs up?  Well, generally speaking, and I

7      expect that the crew of this case will be no

8      different, generally speaking they are very

9      uneducated, very economically deprived, practically

10     destitute, and always desperate.  And why is that

11     the case?  The evidence will show that that's the

12     case because those are the kinds of people you can

13     enlist.  When an earthquake hits Ecuador, they

14     enlist the Ecuadorians, the guy that lost the house,

15     the guys that don't have any money, the guys whose

16     families are starving.  And I expect that each of

17     these crew members will, when asked, tell you about

18     the dire economic circumstances that they were in

19     that caused them to agree to participate in this.

20         And why are those the persons that are

21     targeted?  Because when you live down there, it's

22     not a news flash that there is a lot of cocaine in

23     Colombia, it's not a news flash that the Colombians

24     want the cocaine to leave Colombia and make its way

25     to the United States, and it's not a news flash they

1          will offer you cash to do it.

2              But what happens?  Signing up for that means

3      signing up for a huge risk.  Each of these

4      defendants who have pled guilty that will get on

5      that witness stand and testify are each facing a

6      minimum mandatory sentence of 10 years in a federal

7      penitentiary.  By statute, 10 years.  Up to life.

8      No less than 10.  It's a risk they take.  It's a

9      risk they sign up for.

10             Now, what happens is you need in a drug

11     transportation case not only the uneducated, not

12     only the unskilled, not only the financially

13     desperate, but you need skilled individuals as well.

14     You need a captain, you need a first mate, my

15     client.  The first Officer, I should say.  You need

16     those people because those people are essential to

17     navigating the waters.  And the problem is that

18     those people don't necessarily find themselves in

19     the desperate circumstance.

20             So what happens?  Well, the drug cartels have

21     some rules in terms of how they operate and the

22     first general rule is subsumes all the others.  The

23     first general rule is there are no rules.  They will

24     lie, they will cheat, they will steal, they will

25     deceive, they will kidnap loved ones and they will

1    murder if necessary.  Because $45 million is a lot

2    of money even to drug traffickers, even to the drug

3    cartel.

4         So what do you do when you need a first

5    officer to participate and he's not signing up to

6    take the risk to go to a federal penitentiary for

7    10 years?  You keep him in the dark.  You don't tell

8    him.  You make sure he's not around when the drugs

9    get put in the secret compartment.  You make sure he

10   doesn't know about it because you need that person,

11   just like you need a captain.

12        But the problem is the captain is the top dog.

13   You can't keep him in the dark -- or her in the dark

14   if it's a female captain -- because they're the ones

15   that have got to get the vessel from Point A to

16   Point B.

17        Now, when they get here, when these

18   individuals that are arrested on the vessel get to

19   the United States, they make their first appearance

20   in federal court and they appear in front of a

21   magistrate judge.  And the magistrate judge advises

22   them you have been charged with drug trafficking,

23   you're facing 10-year minimum mandatory, you have a

24   right to a lawyer.  And they all get lawyers.  Just

25   like these two individuals got lawyers.  And the

1    court appoints them.  And they appointed me to

2    represent my client.

3        And then the discovery comes.  And then the

4    lawyers, you will hear, they go out and they meet

5    with their clients and they share with them the

6    discovery and they talk about the fact that they are

7    facing the 10-year minimum mandatory sentence and

8    there is no way to get out from under that because

9    the judge's hands are tied and she or he who

10   presides over the case can't give a lesser sentence

11   unless -- unless -- and there they are waiting with

12   bated breath, what is it?  Unless what?  Unless you

13   sign a plea agreement with the government and agree

14   to testify against your co-defendants and say that

15   they were guilty too.  Then, and only then, by

16   motion of the government, once the government

17   concludes that you're telling the truth, your one

18   opportunity to get out from under that 10-year

19   minimum mandatory.  And that's what's happened here.

20       I don't know how many cooperating witnesses

21   will be called in this case.  Maybe everybody else

22   on the boat.  Maybe two or three from the boat.  But

23   each of them will be subject to cross-examination

24   and I expect that exactly what I have told you is

25   the circumstance that surrounds their testimony here

1    is what you're going to hear from that witness

2    stand.

3         The defense puts on their case last.  The

4    government goes first.  We get to cross-examine

5    those witnesses that they call, but we don't get to

6    put our case on until the end.  So I ask you -- I

7    look forward to the opportunity to address you

8    directly.  I get to do that one more time in my

9    closing argument.

10        But between now and then, you'll see the

11   cross, you'll be able to size up these guys, you'll

12   be able to determine whether or not they're telling

13   the truth, and you will be able to conclude whether

14   or not this case has been proven to you beyond all

15   reasonable doubt predicated on the testimony of

16   those guys and only those guys.

17        I thank you for your attention, I look forward

18   to speaking with you directly one more time and I

19   hope you will wait and hear the defense before you

20   begin to make up your mind.  Thank you very much.

21        THE COURT:  All right.  Mr. Gammons or

22   Mr. Stout, you may call your first witness.

23        MR. STOUT:  Your Honor, the United States

24   calls Gregory Alexander from the U.S. Coast Guard.

25        [Witness sworn]

1          COURTROOM DEPUTY CLERK:  Please be seated.

2     Please state your name and spell your last name for

3     the record.

4          THE WITNESS:  Gregory Alexander,

5     A-l-e-x-a-n-d-e-r.

6                    DIRECT EXAMINATION

7     BY MR. STOUT:

8     Q     Sir, how are you currently employed?

9     A     With the U.S. Coast Guard.

10    Q     How long have you been with the U.S. Coast

11    Guard?

12    A     A little over 15 years.

13    Q     And in that time what has been your primary

14    job?

15    A     My primary role is law enforcement.

16    Q     What kinds of laws do you enforce?

17    A     Do counter narcotics, immigration, commercial

18    fishing, and then recreational boating safety.

19    Q     Where do you enforce these laws?

20    A     I've done the Caribbean, Eastern Pacific,

21    Great Lakes, Northern Atlantic.

22    Q     When you're in the Caribbean or the Eastern

23    Pacific, what is your base of operations?

24    A     I'm currently on Coast Guard Cutter Tahoma.

25    Q     Describe for the jury what a Coast Guard

1    cutter looks like.

2    A       Coast Guard Cutter -- my ship is 270-foot.  We

3    have a hundred crew members on the boat and it's

4    basically our entire base.  So when we go down

5    south, the whole boat goes and the whole crew goes

6    with it.

7    Q       Now, you mentioned that part of your mission

8    is counter narcotics.  How many drug interdictions

9    have you been involved in?

10   A       Eight to ten.

11   Q       And how many of those did you actually seize

12   drugs?

13   A       Eight to ten that I've actually seized.

14   Q       What amounts of drugs are you talking about

15   generally?

16   A       It's ranged from 900 kilograms and my largest

17   was 5,300 pounds.

18   Q       Large amounts of drugs?

19   A       Large amounts, yes, sir.

20   Q       And during those interdictions what has been

21   your role?

22   A       My role is the boarding officer in those

23   cases.

24   Q       Explain to us what a boarding officer is.

25   A       The boarding officer is the title that the

1    members of the Coast Guard that are the law

2    enforcement officers, that's the title that the

3    Coast Guard gives us.

4    Q    In your 8 to 10 interdictions what types of

5    vessels have you interdicted?

6    A    I've done small go-fast style vessels which

7    are just small open center console with outboards,

8    and freighters.

9    Q    How many freighters have you done?

10   A    I've been on 15 or 20 freighters.

11   Q    How many of those did you seize drugs?

12   A    One that I've seized drugs on.

13   Q    Is that the freighter in this case?

14   A    Yes, sir.

15   Q    During the course of your Coast Guard career

16   have you had the opportunity to do -- I believe you

17   mentioned you had done other freighter boardings.

18   In what context have you boarded freighters besides

19   drug interdictions?

20   A    I've boarded them for serving warrants for

21   port state inspections which are run through

22   customs, make sure they're safe to enter U.S. ports,

23   and we've gone on there for drug interdiction.

24   Q    How many overall freighter boardings have you

25   done including drug interdictions but also non --

1    A        Over 15, 20, make a little bit more.

2    Q        Can you explain to us what a typical boarding

3    looks like from the time you sight a suspicious

4    vessel, one of these counter narcotics boardings.

5    Can just give us what a typical one looks like?

6    A        The first very step when we sight a vessel is

7    to do an alpha report.  That's just a general

8    questioning of the boat, very basic questions, what

9    port they have come from, where they're headed, how

10   many crew members are on board, the purpose of their

11   voyage, those types of questions.

12           And then as far as the boarding process, once

13   we determine that we're going to board a boat,

14   myself and a team of two to eight additional

15   personnel will come alongside the boat and we'll get

16   on board and do a safety sweep.  That's what we do

17   on every boat and that's just to make sure it's a

18   sea worthy vessel, it's not going to sink or catch

19   on fire, for the safety of us and the people that

20   are on the boat.

21           And we gather ship's documents, any paperwork

22   they have for the boat, registration and the like,

23   and then the identifications or documents that the

24   crew members have on board.  And we pass that

25   information back to the ship and they run

1    identification and names.

2         And then once that comes back, we will start

3    an investigation to look for whatever we're

4    suspecting that is on the vessel.

5    Q    And describe what the law enforcement

6    investigation part of this process looks like.

7    A    The law enforcement side, we're looking at any

8    indicators of elicit activity or any indicators of

9    things on a boat that don't belong or things that

10   should be on a boat that aren't there.  Demeanor of

11   the crew.

12   Q    And if you develop enough suspicion, how is it

13   that you go about searching a boat?

14   A    If we've gone through the initial phase and I

15   feel like I've developed enough probable cause to do

16   an actual search of a vessel, I pass that

17   information up to my boat and then it goes up to

18   District 7 and they work it from their end and they

19   either give us permission to search based on we have

20   enough probable cause or they say not to if we

21   don't.

22   Q    What's District 7?

23   A    District 7 is basically my cutter's boss that

24   we operate under.

25   Q    And if they give you permission to do a law

1      enforcement search, describe how you actually

2      perform the search.

3      A       The search, we basically go into every

4      compartment and space on the vessel or look for

5      hidden compartments to see if there is anything

6      hidden or stowed anywhere on the boat that's not

7      readily visible.

8      Q       During your time in the Coast Guard have you

9      received any specialized training in performing

10     these types of interdictions and searches?

11     A       Yes, sir, I went to a course at the Federal

12     Law Enforcement Training Center in South Carolina

13     for -- it's a counter narcotics operations course,

14     they teach us how to look for indicators of hidden

15     compartments, how to recognize indicators of elicit

16     trafficking and how to do at sea space

17     accountability measurements.

18     Q       Explain to us what at sea space accountability

19     is.

20     A       At sea space accountability, we take external

21     and internal measurement of any space we can access

22     on the boat while it's at sea and then do a rough

23     sketch so we can determine if there is any voids or

24     missing areas of space on the boat that you could

25     potentially hide something in.

1    Q       Have you received any specialized training to

2    be a boarding officer?

3    A       Yes, sir, in order to get the initial boarding

4    officer qualification, again it was at the Federal

5    Law Enforcement Center in Charlton, South Carolina.

6    It's a course design that teaches you laws and our

7    jurisdiction as the Coast Guard on how to do -- it's

8    basically like a police officer training that you

9    would go through for a police academy, it's just the

10   Coast Guard's version of that.

11   Q       And as a boarding officer do you have full

12   power of arrest?

13   A       Yes, sir.

14   Q       Like an FBI agent or a DEA agent or something

15   like that?

16   A       Yes, sir, full statutory arrest authority.

17   Q       Generally speaking during a boarding what are

18   the boarding officer's duties and responsibilities?

19   A       The responsibilities of the boarding officer

20   is first and foremost the safety of the boarding

21   team and the personnel that -- crew members of

22   whatever boat we're on.  Safety of the ship.  And

23   then making sure when we go through the

24   investigation process that everything is done

25   accurately and within policy.  And preparation of

1     the case package, if something is found and it's

2     going to move forward, we're responsible for

3     everything that's in the case package.

