```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3

       UNITED STATES OF AMERICA,    :
 4                                   :
             Plaintiff,              :
 5                                   :
                                     : CASE    8:17-cr-445
 6     vs.                           : NO.:
                                     :
 7                                   : DATE:  12/12/2017
       GUSTAVO ENRIQUE LLANOS        :
 8     MIRANDA and JAIR MENDOZA      : TIME:   9:23  a.m.
       MONTOYA,                      :
 9                                   : PAGES:  1 - 185
             Defendants.            :
10     ------------------------     :

11                   TRANSCRIPT OF TRIAL DAY 2
                BEFORE THE HONORABLE SUSAN C. BUCKLEW
12                UNITED STATES DISTRICT JUDGE

13     For the Government:

14             TAYLOR G. STOUT, ESQ.
               CARLTON GAMMONS, ESQ.
15             U.S. Attorney's Office
               Suite 3200
16             400 N. Tampa Street
               Tampa, Florida 33602

17

18     For Defendant Gustavo Llanos Miranda:

19             DANIEL L. CASTILLO, ESQ.
               3900 North Boulevard
20             Tampa, Florida 33603

21

       For Defendant Jair Mendoza Montoya:
22
               VICTOR D. MARTINEZ, ESQ.
23             423 S. Hyde Park Avenue
               Tampa, Florida  33606

24

25     Court Reporter:  Lynann Nicely, RPR, RMR, CRR
```

1                    I N D E X

2    WITNESS                                    PAGE

3

4    MATTHEW ELLINGER

5    Direct examination by Mr. Stout            5

6    Cross examination by Mr. Martinez          23

7

8    EDUARDO DE JESUS CHACIN VILLARROEL

9    Direct examination by Mr. Stout            41

10   Cross examination by Mr. Castillo          78

11   Cross examination by Mr. Martinez          136

12   Redirect examination by Mr. Stout          159

13

14   TYLER BARKLEY

15   Direct examination by Mr. Stout            165

16   Cross examination by Mr. Castillo          172

17   Cross examination by Mr. Martinez          173

18

19   JOHNNY MONTGOMERY

20   Direct examination by Mr. Stout            174

21   Cross examination by Mr. Martinez          181

22

23

24

25

1      P R O C E E D I N G S

2          THE COURT:  Anybody have anything before I

3      bring the jury in?

4          MR. CASTILLO:  The government did their part,

5      they sent it to us.  I'm having trouble accessing

6      it, but we'll get it fixed.  So I just let you know

7      that we brought it up and we've resolved it amongst

8      ourselves.

9          THE COURT:  Thank you.  I'm going to bring the

10     jury in.  How much longer do you think you have with

11     this witness?

12         MR. CASTILLO:  I have no questions.

13         MR. MARTINEZ:  I have no questions either, so

14     I guess he can be excused.  Unless you want to just

15     announce we have no questions.  It was left with

16     Mr. Castillo up.

17         THE COURT:  Okay.  No questions.

18         MR. CASTILLO:  He's just a pilot.  I would

19     like to know how to become a pilot, but I don't

20     think the jury wants to know.  I would have loved to

21     have been a pilot when I was younger.

22         THE COURT:  Are you all finished?

23         MR. GAMMONS:  Yes, Your Honor.

24         THE COURT:  Then you may step down and we'll

25     get to the next witness.  Who is your next witness?

1          MR. STOUT:  Your Honor, the United States next

2     calls Matthew Ellinger from the U.S. Coast Guard.

3          THE COURT:  Is he here?

4          MR. STOUT:  Yes, Your Honor.

5          THE COURT:  Let's bring the jury in.

6          (The jury returned to the courtroom.)

7          THE COURT:  Good morning.  Ladies and

8     gentlemen, did anything happen over the evening

9     hours that any of you feel might affect your ability

10    to serve on this jury in any way?  I'm not

11    suggesting it did; I just ask this every morning.

12         Okay.  You will recall when we recessed

13    yesterday afternoon there was a Coast Guard witness

14    on the stand, Jeffrey Jurin, and the government had

15    asked him some questions and then the defense was

16    about to begin.  The defense has informed me they

17    really have no questions for that witness, so I have

18    excused him and we're going to start with the next

19    witness.

20         Mr. Stout, you may call your next witness.

21         MR. STOUT:  The United States calls Matthew

22    Ellinger of the U.S. Coast Guard.

23         [Witness sworn]

24         COURTROOM DEPUTY CLERK:  Please be seated.

25    Please state your name and spell your last name for

1    the record.

2          THE WITNESS:  Matthew Ellinger,

3    E-l-l-i-n-g-e-r.

4                    DIRECT EXAMINATION

5    BY MR. STOUT:

6    Q     Sir, how are you currently employed?

7    A     I work for the United States Coast Guard.

8    Q     What is your rank in the Coast Guard?

9    A     I'm an E6, first class petty officer.

10   Q     What is your primary job in the Coast Guard?

11   A     I'm a machinery technician.  I'm a mechanic.

12   Q     How long have you been with the U.S. Coast

13   Guard?

14   A     January 22nd will be 16 years.

15   Q     And have you served as a machinery tech or

16   mechanic for that entire period?

17   A     Yes, sir.

18   Q     What else have you done with the Coast Guard?

19   A     I've also been a federal law enforcement

20   officer, boarding officer.  I've also been a

21   boarding team member which is assistant to the

22   boarding officer.  I've also been an EMT.

23   Q     You mentioned that you're currently a mechanic

24   or machinery tech.  What cutter are you assigned to?

25   A     I'm currently assigned to the Coast Guard

1    Cutter Tahoma out of Kittery, Maine.

2    Q    Do you have any background or experience in

3    welding?

4    A    Yes, sir, I do.  When I was in high school my

5    junior-senior year I attended vocational school for

6    metal fabrication and welding.  That program was

7    also taught by Hobart Welding Institute in Ohio

8    which at the time of the accident was the number one

9    welding school in the world.

10   Q    Did you obtain any certifications in welding?

11   A    Yes, sir, I was certified in welding through

12   the state of Ohio.

13   Q    Since your education in welding and the

14   courses you took, have you had any further

15   experience with welding?

16   A    Yes, sir, I worked with a [inaudible] drag

17   racing team which is like minor league to the

18   National Hot Rod Association drag racing league.  I

19   was a welder for the racing team.

20   Q    How long ago was that?

21   A    Two years ago.

22   Q    Let's talk about your involvement in the

23   Tahoma's interdiction of Fat Crow.  Were you part of

24   the boarding team?

25   A    No, sir, I was not.

1    Q       What was the first time you went to the Fat

2    Crow?

3    A       First time I went to the Fat Crow was the

4    second day that we were on board.  I went over to

5    assist with finding out why the generators and the

6    main diesel engines were not running.

7    Q       Explain a little bit about that problem.  What

8    was it doing to the ship?

9    A       When I got on board and I spoke with some of

10   the crew members what they had stated is that the

11   generators were overheating and not functioning

12   properly.  Once I came on board I entered into the

13   engine room and I observed that they had two

14   generators up on the upper level.  Well, one was an

15   engine for running the pumps, the onload/offload

16   transfer pumps for the tanker vessel.  That engine

17   had a catastrophic failure.  If you pulled the dip

18   stick, oil and water actually pushed out of it.  It

19   was, however, the same engine that the generator on

20   board was that was right beside it.  What they had

21   done was they had taken parts from the catastrophic

22   failed engine --

23           MR. MARTINEZ:  Objection, Your Honor.  Could

24   we have a clarification as to whom in the crew he's

25   attributing these comments and conduct to?

1          THE COURT:  Sustained.

2     BY MR. STOUT:

3     Q     Would you explain who in the crew you had this

4     conversation with about the engine problems?

5     A     Who I spoke to -- they were identified as the

6     chief engineer and the second engineer.

7     Q     Do you remember their names?

8     A     I do not, sir.

9     Q     If I showed you a photograph of them do you

10    think you would recognize them?

11    A     Possibly.  It's been a little while, but --

12          MR. STOUT:  Your Honor, permission to publish

13    Government Exhibit 101 which is already in evidence.

14          THE COURT:  You may.

15    BY MR. STOUT:

16    Q     Does that person look familiar to you?

17    A     Vaguely, yes, he does.

18    Q     Is this one of the engineers you're talking

19    about from the crew?

20    A     I'm not 100 percent positive.

21          MR. STOUT:  Your Honor, permission to publish

22    Government Exhibit 104 which is also already

23    admitted?

24          THE COURT:  You may.

25    BY MR. STOUT:

1    Q    How about this gentleman?

2    A    Yes, that was -- that was the chief engineer.

3    Q    So when you got to the Fat Crow did the Fat

4    Crow have electricity?

5    A    No, it did not.  The power was off and the

6    main diesel engine was inoperable.

7    Q    What was your purpose in coming to the Fat

8    Crow?

9    A    I was to try and get the lights back on and

10    see why the main propulsion engine was inoperable.

11    Q    Did you have any other purpose in coming to

12    the Fat Crow?

13    A    Yes I was assisting with the at sea space

14    accountability.

15    Q    And explain to us a little bit what that is.

16    A    At sea space accountability is where the

17    members of the boarding team and additional crew

18    members we send over for help go through and account

19    for the entire space to ensure that no spaces are

20    used for smuggling, everything matches up with what

21    the prints that are available to us for the vessel.

22    Q    You testified a moment ago that when you got

23    to the Fat Crow you first went to the engine room.

24    MR. STOUT:  Your Honor, permission to publish

25    Government Exhibit 5B.

1      THE COURT: You may.

2  BY MR. STOUT:

3  Q      Petty Officer Ellinger, you may have a laser

4  pointer there in front of you on the table. If you

5  grab that and point out for us where the engine room

6  is on the ship.

7  A      The engine room is right here and it also

8  carries forward up a deck up into this generator

9  space here where it says GEN.

10 Q      Did you examine the engine and the generators

11 in those rooms?

12 A      Yes, sir.

13 Q      Did you find anything unusual about them?

14 A      Yes, when we were in the actual engine room --

15 what we had noticed is the sewage tank was on the

16 port side or the left side, which would have been

17 roughly about this area. It was very shiny white,

18 very bright in color, along with also the overhead,

19 there was a ceiling in the area. Through our

20 training and experience through Coast Guard law

21 enforcement that's a possible sign of smuggling. So

22 we really wanted to pay attention to that.

23      We also noticed that there was no offload

24 pumps for the sewage tank which is another thing

25 that would make it difficult to offload the sewage,

1       which we were a little interested from.  As soon as

2       I saw that, I notified the boarding officer who was

3       EM1 Alexander at the time.

4       Q       What did you all decide to do about the sewage

5       tank?

6       A       The first day we didn't do anything about it.

7       We did notify the Tahoma what we had found and that

8       it was an indicator.  We didn't do anything else

9       with it on the first day.

10      Q       That first day you were on the Fat Crow did

11      you have a chance to examine in some detail the

12      engine and the engine room and the generators there?

13      A       Yes, sir, I did.

14      Q       In your experience and training as a mechanic

15      what kind of shape were those things in?

16      A       From what I had seen it was very poor.  The

17      condition of the engine room itself was extremely

18      dangerous, a lot of oil, soot, everything along the

19      deck plates.  It was very slippery, very dangerous

20      conditions for anyone to be in.

21              There was excessive amounts of water and oil

22      in the bilge.  Even up around the space where the

23      generators were, which was up right in here, there

24      was also still a lot of fluid and everything across

25      the deck, oil and everything, making it extremely

1    slippery and extremely difficult to move around the

2    area.

3    Q    Did you spend that night, the first day you

4    went over to the Fat Crow, did you spend that night

5    on the Fat Crow?

6    A    No, sir, I did not.  After I completed going

7    through the engine room and we were actually able to

8    get the generators back online that day, I returned

9    back to the Tahoma for the night.

10   Q    When was the next time you went to the Fat

11   Crow?

12   A    Next time would have been the third day or the

13   very next day I went back over to the Fat Crow.

14   Q    What happened when you went back over to the

15   Fat Crow?

16   A    When I went back over to the Fat Crow on that

17   day we were given permission to pull a vent off of

18   the sewage tank in the engine room since we had seen

19   it and thought it looked a little odd and

20   everything.  We went ahead and removed the vent tube

21   after receiving permission and found out that it was

22   actually full of sewage and we actually had a little

23   bit of discharge into the engine room which released

24   toxic gases and we were immediately evacuated out of

25   the space.

1    Q    Where did you go when you evacuated the engine

2    room because of this incident?

3    A    Once we pulled back out of the space the

4    boarding officer directed us to head back up forward

5    just to kind of check the spaces out again that had

6    previously been cleared up in this vicinity towards

7    the bow, forward end of the boat.

8    Q    And what did you discover when you went up

9    there?

10   A    When we went up there we found that there was

11   another generator up there, an auxiliary generator

12   for power up with the forward equipment.

13   Q    Did you notice anything unusual about that

14   generator?

15   A    Yeah, that generator stood out very bad.  What

16   we observed was is the starter for the engine was

17   actually laying on the deck beside it.  Without that

18   being attached it would be very difficult for that

19   engine to run at all.

20        We also noticed that the fuel tank, which was

21   mounted on the engine mounts underneath, was very

22   poorly mounted, it wasn't attached completely, very

23   loosely mounted.  Even the spout at the top of the

24   fuel tank was not completely welded all the way

25   around, which would allow contaminants and debris to

1     get into the fuel which would hamper the engine

2     running.

3     Q     So you mentioned at this point at least

4     earlier in this story that the Fat Crow had lost

5     power.

6     A     Yes, sir.

7     Q     Would this generator have been able to help

8     with that problem in the condition that it was?

9     A     No, sir, in the condition it was in, it would

10    not.

11    Q     Why not?

12    A     It wouldn't have been able to start without

13    the starter actually attached to the engine itself.

14    Also the bolts on -- the mounting bolts holding the

15    generator to the foundation were actually finger

16    tight.  I was able to spin the nuts off the bolts

17    without even using a tool, which is a very dangerous

18    situation it could have created.

19    Q     You mentioned a couple of times that the

20    generator was a dangerous situation.  Why was it

21    dangerous?

22    A     With a heavy piece of machinery I don't know

23    the exact weight of it or anything.  If it would

24    have started and actually been able to start and run

25    with the loose hardware like that, it could have

1      rattled right off of the mounts and bounced around

2      and been a very hazardous situation for anyone in

3      the space.

4      Q      Was the generator hooked up to anything

5      electrical on the ship?

6      A      It was hooked up, it did have connections into

7      an electrical box, but as I previously stated it

8      would have been inoperable without the starter

9      actually attached to the engine.

10     Q      What else did you discover as you searched

11     around this front part of the ship?

12     A      Up there just like in the engine room there

13     was excessive oil and fuel, dirt and debris all over

14     the space, making it very slippery and difficult to

15     go through.

16         While we were up there that's where the crew

17     members were down in the forward void space up in

18     the front.  And actually that's where they came up

19     and they had found new welds which they had

20     photographed and brought up to me and I was able to

21     identify as new welds through the pictures.

22         MR. STOUT:  Your Honor, permission to publish

23     9A through K in succession order here.

24         THE COURT:  I'm sorry, 9A?

25         MR. STOUT:  A through K, the 9 series of

1    exhibits.  They're already admitted.

2         THE COURT:  You may.

3    BY MR. STOUT:

4    Q    I'm showing you Government Exhibit 9A.  Can

5    you describe for us what we see here?

6    A    Yes, sir.  What you see here is the manhole

7    cover which had been welded over and a vent tube

8    attached to it here.  These are what I was

9    identifying as the new welds.  The way I identify

10   that, they're very bright and shiny, very new

11   compared to everything else in the area with

12   excessive rust.

13        These welds themselves aren't as old, but

14   these were -- I'm sorry, what I was identifying as

15   the new welds here on the vent tube.

16   Q    Showing you Government Exhibit 9B.  What do we

17   see here?

18   A    That's also welded over manhole cover.  As you

19   can see the newer welds, the very shiny, very

20   distinctive different colors from the rest of it.

21   Q    What does that indicate to you?

22   A    Through my training and experience with the

23   Coast Guard that is an indication of a possible

24   hidden compartment.

25   Q    And what about those welds suggests to you

1       that there might be a hidden compartment there?

2       A       If they're in an odd space that they would

3       remove a manhole cover or an access here to put it

4       in.  There was no reason for that to need to be

5       there for any kind of structural support or to get

6       through anywhere on that area.

7       Q       I'm going to show you Government Exhibit 9C.

8       What do you see here?

9       A       Themes these the newer welds.  These have a

10      little bit of age to them, but the major difference

11      is that you see the shiny new silver metal that's

12      been placed in there, compared to the rest of the

13      steel which is very rusted, very corroded, very

14      common in a saltwater environment.

15              MR. STOUT:  I'm going to go back to Government

16      Exhibit 5B with Your Honor's permission.  Your

17      Honor, may I republish 5B?

18              THE COURT:  You may.

19      BY MR. STOUT:

20      Q       With the laser pointer will you show us where

21      the welds that we just looked at, where are they on

22      this diagram?

23      A       Right here in the yellow-colored space.  The

24      bulkhead that is not drawn in, but that would be the

25      space that it was put into.

1    Q       When you say bulkhead not drawn in, is there a

2    wall that doesn't appear on this diagram that

3    bisects that yellow room?

4    A       Yes, sir, by bulkhead I mean water tight

5    bulkhead or wall which would separate the spaces

6    which would be drawn in there.  And I apologize for

7    the laser pointer.

8    Q       So when you discovered the welds down on the

9    -- as we look at it, which side of that bulkhead or

10   wall would those welds have been on, the right or

11   the left side?

12   A       The right side.

13   Q       When you discovered them on the right side in

14   that yellow space there, what did you do next?

15   A       I was still up by the generator at that time

16   and so as we were searching around and we were

17   looking around, checking to where we had found the

18   loose hardware and everything.  We started laying on

19   the floor, we actually looked underneath the fuel

20   tank which was on the engine mounting bolts and

21   found that there was a welding glove laying there

22   and also some used welding rods.

23          Once we removed that, we actually found a

24   manhole cover going down into a space underneath

25   which previously hadn't been listed on prints.

1    Q    Would you show us with the laser pointer where

2    the generator would be on this diagram?

3    A    The generator would be roughly about right

4    here.

5    Q    And where was the manhole cover that you

6    discovered underneath the generator?

7    A    Directly underneath it, roughly right there.

8         MR. STOUT:  Your Honor, may I publish

9    Government's Exhibit 9D through J?

10        THE COURT:  You may.

11   BY MR. STOUT:

12   Q    Explain for us what we see here.  This is

13   Government Exhibit 9D, for the record.

14   A    Right here, this red piece of machinery, this

15   is the actual generator itself.  This is the

16   mounting foundation which the generator was mounted

17   on.  And where the hand is right here is where the

18   manhole cover is.  It's a little bit difficult to

19   see.  You can see there is a bolt hole there, there,

20   there, going all the way around the manhole cover

21   which was right here.

22        This was the fuel tank I was talking about

23   that we were able to just unscrew the bolts and

24   slide it right to the side and be able to see it.

25   Q    Showing you Government Exhibit 9E.  What do we

1    see here?

2    A      This is the actual manhole cover itself right

3    here.   It's a little difficult to see the edges, but

4    you can see where the bolt holes here.

5            Right here in his hand is an Allen wrench that

6    was actually sitting on the engine mount right there

7    with the generator that actually fit the bolts that

8    were inside of the manhole cover.

9    Q      Showing you Government Exhibit 9F.  What do we

10   see here?

11   A      This is when after we've opened the manhole

12   cover, this is looking down into the space and this

13   was the first thing that we saw, this white burlap

14   sack which through our training and previous

15   experiences is what we generally see narcotics

16   packaged in.

17   Q      Show you Government Exhibit 9G.

18   A      This is the same space, manhole, looking over

19   towards the other side.  And that's where we

20   actually had multiple bales stacked up.

21   Q      Government Exhibit 9H.

22   A      That is looking down into the space once

23   everything has been removed and you can actually see

24   around.  And actually up at the top that's the

25   manhole cover that we were originally looking down

1    into that we found underneath the generator.

2    Q    You mentioned a minute ago that in the yellow

3    space on the diagram there is a wall or a bulkhead

4    that bisects that space that was not on the diagram.

5    Do you see that wall in this picture?

6    A    No, sir, this is facing the other way.

7    Q    Showing you Government Exhibit 9I.  What about

8    in this photograph?

9    A    Yes, sir.  I do believe -- it's a little rough

10    to see, but the manhole cover should be over in this

11    vicinity.  But as you can see too, the welds here,

12    here, where it's all been cleaned up and that

13    bulkhead has been placed in after the original

14    construction of the ship.

15    Q    So you believe that's the wall that separates

16    one side of the yellow space from the other?

17    A    Yes, sir.

18    Q    Showing you Government Exhibit 9J.  What do we

19    see here?

20    A    That's the bottom view of the manhole cover

21    again.

22    Q    After you discovered the bales, the packages

23    down inside the space underneath the generator, what

24    did you do with them?

25    A    Immediately after we found them we immediately

1    contacted back to Tahoma and let them know what we

2    had found.  From that point we had members from our

3    law enforcement detachment that were deployed with

4    us on board the ship come in and they tested the

5    bales.  They did a puncture test with a narcotics

6    identification kit --

7         MR. MARTINEZ:  Objection without first

8    establishing the predicate for knowledge as to these

9    things.

10        THE COURT:  Sustained.

11   BY MR. STOUT:

12   Q    Were you there whenever the law enforcement

13   team tested the bales?

14   A    Yes, sir, I was.

15   Q    After they tested the bales what did they do

16   with them?

17   A    Once they tested them and we gained permission

18   from the ship to remove them, we took them out and

19   stacked them into the space.

20        MR. STOUT:  Your Honor, permission to publish

21   Government Exhibit 9K.

22        THE COURT:  You may.

23   BY MR. STOUT:

24   Q    What do we see here?

25   A    Those are all the bales that we had removed

1       from the space and stacked up in the generator

2       space.