4     Q     What's a case package?

5     A     A case package is basically a binder we put

6     together as the boarding officer that has pictures,

7     any photographs that were taken during the boarding,

8     videos that were taken, statements of any of the

9     team members involved.  It has the graphical

10    representation we draw of the boat, any evidence

11    seizure tags, any crew members that were on, there's

12    photographs of them, their personal effects.  It's

13    everything that you would regularly have in a case,

14    all in one package.

15    Q     I'm going to turn now to your involvement in

16    the interdiction of the freighter named Fat Crow.

17    When did you first become aware of the freighter?

18    A     It was Thursday, August 24th, I was called up

19    to the bridge of my boat to perform the alpha report

20    on the vessel.  I went up --

21    Q     Why were you called up to perform an alpha

22    report?

23    A     As a boarding officer quite often they'll have

24    us come do the alpha report; that way if anything

25    comes of it or there's any indicators that anything

1    has happened, it keeps continuity with one person

2    being the point of contact with the boat.

3    Q     And you said it was August 24th, of what year?

4    A     2017.

5    Q     Why were you called to the bridge to perform

6    an alpha report with respect to this particular

7    ship?

8    A     When I got to the bridge the captain informed

9    me that their --

10        MR. MARTINEZ:  Objection as to what the

11   captain said, constituting hearsay.

12        THE COURT:  Sustained.

13   BY MR. STOUT:

14   Q     What was it about the ship that led you to

15   perform the alpha report?

16        MR. MARTINEZ:  Objection, it still calls for

17   what the captain said, it appears.

18        THE COURT:  Overruled.  You may answer.

19        THE WITNESS:  The Fat Crow was not

20   broadcasting its AIS transmission.

21   BY MR. STOUT:

22   Q     What's an AIS?

23   A     It's a tracking system that every commercial

24   vessel, regardless of what country they're from, is

25   required to have on it and it broadcasts the name of

1    the boat, positional updates, where they were going,

2    where they were coming from.  It's just a way for

3    commercial industries to track vessels.

4    Q      What's its purpose?

5    A      It's a tracking system that really anybody can

6    access.

7    Q      Is it unusual for it to be off on a big

8    vessel?

9    A      Yes.  All commercial vessels if they're at sea

10   or under way, it's required to be transmitting at

11   all times.  Supposed to be on and transmitting.

12   Q      And this one was off?

13   A      It was off.

14   Q      What else was suspicious about this vessel, in

15   your mind?

16   A      So the AIS wasn't working and then when I

17   initially called on the radio to reach them, there

18   was no -- the first two times I called out on the

19   radio there was no response and based on my training

20   and experience on a boat that size there is always

21   somebody on the bridge to navigate or man the

22   radios.  And the boat also was dead in the water at

23   the time.

24   Q      What do you mean by dead in the water?

25   A      It wasn't moving, it wasn't making way, it was

1     just kind of floating.

2           MR. STOUT:  Your Honor, may I approach the

3     witness?

4           THE COURT:  You may.

5     BY MR. STOUT:

6     Q     I've handed you what's been premarked for

7     identification purposes as Government Exhibit 16.

8     Will you take a look at that and tell me what it is.

9     A     It's a map -- basically a map of the

10    Caribbean.

11    Q     And how do you know that that's what it is?

12    A     I've done multiple deployments in the area.

13    Q     Are you familiar with the Caribbean?

14    A     I have familiar with the Caribbean.

15    Q     And is that because of your work in the

16    Caribbean?

17    A     Yes.

18    Q     Does that appear to be an accurate map of the

19    Caribbean?

20    A     Yes, sir, it is.

21          MR. STOUT:  Your Honor, at this time I'd offer

22    Government Exhibit 16 into evidence.

23          MR. CASTILLO:  No objection.

24          MR. MARTINEZ:  Without objection.

25          THE COURT:  Received in evidence 16.

1          MR. STOUT:  Permission to publish that

2     exhibit?

3          THE COURT:  You may.

4     BY MR. STOUT:

5     Q     Officer Alexander, can you point out to us

6     roughly where you were on this map when you first

7     came across the Fat Crow as you're describing to us?

8     A     Roughly around that area.  I'm not sure of the

9     exact position, but we were northwest of Venezuela.

10    Q     Thank you.  In response to sort of the initial

11    suspicion you developed about the vessel what did

12    you all do?

13    A     I called out and they didn't answer.  We also

14    -- we had a helicopter embarked or on the vessel

15    that was deployed with us.  They flew over the boat

16    and also called out and I could hear them on the

17    radio calling the Fat Crow.  And then I heard there

18    was a -- I heard "no habla ingles" come back across

19    the radio.  So we called the Spanish interpreter up

20    to finish.  At that time when the helicopter started

21    making call outs, the radar, the AIS started

22    broadcasting on the radar, the Fat Crow's AIS

23    started broadcasting.

24    Q     When it started broadcasting over the AIS did

25    it broadcast a name for the ship?

1    A        It did, it broadcast its accurate name as the

2    Fat Crow.

3    Q        Was there anything unusual about what the AIS

4    information reflected?

5    A        Yes, the AIS was broadcasting that it was

6    still at anchor and it was a five or six-day old

7    time stamp on the signal.

8    Q        Where did it say they were at anchor?

9    A        Dominican Republic.

10   Q        How far away were they from the Dominican

11   Republic?

12   A        A long ways.  Based on this, approximately

13   500 miles.  Dominican Republic is right there, so

14   right around the 500-mile scale based on this.

15   Q        So after the helicopter flew over and the ship

16   turns on its AIS, what did you do?

17   A        We had a translator come up to finish the

18   alpha report.  And once that was completed we passed

19   all the information up to D7 to request a boarding

20   of the vessel.

21   Q        At this time were you able to actually see the

22   ship, did you have eyes --

23   A        Yes, sir, we could see it.

24   Q        Describe what it looks like for us.

25   A        It was approximately a 300-foot commercial

1      tanker.

2      Q      How long was it from this point until you

3      actually performed the boarding?

4      A      We did not perform the boarding until Friday

5      late afternoon, the 25th of August, 2017, the next

6      day.

7      Q      Why did you wait almost a day to do that?

8      A      In order -- so the boat was registered to a

9      country out of Africa and in order for us to get on

10     a non-U.S. boat, we have to get permission from that

11     country to get on their boat.

12     Q      And did that permission ultimately come?

13     A      That ultimately came, yes.

14     Q      After that permission came, is that when --

15     A      That's when we started the boarding, yes, sir.

16     Q      Describe how the -- just to be clear, what day

17     did you actually do the boarding?

18     A      That was on Friday, August 25th.

19     Q      Describe for us what time of day it was when

20     you did this.

21     A      That was mid to late afternoon.

22     Q      Describe for us how you actually -- what the

23     boarding looked like, what happened during the

24     boarding.

25     A      We got permission to board, I gathered my team

1    together and we got dressed out in all our gear, got

2    in our small boat off of our ship, rode up alongside

3    the Fat Crow.  We had the cutter, the Tahoma, inform

4    the Fat Crow to put a Jacob's ladder down the side

5    of the ship.  Jacob's ladder is just a ladder that

6    commercial vessels are required to carry at sea,

7    they can hang over the side so you can embark or

8    disembark a vessel at sea.  Had them do that and

9    then had their crew -- told the captain to have his

10   crew gather on the back of the boat on the main

11   deck.

12   Q     Why did you have them gather back there?

13   A     We always have everybody gather just so we

14   have a good accountability of the personnel on board

15   for safety purposes.

16   Q     How did you actually get onto the ship from

17   your ship?

18   A     Once we got on -- from our small boat -- we

19   got on a small boat on our ship, rode over to the

20   Fat Crow and then climbed the Jacob's ladder.

21   Q     On the small boat what was your role?

22   A     I was the boarding officer so on the small

23   boat my job was just to direct how we were getting

24   on board the vessel and the steps we would take once

25   we got on the Fat Crow.

1    Q       As boarding officer were you actually in

2    charge of the boarding itself?

3    A       Yes, sir.

4    Q       Which entails again what responsibilities?

5    A       Safety of my team, their crew, and any

6    investigations or anything that had to do with that

7    vessel and the boarding process itself was all under

8    my responsibility.

9    Q       How many team members did you have with you?

10   A       I had seven additional people.

11   Q       Once you got the eight of you onto the ship,

12   what did you do?

13   A       We divided in two four-man teams and went to

14   each side of the boat and worked our way to the back

15   to where the crew was mustered, just clearing the

16   boat toward the back.  Once we arrived at the back

17   we left two guys there to stand watch on the eight

18   crew members.  We were told there were nine crew

19   members on board.  There were eight on the back.

20   And that would make sense, the captain always stays

21   up on the bridge to control the ship.

22           Myself and one of my team members went up the

23   outside of the superstructure, which is the main

24   like living quarters area of the boat, went to the

25   bridge, made sure the captain was up there, got

1    control of the bridge.  Then we had a four-man team

2    go to the engine room to make sure the engine room

3    was secured and then two of those members stayed in

4    the engine room, the other two cleared all the state

5    rooms and all the other rooms that were in the

6    superstructure.

7         Once we were confident that there was no

8    additional personnel anywhere on the boat, I called

9    the helicopter and the cutter and said we had

10   positive control of the Fat Crow at that time.

11   Q     Before we go on, what's a state room?

12   A     A state room is just like the cabin or the

13   room you live in when you're underway.  Just another

14   name for a bedroom on a boat.

15   Q     During the boarding you just described, where

16   was the helicopter?

17   A     The helicopter was overhead during the

18   boarding.

19   Q     Doing what?

20   A     They were just providing over watch and

21   filming what we were doing.  They stay over until I

22   call positive control and then they will depart

23   scene and go back to the ship.

24   Q     And at this point where you tell the Tahoma,

25   your cutter, that you have positive control, does

1    that mean essentially that you have full control of

2    the Fat Crow?

3    A       Yes, positive control just means there is no

4    way for that ship to be operated without the Coast

5    Guard knowing about it.

6    Q       Once you had full control of the ship what did

7    you do with the nine crew members?

8    A       We had two of my team members go to the

9    captain's stateroom.  The captain on the boat always

10   has the biggest room, he normally has a lounge or

11   like a living room area connected to it.  We had two

12   team members go in there and they sanitize the

13   space, just make sure there were no weapons in

14   there, and then we moved all the crew members inside

15   that space.

16   Q       During the boarding was your team armed?

17   A       Yes, sir.

18           MR. STOUT:  Your Honor, may I approach the

19   witness?

20           THE COURT:  You may.

21           MR. MARTINEZ:  Your Honor, may we approach

22   sidebar briefly?

23           THE COURT:  Sure.

24           (At which time the following sidebar

25   discussion was held:)

1          MR. MARTINEZ:  Your Honor, I'm having a little

2     bit of trouble hearing the witness because the

3     interpreters are right next to me.  If I could

4     either move behind where Mr. Castillo is sitting

5     into the second row of tables, or have the

6     interpreters move behind me, but it's just they're

7     both facing me and they're talking over each other.

8          THE COURT:  They talk loud, both of them,

9     anyway.  Let's see which would be better.

10          MR. CASTILLO:  We have one exhibit for the

11     both of us.  Maybe if Mr. Martinez and I sat

12     together and we moved the defendants over.  I don't

13     know.  Talk to them, we'll just stand up and move,

14     that way we can have a book between us might be more

15     helpful for us.

16          MR. MARTINEZ:  Even moving one seat over might

17     be enough.

18          THE COURT:  We'll try that at the break.  If

19     that doesn't work, we'll move them back.  Move now

20     and then we'll move them back.

21          (At which time the sidebar discussion was

22     concluded and the proceedings resumed as follows:)

23          THE COURT:  We're having trouble hearing

24     because of the interpreters, so we're trying to

25     change or at least the attorneys are trying to

1    change seats.  And if that doesn't work, we may move

2    the interpreters.

3    BY MR. STOUT:

4    Q      Officer Alexander, you mentioned, before we

5    broke, you testified that you had taken the crew of

6    the Fat Crow up to the captain's stateroom.