3               MR. STOUT:  Your Honor, may I have a moment?

4               THE COURT:  You may.

5               MR. GAMMONS:  No further questions.

6               MR. CASTILLO:  I have no questions, Your

7       Honor.

8                           CROSS EXAMINATION

9       BY MR. MARTINEZ:

10      Q       Good morning, sir.

11      A       Good morning, sir.

12      Q       Okay.  You are an engineer.

13      A       Yes, sir.

14      Q       Okay.  And you're a mechanic.

15      A       Yes, sir, as a machinery technician U.S. Coast

16      Guard is considered engineering field which

17      automatically lists me as an engineer.  But

18      machinery technician, yes, sir, I am a mechanic.

19      Q       Now, putting Government Exhibit 5B, this is

20      the schematic that you were asked questions about.

21      Now, you had spoken with regard to a couple of

22      things that made you suspicious because they were

23      historically indicators or indicia of smuggling, do

24      you remember that?

25      A       Yes, sir.

1    Q      Okay.  And I want to ask you some more

2    specifics about those questions because of course

3    every time the jury hears something like that's an

4    indicia of smuggling, they want to be clear on that

5    point to see whether or not a defendant on trial

6    should have been aware.  Are you following me?

7    A      Yes, sir.

8    Q      So you started off talking about things in the

9    engineering room, right?

10   A      In the engine room, yes, sir.

11   Q      In the engine room.  Now, who typically goes

12   into the engine room?  Engineers?

13   A      Yes, sir.

14   Q      Okay.  So they're responsible for the

15   maintenance of the engines?

16   A      Yes, sir.

17   Q      They make sure the engines are running?

18   A      Yes, sir.

19   Q      When the engines break, it's the engineers

20   that go into the engine room?

21   A      Yes.

22   Q      It wouldn't be the cook that goes in there,

23   right?  It's the engine room people.

24   A      I can't speculate on it.  I mean, I know crews

25   have multiple jobs.  I work for the United States

1    Coast Guard, we do more with less.  I'm an engineer,

2    I'm an EMT, I'm a federal law enforcement officer --

3    Q      Fair enough.  So the cook could have been

4    taking a sandwich to the engineer who was working in

5    the engine room, right?

6    A      Yes, sir.

7    Q      And that would put him in the engine room.

8    A      Yes, sir.

9    Q      But ordinarily it's the engineers that fix the

10   engines when they break and they're the ones in the

11   engine room, right?

12   A      Generally, yes, sir.

13   Q      Okay.  Now, you said something about a white

14   ceiling in the engine room and that being indicia of

15   perhaps drug smuggling.  Explain that to me.

16   A      Yes, sir.  Through our training we look for

17   possible indicators.  If we see somewhere like a

18   fitting or a manpower cover like we saw there,

19   bright shiny new hardware, something new that

20   normally wouldn't be open under way or while the

21   vessel is at sea, it's a possible indicator.

22          Throughout the whole engine room everything

23   was covered with oil, grease, soot, debris.  But the

24   overhead and the sewage tank itself was very bright

25   shiny, very clean, really stood out.  Which made it

1    very different from everything else in the space,

2    which could have been a possible indicator, through

3    training and experience, what we look for.

4    Q    Okay.  So if you were a drug smuggler, you

5    might know that a bright white ceiling like this one

6    might be indicia of drug smuggling, right?

7    A    It could be.  I've never been a drug dealer, I

8    wouldn't know that.

9    Q    Or if you've had your requisite training you

10   might know that a white ceiling like this one may be

11   indicia under the particular circumstances of drug

12   smuggling.

13   A    Right.  What we were looking at was is this

14   stood out significantly compared to everything else.

15   And the fact that we saw there was no actual

16   transfer pumps, no overboard isolation valve for the

17   sewage system, which is something that generally you

18   would see on a U.S.-flagged vessel.  It's not

19   uncommon to see on foreign vessels that they don't

20   have everything that we require on United States

21   ships, but for that to be something odd or

22   different, out of place, is definitely something we

23   want to pay more attention to.

24   Q    So it's something you know from your learning

25   and your training and your experience, right?

1    A        Yes, sir.

2    Q        What evidence do you have that either of the

3    defendants on trial had that experience and/or

4    training?

5    A        I don't have any evidence of that, sir.

6    Q        Okay.  Now, the indicia of perhaps drug

7    smuggling existing because there was a bright white

8    ceiling didn't turn out to be an issue in this case,

9    right?

10   A        Not with that situation right there, sir, no.

11   Q        Because in fact no drugs were found above the

12   bright white ceiling, correct?

13   A        Correct, sir.

14   Q        So that covers that.  So now let's go to the

15   bow of the ship and that's here, right?

16   A        Yes, sir.

17   Q        Now, you went and you visited the bow of the

18   ship on the third day, I believe you said on direct

19   examination.  Correct?

20   A        Correct, sir.

21   Q        Do you know if anyone on your team visited

22   this area on Day 2 prior to your visit of this room

23   on Day 3?

24   A        No, I do not, sir.

25   Q        Do you know if the condition of the room that

1   you visited on Day 3 is in the same condition that

2   the room was in the previous day?  Or whether that

3   condition was altered by other members of the Coast

4   Guard team and their search?

5   A       I know that the first day when they did the

6   initial sweep of the boat going through, that it was

7   reported that it was oily and slippery up there,

8   same thing along with the engine room.

9           As far as for the second day, I don't know if

10  anybody went up there that day.

11  Q       All right.  This picture that's 9A, is that a

12  picture taken of this room?

13  A       Yes, sir, forward of it.  In the forward end

14  of it, yes, sir.

15  Q       So this is the floor that's inside this yellow

16  room, right?

17  A       Not the floor; that's the bulkhead.

18  Q       The bulkhead.

19  A       Yes, sir.

20  Q       Now, this room, this room was covered in dirt

21  and slime and grease?

22  A       No, sir, that one was not.

23  Q       Okay.  How about where this was, was that in

24  the room?

25  A       That was in the same room.

1    Q      Okay.  And this one?

2    A      Same room.

3    Q      This one?

4    A      That was taken in the space above that one.

5    In the room above it.

6    Q      What about 9E?

7    A      That's also the same place, above.

8    Q      And 9F?

9    A      Same place, above, looking down into behind

10   where that false bulkhead was.

11   Q      Now we're at 9G.  This is an important picture

12   because it's inside here that the drugs are found?

13   A      Yes, sir.

14   Q      And this 9K, a picture of the drugs that were

15   actually inside this hole; is that right?

16   A      Yes, sir.

17   Q      So to get a visual there is a hole that --

18   give me the approximate dimensions of the hole.

19   A      Three foot by maybe two.  Kind of oval.

20   Q      And this hole is on the floor?

21   A      Yes, sir, the one we're looking at right now

22   is.

23   Q      And on top of the hole is this cover?

24   A      No, sir.

25   Q      What was on top of the hole?

1    A        On top of the hole -- if you go back, let me

2    see, go back a couple more pictures that you have

3    there in your hand, sir.  Keep going back.  Keep

4    going back.  Right there, where the crew member's

5    hand is here is the cover that was over the top of

6    that hole.

7    Q        Okay.  And on top of the cover -- so the hole

8    was not visible, you couldn't see into the hole,

9    right?

10   A        I'm sorry?

11   Q        You couldn't see into the hole before the team

12   got there and looked inside, right?  It was covered.

13   A        Correct.

14   Q        And it was welded shut.

15   A        No, the cover that was on the deck -- if you

16   put your pictures down again real quick, it's

17   actually I believe it was the top one you had.  As

18   you can see right there in that one, right here are

19   the bolt holes where it was bolted into place.

20   Q        Okay.  So if we lift this up, inside is where

21   we find the drugs.

22   A        Yes, sir.

23   Q        Okay.  And in these holes here, that's where

24   the new welds were.

25   A        No, sir.  That's where the bolts were that

1    were holding it in and that's where I identified --

2    actually the crew member is holding the Allen wrench

3    that was used to remove those.  That was actually on

4    the engine mount of the generator that was right

5    there.

6    Q    Okay.  But the bolts that hold those down,

7    those were new or not new?

8    A    They were new, sir.

9    Q    Okay.  So that was one of the suspicions when

10   the Coast Guard got there and they looked and they

11   said oh, new bolts, that might mean something is

12   hidden under there.

13   A    Yes, sir.

14   Q    All right.  And all of this is in the yellow

15   room?

16   A    That is above the yellow room, sir.

17   Q    Above the yellow room.  Now, on top of this,

18   is that where this was?

19   A    Yes, sir.

20   Q    Okay.  So if I were to walk into the room, I

21   would see this.

22   A    Yes, sir, you would see the -- you would

23   actually have to come down a ladder.  If you want to

24   put the schematic back up, the picture of the

25   drawing -- I believe you had it in your hand, sir.

1    Q    Oh yeah, here we go.

2    A    If you were to come into the room, you would

3    have to come off the top deck up here and come down

4    the steps.  The generator would be roughly in this

5    area.  I apologize for my hand shaking.  But it

6    would be in this space here with the stairs coming

7    down.  And it would be off to the starboard side or

8    if you were looking forward, the right side of the

9    space.

10   Q    Okay.  And this room here, before you get to

11   the ladder to then come down, does this have a door

12   to go into this room?

13   A    No, sir.

14   Q    So this line here means nothing?

15   A    That was part of the construction of the ship.

16   That is actually still out on the main deck.  That

17   is not going into the space.  Where you're coming

18   down in the steps from up here is up on the

19   forecastle.  And the way that the gunnel or the side

20   of the ship runs, it runs up this way.

21   Q    Okay.  So are these steps going up here to

22   then come back down?

23   A    Yes, sir.

24   Q    Okay.  So you would go to the front of the

25   ship, the bow, then you would take these steps up,

1      then you would take these steps down.

2      A       Those aren't steps.

3      Q       The ladder.

4      A       Those aren't a ladder.

5      Q       What is that?

6      A       That is part of the side of the ship, part of

7      the super structure -- not super structure but hull

8      of the ship.

9      Q       Let me ask you this.  If I'm walking from this

10     part of the ship to this part of the ship, am I

11     walking on this line or am I walking on the dotted

12     line above it?

13     A       You are walking on the bottom line here.

14     Q       Okay.  When I go all the way down that bottom

15     line and I get to this point, how do I get up here?

16     A       There is another ladder over there to get up

17     to the top.

18     Q       Okay.  So I would come this way, then I would

19     take a ladder to the top and then I would take a

20     ladder down.

21     A       Yes, sir.

22     Q       When I take the ladder up, before I go down,

23     is there something -- is this open to the elements

24     or is there something blocking this, what's that

25     square there?

1    A        That square, it covers over the top of the

2    ladderway going down in there.  But it is out into

3    the open, but there is a cover there.

4    Q        There is a cover.

5    A        Yes, sir.

6    Q        Is that cover locked or unlocked?

7    A        It was unlocked, sir.

8    Q        Unlocked when you saw it or unlocked when the

9    very first person in the Coast Guard got there and

10   saw it?

11   A        It was unlocked when I saw it.

12   Q        Okay.  Was it unlocked when the Coast Guard

13   team got on board the boat?

14   A        I do not know, sir, I was not there.

15   Q        So it may or may not have been locked.

16   A        Yes, sir.

17   Q        Okay.  Then you would take the stairs down,

18   right?

19   A        Yes, sir.

20   Q        And then you would come into contact with 9F,

21   the generator, right?

22   A        Once you turn to the right, once you were

23   coming down the steps, yes, sir.

24   Q        And then if you move that generator,

25   underneath you would see this, right?

1    A       Yes, sir.

2    Q       And this was -- before you guys took the bolts

3    out of it -- bolted shut with new bolts.

4    A       Yes, sir.

5    Q       Okay.  And was this covered with debris on top

6    or was it clean like that?

7    A       That's actually not clean, that's actually

8    very -- you can see by the crew member's hands and

9    everything, there is oil, dirt and debris all over

10   the place in that space.

11   Q       Okay.  Now, what evidence do you have that

12   either of these defendants ever went at any point in

13   time to this part of the ship and went down, up, and

14   then down, and then into the room, and then moved

15   the generator aside to then go into the hole?

16   A       I do not have any evidence that they did it.

17   Q       Okay.  Now, I believe you said that you also

18   found a welding glove.

19   A       Yes, sir.

20   Q       And something else.  My notes don't reflect

21   what the something else was.

22   A       Used welding rods, sir.

23   Q       Used welding --

24   A       Rods.

25   Q       Rods.  What is a welding rod?

1    A        A welding rod is used when you do stick

2    welding.  It's a rod that's used, it's clamped into

3    the clamps, the current runs through it, and

4    whatever they're welding is going to be grounded.

5    The current is then carried through between and runs

6    through the rod.  And as the rod is used, it is

7    spent, it dispenses filler metal down into the area

8    in which it's going.

9    Q        When you go in to investigate these areas on

10   board the ship that may or may not contain

11   contraband, are you wearing gloves?

12   A        Yes.

13   Q        And you're wearing gloves so that you don't

14   contaminate that area?

15   A        I'm sorry, could you say that again?

16   Q        You're a law enforcement officer, right?

17   A        At the time, no, I'm currently not.

18   Q        I'm sorry, I talked over you.

19   A        I was currently not law enforcement.  I was

20   over there to assist, but I was not acting in a law

21   enforcement capacity.

22   Q        Okay.  Were some of the Coast Guard members

23   acting in a law enforcement capacity?

24   A        Yes, sir.

25   Q        And you assisting them in a law enforcement

1    capacity are also making certain to use your best

2    efforts not to contaminate a potential crime scene,

3    right?

4    A        Yes, sir.

5    Q        And that's why you're wearing gloves.

6    A        Yes, sir.

7    Q        And that's because if you're not wearing

8    gloves and you pick up something, okay, with your

9    bare hands, now you've left fingerprints on it

10   potentially, right?

11   A        Yes.

12   Q        And that document may be examined for

13   fingerprints later and we don't want your prints to

14   show up, right?

15   A        Yes, sir.

16   Q        Because you're not going to be the guy on

17   trial, right?

18   A        Exactly, sir.

19   Q        So you were wearing gloves.

20   A        Yes, sir.

21   Q        And you came across the welding rod.

22   A        Yes, sir.

23   Q        And you handed that to somebody to place into

24   evidence for a forensic examination later?

25   A        No, sir.

1    Q      Who did that?

2    A      No one did, to my knowledge, sir.

3    Q      No one took the welding rod to examine it

4    forensically?

5    A      No, sir.

6    Q      It didn't occur to anyone that the

7    fingerprints on the welding rods might relate to the

8    welding and the cocaine found in the hole?

9    A      Not to my knowledge, sir.

10   Q      So that welding rod and whose ever

11   fingerprints may or may not be on it, is just gone.

12   A      Yes, sir.

13   Q      Where is it specifically, it's thrown

14   overboard?  What did you do with it?

15   A      I couldn't tell you where it is, sir.

16   Q      In your training and experience what are you

17   taught to do with those things?

18   A      We were not trained to do anything with it.

19   Welding rods are not an uncommon thing to find on a

20   ship.  We will find welding rods, welding and metal

21   fabrication is done on the ship, so it's not

22   uncommon to find those.

23   Q      I'm not saying that it's common or not.  All

24   I'm saying is that the welding rod may have forensic

25   value because it may have fingerprints on it, right?

1    You understand that?

2    A       Right, I understand that.  It would be a

3    little bit difficult to pull that off of an item

4    like that when the current and everything is running

5    through it.  It would be a little difficult to pull

6    forensic evidence off of it.

7    Q       And what expertise do you have to make that

8    conclusion?  Do you have expertise in fingerprint

9    analysis?

10   A       No, sir, I do not.

11   Q       At all?

12   A       No, sir, I do not.

13   Q       Okay.  So when you just made the statement to

14   this jury that that would be a difficult thing for a

15   fingerprint forensic analysis to do, that was a lie

16   or that was something outside of your knowledge,

17   right?

18   A       Yes, sir.

19   Q       Okay.  So you don't mean to suggest that this

20   jury should take that statement as your expert

21   opinion because you're not qualified to give that

22   opinion --

23           MR. STOUT:  Objection, Your Honor, asked and

24   answered.

25           THE WITNESS:  Correct, sir.

1      BY MR. MARTINEZ:

2      Q      What about DNA off that welding rod, have any

3      training on getting DNA off a welding rod?

4      A      No, sir.

5      Q      Have any idea whether or not there would be

6      any forensic value in the DNA that came off that

7      welding rod?

8      A      No, I do not, sir.

9      Q      Now, let's talk about the glove.  Who took the

10     glove and put it into evidence for forensic

11     examination later?

12     A      I do not know, sir.

13     Q      Who did a fingerprint analysis on the glove?

14     A      I do not know.

15     Q      Who took DNA samples from the glove so that we

16     would know who was wearing the glove and possibly

17     using the welding rod?

18     A      I do not know, sir.

19     Q      Who makes those decisions as to what forensic

20     evidence to collect and preserve for future

21     prosecution later?

22     A      That would be the boarding officer, sir.

23     Q      So the buck stops with him or her?

24     A      Yes, sir.

25     Q      And who is that person in this case?

1    A        That would have been Petty Officer Alexander.

2    Q        No further questions.

3             THE COURT:  Mr. Stout, any redirect?

4             MR. STOUT:  No, Your Honor, thank you.

5             THE COURT:  Thank you, sir, you may step down.

6             You may call your next witness.

7             MR. STOUT:  Your Honor, the United States

8    calls Eduardo de Jesus Chacin Villarroel.

9             [Interpreter sworn]

10            INTERPRETER:  Jesse Leonor.

11            THE COURT:  Mr. Villarroel, raise your right

12   hand to be sworn.

13            [Witness sworn]

14            COURTROOM DEPUTY CLERK:  Please be seated.

15   Please state your name and spell your last name for

16   the record.

17            THE WITNESS:  Eduardo Chasin.

18            THE COURT:  And will you spell your last name?

19            THE WITNESS:  C-H-A-C-I-N.

20                      DIRECT EXAMINATION

21   BY MR. STOUT:

22   Q        Mr. Chacin, where are you from originally?

23   A        Venezuela.

24   Q        How old are you?

25   A        36.

1   Q      What languages do you speak?

2   A      Spanish.

3   Q      Do you speak any English at all?

4   A      No.

5   Q      Have you lived in Venezuela your entire life?

6   A      Yes.

7   Q      What was your occupation?

8   A      In Venezuela I worked with metal, blacksmith,

9   and electrician and mechanic.

10  Q      Who did you work for?

11  A      For the mayor's office of -- for the city.

12  Q      How long did you work for the city?

13  A      Fifteen years of service.

14  Q      Before you worked for the city did you have

15  any military experience?

16  A      Yes, sir.

17  Q      What was that?

18  A      I gave my military service with the Marines, a

19  war ship, a frigate.

20  Q      Was that for the Venezuelan military?

21  A      Yes, sir.

22  Q      How did your military service allow you to

23  work as a mariner aboard a ship or a boat?

24  A      Upon leaving and becoming a reservist I'm

25  given a document which I take to the port captaincy

1      and to the harbormaster's office and there I'm given

2      a document that helps me be a mariner.

3      Q      When did you leave Venezuela -- when did you

4      last leave Venezuela?

5      A      The 21st of April of this year.

6      Q      Why did you leave Venezuela in April of this

7      year?

8      A      To look for a new opportunity because the

9      situation in Venezuela is tough.

10     Q      What do you mean by that?

11     A      That the wage I was earning over there was not

12     sufficient for me to support my family.

13     Q      How much were you making?

14     A      300,000 bolivars, which to dollars would be

15     three dollars per month.

16     Q      What kind of work did you leave looking for?

17     A      On vessels, on oil vessels or whatever would

18     come up.

19     Q      Why did you think that that would pay you

20     more?

21     A      Because the city that I live in, many people

22     had immigrated and I had been told that overseas

23     they paid well.

24     Q      Have you ever pleaded guilty to a crime in

25     this case?

1   A       Yes, sir.

2   Q       Specifically to conspiracy to traffic cocaine?

3   A       Yes, sir.

4   Q       Are you testifying here today because you're

5   cooperating with the United States government in

6   this case?

7   A       Yes, sir.

8   Q       Do you hope that by your cooperation and your

9   testimony you will get a better sentence in the end?

10  A       No, sir.

11  Q       You aren't -- do you hope to get a better

12  sentence because of your cooperation?

13          MR. MARTINEZ:  Objection; asked and answered.

14          THE COURT:  I'm going to overrule the

15  objection.  You can try it one more time.

16          THE WITNESS:  Yes, sir.  I apologize, I

17  apologize that I did not hear the question that you

18  asked me well.

19  BY MR. STOUT:

20  Q       Has anyone from the United States government

21  promised you that you will receive a better sentence

22  because of your cooperation and testimony?

23  A       No, sir.

24  Q       But that's your hope.

25          MR. MARTINEZ:  Objection; leading.

1          THE COURT:  Sustained.  Rephrase.

2          MR. STOUT:  I'll move on, Your Honor.

3     BY MR. STOUT:

4     Q     You testified a minute ago that you left

5     Venezuela in April of 2017.  Where did you go?

6     A     Santo Domingo, Dominican Republic.

7          MR. STOUT:  Your Honor, may I approach the

8     witness?

9          THE COURT:  You may.

10    BY MR. STOUT:

11    Q     How did you get from Venezuela to the

12    Dominican Republic?

13    A     Through some savings that I had and I

14    purchased the tickets and then I went to the city of

15    Santo Domingo.

16    Q     What kind of ticket did you purchase?

17    A     For a plane.

18         MR. STOUT:  Your Honor, may I approach the

19    witness?

20         THE COURT:  You may.

21    BY MR. STOUT:

22    Q     I've handed you what's been premarked for

23    identification Government's Exhibit 106B.  Would you

24    take a look at that?

25    A     Yes, sir.

1    Q    Do you recognize it?

2    A    Yes, sir.

3    Q    What is it?

4    A    It has my email, my wife's, the plane ticket,

5    and an invoice for a phone.

6    Q    Is that your plane ticket that you discussed a

7    moment ago that you took the flight from Venezuela

8    to the Dominican Republic?

9    A    Yes, sir.

10   Q    Did you have that document with you on the Fat

11   Crow?

12   A    Yes, sir.

13   Q    Is that the original ticket or just a copy of

14   the ticket?

15   A    A copy of the ticket that gets to the -- you

16   understand, the original?  The original?

17   Q    Is it an accurate copy of the ticket that you

18   had?

19   A    Yes, sir.

20        MR. STOUT:  Your Honor, at this time I would

21   offer Government Exhibit 106B into evidence.