7    A      Yes, sir.

8    Q      Did you get a good look at the crew members at

9    that time?

10   A      Yes, sir.

11   Q      Do you recognize any of the people in this

12   room as crew members from the Fat Crow?

13   A      Yes, sir, I do.

14   Q      Can you point out anyone you recognize as crew

15   members from the Fat Crow in the room here?

16   A      The two gentlemen in the blue shirts.

17   Q      And what are they wearing on their faces, just

18   so we're clear?

19   A      Oh, with glasses, and they got the headphones

20   on.

21          MR. STOUT:  Your Honor, I would like the

22   record reflect he's indicated the two defendants.

23          THE COURT:  The record should so reflect.

24          MR. STOUT:  Your Honor may I approach the

25   witness?

1          THE COURT:  You may.

2     BY MR. STOUT:

3     Q      Officer Alexander, I handed you what has been

4     premarked Government's Exhibit 100A, 101, 102A,

5     103A, 104, 105A, 106A, 200A, and 201A.  Would you

6     take a look at those exhibits and look back up at me

7     when you're done.

8            What are all of those exhibits?

9     A      Those are photographs of the crew of the Fat

10    Crow.

11    Q      Do those photographs accurately represent the

12    crew members as you saw them that day?

13    A      Yes, sir.

14           MR. STOUT:  Your Honor, at this time I'd offer

15    Government Exhibit 100A, 101, 102A, 103A, 104, 105A,

16    106A, 200A, and 201A into evidence.

17           THE COURT:  Any objections?

18           MR. CASTILLO:  Without objection.

19           THE COURT:  I'll receive into evidence those

20    aforesaid exhibits.

21    BY MR. STOUT:

22    Q      So when you got the crew up into the captain's

23    stateroom what was their demeanor?

24    A      They were calm, they were just going with the

25    flow with what we were doing.

1    Q       You mentioned a moment ago that you started

2    this boarding in the late afternoon.  What else did

3    you accomplish that first day of the boarding?

4    A       That first day we started our ASSA.  We didn't

5    get much accomplished because there was no power on

6    the boat and once it got dark, it was unsafe to be

7    in the engine rooms or walking around the decks

8    without lights.  So it was basically just we got on

9    board, got everything secured, and waited until

10   first light the next day.

11   Q       What happened the following morning?

12   A       The following morning?  Some engineers from

13   our ship, from the Tahoma, came over, as well as a

14   gas-free engineer so we could really start the ASSA

15   process, the at sea space accountability.

16   Q       What is a gas-free engineer?

17   A       A gas-free engineer is a certification that

18   lets you test a space that's not designed for human

19   occupancy to make sure it's safe for people to be

20   inside of it.  So it tests for carbon monoxide or

21   hydrogen sulfide or poisonous gases before we put

22   somebody in a space and have something go wrong.

23   Q       Why is it important to have somebody like that

24   on a ship?

25   A       Just on a ship, especially one that's out to

1    sea with sealed spaces and oxidation and rust, fumes

2    can build up quickly inside of a space that's not

3    ventilated.

4    Q       You mentioned that your cutter sent over

5    engineers as well.  What purpose did they serve?

6    A       Engineers, we call them engineers, they're

7    basically the engine mechanics for the ship and they

8    came over to try to restore power to the Fat Crow.

9    Q       You mentioned that you were working on the at

10   sea space accountability.  How exactly did you go

11   about it?

12   A       We divided everybody into two- to four-man

13   teams.  We had a fair amount of people from the

14   Tahoma on the boat and just started systematically

15   measuring each space on the boat, every stateroom,

16   outside the -- whole boat itself outside.  And then

17   we take our measurements and our graph and we

18   compare them to the ship schematics to see if

19   everything lines up.

20   Q       Were the engineers able to get the power

21   restored on the Fat Crow that day?

22   A       They were able to get power restored on

23   Saturday afternoon.

24   Q       And at that time what did you do?

25   A       We were still working on -- we spent the

1      majority of the day doing the at sea space

2      accountability.  By the time -- while I was there

3      that day we were able to get all the fuel tanks, the

4      cargo tanks of the vessel forward of the

5      superstructure on the vessel at sea space

6      accountability completed.  That's pretty much what

7      we did the majority of the day Saturday.

8      Q      As part of this search that you were doing did

9      you find anything unusual that day?

10     A      There was a couple spaces forward of the cargo

11     tanks that were just voids or empty spaces that we

12     couldn't get access to.  So other than those spaces

13     that we couldn't check, it was restoring power and

14     just going over the boat and looking at things that

15     should or shouldn't be there.

16     Q      Where did you spend that night?

17     A      Friday night?  Or Saturday.  Saturday night I

18     spent on -- I went back to the Tahoma around

19     11 o'clock Saturday night.

20     Q      When was the next time you returned to the Fat

21     Crow?

22     A      Approximately 0700 next morning, Sunday the

23     26th.

24     Q      When you got back to the Fat Crow on Sunday

25     morning what was going on then?

1    A     Got back Sunday morning, the overnight team

2    had told me that they had completed the rest of the

3    ASSA on the superstructure and the fan tail, so that

4    was complete.

5         We started looking at the engine room because

6    that was the biggest spot that we hadn't been able

7    to finish yet and now that power was running we

8    could get in there with lights and see what was

9    going on.

10        One of the first things that stood out was

11    their sewage holding tank that was on the back left

12    side of the engine room.  It was freshly painted and

13    the piping going into it and out of it were also

14    freshly painted.  The rest of the boat was pretty

15    dirty and used as a used vessel.  And the other

16    lines that went to the sewage tank throughout the

17    boat that ran sewage were also the same standards of

18    the rest of the boat, they weren't painted, they

19    were old chipped paint and rusty.  That stood out,

20    based on my training and experience, as something

21    that's abnormal in that situation to have that clean

22    of machinery in such a oily and dirty space.

23    Q     So what did you decide to do about the sewage

24    tank?

25    A     Based on that we talked to the engineers, they

1   said that they didn't use the sewage tank, it was

2   used for overboard discharge, they put their sewage

3   right overboard.  So I called the Tahoma, asked for

4   permission to access the tank, take off the cover to

5   see if it was a sewage tank or if there was anything

6   hidden inside of it.  As part of the ASSA it was a

7   space I needed access for that.

8   Q     What happened whenever you opened the sewage

9   tank?

10  A     So when they started opening the first bolt on

11  the access hatch, sewage indeed came out of it, it

12  set off one of our gas alarms saying there was high

13  sulfur levels in the air.  So we evacuated the

14  engine room due to toxic gas and opened any hatches

15  that accessed the outside so the space could

16  ventilate because we weren't allowed in there until

17  it was checked safe by a gas-free engineer.

18  Q     What did you do while the gas-free engineer

19  was clearing out the engineering space?

20  A     So while that was airing out we sent a group

21  of engineers forward to where those voids were to

22  see if we could find a way to access or make sure

23  those spaces were those spaces.

24  Q     You testified a moment ago that as part of

25  your at sea space accountability, part of your

1      search your team made a sketch of the ship.  Are you

2      familiar with that sketch?

3      A      Yes, sir, I am.

4             MR. STOUT:  Your Honor, may I approach the

5      witness?

6             THE COURT:  You may.

7      BY MR. STOUT:

8      Q      Officer Alexander, I've handed you what has

9      been premarked Government's Exhibit 5A and 5B.

10     Please take a look at those and tell us what they

11     are.

12     A      Those are the sketches we made of the Fat Crow

13     while doing our ASSA.

14     Q      Are they the originals or copies?

15     A      They're copies.

16     Q      Are they accurate copies of the sketches you

17     all made?

18     A      Yes, sir, they are.

19            MR. STOUT:  Your Honor, at this time I would

20     offer Government Exhibit 5A and 5B into evidence.

21            MR. MARTINEZ:  No objection.

22            THE COURT:  Received in evidence 5A and 5B.

23            MR. STOUT:  Your Honor, may I publish those

24     exhibits?

25            THE COURT:  You may.

1      BY MR. STOUT:

2      Q      Describe for us what we're looking at here.

3      A      That's an aerial view of the Fat Crow.  The

4      bottom would be the aft or the back end, and the

5      front is at the top.

6      Q      Now I'm going to show you 5B.  Would you

7      describe for us what we see here?

8      A      That's a profile view of the side of the Fat

9      Crow.

10     Q      Would you mind taking that laser pointer in

11     front of you and pointing out to us where the engine

12     room on this ship is?

13     A      The engine room is this room right here.

14     Q      And to be clear, is that the room where the

15     sewage tank was?

16     A      The sewage tank would have been roughly in

17     this area on the left side of the ship.

18     Q      You just told us that while the -- after you

19     cracked the sewage tank open and the gas alarm went

20     off, you had to go to the front of the ship while

21     that was being cleared out.

22     A      Yes, sir.

23     Q      Where are you talking about?

24     A      Went in this -- this is a doorway with a

25     ladder down to this forward stores area.

1    Q      What did you all find up there?

2    A      We initially, when the space was entered,

3    there was a generator, also right that sat on the

4    aft wall, right on the right side of the ship.  And

5    there was -- it was pointed out with welding gloves

6    and there was welding rods and a stool like somebody

7    -- there appeared as if somebody had been working

8    down there welding something.

9    Q      In searching this area what else did your team

10   find that was unusual?

11   A      There was a hatch that went down that was

12   right here that went down into this space that was

13   open as well.  And when we looked in there you could

14   see like wire brushes and tools and some welded

15   panels on the back wall of that compartment that

16   were not on the ship's schematics.

17   Q      When you say they're not on the ship's

18   schematics, the wall you're talking about, does it

19   appear on this diagram?

20   A      It does not.  There was a wall that ended up

21   being right here.

22   Q      Did it bisect that yellow-orange --

23   A      It basically cut that space almost in half.

24   Q      Why does it not appear on this diagram?

25   A      It wasn't on that diagram because we did

1    the -- when we did the ASSA initially, those two

2    spaces, the yellow space and this space were the

3    voids that I had mentioned that we could not access

4    at first.  And on the ship's schematics they were

5    just shown as voids without any partitions in it.

6    Q     So the wall you're talking about that bisected

7    that yellow room, was that on the ship's schematic

8    or not?

9    A     That was not on the ship's schematic, that was

10   added after the ship had been manufactured.

11   Q     What did you notice on that wall?

12   A     There were two patches -- basically metal

13   patch plates that had been welded onto the wall.

14   Q     Was there anything unusual about the welds?

15   A     Yes, they were very fresh welds.

16   Q     Why did they stand out to you as fresh?

17   A     When you're working in a saltwater environment

18   metal tends to rust and welding speeds up the rust

19   process.  But the walls around the welds were

20   rustier than the welds themselves.

21          MR. STOUT:  Your Honor, may I approach the

22   witness?

23          THE COURT:  You may.

24   BY MR. STOUT:

25   Q     I've handed you what's been premarked

1    Government Exhibit 9A, 9B, and 9C, if you'd take a

2    look at those and tell us what those are.

3    A      These are photographs of those patches that

4    were welded onto that aft wall in that compartment.

5    And then 9C is a close-up of the welds of one of the

6    patches.

7    Q      Do those photographs accurately depict what

8    you saw?

9    A      Yes, sir.

10         MR. STOUT:  Your Honor, at this time I'd offer

11   Government Exhibit 9A, B, and C into evidence.

12         MR. MARTINEZ:  Without objection.

13         THE COURT:  Received in evidence 9A, 9B, and

14   9C.

15         MR. STOUT:  May I publish those exhibits, Your

16   Honor?

17         THE COURT:  You may.

18   BY MR. STOUT:

19   Q      Explain to us what we're looking at here.

20   A      That center part is the patch that was welded

21   in place into that wall.

22   Q      And for the record, this is Government

23   Exhibit 9A.  I'm going to zoom in here.  What is it

24   that you see here that I've zoomed in on?