22        THE COURT:  Any objection?

23        MR. CASTILLO:  No, Your Honor.

24        THE COURT:  Received into evidence 106B.

25        MR. STOUT:  Permission to publish that, Your

1    Honor.

2            THE COURT:  You may.

3    BY MR. STOUT:

4    Q       I'm showing page 2 of Government Exhibit 106B.

5    Do you see the date on this page of the flights you

6    took?

7    A       Yes, sir.

8    Q       What date was that?

9    A       21st of April 2017.

10   Q       When you got to the Dominican Republic what

11   did you do?

12   A       I arrived at the Dominican Republic at 2 p.m.

13   and there I had an issue with immigration because I

14   did not have enough money to enter the country and

15   from there I was detained until 10 at night.  Then

16   after I left and I was picked up by a friend of the

17   family there and took me to a hotel.

18   Q       And when did you first go to look for work?

19   A       The following day.

20   Q       Where did you look for work?

21   A       At a port named Calderas Salinas Calderas.

22   Q       Ultimately did you find a job?

23   A       Yes, sir.

24   Q       What day?

25   A       The 22nd of April -- 22nd, 23rd of April.

```
 1    Q       What was the job?

 2    A       On the Fat Crow vessel, I was given a job on

 3    the vessel.

 4    Q       What job were you hired to do?

 5    A       An oiler for the engines.

 6    Q       What are an oiler's duties and

 7    responsibilities on a ship?

 8    A       To help the chief engineer to repair the

 9    engines and be on top of the electrical engines.

10    Q       How much was your salary?

11    A       $900 per month.

12    Q       What day did you first board the Fat Crow?

13    A       24th of April.

14    Q       And that day who else boarded the Fat Crow

15    with you?

16    A       The captain, Bilarkazar.  The chief engineer,

17    Walter.  And the cook, Mario Acuna.  The bosun,

18    Ariel Bolanos.  And myself.

19            MR. STOUT:  Your Honor, permission to publish

20    104, 106A, 100A, 102A, previously admitted?

21            THE COURT:  You may.

22    BY MR. STOUT:

23    Q       Showing you Government Exhibit 102A.  Who is

24    that?

25    A       The cook, Mario Acuna.
```

1    Q       Showing you Government Exhibit 100A.  Who is

2    that?

3    A       Bosun Ariel Bolanos.

4    Q       Showing you Government Exhibit 104.  Who is

5    that?

6    A       Walter, the chief engineer.

7    Q       And showing you Government Exhibit 106A.  Who

8    is that?

9    A       That's me.

10   Q       You mentioned one other person who boarded the

11   Fat Crow with you on April 24th, Captain Bilarkazar.

12   Was he the captain at the time that the Coast Guard

13   stopped your ship, the Fat Crow?

14   A       No, sir.

15   Q       The men whose photos I just showed you, were

16   they on the ship whenever the Coast Guard stopped

17   it?

18   A       Yes, sir.

19   Q       What happened to Captain Bilarkazar?

20           MR. MARTINEZ:  Objection without first the

21   predicate for knowledge.

22           THE COURT:  Ask him if he knows.

23   BY MR. STOUT:

24   Q       Do you know what happened to Captain

25   Bilarkazar?

1    A        They deboarded him once we reached our

2    destination in Venezuela.

3    Q        Were you there when that happened?

4    A        Yes, sir.

5    Q        So you just told us about April 24th a group

6    of people got on board the Fat Crow, you among them.

7    When was the next time that additional crew members

8    joined the Fat Crow?

9    A        The 27th of that same month, April.

10   Q        And who joined the Fat Crow crew on

11   April 27th?

12   A        First officer Dorian; the oiler, Oscar

13   Herrera; the mariner, Llanos Miranda; and the second

14   engineer, Felipe Castillo.

15   Q        When those men joined the Fat Crow, physically

16   where was the Fat Crow, where was the ship?

17   A        It was at the Bay of Salinas de Bani, to the

18   side of the Calderas shipyard.

19   Q        What country was this in?

20   A        Santo Domingo, Dominican Republic.

21   Q        Was the ship in the same place it was three

22   days earlier when you joined it?

23   A        Yes, sir.

24   Q        You mentioned four people joining that day,

25   the first one being Gustavo Enrique Llanos Miranda.

1    Do you see that person anywhere in this room?

2    A       Yes, sir.

3    Q       Can you point him out for us?

4    A       Yes.

5    Q       What's he wearing?

6    A       Glasses.

7    Q       Does he have hair or not have hair?

8    A       He does not have hair.

9            MR. STOUT:  Your Honor, I would like the

10   record to reflect that the witness has identified

11   defendant Llanos Miranda.

12           THE COURT:  The record should so reflect.

13   BY MR. STOUT:

14   Q       What was his job on the ship?

15   A       Mariner.  Helms-man.

16   Q       Was Llanos Miranda on the ship whenever the

17   Coast Guard stopped you and boarded you?

18   A       Yes, sir.

19   Q       You mentioned a few other men.  Your Honor,

20   permission to publish 104A and 200?

21           THE COURT:  You may.

22   BY MR. STOUT:

23   Q       Showing you Government Exhibit 105A, who is

24   this gentleman?

25   A       Oscar Herrera, oiler.

1    Q    And just for completeness sake, I'm showing

2    you Government Exhibit 200A.  Who is that a photo

3    of?

4    A    Mr. Llanos Miranda.

5    Q    Is that the man you just pointed out to us?

6    A    Yes, sir.

7    Q    You mentioned two other people.  First off,

8    Oscar Herrera, the man I showed you a photo of,

9    Government Exhibit 105A, was he on the Fat Crow when

10   the Coast Guard stopped you?

11   A    Yes, sir.

12   Q    You mentioned two other gentlemen, Dorian and

13   Felipe.  Were either of them on the Fat Crow when

14   the Coast Guard stopped it?

15   A    No, sir.

16   Q    Do you know what happened to those two men?

17   A    One of them, Mr. Dorian, he deboarded in Santo

18   Domingo, I don't know why he deboarded.  And

19   Mr. Felipe, he deboarded while we were anchored in

20   Venezuelan waters due to an illness.

21        THE COURT:  Mr. Stout, we're going to need to

22   take a recess.

23        Ladies and gentlemen, we're going to recess

24   until about 11 o'clock.  You're welcome to walk

25   around.  Please leave your pads on your chairs,

1    please don't discuss the case and we'll start again

2    at 11 o'clock.

3            (The jury retired to the jury room.)

4            THE COURT:  You may step down, sir.  Just make

5    sure you keep them all separate, would you.  Thank

6    you.

7            (Recess was taken from 10:43 until 11:01 a.m.)

8            THE COURT:  Mr. Stout?

9    BY MR. STOUT:

10    Q      When we broke a few minutes ago you were

11    telling us about the people who had joined the Fat

12    Crow in April of 2017.

13    A      Yes, sir.

14    Q      After you first joined the Fat Crow what did

15    you do, what did you learn soon after joining the

16    Fat Crow?

17    A      Once I was on board those first days or week I

18    realized that there was going to be a plan of

19    transporting fuel and transporting drugs.

20    Q      What made you realize that?

21    A      Because the chief engineer and Captain

22    Bilarkazar they had conversations and then the chief

23    engineer gathered the engine room crew and informed

24    us of it.

25    Q      And in particular how was the crew going to

1     transport the drugs?

2     A      We were going to build a stash compartment.

3     Q      You said that the chief engineer was the

4     person who told you that; is that right?

5     A      Yes, sir.

6     Q      Is this the person you're talking about?

7     A      Yes, sir.

8     Q      To be clear, it's not either of the two

9     defendants seated at the table?

10    A      No.

11    Q      At that point do you know if the entire crew

12    of people you mentioned who were on the ship at this

13    time knew it was going to be a drug trip?

14    A      Yes, sir.

15    Q      How do you know that?

16    A      Because we would speak amongst ourselves.

17    Q      You mentioned the stash compartment.  Did you

18    participate in building that?

19    A      Yes, sir.

20    Q      Where was it located on the ship?

21    A      The bow of the ship.

22    Q      How long did it take to build?

23    A      One month, approximately.

24    Q      Who all participated with you in building that

25    compartment?

1    A      The one in charge was the chief engineer and

2    the second engineer, Castillo, Oscar Herrera, the

3    oiler, and myself.

4    Q      Was that everyone on the ship at the time?

5    A      No, sir.

6    Q      Who else was on the ship at the time that this

7    work was being done?

8    A      First Officer Dorian; the bosun, Ariel

9    Bolanos; the helmsman mariner, Llanos Miranda; the

10   cook, Mario Acuna; and myself.

11   Q      And did all of those -- were all those people

12   aware that the ship -- that you all were building

13   the hidden compartment in the bow?

14   A      Yes, sir.

15   Q      You said it took about a month to build the

16   hidden compartment.  Where was the ship during this

17   month, physically in the world, where was it

18   located?

19   A      In the Dominican Republic in the Bay of

20   Salinas de Bani.

21   Q      When did the Fat Crow leave the Dominican

22   Republic?

23   A      The first of June 2017.  June.

24   Q      At that point was the hidden compartment

25   complete?

1    A        Yes, sir.

2    Q        Where did you all go when you left the

3    Dominican Republic in the Fat Crow?

4    A        To a place called Buoy Zero between Venezuela

5    and Aruba.

6    Q        How long did it take you to get there from the

7    Dominican Republic?

8    A        We arrived on the -- the date was the 8th of

9    June.

10   Q        I want to review with you now the members of

11   the crew on the ship who were there when you left

12   the Dominican Republic and went to Venezuela.  Who

13   all was on the ship at that time for the trip when

14   you leave Dominican Republic and go to Venezuela?

15   A        Captain Bilarkazar, chief engineer Walter,

16   second engineer Castillo, bosun Ariel Bolanos, the

17   cook, Mario Acuna, the helmsman mariner Llanos

18   Miranda, and myself.

19   Q        You mentioned earlier that there was a first

20   officer named Dorian.  Was he on the ship when it

21   left the Dominican Republic and went to Venezuela?

22   A        He on that day when we set sail he went down

23   to land but he did not travel with us to Venezuela.

24            MR. STOUT:  Your Honor, may I publish exhibits

25   from the 100-200 series of the government exhibits

1    which are the photographs?

2           THE COURT:  You may.

3    BY MR. STOUT:

4    Q       Showing you Government Exhibit 104.  Just

5    remind us, who is that again?

6    A       Chief engineer Walter.

7    Q       Did he travel with the ship from the Dominican

8    Republic to Venezuela?

9    A       Yes, sir.

10   Q       Showing you Government's Exhibit 105A.  Who is

11   that again?

12   A       Oscar Herrera.

13   Q       Did he make this trip?

14   A       Yes, sir.

15   Q       Showing you Government Exhibit 100A.  Who is

16   that?

17   A       Ariel Bolanos.

18   Q       Did he make the trip?

19   A       Yes, sir.

20   Q       Showing you Government Exhibit 102A.  Who is

21   that?

22   A       Mario Acuna.

23   Q       Did he make the trip?

24   A       Yes, sir.

25   Q       You mentioned two other people that made the

1    trip.  The second engineer, who you said his name

2    was Felipe, and Captain Bilarkazar.  Were those two

3    men on the ship when the Coast Guard later stopped

4    it?

5    A    Yes, sir.

6    Q    They were on the ship when the Coast Guard

7    stopped it?

8         MR. MARTINEZ:  Objection; asked and answered.

9         THE WITNESS:  I'm sorry, I'm sorry.

10        THE COURT:  Sustained.

11   BY MR. STOUT:

12   Q    You mention the second engineer Felipe and the

13   Captain Bilarkazar, they made the trip from the

14   Dominican to Venezuela, is that --

15        MR. MARTINEZ:  Objection; leading to the form

16   of the question.

17        THE COURT:  Sustained.  Rephrase.

18   BY MR. STOUT:

19   Q    When the Fat Crow left the Dominican for

20   Venezuela, was the defendant Llanos Miranda on the

21   Fat Crow?

22   A    Yes, sir.

23   Q    Was the other defendant Mr. Mendoza Montoya on

24   the Fat Crow?

25   A    When I went from Santo Domingo to Venezuela?

1    No.

2    Q    You said that the Fat Crow sailed from the

3    Dominican down to a point off the coast of

4    Venezuela.  How far from land were you when you

5    stopped?

6    A    From Venezuela we would be some 25 miles.

7    Q    To be clear, did you go to a port or did you

8    stop out in the water away from land?

9    A    Far from land, anchored.

10   Q    And how far from land did you anchor?

11   A    25 miles.

12   Q    Remind us again what day you said that the Fat

13   Crow arrived at this spot 25 miles from land off the

14   coast of Venezuela?

15   A    The 8th of June of 2017, of this same year.

16   Q    And after you stopped there who joined the

17   crew?

18   A    Captain Martin Barrios, First Officer Jair

19   Mendoza.

20   Q    How long after you arrived at this spot where

21   you dropped anchor did they join the crew?

22   A    15th, 17th of June.

23   Q    Why did Captain Barrios join the crew?  Why?

24   A    Because they were going to deboard Captain

25   Bilarkazar.

1    Q      Did that in fact that happen?

2    A      Yes, sir.

3           MR. STOUT:  Your Honor, may I publish

4    Government Exhibit 103A?

5           THE COURT:  You may.

6    BY MR. STOUT:

7    Q      Who is this person?

8    A      Captain Martin Barrios.

9    Q      Was he the captain on board the Fat Crow when

10   the Coast Guard interdicted it?

11   A      Yes, sir.

12          MR. STOUT:  Your Honor, permission to publish

13   Government Exhibit 201A.

14          THE COURT:  You may.

15   BY MR. STOUT:

16   Q      Who is this?

17   A      The first officer Jair Mendoza.

18   Q      And what day did you say he joined the Fat

19   Crow?

20   A      The 17th of June.

21   Q      Do you see Mr. Mendoza Montoya sitting in the

22   courtroom here?

23   A      Yes, sir.

24   Q      Can you please point him out?  What is he

25   wearing?

1    A        Glasses and a blue over shirt.

2    Q        Does he have hair or is he bald?

3    A        He has hair.

4            MR. STOUT:  Your Honor, may the record reflect

5    that he indicated the defendant Mendoza Montoya?

6            THE COURT:  The record should so reflect.

7    BY MR. STOUT:

8    Q        How long did the Fat Crow stay anchored this

9    25 miles off the coast of Venezuela?

10   A        From that day that we arrived up until the

11   20th, 21st of August, if I remember correctly.

12   Q        So for all that period of time from June 8th I

13   think you said until late August, what was the Fat

14   Crow doing?

15   A        Receiving fuel from fishing vessels.

16   Q        How often would the fishing vessels deliver

17   fuel to the Fat Crow?

18   A        Daily.

19   Q        And to be clear, was this the fuel you were

20   supposed to transport?

21   A        Yes, sir.

22   Q        While the Fat Crow was anchored off the coast

23   of Venezuela during this period of time, was there

24   ever a meeting about the drugs?

25   A        Yes, sir.

1    Q      How many meetings about the drugs were there?

2    A      Three meetings, sir.

3    Q      When did the first one take place?

4    A      Towards the end of June there was one.

5    Q      Where did the meeting take place?

6    A      On the vessel, on the ship.

7    Q      Who all was present for the meeting?

8    A      All of the crew and the man in charge that

9  came to the meeting.

10    Q      Who was that man?

11    A      Mr. Hector Favio.  Well, there were three.

12  Another one named Herman and another one named El

13  Gordo.

14    Q      How did these three men get to the Fat Crow?

15    A      On a fishing vessel from land to the ship.

16    Q      And what was their role, why did they come out

17  to the ship?

18    A      To give us the proposal for transporting the

19  drugs.

20    Q      What was the proposal?

21    A      To pay us a stipulated amount, an amount that

22  we would agree to at the meeting.

23    Q      Where on the ship did this meeting take place?

24    A      Part of the meeting was at the mess, the diner

25  of the ship, and the other part was at the bridge.

1      Q      Explain what happened at the part of the

2      meeting that took place in the dining area of the

3      ship.

4      A      There Mr. Hector Favio told the entire crew

5      that he came on behalf of the person from land and

6      that if we would agree to make a drug trip.  And we

7      asked for a recess to talk about it amongst

8      ourselves and reach an agreement.

9      Q      Are you saying you had a discussion with the

10     crew where Hector Favio and the other two men were

11     not present?

12             MR. MARTINEZ:  Objection; leading.

13             THE COURT:  Sustained.  Rephrase.

14     BY MR. STOUT:

15     Q      Who all was present at this meeting you just

16     mentioned?

17     A      The captain, Martin Barrios; chief engineer

18     Walter; First Officer Mendoza Montoya; helmsman

19     mariner Llanos Miranda; the cook, Mario Acuna;

20     bosun, Ariel Bolanos; the second engineer, Castillo;

21     the three that came from land; and myself.

22     Q      What did you all decide during that meeting?

23     A      While at the meeting there was an exchange of

24     words amongst the crew members.  Then Mr. Hector

25     Favio stopped the meeting and told us that he would

1   wait for us at the bridge and for us to make a

2   decision.

3   Q      Did you all come to a decision?

4   A      Yes.

5   Q      What decision was that?

6   A      We made the decision of -- well, the officers

7   of the vessel made a separate decision, then we

8   mariners made another decision of asking for a

9   specific amount and mentioning it to Mr. Hector

10  Favio.

11  Q      Who were the officers of the ship?

12  A      The captain, Martin Barrios; Walter Darito,

13  the chief engineer; first officer Jair Mendoza; and

14  second engineer Castillo.

15  Q      Do you know what decision they came to?

16  A      No, sir.

17  Q      Who were the mariners you mentioned?

18  A      Mr. Ariel Bolanos, Mr. Oscar Herrera,

19  Mr. Mario Acuna, and Mr. Llanos Miranda and myself.

20  Q      What decision did the mariners make?

21  A      While we were gathered amongst the mariners

22  Mr. Ariel Bolanos and Mr. Miranda had mentioned that

23  we should ask for a hundred thousand because the

24  market for drugs was very expensive.  So we waited

25  for Mr. Hector Favio to call us and we went in one

1    by one.

2    Q      Was there any other reason that you decided to

3    ask for $100,000?

4    A      Because I followed their lead, I did not have

5    experience, it was the first time I'd done this.

6    Q      Whose lead did you follow?

7    A      Fellow crew members Ariel Bolanos and

8    Mr. Llanos Miranda.

9    Q      You said that you did it -- you followed their

10   lead because you didn't have experience.  Do you

11   know whether they had any prior experience?

12   A      Yes, sir.

13   Q      How do you know that?

14   A      Mr. Ariel Bolanos at one moment told us that

15   he had been over here in prison and Mr. Llanos

16   Miranda also told us that he had been over here in

17   prison.

18   Q      When you say over here, what country do you

19   mean?

20   A      The United States.

21   Q      You said that afterwards you went up to the

22   bridge.  What happened on the bridge?

23   A      We went in one by one to tell Mr. Hector Favio

24   the amount that we wanted.

25   Q      Who was present for these meetings?

1    A       It was Mr. Bolanos, Mr. Oscar Herrera,

2    Mr. Mario Acuna, Llanos Miranda, and myself.  And

3    part of the officers they had already met with

4    Mr. Hector Favio.

5    Q       Were you able to hear what your other crew

6    members were asking for or were you alone when you

7    asked for the amount of money you asked for?

8    A       We went in one by one.

9    Q       And how much did you ask for?

10   A       $100,000.

11   Q       At the end of this meeting where did Hector

12   Favio, Herman and Gordo go?

13   A       Mr. Hector Favio said that he was going to

14   take our proposal to land to see, and then the

15   vessel on which they came arrived and they boarded

16   it and left.

17   Q       What kind of vessel was it that they boarded

18   and left on?

19   A       A vessel -- a fishing boat.

20   Q       How large is it?

21   A       Six, seven meters.

22   Q       When was the next time you saw Hector Favio?

23   A       The end of July.

24   Q       Where did you see him?

25   A       On the vessel.  He also arrived on a fishing

1     vessel.

2     Q      What was his purpose in coming back out to the

3     Fat Crow?

4     A      To bring us an answer as to the offer that he

5     had taken from the previous meeting.

6     Q      Did you have another meeting at this point?

7     A      Yes, sir.

8     Q      Where did that meeting take place?

9     A      At the bridge.

10    Q      Who all was present at this meeting?

11    A      Captain Martin Barrios, First Officer Jair

12    Mendoza, Mr. Llanos Miranda, Mr. Ariel Bolanos, and

13    Mr. Oscar Herrera, Mr. Mario Acuna and myself.

14    Q      And what happened at this meeting?

15    A      Mr. Hector told us that the proposal he had

16    taken from us that the boss did not like it because

17    we had gone higher than the amount that he wanted.

18    Q      So was there a new proposal?

19    A      Yes, sir.

20    Q      What was that?

21    A      Mr. Hector Favio told us that he was bringing

22    us a good offer for a lower amount of money, that

23    for the mariner crew members that he would bring us

24    $50,000 because there was a lot of demand in the

25    market and there was not enough budget to pay the

1    $100,000.

2    Q    The $50,000 you just mentioned, was that for

3    each mariner or for the mariners to split?

4    A    For each mariner.

5    Q    Did you agree to accept that $50,000 to do the

6    drug trip?

7    A    There was an exchange amongst the crew.  Some

8    said yes, some said no, but at the end we all

9    accepted.

10   Q    After you all accepted, where did Hector Favio

11   go?

12   A    Mr. Hector Favio told us that he was going to

13   take the proposal and he left in the same vessel

14   again as before, the fishing vessel.

15   Q    When was the next time you saw Hector Favio?

16   A    Around the 15th of August, 16th.

17   Q    I would like to revisit something just for a

18   moment.  When Hector Favio left after that second

19   meeting you just told us about, did anyone from the

20   ship leave with him?

21   A    Yes, sir.

22   Q    Who?

23   A    Second engineer Felipe Castillo.

24   Q    So you said that in mid August you saw Hector

25   Favio again.  Where did you see him?

1    A       On the vessel, on the ship.

2    Q       How did he get there?

3    A       In the fishing vessel.

4    Q       Did he bring anyone with him when he came back

5    out to the Fat Crow?