25   A      This is where this vent pipe is -- this patch

1    is welded around this vent pipe.  And the fact that

2    the rest of it is all rusty -- if this was all at

3    the same time, there would have been the same level

4    of rust.  But this not being rusted and having been

5    welded would mean that it was an extremely,

6    extremely fresh weld.

7    Q    I'm showing you Government Exhibit 9B.  What

8    are we looking at here?

9    A    That's the second of the two patches that were

10   in there.  And the same thing, the welds stands out

11   in appearance from the rest of the surrounding

12   metal.

13   Q    I'm going to show you 9C.  What does that show

14   us?

15   A    That's a close-up of the welds where you can

16   better see the variation between the boat itself and

17   then the welds as far as rust.

18   Q    Go back to showing Government Exhibit 5B.

19   After you looked down in that room and you

20   discovered the wall with the welds, what did you do

21   at that point?

22   A    At that point looking back at the generator,

23   there was a starter laying next to it and the fuel

24   tank that was supposed to supply was empty.  We

25   looked under the generator, there was another

1    welding glove.  And when we moved that glove, there

2    was a handle on what appeared to be a hatch on the

3    floor under the generator.

4    Q    What was unusual -- anything else unusual

5    about that generator?

6    A    Yeah, it wasn't -- the generator wasn't hooked

7    up at all, there was no way for that generator to

8    run.  Based on my training and experience if the

9    boat was having electrical problems or problems

10   generating power and they had what appeared to be

11   one of the newest of the three generators on board,

12   to have it not even in a run-able condition, just it

13   stood out.

14   Q    And was the Fat Crow when you were on it

15   experiencing electrical problems?

16   A    It was, it wasn't running at all when we first

17   got on.

18   Q    What was unusual about discovering the hatch

19   where you saw it?

20   A    The hatch -- the handle on it was just a

21   homemade handle and then the screws that held the

22   hatch in place were countersunk which just means the

23   top of them were flush with the floor.  And the

24   majority of every hatch on a boat, the bolts come

25   up, that way it prevents dirt clog-up or rust from

1    keeping you from being able to open it if need be to

2    access.

3    Q       Was that hatch indicated anywhere on the

4    ship's blueprints that you reviewed as part of your

5    search?

6    A       It was not on any of the blueprints and the

7    hole was not perfectly round or oval shaped that

8    would have been done if it was cut at a machine shop

9    before installation.

10    Q       Will you show us with your laser pointer there

11    where exactly the generator is in the hatch?

12    A       The generator is right about right here and

13    then the hatch would have been right on the floor

14    right underneath the generator.

15    Q       Show us, please, where the wall was again that

16    bisected that yellow --

17    A       The wall would have been approximately right

18    here.  So about in line with the bottom of that

19    ladder.

20    Q       After you discovered the hatch what did you

21    do?

22    A       After discovering the hatch I called back to

23    the Tahoma, let them know that we found what

24    appeared to be a hidden compartment and asked

25    permission to open the hatch.  They gave us

1    permission.  And it just happened that there was an

2    Allen key, an Allen wrench sitting on the cross

3    members of the generator was mounted on that

4    perfectly fit the bolts that the hatch was closed

5    with.  So we opened the hatch at that point.

6    Q      What did you find inside the hatch?

7    A      We found multiple white packages that were

8    consistent with packages used for narcotic

9    smuggling.

10        MR. STOUT:  Your Honor, may I approach the

11   witness?

12        THE COURT:  You may.

13   BY MR. STOUT:

14   Q      I've handed you what has been premarked

15   Government Exhibit 9D through 9J.  Will you take a

16   look at those and look up at me when you're done.

17        What are those exhibits?

18   A      Those are pictures of the hatch, the

19   generator, and the hidden compartment that were all

20   found in that forward storage room.

21   Q      Do they accurately depict what you just

22   described to us as how you found the hatch?

23   A      Yes, sir.

24        MR. STOUT:  Your Honor, at this time I'd offer

25   Government's Exhibit 9D through 9J into evidence.

1          MR. MARTINEZ:  No objection.

2          THE COURT:  Received in evidence Exhibit 9D

3     through 9J.

4          MR. STOUT:  Permission to publish those

5     exhibits, Your Honor.

6          THE COURT:  You may.

7     BY MR. STOUT:

8     Q     Showing you Exhibit 9D.  Describe for us what

9     we're looking at in this picture.

10    A     That's the generator that's in the forward

11    compartment.  And then this area here is the hatch,

12    you can see where a couple bolts have been pulled

13    out.  And that's the fuel tank for the generator

14    that has the cap on it, which that's where you

15    should be able to run a line -- there should be a

16    line running from that to the generator so it can

17    get fuel.

18    Q     So the way this is set up, the generator can't

19    get any gas?

20    A     There's no way for that to run at all.

21    Q     Showing you Government Exhibit 9E.  Describe

22    for us what we see here.

23    A     This is the hatch that's under the generator.

24    There is the holes where it was removed and then you

25    can kind of see the holes.  It was covered with dirt

1    and oil to blend in with the rest of the ship.

2    Q     Showing you Government Exhibit 9F.  Describe

3    for us what we see here.

4    A     That's after the hatch was taken off and

5    that's when we noticed the white packages in the

6    hidden compartment.

7    Q     Showing you Government Exhibit 9G.

8    A     More of the white packages under the generator

9    in that hidden compartment.

10   Q     Government Exhibit 9H.

11   A     Those were the walls that were installed that

12   were not part of the ship's schematic, just to block

13   that compartment off.

14   Q     That wall we're looking at here?

15   A     Yeah, that wall we're looking at is not part

16   of the ship.

17   Q     Is that the wall that was not on the ship's

18   blueprints?

19   A     Correct.  All bulkheads or walls in ships,

20   they have -- you can kind of see here, there's a

21   beam, kind of like these beams, support beams that

22   stick out.  They don't have smooth walls inside of

23   ships.

24   Q     Showing you Government Exhibit 9I.

25   A     That's another view from inside that hidden

1    compartment of the wall that was added afterwards.

2    Q       And 9J.

3    A       That's in the hidden compartment looking at

4    the bottom of the hatch that goes up to the storage

5    room.

6    Q       After you discovered those white packages

7    inside this space, what did you do with them?

8    A       We pulled one of them out and opened it up to

9    perform a narcotics identification test on the

10   substance that was found in there.  I performed the

11   first test, it tested positive for cocaine.  I

12   performed a second test and it tested positive for

13   cocaine as well.  At that point we let the Tahoma

14   know that we had two positive results for cocaine

15   and requested permission to lift the generator so we

16   could pull all the packages out.

17   Q       Did they give you permission to pull the

18   packages out?

19   A       Yes, sir, they did.

20   Q       I want to show you Government Exhibit 5D

21   again.  Point out to us here where you stored those

22   packages when you pulled them out of the hidden

23   compartment.

24   A       After we pulled them out they were in this

25   same storage room but on the left side of it.

1          MR. STOUT:  Your Honor, may I approach the

2     witness?

3          THE COURT:  You may.

4     BY MR. STOUT:

5     Q     I've handed you what's been premarked

6     Government Exhibit 9K.  What is that?

7     A     That is a photograph of all the packages we

8     pulled out that were stored in the storage

9     compartment.

10    Q     Does it fairly and accurately show the

11    packages as you stacked them in that room you just

12    indicated to us?

13    A     Yes, sir, it does.

14         MR. STOUT:  Your Honor, I offer Government

15    Exhibit 9K into evidence.

16         MR. MARTINEZ:  No objection.

17         THE COURT:  Received into evidence 9K.

18         MR. STOUT:  Permission to publish that

19    exhibit, Your Honor.

20         THE COURT:  You may.

21    BY MR. STOUT:

22    Q     Do you remember about how many packages there

23    were?

24    A     There was about 74 and a half of those

25    packages.

1    Q       At that point after you discovered these

2    packages and tested them for cocaine and pulled them

3    out of the hidden compartment, what did you do?

4    A       After pulled out, we took a photograph.  That

5    one ladder down was the only access point.  We

6    posted a guard there so that nobody could come into

7    or out of that space.  And then we passed all the

8    information back to the Tahoma and then we -- the

9    engineers went back to the Tahoma and then I got a

10   relief crew for overnight.

11   Q       At this point did you consider your search

12   over?

13   A       Yes, sir.

14   Q       What day was this again?

15   A       Sunday.

16   Q       Did you spend Sunday night on the Fat Crow

17   or --

18   A       No, I spent Sunday night back on the Tahoma.

19   Q       When was the next time you went back over?

20   A       I went back over in the morning on Monday

21   morning.

22   Q       What happened on Monday with the Fat Crow?

23   A       Monday morning we went over.  A crew from the

24   Coast Guard Cutter Bernie Weber came on board Monday

25   morning, a two-man team, they did a biometrics on

1    the crew of the Fat Crow.

2    Q      What are biometrics?

3    A      Biometrics is -- it's fingerprints, it's a

4    handheld machine, they do fingerprints and retina

5    scans for anybody we come in contact with.  It's a

6    program we're piloting now.

7    Q      What else happened on Monday?

8    A      Also a little bit after that a crew from the

9    Cutter Confidence sent a boarding team over and when

10   they got on board, I met with their boarding officer

11   and I walked him through the ship and explained

12   everything that had gone on the last couple days,

13   gave him a thorough pass down of the crew's

14   demeanor, what was going on with the boat, showed

15   him where we had found the packages, showed him

16   where the narcotics were sitting, and went over the

17   case package page by page so that he knew everything

18   that was in there and he was aware of what was there

19   and that it was thorough and accurate.

20          Once that was complete, we both called our

21   respective ships and said that we completed the pass

22   down.  And when they said they were good to

23   disembark, I went back to the Tahoma.

24   Q      When you say pass down, what do you mean?

25   A      Pass down is just a thorough covering of all

1 the information that had happened over the last

2 couple of days, about the crew, the ship, the status

3 of the power, the case package.  It's basically the

4 transfer of evidence in custody from one unit to

5 another.

6 Q Did you pass off control and custody of the

7 Fat Crow to the Cutter Confidence?

8 A Yes, we passed off control of the Fat Crow,

9 the crew members, the narcotics, the case package,

10 everything to the Cutter Confidence.

11 Q Did you have any more involvement in the

12 investigation involving the Fat Crow at this point?

13 A No, sir.

14 MR. STOUT:  Your Honor, may I have a moment?

15 THE COURT:  You may.

16 MR. STOUT:  No further questions, Your Honor.

17 THE COURT:  Is this a good time to take an

18 afternoon recess?  We'll be in recess until

19 5 minutes after 4.  You're welcome to walk around.

20 Please don't discuss the case and leave your pads on

21 your chairs.  We'll start at 5 after 4.

22 (The jury retired to the jury room.)

23 THE COURT:  You may step down.  Please don't

24 discuss your testimony over the recess.  We'll start

25 again at 5 after 4.

1          Victor, how are you hearing?  Better, or not?

2          MR. MARTINEZ:  Better.  This is okay.

3          THE COURT:  Let me just tell the interpreters.

4     To the extent you can keep it down a little, they're

5     having a hard time.

6          MR. MARTINEZ:  But this is a good spot for me,

7     provided he doesn't spill water on me.

8          THE COURT:  Yeah, I noticed that.  All right.

9     We'll start again at 5 after 4.

10          (Recess was taken from 3:46 until 4:04 p.m.)

11          THE COURT:  Get the jury.

12          (The jury returned to the courtroom.)

13          THE COURT:  Mr. Castillo?

14                    CROSS EXAMINATION

15     BY MR. CASTILLO:

16     Q     Petty Officer Alexander, you indicated you

17     were in charge of the boarding team from the Tahoma;

18     is that correct?

19     A     Yes, sir.

20     Q     First of all, I want to thank you for your

21     service.

22          Now, as you boarded the Tahoma, before you did

23     that you said you had a -- I'm sorry, before you

24     boarded the Fat Crow, you had a meeting like a

25     debriefing or sometime on the Tahoma?

1    A        Prebrief.

2    Q        Now, when you met with the other officers that

3    were on the Tahoma were you given any information

4    about the Fat Crow before you boarded it?