6    A       Yes, sir.

7    Q       Who was that?

8    A       Mr. Luis Garcia, second engineer.

9            MR. STOUT:  Your Honor, may I publish

10   Exhibit 101?

11           THE COURT:  You may.

12   BY MR. STOUT:

13   Q       Who is this we're looking at?

14   A       Mr. Luis Garcia.

15   Q       So what happened during the third time Hector

16   Favio came out to the Fat Crow?

17   A       He brought a new proposal and he had us gather

18   at the bridge.

19   Q       Who all was present at this meeting?

20   A       Captain Martin Barios, First Officer Jair

21   Mendoza, helmsman mariner Llanos Miranda, bosun

22   Ariel Bolanos, Mr. Oscar Herrera, Mr. Mario Acuna,

23   Mr. Luis Garcia, and myself.

24   Q       What happened during this meeting?

25   A       Mr. Hector Favio tells us that he's bringing a

1     new proposal.  They could not -- the $50,000 for the

2     mariners that he had taken from the offer, that we

3     could not be given the $50,000 because there was a

4     lot of demand in the market, he told us again.  He

5     told us that he was going to give each mariner

6     $37,500 and that he was going to give us a

7     30 percent up front and he got the addresses of our

8     family members and their phone numbers.  And there

9     the meeting ended.

10    Q     When he gave you -- when Hector Favio gave you

11    this new proposal, how did you all feel about the

12    lower amount of money?

13    A     There was upset amongst the crew.

14    Q     Did you all express that upsetness to Hector

15    Favio?

16    A     Yes, sir.

17    Q     What did he say in response?

18    A     He said -- Mr. Hector Favio said if we did not

19    accept the offer, that there was another crew that

20    was willing to make the trip with the drug load.

21    Q     You mentioned that part of this last proposal

22    was an advance payment of 30 percent.  Did you give

23    Hector Favio the contact information for anyone to

24    give that advance to?

25    A     No, sir.

1    Q        Did you ever receive any of that advance?

2    A        No, sir.

3    Q        You mentioned that when Hector Favio came to

4    this meeting he brought the new second engineer,

5    Luis Garcia Flores, with him.  Do you know why the

6    second engineer -- the new second engineer came out?

7    A        Because the second engineer that was there

8    before had been deboarded and they needed to have a

9    new one, so they brought him.

10   Q        Why did the -- do you know why the previous

11   second engineer deboarded?

12   A        Due to a health problem.

13   Q        At the end of this third meeting that you had

14   with Hector Favio where did he go?

15   A        He boarded the fishing vessel again and went

16   to land.

17   Q        Were you on board the Fat Crow when the drugs

18   arrived?

19   A        Yes, sir.

20   Q        How long was it between when Hector Favio left

21   at the end of the third meeting until the drugs

22   arrived?

23   A        The loading of the drugs was programmed to be

24   on the 20th of August on a Sunday is when the drugs

25   were going to arrive and we spent the entire night

1    waiting and it did not arrive that day.  It arrived

2    the following day, Sunday into Monday, at six in the

3    morning.

4    Q     So you're saying the drugs arrived on

5    August 21st.  How long was that after Hector Favio

6    had left the ship?

7    A     A week.  Days.  A week.

8    Q     What time of day did you say the drugs arrived

9    on August 21st?

10   A     Six in the morning.

11   Q     How did they arrive, by what manner?

12   A     Fishing vessel arrived.  It approached the

13   ship towards the bow.  There were five crew members.

14   And from there they threw a rope at us.  And it came

15   tied like sausage style.

16   Q     What do you mean by tied sausage style?

17   A     They would tie the rope to one and every two

18   or three meters there would be another one.

19   Q     When you say another one, what do you mean,

20   what is a "one"?

21   A     Another -- another package of drugs.

22   Q     Describe for us what the boat that brought the

23   drugs out looks like?

24   A     It measured 8 meters, it had two outboard

25   engines, and the drugs came inside of the vessel.

1    Q    Did any of the people who were on board that

2    smaller boat that delivered the drugs actually get

3    up onto the Fat Crow?

4    A    No, sir.

5    Q    You said that they passed a rope up and that

6    the drugs were tied to the rope.  About how many

7    packages total of drugs were there?

8    A    75 packages, sir.

9    Q    Who of the crew of the Fat Crow participated

10    in loading the drugs from that small boat onto the

11    Fat Crow?

12    A    In the first row, I'll call it a row, was

13    Mr. Mario Acuna, Mr. Jair Mendoza, and myself.  We

14    were the ones pulling from the motor boat towards

15    the ship.

16    Receiving behind us would be Mr. Walter and

17    Mr. Llanos Miranda.  Then Mr. Llanos Miranda and

18    Mr. Walter would pass it over to Mr. Luis Garcia and

19    Mr. Luis Garcia would hand it over to Mr. Bolanos.

20    Then Mr. Bolanos would pass it to Mr. Martin

21    Barrios, the captain.  And Mr. Martin would pass it

22    over to -- down to the engine room where the stash

23    compartment was to Mr. Oscar Herrera.

24    Q    Where on the ship was the hidden compartment

25    located?

1   A      In the bow of the ship.

2   Q      How long did it take you all to load the

3   cocaine from the small boat into the hidden

4   compartment, in total?

5   A      An hour, an hour and 20 minutes.  From the

6   vessel to the ship it took some 20 minutes.  And for

7   storing it in the stash compartment, one hour max.

8   Q      Did you all -- after you loaded the drugs did

9   you all wash the ship?

10  A      Yes, sir.

11  Q      Why?

12  A      Because Mr. Hector Favio had left the

13  instructions to the captain that we had to wash

14  along the area where the drugs were loaded, that we

15  had to wash the deck.  And the clothes that we were

16  wearing, we had to throw them away.

17  Q      For what purpose?

18  A      So that no evidence would be left of the

19  substance, of the drug.

20  Q      What day did the Fat Crow leave the place that

21  it had been anchored all that time?

22  A      That same day of loading the drugs, at 3 in

23  the afternoon.

24  Q      Did anything cause you to delay in leaving

25  that day?

1    A      Yes, sir.  There was a problem with the anchor

2    of the ship, it did not want to come up.  There was

3    an electrical problem with the wench of the ship.

4    Q      What did you all do about the anchor?

5    A      The captain gave the second engineer the order

6    to have it cut with the oxygen blow torch.

7    Q      And after you cut the anchor did you leave?

8    A      Yes, sir.

9    Q      Where did you go?

10   A      We had programmed that to go to the country of

11   Guatemala with the fuel.

12   Q      Do you know where you were supposed to offload

13   the drugs?

14   A      The captain -- Mr. Hector Favio gave him some

15   coordinates, but I don't know knowledge to where.

16   Q      How long after you cut the anchor and left on

17   August 21st until the Coast Guard stopped your ship?

18   A      Well, we sailed Monday, Tuesday, then on

19   Wednesday morning the chief engineer received a

20   message from the captain in the engine room that

21   some two miles or one mile behind us we were being

22   followed by the Coast Guard, the American Coast

23   Guard.

24   Q      Were you on board the Fat Crow when the

25   members of the U.S. Coast Guard actually got onto

1      the Fat Crow?

2      A      Yes, sir.

3      Q      How many crew members did the Fat Crow have at

4      the time?

5      A      Nine crew members, sir.

6      Q      And how many crew members did the Fat Crow

7      leave anchor with on August 21st?

8      A      Nine crew members, sir.

9      Q      Were they the same nine people?

10     A      Yes, sir.

11            MR. STOUT:  Your Honor, may I publish

12     government exhibits from the 100 and 200 series that

13     are photographs?

14            THE COURT:  You may.

15     BY MR. STOUT:

16     Q      Showing you Government Exhibit 101.  Remind us

17     who that is.

18     A      Yes, sir.  Carlos Garcia, the second engineer.

19     Q      Was he on the ship when the Coast Guard

20     stopped your ship?

21     A      Yes, sir.

22     Q      Showing you Government Exhibit 103A.  Who is

23     that?

24     A      Captain Martin Barrios.

25     Q      Was he on the ship when the Coast Guard

1    stopped it?

2    A       Yes, sir.

3    Q       Showing you Government Exhibit 102A.  Who is

4    that?

5    A       Mario Acuna, cook.

6    Q       Was he on the Fat Crow when the Coast Guard

7    stopped your ship?

8    A       Yes, sir.

9    Q       Showing you Government Exhibit 100A.  Who is

10   that?

11   A       Mr. Ariel Bolanos.

12   Q       Was he on the ship when the Coast Guard

13   stopped your ship?

14   A       Yes, sir.

15   Q       Showing you Government's Exhibit 105A.  Who is

16   that?

17   A       Oscar Herrera.

18   Q       Was he on the ship when the Coast Guard

19   stopped your ship?

20   A       Yes, sir.

21   Q       Showing you Government Exhibit -- actually we

22   showed you that one already.  Government's

23   Exhibit 104.  Who is that?

24   A       First engineer -- chief engineer Walter.

25   Q       Was he there whenever the Coast Guard stopped

1    the ship?

2    A      Yes, sir.

3    Q      Looking at Government Exhibit 200A.  Who is

4    that?

5    A      Llanos Miranda.

6    Q      Was he on the ship when the Coast Guard

7    stopped it?

8    A      Yes, sir.

9    Q      Is that the same person seated at the defense

10   table over here?

11   A      Yes, sir.

12   Q      Finally I'm showing you Government

13   Exhibit 101A.  Who is that?

14   A      Jair Mendoza, the first officer.

15   Q      Was he on the ship when the Coast Guard

16   stopped it?

17   A      Yes, sir.

18   Q      Is he one of the other men seated at the

19   defense table over here?

20   A      Yes, sir.

21          MR. STOUT:  Your Honor, may I have a moment?

22          THE COURT:  You may.

23          MR. STOUT:  No further questions, Your Honor.

24          THE COURT:  All right.  Mr. Castillo?

25                       CROSS EXAMINATION

1    BY MR. CASTILLO:

2    Q      Mr. Chacin, you were a crewman aboard the Fat

3    Crow as you talked about this morning; is that

4    right?  You were a crewman.

5    A      Yes, sir.

6    Q      And you also told us that the reason you ended

7    up with the Fat Crow is because the conditions in

8    your country Venezuela were bad and you needed to

9    look for work, correct?

10   A      Yes, sir.

11   Q      In fact, about that time there was some

12   political turmoil going on in Venezuela, isn't that

13   correct?

14   A      The usual, the country has had turmoil going

15   five years back.

16   Q      Wasn't there a presidential election this

17   year?

18   A      No, sir.

19   Q      Was there -- the president of Venezuela is a

20   man by the name of Maduro?

21   A      Nicholas Maduro.

22   Q      And recently there have been like rioting in

23   the streets over the way the government has been

24   treating its people, isn't that correct?

25   A      At this time I don't know anything.

1    Q      Talking about the time you were looking for

2    work back in May and June.

3    A      Yes, in May I was not in the country, I was on

4    the vessel.

5    Q      You're correct, I misspoke.  I was talking

6    about April, the April dates when you indicated you

7    were looking for work, I think it was April 24th?

8    A      The 21st of April I headed to Santo Domingo.

9    Q      Yeah, but you also had an airplane ticket from

10   Caracas to the Dominican Republic in April, isn't

11   that right, April 21st?

12   A      Yes, sir.

13   Q      These aren't trick questions.  I'm just asking

14   you how conditions were in Venezuela.  And you

15   indicated you were a poor person, correct, in

16   Venezuela?

17   A      Yes.

18   Q      Now, how much was it that you were making at

19   the time you -- whatever amount of money that you

20   were making at the time in bolivars in Venezuela

21   prior to you leaving Caracas.

22   A      300,000 bolivars.

23   Q      You also said the equivalent of 300,000

24   bolivars is three American dollars?

25   A      Currently, yes.

1   Q      And that would have been the same back in
2   April as well?
3   A      The dollar was lower, it would have been less
4   or more, more dollars, it would have been about $10.
5   Q      So at the time -- let's talk mid April of this
6   year, you were earning approximately US$10 per
7   month?
8   A      Yes, sir.
9   Q      And because things were bad, you told us that
10  you looked for work and eventually ended up on the
11  Fat Crow; is that right?
12  A      Yes, sir.
13  Q      And you also indicated you were making on the
14  Fat Crow about US$900 a month; is that right?
15  A      Yes, sir.
16  Q      That was for your work as a crewman, not
17  having anything to do with drugs, isn't that
18  correct?
19  A      Yes, sir.
20  Q      When you first went to work on the Fat Crow,
21  you had no idea you were going to be involved in a
22  drug venture, did you?
23  A      Yes, sir.
24  Q      That's correct?
25  A      Going on a venture -- after arriving at the

1    ship is when I became aware of the drug venture, as

2    you call it.

3    Q    So when you went to work on the Fat Crow you

4    had no intention of doing anything illegal, correct?

5    A    No, sir.

6    Q    Correct, you didn't -- weren't going to do

7    anything illegal?

8    A    Yes.

9    Q    Okay.  And so all of a sudden now from $3 or

10   $10 a month, you're getting a job in a pays you $900

11   a month, American dollars.

12   A    Yes, sir.

13   Q    Now, isn't it a fact that the reason you found

14   out about work in the Fat Crow was information that

15   you got from your brother-in-law?

16   A    No, sir.

17   Q    Did your brother-in-law pick you up from the

18   Dominican Republic when you arrived there?

19   A    I don't have a brother-in-law in the Dominican

20   Republic.

21   Q    Do you have a brother-in-law that's connected

22   to the owner of the Fat Crow, that has some relation

23   with the owner of the Fat Crow?

24   A    No, sir.

25   Q    All right.  Well, now you got on the Fat Crow

1      in the middle of April, that's when you went to

2      work, correct?

3      A      Yes, sir.

4      Q      Were you paid any money at all when you

5      initially boarded the Fat Crow?

6      A      Yes, sir, $800 was sent to my wife.

7      Q      Okay.  So you didn't get any money; it was

8      sent to your wife, correct?

9      A      Yes, sir.

10     Q      And what was that $800 for?

11     A      Monthly, for my work.

12     Q      So you were paid in advance for the month of

13     April or May for 30 days on the boat?

14     A      No, sir.  It was towards the end, towards the

15     end of the biweekly period in May, that's when I

16     received that payment.

17     Q      All right.  Now, I asked you -- my question

18     was when you got on the Fat Crow how much money did

19     you get; you said that your wife got $800.

20     A      For the month of working, for the biweekly

21     period of May.  Up front I did not receive anything.

22     Q      So that money wasn't given to anybody until

23     afterwards in May, like you said; isn't that right?

24     A      Yes, sir.  Part of crew did receive upfront

25     payment.

1    Q    I'm asking about you right now.  Okay.  So

2    there came a point in time where you said that now

3    you're working on the Fat Crow and you knew the Fat

4    Crow was being used to transport fuel, isn't that

5    correct?

6    A    To transport fuel and I was given the offer of

7    transporting drugs.

8    Q    Okay.  We know that, but that came later.

9    I'll get to that.  I'm talking about -- when you

10   first got on the Fat Crow in the middle of April you

11   knew that the Fat Crow was used to transport fuel.

12   A    Yes, sir.

13   Q    And the money you received for working on the

14   Fat Crow was related to the transportation of fuel,

15   correct?

16   A    Yes, sir.

17   Q    And you had no idea when you first went to the

18   Fat Crow in April that you were going to have any

19   involvement in any drug activity, isn't that

20   correct?

21   A    I realized it a week after having boarded.

22   Q    That was after you got on the boat, right?

23   A    Yes, sir.

24   Q    When you got on the boat you had no idea that

25   was going to happen, isn't that correct?

1    A       Yes, sir.

2    Q       All right.  Now, according to you, after a

3    while on the boat Mr. Favio and some others come on

4    the boat and make you an offer, isn't that right?

5    A       Yes, sir.

6    Q       And according to you everybody got together

7    and discussed that now we're going to be involved in

8    some sort of drug activity, isn't that right?

9    A       Yes, sir.

10   Q       And when you first got on the Fat Crow

11   Mr. Llanos Miranda you had never met him before,

12   isn't that correct?

13   A       No, sir.

14   Q       And you had no -- knew nothing about him prior

15   to your work on the Fat Crow in April.

16   A       No, sir.

17   Q       Okay.  And when you were on the vessel is it

18   common for crew members to just to meet each other

19   and engage in conversation?

20   A       Yes, sir.

21   Q       And you would have -- because you're on the

22   boat together for a long time all the time, isn't

23   that right?

24   A       Yes, sir.

25   Q       And it's important to get along with all the

1    crew members, isn't that right?

2    A      Yes, sir.

3    Q      So you find out a little bit about them and

4    you're going to tell them a little bit about

5    yourself, isn't that right?

6    A      Yes, sir.

7    Q      So establish sort of like a relationship with

8    your co-workers, isn't that right?

9    A      Yes, sir.

10   Q      Now, you're not going to tell these crew

11   members, who are not your family, everything about

12   you, are you?

13   A      No.

14   Q      And you don't expect them to tell you

15   everything because they don't know who you are,

16   isn't that right?

17   A      Yes, sir.

18   Q      You might talk about the food you're going to

19   eat, you might talk about the weather and things

20   like that, isn't that right?

21   A      Yes, sir.

22   Q      That would be normal conversation among crew

23   members on a boat, right?

24   A      Yes, sir.

25   Q      And all that occurred on the Fat Crow prior to

1       Mr. Favio and the others coming on board, isn't that

2       right?

3       A       Yes, sir.

4       Q       So according to you when Mr. Favio came on

5       board that the idea or the offer of becoming

6       involved in drug activity was made to you, isn't

7       that right?

8       A       Yes, sir.

9       Q       Okay.  And you indicated you had no prior

10      experience in drug smuggling, correct?

11      A       Yes, sir.

12      Q       Okay.  And then you said I think it was around

13      the 8th of June is when Favio showed up on the boat.

14      A       On the 8th of June we arrived -- he arrived

15      towards the end of June, early July.

16      Q       Okay.  So you had been a crew mate of

17      Mr. Llanos from middle April up until -- well, until

18      the middle of June for sure, isn't that right?

19      A       From April until August when the Coast Guard

20      got us.

21      Q       Yes, I understand that he was there at the

22      time of the Coast Guard arrival as well.  My

23      question to you is from April 24th, give or take a

24      day, to the middle of June, the 15th or 17th of

25      June, you were a crew mate of Mr. Llanos Miranda

1     aboard the Fat Crow, isn't that right?

2     A      Yells.

3     Q      So that's about two months, right, from the

4     middle of April to the middle of June, isn't that

5     right?

6     A      Yes, sir.

7     Q      And that whole time you had talked about the

8     Fat Crow being in the Dominican Republic and getting

9     or transporting fuel, isn't that right?

10    A      Yes, but while being in the Dominican Republic

11    we realized that we were going to be transporting

12    drugs.

13    Q      And that came at the end of June when

14    Mr. Favio showed up, isn't that right?

15    A      What, about the drugs?

16    Q      Yes.

17    A      No, we realized after being on board the ship

18    for one week.

19    Q      Okay.  When you say "we," you're talking about

20    you realized, isn't that right?

21    A      Because the chief engineer and Captain

22    Bilarkazar communicated to me and to the rest of the

23    crew.

24    Q      Well, you also indicated they spent about a

25    month working on this secret compartment, isn't that

1    right?

2    A    Yes.

3    Q    And various crew members assisted in that,

4    isn't that right?

5    A    Yes, sir.  Part of the entire crew helped.

6    Q    And when they're building this compartment

7    there were no drugs on board, isn't that correct?

8    A    No, sir.

9    Q    And you know that Mr. Llanos Miranda was --

10   you said he was the helmsman, isn't that right?

11   A    Yes, sir.

12   Q    He wasn't the captain or anybody in charge of

13   anything, isn't that right?

14   A    No, sir.

15   Q    Now, you indicated that there was an offer

16   made to you when Mr. Favio showed up and you say

17   that it happened at the end of June or early July

18   the first time Mr. Favio goes on the Fat Crow, isn't

19   that right?

20   A    He brought us the offer of transporting drugs

21   and we, personally, the crew asked for $100,000.

22   Q    And that was when Mr. Favio showed up on the

23   Fat Crow at the end of June, beginning of July,

24   isn't that right?

25   A    Yes, sir.

1   Q       The first time that Mr. Favio shows up on the

2   Fat Crow was when money was discussed, isn't that

3   right?

4   A       Yes, sir.

5   Q       And now Mr. Favio makes you an offer about he

6   wants to pay you to help transport drugs, isn't that

7   right?

8   A       To me and to the entire crew.

9   Q       Well, I'm asking about you, I didn't ask about

10  the entire crew, I'm asking about you.  Right?  That

11  was the first time that money was mentioned by

12  anybody, isn't that right?

13  A       Yes, sir.

14  Q       Okay.  So now at this first meeting with

15  Mr. Favio he makes an offer to you about

16  participating in a drug trip and you relay to him

17  that you want to be paid in dollars, isn't that

18  right?

19  A       Yes, sir.

20  Q       And you tell Mr. Favio that you want $100,000

21  United States dollars to help transport drugs, isn't

22  that right?

23  A       Yes, sir.

24  Q       And that's a quantity of money that you've

25  never had in your lifetime, isn't that right?

1    A        Yes, I've never had that.

2    Q        That's a hundred times what you make a month,

3    isn't that right?

4    A        Yes, sir.

5    Q        You're making $900 a month.  A hundred times

6    that, $90,000, right?

7    A        No, it's not $90,000.  Ask me the question

8    again.

9    Q        If you make $900 a month and you work a

10   hundred months, you would have $90,000, wouldn't

11   you?

12   A        Yes, sir.

13   Q        So this amount of money that you're discussing

14   is more than 100 months worth of work for you, isn't

15   that right?

16   A        Yes, sir.

17   Q        And you who don't know anything, you're not

18   experienced in this, you go to somebody obviously

19   involved in drug trafficking and you say give me a

20   $100,000 and I'll help you.  That's what happened,

21   right?

22   A        Yes, sir.

23   Q        And then according to you, Mr. Favio said I'll

24   take your offer back to other people and I'll let

25   you know.

1    A      Yes, sir.

2    Q      And so Mr. Favio left, according to you, on

3    the boat, he left and went back to land.  And then

4    sometime later he came back for a second meeting,

5    right?

6    A      Yes, sir.

7    Q      Now, according to you he said to you that was

8    too much money but I've got a good offer for you

9    now, isn't that right?

10   A      Yes, sir.

11   Q      And Mr. Favio said we'll give you $50,000 to

12   help us, isn't that right?