5    A        No, sir.

6    Q        Were you given the coordinates of a potential

7    suspicious vessel or anything like that?

8    A        Well, I did the alpha report, so I knew where

9    the vessel was.

10   Q        Now, so that information had to be relayed to

11   you by the aircraft that had discovered the vessel?

12   A        No, I was on the bridge of the Tahoma when I

13   reached out on the radio.  I can see the vessel --

14   Q        Okay, that's what I wanted to make sure we're

15   clear.  So eventually you see the vessel and then

16   you have a meeting with the officers and you make

17   like a plan of action of what's going to happen; is

18   that correct?

19   A        Yes, sir.

20   Q        Then you detail what other officers are going

21   to assist you to carry out this function, correct?

22   A        Right.

23   Q        The boarding team.

24   A        Yes, sir.

25   Q        The boarding team, you put it together.  Now,

1    is it the same people that do it all the time or it

2    just depends, can you change, or are there

3    specialists or anything like that?

4    A       We have -- what do we have, we have about 12

5    people on the ship that are certified as boarding

6    team members, so it's always those people.

7    Q       Now, your rank is a petty officer.  Where does

8    that rank in the table of operations aboard the

9    Tahoma?  Are you like mid management, are you --

10   where would you fall in the --

11   A       It would be a mid level.  I have one -- my

12   direct boss is a law enforcement officer, he's in

13   charge of my division.

14   Q       What's his rank?

15   A       He's an ensign.

16   Q       That would be like a lieutenant, ensign?

17   A       Ensign would be like a lieutenant in another

18   service.

19   Q       So you're beneath a lieutenant, correct?

20   A       Yes.

21   Q       Now, who's above the lieutenant?

22   A       Above him would be the operations officer.

23   Q       Okay.  What would his rank be?

24   A       He's a lieutenant.

25   Q       He's a lieutenant.

1    A       He's a lieutenant.

2    Q       Which is above ensign.

3    A       Yes, sir.

4    Q       How about the lieutenant's boss, who is that?

5    A       Would be the executive officer,

6    lieutenant commander.

7    Q       And who is in charge of the vessel itself, who

8    has the ultimate say-so on the vessel?

9    A       The commanding officer.

10   Q       And who would that be?

11   A       Commander Brown.

12   Q       Commander Brown.  And what's the equivalent of

13   his rank?  Colonel, general?

14   A       He's a commander, so that would be a

15   lieutenant colonel in the Army or the --

16   Q       Okay.  So the Lt. Col. Brown, the Commanding

17   Officer Brown, he has the ultimate say-so, he's

18   responsible for the Tahoma; is that correct?

19   A       For the Tahoma, yes, sir.

20   Q       And if he were to give you a direct lawful

21   order, you would be required to obey it; is that

22   correct?

23   A       A lawful order, yes, sir.

24   Q       I mean, he tells what to do, you do it; is

25   that right?

1    A        Correct.

2    Q        Now, aboard the Tahoma there's a helmsman.

3    Are there several helmsmen, people assigned to like

4    steer the boat?

5    A        There are at different times.  I don't operate

6    that part of the boat, so I don't --

7    Q        So you're familiar with what a helmsman does

8    on a vessel, correct, and that's pretty uniform

9    throughout the seas, international waters, right,

10   any vessel, correct, they have somebody who steers

11   the vessel?

12   A        Okay.

13   Q        And that person is typically given coordinates

14   by somebody else, a navigator or somebody else; is

15   that right?

16   A        Yes, sir.

17   Q        And that person does what he's told, correct?

18   A        Yes, sir.

19   Q        Now, similar to like in your situation we have

20   Commander Brown, whatever his orders as it goes down

21   the chain of command and everybody follows whatever

22   he says, correct?

23   A        Yes, sir.

24   Q        Now, the person at the bottom, let's say a

25   yeoman or something, some crewman aboard the Tahoma

1    says I don't want to follow that order, what happens

2    to him?

3    A      Depends if it's a lawful order or not.

4    Q      Assume it's a lawful order, he says I don't

5    want to do that.  He gets in trouble, right?

6    A      There could be punitive stuff.

7    Q      So in other words, if a lower level crewman

8    disobeys a lawful command of a captain, he can get

9    in serious trouble?

10   A      He could, but it's no different than any boss

11   in any corporation.

12   Q      All right.  Typically that's what happens,

13   right, you're under the command of the captain,

14   there are safety issues of the stuff, vessel at the

15   high seas, that's typically how it works, is that

16   happen, you obey the commands of the captain?

17   A      Yes.

18   Q      Now, on the Fat Crow you have no idea about

19   the commanding control structure of the Fat Crow, do

20   you?

21   A      Not initially, no.

22   Q      No.  When you boarded, you asked people what

23   they did, then you had a general understanding of

24   who did what; is that correct?

25   A      Yes, sir.

1    Q       You don't speak Spanish, do you?

2    A       No, sir.

3    Q       How many interpreters assisted you in the

4    boarding of the Fat Crow?

5    A       We had three or four over the course of four

6    days.

7    Q       And when you reached out with radio

8    communication to somebody on the Fat Crow did that

9    person identify themselves?  Didn't you say somebody

10   said "no Ingles" or something?

11   A       Right.  That's when I reached out.

12   Q       That's what I'm saying, you were on the radio

13   trying to communicate --

14   A       I reached out and nobody answered on the

15   radio.

16   Q       Okay.  But eventually somebody responded "no

17   Ingles," isn't that correct?

18   A       Yes.

19   Q       Now, when did that happen?

20   A       When the helicopter -- after I had called

21   twice and got no response, then the helicopter

22   called.

23   Q       So the helicopter made some communication with

24   the Fat Crow.

25   A       Right.

1    Q      And you were overhearing that conversation?

2    A      Yeah, I could see the Fat Crow and I could see

3    the helicopter and all radios were connected.

4    Q      And somebody over the radio said "no Ingles",

5    meaning I don't speak English, something to that

6    effect.

7    A      Yes.

8    Q      That's what you understood it.

9    A      Yes.

10   Q      Do you have any idea who that was?

11   A      No, sir.

12   Q      And eventually you did in fact board the Fat

13   Crow, correct?

14   A      Yes, sir.

15   Q      With other officers.  When I say other

16   officers --

17   A      Other boarding team members.

18   Q      Okay.  Did you have any contact with

19   Mr. Llanos Miranda, the gentleman seated in the

20   middle there?

21   A      I had contact with everybody that was on

22   there.

23   Q      But you didn't speak to him directly because

24   you don't speak Spanish.

25   A      Correct.

1    Q       You learned that he spoke Spanish, correct?

2    A       Yes.

3    Q       When you initially saw him and tried to talk

4    to him, you learned he spoke Spanish and you didn't.

5    A       Correct.

6    Q       And you needed the help of an interpreter to

7    find out who he was, et cetera, what he did, isn't

8    that right?

9    A       Yes.

10   Q       Did you eventually learn that he was the

11   helmsman aboard the Fat Crow?

12   A       I did not know that.

13   Q       You didn't know that?  Okay.  So in any of

14   your communications with the commanding control

15   structure of the Tahoma did anybody say to expect to

16   find drugs on the Fat Crow?

17   A       No, sir.

18   Q       You didn't get any information like that at

19   all.

20   A       No, sir.

21   Q       And it was purely because of your boarding and

22   the techniques and the search that you did where you

23   discovered what was depicted on the photos in

24   evidence, correct?

25   A       Yes, sir.

1    Q      The welds and all that.  Now, this is a huge

2    vessel, isn't that right?

3    A      Yes, sir, it was.

4    Q      Like a football field, I think you said?

5    A      About 300 feet.

6    Q      Size of a football field in length?

7    A      Yes.

8    Q      And do you remember how many levels like from

9    the bottom to the top were there?

10   A      I do not remember.

11   Q      More than three?

12   A      More than three.

13   Q      Okay.  And how long did it take you to

14   discover the secret compartment?

15   A      The hidden compartment we found on the -- got

16   on Friday, two of us -- over two days since we had

17   been on the boat.

18   Q      So it took your team two days from the time

19   you boarded the vessel, the Fat Crow, to the time

20   you actually found the items depicted in the

21   photographs, the white packages.

22   A      Yes, sir.

23   Q      At any time were you having communications

24   back with the Tahoma about your status and what you

25   were doing?

1    A      Yes, sir.

2    Q      And did you just report to them hey, we're

3    looking, we don't find anything?

4    A      Our reports went back as we have 20 percent

5    ASSA complete, 30 percent ASSA complete, that's how

6    communications.

7    Q      So you're telling us that you had no prior

8    knowledge or information that drugs were being

9    smuggled aboard the Fat Crow, correct?

10   A      Correct.

11   Q      Yet you searched this vessel for two days,

12   correct?

13   A      Correct.

14   Q      Now, is that normal to search a vessel for two

15   days?

16   A      A vessel of that size, it is, yes, sir.

17   Q      Now, you indicated that you've boarded about

18   20 freighters in your career?

19   A      Yes, sir.

20   Q      Now, you said you've been in the Coast Guard

21   for 15 years?

22   A      Yes, sir.

23   Q      And how many of those years were devoted to

24   being a boarding officer?

25   A      I've been a boarding officer since 2010.

1    Q      So seven years?

2    A      Yes, sir.

3    Q      So it was during that seven years that you

4    boarded these twenty freighters, correct?

5    A      Yes, sir.

6    Q      And Fat Crow being this one?

7    A      Yes, sir.

8    Q      And that's the only one that you've actually

9    found drugs aboard, isn't that correct.

10   A      First freighter, yes, sir.

11   Q      First freighter.

12   A      Yes, sir.

13   Q      I'll talk a little bit about the differences

14   in the vessels that you've covered, too.  But your

15   knowledge about the Fat Crow here, you're saying you

16   had never met Mr. Llanos Miranda prior, correct?

17   A      Not prior to the boarding, no.

18   Q      Prior to the boarding.  All right.  And it

19   took you two days to find the drugs.

20   A      Yes, sir.

21   Q      Okay.  Now, from the photographs and the

22   information that you had, there is no way even

23   through your training you can tell us who put that

24   there, could you, what person put that there.  You

25   just know that it was there.

1    A       Yes, sir.

2    Q       How it got there and under what conditions,

3    you have no idea aside from what somebody might have

4    told you; is that right?

5    A       Correct.

6    Q       Because your training can't tell you, well, it

7    took 6-foot tall man or anything, we don't know

8    that, that's just pure -- all you can tell us is you

9    found the drugs.

10   A       Yes, sir.

11   Q       Okay.  And you talked about the different

12   types of vessels in international waters that you've

13   boarded.

14   A       Yes, sir.

15   Q       All right.  Now, is this the first time you've

16   ever testified in court?

17   A       Yes, sir.

18   Q       Okay.  First time.  All these boardings you've

19   done, this is the first time you've ever needed to

20   testify in court.

21   A       Yes, sir.

22   Q       Now, you indicated earlier you talked about go

23   fast vessels.  Why don't you explain to the jury,

24   what is a go fast vessel?

25   A       A go fast vessel is a small vessel usually

1     under 40 feet that has multiple outboard motors,

2     maybe center console.  There's no cabins, it's just

3     an open boat like you would see a sport fisher or

4     something around here.

5     Q     And they're usually painted dark green or

6     blue, the color of the sea; is that right?

7     A     They're painted all different colors.

8     Q     When you say 40 feet, would it be from where

9     you are to the jury box, more or less, or longer?

10    A     Yeah, probably at the most.

11    Q     And typically these go fast vessels have like

12    three outboard motors on them?

13    A     Well, one to four.

14    Q     Okay.  And they're used to smuggle large

15    quantities, usually about a ton or two, of drugs and

16    usually have three- or four-man crew?

17    A     Sometimes, yes.

18    Q     And that's something obviously totally

19    different than this particular vessel.

20    A     Correct.

21    Q     And you've boarded those types of vessels,

22    right?

23    A     Yes, sir.

24    Q     And there is also like fishing vessels that

25    can be used to transport drugs or fuel, isn't that

1    right?