13   A      Yes, sir.

14   Q      You personally were going to get $50,000 to

15   help in this drug trip, right?

16   A      Yes, sir.

17   Q      And after a period of time you said okay, I'll

18   do it, isn't that right?

19   A      Yes, sir.

20   Q      And now after Mr. Favio gives you this offer

21   which came from him telling you I'll pay you

22   $50,000, he leaves the boat and goes to land again.

23   A      Yes, sir.

24   Q      Now, this was his offer to you that you

25   accepted, but he didn't give you any money.

1   A       No, sir.

2   Q       All right.  He then goes back to land and then

3   after some time Mr. Favio comes back to the Fat Crow

4   for a third meeting.

5   A       Yes, sir.

6   Q       And now Favio says no, $50,000 is too much,

7   I'll give you $37,500, right?

8   A       Yes, sir.

9   Q       And he told you if you guys don't want to take

10  it, we've got other crew men who will do it, isn't

11  that right?

12  A       Yes, sir.

13  Q       All right.  So did he tell you why it changed

14  from $50,000 to $37,500 in that period of time?

15  A       Because there was a lot of demand in the

16  market.

17  Q       Well, that was the same reason he gave why he

18  wouldn't pay you $100,000, right, and offered you

19  $50,000.

20  A       Yes, when he took the first offer and he

21  returned with the $50,000, he came with the same

22  thing, that there was a high demand.

23  Q       But you said okay, I'll take the $50,000.

24  A       Yes.

25  Q       Why did he have to go back to land to get

1     another deal if you said I'll take the $50,000?

2     A     He took the offer to land, but the one in

3     charge on land tells him that we're not going to

4     give them 50, we're going to give them 37.

5     Q     That's what Mr. Favio tells you.

6           THE COURT:  We're going to need to recess for

7     lunch.

8           Ladies and gentlemen, it's approximately

9     12:30.  We're going to be in recess until 1:45.

10    You're welcome to go get lunch, walk around.  Please

11    don't discuss the case.  Leave your pads on your

12    chairs.

13          (The jury retired to the jury room.)

14          THE COURT:  Sir, you may step down.  We'll

15    start again at 1:45.  We're in recess until 1:45.

16          (Lunch break.)

17          (The jury returned to the courtroom.)

18          THE COURT:  Mr. Castillo?

19          MR. CASTILLO:  Thank you, Your Honor.

20    BY MR. CASTILLO:

21    Q     Mr. Chacin, I think when we left off we were

22    talking about the third meeting you had with

23    Mr. Favio and others aboard the Fat Crow.  Okay?

24    And we were talking about how he had come and

25    offered you $50,000, you accepted, and then he went

1      to land and came back and offered you $37,500.  Do

2      you remember that?

3      A      Yes, sir.

4      Q      Now, that third meeting aboard the Fat Crow,

5      when was that again?

6      A      Toward the end or early August, 15th or 20th

7      of August.

8      Q      Let me ask it this way.  About how many days

9      before the Fat Crow was intercepted by the Coast

10     Guard did this third meeting occur?

11     A      Fifteen days prior to the Coast Guard catching

12     us.

13     Q      All right.  Because it was at that third

14     meeting, according to you, when the agreement was

15     made that you would accept $37,500 for the job,

16     isn't that right?

17     A      Yes, sir.

18     Q      Now, let me ask you a question.  This third

19     meeting, okay, aboard the Fat Crow, you said that

20     Mr. Favio and the others came by boats to the Fat

21     Crow, is that right?

22     A      Yes, sir.

23     Q      And when you're on the Fat Crow are you able

24     to communicate with anybody on land by telephone or

25     any other type of communication?

1    A       No, sir, we had one opportunity to make a

2    phone call on a sat phone that was given to us, but

3    it was only one single call and it was given to us

4    by First Officer Jair Mendoza.

5    Q       Well, okay, you kind of answered another

6    question.  I was going to get to that.  There was a

7    satellite phone on the Fat Crow that was available

8    to communicate; isn't that correct?

9    A       There was, but it was only for one single call

10   and then afterwards the first officer said that it

11   had ran out of its balance and that the people in

12   charge of the ship were supposed to add to its

13   balance, but it never came about.

14   Q       My question was a simple yes or no question.

15   Was there a satellite phone available on the Fat

16   Crow?

17   A       Yes.

18   Q       And the use of that satellite phone was

19   controlled by the captain and the first officer?

20   A       Yes, sir.

21   Q       In other words, if you as a crewman wanted to

22   call your family for some reason, you would have to

23   get permission from one of them to use the phone,

24   correct?

25   A       Yes, sir.

1    Q      Now, you indicated there may have been some

2    problems with the phone and why you could or could

3    not use it, correct?

4    A      Yes, sir.

5    Q      But you did in fact make a call at one time,

6    isn't that correct?

7    A      Yes, sir.

8    Q      And you knew as a crewman that there was a

9    phone available -- if you really needed to use it,

10   there was one available, correct?

11   A      Yes, sir.

12   Q      Okay.  Now, you also indicated that -- because

13   the reason I ask that question is if you're making

14   this agreement for the $37,500 to participate in

15   this smuggling operation, how would you make sure

16   that you got the money?

17   A      Well, I'm not sure.  Well, I am sure now

18   because I spoke with my wife a few days ago and she

19   told me that at no time did she receive that money.

20   Q      I understand you never got a dime out of that,

21   you never got paid at all, correct?

22   A      I was never paid.

23   Q      But at the time that you're talking to

24   Mr. Favio, you're expecting to get $37,500, isn't

25   that right?

1    A       Yes, sir.

2    Q       In other words, you're entering into an

3    agreement with Mr. Favio, isn't that right?

4    A       The entire crew reached an agreement.

5    Q       I'm asking you what you did.

6    A       Okay.

7    Q       Did you make an agreement with Mr. Favio to

8    smuggle drugs?

9    A       Yes, sir.

10   Q       Your agreement was you would assist them and

11   they would pay you $37,500, right?

12   A       Yes, sir.

13   Q       Now, you never expected to get that money

14   aboard the Fat Crow, right; they weren't going to

15   pay you on the Fat Crow, were they?

16   A       No, sir.

17   Q       You expected that they would pay your family,

18   isn't that right?

19   A       Yes, sir.

20   Q       Because that's what Mr. Favio told you, right?

21   A       Yes, sir.

22   Q       So for an agreement -- you expected to get

23   paid money for your services on this smuggling

24   venture, correct?

25   A       Yes, sir.

1    Q       But you never got any money at all for this.

2    A       Never received.

3    Q       And the money that you told us about that you

4    did get, the $900 earlier, that was for your work on

5    the Fat Crow working with the fuel, isn't that

6    correct?

7    A       Yes, sir.

8    Q       Now, there came a point in time where you were

9    aboard the Fat Crow and the Coast Guard comes and

10   boards the vessel, correct?

11   A       Yes, sir.

12   Q       And you were there when they searched the boat

13   and eventually found packages in the front

14   compartment, correct?

15   A       Yes, sir.

16   Q       And then from there you were taken and put on

17   another vessel and taken to another facility where

18   you were talked to by agents, isn't that right?

19   A       Yes, sir.

20   Q       Now, when you were aboard the Fat Crow when

21   the Coast Guard boarded, you had no conversations

22   with Mr. Llanos on that occasion, did you?

23   A       Yes, there were conversations.

24   Q       All right.  This is as they were boarding the

25   boat?

1          MR. STOUT:  Objection, Your Honor.

2          MR. CASTILLO:  It's unresponsive, but I'll

3     object too.

4          MR. STOUT:  May we approach, Your Honor?

5          THE COURT:  Sure.

6          (At which time the following sidebar

7     discussion was held:)

8          MR. STOUT:  I just want defense counsel to be

9     aware that you're getting into a territory where you

10    may elicit an answer that would comment on your

11    client's decision not to talk to law enforcement.

12    So what I expect he will say, if you keep going down

13    this road, he may say something along the lines of

14    well, we had an agreement amongst all of ourselves

15    that we made after we got stopped by the Coast Guard

16    that we wouldn't talk to law enforcement at all.

17    And he may say that.  And if you elicit that, I want

18    you to know that that's what's coming.

19         MR. MARTINEZ:  I was trying to not go there, I

20    was trying to point out that on the boat they had no

21    conversations, but I'm getting ready to move on.

22         MR. STOUT:  Okay, I just wanted you to make

23    sure you were aware that could come.

24         MR. MARTINEZ:  Yes, thank you.

25         (At which time the sidebar discussion was

1    concluded and the proceedings resumed as follows:)

2    BY MR. CASTILLO:

3    Q    Mr. Chacin, when the Coast Guard boarded the

4    Fat Crow, eventually you and all the crew were taken

5    into custody, you were placed under arrest?

6    A    Yes, sir.

7    Q    And eventually you arrived at a facility

8    somewhere here in Tampa, isn't that right?

9    A    Upon detaining us there on the Fat Crow we

10    were sent to a Coast Guard vessel that belonged to

11    the American fleet.

12    Q    Yes.  And then eventually you arrived here in

13    Tampa, isn't that right?

14    A    Yes, sir.

15    Q    And when you arrived in Tampa, you were met by

16    agents of the federal government, isn't that right?

17    A    Yes, we were received by them.

18    Q    And the agents, they talked to you in essence

19    to ask you what happened, isn't that right?

20    A    Yes, sir.

21    Q    And when you were first met by the agents you

22    were kind of led to believe that you were in a lot

23    of trouble, isn't that right?

24    A    Yes, sir.

25    Q    And you were told by the agents that it would

1      be in your best interests to cooperate with them,

2      isn't that right?

3      A      Yes.

4      Q      And that was before you had a lawyer, isn't

5      that right?

6      A      Yes, sir.

7      Q      And you made the decision to talk to the

8      agents and answer their questions, isn't that right?

9      A      Yes, sir.

10     Q      And would you agree that that was about

11     September 17th of this year, a couple months ago?

12     A      Yes, sir.

13     Q      And that was the date you would have met with

14     agents of the federal government and talked to them;

15     is that right?

16     A      Yes, sir.

17     Q      And you voluntarily answered their questions,

18     isn't that correct?

19     A      Yes, sir.

20     Q      And you lied to them during that interview,

21     didn't you?

22     A      Yes.

23     Q      Because you were scared, isn't that right?

24     A      Yes, sir.

25     Q      So you thought that you could make up a story

1    and lie to them, isn't that right?

2    A       Yes, sir.

3    Q       One of the things that you told the agents was

4    that you only learned about the drugs on the Fat

5    Crow after the Coast Guard found the bales, isn't

6    that what you told the agents on September 17th?

7    A       No, sir.

8    Q       You never told the agents that that's the only

9    time you learned about the drugs aboard the Fat

10   Crow?

11   A       I realized -- I told the agents that I had

12   realized about the drugs when they were loaded on

13   while we were anchored off the coast of Venezuela,

14   they came in a vessel.

15   Q       Well, do you remember meeting with the agent

16   Ivan Garcia?

17   A       Yes, sir.

18   Q       And he's the person you spoke to -- he's the

19   agent you spoke to when you got here in September,

20   isn't that right?

21   A       With him and another young lady, I don't

22   remember her name.

23   Q       Okay.  Well, there came a point in time where

24   you also came to this courthouse and you were

25   brought before a magistrate judge reference these

1    charges, isn't that right?

2    A    Yes, sir.

3    Q    And that was in September, I think it was

4    September 18th of this year, isn't that right, more

5    or less?

6    A    Yes, sir.

7    Q    And you and all the crew members aboard the

8    Fat Crow were brought into this courthouse, right?

9    A    Yes, sir.

10   Q    And it was at that time that the indictment

11   was read to you and you were informed of the charges

12   against you, isn't that right?

13   A    Yes, sir.

14   Q    And at that time you asked the court to

15   appoint you a lawyer because you were without money

16   to hire your own, isn't that right?

17   A    Yes, sir.

18   Q    And the court did in fact appoint you a

19   lawyer, Ms. Hughes, isn't that right?

20   A    Yes, sir.

21   Q    And that would have been September 18th of

22   this year, isn't that right?

23   A    Yes, sir.

24   Q    Now, I'm not going to ask you the substance of

25   the conversations you had with Ms. Hughes, but there

1    were times that Ms. Hughes would visit you at the

2    jail, isn't that correct?

3    A      Yes, sir.

4    Q      And you would discuss the case with her, isn't

5    that right?

6    A      Yes, sir.

7    Q      And she would bring to you the reports and the

8    information in this case about the Fat Crow and your

9    case, isn't that right?

10   A      She was waiting for the government to give her

11   the evidence, it was after about a third or fourth

12   visit that she brought and read some sheets to me.

13   Q      Okay. And my point is she would take you --

14   these documents and pictures having to do with this

15   case, to you at the jail, isn't that right?

16   A      Yes, sir.

17   Q      And you were able to look at the evidence

18   against you -- all the reports, all the pictures,

19   and discuss all this with her, isn't that right?

20   A      Yes, sir.

21   Q      And you were able to see a copy of the report

22   that was written about your interview with Agent

23   Garcia on the 17th of September, isn't that right?

24   A      Yes, sir.

25   Q      And at the beginning of that interview Agent

1      Garcia told you I want the truth, isn't that right?

2      A      Yes, sir.

3      Q      And he told you that it would be in your best

4      interests to tell the truth to help yourself, isn't

5      that right?

6      A      Yes, sir.

7      Q      And you know that while he was interviewing

8      you he was taking notes, isn't that right, he had a

9      pad and was taking down what you were saying?

10     A      Yes, sir.

11     Q      And he told you he was going to put everything

12     together in a report, isn't that right?

13     A      Yes, sir.

14     Q      Now, you knew that you needed to tell the

15     truth to the agent when you spoke to him, right?

16     A      Yes.

17     Q      And you knew that it was important to be

18     complete and accurate, isn't that right?

19     A      Yes, sir.

20     Q      And at that meeting you never told him

21     anything about any conversations you had with

22     Mr. Llanos, isn't that correct?

23     A      To Mr. Garcia?

24     Q      Yes.

25     A      No.

1    Q     So that information about the $100,000 that

2    you asked from Mr. Favio because somebody told you

3    that's a good number, none of that information did

4    you tell to Mr. Garcia, Agent Garcia, isn't that

5    correct?

6    A     No, sir.

7    Q     And you then eventually after looking at the

8    evidence against you and the reports that you saw,

9    you made a decision after consultation with your

10    lawyer to plead guilty to these charges, isn't that

11    right?

12    A     Yes, sir.

13    Q     And you became aware because you were told by

14    the court on the first day that you were looking at

15    a minimum mandatory 10-year sentence, isn't that

16    right?

17    A     Yes, sir.

18    Q     And you had discussions with your attorney and

19    others about the sentencing guidelines, isn't that

20    right, the federal sentencing guidelines?

21    A     Yes, sir.

22    Q     The little table with all the numbers and the

23    columns?

24    A     Yes, sir.

25    Q     And you became aware that the way that an

1    advisory sentence was calculated was certain factors

2    were put into a formula, isn't that right?

3    A        Formula -- how so, could you explain that?

4    Q        Well, the sentencing guidelines, there is a

5    formula that's used to arrive at a reasonable

6    sentence, isn't that right?

7    A        Yes, sir.

8    Q        And some of the factors are the weight of the

9    drugs, right, that's one of the factors that's

10   considered?

11   A        Yes, sir.

12   Q        Another factor is if you have a prior record

13   or any type of criminal activities, isn't that

14   right?

15   A        Yes, sir.

16   Q        And if you qualify for certain benefits what

17   we call the safety valve, that can also lower your

18   sentence as well?

19   A        No, she didn't talk to me about that, a

20   reduction in sentence, no.

21   Q        Well, you knew that there were certain

22   adjustments that were made based upon your conduct

23   and your past conduct and what happened in this

24   case, isn't that right?

25   A        Yes, sir.

1    Q       And you became aware that mariners in your

2    situation normally would fall into a range of 135 to

3    168 months, isn't that correct?

4    A       Well, she talked to me about 120 months.

5    Q       Well, 120 months is 10 years, isn't that

6    right?

7    A       Yes, sir.

8    Q       And that's what you became aware, there is a

9    minimum mandatory of 10 years because of this

10   offense, isn't that right?

11   A       Yes, sir.

12   Q       Anyway, after discussing all that with her,

13   you decided you wanted to plead guilty, isn't that

14   right?

15   A       Yes, sir, because there was some evidence that

16   a fellow crew member had already spoken about

17   everything that had happened.

18   Q       Well, you decided to plead guilty, isn't that

19   right?

20   A       After receiving the evidence that she showed

21   me that there was a fellow member who had spoken.

22   Q       All right.  But the point is you decided to

23   plead guilty at some point; isn't that right?

24   A       Yes, sir.

25   Q       And you also became aware and you knew that

1    one of the ways you can go below the 10-year minimum

2    mandatory was to cooperate with the government,

3    isn't that right?

4    A    Yes, sir.

5    Q    In fact, there came a point in time where you

6    signed a document we call a plea agreement, isn't

7    that right?

8    A    Yes, sir.

9         MR. CASTILLO:  Your Honor, may I approach the

10   witness?

11        THE COURT:  You may.

12   BY MR. CASTILLO:

13   Q    I'm going to show you now what has been marked

14   for identification as Government Exhibit 106C and

15   ask if you recognize that document.

16   A    Yes, sir.

17   Q    I know it's in English, but have you seen it

18   before?

19   A    Yes, sir.

20   Q    And are these your initials at the bottom of

21   each page, on every page in this document?

22   A    Yes, sir.

23   Q    And those initials indicate that that page was

24   read to you and you were in agreement with it?

25   A    Yes, sir.

1    Q    And on page 24 of that document there is some

2    copies of some signatures and there appears to be a

3    signature above Eduardo de Jesus Chacin Villarroel?

4    A    Yes, sir.

5    Q    Is that your signature, sir?

6    A    Yes, sir.

7    Q    Is this a copy of the document that you

8    signed?

9    A    Yes, sir.

10    Q    Having to do with your plea of guilty?

11    A    Yes, sir.

12         MR. CASTILLO:  Your Honor, at this time I

13    would move 106C into evidence.

14         THE COURT:  Do you have any objections?

15         MR. STOUT:  No objection, Your Honor, as long

16    as it's clear that the defense moved that in and not

17    us.

18         THE COURT:  Okay.  So that would be Defense

19    Exhibit Number 1, I suppose.

20         MR. CASTILLO:  For the record it's 106C.

21         THE COURT:  But they're not moving it.

22         MR. CASTILLO:  I'll change it, but --

23         THE COURT:  All right.

24    BY MR. CASTILLO:

25    Q    On the ELMO now before us is this Government

1      Exhibit 106C which is the plea agreement that you

2      identified.  That's the same document I just showed

3      you, correct?

4      A      Yes, sir.

5      Q      Okay.  On the very first page here on

6      paragraph 1 it says the defendant shall enter a plea

7      of guilty to Count One of the indictment.  In

8      essence it's charging you with conspiracy to

9      distribute and possession with intent to distribute

10     more than 5 kilograms or more of cocaine while

11     aboard a vessel subject to the jurisdiction of the

12     United States in violation of these federal laws.

13     That's what you understood that you were doing,

14     you're pleading guilty to conspiracy, right?

15     A      Yes, sir.

16     Q      And this document, after you signed it, did

17     you go in front of another judge and plead guilty in

18     front of that judge?

19     A      No, sir.

20     Q      Did you go in front of Judge McCoun,

21     Magistrate Judge McCoun?

22     A      Upon signing it I came to court.  I came to

23     court and signed my guilt.

24     Q      And you went before Magistrate Judge McCoun

25     who went over this document with you, right?

1    A       Yes, sir.

2    Q       With another judge in a courtroom like this

3    one, right?

4    A       Yes, sir.

5    Q       And the judge spent about an hour going over

6    this document with you, isn't that right?

7    A       Yes, he read it to us, yes.

8    Q       Making sure that you understood what you were

9    doing, isn't that right?

10   A       Yes, sir.

11   Q       Because you were also told by the judge that

12   you had the right go to trial if you chose to, isn't

13   that right?

14   A       Yes, sir.

15   Q       But he wanted to make sure this was your

16   decision to plead guilty pursuant to this agreement,

17   isn't that right?

18   A       Yes, sir.

19   Q       And he went over this document with you to

20   make sure that you understood it, isn't that right?

21   A       Yes, sir.

22   Q       And you understood right here in writing by

23   entering a plea that you were looking at a minimum

24   mandatory term of imprisonment of 10 years up to

25   life imprisonment.

1    A       Yes, sir.

2    Q       And a fine not to exceed $10 million, right?

3    A       Yes.

4    Q       That's a lot of months aboard the Fat Crow,

5    isn't it?

6    A       Yes, sir.

7    Q       A term of supervised release of at least five

8    years up to life.

9    A       Yes, sir.

10   Q       And a special assessment of $100 that you've

11   got to pay at the time of sentencing, isn't that

12   right?

13   A       Yes, sir.

14   Q       Now, you haven't been sentenced yet, have you?

15   A       No, sir.

16   Q       And you know that sometime in the future

17   you're going to appear before Judge Bucklew and

18   she's going to sentence you, isn't that right?

19   A       Yes, sir.

20   Q       And at this moment as you sit there you have

21   no idea what sentence you're going to get, isn't

22   that right?

23   A       No.

24   Q       But you know that by entering this plea you'll

25   looking at at least 10 years up to life

1    imprisonment, isn't that right?

2    A    Yes, sir.

3    Q    And then this plea agreement is a deal between

4    you and the prosecutor, the federal government,

5    isn't that right?

6    A    I'm cooperating with justice, speaking the

7    truth.

8    Q    Yeah, but I'm talking about this deal.  This

9    deal is between you and the government, isn't that

10   right?

11   A    Deal, how so?

12   Q    All right.  I'm going to direct your attention

13   to page 16 of this same document we've been

14   discussing.  And in paragraph 6 right here where my

15   finger is on your screen, "It is understood by the

16   parties that the court is neither a party to nor

17   bound by this agreement."  Do you see that?  Do you

18   see that?

19   A    Yes, sir.

20   Q    And those are your initials right there at the

21   bottom of the page, right?

22   A    Yes, sir.

23   Q    And you told us that when you put those

24   initials there, you agreed with everything on that

25   page, isn't that right?