2    A    Yes, sir.

3    Q    You've boarded those as well?

4    A    Yes, sir, I have.

5    Q    Okay.  And how big on are those vessels?

6    A    They range in length from 20 to 70 feet.

7    Q    So maybe the length of this courtroom at the

8    most from where the judge is sitting to the door?

9    And the width is maybe like 20 feet or so from you

10   to me, something like that?

11   A    Yes, sir.

12   Q    Okay.  And this -- well, you've talked about

13   pictures that you've seen, but you actually boarded

14   the Fat Crow, it's a big vessel.

15   A    Yes.

16   Q    You already described it, big.  And when your

17   team boarded the Fat Crow did you go -- because they

18   worked for two days, how did it go, did you start at

19   the back boat, the stern, and work forward, or did

20   you have some sort of plan on how to search or what

21   was it?

22   A    The first day we started with the cargo tanks

23   that had the diesel fuel in it.

24   Q    Where were the cargo tanks located?

25   A    The whole middle section of the vessel.

1    Q      In the lower levels?

2    A      On the main deck where the hatch is that went

3    into the fuel tanks.

4    Q      Okay.  That's where you started.

5    A      Uh-huh.

6    Q      Okay.  I'm looking at Government's 5B.  We've

7    talked about that in the direct, okay.  All right.

8    And so when you say that you -- you say you searched

9    -- is this the area that you searched?

10   A      These are the fuel tanks where we started the

11   gas-free.

12   Q      And eventually, okay, here -- and it took you

13   two days to eventually find in location where the

14   drugs were eventually found.

15   A      It took us two days to find the hidden

16   compartment.  We had found that location when we

17   were doing ASSA and those were the voids that showed

18   up on the ship's schematics.

19   Q      Right.  My point is it took you two days to

20   find that, from the time you boarded.

21   A      To find the hidden compartment, yes.

22   Q      Now, you indicated that you -- on the Tahoma

23   that you had sometimes assumed the helm and steered

24   the boat?

25   A      I never said that.

1    Q    Oh, I'm sorry, I misunderstood you, okay.

2    There are people who are assigned to control the

3    helm at times; is that right?

4    A    Yes.

5    Q    And their authority is limited to just

6    operating the vessel and the coordinates that are

7    given to them by someone else; is that right?

8    A    When they're doing helmsman, that's their job.

9    Q    And a helmsman really has no authority to do

10   anything on the boat other than control the helm;

11   isn't that right?

12   A    That's not necessarily true.  While it's their

13   watch to drive the boat, if they left that the boat

14   could do something it shouldn't do, so they're not

15   going to abandon their post.

16   Q    Well, my point is their ranks -- they don't

17   have authority to command anybody else to do

18   anything on the boat do they; their job is to steer

19   the boat.

20   A    That's not necessarily true.

21   Q    No?  Okay.  That's in the Coast Guard with the

22   personnel that you had -- you said about a hundred

23   people in the Tahoma?

24   A    Yes, sir.

25   Q    All right.  I have no further questions, Your

1    Honor, thank you.

2              THE COURT:  All right.  Mr. Martinez?

3                    CROSS EXAMINATION

4    BY MR. MARTINEZ:

5    Q      Good afternoon.

6    A      Good afternoon.

7    Q      Let me go ahead and begin with the exhibit

8    that's up, Government Exhibit 5B.  All right.  This

9    is the Fat Crow, correct?

10   A      It's a drawing of, yes.

11   Q      Okay.  Is this to scale, is it not to scale?

12   A      No, sir, it's not to scale.

13   Q      Not to scale.  All right.  But this is

14   approximately a football field long, right?

15   A      Yes, sir, approximately.

16   Q      So for those of you that haven't had an

17   opportunity to be on board this vessel, okay, can

18   you tell me, what is this, is this like a walkway --

19   A      That's a walkway, a catwalk that goes from the

20   superstructure area to the forward -- the fauxhall,

21   which is the forward part of the boat.

22   Q      Okay.  And this is the bridge.

23   A      Yes, sir.

24   Q      That's the command center.

25   A      Yes, sir.

1    Q      That's where the captain is.

2    A      Where they drive the boat from, yes, sir.

3    Q      That's where they drive the boat from.  So

4    that's where the steering would be.

5    A      Yes, sir.  There and the engine room.  You can

6    steer a boat from the engine room or the -- right

7    above the engine room where it says aft steering,

8    right here, you can steer from there.  You can

9    direct propulsion, sometimes steer it from the

10   engine room on pretty much any vessel and the

11   bridge.

12   Q      So if you're in the process of steering the

13   boat, you do it from either the bridge or that room.

14   A      Yes, sir.

15   Q      Now, what are these other rooms here?

16   A      That's -- the aft room, that's the gallery

17   which is the kitchen where they do the food prep.

18   That's the dining area, the mess deck.  And this was

19   the captain's stateroom -- crew berthing and

20   captain's stateroom.

21   Q      Here as you start on this walkway that you

22   referred to, you have tank, tank, tank, tank, tank,

23   right?

24   A      Yes, sir.

25   Q      Five tanks.  And those are tanks that you put

1    liquid stuff in.

2    A    Yes.  Liquid cargo.

3    Q    Liquid cargo.  Okay.  So if you're a crew

4    member, everything that you're doing is here on this

5    back end of the boat, right?

6    A    It depends what you're doing.

7    Q    Okay.  Let's say I wanted to walk here just to

8    be standing above tank 3, then that's where I would

9    be.

10   A    Well, so there is a pump room right here, so

11   if they have to transfer tanks for stability or

12   something starts leaking, one of the tanks leaks,

13   they can transfer to other tanks.  There is a pump

14   room that you have here that has all the pumps to

15   transfer stuff between tanks.  And there is valves,

16   there is valves and piping on the deck that you want

17   to check on a regular basis.

18   Q    And the valves to the tanks are at the top of

19   the tank?

20   A    Yeah, at the top there is check valves and

21   access points all across the deck of the boat.

22   Q    All right.  Assuming there is no problem with

23   the tanks and there is no need to check and open up

24   a valve and look inside the tank, what would be the

25   other purpose of being up here?

1    A       Well, you would do a round on a very regular

2    basis to make sure there is no problems with any of

3    the valves or piping on the deck.

4    Q       Okay.  So you might do the rounds and make

5    sure, look inside tank 5 and 4 and 3 and 2 and 1 to

6    make sure everything is okay.

7    A       Yes, sir.

8    Q       Okay.  Now, we've talked a lot about hidden or

9    secret compartments.  They call them hidden or

10   secret because they don't want people to find them,

11   right?  Because they have contraband in them, like

12   cocaine.  So you're not going to neon sign saying

13   the cocaine is in here.

14   A       Correct.

15   Q       Now, the hidden compartment or the secret

16   compartment on this vessel is over here.

17   A       Yes, sir.

18   Q       Right?  Now, what is -- if I was on this boat

19   and I was walking this way checking the tanks and I

20   check tank 1, what's the reason for me to come in

21   here?  What's there?

22   A       On that boat it appeared to be like a storage,

23   a storage room.  But it also had a generator in it.

24   So you were engineering side you would check the

25   generator and make sure it's working.

1    Q    And if the generator is working, what would I

2    be doing in that room?

3    A    You would be doing regular rounds on it to

4    make sure it's not overheating, leaking, catching on

5    fire.

6    Q    Okay.  All right.  So there might be cause to

7    go into that room to check and make sure everything

8    is okay.  What's next to it?

9    A    That's that room where the generator is is

10   where the ladder is.  That ladder, that ladder, the

11   generator is right here on the port side in that

12   room where the ladder is.

13   Q    Okay.  And the secret compartment is what,

14   under the generator?

15   A    Under the generator.

16   Q    So you walk down the deck and then you get to

17   the storage room and then there is a ladder and you

18   take the ladder down and then there is a generator

19   and then underneath the generator is the secret

20   compartment.

21   A    Yes, sir.

22   Q    Okay.  So to look into the secret compartment

23   do you have to move the generator?

24   A    You didn't have to move it to look into it.

25   Q    Okay.  Let's see.  This is Government Exhibit

1    9A.    Okay.  What is it that we're looking at here?

2    A       Those are what appear to be patch panels.

3    Q       Okay.  But --

4    A       On the bulkhead.

5    Q       -- in relationship to the room and in

6    relationship to the generator, what are we looking

7    at?

8    A       That would have been in the room under the

9    generator.

10   Q       Underneath the generator.

11   A       Underneath the generator.

12   Q       So to see that, you have to move the generator

13   or lean down and look underneath it?

14   A       You can look in or crawl into the hatch.

15   There was two -- where this is, that other one that

16   had -- the yellow room I said there was a wall there

17   that was not part of the initial schematics, the

18   design of the boat, these hatches were on the side

19   that was accessible through a hatch that was already

20   open in that forward room.

21   Q       Then I would see that.

22   A       Yes.

23   Q       And how big is this circle?  Since it's not --

24   I don't have anything to look at in relation to.

25   A       Approximately two feet wide.

```
 1    Q      Like bigger than the courtroom clock?

 2    A      Not as tall, but wider.

 3    Q      Okay.  What is that?  This is now Government

 4    Exhibit 9B.

 5    A      It's another patch that was down in that

 6    space.  They're about the same size, roughly the

 7    same size.

 8    Q      And does 9B and 9A, are they the same thing?

 9    I mean, are they two different openings to two

10    different spots?

11    A      No, two different openings to the same spot.

12    Q      Okay.  And did you cut through these to get

13    down below?

14    A      No, sir, we did not.

15    Q      Okay.  How did you get underneath that?

16    A      That was on the back bulkhead.  That was on

17    the other side of the -- when we went into the hatch

18    where the hidden compartment was, that's where the

19    divider between the two.

20    Q      Let me ask the question this way.  Was the

21    secret compartment welded shut?

22    A      No, it was not, it was bolted shut.

23    Q      Huh?

24    A      It was bolted shut on the top.

25    Q      It was bolted shut.
```

1     A       On the top.

2     Q       Is that the bolts we're looking at?

3     A       It was bolted on the top where the hatch was.

4     Q       Oh, where the hatch was.  Have we seen the

5     picture of that yet?

6     A       Yes, you have.

7     Q       Okay.  So bolted on the top is where it was.

8     Now, you were on the boat for four days?

9     A       We first boarded on Friday and we passed it

10    off on Monday morning.

11    Q       And so that's Friday, Saturday, Sunday,

12    Monday.  And all of the crew -- is it fair to all of

13    the crew only spoke Spanish?

14    A       As far as I knew, yes.

15    Q       So you didn't have word one with any of them

16    because you don't speak the language.

17    A       I don't speak enough to have a conversation,

18    no.

19    Q       Okay.  Now, you had testified on direct that

20    you reached out with a transmission at sea to the

21    Fat Crow, do you remember that?

22    A       I reached out on the radio.

23    Q       On the radio.  That was you personally?

24    A       Yes.

25    Q       And when you reach out to someone at the Fat

1    Crow, where is the radio on their end, is it up here

2    on the bridge?

3    A       They would have a radio on -- yes, there were

4    radios on the bridge.

5    Q       Okay.  And was the Fat Crow dead in the water

6    at the time?

7    A       Yes, sir.

8    Q       Okay.  So it wasn't moving.

9    A       Correct.

10   Q       So nobody was steering it.

11   A       Correct.

12   Q       Do you know if there was anybody at that

13   particular time that happened to be on the bridge to

14   hear your transmission?

15   A       No, I don't.

16   Q       So you're not trying to suggest to this jury

17   that someone was ignoring the transmission.

18   A       I'm saying based on my training and experience

19   nobody would -- that's the best lookout spot and if

20   your vessel is dead in the water, if somebody else

21   was coming upon you or somebody was reading out to

22   you, you would want to be there.  For the safety of

23   your own crew.

24   Q       Let's say there was somebody and that somebody

25   didn't speak English.  Were you transmitting in

1    Spanish?

2    A      I did not.

3    Q      Were you transmitting in English?

4    A      I transmitted in English twice and they did it

5    in Spanish.

6    Q      And then someone ultimately transmitted back

7    "no hables Ingles."