1    A      Yes, sir.

2    Q      So again I'll ask you the question, this

3    agreement is between you and the government, isn't

4    that correct?

5    A      Yes, sir.

6    Q      The court is not a party to this agreement.

7    The judge is not bound by this, isn't that right?

8    A      No, sir.

9    Q      In fact, the next sentence right there says

10   the court may accept or reject the agreement or

11   defer a decision until it has had an opportunity to

12   consider the presentence report prepared by the

13   United States Probation Office.  That's what it

14   says, right?

15   A      Yes, sir.

16   Q      And that's what you agreed to, right?

17   A      Yes, sir.

18   Q      Have you been interviewed by a probation

19   officer to put the presentence report together?

20   A      Yes, sir.

21   Q      Has that report been prepared, to your

22   knowledge?

23   A      They already took my questions.

24   Q      But have you seen the report, the report from

25   the probation officer about your case, has it been

1    done yet?

2    A    No, I have not seen it.

3    Q    Okay.  But you're aware that you already

4    answered the questions and you know that they're

5    preparing one, isn't that right?

6    A    Yes, sir.

7    Q    And that's what they're talking about in this

8    second sentence about the presentence report, isn't

9    that right?

10   A    Yes, sir.

11   Q    And you still haven't seen it because it

12   hasn't been prepared to your knowledge, isn't that

13   right?

14   A    I don't know if it's been prepared.  That's

15   why I have not seen it.

16   Q    Yeah, you haven't seen it.  All right.  And

17   the next page, same paragraph but on page 17, third

18   line down says, "The defendant further understands

19   and acknowledges that any discussions between the

20   defendant or defendant's attorney and the attorney

21   or other agents for the government regarding any

22   recommendations by the government" -- here it says

23   "are not binding on the court and that should any

24   recommendations be rejected, defendant will not be

25   permitted to withdraw defendant's plea pursuant to

1      the plea agreement."

2             That's what it says, right?

3      A      Yes, sir.

4      Q      What you understood that to mean was once you

5      plead guilty, the judge has the ultimate word on

6      what your sentence is going to be.

7      A      Yes, sir.

8      Q      Anything the government might say or your

9      lawyer might say is not binding on the judge.

10     A      Yes, sir.

11     Q      So you realize that it's up to you to impress

12     this judge in your benefit, isn't that right?

13     A      Yes, sir.

14     Q      And you know that she's listening to

15     everything that you're saying, isn't that right?

16     A      Yes, sir.

17     Q      Now, one of the benefits that you're getting

18     by this plea agreement in paragraph 5 is that Count

19     Two, the possession offense, will be dismissed.

20     A      Yes, sir.

21     Q      That's what you understand it because that's

22     what it says, right?

23     A      Yes, sir.

24     Q      You were originally charged with two charges,

25     isn't that right?

1    A       In the beginning, yes.

2    Q       Conspiracy and possession, isn't that right?

3    A       Yes, sir.

4    Q       And what you're pleading to here is the

5    conspiracy count, right?

6    A       Yes, sir.

7    Q       And one of the benefits that you got by

8    pleading guilty and cooperating with the government

9    is that they're going to dismiss the possession

10   count, right?

11   A       Yes, sir.

12   Q       In the next paragraph you're also getting

13   another benefit.  If the court accepts the plea

14   agreement, the United States Attorney's Office for

15   the Middle District of Florida agrees not to charge

16   you with committing any other federal criminal

17   offenses known to the United States Attorney's

18   Office at the time of the execution of this

19   agreement.  That's what it says, right?

20   A       Yes, sir.

21   Q       And you signed this document on November 6th,

22   isn't that right, of this year?

23   A       Yes, sir.

24   Q       That's the date that's reflected on page 24

25   right above your signature, isn't that right?

1    A       Yes, sir.

2    Q       And back to page 4, guideline sentence, we

3    talked about, that's you said the calculation and

4    the chart and that formula.  Remember that?

5    A       Yes, sir.

6    Q       This paragraph talks about that formula and

7    how it's going to -- the guidelines will be used in

8    your case, isn't that what it says?

9    A       Yes, sir.

10   Q       And another benefit that you get, paragraph 8,

11   is accepting responsibility, three levels.  In other

12   words, by pleading guilty and letting the government

13   know that you want to plead guilty way prior to

14   trial, they're going to recommend that you get three

15   levels off of your calculation, isn't that what it

16   says?

17   A       Yes, sir.

18   Q       And then paragraph 9 you, remember how we

19   talked about the guidelines, that there is a range,

20   a low end and a high end?

21   A       Yes, sir.

22   Q       And you indicated you thought you got

23   120 months, that's what you understood?

24   A       A minimum of 120, yes, sir.

25   Q       But there was a range up to 168 months, isn't

1    that right?

2    A      Yes, sir.

3    Q      Which is 14 years.

4    A      Yes, sir.

5    Q      Remember that number?

6    A      Yes.

7    Q      Okay.  And what the government has agreed here

8    is that they're going to recommend that you get the

9    low end of that range, whatever it is.

10   A      Yes, sir.

11   Q      That's a recommendation that they're going to

12   make to the judge, isn't that right?

13   A      Yes, sir.

14   Q      But we already learned in the other paragraph

15   in this agreement that the judge doesn't have to

16   accept that recommendation, isn't that right?

17   A      Yes, sir.

18   Q      Now, paragraph 10, this is where you agree to

19   cooperate, all right, and that begins on page 6 of

20   your plea agreement.  Those are your initials, isn't

21   that right?

22   A      Yes, sir.

23   Q      Meaning you understood what was on this page,

24   isn't that right?

25   A      Yes, sir.

1    Q      And we know that at least two occasions

2    somebody has discussed this provision with you in

3    detail, isn't that right?

4    A      Two people?

5    Q      Yeah.  In other words, your attorney went over

6    it with you the day you signed it, isn't that right?

7    A      Yes, sir.

8    Q      And she answered any questions that you might

9    have had about this provision, isn't that right?

10   A      Yes, sir.

11   Q      And again when you went in front of Judge

12   McCoun, he also asked you questions about this

13   provision, isn't that right?

14   A      Yes, sir.

15   Q      To make sure that you understood what it was

16   that you were agreeing to, isn't that right?

17   A      Yes, sir.

18   Q      And what cooperation is set forth here and how

19   you understand it is that first line is you agree to

20   cooperate fully with the United States in the

21   investigation and prosecutions of other persons and

22   to testify subject to a prosecution for perjury,

23   fully and truthfully in any federal court proceeding

24   and other provisions that are set forth there.  I'm

25   not going to go into it, but that's in essence what

1    you agreed to do, is that right?

2    A    Yes, sir.

3    Q    In exchange for you doing that, right here in

4    the middle where it says if the cooperation is

5    completed prior to sentencing, the government agrees

6    to consider whether your cooperation qualifies as

7    substantial assistance in accordance with the

8    policies of the United States Attorney of the Middle

9    District of Florida warrant the filing of a motion

10   at the time of sentencing recommending a downward

11   departure from the applicable guideline range or,

12   see it says "or," number two, the imposition of a

13   sentence below a statutory minimum, or both.  That's

14   what you understand your cooperation to be, isn't

15   that right?

16   A    Yes, sir.

17   Q    So the government hasn't filed any type of

18   motion for you yet, have they?

19   A    No.

20   Q    You haven't seen it?

21   A    No, sir.

22   Q    You haven't seen it.  All right.  Look over

23   here on the last page, the last paragraph of the

24   paragraph on page seven.  In any case, the defendant

25   understands that the determination as to whether

1    substantial assistance has been provided or what

2    type of motion related thereto will be filed, if

3    any, rests solely with the United States Attorney

4    for the Middle District of Florida and the defendant

5    agrees that you cannot and will not challenge that

6    determination, whether by appeal, collateral attack

7    or otherwise.  That's what you agreed to, right?

8    A     Yes, sir.

9    Q     Those are your initials at the bottom of page

10   7, right?

11   A     Yes, sir.

12   Q     And you've agreed that if the United States

13   Attorney's Office has decided not to help you out,

14   that you're not going to complain about it, you're

15   not going to appeal it, you're not going to do

16   anything about it.

17   A     No, sir.

18   Q     That's what it says, right?

19   A     Yes, sir.

20   Q     That's what you agreed to do, right?

21   A     Yes, sir.

22   Q     So that you realize that your life and how

23   much time you're going to do in prison rests solely

24   with the decision this prosecutor is going to make

25   and how much value your testimony, your cooperation

1    has been to his office, isn't that right?

2    A    Yes, sir.

3    Q    And you know that they're prosecuting

4    Mr. Llanos Miranda, isn't that right?

5    A    Yes, sir.

6    Q    And you know that it's important to the

7    government to get information from you to try to

8    help their case against Mr. Llanos Miranda, isn't

9    that right?

10   A    Yes, sir.

11   Q    And you know that if you were to get up there

12   and say Mr. Llanos Miranda had nothing to do with

13   this, that wouldn't help the government, correct?

14   A    Yes.

15   Q    And you indicated that there was a

16   conversation one time when Favio came aboard the

17   boat -- there were three meetings.  The first time

18   he came aboard you told this jury that Mr. Llanos

19   Miranda told you that we should ask -- "we" meaning

20   the crew, should ask for $100,000.  That's what you

21   said, right?

22   A    Yes, sir.

23   Q    All right.  And when Mr. Llanos said that to

24   you, who else was with you?

25   A    Mr. Ariel Bolanos, Mr. Mario Acuna, and

1      Mr. Oscar Herrera.

2      Q      So you're telling me that Mr. Llanos told you

3      in front of these other people -- a guy that you

4      said you didn't know very well, is going to talk to

5      you now about drug smuggling and how much money we

6      should get.  That's what you're saying, right?

7      A      Who is it I don't know?

8      Q      Mr. Llanos.  You said you didn't know him very

9      well.

10     A      I didn't know his past, but in the three

11     months that we were on the ship I did get to know

12     him.

13     Q      Yeah, but you also told us that even though

14     you know somebody in the ship, you're not going to

15     know everything about somebody, isn't that right?

16     A      No.

17     Q      Okay.  So now you're saying that these other

18     people were present when Mr. Llanos told you this,

19     isn't that right?

20     A      Yes.

21     Q      But aside from your testimony and you saying

22     this in the presence of other people, this is not

23     recorded or on TV or anything, is it?

24     A      No, it was not recorded.

25     Q      Well, there came a point in time where we

1    already know in September when you talked to Agent

2    Garcia, you didn't tell him that, did you?

3    A      Yes, I did not tell them because we amongst

4    the crew had reached an agreement that we would

5    not -- that we would say that we did not know

6    anything.

7    Q      Now, you're saying you had an agreement not to

8    talk about anything, that's what you're saying now,

9    right?

10   A      Well, not an agreement, it's just that we

11   spoke amongst ourselves saying when we talked to the

12   agents, that we would not say anything, say that we

13   did not know anything about the drugs.

14   Q      So you had an agreement amongst yourselves --

15   you had an agreement not to talk about the drugs to

16   the agents, isn't that right?

17   A      Yes, sir.

18   Q      And you broke that agreement because you spoke

19   to Agent Garcia in September, isn't that right?

20   A      Because in speaking with Agent Garcia I went

21   to the truth.  I told them part of the truth, that

22   except for the -- I lied about not helping to load

23   the drugs.  I told them the truth, but in part.  I

24   told them that I had only seen the loading of the

25   drugs on the stern of the ship and loaded on by the

1    crew members of the motorboat that brought it.

2    Q    Well, you lied to Agent Garcia because it

3    helped you out and it benefited you, isn't that

4    right?

5    A    I lied to him only in telling him that I did

6    not bring the drugs up.

7    Q    And that was a lie.

8    A    Yes, sir.

9    Q    And you lied to Agent Garcia because you

10   thought it was going to help you, isn't that right?

11   A    Yes, sir.

12   Q    You lie when it's good for you, don't you?

13   A    No, I've only lied that time only.

14   Q    That's the only time you ever lied is that

15   time.

16   A    Of course.

17   Q    Isn't that a lie right there?

18        THE COURT:  All right, Mr. Castillo, you need

19   to conclude.

20   BY MR. CASTILLO:

21   Q    Well, you also had a -- after you -- you made

22   the decision to plead guilty, isn't that right?

23   A    Yes, sir.

24   Q    And you had an interview with the agent in

25   October -- October 31st of this year, isn't that

1     right?

2     A       Yes, sir.

3     Q       You talked with this agent, Agent Ward, isn't

4     that right?

5     A       Yes, sir.

6     Q       Actually it was October 30th.  It was at the

7     end of October that he met you in the Pinellas

8     County Jail to talk to you, isn't that right?

9     A       The gentleman agent was there and my attorney

10    was there and another young lady.

11    Q       And that's when you talked to the agents to

12    help start your cooperation with the government in

13    this case, isn't that right?

14    A       Yes, sir.

15    Q       Okay.  And when you met with the agent, you

16    had already had the reports and the discovery in

17    this case you'd already gone through, isn't that

18    right?

19    A       Yes, sir.

20    Q       And you knew that Mr. Llanos was intending to

21    go to trial at that time, isn't that right?

22    A       At no time did I know he was going to trial.

23    Q       But nonetheless, you had the information about

24    the case that you had reviewed prior to making your

25    decision to plead guilty, right?

1      A      Yes, sir.

2      Q      Now, when you had your interview with Agent

3      Ward, that's when you told him about your

4      participation in this drug venture, isn't that

5      right?

6      A      Yes, sir.

7      Q      And you also told him that you were never paid

8      for your drug participation, isn't that right?

9      A      Yes, sir.

10     Q      Even though you were expecting $37,500, what

11     you got was arrested, isn't that right?

12     A      We were waiting on 10 percent and they talked

13     about $10,000, but nothing ever arrived.

14     Q      That was a further reduction in the agreement

15     that they made with you, isn't that right?

16     A      No, sir.  Of the $37,500 we were going to be

17     given 30 percent of that and that equalled $10,500.

18     Q      And you didn't get that.

19     A      No.

20     Q      Okay.  Now, another part of your provision is

21     that you're also aware that whatever sentence you

22     get in this case you've given up your right to

23     appeal except for very limited instances, isn't that

24     right?

25     A      Yes, sir.

1    Q    And I'll direct your attention to page 17,

2    paragraph 7, and that's what we've been discussing.

3    That's pretty much your understanding is that you're

4    waiving your right to appeal any sentence you get by

5    the judge, isn't that right?

6    A    Yes, sir.

7    Q    With these limited exceptions that are listed

8    there, isn't that right?

9    A    Yes, sir.

10   Q    Now, this document, when you signed it, who

11   prepared it?

12   A    The government.  And it was my counselor -- my

13   attorney was the one who gave it to me.

14   Q    Well, that's my point.  In other words, your

15   attorney didn't prepare this, did she?

16   A    No.  She read it to me with a female

17   translator.

18   Q    In this document you couldn't make any

19   changes, you had to sign it the way it was written,

20   isn't that right?

21   A    Yes, because I was accepting my guilt.

22   Q    But all the words and all the language in this

23   document was prepared by the prosecutor, isn't that

24   right?

25   A    Yes, sir.

1    Q    And then you had it read to you and you said

2    okay, I'm going to sign it, I agree, isn't that

3    right?

4    A    Yes, sir.

5    Q    So there is a part here called facts, page 20,

6    and you agree that that's what you did and that's

7    what happened in this case, right?

8    A    Yes, sir.

9    Q    But that language and those words were put

10   together by the government, right?

11   A    Yes, sir.

12   Q    And when all these names are put there of all

13   the different people, you agreed based upon what you

14   know in your case you agreed to sign this document,

15   right?

16   A    Yes, sir.

17   Q    And on the back page here this is the

18   signature, your signature and attorneys and

19   everybody in this case, right?

20   A    Yes, sir.

21   Q    And this was a document that was filed with

22   the court and you went to court for it and discussed

23   it with you, right?

24   A    Yes, sir.

25   Q    Were you present on the vessel with any

1    communication between Mr. Llanos and the captain

2    when Mr. Llanos was complaining and wanted to get

3    off the boat because he hadn't been paid?

4    A      He made the decision of talking to the captain

5    but it was due to the low amount of money that he

6    was being given for the drug load because he said

7    that it was too little what he was being given.

8    Q      And you were present for that?

9    A      It could be heard in the hallways and at one

10   of the meetings with Mr. Hector Favio that's one of

11   the topics that was talked about.

12   Q      Okay.  So now you're in a hallway overhearing

13   a conversation, right?

14   A      No, the hallways, we would talk amongst

15   ourselves, that's what I mean.

16   Q      So the whole crew is talking about the fact

17   that Mr. Llanos wants to get off the boat?

18   A      No.

19   Q      My question to you was were you present when

20   Mr. Llanos was complaining to the captain about

21   wanting to get off the boat.

22   A      There were several of us crew members there.

23   Q      All right.  So you remember there was a time

24   when Mr. Llanos was complaining to the captain,

25   right?

1     A     Yes, but if you -- if we take it to the end

2    you will see that here it is, he's here with us, and

3    he just made the decision of going and no one put a

4    gun to his head to come along.

5    Q     Yes, but when you're docked in the middle of

6    the ocean and you want to get off the boat, what

7    opportunity does he have to leave if the captain

8    doesn't want him to leave?

9          THE COURT:  Mr. Castillo, he doesn't need to

10   answer that question.  You need to conclude.

11         MR. CASTILLO:  That's all I have, Your Honor.

12         THE COURT:  All right.

13         MR. CASTILLO:  We'll fix this later.  I've got

14   this exhibit.

15         THE COURT:  Let's take a recess.  It's

16   3 o'clock.  We're going to be in recess until 3:20.

17   You're welcome to walk around.  Please don't discuss

18   the case and leave your pads on your chairs.

19         (The jury retired to the jury room.)

20         (Recess was taken from 2:57 until 3:14 p.m.)

21         MR. STOUT:  Your Honor, after this witness I

22   plan on introducing the certified conviction that

23   Your Honor made a prior ruling on.  I didn't know

24   how you wanted to do that, if I would be permitted

25   to read it or if you would like to read it to them,

1    to the jury.

2          THE COURT:  No, I'm not going to read it.  You

3    can offer it into evidence and you can read it.

4          MR. STOUT:  Put it on the screen and -- thank

5    you, Your Honor.

6          MR. CASTILLO:  Are you going to give a 404(b)

7    instruction at the same time?

8          THE COURT:  And I will give a 404(b)

9    instruction.

10         MR. CASTILLO:  Oh, I know you're going to do

11   it, I respect your decision, but I move for a

12   mistrial in advance once it comes in, so I don't

13   have to stand up and do it again.

14         Oh, Judge, just so the record is clear, I

15   think we've been working okay, but obviously I'm

16   adopting all of Mr. Martinez's objections and

17   arguments unless I opt out.  I think it's been

18   working okay, I don't think we've had any motions

19   yet, but just so the record are clear --

20         THE COURT:  I will note that you're adopting

21   his objections to the extent they're applicable to

22   your client and he's adopting yours to the extent

23   they're applicable to his client, unless you opt

24   out.

25         MR. CASTILLO:  Yes, Your Honor, that's

1     retroactive as well, starting from the beginning of

2     trial.

3          Your Honor, while they're out, tomorrow

4     morning do you have any sentences?  We're starting

5     at 9?  I have a state court matter --

6          THE COURT:  9, yes.  I do have a sentencing,

7     but it's at 8:30 and it should be quick, it's an

8     illegal re-entry case.

9          MR. CASTILLO:  Okay, that's fine, because I'll

10    have somebody cover my state matter, that's all.

11         THE COURT:  Who is going to be doing the

12    interpreting?  Would you get the jury?

13         Did you include a 404(b) instruction in your

14    instructions you gave me or should I go to the book?

15         MR. STOUT:  Your Honor, there is a 404(b)

16    instruction for the end, I believe -- let me

17    double-check.  It might be safe to go to the book.

18         (The jury returned to the courtroom.)

19         THE COURT:  Mr. Martinez?

20                    CROSS EXAMINATION

21    BY MR. MARTINEZ:

22    Q    Good afternoon, Mr. Chacin.  I represent

23    Mr. Mendoza.  I have a couple followup questions.

24         I want to go back a second to defendant Llanos

25    Exhibit Number 1 which is your plea agreement.  This

1    document is already in evidence so the jury will get

2    it and they'll be able to read it during their

3    deliberations.  I'm not going to go through it with

4    you line by line, but I want to confirm a couple of

5    things with you about it.

6         First of all, with regard to you and I, you

7    and I have never met each other before, have we?

8    A    No, sir.

9    Q    And I did not take your pretrial deposition or

10   interview you in any way in advance of this trial,

11   did I?

12   A    No, sir.

13   Q    So the very first time that I heard your story

14   was today, right?

15   A    Yes, sir.

16   Q    Now, in contrast to the government's theory of

17   prosecution, that was created by them and put on the

18   stipulated fact section within your plea agreement,

19   correct?

20        THE COURT:  Okay.  I'm going to ask you to ask

21   another question.  He doesn't know what the

22   government's theory of prosecution is.

23   BY MR. MARTINEZ:

24   Q    Let me break it down this way.  You already

25   conceded in your cross-examination to Mr. Castillo

```
 1      that the government created the plea agreement in

 2      this case, right?  Your plea agreement.

 3      A       Yes, sir.

 4      Q       They wrote it up entirely, correct?

 5      A       Yes, sir.

 6      Q       By the time you had a chance to look at it to

 7      decide whether it spoke the truth, it was already

 8      put before you like a take-it-or-leave-it deal,

 9      correct?

10      A       Before I --

11      Q       Before you what?

12      A       The signature, if I ever read the document?  I

13      never read the document.

14      Q       You can't read English, right?

15      A       No, sir.

16      Q       The document was read to you word for word in

17      Spanish by your lawyer with the assistance of an

18      interpreter, that's what you've already told us,

19      right?

20      A       Yes, sir.

21      Q       You swore to that today, correct?

22      A       Yes, sir.

23      Q       You swore to the exact same fact before U.S.

24      Magistrate Judge Tom McCoun as well, correct?

25      A       Yes, sir.
```

1    Q      So when you get to page 20 of the stipulated

2    fact section, you are reading it for the very first

3    time, right?

4    A      There I knew what had already happened, that

5    the Tahoma had already boarded us.

6    Q      But all the words and all the sentences on

7    page 20, all of 21, all of 22, and up to this point

8    on page 23, you didn't type those up and put those

9    there, did you?