8    A      Yes.  To an English transmission.

9    Q      That means I don't speak English.

10   A      I don't speak English.  And they responded to

11   an English transmission that they don't speak

12   English.

13   Q      Okay.  Now, the space accountability, we

14   talked about that on direct examination.  Space

15   accountability is looking to see that every

16   potential space on the vessel is accountable, right?

17   A      Correct.

18   Q      Because there could be a secret compartment,

19   right?

20   A      Or it could just be a legitimate space that

21   has something in it.

22   Q      Okay.  And if there is a void, you want to

23   look inside of it, right?

24   A      Yes.

25   Q      And it's typically designed so that you

1    wouldn't think that there is a reason to look in

2    there, right?

3    A      Correct.

4    Q      So if we take, for instance, the wall that's

5    behind you, okay, there is doors, okay, that lead to

6    space behind you.  Okay.  If that was all a wall, we

7    might not know that there is space on the other

8    side, right?

9    A      Correct.

10   Q      But you, after you take your space

11   accountability course, know how to look at a wall

12   and determine if it's a real wall with nothing

13   behind it, or a wall with space behind it.

14   A      Correct.

15   Q      Like the wall behind the jury, there is

16   actually another room behind it, right?

17   A      I don't know.

18   Q      Well, there is a door there.

19   A      Correct.

20   Q      So we can presume that there is another room.

21   And when did you take this course, this space

22   accountability course?

23   A      I took this course in 2011.

24   Q      Okay.  And how long does it take to complete

25   the course?

1    A      It's a five-day course.

2    Q      So it's like 8 hours a day for five days?

3    A      8 to 10.

4    Q      Okay.  So 8 to 10 hours for five days,

5    potentially 50 hours of learning how to look for

6    secret spaces.

7    A      Yes, sir.

8    Q      Do you know whether or not any of the

9    defendants in this case ever took a course like

10   that?

11   A      No, I don't.

12   Q      Outside of you being a law enforcement officer

13   in the Coast Guard is it necessary to be able to

14   navigate at sea to take that 50-hour course?

15   A      No, sir.

16   Q      Now, you had in response to one of

17   Mr. Castillo's questions, you conceded that you

18   don't know who put the cocaine in that compartment,

19   right?

20   A      Correct.

21   Q      And you don't know when it got in that

22   compartment, right?

23   A      Correct.

24   Q      And you don't know how it got in that

25   compartment, right?

1    A       Correct.

2    Q       And you don't know how long it had been in

3    that compartment, right?

4    A       Correct.

5    Q       Now, ultimately after that long extended

6    search for space accountability, you ended up

7    finding the packages of cocaine which were shown in

8    the photograph of one of the government's exhibits,

9    do you remember that?

10   A       Yes, sir.

11   Q       Now, those packages were individually

12   packaged, right?

13   A       Yes.

14   Q       What was the material that was used to package

15   the cocaine that we saw in the photograph?

16   A       They were a burlap style -- nylon burlap sack.

17   Q       And was there multiple wrappings or was it

18   just that and then cocaine?

19   A       Oh, no, there was multiple wrappings inside of

20   that sack.

21   Q       How many wrappings were attributable to each

22   package?

23   A       I'm not sure.  I did not open all the

24   packages.

25   Q       With the ones that you did open, how many of

1      the packages found or seized did you open?

2      A      I only opened one package just enough to cut

3      it with the knife to be able to test the substance

4      inside.  We didn't open it up and pull anything out

5      of the package.

6      Q      Okay.  As to the one package that you did

7      open, how many layers of packaging were there?

8      A      I'm not sure.  All we did, we opened that

9      white sack was the outer layer and then we just cut

10     through with a knife to get substance.  We didn't

11     individually remove --

12     Q      So you don't know if it was one, two, three or

13     four layers or more?

14     A      No, sir.

15     Q      With regard to each of those layers that

16     ultimately had the cocaine within it, did you or

17     anyone on behalf of the Coast Guard check that

18     packaging of that cocaine for fingerprints?

19     A      No, sir.

20     Q      Do you have any reason to believe that the

21     fingerprints of these defendants were found on any

22     of the packages that were seized?

23     A      I have no way to know either way.

24     Q      Did you or someone on behalf of the Coast

25     Guard conduct fingerprint analysis on the packaging

1   to ascertain who touched those packages before they

2   ended up in that hidden secret compartment?

3   A       No, sir, the Coast Guard does not do

4   fingerprinting.

5   Q       Okay.  Are you aware as you sit here today who

6   on behalf of the government conducted that

7   fingerprint analysis?

8   A       No, sir, I do not.

9   Q       Do you know even if a fingerprint analysis was

10  done by any branch of law enforcement other than the

11  Coast Guard?

12  A       No, sir.  As I say when I passed it off on

13  Monday morning, I had no other involvement with the

14  Fat Crow.

15          MR. CASTILLO:  No further questions.

16          THE COURT:  Mr. Stout?

17                    REDIRECT EXAMINATION

18  BY MR. STOUT:

19  Q       Petty Officer Alexander, what is the purpose

20  of doing an at sea space accountability?

21  A       The purpose of at sea space accountability is

22  to check for any anomalies or missing or unaccounted

23  for space to the best extent we can do while a boat

24  is not tied up to a pier.  To see if there is any

25  hidden compartments or anything smuggled on the

1      boat.

2      Q      Is the goal of it to try to account as best as

3      possible for every square inch of a vessel like

4      this?

5      A      Yes, sir.

6      Q      And is the goal -- do you stop before you

7      finish accounting for everything?

8      A      No, sir, whether we find something or not find

9      something, we go until we call in a 100 percent ASSA

10     complete.  The "at sea" part of the accountability

11     is like the tanks that are full of diesel, we can't

12     actually go in there and measure them because

13     they're full of fuel so that's why it's "at sea."

14     We check as much of as we can without it being tied

15     to a pier and we can offload fuel or move cargo

16     around or whatever.

17     Q      A moment ago Mr. Castillo asked you a number

18     of questions about the hierarchy, your command

19     structure; do you remember that?

20     A      Yes, sir.

21     Q      And he asked you about whether you would be

22     required to follow the lawful order of your captain

23     or commanding officer on your ship, do you remember

24     that?

25     A      Yes, sir.

1    Q    If your commanding officer on the Tahoma

2    ordered you to smuggle cocaine, 1,500 kilos of

3    cocaine, would you do that?

4    A    No, sir.

5        MR. STOUT:  No further questions.

6        THE COURT:  All right.  Thank you, sir.  You

7    may step down.

8        Who is your next witness, Mr. Stout or

9    Mr. Gammons?

10        MR. GAMMONS:  Jeffrey Jurin.  He's a

11    helicopter pilot.  The United States calls Jeffrey

12    Jurin.

13        [Witness sworn]

14        COURTROOM DEPUTY CLERK:  Please be seated.

15    Please state your name and spell your last name for

16    the record.

17        THE WITNESS:  Lt. Jeffrey Jurin, J-u-r-i-n.

18                DIRECT EXAMINATION

19    BY MR. GAMMONS:

20    Q    Good afternoon.

21    A    Good afternoon.

22    Q    How are you currently employed?

23    A    I'm a employed with the U.S. Coast Guard.

24    Q    In what capacity?

25    A    A helicopter pilot and mission commander for

1      airborne use of force counter narcotics.

2      Q       Where did you complete your undergraduate

3      degree?

4      A       At the U.S. Merchant Marine Academy.

5      Q       And what was your degree in?

6      A       Marine systems engineering.

7      Q       You mention you are employed with the United

8      States Coast Guard.  When did you join the United

9      States Coast Guard?

10     A       In 2009.

11     Q       In 2009 where were you directed for training?

12     A       Pensacola, Florida.

13     Q       And specifically what were you doing in

14     Pensacola, Florida?

15     A       The primary and advanced flight training for

16     the U.S. Coast Guard.

17     Q       And can you tell the jurors what training that

18     you took part in when you were in Pensacola,

19     Florida?

20     A       Sure.  So the approximately first six months

21     were classroom physiological and physical training

22     there in Pensacola, followed by about six months of

23     training in a fixed wing tandem cockpit turboprop

24     aircraft with an instructor.  And then at the

25     completion of that was about eights months of

1    helicopter training, advanced flight training in a

2    TH57 helicopter.  And that completed the naval

3    flight training before moving on to [Aviation

4    Training Center Mobile for Coast Guard-specific

5    training.

6    Q    You mentioned your initial training versus

7    your advanced training.  What's the difference

8    between those two?

9    A    The first portion is in a fixed wing aircraft

10   learning some of the basic airmanship skills, where

11   the second part of the training is specific to

12   helicopters and learning how to fly a helicopter.

13   Q    And you mentioned after you left Pensacola you

14   moved to Mobile, Alabama?

15   A    Yes, that was for Coast Guard-specific

16   training, learning the specific aircraft that we'd

17   fly in the Coast Guard and learning how to utilize

18   that aircraft for the mission.

19   Q    And specifically what type of helicopter do

20   you fly?

21   A    It's an MH-65D.

22   Q    When you fly the MH-65D typically how many

23   people are in that helicopter with you?

24   A    A total of three for airborne use of force.

25   We have two pilots and a precision marksman in the

1    back.

2    Q    Can you explain for the jurors what respective

3    roles the two pilots have on board?

4    A    Sure.  The pilot in the right seat is actually

5    on controls, physically manipulating the controls,

6    flying the helicopter.  The pilot in the left seat

7    is kind of in charge of the mission, running the

8    mission, operating radios, performance calculations,

9    navigation.  And then the precision marksman in the

10   back is operating the camera, the forward looking

11   infrared camera, as well as the guns.

12   Q    And you mentioned a camera.  The MH-65D has a

13   camera?

14   A    It does.

15   Q    What type of guns does it have on board?

16   A    It's got a shoulder fired 50-caliber Barrett

17   sniper rifle and then a mounted M240 machine gun.

18   Q    Where was your first assignment as a

19   helicopter pilot in the Coast Guard?

20   A    At Air Station New Orleans.

21   Q    And how long were you in New Orleans?

22   A    About four years.

23   Q    While you were in New Orleans how often were

24   you flying the helicopter?

25   A    About three times a week.

1    Q    And what was your primary mission when you

2    were in New Orleans?

3    A    Primarily search and rescue.

4    Q    And after New Orleans what was your next

5    assignment?

6    A    Helicopter Interdiction Tactical Squadron in

7    Jacksonville, Florida.

8    Q    And did the type of missions you were

9    participating in change from when you were in New

10   Orleans to when you moved to Jacksonville?

11   A    It did.  Our primary mission at HITron is

12   airborne use of force for counter narcotics.

13   Q    When you moved to Jacksonville -- let me ask

14   this, is that where you're currently stationed?

15   A    It is.

16   Q    When you moved to Jacksonville how often were

17   you operating the helicopter?

18   A    About the same, three times a week.

19   Q    And approximately how many live missions have

20   you participated in since moving to Jacksonville?

21   A    About 18.

22   Q    In addition to the live missions do you also

23   take part in training missions as well?

24   A    Yes, constantly.

25   Q    When you're deployed from Jacksonville where

1     do you go in your official capacity?

2     A      We logistically get from Jacksonville,

3     Florida, down closer to the coast of Colombia,

4     Central and South America, either by air lift or

5     riding a Coast Guard ship down there.

6     Q      Coast Guard ship also known as a Coast Guard

7     cutter?

8     A      Yes, exactly, we call it a cutter.  Thank you.

9     Q      When you're deployed approximately how long

10    are you deployed for?

11    A      Approximately 30 to 90 days.

12    Q      Are you familiar with the Coast Guard Cutter

13    Tahoma?

14    A      I am.

15    Q      Have you had the opportunity to deploy to that

16    Coast Guard cutter?

17    A      I did, I deployed this past summer from July

18    through August.

19    Q      Can you describe the Tahoma for the jurors?

20    A      Sure.  It's a 270-foot medium endurance Coast

21    Guard cutter.

22    Q      And is your helicopter on board the cutter as

23    well?