10   A      No, sir.

11   Q      All you had to do was sign on the last page,

12   agreeing that those facts that they typed up were

13   true, right?

14   A      Yes, sir.

15   Q      All right.  Now, there is a provision in your

16   plea agreement that says that if you do not tell the

17   truth, you can be prosecuted for a separate criminal

18   offense of perjury, isn't that correct?

19   A      Yes, sir.

20   Q      And you understand that I am not an attorney

21   that works for the United States Attorney's Office,

22   right?

23   A      No.  What I understand, you're the defense

24   attorney of Mr. Jair.  I don't know that you work

25   for the prosecution because this is the first time

1    I've seen you.

2    Q    All right.  Well, I'll tell you I don't work

3    for the prosecution.  And you know that if there is

4    going to be a perjury prosecution brought against

5    you in the future for false statement, it has to be

6    initiated by the U.S. Attorney's Office, right?

7    A    Yes, sir.

8    Q    So if you stick to the script, there isn't

9    going to be a prosecution for false statement, is

10   there?

11   A    Yes, sir.

12   Q    Now, are you aware as to whether or not the

13   other cooperating defendants in this case have the

14   exact same plea agreements with the exact same

15   language in it regarding the alleged facts of the

16   case?

17   A    I couldn't say.

18   Q    Where are you housed in the Pinellas County

19   jail?

20   A    The sixth floor, C3.

21   Q    And are you housed with Mario Acuna Garcia?

22   A    No, sir.

23   Q    Are you housed with Martin Miguel Barrios

24   Leon?

25   A    No, sir.

1    Q        Are you housed with Oscar Herrera Venera?

2    A        No, sir.

3    Q        Do you see any of those individuals either in

4    the yard or at break or at religious services?

5    A        No, sir.

6    Q        Were you transported from the Pinellas County

7    jail to this courthouse in the company of any of

8    these gentlemen?

9    A        Yes, sir, but we did not speak along the way.

10   Q        So you anticipated my next question, correct?

11   A        No.

12   Q        I hadn't asked it yet.

13   A        I jumped ahead.  I don't know if that's the

14   question you were going to ask.

15   Q        And during this transportation where you were

16   in the company of these individuals was that from

17   the Pinellas County jail to this Tampa federal

18   courthouse?

19   A        Yes, sir.

20   Q        And is that approximately like a 40-minute

21   drive?

22   A        Approximately, yes.  I don't know the route, I

23   don't know.

24   Q        But you know how long you were sitting in a

25   van with them, right?

1    A       Yes, sir.

2    Q       And that's a distance from one county to

3    another, correct?

4    A       Yes, sir.

5    Q       And were you and these other individuals

6    transported together yesterday as well or just

7    today?

8    A       Only today, sir.

9    Q       So today when it was expected that you, one of

10   the four cooperating witnesses would testify, you

11   and the other three were all put in the van together

12   to come together, right?

13   A       Yes, sir.

14   Q       And along that way you didn't have one single

15   conversation when any of those men about your

16   testimony today.

17   A       When we were being handcuffed I mentioned to

18   Mr. Oscar that his belly was big, but beyond that,

19   nothing else.

20   Q       Just a comment on his weight, that's it.

21   A       Yes, sir.

22   Q       All right.  Let me go back to the beginning so

23   I'm sure I understand what you are telling this

24   jury.  I want to go back to Venezuela.  You have a

25   family?

1  A     Yes, sir.

2  Q     Are you married?

3  A     Yes, sir.

4  Q     Do you have any children?

5  A     Yes, sir.

6  Q     How many?

7  A     Four children, sir.

8  Q     And how old are your four children?

9  A     The oldest girl is 19, second one is 13,

10  third, a boy, is 12, and the youngest is 9.

11  Q     Do you love your children?

12  A     Yes, sir.

13  Q     Do you miss your children?

14  A     Yes, sir.

15  Q     Do you want to see your children again?

16  A     Yes, sir.

17  Q     Do you want to see your wife again?

18  A     Yes, sir.

19  Q     Is there anything you wouldn't do to make that

20  happen?

21  A     I would not do what I did again.

22  Q     What about now that you've already done it, is

23  there anything you wouldn't do to get back and see

24  them again?

25  A     That I wouldn't do now?

1    Q       Is there anything you wouldn't do to be able

2    to see them again?

3    A       Speak the truth to be able to be leave prison

4    here earlier, cooperate with justice.

5    Q       So you wouldn't lie.

6    A       No, sir.

7    Q       To be able to see them again.  But you are

8    apart from them predicated upon your own doing,

9    right?

10   A       Yes, sir.

11   Q       You decided that you would become a drug

12   trafficker, right?

13   A       Yes, sir.

14   Q       Nobody forced you to do that, right?

15   A       No, sir.

16   Q       And now you find yourself in your present

17   predicament, correct?

18   A       Yes, sir.

19   Q       Facing your 10-year minimum mandatory sentence

20   unless the government moves this court to give you a

21   lesser sentence, right?

22   A       Yes, sir.

23   Q       Now, why would you put yourself in the

24   position to take that risk?

25   A       Because what, of pleading guilty?

1    Q       No.  Why did you agree to become a drug

2    dealer?

3    A       The country's situation.  But here I am, I'm

4    paying for what I did.

5    Q       Right.  You were in a desperate economic

6    circumstance, were you?

7    A       It's, well, we would eat two times a day.

8    Sometimes my wife and I would eat once, but my

9    children never stopped eating three times.

10   Q       Did your wife work?

11   A       Yes, sir.  She would help me.

12   Q       And how much would she earn?

13   A       I'd earn 300 a month and she would earn 500 or

14   600 a month.

15   Q       We're not talking about U.S. dollars, right?

16   A       No, sir.

17   Q       You already told this jury that your average

18   earnings during the time period where you were in

19   this economic circumstance, this dire economic

20   circumstance, was between $3 and $10 a month, your

21   earnings, right?

22   A       Yes, sir.

23   Q       And your wife, can we presume she was earning

24   approximately the same amount of income?

25   A       Yeah, a little bit more, sir.

```
 1    Q       Well, if you're $3 to $10, what's her range?

 2    A       She was at about $20.

 3    Q       So a really good month she brings in $20 and

 4    you bring in $10, right?

 5    A       Yes, sir.

 6    Q       So it's $30 for you and your wife and your

 7    four kids.

 8    A       Yes, sir.

 9    Q       Becoming a drug trafficker was your only way

10    to end that cycle, right?

11    A       Yes, sir.

12    Q       So you decided to take the risk, right?

13    A       Yes, sir.

14    Q       Now, you had said that you didn't know that

15    you were going to be participating in a drug venture

16    until you got to the Dominican Republic.  Do you

17    remember that testimony?

18    A       Yes, sir.

19    Q       Isn't it a fact that you were hired in

20    Venezuela to do this deal?

21    A       No, sir.

22    Q       Let's examine that.  I'm going to put before

23    you Government Exhibit 106B which has already been

24    introduced into evidence.  It's a three-page

25    exhibit.  This is your itinerary, is it not?
```

1     A       That's the ticket from Caracas to Santo

2     Domingo.

3     Q       Now, you testified on direct examination that

4     you decided to leave the house and your wife and

5     your children to go look for work in Dominican

6     Republic, right?

7     A       Yes, sir.

8     Q       You had no idea if when you got to the

9     Dominican Republic you were going to find work or

10    not, right?

11    A       Yes, sir, and I didn't have the best of --

12    it's like an adventure, the way all immigrants do.

13    Q       You weren't in any kind of economic

14    circumstance to start taking wild-eyed adventures,

15    were you?

16    A       Not as a dreamer, but I made a decision

17    because that was the chance I had to find a better

18    life out of Venezuela.

19    Q       All right.  If it was so easy for people in

20    Venezuela that were making $10 a month to go to

21    Dominican Republic and start making $900 a month,

22    wouldn't you think everybody would do that?

23    A       Well, I'm going to answer by saying that there

24    have been 6 million Venezuelans that have immigrated

25    to Santo Domingo, to Panama, to Ecuador, to Chile,

1    to many other countries; not me alone, it's been

2    many Venezuelans.

3    Q    So you are competing with 6 million people who

4    are looking to better their financial circumstance,

5    right?

6    A    Competing -- looking for each day's daily

7    bread for our children, that's not competing.

8    Q    You were so lucky that two days after you

9    arrived in Dominican Republic without knowing what

10   job you were looking for, you landed a job with the

11   Fat Crow.

12   A    Yes, sir.

13   Q    Now, the Fat Crow, we know from what happens

14   in the future, is getting ready to build a secret

15   compartment on the boat to house $45 million of

16   cocaine, right?

17   A    Yes, sir, that's what the judge read to us on

18   the day that he read us the charges, the amount, the

19   earnings that those drugs would have.

20   Q    Even if you didn't know at the time how much

21   those 1,500 kilograms were worth, you knew you were

22   building a compartment to hide a large amount of

23   cocaine, right?

24   A    Yes, sir, 2,000 kilograms was the compartment.

25   Q    And certainly the owners of the Fat Crow and

1      the owners of the cocaine knew that they were fixing

2      to embark on the drug cocaine importation, correct?

3              MR. STOUT:  Objection, Your Honor.

4              THE COURT:  Sustained.  I don't know how he

5      would know what the owners knew.

6      BY MR. MARTINEZ:

7      Q      Okay.  When you went to look for a job you

8      ended up finding the job with the Fat Crow, right?

9      A      Yes, sir.

10     Q      What did they hire you to do?

11     A      To transport fuel.

12     Q      But by your own admission that's not what they

13     were planning to do; they were planning on

14     trafficking in cocaine, right?

15     A      After being on the ship for a few days I

16     realized that once the construction of the stash

17     compartment came about to transport the drugs.

18     Q      So it's your under oath testimony that they

19     hired you to transport gasoline, but two or three

20     days later you found out they're really looking for

21     people to transport cocaine.

22     A      To transport -- a dual purpose, to transport

23     fuel and to transport cocaine.

24     Q      Well, the fuel was the guise, correct?  The

25     cocaine was actually what was hidden in the secret

1      compartment that you built, right?

2      A      Yes, sir.

3      Q      And you're saying you didn't go to find a drug

4      trafficking job and you weren't hired for a drug

5      trafficking job in advance, it just turned into a

6      drug trafficking job two days after you got there.

7      A      Yes, sir.

8      Q      Now, after you built this secret

9      compartment -- how long did you say it took to do

10     that?

11     A      It took us one month approximately.

12     Q      After you built the drug trafficking secret

13     compartment, now it's ready to receive the drugs,

14     right?

15     A      Yes, sir.

16     Q      And we don't know when the drugs arrived that

17     you put in the secret compartment, but you do,

18     right?

19     A      The entire crew knew the day that it arrived,

20     the day that we loaded.

21     Q      And besides the words that leave your mouth,

22     what proof do you have of that?

23     A      Of?  The drugs?

24     Q      Of when the drugs arrived.

25     A      We knew that they were arriving that day

1    because they had communications with the captain on

2    the day that the drugs were going to arrive.

3    Q      Says who?

4    A      I'm saying it.  Right now I'm saying it.

5    Q      Right.  You're saying it, right?  You're the

6    same guy that entered into the plea agreement with

7    the government, right?

8    A      Yes, sir.

9    Q      You're the same guy that admitted that you

10   were hoping to gain the benefit by assisting the

11   government.

12   A      Yes.

13   Q      Do you remember the prosecutor asking you that

14   question?

15   A      No, I don't remember.

16   Q      One of the first questions he asked you was

17   are you expecting a benefit by cooperating with the

18   government.  Do you remember that question?

19          MR. STOUT:  Objection, Your Honor.

20          THE COURT:  Sustained as far as asking him

21   what the prosecution asked him.  Ask another

22   question.

23   BY MR. MARTINEZ:

24   Q      Do you recollect having stated at first that

25   you were not expecting to get a benefit from

1    cooperating with the government during your direct

2    examination?

3            MR. STOUT:  Objection, Your Honor.

4            THE COURT:  Sustained.  Ask another question.

5    BY MR. MARTINEZ:

6    Q      You testified that you didn't make any money

7    off of this drug trafficking venture.  Do you

8    remember that?

9    A      Yes, sir.

10   Q      Now, in terms of your conversations with the

11   government, I want to ask you a couple of questions

12   about that, all right?  We've already established

13   that you and I have not spoken prior to today.

14   A      No, sir.

15   Q      What about the gentlemen at this table, the

16   prosecution, have you spoken to them prior to today?

17   A      The prosecutor, the agent.

18   Q      Which prosecutor?

19   A      The one that's to my right.

20   Q      The gentleman with the beard?  Is that the

21   only one at that table that you've spoken to?

22   A      Yes, sir.

23   Q      Okay.  And did you speak to him after you

24   signed Defendant Llanos Exhibit 1, your plea

25   agreement?

1   A        What was the question?

2   Q        Before you signed the plea agreement you were

3   represented by a lawyer, correct?

4   A        Yes, sir.

5   Q        And who was that lawyer?

6   A        Counselor Irina Hughes.

7   Q        You just looked to the audience.  She's here

8   today?

9   A        Yes.

10  Q        And you weren't visited by any government

11  agents at the jail while she represented you without

12  her permission, right?

13  A        They would always, on the days they went to

14  speak with me, my attorney was always there.

15  Q        And on the days that they went to see you, on

16  the days that they went to see you, was that

17  subsequent to your signing the plea agreement?

18  A        Yes, sir.

19  Q        And subsequent to you agreeing to the facts

20  that they typed up?

21  A        Yes, sir.

22  Q        And during those meetings where your lawyer

23  was present and the government was present, were you

24  spoken to regarding the testimony that you would

25  give in this proceeding?

1    A      No, I was told the document and how -- but I

2    was not told what I had to say.

3    Q      Well, were you given in advance the questions

4    that were going to be asked to you?

5    A      That I was going to be asked some questions,

6    that I had to say the truth.

7    Q      And did they tell you what kinds of questions

8    they would be asking you?

9    A      No, sir.

10   Q      Well, did they interview you about what you

11   knew about the case before deciding to use you as a

12   witness?

13   A      Yes, of the testimony that I had given the

14   agents, to speak the truth about that.

15   Q      And how many meetings did you have with the

16   government in preparation of your testimony today?

17   How many times did that occur?

18   A      Two times.

19   Q      And when was the first time?

20   A      One week ago, week and a half max, I don't

21   remember well.

22   Q      How long did that meeting last?

23   A      An hour and a half.  The document would be

24   read to me.

25   Q      What kind of document was read to you?

1    A      The one where I plead guilty, the one that has

2    my initials?

3    Q      The plea agreement, the one that had the facts

4    on it that they typed up?

5    A      Yes, sir.  Yes, sir.

6    Q      And when was the second meeting?

7    A      A few days later, some four or five days

8    later.

9    Q      And how long was that meeting?

10    A      Also an hour and a half.

11    Q      And what document did you discuss for that

12    hour and a half meeting?

13    A      They reviewed the document again for me, how I

14    was going to express myself, you understand.

15    Q      When you read the plea agreement you came to

16    learn that any money that you had been paid in

17    advance for participating in this drug transaction

18    would have to be forfeited back to the government,

19    right?

20    A      That was also read to me.

21    Q      Is that when you decided to say that you

22    didn't get any money at all in this transaction?

23    A      No, much earlier I said that I had not

24    received any money.

25    Q      When did you learn that if you had received

1    any money, you would have to give it back?

2    A    That never happened because my wife never told

3    me.  If it would have happened --

4    Q    This was the question:  When did you learn

5    that the law here in the United States and your plea

6    agreement requires you to return any money you might

7    have gotten?

8    A    During those days when my attorney read that

9    document to me with the female translator.

10   Q    And it was after that was read to you and

11   after you signed it and after you plead guilty

12   before you met with the agents to talk about the

13   money you may or may not have received, right?

14   A    I didn't talk -- they didn't talk to me about

15   money or anything like that.

16        MR. MARTINEZ:  May I have a moment, Judge?

17        THE COURT:  You may.

18   BY MR. MARTINEZ:

19   Q    This was -- I deviated from this.  This is

20   Government's Exhibit 106B.  This is your airline

21   ticket, right?

22   A    Yes, sir.

23   Q    This is the airline ticket that you bought to

24   go to Venezuela in the hopes that you might find a

25   job there, right?

1  A      Not Venezuela.  Santo Domingo.

2  Q      I stand corrected.  From Caracas, Venezuela,

3  to Santo Domingo, and then Santo Domingo back to

4  Caracas, Venezuela.

5  A      Yes, but I had to buy the ticket showing the

6  return flight back from Santo Domingo back to

7  Caracas and it's stipulated there that if I decided

8  to come on that day that I would have to pay for it.

9  Q      So you bought a round trip ticket?

10  A      Yes, sir.  But I only used the Venezuela one.

11  Q      Right.  You bought a round trip ticket, but

12  you only used one portion of it.

13  A      Yes, sir.

14  Q      And the drug traffickers paid for that round

15  trip ticket from Caracas, Venezuela, to Dominican

16  Republic?

17  A      No, sir.

18  Q      And you were dead broke at the time, so where

19  did you get the money?

20  A      Well, it came from money that I had saved and

21  from -- I've had a job for 15 years, working, I had

22  benefits, I had vacation, I have religious holidays,

23  pay for children, and my wife helped me as well.

24  Q      So a couple that doesn't have enough money for

25  three square meals a day has money sitting around in

1    savings to spend on a round trip ticket in the hopes

2    that it might lead to something, is that what you're

3    saying?

4    A    To seek the future of one's children, yes.

5    Q    How much money was this round trip ticket from

6    Venezuela to Dominican Republic?

7    A    I believe it came out to 450 to 550, the

8    ticket.

9    Q    So if a good month you're making $30 a month,

10   this is over a year's worth of income that you spend

11   allegedly on this round trip ticket in the hope that

12   you might find something in Dominican Republic.

13   A    In the beginning -- it's bolivas.  I make

14   300,000 bolivas a month, not dollars.

15   Q    Tell us in American dollars, how much is a

16   round trip ticket from Caracas, Venezuela, to the

17   Dominican Republic.

18   A    It's 300 -- about $20.  Back then it was about

19   $20.

20   Q    So it's your under oath testimony that you can

21   get a round trip ticket from Caracas, Venezuela, to

22   the Dominican Republic for $20, that's $10 each way,

23   right?

24   A    Yes, sir.

25   Q    And what airline is this?

1    A       Laser.

2    Q       Thank you.  No further questions.

3            THE COURT:  Mr. Stout, any redirect?

4            MR. STOUT:  Yes, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. STOUT:

7    Q       Mr. Chacin, do you recall the defense lawyers

8    asking you about how you got here today, your

9    transport here today?

10   A       Yes, sir.

11   Q       Did you ride with other of your crew members

12   from the Fat Crow from the jail to here today?

13   A       Yes, sir.

14   Q       And did you also ride with federal law

15   enforcement agents from the jail to here today?

16   A       Yes, sir, three, there were three people.

17   Q       Do you remember the defense lawyers asking you

18   about your meetings with the government before this

19   trial?

20   A       Yes, sir.

21   Q       Was I at the last two of those meetings you're

22   talking about?

23   A       Yes, sir.

24   Q       Did I speak in Spanish to you during those

25   meetings or were there agents to translate?

1    A       A translator was used.

2    Q       During those meetings did we talk about your

3    plea agreement which the defense lawyers have

4    already talked to you about?

5    A       Yes, sir.

6    Q       I'm going to show you page 10 of what I

7    suppose is now Defense Exhibit Number 1.  I'm going

8    to read it to you.  It says, "If the cooperation is

9    completed prior to sentencing the government agrees

10   to consider whether such cooperation qualifies as

11   substantial assistance in accordance with the policy

12   of the United States Attorney for the Middle

13   District of Florida."

14          Is your understanding of that provision that

15   the United States Attorney's Office has promised --

16          MR. MARTINEZ:  Objection, it's leading.

17          THE COURT:  Rephrase.

18   BY MR. STOUT:

19   Q       Has anyone from the United States Attorney's

20   Office promised you 100 percent that you will get a

21   better sentence because of your testimony and

22   cooperation in this case?

23   A       No, sir.

24   Q       I show you page 8 of that same document.  I'm

25   going to read provision labeled provision B there.

1    It says, "It is understood that should the defendant

2    knowingly provide incomplete or untruthful

3    testimony, statements, or information pursuant to

4    this agreement, or should the defendant falsely

5    implicate or incriminate any person, or should the

6    defendant fail to voluntarily and unreservedly

7    disclose and provide full, complete, truthful and

8    honest knowledge, information and cooperation

9    regarding any of the matters noted herein, the

10   following conditions shall apply."

11        And then the first condition there says, "The

12   defendant may be prosecuted for any perjury or false

13   declarations, if any, committed while testifying

14   pursuant to this agreement before obstruction of

15   justice."

16        Do you understand that provision?

17   A    Yes, sir.

18   Q    When we met, you and I, in those two meetings

19   prior to your testimony today, did we discuss that

20   provision?

21   A    Yes, sir.

22   Q    You testified earlier that when you met with

23   the federal law enforcement agents the day that they

24   brought you here to the Middle District of Florida

25   on September 17th, you did not tell them the whole

1    truth.  Do you remember testifying about that?

2    A      Yes, sir.

3    Q      Did you in fact tell them lies that very first

4    time you met with them in September?

5    A      Yes, sir.

6    Q      Was that before you signed this document and

7    entered into the plea agreement?

8    A      Yes, sir.

9    Q      Have you told the truth today in your

10   testimony?

11   A      Yes, sir.

12   Q      The complete truth?

13   A      Yes, sir.

14   Q      Do you believe it's in your best interests to

15   tell the truth?

16   A      Yes, sir.

17   Q      Do you remember testifying much earlier today

18   about the conversation you had with Mr. Llanos, the

19   defendant, about the amount of money you should ask

20   for from Hector Favio, do you remember that?

21   A      Yes, sir.

22   Q      Why did Mr. Llanos tell you that you should

23   ask for a hundred thousand dollars?

24   A      He had experience in these cases and

25   transporting drugs to the United States.

1    Q      And what else did he tell you about his

2    experience in transporting drugs to the United

3    States?

4    A      That he was jailed in the United States.

5          MR. STOUT:  Your Honor, may I have a moment?

6          THE COURT:  You may.

7          MR. STOUT:  No further questions.

8          THE COURT:  All right.  Thank you, sir, you

9    may step down.  You may call your next witness.