24    A      It is.

25    Q      Are you familiar with the ship Fat Crow?

1    A       I am.

2    Q       In August of 2017 were you dispatched in your

3    capacity as a helicopter pilot to Fat Crow?

4    A       I was.

5    Q       Why were you dispatched to that location?

6    A       On August 23rd the ship's personnel on board

7    Cutter Tahoma detected a radar contact that was

8    transponding on AIS which is the Automatic

9    Identification System.  It broadcasts a commercial

10   ship's information for other ships to see to -- for

11   the safety of life at sea.  It says who they are,

12   what they're doing, where they're going, for traffic

13   deconfliction and so on.  This ship wasn't

14   broadcasting on it, so the cutter personnel took

15   interest in it.

16          It was in the evening, so the following

17   morning we launched in the helicopter to go take a

18   look at it and see exactly who they were, what the

19   ship was.

20   Q       Based on your training and experience was it

21   odd that this ship wasn't transponding on AIS?

22   A       It is, yes.  A radar contact of that size is

23   required by the International Maritime Organization

24   to broadcast on AIS.

25   Q       And you mentioned that you weren't dispatched

1      that night, you were dispatched the next morning.

2      What was the reason for that?

3      A      Detected it at night and the speed at which

4      the Fat Crow was moving, it didn't make sense to

5      wake everybody up and try to execute a mission at

6      night like that.  It was just as easy to just follow

7      the ship overnight, wait until the next morning when

8      everybody was fresh, wait for daylight where it's a

9      lot safer to operate in all regards.

10     Q      Were you worried about the Fat Crow outrunning

11     the Tahoma?

12     A      No.  The Fat Crow was going slower than the

13     Tahoma was capable of moving, so we had no problem

14     just shadowing it overnight.

15     Q      That next morning when you were dispatched to

16     the ship Fat Crow, what was your purpose of being

17     sent out there?

18     A      Since it was at night and we hadn't been able

19     to put our eyes on it yet, our primarily objective

20     was reconnaissance, just go out and take a look at

21     the ship, see who they are, what they are, what

22     they're doing, and then as well as observe any kind

23     of reaction to law enforcement presence.

24          MR. GAMMONS:  May I approach the witness, Your

25     Honor?

1          THE COURT:  You may.

2     BY MR. GAMMONS:

3     Q     Lt. Jurin, I'm showing you what has been

4     premarked for identification as Government Exhibit

5     3A and 3B.  Can you take a look at those?

6     A     Sure.

7     Q     Do you recognize them?

8     A     I do.

9     Q     What are they?

10    A     The motor vessel Fat Crow.

11    Q     And do those photos fairly and accurately

12    depict that ship as it appeared on August 24, 2017?

13    A     It does.

14          MR. GAMMONS:  Your Honor, at this time the

15    government requests to move into evidence Government

16    Exhibit 3A and 3B.

17          MR. MARTINEZ:  No objection.

18          THE COURT:  Received into evidence 3A and 3B.

19          MR. GAMMONS:  May I have permission to

20    publish, Your Honor?

21          THE COURT:  You may.

22    BY MR. GAMMONS:

23    Q     Lt. Jurin, I'm showing you Government Exhibit

24    3B.  Can you describe what's depicted in that

25    photograph?

1    A        Motor vessel Fat Crow.  Looks like it came

2    from the flight on August 24th underway on a

3    northwesterly heading and it's Motor Vessel Fat Crow

4    as we saw it on the 24th.

5    Q        Now I'm showing you Government Exhibit 3A.

6    What does that photo depict?

7    A        Same vessel, just a different aspect.

8    Q        Can you describe what you observed on the Fat

9    Crow when you did your first flyover on August 24th?

10   A        Sure.  We observed a approximately 300-foot

11   coastal tanker, blue hull with the white

12   superstructure, red decks, and red bottom paint.

13   Q        And what is an IMO number?

14   A        IMO is the International Maritime Organization

15   and the number associated with that is like a

16   license plate for a ship but instead of state

17   registered it's an internationally recognized

18   number.

19   Q        It's like a license plate for a ship?

20   A        Exactly.

21   Q        When you approached the Fat Crow for the first

22   time on August 24th did it have any flag displayed?

23   A        No, it did not.

24   Q        Based on your training and experience was that

25   odd for any reason?

1    A        Yeah, absolutely.  Normally any ship would fly

2    the flag of the nation which it calls home in order

3    to hail that as protections under that flag state's

4    authority.

5    Q        And do most vessels that you have come across

6    in your training and experience that are in

7    international waters, are most of them flying the

8    flag?

9    A        Yes.

10   Q        On August 24th when you first encountered Fat

11   Crow did you take any action in relation to the

12   ship?

13   A        We just circled the ship, observed their

14   reaction to our presence on scene and took some

15   imagery to bring back to the cutter personnel to

16   show them.

17   Q        On that occasion did you personally reach out

18   to the Fat Crow?

19   A        We did not, not on the 24th.

20   Q        After you orbited the ship what did you do?

21   A        I'm sorry, I think I might have skipped ahead

22   here.  On the 24th we're saying, not on the 25th.

23   Q        The 24th, correct.

24   A        On the 24th we did reach out to them.  First

25   the Cutter Tahoma hailed them twice on radio, marine

1    band channel 16, which is the international handling

2    and distress frequency.  They didn't answer to that.

3    The cutter asked us and the helicopter to reach out

4    to them and I did reach out on channel 16.  They

5    didn't answer my initial radio call.  Approximately

6    two minutes passed, I reached out again on channel

7    16 and at that time they did answer back and Cutter

8    Tahoma then established direct communications with

9    the Fat Crow.

10   Q    After you established communication with the

11   folks on the Fat Crow, the people on Tahoma began

12   communicating directly with the people on Fat Crow?

13   A    They did.

14   Q    What did you do and the other pilot and the

15   precision marksman in the helicopter do after that?

16   A    At that point our mission was essentially

17   complete.  We stayed on scene in case the cutter

18   needed us for anything else, but there was nothing

19   else for us to do so we returned back to Tahoma.

20   Q    Did you have occasion to revisit Fat Crow

21   during that deployment?

22   A    We did.  The following day we got permission

23   to conduct a right-of-visit boarding on Fat Crow and

24   we launched from Tahoma to provide a boarding team

25   cover while the boarding team got on board Fat Crow.

1    Q      And what date was that?

2    A      It was August 25th.

3    Q      What was your specific role on August 25th to

4    do?

5    A      During boarding team cover we provide an eye

6    in the sky and direct communication with the

7    boarding team as they board.  We can notify them as

8    to the whereabouts of the crew on board the ship,

9    have a little bit better visibility from the

10   helicopter, and then we also have the capacity to

11   provide suppressing support in case there is any

12   threats on board.

13   Q      What do you mean by suppressing support?

14   A      The gunner in the back is a trained sniper and

15   he has the 50-caliber sniper rifle and he would

16   neutralize any kind of threat that came up to the

17   boarding team.

18   Q      On that occasion did you take any video or

19   photographs?

20   A      We did, we took both.

21          MR. GAMMONS:  May I approach the witness, Your

22   Honor?

23          THE COURT:  You may.

24   BY MR. GAMMONS:

25   Q      I've handed you what has been premarked for

          1    identification as Government Exhibit 4A, 4B, 4C, and

          2    4D.  Can you take a look at those items?

          3    A      Yes.

          4    Q      What are 4A and 4B?

          5    A      They are disks from our ESS video, our video

          6    on the helicopter.

          7    Q      And what about 4C and 4D?

          8    A      4C is our helicopter on August 25th taking off

          9    or returning to the Tahoma with the Fat Crow in the

         10    background.

         11    Q      And with regard to Government Exhibit 4C and

         12    4D, do they fairly and accurately represent the

         13    scene as you saw it on August 25th of 2017?

         14    A      Absolutely.

         15    Q      And the two disks, 4A and 4B, how are you

         16    certain that those items are the video that you took

         17    from your helicopter on August 25th?

         18    A      I saw the videos the day that we took the

         19    video, I reviewed those, and then I reviewed them

         20    prior to the trial yesterday from the disk and

         21    initialled them.

         22          MR. GAMMONS:  At this time the government

         23    requests to move into evidence Government's

         24    Exhibit 4A, 4B, 4C, and 4D.

         25          MR. MARTINEZ:  No objection.

1            THE COURT:  Received into evidence 4A, 4B, 4C,

2      and 4D.  And Mr. Gammons, this is probably a good

3      time to stop.

4            MR. GAMMONS:  I may need five more minutes,

5      Your Honor.

6            THE COURT:  Five more minutes?  Okay.  Five

7      more minutes.

8            MR. GAMMONS:  Permission to publish, Your

9      Honor?

10            THE COURT:  You may.

11      BY MR. GAMMONS:

12      Q      What does this photo depict, Lt. Jurin?

13      A      That's our helicopter on August 25th probably

14      taking off from Tahoma to the Fat Crow.

15      Q      This is Government Exhibit 4D.  What does that

16      photo depict?

17      A      That's us in a hover over top the Fat Crow,

18      providing boarding team cover with the boarding team

19      boat alongside.

20      Q      And the part I've blown up, is that the

21      boarding team boat?

22      A      It is.

23      Q      Now showing you Government Exhibit 4A.  Is

24      this video taken from your helicopter?

25      A      It is.  The camera in this case is parked at a

1    particular position while the gunner is actually on

2    the guns, not actively operating it.  But it will

3    come back into view.

4    Q      Lt. Jurin, what's being depicted on the video?

5    A      The boarding team is now alongside and

6    climbing up the Jacob's ladder onto the Fat Crow.

7    Q      Now showing you Government Exhibit 4B.  What's

8    being depicted in this exhibit?

9    A      At this point the boarding team is all on

10   board and they have gathered the majority of the

11   crew at the stern of the vessel and we're still in a

12   hover there for boarding team cover.

13   Q      Lt. Jurin, what is positive control?

14   A      Essentially the boarding team takes complete

15   control of the ship itself and the crew.

16   Q      And how does one take positive control of a

17   ship?

18   A      They assume control of both the bridge and the

19   engine room and control of the crew as well, in

20   isolated spot.

21   Q      Did the Coast Guard boarding team ultimately

22   take positive control of Fat Crow?

23   A      They did.

24   Q      After that what did you do?

25   A      We stayed on scene until our overwatch was no

1    longer needed, which was pretty much coincident with

2    positive control, and then we returned to Cutter

3    Tahoma, landed and shut down.

4          MR. GAMMONS:  No further questions, Your

5    Honor.

6          THE COURT:  We are going to recess for the

7    evening.  Ladies and gentlemen, I do have two

8    sentencings in the morning, one at 8:30 and one at

9    9:00, so we're going to start at 9:30 tomorrow

10   instead of 9:00.  So you need to be here at 9:30 and

11   we'll start promptly at 9:30.

12         Please don't discuss the case.  Please leave

13   your pads on your chairs and I'll see you in the

14   morning at 9:30.

15         (The jury retired to the jury room.)

16         THE COURT:  We're in recess until 9:30

17   tomorrow morning.  Sir, you may step down.  Please

18   don't discuss your testimony over the evening hours.

19   And we'll see you at 9:30.  Thank you.

20         (The proceedings adjourned at 5:02 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3     STATE OF FLORIDA          )

4     COUNTY OF HILLSBOROUGH   )

5         I, Lynann Nicely, RMR, CRR, Official Court

6     Reporter for the United States District Court, Middle

7     District, Tampa Division,

8         DO HEREBY CERTIFY, that I was authorized to and

9     did, through use of Computer Aided Transcription,

10    report in machine shorthand the proceedings and

11    evidence in the above-styled cause, as stated in the

12    caption hereto, and that the foregoing pages,

13    numbered 1 through 139, inclusive, constitute a true

14    and correct transcription of my machine shorthand

15    report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17    the City of Tampa, County of Hillsborough, State of

18    Florida, February 26, 2018.

19

20

21         _____/s/ Lynann Nicely_____
                  Lynann Nicely, RPR, RMR, CRR, CRC
22                Official Court Reporter

23

24

25