10          MR. STOUT:  Your Honor, before we move to the

11    next witness I would like to offer for admission

12    Government Exhibit 200B which is a certified

13    conviction for defendant Gustavo Enrique Llanos

14    Miranda that Your Honor has already made a pretrial

15    ruling on the admissibility.

16          THE COURT:  Okay.  We'll receive into evidence

17    Exhibit 200B.

18          MR. STOUT:  Your Honor, may I publish that

19    exhibit?

20          THE COURT:  You may.

21          MR. STOUT:  Your Honor, with your permission

22    I'm going to read select parts of this to the jury.

23          THE COURT:  All right.

24          MR. STOUT:  It says in the United States

25    District Court for the Eastern District of New York,

1    it's a judgment in a criminal case, United States

2    vs. Gustavo Enrique Llanos Miranda.  It says the

3    defendant pleaded guilty to Count One of the

4    indictment in that case.  Says the title and section

5    and the nature of the offense to which he plead

6    guilty which is 21 United States Code, Section

7    952(a) and 960(b)(3).  The nature of the offense is

8    importation of cocaine.  Said that the remaining

9    counts against the defendant were dismissed.

10        And on the second page at the top it says that

11   the defendant is hereby committed to the custody of

12   the United States Bureau of Prisons to be in prison

13   for a total term of 51 months.

14        And on the very first page the date of this

15   certified judgment is April 22nd, 2002.

16        THE COURT:  Ladies and gentlemen, I have an

17   instruction to read you that pertains to the exhibit

18   that just came into evidence.  You will remember at

19   the beginning of the trial I said there may be a

20   time when I would give you an instruction that you

21   should consider a piece of evidence for certain

22   things but not for other things and this is one of

23   those times.  So let me read the instruction to you.

24        You've just heard evidence in the form of the

25   exhibit that I have admitted of an act that was

1    allegedly done by the defendant on another occasion

2    that may be similar to the acts or act with which

3    the defendant is currently charged in this case.

4         You must not consider any of the evidence to

5    decide whether the defendant engaged in the activity

6    alleged in this indictment.  The evidence is

7    admitted and may be considered by you for the

8    limited purpose of assisting you in determining

9    whether the defendant had the state of mind or the

10   intent necessary to commit the crime that he's

11   charged with in this indictment.

12        Mr. Stout, you may call your next witness.

13        MR. STOUT:  Your Honor, the United States

14   calls Tyler Barkley of the United States Coast

15   Guard.

16        [Witness sworn]

17        COURTROOM DEPUTY CLERK:  Please be seated.

18   Please state your name and spell your last name for

19   the record.

20        THE WITNESS:  Tyler Barkley, B-a-r-k-l-e-y.

21                    DIRECT EXAMINATION

22   BY MR. STOUT:

23   Q    Sir, how are you currently employed?

24   A    I'm employed with the U.S. Coast Guard.

25   Q    What is your position with the U.S. Coast

1    Guard?

2    A       I'm an E4 and a maritime enforcement

3    specialist.

4    Q       Is E4 a petty officer?

5    A       Correct.

6    Q       Petty Officer Barkley, what's a maritime

7    enforcement specialist?

8    A       It's a rating in the Coast Guard.  We handle

9    law enforcement, federal law enforcement

10   specifically.

11   Q       How long have you been doing that for?

12   A       In my current rating three years almost.

13   Q       How long have you done federal law enforcement

14   for the U.S. Coast Guard?

15   A       Coming up on five and a half years.

16   Q       Have you participated in any drug

17   interdictions as part of your time with the U.S.

18   Coast Guard?

19   A       Yes, I have.

20   Q       What was your role in those interdictions?

21   A       Most of them I was the boarding officer.

22   Q       Have you received specialized training in

23   being a boarding officer?

24   A       Yes, I have.

25   Q       What training was that?

1    A       Going to school, a school to become a maritime

2    enforcement specialist which was 10 weeks and then

3    going back to the Federal Law Enforcement Training

4    Center for two weeks specifically for boarding

5    officer school.

6    Q       What U.S. Coast Guard cutter are you currently

7    assigned to?

8    A       Coast Guard Cutter Confidence.

9    Q       I would like you to explain the Coast Guard

10   Cutter Confidence's role in the Fat Crow

11   interdiction.

12   A       We met up with the Fat Crow and the Coast

13   Guard Cutter Tahoma in the Caribbean.  And after

14   they had already found narcotics on board, started

15   the boarding, we took over that boarding to relieve

16   them.

17   Q       Where did the Tahoma go at that point?

18   A       They had some training up north.

19   Q       Do you remember approximately what day

20   Confidence took control of the Fat Crow from Tahoma?

21   A       Specifically, no.  I know it was the end of

22   August, anywhere from like the 28th to like the 2nd

23   of September, in that timeline.

24   Q       What was your role in the hand-off of the Fat

25   Crow from Tahoma to the Confidence?

1    A        My role was to escort my boarding team over to

2    the Fat Crow, get all the information from the case

3    that they have gathered so far, do a debrief with

4    their boarding officer and their boarding team, and

5    to completely take over the case.

6    Q        Explain to us physically how you accomplished

7    that.

8    A        Well, initially we embarked, we met the

9    boarding team that was already on scene which was

10   Coast Guard Cutter Tahoma's boarding team, on the

11   bridge.  They took us through a tour of the vessel,

12   showed us any safety concerns, showed us where they

13   found the narcotics on board, briefed us about how

14   they initially did the boarding and all the steps

15   they had taken up until that point.

16          After the tour we went back to the bridge.  On

17   the way there they showed us where the crew members

18   were staying currently and we went through the case

19   package that they had accomplished thus far.

20   Q        At what point did the Tahoma totally

21   relinquish control of the Fat Crow to you and your

22   team?

23   A        The day we arrived on scene.

24   Q        After the Tahoma left the scene and you were

25   in control of the Fat Crow did you attempt to sail

1    it?

2    A    Yes, we did.

3    Q    How did that attempt go?

4    A    Due to safety concerns and multiple casualties

5    on board pertaining to like fire, smoking, we were

6    unable to safety navigate the vessel.

7    Q    When you say casualties, what do you mean,

8    what exactly are you talking about?

9    A    By using their crew members, their captain,

10   their engineer, they were able to successfully get

11   the Fat Crow under way.  We sailed for anywhere from

12   two to four hours, making very low speed.  Their

13   navigation equipment wasn't adequate and there was a

14   fire on the bridge that we had to take care of and

15   extinguish and the steering went out while sailing

16   as well.  So after all of that there was smoking

17   down below, we stopped the engines, secured and

18   relayed everything to Cutter Confidence to let them

19   know that we weren't able to continue sailing.

20   Q    When you say you weren't making very fast

21   speed, what kind of speed are you talking about?

22   A    Approximately three knots.

23   Q    Which in miles per hour what's that?

24   A    Very similar, approximately like 3 miles an

25   hour, 3 to 5.

1    Q    After you had to shut down the engines on the

2    Fat Crow, what did you and your team -- how did you

3    and your team decide to move the Fat Crow from that

4    point going forward?

5    A    The following day we towed or discussed the

6    possibility of towing.

7    Q    Did Confidence ultimately tow the Fat Crow?

8    A    We did ultimately tow, yes.

9    Q    How many drug interdictions have you been

10   involved in as a boarding officer or a boarding team

11   member?

12   A    Five, five or six.  All as boarding officer

13   with the exception of one.

14   Q    And how many ships have you boarded,

15   regardless of whether it was for drug interdiction

16   or for some other purpose?

17   A    Say again.

18   Q    How many ships total have you boarded, whether

19   it was for a drug interdiction or for some other

20   purpose?

21   A    Ships and vessels, over 50.

22   Q    In your training and experience doing such

23   boardings what kind of shape was the Fat Crow in?

24   A    Not good shape.

25   Q    Ultimately what did the Coast Guard Cutter

1       Confidence and your team do with the Fat Crow and

2       its crew and the drugs and so on?

3       A       The first day, like I said, we tried to sail,

4       we were unsuccessful.  My boarding team and I stayed

5       overnight on the Fat Crow.  The next morning the

6       crew members were transferred over to Cutter

7       Confidence, they were made detainees.  We

8       transferred the narcotics over to Confidence, as

9       well as evidence and personal belongings.

10      Q       Did the Coast Guard Cutter Confidence tow the

11      Fat Crow all the way here to the Middle District of

12      Florida?

13      A       We did not.

14      Q       What did you do with it between it getting

15      here and how did you get rid of it?

16      A       We transferred it to another cutter.

17      Q       Do you know what cutter that was?

18      A       Cutter Diligence.

19      Q       Do you know when that was?

20      A       I couldn't give you an exact date.  It was

21      approximately a week after we initially arrived on

22      scene with the Fat Crow.

23              MR. STOUT:  Your Honor, may I have a moment?

24              THE COURT:  You may.

25              MR. STOUT:  I have no further questions, Your

1    Honor.

2              THE COURT:  Okay.  Mr. Castillo?

3                      CROSS EXAMINATION

4    BY MR. CASTILLO:

5    Q      Good afternoon, sir.  Mr. Stout asked you your

6    assessment of the Fat Crow.  I think your response

7    was it's not in good shape?

8    A      Correct.

9    Q      As part of your duties as a law enforcement

10   specialist with the Coast Guard do you board other

11   vessels to ensure seaworthiness?

12   A      Yes, we do.

13   Q      And obviously if it's in American waters it

14   would be different standards than international

15   waters, correct?

16   A      Correct.

17   Q      If this Fat Crow was in international waters

18   would there be many citations issued for

19   various violations?

20   A      With them being foreign, no.  If they were

21   U.S., yes.

22   Q      Because we've seen photographs of the Fat Crow

23   and you actually boarded it, correct?

24   A      Correct.

25   Q      And you're a sea man and you receive training

1    in vessels and vessel identification and safety

2    issues at sea, isn't that right?

3    A      Correct.

4    Q      So although the Fat Crow may have been

5    underway and may be fairly seaworthy, it wasn't a

6    state of the art vessel by any means, correct?

7    A      That is correct.

8          MR. CASTILLO:  That's all I have, Your Honor.

9          THE COURT:  Mr. Martinez?

10                    CROSS EXAMINATION

11   BY MR. MARTINEZ:

12   Q      Good afternoon.  You were the boarding

13   officer, is that right?

14   A      Correct, the relieving boarding officer.

15   Q      Okay.  Are you the -- let me ask you this.

16   You're not the first Coast Guard person to testify

17   in this case.  Have you talked to any of the other

18   Coast Guard personnel that have previously testified

19   in this case?

20   A      Not about the case.

21   Q      Okay.  Are you the individual -- let me back

22   up.  It's our understanding predicated upon the

23   prior testimony of other Coast Guardsmen that there

24   was a welding rod and a glove and that the cocaine

25   had packaging on it, okay, there was questions about

1    the forensic examination that was or was not done or

2    performed on those items.  And I was corrected to

3    put that inquiry to the boarding officer.  Is that

4    you?

5    A       That's not me.

6    Q       That's not you?

7    A       That's not.

8    Q       Never mind then.  Thank you.

9            THE COURT:  Mr. Stout, any other questions?

10           MR. STOUT:  No, Your Honor.

11           THE COURT:  Thank you, sir, you may step down.

12           You may call your next witness.

13           MR. STOUT:  The United States calls Johnny

14   Montgomery of the U.S. Coast Guard.

15           [Witness sworn]

16           COURTROOM DEPUTY CLERK:  Please be seated.

17   Please state your name and spell your last name for

18   the record.

19           THE WITNESS: Johnny Montgomery,

20   M-o-n-t-g-o-m-e-r-y.

21                     DIRECT EXAMINATION

22   BY MR. STOUT:

23   Q       Sir, how are you currently employed?

24   A       With the U.S. Coast Guard.

25   Q       How long have you been with the U.S. Coast

1    Guard?

2    A       Fourteen years.

3    Q       What's your current rank with the Coast Guard?

4    A       E6, maritime enforcement specialist first

5    class.

6    Q       Is that a petty officer?

7    A       Petty officer first class.

8    Q       To what Coast Guard cutter are you currently

9    assigned?

10   A       The Coast Guard Cutter Diligence.

11   Q       During your 14 years with the Coast Guard what

12   job have you had with the Coast Guard?

13   A       I was at the Coast Guard Cutter Diligence

14   recently.  Before that I was at PACTACLET, Pacific

15   Tactical Law Enforcement Team in San Diego,

16   California, for three years.  Before that I was a

17   maritime enforcement specialist A school instructor

18   that taught law enforcement for five.  Before that I

19   was at a maritime safety security team for four

20   years in San Diego and then I was on an 87-foot

21   patrol cutter.

22   Q       Have you served as a boarding officer in

23   interdictions of various kinds?

24   A       Yes, sir.

25   Q       Approximately how many times?

1    A       Approximately 20 boardings.

2    Q       Are those boardings for any purpose or just

3    for drug interdiction?

4    A       Drug interdiction.

5    Q       How many boardings total?

6    A       Approximately 20.

7    Q       I mean beyond just drug interdictions.

8    A       Um, hundreds.

9    Q       Explain the Coast Guard Cutter Diligence's

10   role in the Fat Crow case.

11   A       Initially we were to respond to the Coast

12   Guard Cutter Confidence to relieve them from the Fat

13   Crow, the narcotics, the case package, and the nine

14   attendees so they could leave and do whatever they

15   needed to go do.

16   Q       Where did you do the hand off?

17   A       It was in the Caribbean.

18   Q       Do you remember approximately when?

19   A       Not exactly.  It was in the Caribbean ocean.

20   I don't know the exact location.

21   Q       Physically how did you relieve the

22   Confidence's crew of the Fat Crow and all the

23   materials that came with it, the personnel?

24   A       So I took a small boat over to the Confidence.

25   I met with ME3 Berkley and he had all the paperwork

1    for the detainees, the evidence, the narcotics, the

2    case package.  We went over the paperwork.  I

3    ensured that the numbers and the names and all the

4    information matched.

5         Once we verified that everything was there, I

6    then signed the paperwork.  It was then transferred

7    by small boat back to my vessel which was the

8    Diligence.  I rechecked that the numbers matched up

9    exactly from what we had on the previous boat that

10   is now on my current boat.

11   Q    Did you move the detainees from the Confidence

12   to the Diligence?

13   A    Yes, sir.

14   Q    Did you move the drugs?

15   A    Yes, sir.

16   Q    Did Diligence tow the Fat Crow?

17   A    Yes, sir.

18   Q    Where did Diligence tow the Fat Crow to?

19   A    Just off the coast of Tampa.

20   Q    What did you do with it there?

21   A    We transferred it over to PANEX.

22   Q    What is PANEX?

23   A    PANEX is a federal agency that took control of

24   that vessel, that was the disposition into Tampa.

25   Q    After your cutter relinquished control of the

1      Fat Crow itself where did your Cutter Diligence go?

2      A      We then pulled into -- I misspoke,, it was

3      St. Pete, station St. Pete, just off the coast of

4      that.  We then pulled into St. Petersburg.

5      Q      Is there a Coast Guard station there?

6      A      Coast Guard station, St. Petersburg.

7      Q      When you pulled into the Coast Guard station

8      there in St. Petersburg what did you do with the

9      drugs?

10     A      From there we dispositioned to the DEA, FBI,

11     CGIS, Homeland Security, which all makes up PANEX.

12     I did the paperwork.  I recounted.  The numbers were

13     the same as before when we took them on.

14            They came on board, verified that the numbers

15     matched up with the narcotics and the detainees, the

16     names matched up as well with their personal

17     effects, case package, and then everything was

18     signed for and then dispositioned off the vessel.

19     Q      When you say dispositioned off the vessel

20     physically what did you do with the drugs?

21     A      So the drugs we keep them locked in the same

22     place we keep our ammunition.  It was locked under

23     key.  I went down, unlocked that, verified that all

24     the narcotics was there.  We call it a daisy chain

25     where every Coast Guard member hand in hand lines up

1    from the bottom of the vessel all the way up off the

2    brow onto land and it's hand by hand passed over

3    hand by hand.  I then verified it again as well on

4    land that the same number matched up with what was

5    in the [inaudible] --

6    Q    Were you actually there to witness this

7    transfer?

8    A    Yes, sir.

9         MR. STOUT:  Your Honor, may I approach the

10   witness?

11        THE COURT:  You may.

12   BY MR. STOUT:

13   Q    Petty Officer Montgomery, I've handed you what

14   has been premarked Government Exhibit 2.  Will you

15   take a look at that and tell me what it is.

16   A    That is my crew.  That is my boat behind it

17   and that is also the narcotics that were taken off

18   our vessel onto the Coast Guard station.

19   Q    Is it a photograph?

20   A    Yes, sir.

21   Q    Were you there when the photograph was taken?

22   A    Yes, sir.

23   Q    Where was it taken?

24   A    I was standing behind the camera doing --

25   still verifying the paperwork, but it was taken at

1    the St. Petersburg station Coast Guard.

2    Q    Does it accurately represent what you say

3    there that day, the scene?

4    A    Yes, sir.

5         MR. STOUT:  Your Honor, I would offer

6    Exhibit 2.

7         MR. MARTINEZ:  Without objection.

8         THE COURT:  Received in evidence number 2.

9         MR. STOUT:  May I publish that Exhibit 2?

10        THE COURT:  You may.

11   BY MR. STOUT:

12   Q    Do you remember how many bales there were in

13   total of drugs that you offloaded?

14   A    Approximately 47.

15   Q    And do you recognize the people in the

16   photograph standing behind the bales?

17   A    Yes, sir.

18   Q    Who are they?

19   A    It's the crew of the Coast Guard Cutter

20   Diligence.

21        MR. STOUT:  Your Honor, may I have a moment?

22        THE COURT:  You may.

23        MR. STOUT:  No further questions, Your Honor.

24        THE COURT:  Mr. Castillo?

25        MR. CASTILLO:  No questions, Your Honor.

1          THE COURT:  Mr. Martinez?

2                    CROSS EXAMINATION

3     BY MR. MARTINEZ:

4     Q     Sir, the picture that was just up, the

5     photograph of all the bales?

6     A     Yes, sir.

7     Q     The wrapping that was -- that the bales were

8     wrapped in, who would be the individual that would

9     be responsible for the forensic information of that

10    wrapping?  If we were looking for either DNA or

11    fingerprints, if you know?

12    A     As far as I'm aware no one on board that

13    vessel has that certification of forensics.

14    Q     Okay.  And when it comes back to the United

15    States -- because you're in St. Petersburg at that

16    point, right?

17    A     Yes, sir.

18    Q     Where do the bales go, if you know?

19    A     Where is the location that they are taking it

20    to?

21    Q     Yes.

22    A     I'm unaware of that location.

23    Q     Who takes custody of it, is it the DEA, some

24    other federal agency, do you know?

25    A     It's the DEA, sir.

1      Q      So it would be the DEA then that would be able

2      to conduct the forensic examination because they

3      would actually have possession of the drugs and

4      whatever the drugs -- the material the drugs were

5      wrapped in, correct?

6              MR. STOUT:  Objection, Your Honor.

7              THE COURT:  What's the basis?

8              MR. STOUT:  Speculative.

9              THE COURT:  If he knows, he can answer.  If

10     you don't know, then you just say you don't know.

11             THE WITNESS:  I don't know, Your Honor.

12     BY MR. MARTINEZ:

13     Q      Okay.  But you do know that you surrendered

14     the drugs and the material they were wrapped in to

15     the Drug Enforcement Administration, that much you

16     know?

17     A      Yes, sir.

18     Q      Thank you.

19             THE COURT:  Anything else?

20             MR. STOUT:  No, Your Honor.

21             THE COURT:  Thank you, sir, you may step down.

22             You may call your next witness.

23             MR. STOUT:  The United States calls Miguel

24     Martin Barrios Leon.

25             THE COURT:  Is he incarcerated?

1          MR. STOUT:  Yes, Your Honor.

2          THE COURT:  Let me get you to approach sidebar

3     a minute.

4          (At which time the following sidebar

5     discussion was held:)

6          THE COURT:  He's another crewman?

7          MR. STOUT:  Yes, Your Honor.

8          THE COURT: Do you want to just go ahead and

9     recess?

10         MR. CASTILLO:  Please, Judge, my head is

11    pounding.  I was going to ask you.

12         MR. STOUT:  We can.  If he's going to be a

13    long witness like the last guy.  Maybe less.

14         MR. CASTILLO:  No, I'm not going to go like

15    that.

16         THE COURT:  Thank God.  All right.  Then I'm

17    going to excuse the jury, they'll be happy anyway.

18    Just while you're up here, is anybody claiming any

19    interest in the vessel?  I mean, we've got

20    forfeiture stuff.

21         MR. MARTINEZ:  Not these two defendants.

22         THE COURT:  So we're not going to have any

23    forfeiture.

24         MR. STOUT:  Not that the jury is going to

25    decide forfeiture.

1          THE COURT:  All right.

2          (At which time the sidebar discussion was

3    concluded and the proceedings resumed as follows:)

4          THE COURT:  Ladies and gentlemen, we're going

5    to go ahead and recess about 10 minutes early.

6    We'll start in the morning at 9:00 which is when we

7    would normally start at and I anticipate we'll start

8    promptly at 9:00.

9          Please don't discuss the case, please leave

10   your pads on your chairs and we'll start at 9:00

11   tomorrow morning.

12         (The jury retired to the jury room.)

13         THE COURT:  We're in recess until tomorrow

14   morning at 9:00.

15         (The proceedings adjourned at 4:43 p.m.)

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3      STATE OF FLORIDA            )

4      COUNTY OF HILLSBOROUGH      )

5          I, Lynann Nicely, RMR, CRR, Official Court

6    Reporter for the United States District Court, Middle

7    District, Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9    did, through use of Computer Aided Transcription,

10   report in machine shorthand the proceedings and

11   evidence in the above-styled cause, as stated in the

12   caption hereto, and that the foregoing pages,

13   numbered 1 through 185, inclusive, constitute a true

14   and correct transcription of my machine shorthand

15   report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17   the City of Tampa, County of Hillsborough, State of

18   Florida, February 26, 2018.

19

20

21         _____/s/ Lynann Nicely_____
                Lynann Nicely, RPR, RMR, CRR, CRC
22              Official Court Reporter

23

24

25