```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION


 3

        UNITED STATES OF AMERICA,    :
 4                                    :
             Plaintiff,               :
 5                                    :
                                      : CASE    8:17-cr-445
 6      vs.                           : NO.:
                                      :
 7                                    : DATE:  12/13/2017
        GUSTAVO ENRIQUE LLANOS        :
 8      MIRANDA and JAIR MENDOZA      : TIME:  8:55 a.m.
        MONTOYA,                      :
 9                                    : PAGES: 1 - 206
             Defendants.              :
10      -------------------------     :

11

                   TRANSCRIPT OF TRIAL DAY 3
12          BEFORE THE HONORABLE SUSAN C. BUCKLEW
                 UNITED STATES DISTRICT JUDGE
13

        For the Government:
14
                    TAYLOR G. STOUT, ESQ.
15                  U.S. Attorney's Office
                    Suite 3200
16                  400 N. Tampa Street
                    Tampa, Florida 33602
17


18      For Defendant Gustavo Llanos Miranda:

19                  DANIEL L. CASTILLO, ESQ.
                    3900 North Boulevard
20                  Tampa, Florida 33603


21

        For Defendant Jair Mendoza Montoya:
22
                    VICTOR D. MARTINEZ, ESQ.
23                  423 S. Hyde Park Avenue
                    Tampa, Florida  33606

24


25      Court Reporter:  Lynann Nicely, RPR, RMR, CRR
```

1                       I N D E X

2      WITNESS                                  PAGE

3

4      MARTIN MIGUEL BARRIOS LEON

5      Direct examination by Mr. Stout             6

6      Cross examination by Mr. Castillo          49

7      Cross examination by Mr. Martinez          81

8      Redirect by Mr. Stout                      97

9

10     MARIO JOSE ACUNA GARCIA

11     Direct examination by Mr. Gammons         114

12     Cross examination by Mr. Castillo         137

13     Cross examination by Mr. Martinez         157

14     Redirect examination by Mr. Gammons       164

15

16     OSCAR HERRERA VENERA

17     Direct examination by Mr. Gammons         167

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURT:  We're on the record.

MR. MARTINEZ:  I have been providing clothing for the defendant for him to wear, but I have been advised --

THE COURT:  They're wearing clothes.

MR. MARTINEZ:  Well, actually, Judge, my client has advised me he doesn't want to be in civilian clothes, he wants to be in the clothes that he ordinarily gets transported in from the Pinellas County Jail, he wants to be in orange.  It's up to him.  I told him that he could be in civilian clothes and I could make it known that he has been in a custody setting for all this time.  It's not necessary to be in orange just to get that information before the jury, but he wants to be in orange.  So I'm going to defer to him.

MR. CASTILLO:  My client wants the same thing, Judge.

THE COURT:  They both want to wear orange jumpsuits?

MR. MARTINEZ:  Yes.  So it's less work for me.

THE COURT:  They look very nice.

THE DEFENDANT:  We're not seen as victims but as victimizers and that's not the impression we want

1     to give to the jury.

2          THE COURT:  Say that again?

3          THE DEFENDANT:  We have to give an appearance

4     to the jury and if they see us in plain clothes,

5     they are not seeing us as victims.

6          THE COURT:  Oh, okay, you want to appear to be

7     a victim, is that what he's saying?

8          MR. MARTINEZ:  I think so, Your Honor, yes.

9          THE COURT:  Okay.  So the fact that you're in

10    jail -- you want them to know you're in jail, is

11    that right?

12         THE DEFENDANT:  Exactly, correct.

13         THE COURT:  Any objections from the

14    government?

15         MR. STOUT:  No, Your Honor.

16         THE COURT:  Okay.  That's fine.  As long as

17    it's fine with everybody -- it's certainly fine with

18    me.  Obviously the jury will then know you're

19    incarcerated or in jail, so fine.  Tomorrow when

20    you're brought over, just tell them.

21         MR. CASTILLO:  I think their clothes are back

22    here.  Maybe at the break or something or if you

23    want to give them a few minutes to change now.

24         THE COURT:  At lunch or whenever you can

25    change if that's your desire.  Okay.

1          THE DEFENDANT:  Thank you very much.

2          MR. CASTILLO:  Judge, the marshal informs me

3     it would take two minutes to change out.

4          THE COURT:  You want to go change now?

5          THE DEFENDANTS:  Yes.

6          THE COURT:  Okay.  Our jurors aren't all here,

7     so that's fine.  They still need to be kept separate

8     from the next witness though.

9          (Recess was taken from 8:58 until 9:04 a.m.)

10          (The jury returned to the courtroom.)

11          THE COURT:  All right.  Ladies and gentlemen,

12     anything happen over the evening hours that any of

13     you feel could affect your ability to serve on this

14     jury?  Any questions before we start?  Concerns of

15     any kind?  Okay.  I anticipate we'll follow a

16     similar schedule that we did yesterday.

17          All right.  Mr. Stout, you may call your next

18     witness.

19          MR. STOUT:  Your Honor, the United States

20     calls Martin Miguel Barrios Leon.

21          [Witness sworn]

22          COURTROOM DEPUTY CLERK:  Please be seated.

23     Please state your name and spell your last name for

24     the record.

25          THE COURT:  Would you state your name.

1          THE WITNESS:  Martin Miguel Barrios Leon.

2                    DIRECT EXAMINATION

3     BY MR. STOUT:

4     Q      Mr. Barrios, were you the captain of the Fat

5     Crow when the Coast Guard interdicted it in August

6     of this year?

7     A      Yes.

8     Q      Where are you from?

9     A      Cartagena, Colombia.

10    Q      How long have you lived in Colombia?

11    A      51 years, my whole life.

12    Q      What is your primary language?

13    A      Spanish.

14    Q      Do you speak any English at all?

15    A      No.

16    Q      What is your occupation?

17    A      I'm a mariner.

18    Q      Explain to us how -- what kinds of ships

19    you've worked on as a mariner.

20    A      Cargo ships and tankers.

21    Q      What positions have you held as a mariner on

22    these types of ships?

23    A      I started as a mariner, then afterwards to

24    bosun, then first officer, and then last one would

25    be captain.

1    Q      How long have you been a captain?

2    A      Approximately some 10 to 12 years.

3    Q      How large is the largest ship you've been a

4    captain of?

5    A      The largest?  About 70 meters, more or less.

6    Q      Was the largest one you're captained larger or

7    the same size or smaller than the Fat Crow, how does

8    it compare to the Fat Crow?

9    A      It's larger than Fat Crow.

10   Q      Where have you worked as a captain, where are

11   your routes?

12   A      My main route has been from Panama to La

13   Guajira and Punto Bolivar in Colombia and from

14   Panama to Guatemala.

15   Q      What types of cargo have you been responsible

16   for transporting?

17   A      From Colombia to Panama what gets transported

18   are things in the range of appliances.

19   Q      What kinds of appliances are you talking

20   about?

21   A      Washers, ranges, refrigerators, computers,

22   televisions.

23   Q      And the appliances you transported, was that

24   legitimate cargo or was that contraband in some way?

25   A      At first it started out as contraband because

```
1      in Colombia taxes would not be paid for those items.

2      Q       What is your salary as a ship's captain on

3      these cargo ships?

4      A       In the cargo ships or on the last one?

5      Q       On the cargo ships you just discussed you were

6      transporting appliances and so forth.

7      A       Well, when I started I was having an average

8      of $600 to $700.

9      Q       Are you talk about U.S. dollars?

10     A       Correct.

11     Q       And is that $600 per month, per year?

12     A       Monthly.

13     Q       And as you moved up the ranks what did your

14     salary become as a ship's captain?

15     A       As I was promoted my salary was increased as

16     well.

17     Q       Can you give us some idea what it was per

18     month?

19     A       More or less a thousand, $1,200.

20     Q       And how much do you make now as a ship's

21     captain?

22     A       $2,800.

23     Q       Was that your salary for being the captain of

24     the Fat Crow?

25     A       Yes.
```

1  Q      You mentioned that you -- you mentioned

2  several routes to us that you transported cargo on.

3  How many trips per year did you do as a ship's

4  captain?

5  A      Well, at first we were doing -- between

6  Colombia and Panama we were doing three to four

7  trips per month.

8  Q      What are a captain's duties on board a ship?

9  A      The captain is responsible for everything that

10 takes place on a ship and responsible for the

11 personnel of the ship.

12 Q      Are you responsible for navigation?

13 A      Correct.

14 Q      How did you become a captain?

15 A      I'm a captain learned in the trade.  I did not

16 study it.  I learned it as I went.

17 Q      Do you mean on-the-job training?

18 A      That's correct, in practice.

19 Q      Do you have any certifications to be a ship's

20 captain?

21 A      Yes, the Panamanian maritime authority gave me

22 my captain's license.

23 Q      Have you pleaded guilty in this case involving

24 the Fat Crow?

25 A      Yes.

1    Q    To conspiring to traffic drugs?

2    A    Yes.

3    Q    As part of your plea agreement with the United

4    States did you agree to cooperate and in part of

5    that to testify in this trial?

6    A    Yes.

7    Q    Do you hope that by your cooperation and

8    testimony you will ultimately receive a better

9    sentence?

10    A    Yes.

11    Q    Has anybody from the U.S. government promised

12    you that you will receive a better sentence?

13    A    No.

14    Q    I want to turn now to your involvement with

15    the Fat Crow.  How were you first recruited to be

16    the captain of the Fat Crow?

17    A    I had been called initially for the Fat Crow

18    to be an officer.

19    Q    And then how did you become a captain?

20    A    I got to be the captain because the captain

21    that was there had a problem, I don't know what type

22    of problem or issue he had, but they got him off and

23    placed me as captain.

24    Q    Who recruited you?

25    A    Mr. Jose Gonzalez.

1    Q       How did you know Jose Gonzalez?

2    A       In Colombia I used to work with him with

3    ships, with merchandise from Panama to Colombia.

4    Q       The same trips you told us about a minute ago?

5    A       Correct.

6    Q       When did he first mention this to you?

7    A       He mentioned that to me around early March.

8    In early March he made a comment to me that there

9    was a possibility of me going to this ship as an

10   officer, that there was a need for that in this

11   other ship.

12   Q       At that point did he tell you that it was

13   going to be a trip to transport cocaine?

14   A       No.

15   Q       What did he tell you was the purpose of the

16   trip?

17   A       The purpose of the trip was to transport fuel,

18   diesel.

19   Q       When did you first arrive on board Fat Crow?

20   A       I boarded the Fat Crow on the 15th of June.

21   Q       You said a minute ago that Jose Gonzalez first

22   mentioned the trip to you in March.  How come it

23   took you three months or so to join the ship?

24   A       Because I was working on another ship.

25   Q       When you joined the Fat Crow where was it?

1    A       Where was the Fat Crow or where was I?

2    Q       Where was the Fat Crow?

3    A       It was in Venezuela.

4            MR. STOUT:  Your Honor, permission to publish

5    Government Exhibit 16 which has already been

6    admitted?

7            THE COURT:  You may.

8    BY MR. STOUT:

9    Q       Mr. Barrios, you should have a laser pointer

10   there in front of you.  Can you show us on this map

11   where the ship was anchored whenever you first

12   joined it?

13   A       In this position here approximately.

14   Q       Now, when you joined the ship was it in a port

15   or was it offshore somewhere?

16   A       It was anchored in an anchoring area.

17   Q       How far offshore was it?

18   A       We were approximately some 19 miles from the

19   Lamakoya Lighthouse in Venezuela.

20   Q       How did you physically get from shore out to

21   the ship?

22   A       We were taken in a motor boat, in a small fast

23   motorboat with outboard engines.

24   Q       What day did you say you joined the Fat Crow?

25   A       The 15th of June.

1    Q    That same day did anyone else ride with you in

2    the small speed boat out to join the Fat Crow crew?

3    A    Yes, Mr. Jair Mendoza.

4    Q    Do you see that person sitting anywhere in

5    this courtroom?

6    A    Yes.

7    Q    Can you tell us what he's wearing?

8    A    He has a suit -- an orange shirt and glasses.

9    Q    Does he have hair or no hair?

10    A    Yes, he has hair.

11    Q    And is he the gentleman who just stood up for

12    us?

13    A    Yes, sir.

14    MR. STOUT:  Your Honor, if the record would

15    reflect that he's indicated defendant Mendoza

16    Montoya.

17    THE COURT:  The record should so reflect.

18    BY MR. STOUT:

19    Q    You pointed out to us a spot on the map here

20    where the Fat Crow was anchored when you joined it.

21    What date did the Fat Crow leave that position?

22    A    The 21st of August.

23    Q    So did it stay in that position from the

24    entire time from when you joined the ship on

25    June 15th until the 21st of August?

1    A    Yes.

2    Q    You mentioned that when you rode out on

3    June 15th to join the crew, you rode out with

4    Mr. Mendoza Montoya.  Did you know him before that?

5    A    Yes.

6    Q    How so?

7    A    We worked as mariners, when we were starting

8    out as mariners we worked together as mariners.

9    Q    How long had it been since you'd seen him

10   before June 15th?

11   A    I worked with him back in 2000 or -- 2000,

12   2002, and then from that time forward I saw him

13   maybe once or twice at the most, but we never worked

14   together again.

15   Q    What was Mr. Mendoza's position on the Fat

16   Crow?

17   A    First officer.

18   Q    In the hierarchy of people on board the Fat

19   Crow, as captain where did you rank?

20   A    Me or Mr. Mendoza?

21   Q    You.

22   A    I'm the captain.

23   Q    Does that make you first in command?

24   A    Correct.

25   Q    Who is second in command of the Fat Crow?

1  A    Mr. Jair Mendoza, first officer.

2  Q    What are the -- you mentioned a minute ago

3  that some of the -- one of the responsibilities of a

4  captain is navigation.  Were you responsible for

5  navigating the Fat Crow?

6  A    Yes.

7        MR. STOUT:  Your Honor, may I approach the

8  witnessed?

9        THE COURT:  You may.

10 BY MR. STOUT:

11 Q    I've handed you what has been premarked

12 Government Exhibits 13A and 14A.  Would you take a

13 look at those and tell us what they are?

14 A    It's a GPS, a portable navigation device.

15 Q    Is it a photograph of the device or is it the

16 device itself?

17 A    It's a photograph of the device itself.

18 Q    Do you recognize that particular one, that

19 particular device?

20 A    Yes, it's my property.

21 Q    And did you have it on board the Fat Crow with

22 you?

23 A    Yes.

24 Q    Does that photograph accurately depict the

25 handheld GPS device?

1    A      Yes.

2    Q      What about Government's Exhibit 14A?

3    A      It's a fixed GPS, this is the one on the ship.

4    Q      Was that the GPS device on board the Fat Crow

5    when you joined it?

6    A      Correct.

7    Q      Does that photograph accurately depict that

8    device?

9    A      Correct.

10          MR. STOUT:  Your Honor, at this time I'd offer

11   Government Exhibit 13A and 14A into evidence.

12          THE COURT:  Any objection?

13          MR. MARTINEZ:  No, Your Honor.

14          THE COURT:  I'll receive into evidence 13A and

15   14A.

16          MR. STOUT:  Your Honor, may I publish those

17   exhibits?

18          THE COURT:  You may.

19   BY MR. STOUT:

20   Q      Mr. Barrios, is that your handheld GPS device?

21   A      Yes.

22   Q      Mr. Barrios, is that Government Exhibit 14A,

23   is that the ship's GPS device?

24   A      Correct.

25   Q      You said that you joined the Fat Crow crew on

1    June 15th.  When did you learn that it was going to

2    be a trip to transport cocaine?

3    A      When I arrived at the Fat Crow I met with --

4    the first person who mentioned to me any comment

5    regarding that trip was Mr. Gustavo Llanos.

6    Q      Do you see that person sitting here in the

7    room?

8    A      Yes.

9    Q      What is he wearing?

10   A      Dressed with orange shirt and pants and

11   glasses.

12   Q      Does he have hair or no hair?

13   A      No, he does not have hair.

14   Q      Can you point him out to us in the courtroom?

15   A      Right there.

16          MR. STOUT:  Your Honor, please let the record

17   reflect he's indicated defendant Mr. Llanos Miranda.

18          THE COURT:  The record should reflect.

19   BY MR. STOUT:

20   Q      Now, you said that he mentioned something to

21   you about this being a drug trip.  What was it he

22   said to you?

23   A      No, no, no, I did not say that he told me it

24   was a drug trip.

25   Q      Excuse me.  Then what did he tell you?

1    A       We were talking and he told me that, well,

2    let's see if we're going to hit a home run.  And

3    with a home run he's referring to a drug trip.

4    Q       How do you know that that's what he meant?

5    A       Well, those are the terms that mariners

6    usually use like a home run, a big goal, a penalty

7    kick, those types of things.

8    Q       In your experience those sorts of terms mean a

9    trip to transport drugs?

10           MR. MARTINEZ:  Objection; leading.

11           THE COURT:  Sustained.  Rephrase.

12   BY MR. STOUT:

13   Q       The terms you just mentioned to us, what do

14   those mean in your experience?

15   A       That we'll be trafficking in drugs.

16   Q       Now, you mentioned that Mr. Mendoza Montoya

17   joined the trip as the first officer.  What are the

18   first officer's duties on board a ship?

19   A       Well, the first officer is the person after

20   the captain who needs to make sure that everything

21   is in good shape, that the ship is in good shape,

22   that everything is functioning perfectly.

23   Q       Do you know what a bridge log is?

24   A       Yes.

25   Q       What's a bridge log?

1    A      It's a book where one records everything that

2    happens on the ship daily.

3    Q      Who on a ship is responsible for keeping the

4    bridge log or maintaining the bridge log?

5    A      For that it gets filled out by the first

6    officer and then the captain signs it.

7    Q      And on the Fat Crow who in fact maintained the

8    bridge log?

9    A      Mr. Jair Mendoza.

10   Q      What kind of information do you record in a

11   bridge log?

12   A      All the events that take place in the day.

13   Q      What types of events?

14   A      Well, for example, any maintenance of the ship

15   or if anything spilled, that's recorded in the log.

16   Q      Are you familiar with the bridge log on the

17   Fat Crow?

18   A      Yes.

19   Q      Did you use it to record when members of the

20   crew joined and left the ship?

21   A      Yes.

22          MR. STOUT:  Your Honor, may I approach the

23   witness?

24          THE COURT:  You may.

25   BY MR. STOUT:

1    Q    Mr. Barrios, I've handed you what has been

2    premarked for identification Government Exhibit 11A,

3    11B, 11C, and 11D.  Would you have take a look at

4    those and look up at me when you're done.

5         What are those exhibits?

6    A    11A.

7    Q    What is that?

8    A    That's the logbook.

9    Q    Is that the bridge log from the Fat Crow?

10   A    Yes.

11   Q    What about 11B?

12   A    This is the continuation of the log.

13   Q    Is it another portion of the same bridge log?

14   A    Correct.

15   Q    What about 11C?

16   A    That's a continuation of the log book.

17   Q    What about 11D?

18   A    Logbook, all the pages.

19   Q    Now, is that the original logbook or a copy?

20   A    These are copies of the original book.

21   Q    Are they fair and accurate copies of the

22   original book?

23   A    Correct.

24        MR. STOUT:  Your Honor, at this time I would

25   offer Government Exhibit 11A, 11B, 11C, 11D into

1    evidence.

2         THE COURT:  I'll receive into evidence 11A,

3    11B, 11C, 11D.

4         MR. STOUT:  Your Honor, may I approach the

5    witness again?

6         THE COURT:  You may.

7    BY MR. STOUT:

8    Q    Mr. Barrios, I'm about to hand you what has

9    been premarked Government Exhibit 11A1, 11A2, 11C1,

10   11C2, 11C3, and 11D1.  Please take a look at those

11   exhibits and tell us what those are.

12   A    1 and 2 are copies from the logbook when

13   Captain Bilarkazar was there.  11C3 and 11D, that's

14   when I came in as captain with Mr. Mendoza as

15   officer.

16   Q    Are all of those exhibits small portions of

17   the bridge logbook that we just discussed a moment

18   ago?

19   A    Correct.

20   Q    Are they fair and accurate copies?

21   A    Correct.

22        MR. STOUT:  Your Honor, at this time I would

23   offer Government Exhibit 11A1, 11A2, 11C1, 11C2,

24   11C3, and 11D1 into evidence.

25        THE COURT:  I'll receive those exhibits into

1    evidence.

2         MR. STOUT:  Your Honor, may I publish

3    Government Exhibit 11C3?

4         THE COURT:  You may.

5    BY MR. STOUT:

6    Q     Mr. Barrios, I've blown up a portion of

7    Government's Exhibit 11C3.  Do you see the date at

8    the top of this document?

9    A     15th of June.

10   Q     And do you see reflected at 11:30 what event

11   took place?

12   A     That's where we show the entry of Martin

13   Barrios and Mendoza to the crew of the ship and then

14   the exit of Mr. Bilarkazar.

15   Q     And what position was Mr. Bilarkazar?

16   A     He was the captain.

17   Q     Is that the captain that you replaced?

18   A     Correct.

19   Q     I'm going to go back to that exhibit just a

20   moment.  Do you recognize the handwriting on that

21   port of the bridge log there?

22   A     Correct.  It's the handwriting of Mr. Jair

23   Mendoza.

24   Q     Now, you said that after you joined the crew

25   on June 15th Mr. Llanos Miranda made a comment to

1    you about hitting home run and you said that you

2    understood that comment to mean that it was a drug

3    trip.  How did you know that?  How did you come to

4    understand that that's what terms like that meant?

5    A    Can you repeat, please?

6    Q    How did you know that the sports terms you

7    mentioned a moment ago -- a moment ago you testified

8    that various sporting terms like home run or scoring

9    a goal signify to you that a trip is to transport

10    drugs.  How do you know that?

11    A    Well, that's usually what one says as a

12    mariner when you meet up with other mariners and

13    you're talking with them, you speak like that.  You

14    never talk about saying that we're going to be

15    trafficking in drugs.

16    Q    Have you ever been on board a ship or a boat

17    that trafficked drugs?

18    A    Yes.

19    Q    Before the Fat Crow?

20    A    Yes.

21    Q    Did you know the other defendant, Mr. Llanos,

22    the man who made this comment to you, Llanos

23    Miranda, before you joined the Fat Crow crew?

24    A    Yes.

25    Q    How so?

1    A       We had seen each other, I was at a ship in

2    Cartagena and he went aboard that ship and there we

3    saw each other.

4    Q       Before you joined the Fat Crow crew when had

5    you last seen him before that?

6    A       No, that was the only time I had seen him, I

7    had never seen him before, I didn't know him.

8    Q       You stated a moment ago that you didn't

9    discover that this was a trip to transport drugs

10   until you got on board the ship.  Do you know

11   whether Mr. Mendoza Montoya knew it was going to be

12   a trip to transport drugs before he got on the ship?

13           MR. MARTINEZ:  Objection without first

14   establishing if it's predicated upon some hearsay

15   statement.

16           THE COURT:  Well, I think it calls for a yes

17   or no answer and then he can ask him how he knew.

18           THE WITNESS:  Excuse me?

19   BY MR. STOUT:

20   Q       You can answer the question, do you know

21   whether Mr. Mendoza Montoya knew before he got on

22   the ship that it was going to be a ship to smuggle

23   cocaine?

24   A       No, he didn't mention -- when I met with him

25   he didn't mention any of that to me.

1    Q      At any point did Mr. Mendoza Montoya ever

2    mention to you when he learned?

3    A      I found out once I was on the boat.

4    Q      You've testified about when you found out.

5    Did you ever in the course of your time on board the

6    Fat Crow learn when Mr. Mendoza Montoya found out?

7    A      Mr. Mendoza Montoya found out about --

8    Q      That it was going to be a trip to transport

9    drugs.

10   A      I'm not understanding the question well.

11   Q      Yes or no, do you know when Mr. Mendoza

12   Montoya learned it was going to be a trip to

13   transport drugs?

14   A      No, I don't know when he found out.  When we

15   were on the Fat Crow it was already --

16   Q      Okay.  So your testimony is that you don't

17   know when he found out; is that right?

18   A      Up until -- up until -- when I met up with him

19   on land, we didn't talk about anything like that.

20   Q      When did you meet up with him on land?

21   A      The 5th of June in Macao, Colombia.

22   Q      How long were you with him before you rode the

23   little boat out to the ship?

24   A      From the 5th of June up until the 15th when we

25   climbed the ship.

1    Q      And physically where were you?

2    A      In Venezuela.

3    Q      Where were you staying?

4    A      The hotel.

5    Q      I want to review with you now who the crew of

6    the Fat Crow was when you joined it on June 15th.

7           MR. STOUT:  Your Honor, at this time may I

8    publish the 100 and 200 exhibits that are

9    photographs?

10          THE COURT:  You may.

11   BY MR. STOUT:

12   Q      Showing you Government Exhibit 104.  Do you

13   know who that is?

14   A      Walter.

15   Q      Was he on board the Fat Crow when you joined

16   on June 15th?

17   A      Yes.

18   Q      What was his position?

19   A      The chief engineer.

20   Q      Showing you Government Exhibit 106A.  Who is

21   that?

22   A      Eduardo Chasin.

23   Q      Was he on the board the Fat Crow when you

24   joined on June 15th?

25   A      Yes.

1    Q        What was his position?

2    A        Oiler.

3    Q        Showing you Government Exhibit 105A.  Who is

4    that?

5    A        Oscar Herrera.

6    Q        Was he on board the Fat Crow when you joined

7    on June 15th?

8    A        Yes.

9    Q        What was his position?

10   A        Oiler/welder.

11   Q        Showing you Government Exhibit 100A.  Who is

12   that?

13   A        Bolanos.

14   Q        Was he on board the Fat Crow when you joined

15   on June 15th?

16   A        Yes.

17   Q        What was his position?

18   A        Bosun, bosun.

19   Q        Showing you Government Exhibit 102A.  Who is

20   that?

21   A        Mario Acuna.

22   Q        Was he on board the Fat Crow when you joined

23   on June 15th?

24   A        Yes.

25   Q        What was his position?

1    A        The cook.

2    Q        I'm showing you Government's Exhibit 102A.

3    Who is that?

4    A        Jair Mendoza.

5    Q        Is that one of the two people sitting at the

6    table here to my right?

7    A        Yes.

8    Q        And what was his position again?

9    A        First officer.

10   Q        That's the person that joined with you on

11   June 15th?

12   A        Yes.

13   Q        Finally I'm showing you Government

14   Exhibit 200A.  Who is that?

15   A        Gustavo Llanos.

16   Q        What was his position?

17   A        Mariner.

18   Q        Was he on board the ship when you joined on

19   June 15th?

20   A        Yes.

21   Q        And he's the other of the two gentlemen you

22   indicated earlier seated at the table to my right?

23   A        Yes.

24   Q        Now, was there anyone else on board the ship,

25   a member of the crew at that time?

1    A        There was Mr. Felipe.  I don't remember his

2    last name right now.

3    Q        What was his position?

4    A        Second engineer, machines.

5    Q        Was he on board the Fat Crow when the Coast

6    Guard later stopped your ship?

7    A        No.

8    Q        Why did he leave, do you know?

9    A        Because he was sick with a prostate problem.

10   Q        You mentioned that you joined the Fat Crow on

11   June 15th and the ship stayed in that position you

12   indicated until August 21st.  What were you all

13   doing that entire time?

14   A        We were receiving fuel from the fisherman that

15   would bring it.

16   Q        What kind of vessels would bring fuel to the

17   Fat Crow?

18   A        The fishing vessels, small ships.

19   Q        How often would they bring fuel to the Fat

20   Crow?

21   A        Every week, weekly, and every 15 days.

22   Q        How much would they bring at a time?

23   A        There would be -- some would bring

24   10,000 gallons, some would bring five, some three,

25   like that, and so on.

1     Q     By the time the Fat Crow left on August 21st,

2    do you know how much fuel was on board Fat Crow?

3    A     260,000 gallons of fuel.

4    Q     Was this legitimate fuel that you were going

5    to transport on board Fat Crow?

6    A     No.

7    Q     During these -- the period from June 15th to

8    August 21st, did the crew ever have meetings

9    concerning transporting drugs on board Fat Crow?

10    A     No, we would not meet, we would not meet -- I

11    investigated with each one of the crew members.

12    Q     Do you know a man named Hector Favio?

13    A     Yes.

14    Q     Did he ever come out to the Fat Crow?

15    A     Yes.

16    Q     For what purpose?

17    A     With the purpose of organizing the drug trip.

18    Q     How many times did he come out to the Fat Crow

19    for that purpose?

20    A     He was there -- he was on the ship four times.

21    Q     When was the first time he came out?

22    A     The first time -- I don't have the exact date.

23    It was around the month of July, the month of July.

24    Q     How did he physically get out to the Fat Crow?

25    A     I was sent to go to land, a motor boat was

1    sent for me to go to land.  When I arrived on land I

2    met there with Mr. Jose Gonzalez and with Mr. Hector

3    Favio.

4    Q      Was Jose Gonzalez the man who originally

5    recruited you for this trip?

6    A      Correct.  For fuel.

7    Q      When you met with Jose Gonzalez and Hector

8    Favio, what happened?

9    A      Mr. Jose Gonzalez tells me that he is no

10   longer going to be the administrator of the Fat

11   Crow, that it's going to be -- that the

12   administrator is going to be Mr. Hector Favio.

13   Q      So then when did you go back out to the Fat

14   Crow?

15   A      The following day I went to the Fat Crow with

16   Mr. Hector Favio.

17   Q      Did anybody else go with you?

18   A      It was Mr. Herman.  I don't know what Herman's

19   last name is.

20   Q      And when you and Hector Favio and Herman

21   returned to the Fat Crow, what did you all do?

22   A      Initially -- I had sent word to Gonzalez that

23   the work that had been done to the ship at the dry

24   dock was not done well, that the job had not been

25   done well.

1    Q    Did Fat Crow have a number of mechanical

2    problems?

3    A    Yes.

4    Q    Are these the issues you're talking about?

5    A    Correct.  The entire structure of the ship,

6    the mechanical and the deck.

7    Q    When you got back to the ship with Hector

8    Favio and Herman, what did you all discuss with

9    respect to the mechanical problems?

10   A    No, we took him to the engine room and showed

11   him all the problems that we were having in the

12   engine room, did the same thing with the deck, and

13   he took note of everything.

14   Q    After you showed him the engine room and the

15   deck, what did you all discuss?

16   A    There he mentioned to me that the ship would

17   possibly be up for doing a drug trip and then he

18   asked me if I was up to the task.

19   Q    What did you say in response to that?

20   A    Said yes.

21   Q    And what else did Hector Favio discuss with

22   you about the trip?

23   A    That a drug trip would possibly be done and

24   that it wouldn't be on this trip necessarily, it

25   could be on the next one, but if not on this one or

1    on another trip, but that it could possibly be done.

2    Q       Did you discuss how much you would be paid to

3    do the trip?

4    A       At that time we didn't know -- I spoke with

5    him personally and then afterwards we met with all

6    of the personnel.

7    Q       And when you say you met with all of the

8    personnel, are you talking about the same day that

9    Hector Favio came to look at the mechanical

10   problems?

11   A       Correct.

12   Q       And when you say you met with everyone, who do

13   you mean?

14   A       All the crew that were there at the moment.

15   Q       Were all the people whose photographs that we

16   reviewed a moment ago present at that meeting?

17   A       Correct.

18   Q       Were both defendants present at that meeting?

19   A       Yes.

20   Q       What happened during this meeting with the

21   entire crew?

22   A       During that meeting it was being mentioned

23   what had been mentioned to me that there was a

24   possibility of a trip being done either on that trip

25   or it was possible that it would be done the next

1      trip, but that he needed to know if the trip were to

2      be done how much each crew member was expecting to

3      get for the trip.

4      Q      So did crew members tell him how much they

5      wanted to do the trip?

6      A      Yes, he met -- after that he met with each

7      crew member individually and each crew member told

8      him how much they were hoping to get.

9      Q      Now, this group meeting, where on the ship,

10     what room on the ship did the group meeting take

11     place?

12     A      Initially we did it at the diner, but the

13     space was too small and then after we went to the

14     bridge of the ship.

15     Q      And you mentioned that crew members had

16     individual meetings with Hector Favio.  Where did

17     those individual meetings take place?

18     A      In the bridge of the ship.

19     Q      Could you hear what your fellow crew members

20     asked for, how much they asked for?

21     A      No, that was individual and personal.

22     Q      So when you spoken to Hector Favio in your

23     individual meeting with him how much did you ask for

24     to do the trip?

25     A      $150,000.

1    Q       After Hector Favio had these individual

2    meetings with the crew members did he stay on the

3    ship or did he go back to shore?

4    A       No, after work he went to shore, he went to

5    land.

6    Q       For what purpose?

7    A       Well, to inform -- supposedly to inform of the

8    problems that the ship was having and also to take

9    back the price of what each crew member was hoping

10   to get.

11   Q       When was the next time you saw Hector Favio?

12   A       After about -- he returned to the ship after

13   about two or three days again.

14   Q       And when he returned to the ship what happened

15   then?

16   A       When he returned he said that the drug trip

17   would possibly be done but that the total amount,

18   the all together amount of what would have to be

19   paid was too high, it was exaggerated, that it was

20   not -- there wasn't enough to pay it.

21   Q       So was there a new proposal?

22   A       Yes, there was a new proposal.

23   Q       What proposal was that?

24   A       That proposal he made was that he would be

25   paying $300 per kilo of drugs.

1    Q    When Hector Favio made that proposal who all

2    was present when he made that proposal?

3    A    All of us crew members were there.  All the

4    crew members -- when I arrived at the meeting.

5    Q    The entire crew of the ship, were they all

6    present?

7    A    Correct.

8    Q    Including both defendants?

9    A    Correct.

10   Q    What did the crew think of this proposal, the

11   $300 per kilo proposal?

12       MR. CASTILLO:  Your Honor, I'm going to object

13   and ask that we have specific responses by

14   individuals as opposed to the crew.

15       THE COURT:  Okay.  I'll sustain.

16       THE WITNESS:  What was that?

17   BY MR. STOUT:

18   Q    I'm going to ask you a new question.  Did

19   Hector Favio at that time tell you how many kilos

20   the Fat Crow was going to be transporting?

21   A    No, he told us that it would be the 300, but

22   he did not tell us exactly what was the amount of

23   drugs that we would be transporting.  He was asked

24   how much was going to be transported, but he said he

25   did not have that information yet.  But that it was

1      $300, what was going to be paid per kilo.

2      Q      After Hector Favio made this $300 per kilo

3      proposal, did he return back to land again?

4      A      Yes, he returned again to land.

5      Q      When was the next time you saw Hector Favio?

6      A      I saw him -- he returned again after about

7      10 days, more or less.

8      Q      And when he came to the Fat Crow did he come

9      alone or did he come with somebody else?

10     A      He came with Mr. Jair Mendoza because Mr. Jair

11     Mendoza had gone to land, and with the person in

12     charge of the fuel, with El Gordo.

13     Q      So in the interim since that previous meeting

14     with Hector Favio had Mr. Mendoza Montoya gone to

15     land there in Venezuela?

16     A      Correct.

17     Q      For what purpose?

18     A      He went with the purpose that he was going to

19     call his mom who was having her birthday around

20     those days.

21     Q      Why did he have to go to land to call his mom?

22     A      Because there was no -- there where we were

23     there was no telephone signal.

24     Q      When Hector Favio returned with Mr. Mendoza

25     Montoya what happened at that point?

1    A       Well, he returned with Mr. Mendoza Montoya and

2    he told us that the trip was going to be done and

3    that the drugs that would be transported would be

4    1,500 kilos.

5    Q       When he told you that, who else was present?

6    A       All were present.

7    Q       Including both defendants?

8    A       Including both defendants.

9    Q       Clarify for me, at this point whenever you

10   have this meeting was the second engineer, the

11   original second engineer, still on board Fat Crow?

12   A       Yes, Mr. Garcia was already there.

13   Q       Was that the second engineer when you joined

14   the Fat Crow or that somebody who joined later?

15   A       No, only Mr. Garcia.

16   Q       Now, I believe you testified earlier that

17   there was a guy named Mr. Castillo who was the

18   second engineer on board the Fat Crow and that he

19   left at some point because he was sick.  When did he

20   leave?

21   A       The date?  I don't know the date, I sure

22   don't.

23   Q       Well, at this third meeting that we're talking

24   about now, was he present or was someone else

25   present in his place?

1    A        No, he was not present, he had already left.

2    Q        And who had come in his place?

3    A        Mr. Garcia.

4             MR. STOUT:  Your Honor, may I publish

5    Government's Exhibit 101?

6             THE COURT:  You may.

7    BY MR. STOUT:

8    Q        Who is that?

9    A        Yes, that's Mr. Garcia.

10   Q        So how much total was the crew supposed to

11   split based on the $300 per kilo and the 1,500-kilo

12   load?

13   A        Would be $450,000.

14   Q        How much of that were you going to get?

15   A        $80,000.

16   Q        What was your salary -- your nondrug salary on

17   board the Fat Crow as a captain?

18   A        $2,800.

19   Q        So this $80,000 that you stood to make, how

20   many months or years of your salary, your normal

21   salary, would that account for?

22   A        Approximately three years.

23   Q        Now, you said you were going to make $80,000.

24   Do you know how much anybody else was going to make?

25   A        The mechanic, he was going have the same,

1    $80,000 also.  And Mr. Garcia and Mr. Jair were

2    going to be $60,000.

3    Q     When you say the mechanic, what's the name of

4    the person you're talking about who was going to

5    make the same as you?

6    A     Luis Garcia.

7    Q     Do you know how much the other crew members

8    were going to make?

9    A     There the rest of the crew would be getting an

10   average of $30,000, $30,000 to $31,000, more or

11   less.

12   Q     Were you going to be paid any of this money up

13   front or all on the back end?

14   A     No, the 30 percent of the $80,000 was going to

15   be given to us.

16   Q     How was that supposed to be given to you?

17   A     It was going to be delivered to my brother

18   over there in Colombia.

19   Q     Did you instruct Hector Favio to deliver the

20   money to your brother?

21   A     Correct.

22   Q     Do you know who Mr. Llanos Miranda, where was

23   his 30 percent up front payment to go?

24   A     He didn't have who to send it to and he asked

25   me for the favor of seeing if my brother could get

1      it and I told him that yes.

2      Q      Did your brother ever receive any of this up

3      front payment for the drug trip?

4      A      I was -- for me I was given $10,000, but for

5      Mr. Llanos Miranda I was told that nothing was sent.

6      I don't know if they said they were going to send it

7      later.

8      Q      When you say you got $10,000, do you mean you

9      yourself personally received it or your brother

10     received it?

11     A      My brother received it.

12     Q      How do you know your brother received that

13     money?

14     A      Because he told me when I spoke with him on

15     the phone once I was already here in prison.

16     Q      When did you learn that the Fat Crow's trip

17     that it was supposed to take was eminent, that it

18     was about to start?

19     A      When did I find out?

20     Q      Yes.

21     A      The first meeting we didn't know about the

22     trip, it was undecided at the first meeting.  Then

23     by the time he tells us that we're going to carry

24     1,500 kilos, that's when we knew the trip was going

25     to be done.

1    Q    Did you know how soon after it was going to be
2    done?
3    A    It was for right away, it was for right away.
4    Q    How do you know that?
5    A    Because he brought us the offer, how much each
6    one was going to make and he asked each one for the
7    address to send the money to and each one person
8    gave their address for the money to be sent to
9    whoever would be receiving it.
10   Q    What about that indicated to you that you were
11   about to start the trip?
12   A    He told me -- he communicated to me that that
13   money would be delivered and that the following day
14   then the drug would come.
15   Q    Who told you that?
16   A    Hector Favio.
17   Q    Now, did the drugs in fact arrive the very
18   next day after this meeting?
19   A    No.
20   Q    How come?
21   A    Because we had a problem with one of the
22   generators to be exact.
23   Q    So after the third meeting how did you --
24   after the third meeting did Hector Favio stay on the
25   Fat Crow or did he go back to shore?

1    A        No, he returned to land.

2    Q        Then when was the next time you saw him?

3    A        When I informed that we had a problem with the

4    generator that it had to be sent to land, he

5    returned to the ship.

6    Q        Now, you mentioned earlier that you didn't

7    have cell phone service out there where you were.

8    How did you communicate with him?

9    A        By radio.

10   Q        So when you told him about the generator

11   problem did he come back out to the Fat Crow?

12   A        Yes, because I had told him by radio, I had

13   sent word that the generator needed to be sent over

14   and to send someone to get it, but he told us no, to

15   wait for someone to be sent to the ship but

16   afterwards it was him who showed up.

17   Q        Why did he himself show up?

18   A        To give the chief engineer instructions as to

19   what to do with the generator because he's an

20   engineer also, mechanic.

21   Q        Were you all able to fix the generator?

22   A        Yes.

23   Q        After you fixed the generator where did Hector

24   Favio go?

25   A        Hector Favio, he moved over to another ship,

1    another smaller ship that was there next to us.

2    Q       What was the name of that ship?

3    A       Abu Dhabi.

4    Q       And after Hector Favio left and got on the Abu

5    Dhabi, how long from that point until the drugs

6    arrived?

7    A       Well, he transferred over in the afternoon

8    after the repair, then after he transferred over

9    then the drugs arrived the next morning like at

10   5 a.m., between 4 and 5 a.m.

11   Q       How did the drugs arrive?

12   A       In a go fast vessel, in a fast vessel with

13   200-horsepower engines.

14   Q       How big was this vessel you're talking about?

15   A       More or less the distance from here to there.

16   Q       When you say from here to there are you

17   talking about from where you're sitting to the jury

18   box?

19   A       Correct, to that wall.

20   Q       Okay.  How many people were on board this

21   small boat?

22   A       Three people.

23   Q       How did you all get the drugs from the small

24   boat up to the Fat Crow?

25   A       They had tied it with ropes and they threw the

1      ropes to us and then we would lift it up.

2      Q        Describe exactly how you got the drugs up on

3      to the Fat Crow.  Where was everybody positioned?

4      A        Well, the drugs, we lifted them up onto the

5      front part of the ship around the bow and along the

6      right-hand side, the starboard side.

7      Q        And then what did you do with them when you

8      got them up there?

9      A        Well, we lifted them up amongst all the crew

10     members, we lifted them up on to the ship.

11     Q        Who among the crew participated in lifting the

12     drugs up onto the ship?

13     A        All of the crew members.

14     Q        Including all the men whose pictures we've

15     seen?

16     A        Correct.

17     Q        Including the two defendants?

18     A        Correct.

19     Q        Do you remember how many packages of drugs

20     there were?

21     A        75.

22     Q        Once you had all 75 packages up on the ship

23     where did you put them?

24     A        We placed them in the front part of the ship,

25     in the bow area.

1    Q       Who put them in the hidden compartment?

2    A       In the hidden compartment it was placed there

3    by Mr. Garrido, Mr. Acuna, Mr. Garcia and

4    Mr. Bolanos.

5    Q       And what part did the two defendants play,

6    Mr. Llanos Miranda and Mr. Mendoza Montoya, in

7    loading the drugs?

8    A       Well, we all helped in lifting them, in

9    lifting them up, and them being passed from the ship

10   and lifting them up towards us.

11   Q       How long did it take the entire operation from

12   pulling all the packages up on to the deck and

13   putting them in the hidden compartment, how long did

14   all of that take?

15   A       All of that took about an hour, an hour and a

16   half.

17   Q       After you loaded all the drugs into the ship

18   did you and your crew clean the ship in any way?

19   A       Yes, it was cleaned, the ship was washed and

20   all the clothes were thrown away, the ones that

21   handled the drugs.  Except for Bolanos, he did not

22   throw his away.

23   Q       Why did you take those measures?

24   A       Because Mr. Walter had told me that wherever

25   the drugs touch needed to be washed.  And then also

1      generally when going on a trip one washes all the

2      deck.

3      Q      Does one generally throw your clothes

4      overboard?

5      A      Correct.

6      Q      What day did the Fat Crow actually leave that

7      position where it had been anchored when you joined

8      in June?

9      A      On the same day we received the drugs, on the

10     21st of August.

11     Q      When did you learn where you were supposed to

12     deliver the drugs?

13     A      At first Mr. Hector had told us that we were

14     going to Guatemala, that we were going to take the

15     fuel to Guatemala.

16     Q      Where were you going to take the drugs?

17     A      The drugs, the drugs we were going to leave

18     them at high seas there around Honduras.

19     Q      When you say you were going to leave them at

20     high seas, do you mean you were going to deliver

21     them out at sea somewhere?

22     A      We were going to deliver them to another

23     vessel.

24     Q      And who told you where you were supposed to go

25     to do that?

1    A        Mr. Hector Favio.

2    Q        Did anything cause you to delay in leaving on

3    August 21st, the day that the drugs were delivered?

4    A        Yes, we would a problem with the anchor, we

5    had a problem with the motor that raises the anchor.

6    Q        So what did you do?

7    A        Well, there we strived to solve the problem,

8    wasn't able to solve the problem so the chain, it

9    was cut off, to the anchor.

10        MR. STOUT:  Your Honor, may I republish

11    Government Exhibit 16?

12        THE COURT:  You may.

13    BY MR. STOUT:

14    Q        Mr. Barrios, would you take that laser pointer

15    again and show us where the ship was anchored on

16    August 21st, the day that you began your trip?

17    A        We were in this position, more or less.

18    Q        Now, can you take that laser pointer and point

19    us to approximately where you were supposed to

20    deliver the drugs at sea?

21    A        More or less around here from Honduras.

22    Q        And then where were you going to take the

23    fuel?

24    A        The fuel we were going to take to Guatemala.

25    Q        About how long after you cut off the anchor

1    and left on August 21st was it until the Coast Guard

2    stopped your ship?

3    A       The Coast Guard interdicted us on the 24th.

4            THE COURT:  Why don't we take a recess.  We'll

5    be in recess until 11 o'clock.  You're welcome to

6    walk around.  Please don't discuss the case.

7            (The jury retired to the jury room.)

8            THE COURT:  Sir, you may step down.  We'll

9    start again at 11 o'clock.

10           (Recess was taken from 10:40 until 10:59 a.m.)

11           (The jury returned to the courtroom.)

12           THE COURT:  Ladies and gentlemen, as soon as

13   we get the witness in the witness box, we'll start.

14   Mr. Stout, you can continue, sir.

15           MR. STOUT:  No further questions, Your Honor.

16           THE COURT:  All right.  Mr. Castillo?

17           MR. CASTILLO:  Yes, Your Honor, may it please

18   the court.

19                     CROSS EXAMINATION

20   BY MR. CASTILLO:

21   Q       Mr. Barrios, you indicated that you were hired

22   to be the captain of the Fat Crow and you arrived on

23   the Fat Crow in the middle of June of this year

24   about June 15th, correct?

25   A       Correct.

```
 1    Q       And when you first were hired to be the
 2    captain of the Fat Crow, nobody had said anything to
 3    you about drugs at all, isn't that correct?
 4    A       Correct.
 5    Q       Now, you indicated during your direct
 6    examination you talked about a boat called the Abu
 7    Dhabi, do you remember that?
 8    A       Correct.
 9    Q       And I want to direct your attention to about
10    February or March of this year in Cartagena.  Were
11    you the first officer aboard the Abu Dhabi about
12    that time?
13    A       No, it's not the first officer.
14    Q       Well, did you work aboard the Abu Dhabi at
15    about that time?
16    A       I was helping the administrator.
17    Q       Okay, I'm sorry, well, the Abu Dhabi was
18    docked at Cartagena, isn't that correct, it wasn't
19    at sea.
20    A       It was at sea.
21    Q       But it was docked in Cartagena, correct?
22    A       Correct.
23    Q       And you remember at that time you met
24    Mr. Llanos Miranda around that time for the first
25    time in your life, isn't that correct?
```

1    A       Correct.

2    Q       And you were working aboard the Abu Dhabi and

3    Mr. Llanos was hired to do about two hours worth of

4    work on the Abu Dhabi, isn't that correct?

5    A       No, I don't know who hired him.

6    Q       Well, did you see him work aboard the Abu

7    Dhabi?

8    A       He was there at the Abu Dhabi.

9    Q       And he was cleaning tanks in the Abu Dhabi?

10   A       I don't know if he was cleaning tanks.

11   Q       Well, he was aboard the Abu Dhabi for about

12   two hours, isn't that right?

13   A       When the tests were being done of the ship.

14   Q       Of the Abu Dhabi in Cartagena, isn't that

15   correct?

16   A       Correct.

17   Q       And that's the only time in your life that you

18   had ever met Mr. Llanos Miranda prior to this event,

19   isn't that right?

20   A       Correct.

21   Q       And you indicated you're Colombian, correct?

22   A       Correct.

23   Q       And you also indicated that you had

24   participated in another drug trip before the Fat

25   Crow, isn't that right?

1    A        Correct.

2    Q        How many times?

3    A        One time.

4    Q        What was the name of that boat?

5    A        It was Lida Isabel.

6    Q        And the Lida Isabel is a different vessel than

7    the Abu Dhabi, isn't that right?

8    A        Correct.

9    Q        And Mr. Llanos Miranda wasn't with you on the

10   Lida Isabel, was he?

11   A        No.

12   Q        How long prior to you boarding the Fat Crow in

13   June did you do your drug trip on the Lida Isabel?

14   A        I didn't do the drug trip.  I was going to do

15   the drug trip but it didn't happen.

16   Q        Well, you told this jury that you had

17   experience in a drug trip prior to this event.

18   A        There was drugs, but we did not do the trip.

19   Q        Okay.  So you didn't do a drug trip.

20   A        We were going to do it, but they arrived and

21   we were boarded and the trip was cancelled.

22   Q        Okay.  And this is aboard the Lida Isabel,

23   right?

24   A        Lida Isabel.

25   Q        Again my question is how long prior to your

1      boarding the Fat Crow did this event with the Lida

2      Isabel occur?

3      A        About five years.

4      Q        Oh, so five years before.  You were never

5      arrested or anything for that charge with the Lida

6      Isabel?

7      A        No.

8      Q        On the Lida Isabel what were you supposed to

9      do?

10     A        To do?  How so?

11     Q        What was your role in the drug trip that

12     didn't occur?

13     A        I was the captain.

14     Q        The captain.  And the Lida Isabel, how big is

15     the Lida Isabel?

16     A        Smaller than the Fat Crow.

17     Q        Is it a freighter, is it a fishing vessel,

18     what kind of boat?

19     A        A freighter for transporting appliances.

20     Q        Did you get paid any money for your

21     participation in the drug aspect of that case?

22     A        The trip didn't happen.

23     Q        Okay.  Were you supposed to get money?

24     A        Correct.

25     Q        How much were you supposed to get?

```
1    A       I was going to receive $20,000.

2    Q       But you got nothing.

3    A       Trip didn't happen.

4    Q       Yeah, but you didn't get any money either,

5    right?

6    A       No.

7    Q       And that was about five years prior to this

8    event with the Fat Crow, right?

9    A       Correct.

10   Q       So now you board the Fat Crow I think you said

11   the 17th of June, is that right?

12   A       The 15th of June.

13   Q       15th of June, the middle of June.  And when

14   you boarded the Fat Crow you boarded as the captain,

15   is that right?

16   A       Correct.

17   Q       Now, the captain of a freighter or a vessel of

18   this type, you're in charge of everything, isn't

19   that right?

20   A       Correct.

21   Q       You were the last word as far as any issue

22   having to do with the ship or the crew, isn't that

23   right?

24   A       Correct.

25   Q       And you're the one that -- okay.  Let me ask
```

```
 1      you this question.  Mr. Llanos Miranda, he was the

 2      helmsman aboard the Fat Crow, is that right?

 3      A      Correct.

 4      Q      That was his primary job was to steer the

 5      vessel, right?

 6      A      Correct.

 7      Q      And the orders or the direction in which the

 8      boat was to travel would come from you or maybe the

 9      first officer, isn't that right?

10      A      Correct.

11      Q      And if there was some sort of dispute between

12      the first officer and you, your word would control,

13      isn't that right?

14      A      Correct.

15      Q      Now, there was a satellite phone aboard the

16      Fat Crow; is that correct?

17      A      Correct.

18      Q      And it's kind of expensive to use it, right?

19      A      Correct.

20      Q      And you tried to keep the cost down and use it

21      as little as possible, isn't that right?

22      A      Correct.

23      Q      But a phone is available for important calls

24      or emergencies, isn't that right?

25      A      Correct.
```

1    Q    And anybody who wanted to use that phone had

2    to get specific permission from you, isn't that

3    right?

4    A    Correct.

5    Q    A crewman couldn't just get the phone because

6    they felt like it, without your permission, isn't

7    that right?

8    A    The telephone was handled by myself and

9    Mr. Jair.

10   Q    And Mr. Llanos Miranda, his job on the boat

11   was under you, isn't that right, you told him what

12   to do, isn't that right?

13   A    Correct.

14   Q    Mr. Llanos Miranda didn't tell you what to do,

15   did he?

16   A    No.

17   Q    Because you're the captain.

18   A    Yes.

19   Q    All right.  Now, when you boarded the Fat Crow

20   on June 15th, Mr. Llanos Miranda was already on the

21   boat, correct?

22   A    Correct.

23   Q    And before you arrived on the Fat Crow, you

24   did not know that Mr. Llanos Miranda would be on

25   there; is that right?

1    A       I did not know.

2    Q       So when you arrived on the Fat Crow, you were

3    the one that recognized Mr. Llanos Miranda, isn't

4    that right?

5    A       We recognized each other because when I

6    arrived he was on the deck.

7    Q       Well, yeah, but you were the first one that

8    reached out to him when you arrived first, isn't

9    that right?

10   A       How so the first one?

11   Q       Well, you recognized Mr. Llanos Miranda

12   because you had seen him a couple months before on

13   the Abu Dhabi, isn't that right?

14   A       Correct.

15   Q       And just so that we're clear, the Abu Dhabi in

16   Cartagena, that had nothing to do with drugs at that

17   time, isn't that right?

18   A       Yes.

19   Q       That was the first time and only time you had

20   met Mr. Llanos Miranda prior to this event, correct?

21   A       Correct.

22   Q       So now you get on the Fat Crow in the middle

23   of June and you see Mr. Llanos Miranda for the first

24   time since the Abu Dhabi, isn't that right?

25   A       Correct.

1    Q       And you were the one that said hey, Gustavo,

2    how are you doing, something like that, isn't that

3    right?

4    A       We greeted each other.  I didn't remember his

5    name.  I remembered his face, but not his name.

6    Q       All right.

7    A       Because in Cartagena we never were introduced

8    to each other even, we saw each other but were never

9    introduced to each other.

10   Q       So you just recognized him by looking at him,

11   isn't that right?

12   A       Correct.

13   Q       And prior to your arrival on the Fat Crow the

14   only thing you knew about him was what he looked

15   like and what he did on the Abu Dhabi, right?

16   A       Correct.

17   Q       Now, according to your testimony when you

18   arrived on the Fat Crow on June and you saw

19   Mr. Llanos Miranda, he told you that we're going to

20   get a batazo, a b-a-t-o-s-o, isn't that right?

21   A       Correct.

22   Q       That was his word, isn't that right?  And

23   that's a word that's popular in Colombia, batazo,

24   isn't that right?

25   A       Amongst mariners, yes.

1    Q       Okay.  But according to you, we did not talk

2    about -- you did not talk about drugs, he said

3    batazo, that's the word that he used, right?

4    A       Correct.

5    Q       And you said that you understood it to mean a

6    drug trip.

7    A       Correct.

8    Q       But the moment you arrived on the Fat Crow,

9    you had no idea about any type of drug trip, isn't

10   that right?

11   A       Correct.

12   Q       In fact, the first time we knew anything about

13   drug trip was when Mr. Hector Favio showed up at the

14   end of June or the beginning of July, isn't that

15   right?

16   A       When I found out.

17   Q       Right.  And you're the captain.  Right?  So

18   two weeks after you get aboard the Fat Crow is when

19   you get information about a drug trip, isn't that

20   right?

21   A       Correct.

22   Q       Yes.  Okay.  And then we talked about other

23   meetings with Mr. Favio coming back and amounts and

24   everything, that happened after this meeting at the

25   end of June, beginning of July, isn't that right?

1    A        No, I'm sorry, not two weeks.

2    Q        Not two weeks?

3    A        No, he says two weeks after I arrived?

4    Q        Well, you said you got aboard the Fat Crow on

5    June 15th and that Mr. Favio came aboard the Fat

6    Crow for the first time at the end of June,

7    beginning of July.

8    A        End of July.

9    Q        Oh, so a month and a half later then.

10   A        The end of July.

11   Q        So now six weeks after you get on the Fat Crow

12   that's when you learn about a drug trip for the

13   first time, isn't that right?

14   A        No, I found out about the drug trips after,

15   after I spoke with -- when Llanos Miranda told me

16   about the batazo, that's when I told -- then I spoke

17   with the mariners.

18   Q        Okay.  So now the mariners knew about the drug

19   trip, according to you, in June when you arrived on

20   the Fat Crow, that's what you're telling us?

21   A        Yes, they knew, yes.

22   Q        They knew about a drug trip in June, but the

23   meeting with Mr. Favio didn't occur until six weeks

24   later.

25   A        Correct.

1    Q      Okay.  Now, you were called to shore

2    according to you -- they said you were summoned by

3    radio to go to shore to meet with Mr. Favio, isn't

4    that right?

5    A      Not Mr. Favio, Mr. Gonzalez.  I didn't know

6    Mr. Hector Favio.

7    Q      Well, Mr. Gonzalez summoned you to shore, he's

8    the person that contracted you to captain the Fat

9    Crow, correct?

10   A      Correct.

11   Q      And then you got a radio transmission,

12   according to you, at the end of July to go to shore,

13   isn't that right?

14   A      Correct.

15   Q      At that time you met with Mr. Gonzalez, you

16   knew him, right?

17   A      Yes.

18   Q      And he told you that I'm no longer in charge

19   of the Fat Crow, Mr. Favio is going to take over

20   from here forward, isn't that right?

21   A      Correct.

22   Q      And that's when he gave you information and we

23   started talking about drugs, isn't that right?

24   A      No.

25   Q      No, he didn't talk about drugs then?

1   A       No, then there, no, that time when I spoke

2   with Mr. Hector Favio and Mr. Gonzalez?  No, he did

3   not.

4   Q       So when you're on shore you're not talking

5   about drugs, right?

6   A       Do not talk about drugs.

7   Q       Okay.  But you just learned that Mr. Favio is

8   taking over the control of the Fat Crow from here

9   forward, correct?

10  A       Correct.

11  Q       And then you go back to the Fat Crow, right?

12  A       Correct.

13  Q       And then sometime after that Mr. Hector Favio

14  shows up aboard the Fat Crow, correct?

15  A       The following day from when I went to land.

16  Q       So again, so we get the time, you come back on

17  the Fat Crow and the next day Mr. Favio shows up.

18  A       I went together with Mr. Hector Favio.

19  Q       Okay.  You're aboard the Fat Crow with the

20  other crewmen, isn't that right?

21  A       Correct.

22  Q       And now Mr. Favio tells you for the first time

23  that there is going to be drugs involved in this

24  trip, isn't that right?

25  A       That there would possibly be.

1    Q       Possibly.  Because you were negotiating at

2    that time, isn't that right?

3    A       Correct.

4    Q       And you indicated that Mr. Favio eventually

5    talked to every crew member individually, isn't that

6    right?

7    A       Correct.  When he spoke individually it was

8    about the amount that was going to be asked for.

9    Q       With each individual crewman, isn't that

10   right?

11   A       Correct.

12   Q       And you indicated that when the crewman would

13   speak to Mr. Favio, you were not present and you

14   couldn't hear what they were discussing, isn't that

15   right?

16   A       No, when we spoke at the meeting we were all

17   together, but when the price was going to be talked

18   about that was spoken individually.

19   Q       All right.  But the point is you had this

20   meeting with the crew and Mr. Favio, right?

21   According to you.

22   A       Correct, the first meeting.

23   Q       And this is aboard the Fat Crow.

24   A       Aboard the Fat Crow.

25   Q       And then Mr. Favio announces, gentlemen, I

1    want you all to deliver drugs for me, something to

2    that effect.

3    A      No, it's not I want you to deliver drugs for

4    me, no.  As I mentioned, once I finished showing him

5    the ship, he made the comment to me that he and

6    Mr. Herman had already hired all of the crew that

7    was there in Barranquilla.

8    Q      For another vessel.

9    A      No, for the Fat Crow.

10   Q      Implying that if you guys didn't want to do

11   the job, he'd get somebody else to do it; is that

12   right?

13   A      How so?

14   Q      Well, you're saying about this other crew

15   that's ready in Barranquilla, right?

16   A      No, the crew of the Fat Crow was hired by

17   Mr. Herman and Mr. Favio in Barranquilla.

18   Q      Right.  And that's the people that we're

19   talking about that we've seen all the pictures,

20   these are the people aboard the Fat Crow, we don't

21   dispute that.  What we're saying is that when

22   Mr. Favio shows up and he starts making a

23   conversation about drugs, you're saying that

24   everybody was present.

25   A      Correct.

1    Q        And that's when Mr. Favio announces something

2    about I need you guys to do a drug trip, right?

3    A        No, those are not his words.

4    Q        Well, what were his words?

5    A        He spoke with me and then he gathered us all

6    together because he had already hired all of them in

7    Barranquilla.

8    Q        So now you're telling us or we understand

9    Mr. Favio tells you about a drug trip and then you

10   tell that to the crew; is that right?

11   A        No.

12   Q        Not that either?  Tell me how it happened.

13   A        Mr. Favio tells me, he asked me, he said that

14   the ship is possibly going to do a drug trip and if

15   I would like to continue being the captain on the

16   ship, and I said yes.

17   Q        And that's a conversation between you and

18   Mr. Favio, correct?

19   A        Correct.

20   Q        Nobody else was there, right?

21   A        There was no one else there.

22   Q        Mr. Llanos Miranda was not participating in

23   this conversation, correct?

24   A        With Mr. Hector Favio and me, no.

25   Q        The information is passed from Mr. Favio to

1     you, isn't that right?

2     A     Correct.

3     Q     All right.  Then what do you do with that

4     information, tell us now what happens.

5     A     Well, then I continue with Mr. Hector Favio

6     and afterwards he tells me that we need to meet with

7     all of the personnel.

8     Q     All right.  So did Mr. Favio speak to the crew

9     before this conversation that you're having with

10    him?

11    A     No, he had not gathered them together before.

12    Q     All right.  So you had this conversation and

13    then you go to the crew and as the captain you

14    gather the crew together, right?

15    A     Correct.

16    Q     All right.  So now according to you the crew

17    is present and you're there, right?

18    A     Correct.

19    Q     Where is Mr. Favio?

20    A     Present at the meeting.

21    Q     All right.  So now it's you and Favio and the

22    rest of the crew, right?

23    A     Correct.

24    Q     So now you then tell the crew what?

25    A     The crew already knew that the drug trip was

1      going to be made because Mr. Hector Favio had

2      already hired them from Barranquilla.

3      Q      Which crew in Barranquilla?

4      A      Mr. Llanos, Mr. Barrios, Mr. Bolanos,

5      Mr. Herrera.

6      Q      Okay.  The people we saw the pictures on the

7      screen.

8      A      Correct.

9      Q      But you're saying now that Favio had hired

10     them in Barranquilla?

11     A      In Barranquilla.

12     Q      But Mr. Favio didn't take over the

13     administration of the Fat Crow until you met with

14     him on land at the end of July, early August, isn't

15     that right?

16     A      That's when I met him.

17     Q      So now he's telling you that he hired them in

18     Cartagena before then?

19     A      In Barranquilla.

20     Q      I'm sorry, I meant Barranquilla.  I'm sorry, I

21     misspoke.  That's what happened?

22     A      Could you repeat the question?

23     Q      Okay.  You're saying that Mr. Favio had hired

24     this crew aboard the Fat Crow from Barranquilla

25     before the end of July when you had this meeting on

1       shore, is that what you're saying?

2       A       Correct.

3       Q       Didn't you tell us that Mr. Gonzalez met with

4       you on land and told you that I'm no longer in

5       charge, that now it's Mr. Favio?

6       A       Correct.

7       Q       So all these people that we saw in these

8       pictures and this crew aboard the Fat Crow were

9       already on the Fat Crow, isn't that right?

10      A       When I arrived they were on board.

11      Q       Yeah.  And so now when Mr. Favio takes over at

12      the end of July, early August, how could he have

13      contracted with them in Barranquilla when they're

14      already aboard the Fat Crow?

15      A       The Fat Crow was at the shipyard in the

16      Dominican.  [Inaudible] the boat over there.

17      Q       Well, I understand all that.  And Mr. Gonzalez

18      was in charge of the Fat Crow up until the end of

19      July like you said, isn't that right?

20      A       No.  He hired me for the Fat Crow.

21      Q       Yes.

22      A       But I was on another ship.

23      Q       I understand that.  And Mr. Gonzalez hired

24      you.

25      A       So then what is it that you don't understand?

1    Q       How your story -- I'm trying to understand

2    your story, that's what I'm trying to understand.

3    A       I'm not telling stories.

4    Q       Well, okay, then explain to me how Mr. Favio

5    could have contracted this crew or Mr. Llanos in

6    April if he didn't take over the administration of

7    the Fat Crow until late June, early August, of 2017.

8    You tell me.

9    A       I don't know what partnership they might have

10   or what partnership between them and if he hired

11   them and moved over -- that I don't handle.

12   Q       Well, the fact of the matter is you don't know

13   what Mr. Llanos discussed with Mr. Favio, if

14   anything; isn't that right?

15   A       Well, where?

16   Q       You were never present when Mr. Llanos spoke

17   with Mr. Favio, isn't that right?

18   A       No.

19   Q       That's if they had any meetings at all, isn't

20   that right?

21   A       Well, he told me, Mr. Llanos told me that

22   Mr. Favio had hired him.

23   Q       Oh, now Mr. Llanos tells you that Favio hired

24   him.

25           All right.  Mr. Barrios, you remember when

1    eventually you get arrested for your activities on

2    the Fat Crow and you're brought to St. Petersburg,

3    Pinellas County, remember that?

4    A    Yes, that's correct.

5    Q    And about the end of September you had a

6    meeting with this agent, Agent Ward, at the jail or

7    at the office?

8    A    Yes.

9    Q    And when you had this meeting with Agent Ward

10   he told you tell me what happened, it's in your best

11   interests to cooperate, something like that?

12   A    I was with my attorney.

13   Q    Were you with your attorney the very first

14   time you met with him?

15   A    Yes."

16   Q    Okay.  Well, all right.  You had a meeting

17   with -- you were interviewed by Agent Ward on

18   September 22nd, does that ring a bell, is that

19   right?

20   A    I don't know the date, but I did interview

21   with him.

22   Q    Well, that interview that you had with him was

23   before you came to court for the first time, isn't

24   that right?

25   A    No.

1    Q       No?  Okay.  Did you have another meeting with

2    Mr. Ward in November a couple of weeks ago?  I'm

3    sorry, I'm sorry.  Did you have a meeting with Agent

4    Ward at the end of October, October 23rd, with your

5    attorney?

6    A       The meetings have been with my attorney and

7    with the agent.

8    Q       Okay.  But there was a time -- there was a

9    meeting when you first got here that you didn't have

10   an attorney and you spoke to the agent, isn't that

11   right?

12   A       A meeting where I did not have an attorney?

13   Q       Yes.

14   A       No.

15   Q       You weren't appointed an attorney until you

16   went to court, isn't that right?

17   A       Correct.

18   Q       And you were interviewed with the agent before

19   you came to court when you first got to Middle

20   District of Florida, isn't that right?

21   A       When we first arrived over here on the 17th at

22   a building that belongs to the feds, there I was

23   interviewed by two agents, two agents of the DEA.

24   Q       All right, let's talk about that meeting.  You

25   didn't have an attorney then, did you?

1    A       I did not have an attorney.

2    Q       So now you remember you didn't have an

3    attorney then.

4    A       Not then when I arrived on the 17th, I did not

5    have an attorney.

6    Q       But you did speak to Agent Ward, isn't that

7    correct?

8    A       As we spoke when he introduced himself there

9    at that room where they had us all.

10   Q       Are my questions confusing?  I asked you did

11   you have a meeting with him before you went to

12   court, yes or no.

13   A       Meaning before going to the court?  I did not

14   have one.

15   Q       You just told us that when you got here you

16   did speak to him and you told him you were about to

17   tell us what you told him.

18   A       About?  I never said I was about to say.

19   Q       All right.  All right.  Well, my point is

20   this.  When you spoke -- how about this.  When you

21   spoke with the agent, was he speaking to you with an

22   interpreter?

23   A       When I spoke with -- no.

24   Q       So Agent Ward speaks Spanish, he spoke

25   directly to you?

1    A      Correct.

2    Q      You don't speak English, do you?

3    A      I do not speak English.

4    Q      And do you remember when Agent Ward was

5    talking to you that he was taking notes, do you

6    remember that?

7    A      Correct.

8    Q      He was taking down what you were telling him,

9    right?

10   A      Correct.

11   Q      And he was asking you about what happened and

12   what you knew that occurred aboard the Fat Crow,

13   isn't that right?

14   A      Correct.

15   Q      Now, and you met with him at least twice,

16   isn't that right?

17   A      Correct.

18   Q      And on neither occasion that you spoke to

19   Agent Ward did you ever tell him that Mr. Llanos

20   Miranda told you about a batazo, did you?

21   A      I did tell him.

22   Q      You told him?

23   A      Yes.

24   Q      Okay.  And did you tell Agent Ward about the

25   first time you met Mr. Llanos Miranda aboard the Abu

1    Dhabi?

2    A     I told him that we had met on a ship, but I

3    didn't tell him the name of the ship, that we had

4    met in Cartagena, that we had seen each other in

5    Cartagena.

6    Q     You're sure that Agent Ward was writing these

7    things down and taking notes while you were

8    answering his questions?

9    A     He was writing.

10   Q     Did you subsequently see his report about what

11   you had told him, that he prepared a report about

12   these interviews, did you see that?

13   A     He was writing.

14   Q     But did there come a point in time after these

15   meetings that you were shown a copy of a report

16   about your interview with Agent Ward?

17   A     Well, he was writing like that like you are

18   writing.

19   Q     I understand.  My point is -- my question is

20   simple.  After that, after you met with him, were

21   you eventually shown a report, a report of what he

22   had written down about what you said, did you see

23   it?

24   A     No.

25   Q     Okay.  Now, when you had -- let me ask you

1      this way.  You talked about the fact that you

2      personally received $10,000, correct?

3      A      Not personally.  My brother received it.

4      Q      You got me there.  I meant to say that.  Your

5      brother was paid on your behalf -- the $10,000 went

6      to your brother because of you, isn't that right?

7      A      Correct.

8      Q      Because you personally had made an agreement

9      with Mr. Favio to do what he asked and take these

10     drugs aboard the Fat Crow, isn't that right?

11     A      Correct.

12     Q      And you got some money for it, isn't that

13     right?

14     A      The $10,000 that he gave me.

15     Q      You got something for it, right?

16     A      Correct.

17     Q      And this -- you said that Mr. Llanos Miranda

18     had asked you for a favor to ask your brother to get

19     his money, that's what you said, isn't that right?

20     A      Correct.

21     Q      All right.  And when this request by

22     Mr. Llanos to you occurred, was anybody else

23     present?

24     A      Mr. Hector Favio was there.

25     Q      He was there.  So Mr. Llanos asked you in

1    front of Mr. Favio to give your brother his part of

2    the money.

3    A    No, he asked me -- Mr. Llanos asked me if my

4    brother could receive the money because he didn't

5    have anyone to give it to.  Then afterward the two

6    of us spoke with Mr. Hector Favio for the money to

7    be delivered to my brother.  Then we filmed -- I

8    filmed a video for my brother explaining to him on

9    behalf of Mr. Llanos and Mr. Llanos filmed the video

10   for his wife for her to go to Barranquilla and my

11   brother would hand the money to him over there.

12   Q    Where are these videos?

13   A    They were in the phone of Mr. Hector Favio.

14   Q    Okay.  So we don't have those individuals.  So

15   now what do you have?  We have you saying that this

16   meeting occurred at least twice, right?

17   A    Two times or one time?

18   Q    Well, you said one time he asked you to give

19   the money to your brother, right?

20   A    Correct.

21   Q    And then you went with the two of you to

22   Mr. Favio?

23   A    Correct.

24   Q    That's two meetings, right?

25   A    Correct.

1    Q    And that's when you say all this happened

2    about getting his -- Mr. Llanos's money to your

3    brother, isn't that right?

4    A    Yes, correct.

5    Q    But no money ever went to your brother on

6    behalf of Mr. Llanos, did it?

7    A    Correct.

8    Q    You got some money, right?

9    A    Correct.

10   Q    But as far as you know your brother, going to

11   your brother, Mr. Llanos got no money; is that

12   right?

13   A    Correct.

14        MR. CASTILLO:  Your Honor, may I approach the

15   witness?

16        THE COURT:  You may.

17   BY MR. CASTILLO:

18   Q    I would like to show you, Mr. Barrios, what

19   has been marked as Defendant's Number 2 and I ask if

20   you recognize that document.  I realize it's in

21   English, but take a look at it.

22   A    Yes, these are my initials.

23   Q    On the bottom of each page those are your

24   initials?

25   A    Correct.

1    Q      And on the last page you signed this?

2    A      Correct.

3    Q      And this is a copy of your plea agreement?

4    A      Correct.

5    Q      And this is a document that you signed and

6    then would eventually put in the court file?

7    A      Correct.

8    Q      And you eventually went to court before a

9    Magistrate Judge McCoun and he went over this

10   document with you?

11   A      Correct.

12          MR. CASTILLO:  Your Honor, at this time I

13   would move Defendant Llanos Exhibit Number 2 into

14   evidence, the plea agreement.

15          MR. STOUT:  No objection, Your Honor.

16          THE COURT:  I'll receive into evidence Llanos

17   2.

18   BY MR. CASTILLO:

19   Q      Now, Mr. Barrios, this plea agreement was

20   given to you to sign after you decided to plead

21   guilty; is that correct?

22   A      Correct.

23   Q      And this document was prepared by the

24   government?

25   A      That document was given to me by my attorney.

1    Q     Well, but you didn't write this document,

2    right?

3    A     No.

4    Q     And you know he didn't write it, your attorney

5    didn't write it, did he?

6    A     No.

7    Q     This document that we're talking about was

8    given to you by your attorney and there was an

9    agreement for you to plead guilty in exchange for

10   certain benefits, right?

11   A     Correct.

12   Q     Now, in your meetings with Agent Ward did you

13   tell him about this prior attempted drug trip that

14   occurred five years ago that didn't happen?

15   A     No, he didn't ask me.

16   Q     You didn't tell him?

17   A     No.

18   Q     Didn't he ask you to tell him everything about

19   your past?

20   A     No.

21   Q     He didn't ask you the question if you had been

22   involved in prior drug trips, he never asked you

23   that?

24   A     The one who asked me was the prosecutor.

25   Q     Okay.  Well, somebody asked you, right?

1    A      Yes.

2    Q      On page three of your plea agreement, I know

3    it's in English and you can't read it, but paragraph

4    6 says if the court accepts this plea agreement, the

5    United States Attorney's Office for the Middle

6    District of Florida agrees not to charge you with

7    committing any other federal criminal offenses known

8    to the United States Attorney's Office at the time

9    of the execution of this agreement relevant to the

10   conduct giving rise to this plea agreement.  Do you

11   see that?  Do you see that?  Those are your initials

12   at the bottom of page 4; is that right?

13   A      Correct.

14   Q      And those initials mean that that page was

15   read to you and you understood it, isn't that right?

16   A      Correct.

17   Q      And you understood that by this paragraph that

18   we just went over, any prior criminal conduct that

19   you may have committed and you told him about, they

20   wouldn't charge you with.

21   A      Correct.

22   Q      So this trip we talked about the Lida Isabel,

23   you told him about that, isn't that right?

24   A      I mentioned to him that I was going to do that

25   trip, to the prosecutor.

1    Q       Now, Mr. Barrios, when you testified here this

2    morning about anything that Mr. Llanos Miranda may

3    have told you, aside from Mr. Favio -- maybe he was

4    present, maybe he videotaped it, whatever -- nobody

5    else was present during any conversation that you

6    had with Mr. Llanos and yourself, isn't that

7    correct?

8    A       No.

9    Q       No, I'm correct, there was nobody else there?

10   A       There were only the three of us.

11   Q       So only -- your word is the only information

12   that we have about the existence of any of these

13   conversations, correct?

14   A       Correct.

15          MR. CASTILLO:  I have no further questions,

16   Your Honor.

17          THE COURT:  All right.  Mr. Martinez?

18                    CROSS EXAMINATION

19   BY MR. MARTINEZ:

20   Q       Good afternoon, Mr. Barrios.

21   A       Good afternoon.

22   Q       You've been on the witness stand for three

23   hours.  I'm going to try to simplify some of the

24   issues.  Some of the testimony has gotten a little

25   convoluted.

1          To over simplify, you are here because you've

2    cut a deal with the government, right?

3    A     A deal with the government?  I pled guilty.

4    Q     You pled guilty, but you can plead guilty

5    without cooperating.  You're doing both.  Right?

6    A     I'm cooperating.

7    Q     Right.  And the goal of the cooperation is to

8    reduce the exposure that you have criminally, to

9    lessen the sentence you ultimately get.

10   A     Correct.

11   Q     And you know because of these defendants' not

12   guilty plea that they are in effect saying we didn't

13   know there was cocaine aboard the Fat Crow, right?

14   A     They're saying that they did not know.

15   Q     Correct.

16   A     How could they not know if they helped load

17   it?

18   Q     We're going to work it like this.  I ask the

19   questions and you give the answers.

20         You don't look very nervous in that witness

21   box.

22         THE COURT:  Okay.  Let's ask another question.

23   That's not relevant.

24   BY MR. MARTINEZ:

25   Q     Do you already have an anticipation that

1    you're going to get a really good deal based upon

2    what you're doing?

3    A    Yes.

4    Q    Okay.  And you know that what you have to do

5    to get that deal is that you have to say that the

6    defendants in this case knew of the cocaine aboard

7    the Fat Crow.

8    A    No, I don't have to say that.  I have to say

9    the truth.

10   Q    If you don't say that, you haven't done the

11   government any good, have you?

12   A    What do you mean?

13   Q    I'll ask another question.  Let's say I'm

14   asking you -- let's just talk about my client.  Did

15   Mr. Mendoza know there was cocaine on that boat?

16   A    Correct.

17   Q    Okay.  Prove it to me.

18   A    He helped load it.

19   Q    Says who?

20   A    Says I and says the rest of the crew that was

21   with him.

22   Q    And how do you know that the rest of the crew

23   are going to say that?

24        MR. STOUT:  Objection, Your Honor.

25        THE COURT:  Sustained.  Ask another question.

1    BY MR. MARTINEZ:

2    Q      Have you had conversations with each member of

3    this crew wherein they told you they were going to

4    testify and parrot what you said?

5    A      No.

6    Q      So when you said that you knew that that was

7    going to happen, that was a lie.

8    A      They were there present when the drugs were

9    loaded.  We were all there when the drugs were

10   loaded.

11   Q      So you say.  Right?

12   A      That's how it is.

13   Q      And if anyone else in the crew were to parrot

14   that statement, the only proof we have that it's

15   true are the words leaving their mouth, right?

16        MR. STOUT:  Objection, Your Honor.

17        THE COURT:  Okay.  Ask another question about

18   what anybody else might do.  That's not relevant.

19   BY MR. MARTINEZ:

20   Q      Let's talk a little bit about the benefits

21   that you're going to get.  You are by your own

22   admission a veteran drug dealer, right?

23   A      I'm not a drug dealer.

24   Q      Well, you realize that Count One of the

25   indictment that you pled to charges you with

1    conspiracy to possess with intent to distribute over

2    5 kilograms of cocaine, right?

3    A       Correct.

4    Q       That's what you pled guilty to, right?

5    A       Correct.

6    Q       That means you're a drug trafficker, right?

7    A       If that's what the agreement says, what the

8    charge says, that's what it is.

9    Q       Is it a lie?

10   A       No, it's not a lie.

11   Q       Okay.  Well, our two choices is it's a lie or

12   it's the truth.  That means it's the truth.

13   A       The truth.

14   Q       Okay.  So we've established that you are a

15   drug trafficker.  Now, you also conspired to possess

16   with intent to distribute back when you conspired to

17   do it on the Lida Isabel, correct?

18   A       Correct.

19   Q       Right.  Because you don't have to complete the

20   conspiracy to be guilty of conspiracy.

21           THE COURT:  Ask another question.  He doesn't

22   know that.

23   BY MR. MARTINEZ:

24   Q       Now, even though you have admitted to

25   conspiring to distribute drugs on the Lida Isabel,

1      you do not have any expectation that the government

2      is going to charge you with that separate drug

3      trafficking historical event.

4           MR. STOUT:  Objection, Your Honor.

5           THE COURT:  Tell me the basis.

6           MR. STOUT:  Speculative, Your Honor.

7           THE COURT:  Overruled.  I'm not sure he can

8      answer the question, but if he can.

9           THE WITNESS:  Repeat the question.

10     BY MR. MARTINEZ:

11     Q      You don't have any expectation that the man

12     that you confessed to regarding the Lida Isabel drug

13     trafficking offense, this guy right here, that he's

14     going to indict you for that federal drug

15     trafficking historical offense.

16     A      Who is going to accuse me?

17     Q      The United States Attorney's Office for the

18     Middle District of Florida.

19     A      No.

20     Q      Okay.  And if he did, you would be facing

21     another 10-year minimum mandatory on that offense --

22          THE COURT:  Ask another question.  He does not

23     know that.  He can't answer that.

24     BY MR. MARTINEZ:

25     Q      With regard to this case you entered into a

1    plea agreement, right?

2    A      Correct.

3    Q      And it's already in evidence, right?

4    A      Correct.

5    Q      And you've read every page of that entire

6    agreement, right?

7    A      It was read to me, it was translated to me.

8    Q      And you testified in front of a magistrate

9    judge that you understood all of it, right?

10   A      Correct.

11   Q      Okay.  And part of that plea agreement

12   requires you to return any illegally obtained funds,

13   right?

14   A      Correct.

15   Q      When did your brother return the $10,000 to

16   the United States?

17   A      He has not returned it.

18   Q      When is his deadline to return it under the

19   plea agreement?

20   A      I don't know what deadline there is.  I don't

21   remember.

22   Q      He's never going to return it, is he?

23   A      Never going to return it.

24   Q      So that's another benefit.  You get to keep

25   the $10,000 to boot, right?

1    A        Correct.

2    Q        All right.  Let's talk about, since you have

3    some drug trafficking experience, how it works by

4    way of recruitment.  I'm putting before you

5    Government Exhibit 106B which has already been

6    introduced into evidence.  You see that name there,

7    Eduardo Chasin?

8    A        Chasin Eduardo, yes.

9    Q        And he is part of the crew, right?

10   A        Correct.

11   Q        And are you aware that he has also pled

12   guilty?

13   A        Correct.

14   Q        And did you travel with him yesterday in the

15   same transport van from the Pinellas County Jail?

16   A        Correct.

17   Q        And are you housed in the same unit with him

18   at the Pinellas County Jail?

19   A        Not in the same unit.

20   Q        Do you see him at the Pinellas County Jail

21   either in the yard or rec or anything like that?

22   A        No, we're in separate yards.

23   Q        What about yesterday on the van right over

24   here, were you with him?

25   A        Yes, we came in the same car.

1    Q      When you say car, do you mean car like

2    automobile or car like a van?

3    A      A van.

4    Q      And are the prisoners put in the back of the

5    van?

6    A      One in each chair.

7    Q      In the back of the van.

8    A      There is four seats, one in each seat.

9    Q      Okay.  And who else was in the van besides you

10   and Eduardo Chasin?

11   A      Mr. Mario Acuna.

12   Q      And who is he?

13   A      Oscar Herrera.  They're mariners, crew members

14   of the Fat Crow.

15   Q      So the four cooperating defendants all came

16   together in the back of the van today.

17   A      Not today.  Today we only three of us came.

18   Q      Okay.  Because we're done with Eduardo Chasin,

19   so he didn't come today.

20   A      Correct.

21   Q      But yesterday all four of you in the van,

22   right?

23   A      Correct.

24   Q      On the way over here from Pinellas and on the

25   way back from Hillsborough returning to Pinellas?

1    A       Correct.

2    Q       And how many law enforcement officers were in

3    that van?

4    A       Three officers.

5    Q       And where were they seated?

6    A       One was driving, one is in the middle seat,

7    and one was in the back.

8    Q       Okay.  And did those individuals speak

9    Spanish?

10   A       One kind of spoke Spanish.

11   Q       What does that mean?

12   A       That we could have communication, not fluent,

13   but we could understand each other.

14   Q       And was there a prohibition for you all

15   speaking to each other?

16   A       Yes, they told us that we could not talk among

17   us.

18   Q       So you didn't speak at all?

19   A       No.

20   Q       Then when you get in the marshals holding cell

21   in this building you don't speak at all.

22   A       It was different.

23   Q       There you can speak to each other.

24   A       We were in different cells.

25   Q       All right.  You had said that the crew was

1    hired in Barranquilla, is that right?

2    A    Correct.

3    Q    Now, when the crew is hired is it your

4    testimony that they know that there is going to be a

5    drug deal on the Fat Crow before you do?

6    A    Yes, because they're already on the boat

7    before I was.

8    Q    So if this gentleman flew from Caracas,

9    Venezuela, to Santo Domingo, do you know how he made

10   it to Barranquilla to get hired?

11   A    He was hired in Dominican.

12   Q    So when you said all the crew was hired in

13   Barranquilla, that was not the truth.

14   A    All the Colombians.  The Venezuelans they told

15   me they were hired there at the Dominican.

16   Q    So when you told Mr. Castillo that all the

17   crew was hired in Barranquilla, you meant all the

18   Colombian members of the crew were hired in

19   Barranquilla.

20   A    Except the Venezuelans, two Venezuelans.  All

21   the rest were in Barranquilla.

22   Q    When you were hired you said you were not told

23   that it was going to be a drug deal; is that right?

24   A    Correct.

25   Q    Are you aware now that when you were

1    purportedly told that, there were people busy

2    building a secret compartment in the Fat Crow to

3    transfer drugs?

4    A    Could you say that?

5    Q    Is it your understanding today that just one

6    or two days after April 22, 2017, construction began

7    on a secret compartment inside the Fat Crow.

8    A    I did not know when it began because I was not

9    there.

10   Q    But you know that the only purpose for the

11   construction of a secret compartment in the Fat Crow

12   is to transport cocaine.

13   A    Correct.

14   Q    But nonetheless, you were not advised when you

15   were hired that that was the mission of the Fat

16   Crow.

17   A    Correct.

18   Q    So when you arrived in mid June on the Fat

19   Crow, you had no idea that back in April

20   construction had commenced on the hidden

21   compartment.

22   A    Correct.

23   Q    And when you arrived on board the Fat Crow in

24   the status of being no less than the captain, you

25   weren't shown the hidden compartment, were you?

1    A       No, I wasn't.

2    Q       So even while you're aboard the Fat Crow in

3    June as the captain, you're unaware of a secret

4    compartment or any plan to transport drugs in it,

5    right?

6    A       We're talking about transporting -- I already

7    knew because I had already spoken with the crew.

8    Q       You had spoken to the crew, you say, right?

9    A       When Llanos told me about the batazo, then I

10   integrated with the crew.

11   Q       We're back to the batazo.

12   A       Correct.

13   Q       You say that there came a point in time where

14   the crew participated in loading the cocaine onto

15   the boat.  Do you remember that?

16   A       Correct.

17   Q       Including yourself, what's the total number of

18   the crew?

19   A       Nine crew members.

20   Q       So nine in total.

21   A       Nine in total.

22   Q       Nine you say all participated.

23   A       Nine all participated.

24   Q       Now, were you and the other eight individuals

25   purportedly wearing some kind of either biohazard

1    suit or gloves or anything like that to do this

2    transfer of cocaine onto the boat?

3    A      No.

4    Q      None of that?

5    A      None of that.

6    Q      And when it came, you didn't know in advance

7    it was coming.

8    A      When what came?

9    Q      The cocaine.

10   A      Yes, I knew it was coming.

11   Q      You knew like 3:00 in the afternoon today it

12   will be here.

13   A      Yes, I already knew.

14   Q      Okay.  But there was no special preparations

15   made for it, right?

16   A      No.

17   Q      So now you've got nine guys, right?

18   A      Nine crew members.

19   Q      And they're all helping.

20   A      Correct.

21   Q      And there are 75 packages?

22   A      75 packages.

23   Q      And it's like a daisy chain, right?

24   A      Correct.

25   Q      So if I'm crew member number 1, I pass the

1      package to crew member number 2, right?

2      A      Correct.

3      Q      And then to number 3, right?

4      A      And number 4.

5      Q      So each crew member handles the package and

6      then passes it to the next crew member, right?

7      A      Correct.

8      Q      So each crew member would then touch and hold

9      and move 75 packages.

10     A      Repeat that.

11     Q      There is 75 packages, right?

12     A      Correct.

13     Q      And they have got to be moved from Point A to

14     Point B, right?

15     A      Correct.

16     Q      And there is nine guys assisting in that

17     process, right?

18     A      Correct.

19     Q      And starting with the package number 1, right,

20     that's picked up, right, passed to crew member

21     number 2, right?

22     A      To the chain, it continues to pass along the

23     chain that was formed.

24     Q      Through the chain.  So if I'm a member of that

25     chain, I have now handled and touched all 75

1      packages.

2      A      I don't know if we touched all 75 since there

3      were several of us.

4      Q      Well, if it's a daisy chain, each package gets

5      passed along from one person, to the next, to the

6      next, to the next, right?

7      A      When the drugs are being received there's

8      three at the railing, three behind, and then it

9      continues.

10     Q      And you say that my client participated in

11     that process?

12     A      Correct.

13     Q      So he would have handled those packages,

14     according to you, right?

15     A      Correct.

16     Q      And the proof of that would come from one of

17     two places; because you and the other cooperating

18     defendants say so --

19            MR. STOUT:  Objection, Your Honor.

20            THE COURT:  I don't think he can answer where

21     the proof would come from, so sustained.  And it's

22     argumentative.

23            MR. MARTINEZ:  May I have a moment, Your

24     Honor?

25            THE COURT:  You may.

1          MR. MARTINEZ:  No further questions, thank

2    you.

3          THE COURT:  Mr. Stout?

4                    REDIRECT EXAMINATION

5    BY MR. STOUT:

6    Q     Mr. Barrios, do you know when the hidden

7    compartment was built?

8    A     When it was built?

9    Q     Was it built before you joined the ship?

10   A     Correct.

11   Q     The defense lawyers made a few mentions about

12   your plea agreement.  Do you remember that?

13   A     Correct.

14   Q     And you said you were familiar with it.  Do

15   you remember that?

16   A     Correct.

17   Q     I want to show you page eight of that now

18   Defense Exhibit 2 or Llanos Miranda Exhibit 2.  I

19   want to read a provision of that for you, starting

20   here at B and provision 1.  "It is understood that

21   should the defendant knowingly provide incomplete or

22   untruthful testimony, statements, or information

23   pursuant to this agreement, or should the defendant

24   falsely implicate or incriminate any person, or

25   should the defendant fail to voluntarily and

1    unreservedly disclose and provide full, complete,

2    honest knowledge and cooperation regarding any of

3    the matters noted herein, the following conditions

4    shall apply," and number one says, "the defendant

5    may be prosecuted for any perjury or false

6    declarations, if any, committed while testifying

7    pursuant to this agreement or for obstruction of

8    justice."

9    A       Correct.

10   Q       Do you understand that provision?

11   A       Correct.

12           MR. STOUT:  Your Honor, may I have a moment?

13   I don't have any further questions, Your Honor.

14           THE COURT:  Ladies and gentlemen, we're going

15   to recess for lunch.  We'll be in recess until 1:45.

16   You're welcome to walk around.  Please don't discuss

17   the case.  We'll start again at 1:45.  Thanks.

18           (The jury retired to the jury room.)

19           THE COURT:  Sir, you may step down.

20           (Lunch break.)

21           THE COURT:  Mr. Stout, who is your next

22   witness?

23           MR. STOUT:  Our next witness is going to be

24   Joseph Pfrimmer of the United States Coast Guard.

25           THE COURT:  Would you go ahead and get the

1      jurors, please.

2              (The jury returned to the courtroom.)

3              THE COURT:  Mr. Stout, you may call your next

4      witness.

5              MR. STOUT:  Your Honor, the United States

6      calls Joseph Pfrimmer of the United States Coast

7      Guard.

8              [Witness sworn]

9              COURTROOM DEPUTY CLERK:  Please be seated.

10     Please state your name and spell your last name for

11     the record.

12             THE WITNESS:  Petty Officer Joseph Pfrimmer,

13     P-f-r-i-m-m-e-r.

14                     DIRECT EXAMINATION

15     BY MR. GAMMONS:

16     Q      Good afternoon.  Mr. Pfrimmer, how are you

17     employed?

18     A      By the U.S. Coast Guard.

19     Q      How long have you been with the U.S. Coast

20     Guard?

21     A      Six and a half years.

22     Q      What is your current title?

23     A      Intelligence specialist, second class.

24     Q      Where are you currently stationed to work?

25     A      I'm currently stationed at the U.S. Coast

1      Guard Digital Forensics Lab in Miami, Florida.

2      Q      What do you do there?

3      A      There I process all the electronic devices

4      that are seized by the Coast Guard cutters and they

5      eventually come to our lab from the case agent.

6      Q      And what is your title at that lab in Miami?

7      A      Digital forensic examiner.

8      Q      Other than yourself do other people share that

9      same title in your lab?

10     A      Yes, there is two other full-time forensic

11     examiners.

12     Q      Does that Miami lab have any sort of

13     specialty?

14     A      Yes, we specialize in maritime GPS units.

15     Q      What is the area responsibility for that lab

16     in Miami?

17     A      From South Carolina south to Puerto Rico and

18     the entire Caribbean, but we have also done cases

19     through the whole United States.

20     Q      When does that lab have occasion to work cases

21     throughout the United States?

22     A      Word of mouth, other agents from different

23     regions will hear about our capabilities with

24     maritime GPS and other electronics and they'll get

25     in contact with us and ask us if we can support

1      their case.

2      Q      So you don't work only with the United States

3      Coast Guard?

4      A      No.

5      Q      Can you describe generally what a typical day

6      in the lab is like for you?

7      A      Typical day in the lab, we could receive

8      anywhere from one to two cases or three or four for

9      the entire week.  We'll intake those cases, sign the

10     chain of custody forms, make sure that all the

11     electronic devices are there.  We'll assign them a

12     case number and based on the priority, if it's a

13     search warrant we'll do the search warrant first; if

14     it's consent, it could go towards the bottom of the

15     pile.  Abandoned property will go underneath that.

16     We'll work our backlog of cases from what we

17     received -- the furthest away to the newest.

18     Q      In a year approximately how many devices does

19     your lab analyze?

20     A      This year to date we have received over 800

21     electronic devices and over 180 cases.

22     Q      Have you engaged in any training in relation

23     to your official duties?

24     A      Yes, I have.

25     Q      Can you tell me about that?

1    A       Yes, I'm a Department of Defense certified

2    digital media collector and Department of Defense

3    digital forensic examiner.  I've also attended

4    Cellebright, which is cell phone extraction tool;

5    Advanced Cellphone Forensics where I'm able to

6    remove the memory chip of the cell phone and extract

7    the data from that, that's called Chip-Off; Berla,

8    which is our GPS forensics; Magnet Forensics for

9    internet evidence finder; and a couple more.

10    Q       Have you ever testified in federal court

11    before?

12    A       Yes, I have, five previous cases.

13    Q       In those cases were you designated as an

14    expert?

15    A       Yes, sir.

16    Q       So let me ask you, when you receive a new

17    device at your lab, walk me through the protocol

18    that you take.

19    A       The protocol that I take -- if it's shipped to

20    us through FedEx, I'll open the FedEx box, I'll

21    record the date and time --

22    Q       Let me ask you to slow down a little bit so

23    the interpreters can keep up.

24    A       If it's through FedEx, I'll open the FedEx

25    box, record the date and time that I received it

1     from FedEx, and then I will check in those

2     electronic devices through the chain of custody, and

3     then I'll assign an internal case number to it.  And

4     then once it's time to start that case, I'll open up

5     the evidence bag and examine each device.

6          If it's a GPS unit, before we power it on we

7     photograph the device and then I'll turn on a signal

8     jammer to make sure that the GPS does not receive

9     any additional signals.  And once it's powered on,

10    I'll photograph the various settings inside the GPS

11    unit to see what record method it was turned on

12    with.  And from there I'll connect it to my forensic

13    work station and extract the data using the GPS

14    software tools.

15    Q     After you've extracted the data, what do you

16    do?

17    A     Once it's extracted using the Garmin software

18    tools, I'll then view the data using Google Earth

19    and create an analytical product based on the data

20    extracted.

21         MR. GAMMONS:  Your Honor, may have permission

22    to publish Government Exhibit 13A?

23         THE COURT:  You may.

24    BY MR. GAMMONS:

25    Q     Mr. Pfrimmer, I'm showing you what has been

1    received in evidence as Government Exhibit 13A.  Do

2    you recognize that?

3    A       Yes, I do.

4    Q       Who took that picture?

5    A       I did.

6    Q       Is taking a photograph like this something you

7    commonly do in your course of your responsibilities?

8    A       Yes.  Every device gets photographed

9    physically and internally once we power it on, too.

10   Q       And what is the device depicted in Government

11   Exhibit 13A?

12   A       That is a handheld Garmin GPS unit.

13   Q       Have you examined handheld units like this one

14   in the past?

15   A       Yes, I have.

16   Q       Who provided you with this handheld unit?

17   A       The case agent, Special Agent Dan Ward,

18   through FedEx.

19   Q       And what were you asked to do in relation to

20   this device?

21   A       I was asked to extract the data that was

22   within this device and create an analytical product

23   of the data.

24   Q       Is that what you did?

25   A       Yes, sir.

1          MR. GAMMONS:  May I approach the witness, Your

2     Honor?

3          THE COURT:  You may.

4     BY MR. GAMMONS:

5     Q    Mr. Pfrimmer, I've handed you what has been

6     premarked for identification as Government

7     Exhibit 13B and 13C.  Do you recognize those

8     documents?

9     A    Yes, I do.

10    Q    What are they?

11    A    These are the two analytical products I

12    created for this handheld Garmin GPS unit.

13    Q    And how did you create those analytical

14    products?

15    A    The GPS file that was extracted from this unit

16    I then put it into Google Earth and it automatically

17    plots all the positions for you and then you're able

18    to click on the specific points and conduct your

19    analysis based on the time stamps and the

20    latitude/longitude positions.  Then I used Google

21    Earth to take a screenshot of what I wanted to

22    depict in my analytical product.

23    Q    Government's Exhibit 13B and 13C, did they

24    come from data that was taken off the GPS device

25    shown in Government Exhibit 13A?

1    A       Yes, sir.

2            MR. GAMMONS:  Your Honor, at this time the

3    government would request to move into evidence

4    Government Exhibit 13B and 13C.

5            THE COURT:  Any objections?

6            MR. MARTINEZ:  None.

7            THE COURT:  Received into evidence 13B and C.

8            MR. GAMMONS:  May I have permission to

9    publish, Your Honor?

10           THE COURT:  You may.

11   BY MR. GAMMONS:

12   Q       I'm showing you Government Exhibit 13B now.

13   First I want to start off in the center of the

14   analytical product, the red dot.  What does that

15   depict?

16   A       The red dot that says Coast Guard Cutter

17   Tahoma spotted the Fat Crow, that is the position

18   that I plotted based on the law enforcement

19   situational report that was provided me of the

20   initial detection.

21   Q       Generally speaking what geographical area does

22   this map show?

23   A       The Caribbean Sea.

24   Q       What is the country to the north of this map?

25   A       The north would be Dominican Republic and

1    Haiti.

2    Q      What about to the south?

3    A      To the south you would have Colombia on your

4    west and Venezuela on your east.

5    Q      What about to the west?

6    A      To the west of Haiti is Jamaica.

7    Q      I want to focus on the legend on the map.

8    What is a waypoint?

9    A      A waypoint is a user-generated position that

10   the user wished to save to navigate to in the

11   future.

12   Q      So it's something that the user would have to

13   put into the GPS?

14   A      Yes, sir.

15   Q      And what is a trackpoint?

16   A      A trackpoint -- when the GPS automatically

17   turns on, it records your position in set intervals

18   and the purpose of a track log is if you are to get

19   lost, you're able to retrace your steps to find your

20   way home.

21   Q      So a trackpoint necessarily will be where the

22   GPS physically was?

23   A      Yes, sir.

24   Q      And it's not the case with waypoints?

25   A      No.

1    Q      Based on this analytical product that you

2    created, what waypoints have been listed?

3    A      The waypoints that have been listed, there is

4    a waypoint north in Venezuela named FAC Crow and

5    then PTA Macolla which is north of Venezuela.  And

6    then in Colombia there is a waypoint named

7    Barranquilla and then there is one in Haiti and then

8    there is three off the coast of Jamaica, to the west

9    of Jamaica.

10    Q      And focusing specifically on FAC Crow, is that

11    something that's populated by the GPS device?

12    A      No, that is not, that is user created.  The

13    typically naming convention for a GPS unit, it's

14    going to start 001 and so on until the log fills up.

15    But you are then able to change the name manually

16    into whichever you desire.

17    Q      What are the trackpoints on Government

18    Exhibit 13B?

19    A      The trackpoints -- there was two logs,

20    19 nautical miles north of La Macolla, Venezuela,

21    which occurred on the 2nd, 9th, and 10th of August.

22    And the next time the GPS unit was turned on was

23    after the Coast Guard was on scene the 27th of

24    August which was southwest of Jamaica.

25            MR. GAMMONS:  Your Honor, may I have

1      permission to publish Government Exhibit 13C?

2              THE COURT:  You may.

3      BY MR. GAMMONS:

4      Q     Mr. Pfrimmer, what does this depict?

5      A     This is a close-up screenshot of the

6      trackpoints and waypoints north of Venezuela.

7      Q     And how many waypoints are listed?

8      A     Two.  FAC Crow and PTA Macolla.

9      Q     Can you explain the white box that you've

10     included on the analytical product?

11     A     Yes, this would be the time -- for the track

12     log, when the GPS recorded -- when it started

13     recording a position on the 2nd of August, and then

14     again on the 9th and 10th of August, which is

15     approximately 19 nautical miles north of La Macolla,

16     Venezuela.

17             MR. GAMMONS:  Your Honor, permission to

18     publish Government Exhibit 14A?

19             THE COURT:  You may.

20     BY MR. GAMMONS:

21     Q     Showing you Government Exhibit 14A, do you

22     recognize that?

23     A     Yes, I do.

24     Q     What is it?

25     A     It's a larger Garmin GPS unit that is not

1    handheld, it is typically mounted to a center

2    console on a vessel.

3    Q    Did you take that picture?

4    A    Yes, I did.

5    Q    What were you asked to do with this device?

6    A    I was also asked to extract the data out of

7    this unit and analyze it and create an analytical

8    report.

9    Q    And who provided you with this device?

10   A    The case agent, Special Agent Dan Ward,

11   through FedEx.

12   Q    Did you in fact create a analytical product

13   based upon the GPS plots that were in this device?

14   A    Yes, I did.

15        MR. GAMMONS:  May I approach the witness, Your

16   Honor?

17        THE COURT:  You may.

18   BY MR. GAMMONS:

19   Q    I've handed you what has been premarked for

20   identification as Government Exhibit 14B.  Do you

21   recognize that document?

22   A    Yes, I do.

23   Q    How do you recognize it?

24   A    That is an analytical product I created

25   extracting from Exhibit 14.

1    Q       Government Exhibit 14A?

2    A       Yes.

3    Q       Does it fairly and accurately reflect the

4    analytical product you created?

5    A       Yes, sir.

6            MR. GAMMONS:  At this time the government

7    requests to move into evidence Government

8    Exhibit 14B.

9            MR. MARTINEZ:  Without objection.

10           THE COURT:  Received into evidence 14B.

11           MR. GAMMONS:  May I have permission to

12   publish, Your Honor?

13           THE COURT:  You may.

14   BY MR. GAMMONS:

15   Q       I'm showing you Government Exhibit 14B.  I

16   want to focus on -- let me ask you this.  What

17   geographical area does this depict?

18   A       The Caribbean Sea.

19   Q       And I want to focus on the legend.  In

20   addition to waypoint we also have route and track.

21   What is a route?

22   A       A route is using two or more waypoints to

23   create a route or a navigational path that you wish

24   to navigate to in the future.  And a track is when

25   your GPS automatically turns on, it creates a log of

1      the trackpoints so that way you can retrace your

2      steps if you happen to get lost.

3      Q      The waypoints are points that the user would

4      have to program into the device?

5      A      Yes.

6      Q      So essentially routes would not have had to

7      have been traveled by the GPS device?

8      A      Correct.

9      Q      Whereas tracks show where that device has

10     been.

11     A      Correct.

12     Q      After reviewing the GPS device depicted in

13     Government Exhibit 14A, how many routes were there?

14     A      There were a total of 19 routes.

15     Q      In this Government Exhibit 14B are those

16     routes depicted by the pink line?

17     A      Yes, they are.

18     Q      How many tracks were there?

19     A      A total of two tracks.

20     Q      And where on this map are the tracks depicted?

21     A      The tracks are west of Jamaica.

22     Q      And they are depicted by that red line?

23     A      Yes, sir.

24            THE COURT:  It might be helpful, he's got a

25     laser up there, if he shows us where he's talking

1     about.  The color kind of blends.

2     BY MR. GAMMONS:

3     Q     Mr. Pfrimmer, I think you have a laser pointer

4     on the desk.

5     A     I'm sorry.

6     Q     Can you show me where the tracks are?

7     A     Right here.  West of Jamaica which occurred on

8     the 27th through the 29th of August.

9     Q     And otherwise there were no tracks on that

10    map?

11    A     No, prior to being boarded by the Coast Guard,

12    no, there was not.

13          MR. GAMMONS:  No further questions, Your

14    Honor.

15          THE COURT:  Mr. Castillo, any questions?

16          MR. CASTILLO:  No, Your Honor.

17          THE COURT:  Mr. Martinez?

18          MR. MARTINEZ:  None, Your Honor, thank you.

19          THE COURT:  Sir, you may step down.

20          You may call your next witness.

21          MR. STOUT:  Your Honor, the United States

22    calls Mario Jose Acuna Garcia.

23          [Witness sworn]

24          COURTROOM DEPUTY CLERK:  Please be seated.

25    Please state your name and spell your last name for

1    the record.

2           THE WITNESS:  Mario Jose Acuna Garcia.

3           THE COURT:  Can you spell your last name?

4           THE WITNESS:  A-C-U-N-A.

5           THE COURT:  Thank you.  Mr. Gammons?

6                     DIRECT EXAMINATION

7    BY MR. GAMMONS:

8    Q      Good afternoon, Mr. Acuna.

9    A      Good afternoon.

10   Q      Were you on board the vessel Fat Crow when it

11   was interdicted by the United States Coast Guard?

12   A      Yes, sir.

13   Q      Were you aware that there was cocaine on board

14   when that ship was interdicted?

15   A      Yes, sir.

16   Q      Have you pled guilty to conspiracy to possess

17   with intent to distribute cocaine in relation to

18   that event?

19   A      Yes, sir.

20   Q      Do you have a plea agreement with the United

21   States?

22   A      Yes, sir.

23   Q      Has anybody from the government promised you

24   anything about what sentence you will receive in

25   relation to this case?

1    A       No, sir.

2    Q       How old are you?

3    A       37.

4    Q       In April of 2017 where were you living?

5    A       Dominican Republic.

6    Q       Who were you living with?

7    A       With my lady.

8    Q       What were you doing for money at that time?

9    A       I worked at the shipyard as a painting

10   assistant.

11   Q       In addition to working as a painting assistant

12   have you always worked as a mariner?

13   A       Yes, sir.

14   Q       When did you become working as a mariner?

15   A       In 2005.

16   Q       When was the first time that you saw the ship

17   Fat Crow?

18   A       The month of March of 2017.

19   Q       What were the circumstances in which you saw

20   Fat Crow?

21   A       At the shipyard.

22   Q       Do you know why the ship was there?

23   A       Yes, it was for a repair of painting and

24   sandblasting.

25   Q       And you saw it there in the Dominican

1    Republic?

2    A     Yes, sir.

3    Q     Did there ever come a time when you sought

4    employment on the Fat Crow?

5    A     Yes, sir.

6    Q     Who did you speak to try to gain employment on

7    that ship?

8    A     With Mr. Carlos, the one in charge of the

9    ship.

10   Q     What did Mr. Carlos tell you?

11   A     That at that time he didn't have an answer for

12   me but that if anything changed he would let me

13   know.

14   Q     At some point later did someone contact you in

15   relation to employment on the Fat Crow?

16   A     Yes, sir, Mr. Julio.

17   Q     Did you know Mr. Julio personally?

18   A     No, sir.

19   Q     What did Mr. Julio tell you?

20   A     That he needed my documentation as a possible

21   employment as a cook.

22   Q     Did you provide that documentation?

23   A     Yes, sir.

24   Q     And were you offered employment with that

25   ship?

1    A      Yes, sir.

2    Q      How long was the contract for?

3    A      For three months.

4    Q      And how much were you to be paid for those

5    three months?

6    A      $1,100 monthly.

7    Q      At that point where did you think the Fat Crow

8    would be sailing?

9    A      To Venezuela, we were told.

10   Q      And what was Fat Crow going to be shipping?

11   A      Diesel.

12   Q      Diesel fuel?

13   A      Yes, sir.

14   Q      And did you know where in Venezuela

15   specifically Fat Crow was to go?

16   A      Yes, to Punto Fijo Guaranaos.

17   Q      Did there come a time when you had a meeting

18   with other crewmen of Fat Crow?

19   A      Yes.

20   Q      Do you remember more or less when that was?

21   A      Yes, on the 20th of the month of April.

22   Q      Was the captain of the Fat Crow at that

23   meeting?

24   A      Yes, sir.

25   Q      What was his name?

1    A        Jorge Bilarkazar.

2    Q        Skipping ahead, the captain who was on board

3    when Coast Guard stopped the ship, was that a

4    different captain from Mr. Bilarkazar?

5    A        No, sir.

6    Q        Who was the captain at that point when the

7    United States Coast Guard interdicted the boat?

8    A        Captain Martinez.

9    Q        I want to talk about the April 20th meeting

10   for a moment.  I'm showing you Government

11   Exhibit 102A.  Do you recognize that young man?

12   A        Yes, that's myself.

13   Q        I'm showing you Government Exhibit 106A.  Do

14   you recognize that individual?

15   A        Yes, sir.

16   Q        Who is that?

17   A        Eduardo Chasin.

18   Q        Was he at that meeting in the Dominican

19   Republic?

20   A        Yes, sir.

21   Q        Showing you Government Exhibit 104.  Do you

22   recognize that individual?

23   A        Yes, sir.

24   Q        Who is that?

25   A        Walter Garrido, the chief engineer.

1    Q    Was he at that meeting on April 20th in the

2    Dominican Republic?

3    A    Yes, sir.

4    Q    And I'm showing you Government Exhibit 100A.

5    Do you recognize that individual?

6    A    Yes, sir.

7    Q    Who is that?

8    A    Bolanos.

9    Q    Was he at that meeting on April 20th in the

10   Dominican Republic?

11   A    Yes, sir.

12   Q    What was discussed on that occasion?

13   A    At that time we introduced ourselves,

14   Mr. Julio introduced my fellow companions to me and

15   told me what everyone's position was going to be.

16   Q    And again I'm showing you Government

17   Exhibit 104.  What was Mr. Walter's position to be?

18   A    Chief engineer.

19   Q    And Government Exhibit 100A, what was

20   Mr. Bolanos' position to be?

21   A    Bosun, bosun.

22   Q    Government Exhibit 106A, what was

23   Mr. Eduardo's position to be?

24   A    Oiler.

25   Q    When did you board the Fat Crow?

1    A        The day was the 24th.

2    Q        Was that still in the Dominican Republic?

3    A        Yes, sir.

4    Q        When you boarded were there any other crew on

5    board?

6    A        Yes, the crew that was going to get off.

7    Q        And did that old crew deboard?

8    A        Yes, sir.

9    Q        In the coming week did any other new crewman

10   join you aboard the Fat Crow?

11   A        Yes, sir.

12   Q        Who is that?

13   A        Mr. Llanos, Mr. Dorian, Oscar Herrera, and

14   Felipe.

15   Q        Do you see Mr. Llanos here in court today?

16   A        Yes, sir.

17   Q        Can you point at him and indicate where he's

18   sitting and what he's wearing?

19   A        In an orange sweater like mine -- in another

20   sweater just like mine.

21   Q        Does he have hair or no hair?

22   A        No, he's bald.

23            MR. GAMMONS:  Your Honor, may the record

24   reflect that he's identified the defendant

25   Mr. Gustavo Enrique Llanos Miranda?

1          THE COURT:  The record should so reflect that.

2     BY MR. GAMMONS:

3     Q     Showing you Government Exhibit 105A.  Do you

4     recognize that individual?

5     A     Yes, sir.

6     Q     Who is that?

7     A     Oscar.

8     Q     What was his job aboard the Fat Crow?

9     A     Welder.

10    Q     After you boarded the Fat Crow did you make

11    preparations in relation to your job as a cook?

12    A     Yes, sir.

13    Q     What did you do?

14    A     I prepared my inventory for the food and

15    kitchen utensils that I needed.

16    Q     And when did you ultimately depart the

17    Dominican Republic on board the Fat Crow?

18    A     The day was the 3rd of June.

19    Q     So you boarded around April 24th and you

20    didn't depart the Dominican Republic until June 3rd.

21    What was the delay?

22    A     They were performing some repairs and there

23    was also a problem with the flag and the name of the

24    ship that had not been placed on it.  And the day we

25    were going to set out, the ship had a breakdown and

1    we drifted almost onto the street.  So we could not

2    leave until the 3rd of June.

3    Q       And when you ultimately did leave the

4    Dominican Republic, where was the boat heading?

5    A       Venezuela.

6    Q       Did you ever learn about a secret compartment

7    being built aboard the Fat Crow?

8    A       Yes, after around a month and a half I found

9    out that they were doing that.

10   Q       And how did you specifically find out?

11   A       Panels began to be cut on deck and maintenance

12   was being done to the area where it was going to be

13   done.

14   Q       But how did you come to learn that that

15   area -- did you find out what that area was to be

16   used for?

17   A       Yes, sir.

18   Q       How did you find out?

19   A       A conversation I had with Captain Bilarkazar.

20   Q       And what happened during that conversation,

21   what was said?

22   A       Yes, he told me that it was going to be used

23   to carry the drugs but that at first several clean

24   trips were going to be done.

25   Q       What do you mean by clean trip?

1    A       I couldn't say.  He only told me that, that

2    there will be several clean trips and then on the

3    third trip is when the drugs will be loaded.

4    Q       At that time when you spoke to the captain, at

5    that time Captain Bilarkazar, did you talk to

6    anybody else on the boat about the secret

7    compartment?

8    A       Yes, with Eduardo.

9    Q       Tell me what happened during that

10   conversation.

11   A       No, he told me that we were going to work with

12   a double and he explained to me as well what was

13   going to be done.

14   Q       And what is a double?

15   A       In other words, that the drugs would be

16   carried at a certain time.

17   Q       And these conversations with Eduardo and

18   Captain Bilarkazar, those were the first time you

19   heard about drugs being carried on the Fat Crow?

20   A       Yes, sir.

21   Q       Do you remember when you arrived in Venezuela?

22   A       We arrived on the 8th of June to the coast,

23   not to Venezuela specifically.

24   Q       About how far off the coast were you?

25   A       Between 20 and 25 miles.

1    Q      Was the captain later replaced on the boat,

2    Captain Bilarkazar?

3    A      Yes, sir.

4    Q      Who replaced him?

5    A      Captain Martinez.

6    Q      Showing you Government Exhibit 103A.  Do you

7    know who that is?

8    A      Yes, sir.

9    Q      Who is that?

10   A      Captain Martinez.

11   Q      Was the first officer of the boat replaced as

12   well?

13   A      Yes, sir.

14   Q      Who was the old first officer?

15   A      Dorian.

16   Q      And who was the new first officer?

17   A      Mr. Jair.

18   Q      Do you see Mr. Jair in the courtroom today?

19   A      Yes, sir.

20   Q      Can you point at where he is and describe what

21   he's wearing and what kind of hairstyle he has?  Is

22   he the man standing up in front of you?

23   A      Yes, sir.

24   Q      Your Honor, may the record reflect he's

25   pointing to the defendant, Mr. Jair Mendoza Montoya?

1        THE COURT:  The record will so reflect.

2   BY MR. GAMMONS:

3   Q     Do you know a man named Hector Favio?

4   A     Yes, sir.  Met him on board.

5   Q     How many times did you meet Hector Favio?

6   A     Four times.

7   Q     Were each of those times on board the Fat

8   Crow?

9   A     Yes, sir.

10  Q     Before you met Mr. Hector Favio the first time

11  had you ever met him before?

12  A     No, sir.

13  Q     I want to talk about your first meeting with

14  Hector Favio.  Do you remember approximately what

15  month that was?

16  A     Yes, the month of July or between June, July,

17  and June or early July.

18  Q     And when Hector Favio came to the boat did he

19  come alone?

20  A     No.  That time he arrived with two other

21  people.

22  Q     Who were those two other people?

23  A     Mr. Herman and the person whose name that they

24  call El Gordo.

25  Q     Hector Favio came with Herman and El Gordo?

1    A      Yes.

2    Q      During that meeting what was discussed that

3    you were present to observe?

4    A      At that time he spoke about the problems we

5    had on the ship because at that time we had already

6    been anchored there for several days without

7    communication.  We didn't have water nor -- the food

8    was also in decay.

9    Q      And Hector Favio discussed these issues with

10   the crew?

11   A      About the food and that?  Yes.

12   Q      Did Hector Favio have any discussion about

13   drugs that you were present to hear during that

14   first meeting?

15   A      At that first meeting, no.

16   Q      I want to talk about the second meeting.  How

17   long after the first meeting was the second meeting?

18   A      About a week.

19   Q      And Hector Favio came to the Fat Crow?

20   A      Yes, sir.

21   Q      Was he alone?

22   A      No, at that time he also returned with El

23   Gordo.

24   Q      During that meeting did he -- what did Hector

25   Favio talk to you about?

1    A      Yes, there things started to get in motion

2    regarding the supposed drugs that were going to be

3    carried on.

4    Q      What do you mean about starting to get in

5    motion?

6    A      He went to explain to us that the ship had

7    already been anchored there for a long time and that

8    we would possibly have to leave with that stuff and

9    that preparations were being made.

10   Q      When this conversation occurred, where on the

11   Fat Crow were you?

12   A      At the bridge.

13   Q      Was the crew present?

14   A      Yes, sir.

15   Q      Let me ask you specifically, was Mr. Mendoza

16   Montoya present?

17   A      Yes, sir.

18   Q      Was Mr. Llanos Miranda present?

19   A      Yes, sir.

20   Q      Did Mr. Hector Favio come back out to the Fat

21   Crow a third time?

22   A      Yes, sir.

23   Q      How long after was the third meeting from the

24   second meeting?

25   A      Also the days were brief.

1    Q      Less than a week?

2    A      Yes, they were one week max.

3    Q      When Hector Favio came on that occasion did he

4    come alone?

5    A      No, sir.

6    Q      Who did he come with?

7    A      The third time he returned with a man who was

8    in charge of the drugs.

9    Q      And did Mr. Hector Favio speak with the crew?

10   A      Yes, sir.

11   Q      Where did he speak with the crew?

12   A      At the bridge.

13   Q      During those discussions was Mr. Mendoza

14   Montoya present?

15   A      Yes, sir.

16   Q      What about Mr. Llanos Miranda?

17   A      Yes, sir.

18   Q      During that conversation with the group what

19   did Mr. Hector Favio say?

20   A      On that occasion we were going to talk about

21   the payment that would take place for the drugs.

22   Q      Specifically what information did Hector Favio

23   tell the crew during that group meeting?

24   A      On that occasion he said that we were going to

25   leave with the cargo and he wanted to know how much

1    each one would be charging because he had to take

2    that answer to land and then return back with a firm

3    answer whether they accepted the payment or not.

4    Q      Would a clean trip still occur?

5    A      No, on that occasion we were no longer going

6    to go out with a clean trip because it was firm that

7    we were going to have the drugs loaded.

8    Q      During that meeting with the crew did he tell

9    you how much -- what quantity of drugs would be

10   transported?

11   A      Yes, there was an average of between 1,000 to

12   1,500.

13   Q      1,500 what?  What measurement?

14   A      Kilograms.

15   Q      After that group meeting did you meet with

16   Hector Favio individually?

17   A      Yes, everyone met individual.

18   Q      What was the purpose of that individual

19   meeting?

20   A      It was because each one would have to tell him

21   how much they wanted to charge and he wanted to do

22   them individually so there would not be any conflict

23   where one would charge more than another.

24   Q      Did Mr. Mendoza Montoya have a private meeting

25   like that?

1    A    Yes, sir.

2    Q    Did Mr. Llanos Miranda have a private meeting

3    like that?

4    A    Yes, sir.

5    Q    During your private meeting how did you

6    determine how much money you were going to ask for?

7    A    On that occasion I asked Captain Martinez for

8    support because I did not know how much one could

9    charge.

10   Q    And what did Captain Martinez tell you?

11   A    To charge $60,000.

12   Q    Is that what you told Hector Favio during your

13   individual meeting?

14   A    Yes, sir.

15   Q    What was Hector Favio's response?

16   A    No, he simply wrote it down in this little

17   booklet he had on a pad like this one and what he

18   had to do was take everyone's answer to land and

19   then come back if they were in agreement with it.

20   Q    Previously you had negotiated $1,100 a month

21   to act as a chef on the Fat Crow, correct?

22   A    Yes, that was my monthly salary.

23   Q    This $60,000 that you requested from Hector

24   Favio was for what?

25   A    For the drug load.

1    Q       Did Mr. Hector Favio come to the boat a fourth

2    time to meet with the crew?

3    A       Yes, sir.

4    Q       How much time passed between the third and the

5    fourth meeting?

6    A       It was also a few days.

7    Q       And by this fourth meeting do you remember

8    approximately what date it was?

9    A       The date exactly?  I don't remember, but I

10   know it was a few days went by.  It would be about

11   the 15th of the 8th month.

12   Q       Did Mr. Hector Favio meet with the crew again

13   on this occasion?

14   A       Yes, sir.

15   Q       During that group meeting with the crew was

16   Mr. Mendoza Montoya present?

17   A       Yes, sir.

18   Q       Mr. Llanos Miranda present?

19   A       Yes, sir.

20   Q       Where did that meeting occur?

21   A       At the bridge.

22   Q       During this meeting what did Hector Favio tell

23   to the crew?

24   A       At that time in that meeting he came to tell

25   us that the amount that each one had asked for was

1    too high and that some cuts had to be made to the

2    payment that was going to be given.

3    Q      And did he speak with the crew members

4    individually?

5    A      Yes, sir.

6    Q      Did he speak to you individually?

7    A      Yes, sir.

8    Q      Did he speak to Mr. Mendoza Montoya

9    individually?

10   A      Yes, sir.

11   Q      Did he meet with Mr. Llanos Miranda

12   individually?

13   A      Yes, sir.

14   Q      What did you and Mr. Hector Favio discuss

15   during your private meeting?

16   A      On that occasion he mentioned to me that he

17   had to reduce me by 50 percent and that what had

18   been agreed upon on land was that I would be given

19   $37,000.

20   Q      Were you to be given that month up front?

21   A      30 percent only.

22   Q      So you were to receive $37,000?

23   A      No.  In other words, the full payment was

24   going to be $37,000 and 30 percent of that would be

25   $10,050.

1    Q    And how were you to receive that money?

2    A    That money Mr. Julio would make sure it would

3    arrive at my house in Santo Domingo.

4    Q    And how did he get the information to your

5    house in Santo Domingo?

6    A    No, it didn't get it there, but he simply --

7    since I had not been paid for my months of work, he

8    was going to make it look like I was getting paid

9    for my months of work.

10   Q    Did you provide your home address or contact

11   information to Mr. Hector Favio?

12   A    Yes, because when I left Santo Domingo I left

13   him with the telephone number and the address for my

14   lady so that if anything happened, he would know how

15   to reach her.

16   Q    After Hector Favio left that fourth meeting

17   how much later was it that the cocaine arrived on

18   board?

19   A    It arrived on the 20th, between 5:00, 5:30 in

20   the morning, of the 8th month.

21   Q    And how much time elapsed between the fourth

22   meeting with Hector Favio and the 20th of August?

23   A    He was on board on the 19th, almost a whole

24   day and part of the night.

25   Q    Were you personally expecting the cocaine to

1  arrive on the 20th?

2  A     Yes, we all had to get up at 3:00 in the

3  morning because that's the hour when it was

4  supposedly going to arrive, but it arrived after a

5  delay.

6  Q     Who told you it would arrive at 3:00 in the

7  morning?

8  A     The captain.

9  Q     How did the cocaine arrive at the boat?

10 A     In a motorboat.

11 Q     Were there people on that motorboat?

12 A     Yes, there were three people.

13 Q     And how did the cocaine get from that

14 motorboat onto the Fat Crow?

15 A     They tied the bales, threw them to the water

16 and we would pull them.

17 Q     Who pulled them up to the boat?

18 A     The first row it was myself, Eduardo, and Mr.

19 Montoya.

20 Q     And was it only the three of you pulling it?

21 A     Yes, sir.

22 Q     After that who was there?

23 A     Next was Mr. Walter and Mr. Llanos.

24 Q     And where were they located?

25 A     In the area behind us.

1    Q      And was anybody else participating?

2    A      Yes.  Then the one who followed was Mr. Luis

3    Carlos and afterwards was Mr. Bolanos, then the

4    captain, and then Mr. Oscar.

5    Q      And where was the cocaine ultimately placed in

6    the ship?

7    A      In the area of the bow.

8    Q      Was it put in that secret compartment?

9    A      Well, that area I wasn't there.  The captain

10   ordered me to retire and I went to my area to do my

11   work in the kitchen.  I know that of the personnel

12   that stayed behind, they formed two groups, one to

13   wash the deck and the other one to put that away.

14   But I don't know who was in which group.

15   Q      And when you say put that away, are you

16   referring to the drugs?

17   A      Yes, sir.

18   Q      Do you know why they washed the deck?

19   A      I imagine it's to erase evidence.

20   Q      Do you know who gave that order?

21   A      The captain.

22   Q      The clothes that you were wearing when you

23   brought the cocaine onto the ship, did you keep

24   them?

25   A      No, sir, we threw them to the water.

1    Q        Why did you do that?

2    A        Captain's orders.

3    Q        How long after the cocaine was loaded onto the

4    boat did the Fat Crow begin sailing?

5    A        There around 2:00 to 3:00 in the afternoon.

6    Q        The same day?

7    A        Yes, sir.

8    Q        How long after you began sailing was the boat

9    stopped by the United States Coast Guard?

10   A        Between the second and the third day.

11   Q        Do you recall you said that you had your wages

12   sent to your wife?

13   A        Yes, sir.

14   Q        Did she ever receive the salary that you were

15   promised as a cook aboard the Fat Crow?

16   A        At first she only received $600.  It wasn't

17   until after all this problem happened with

18   everything that $3,065 were delivered to my wife.

19   For my salary.

20   Q        That was for your salary?

21   A        Yes, sir.

22   Q        Did you ever see the $37,000 that you were

23   promised for transporting the drugs?

24   A        No, sir.

25            MR. GAMMONS:  No further questions.

1          THE COURT:  Mr. Castillo?

2                    CROSS EXAMINATION

3      BY MR. CASTILLO:

4      Q     Mr. Acuna, you indicated you were hired to be

5      the cook aboard the Fat Crow, correct?

6      A     Yes, sir.

7      Q     And prior to you boarding the Fat Crow I think

8      you kind of indicated that you had never done a drug

9      trip in the past, right, because you didn't know

10     what to charge, right?

11     A     Exactly.

12     Q     So prior to your involvement with the Fat Crow

13     you had never been involved in drug smuggling,

14     correct?

15     A     Yes, sir.

16     Q     And when you were first hired to work on the

17     Fat Crow do you believe that you were doing

18     legitimate work as a cook aboard the Fat Crow, isn't

19     that right?

20     A     Yes, sir.

21     Q     And when you were hired -- who was it that you

22     spoke to about the work, who was it that gave you

23     the job aboard the Fat Crow?

24     A     Mr. Julio, to be exact.

25     Q     Okay.  And the money that you got initially,

1    did he give it to you?

2    A    Yes, he had it arrive at my house.

3    Q    What was the amount that you had agreed to

4    with Mr. Julio?

5    A    $1,100.

6    Q    When you say dollars, are you talking about

7    American dollars or what?

8    A    No, American.

9    Q    So when you worked on ships in the past have

10   you been paid in American dollars?

11   A    On certain vessels, yes; on others, no.  It

12   depends on the flag of the ship.

13   Q    The Fat Crow was flagged in Africa in the

14   country of Togo, wasn't it?

15   A    Yes, yes.

16   Q    And you wanted to be paid in dollars even

17   though this boat was flagged in Togo, isn't that

18   right?

19   A    When I refer to the flag of the vessel if I

20   work at a vessel with a Venezuela flag, they'll pay

21   me in Bolivars.  And if I do a contract with a ship

22   with a foreign flag, they need to pay me in dollars.

23   Q    Well, isn't Venezuela a foreign country from

24   the Dominican Republic?

25   A    Well, the thing is I am Venezuelan, but I live

1    in the Dominican Republic.

2    Q       Okay, so -- all right.  Anyway, there came a

3    point in time where you board the Fat Crow, you

4    agreed to work on the Fat Crow, right?

5    A       Yes, sir.

6    Q       And we already established you had no

7    intention of doing anything illegal when you first

8    started working aboard the Fat Crow, right?

9    A       Yes, sir.

10   Q       In fact, it wasn't until later on in the

11   voyage or your time on the Fat Crow when Mr. Favio

12   came aboard is when this discussion about drugs came

13   about, isn't that right?

14   A       Yes, sir.

15   Q       And when you indicate or you told us that

16   Mr. Favio in one of his trips aboard the Fat Crow

17   talked to you personally about becoming involved in

18   drug smuggling, isn't that right?

19   A       Yes, sir.

20   Q       And your conversations with Mr. Favio was

21   brought about by conversations that you had had with

22   the captain, isn't that right?

23   A       Yes.

24   Q       And when you refer to the captain as Captain

25   Martinez, are you talking about the same captain

1    that was the captain at the time the Coast Guard

2    interdicted the boat?

3    A    Yes, sir.

4    Q    You didn't know the captain's last name to be

5    Barrios Leon, you didn't know that?

6    A    Well, in other words, if we all referred to

7    him as Captain Martinez, I referred to him as that.

8    Q    Okay.  So you called him Captain Martinez

9    regardless of what his name was, right?

10   A    Yes, by me calling him Captain Martinez, there

11   was respect between us.

12   Q    Okay.  And you indicated that there came a

13   point in time where you met with Mr. Favio alone,

14   isn't that right?

15   A    Yes, sir.

16   Q    And the purpose of that meeting with Mr. Favio

17   was to discuss your payment for participating in a

18   drug smuggling venture, right?

19   A    Yes, sir.

20   Q    And during that conversation that you had with

21   Mr. Favio you voluntarily agreed to participate in

22   this drug smuggling activity, isn't that right?

23   A    Yes, sir.

24   Q    That was an agreement between you and

25   Mr. Favio, right?

1    A       Yes, sir.

2    Q       Now, you also indicated that other crewmen met

3    with Mr. Favio by themselves, right?

4    A       Yes, sir.

5    Q       And you indicated that Mr. Llanos Miranda at

6    some point went and met with Mr. Favio, according to

7    you, isn't that right?

8    A       Yes, sir.

9    Q       So what you can tell us is that you were

10   present on the boat and you saw Mr. Llanos Miranda

11   go into a room with Mr. Favio, isn't that right?

12   A       Yes, sir.

13   Q       And the captain wasn't in there, right?

14   A       No, sir.

15   Q       In fact, nobody was in there except the two of

16   them, isn't that right?

17   A       Yes, sir.

18   Q       And you can't tell us exactly what was said

19   between the two of them, can you?

20   A       No, sir.

21   Q       Because you didn't overhear what was being

22   said between the two of them, isn't that right?

23   A       Yes, sir.

24   Q       And that would be the same for every crewmen

25   who may have met with Mr. Favio, right?

1     A      Yes, sir.

2     Q      Because any discussions those people may have

3     had with Mr. Favio, it was intended to be private

4     and nobody could hear, right?

5     A      Yes, sir.

6     Q      Just like you're telling us now what you said

7     to Mr. Favio, you know because you were there,

8     right?

9     A      Yes, sir.

10    Q      Okay.  And nobody else was in the room and

11    there were no video recordings or anything like that

12    of your conversation with Mr. Favio, correct?

13    A      Yes, sir.

14    Q      And you initially told him that you wanted

15    60,000 American dollars at the initial meeting with

16    Mr. Favio to participate in a drug smuggling

17    venture?

18    A      Yes, sir.

19    Q      60,000 American dollars, that's about

20    60 months worth of work for what you're used to

21    doing, isn't that right?

22    A      Yes, sir.

23    Q      60 months is five years, right?

24    A      Yes, sir.

25    Q      So you're being offered the equivalent of five

1      years' salary to be participating in this illegal

2      activity, right?

3      A      Yes, sir.

4      Q      And in your conversation with Mr. Favio, you

5      agreed to do that.

6      A      Yes, sir.

7      Q      All right.  And then there came a point in

8      time where Mr. Favio left and went ashore, right, on

9      a boat?

10     A      Yes, sir.

11     Q      And then he eventually came back I think,

12     according to you, a week later, isn't that right?

13     A      Yes, sir.

14     Q      And then did he again speak to you in private

15     with nobody else present?

16     A      Yes, sir.

17     Q      And he told you in essence that's too much

18     money, we can't pay that, something like that,

19     right?

20     A      Yes, sir.

21     Q      And he told you would you take $37,500?

22     A      Yes, sir.

23     Q      And you said okay, I'll do it.

24     A      Yes.

25     Q      And nobody else was there to hear you say

1        that, right?

2        A       No, sir.

3        Q       Okay.  So eventually you make an arrangement

4        they're supposed to send your wife 30 percent of

5        that $37,000, right, $10,500?

6        A       Yes, sir.

7        Q       And that never happened, right?

8        A       Never.

9        Q       But you were told by Mr. Favio that's what was

10       going to happen, right?

11       A       I didn't understand that.

12       Q       Mr. Favio told you that was going to happen.

13       A       Yes, sir.

14       Q       And that never happened?

15       A       Didn't happen.

16       Q       But you were expecting to get paid, right?

17       A       Yes.

18       Q       Okay.  Now, the day -- I think you said

19       August 20th, August 21st, when the Coast Guard --

20       not the Coast Guard, but when the boats came with

21       the packages, do you remember that day?

22       A       Yes, sir.

23       Q       You indicated they woke you up at like 3:00 in

24       the morning, do you remember that?

25       A       Yes, sir.

1    Q      Who was it that came and got you, the captain?

2    A      Mr.

3    Q      Did the captain -- was the captain there in

4    the morning when you got out of your room?  Did you

5    meet the captain that morning?

6    A      Yes, he was at the bridge.

7    Q      And you were summoned to the bridge and told

8    to be up there at the time they woke you up, isn't

9    that right?

10   A      Yes, sir.

11   Q      And you understood those orders that came from

12   the captain that the crew was to report to the

13   bridge, right?

14   A      Yes, sir.

15   Q      And eventually all the crew members went up to

16   the bridge, isn't that right?

17   A      Yes, sir.

18   Q      And then after a period of time the captain

19   assigned you duties, isn't that right, he told

20   everybody what they were going to be doing?

21   A      Yes, sir.

22   Q      And you as a mariner know that on the high

23   seas the captain is in charge of the vessel, isn't

24   that right?

25   A      Yes, sir.

1    Q      And if he gives you an order, you're expected

2    to obey it, right?

3    A      Yes, sir.

4    Q      That's your job as a mariner, right?

5    A      Yes, sir.

6    Q      You don't tell the captain what to do.

7    A      No, sir.

8    Q      Okay.  So the captain, Captain Martinez, is

9    that how you refer to him?

10   A      Yes, sir.

11   Q      He told everybody what they were going to be

12   doing, right?

13   A      Yes, sir.

14   Q      And as far as you know everybody did what the

15   captain said, isn't that right?

16   A      Yells.

17   Q      And then there came a point in time where this

18   smaller boat showed up alongside the Fat Crow, isn't

19   that right?

20   A      Yes, sir.

21   Q      And I think you indicated you were one of the

22   first persons at the side of the vessel where these

23   packages got on board the Fat Crow, isn't that

24   right?

25   A      Yes, sir.

```
 1     Q      And the package -- these were eventually about

 2     75 packages in total?

 3     A      Yes, sir.

 4     Q      And these packages were being brought from a

 5     boat on the water into the Fat Crow, right?

 6     A      Yes, sir.

 7     Q      And what you were told to do is take the

 8     packages that were given to you and hand them to

 9     somebody behind you, right?

10     A      Yes, sir.

11     Q      Now, from looking at these packages you really

12     didn't know what was inside, did you?

13     A      No, sir.

14     Q      So you were given a package and that package

15     you handed it off to someone else, isn't that right?

16     A      Yes, sir.

17     Q      And your testimony was that Mr. Llanos Miranda

18     was on one of the lines behind you, isn't that

19     right?

20     A      Yes, sir.

21     Q      And as far as you know Mr. Llanos Miranda was

22     told to be there because the captain told him to do

23     that, isn't that right?

24     A      Yes, sir.

25     Q      Okay.  And do you remember if you gave any
```

1    packages to Mr. Llanos Miranda?

2    A      Yes, we all handed them because they were

3    behind me and we needed to untie them.

4    Q      My point.  So crew member would give it to

5    another crew member who would pass it down the line.

6    A      Yes, sir.

7    Q      And there were some other crewmen that were

8    inside the front part of the vessel down below,

9    isn't that right?

10   A      Yes, sir.

11   Q      And Mr. Llanos Miranda was not down below, he

12   was behind you, isn't that right?

13   A      Yes, sir.

14   Q      In this country we refer to it as a fire

15   bucket brigade, people would hand them -- that's how

16   they would hand a bucket of water and somebody at

17   the end would throw the bucket of water on the fire.

18   That's what happened here?

19   A      I couldn't say because I don't live in this

20   country.

21   Q      Well, it was called a daisy chain, but it was

22   a chain of crewmen?

23   A      Could be.

24   Q      Well, that's what happened, wasn't it?

25   A      Yes, sir.

1    Q      People pass a package to another one, right?

2    A      Yes, sir.

3    Q      You didn't own those packages, did you?

4    A      No, sir.

5    Q      Other than you being told whatever, you were

6    just doing what you were told by the captain, isn't

7    that right?

8    A      Yes, sir.

9    Q      Okay.  There came a point in time that

10   eventually all the packages were loaded aboard the

11   Fat Crow, right?

12   A      Yes, sir.

13   Q      And you told us on direct the captain relieved

14   you of your duties and you never went down below,

15   isn't that right?

16   A      Yes, sir.

17   Q      So some other crewmen were maybe down below

18   doing something with the packages, but you never

19   went down there, right?

20   A      Yes, sir.

21   Q      And you know that Mr. Llanos Miranda was the

22   helmsman aboard the Fat Crow, isn't that right?

23   A      Yes, sir.

24   Q      And when you were relieved of your duties, so

25   was he, isn't that right?

1    A    I don't know, sir.

2    Q    He was there with you when the captain told

3    you --

4    A    He couldn't have retired because the deck

5    personnel had to wash the deck.  Bolanos, Llanos,

6    and Mr. Jair.

7    Q    But Mr. Llanos was the one supposed to steer

8    the boat.  Right?

9    A    At that time the ship wasn't under way; we

10   were anchored, so why was he going to be at the

11   wheel?

12   Q    I'll ask the questions, okay.  But the thing

13   is, you were relieved and then you left that area,

14   right?

15   A    Yes, sir.

16   Q    And what happened, what the other people were

17   doing, you really don't know because you left, isn't

18   that right?

19   A    Yes, sir.

20   Q    Eventually there came a point in time where

21   you arrived here in the Middle District of Florida

22   right before you came to court, do you remember

23   that?

24   A    Yes, sir.

25   Q    And do you remember giving an interview to

1    agents upon your arrival here in the Middle

2    District?

3    A     Yes, when we were taken to the department.

4    Q     Right.  In other words, when you got from --

5    after you were taken off the Fat Crow, you were put

6    on another boat, and eventually you came here to

7    this area here in Tampa, St. Petersburg, isn't that

8    right?

9    A     Yes, sir.

10   Q     And you eventually met with agents of the

11   federal government and they asked you what happened,

12   isn't that right?

13   A     Yes.

14   Q     And eventually there came a point in time that

15   you told the agents that when you were in the

16   Dominican Republic that you overheard the crew

17   referring to a delivery of fertilizer, isn't that

18   right?

19   A     Yes, sir.

20   Q     And that's what you told the agents you

21   understood was going to be part of the trip, right?

22   A     Yes, sir.

23   Q     And you knew that the Fat Crow was

24   transporting diesel fuel as well, right?

25   A     Yes, sir.

1    Q    And I think you indicated because you were the

2    cook you never went to the front part where this

3    compartment was that was built, you never saw that?

4    A    No, because that was being made in an area,

5    how do I say it, below the deck.

6    Q    My point is you don't know who was there doing

7    anything, you don't know what was going on there,

8    right?

9    A    Well, in part there was repairs being made to

10   the tanks and Mr. Jair was doing some cleaning and

11   there was also some welding work being done.

12   Q    Well, there was an area in the front part of

13   the ship when you were putting the packages --

14   pulling the packages from the little boat, right?

15   A    Yes.

16   Q    And then eventually those packages were turned

17   and then they were put in an area down below the

18   front part of the vessel, isn't that right?

19   A    Yes, sir.

20   Q    But you never went to that final destination,

21   you never went down there to where the packages

22   eventually ended up, isn't that right?

23   A    No, sir.

24   Q    Because you did what you did and then you

25   left, went back to the kitchen, right?

1    A      Yes, sir.

2    Q      Okay.  That was the day that these packages

3    came aboard, right?

4    A      Yes, sir.

5    Q      And you were aboard the Fat Crow since mid

6    April of this year, isn't that right?

7    A      I didn't say.

8    Q      And you never saw the compartment that was in

9    front part of the ship where these packages

10   ultimately ended up, did you?

11   A      No, I never went down to that.

12   Q      That's what I'm saying, you never had nothing

13   to do with that, did you, correct?

14   A      No, sir.

15   Q      And you had no idea who built it, how it was

16   made, or anything like that because you weren't

17   there.

18   A      I do know who built it, but I don't know the

19   size or things like that, but I do know who built

20   it.

21   Q      Okay.  Well, you know because somebody told

22   you, isn't that right?

23   A      No, I saw the people that were doing it.

24   Q      Well, you saw people going down doing work

25   down in the front part of the vessel, isn't that

1    right?

2    A       Yes, sir.

3    Q       You knew that something was being done down in

4    that front part of the vessel, isn't that right?

5    A       Yes, sir.

6    Q       Because people were coming up and going down

7    in that area, right?

8    A       Yes, sir.

9    Q       But you personally never went there to see

10   what was going on, did you?

11   A       No, sir.

12   Q       Aside from what you may have been told, you

13   have no idea about any of the reasons why this

14   compartment was constructed, do you?

15   A       No, sir.

16   Q       Okay.  Mr. Acuna, there came a point in time

17   where you decided to plead guilty in this case,

18   isn't that right?

19   A       Yes, sir.

20   Q       And you were handed a document, a plea

21   agreement, isn't that right?

22   A       Yes, sir.

23   Q       And that document was taken to you by your

24   attorney and it was read to you by an interpreter at

25   the jail, isn't that right?

1    A      Yes, sir.

2            MR. CASTILLO:  Your Honor, may I approach the

3    witness?

4            THE COURT:  Yes.

5    BY MR. CASTILLO:

6    Q      Mr. Acuna, I'm going to show you a copy of

7    what has been marked as Defendant Llanos Exhibit 3.

8    It's a document in English, but I'm asking if you

9    can recognize it.

10   A      Yes, sir.

11   Q      Are these your initials at the bottom of every

12   page?

13   A      Yes, sir.

14   Q      That's your signature on the last page on page

15   24?

16   A      Yes, sir.

17   Q      And it was signed on 20th of November 2017?

18   A      Yes, sir.

19   Q      And your understanding that these are the

20   conditions and the terms of your agreement to plead

21   guilty in this case?

22   A      Yes, sir.

23   Q      Okay.  And you remember this document, you

24   signed it and eventually you came in front of a

25   magistrate judge who accepted your plea?

1    A       Yes, sir.

2    Q       And that process took about an hour?

3    A       Yes, sir.

4    Q       The judge was asking you a lot of questions

5    about this document?

6    A       Yes, sir.

7            MR. CASTILLO:  Your Honor, at this time I'd

8    move Defendant Llanos Exhibit 3 into evidence.

9            THE COURT:  Any objections?

10           MR. GAMMONS:  No objections.

11           THE COURT:  Received in evidence Llanos

12   Number 3.

13   BY MR. CASTILLO:

14   Q       Mr. Acuna, I'm just going to show you page 24

15   of this exhibit that's on the screen in front of

16   you.  This is your signature there, a copy of your

17   signature above your name?

18   A       Yes, sir.

19           MR. CASTILLO:  I have no further questions,

20   Your Honor.

21           THE COURT:  Why don't we take an afternoon

22   recess, we'll be in recess until 3:35.  You're

23   welcome to walk around.  Please don't discuss the

24   case.

25           (The jury retired to the jury room.)

1          THE COURT:  Sir, you may step down.  And we'll

2     be in recess until 3:35.

3              (Recess was taken from 3:16 until 3:37 p.m.)

4              (The jury returned to the courtroom.)

5          THE COURT:  Mr. Martinez?

6                     CROSS EXAMINATION

7     BY MR. MARTINEZ:

8     Q      Good afternoon, Mr. Acuna.

9     A      Good afternoon.

10    Q      On direct examination you testified as to

11    specific dates where meetings occurred.

12    A      Yes, sir.

13    Q      And some dates you were very specific about,

14    other dates you could not remember exactly.

15    A      Yes, sir.

16    Q      With the dates that you were specific about,

17    are you 100 percent certain as to those dates?

18    A      The leaving of the ship, yes, when we set sail

19    from Santo Domingo, yes.  The one that I'm not

20    specific with -- well, the loading of the drug also,

21    yes.

22    Q      What about the April 20th date?

23    A      Yes, that was my meeting with Mr. Julio and

24    the other crew members.

25    Q      Now, with your meetings with the government,

1      you have had meetings with the government, correct?

2      A      Yes, sir.

3      Q      And how many meetings in advance of your trial

4      testimony have you had with the government?

5      A      Three meetings.

6      Q      Three meetings.  And all of these three

7      meetings occurred after you signed the plea

8      agreement and read the stipulated fact section; is

9      that correct?

10     A      Yes, sir.

11     Q      And with regard to those meetings, okay, when

12     were those three meetings, approximately?

13     A      In a span of 15 days, 10, 15 days.  The last

14     one.

15     Q      Within what historical time period?

16     A      Eight days.

17     Q      So within the last week approximately you've

18     had three different meetings with the government?

19     A      Yes, sir.

20     Q      Now, you and I have not had any pretrial

21     meetings, have we?

22     A      No, sir.

23     Q      With the three pretrial meetings you've had

24     with the government within the last week

25     approximately, who was present at those meetings?

1    A        The prosecutor and the DEA agent.

2    Q        Which -- is one of the prosecutors that you're

3    referring to seated at the government's table?

4    A        Yes, sir.

5    Q        Which of the two prosecutors there?

6    A        The second one to the side.

7    Q        So the gentleman in the middle?

8    A        Yes.

9    Q        And the agent you're referring to is the

10   gentleman to the left of him.

11   A        Yes, sir.

12   Q        Now, and how long was each meeting

13   approximately?

14   A        Time span of about a half an hour.

15   Q        So in total about an hour and a half meetings

16   with you before your testimony today.

17   A        Yes, sir.

18   Q        Now, were you told by either the prosecutor or

19   the agent what dates to testify to and/or whom to

20   say was present at those meetings?

21   A        Yes.

22   Q        And who told you of those dates and who was

23   present at those meetings, which one of the

24   gentlemen?

25   A        No, I met with the gentleman from the DEA and

1      the prosecutor was there.

2      Q      But do you remember which person gave you that

3      information?

4      A      Well, the prosecutor told me that the court

5      would be -- well, that my date would be the 7th or

6      8th -- well, he told me that they were going to

7      travel, I didn't know what they -- they were going

8      to travel -- that I would be coming over to testify

9      but I don't know which day I was going to testify,

10     but I would be here the whole week, but I don't know

11     which day would be the day I testify on.

12     Q      You misunderstood me.  I'm not asking you if

13     they told you what date to anticipate that you would

14     testify.  I'm asking you if they told you the dates

15     that events occurred and the persons that were

16     purportedly present.

17     A      Oh, no, no.

18     Q      So this is your testimony from your memory

19     which you say you're certain of.

20     A      Yes, sir.

21     Q      The meeting on April 20th, do you remember

22     testifying as to that meeting?

23     A      Yes, sir.

24     Q      I'm putting before you Government Exhibit 106B

25     which has already been received into evidence.  Do

1      you recognize that name?

2      A      Yes, sir.

3      Q      Who is that?

4      A      Eduardo Chacin.

5      Q      He's one of the individuals that drove with

6      you this morning in the van to the courthouse?

7      A      Yes, sir.

8      Q      Or yesterday, I should say.

9      A      Yesterday.

10     Q      Now, during your discussions -- and this is an

11     individual that you say -- your under oath testimony

12     was that this individual was present at the

13     April 20th meeting, correct?

14     A      Yes, sir.

15     Q      Did the government in one of your meetings

16     with you this last week ask you to explain how this

17     individual could have been present at this meeting

18     if he was in Caracas, Venezuela, until April 22nd?

19     A      No, because at that time I explained it to the

20     prosecutor -- I'm sorry, I'm sorry, it was between

21     the 20th and the 24th, around those dates.  With

22     that you are correct, Mr. Attorney, that we boarded,

23     but the meeting was on the 22nd, that I did explain

24     to the counselor.

25     Q      But what you explained to them is different

1      than what you testified under oath to this jury,

2      correct?

3      A       Uh-huh.

4      Q       Let me go back to the date of the Coast Guard

5      interdiction.  The Coast Guard took into custody

6      everybody that was on board the Fat Crow, correct?

7      A       Yes, sir.

8      Q       And how long were all those individuals on

9      board the Coast Guard vessel before you ended up in

10     port in Tampa?

11     A       About two days, two or three days they spent

12     on board.

13     Q       And during that two- or three-day period were

14     each of you sequestered from the other?

15     A       No.  They had us all together in the captain's

16     cabin.

17     Q       Okay.  So everybody that was on the Fat Crow

18     was in a custody sitting all together in the same

19     room.

20     A       Yes, sir.

21     Q       And that was for a three-day period of time.

22     A       Yes, more or less.

23     Q       So even if you were sequestered from each

24     other once you were in the Pinellas County Jail, you

25     still had those three days together before you got

1    to Tampa, correct?

2    A     Yes, sir.

3    Q     And there were no restrictions on the

4    conversations that you were having with one another,

5    correct?

6    A     No, they just told us to remain silent, but we

7    would always talk about anything.

8    Q     So they told you to remain silent, but you

9    just talked anyway.

10   A     Yes.

11   Q     And nobody was policing those conversations.

12   A     Yes, there were -- there were people from the

13   vessel there.

14   Q     Right.  But nobody was prohibiting you from

15   talking, right?

16   A     No, no.

17   Q     So if they give you an order not to talk and

18   you talk anyway, there isn't much policing of that

19   rule going on, is there?

20   A     In other words, what they wanted was for us to

21   not talk -- how do I say it, to talk softly as we

22   could so that -- because they were there doing their

23   work and they didn't want us to hinder their work.

24   Q     So they didn't want you to talk in a way that

25   would make a disturbance, would that be fair to say?

1    A      Yes, sir.

2    Q      What did -- you were transported from the

3    Pinellas Jail to this courthouse both yesterday and

4    today; is that right?

5    A      Yes, sir.

6    Q      And on each occasion it was with the four

7    defendants that are cooperating with the government

8    in this case?

9    A      Yes, sir.

10         MR. MARTINEZ:  No further questions.

11         THE COURT:  Mr. Gammons?

12                    REDIRECT EXAMINATION

13   BY MR. GAMMONS:

14   Q      Mr. Acuna, I'm showing you Government's

15   Exhibit 103A.  Do you recognize that individual?

16   A      Yes, sir.

17   Q      Who do you know that person as?

18   A      Captain Martinez.

19   Q      During the meetings with Hector Favio, you

20   couldn't hear -- let me ask this way.  During the

21   individual meetings with Hector Favio and the

22   defendants, you couldn't hear what they were talking

23   about.

24   A      No, sir.

25   Q      Could you hear what Hector Favio said during

1  those group meetings with the entire crew?

2  A  Yes, sir.

3  Q  And was Mr. Mendoza Montoya present during

4  those group meetings?

5  A  Yes, sir.

6  Q  And was Mr. Llanos Miranda present at those

7  group meetings?

8  A  Yes, sir.

9  Q  During those meetings was the amount of

10  cocaine to be smuggled discussed?

11  A  Yes, what was spoken of was between 1,000 to

12  1,500 kilos, that's what was said.

13  Q  During those meetings was how much the crew

14  were to be paid discussed?

15  A  Yes, that each one would charge separately

16  what would be agreed to with him.

17  Q  The morning that the cocaine came and

18  Mr. Mendoza Montoya woke you up, do you know if he

19  woke anybody else up?

20  A  Yes, I imagine that it was everyone from the

21  hull which was Mr. Bolanos and Llanos who slept

22  there the same hallway that I was in.

23  Q  You were also asked about transporting

24  fertilizer, do you recall that?

25  A  Yes, sir.

1    Q       Who talked to you about fertilizer?

2    A       That was mentioned to me by Mr. Bilarkazar.

3    Q       The previous captain?

4    A       Yes.

5    Q       When Mr. Bilarkazar talked to you about

6    fertilizer, what did you understand that to mean?

7    A       It's my understanding that fertilizer is a

8    prime material for compost.  At that time we were

9    not talking about drugs yet.

10   Q       I want to talk to you about your

11   transportation to the courthouse.  You rode over

12   with other members from the crew today and

13   yesterday?

14   A       Yes, sir.

15   Q       Were there law enforcement agents in that

16   vehicle?

17   A       Yes, sir.

18   Q       Were you permitted to speak to the other

19   members of the crew?

20   A       No, sir, no, sir, they had us separated.

21   Q       Do you have a plea agreement in this case?

22   A       In the transporting or --

23   Q       Sorry.  Do you have a plea agreement in

24   relation to this case with the United States?

25   A       Yes, sir.

1    Q      Have you reviewed that with your attorney?

2    A      No, because my female attorney is traveling

3    and the gentleman that she left in her stead has not

4    come to visit me again.

5    Q      Have you ever reviewed that document with your

6    attorney?

7    A      Yes, yes.

8    Q      Based on your understanding of that document

9    do you believe it permits you to testify falsely in

10   this case?

11   A      No, sir.

12          MR. GAMMONS:  No further questions.

13          THE COURT:  You may step down.  Thank you,

14   sir.

15          You may call your next witness.

16          MR. GAMMONS:  The United States calls Oscar

17   Herrera Venera.  He's also an in custody witness.

18          [Witness sworn]

19          COURTROOM DEPUTY CLERK:  Please be seated.

20   Please state your name and spell your last name for

21   the record.

22          THE WITNESS:  Oscar Herrera Venera.

23                      DIRECT EXAMINATION

24   BY MR. GAMMONS:

25   Q      Good afternoon.

1    A      Hello.

2    Q      Were you on board the Fat Crow when it was

3    interdicted by the Coast Guard?

4    A      Yes, sir.

5    Q      And did you participate in the plan to

6    transport cocaine aboard the Fat Crow?

7    A      Yes, sir.

8    Q      Have you pled guilty to conspiracy in relation

9    to your involvement in that crime?

10   A      Yes, sir.

11   Q      And do you have a plea agreement with the

12   United States in relation to that crime?

13   A      Yes, sir.

14   Q      Has anybody made you any promises about what

15   your ultimate sentence will be in that case?

16   A      No, sir.

17   Q      Mr. Herrera, how old are you?

18   A      65.

19   Q      And in the beginning of 2017 where did you

20   live?

21   A      The City of Barranquilla, Colombia.

22   Q      And who did you live with there?

23   A      With my lady and the last son that I have, his

24   name is Oscar like me, Oscar Herrera.

25   Q      And what were you doing for work at that time?

1    A       Well, at that time I was working on the

2    market.  My profession is a mariner welder.  But due

3    to my age I couldn't find work in Colombia due to my

4    age, so I was working at the market.  I cannot find

5    work as a welder, so I was working at the market.

6    Q       And how long have you been working as a welder

7    and a mariner?

8    A       Well, all of my -- many years, since I was

9    young.  Since the year '78, more or less.

10   Q       Did there come a time when you learned about a

11   ship named the Fat Crow?

12   A       Yes, by way of a friend who's in the trade who

13   is a mariner.

14   Q       What is that friend's name?

15   A       Francisco Bolanos.

16   Q       I'm showing you Government's Exhibit 100A.  Do

17   you know that individual?

18   A       Yes, sir.

19   Q       Who is it?

20   A       Francisco Bolanos.

21   Q       How do you know Mr. Bolanos?

22   A       Well, because there is a place where all we

23   mariners gather there in Barranquilla, all we

24   mariners gather there.  So there we all have each

25   other's phone numbers in case some job comes up, we

1    can call one another in case a job comes up.

2    Q      And what did Mr. Bolanos tell you about the

3    Fat Crow?

4    A      Well, that a welder was needed for that ship.

5    Q      Did you meet with Mr. Bolanos to talk more

6    about that job opportunity?

7    A      Well, yes, he set an appointment for me to

8    meet with him there at a place in the middle of

9    Barranquilla.

10   Q      Besides you and Mr. Bolanos, was anybody else

11   there?

12   A      Well, there were also others, others who were

13   also looking for spots.

14   Q      What information did -- sorry.  Who was the

15   coordinator of the trip at that meeting you had?

16   A      There a Mr. Herman.

17   Q      Had you met Mr. Herman before?

18   A      Well, he's also an old-time mariner of the

19   trade.  I haven't seen him in years.  Yes, it had

20   been several years since I had seen him up until

21   that day.

22   Q      And what did Mr. Herman tell you about

23   possibly working on the Fat Crow?

24   A      Well, yes, that they were recruiting, that

25   they were in need of some personnel, that they

1    needed a welder.

2    Q    And did you express interest in that job?

3    A    Yes, I expressed my interest in the job.  And

4    since I had my documents expired, he said well, if

5    you fix your papers, then, yes.

6    Q    What documents were expired of yours?

7    A    Well, my passport, my passport was expired and

8    some courses, in courses that are required of you at

9    the marina.

10   Q    Did you take care of those issues?

11   A    Yes, and I went out to borrow some money to do

12   that, yes.

13   Q    And did you ever have another meeting with an

14   organizer of the Fat Crow?

15   A    Well, afterwards, yes, once I fixed my

16   documents, once I had my documents, then he

17   introduced me to Mr. Favio.

18   Q    Do you know Mr. Favio's first name?

19   A    It was always Hector Favio, Hector Favio,

20   Hector Favio, Hector Favio.

21   Q    Where did you meet Hector Favio?

22   A    I had known him for many years ago, I had

23   worked with him some 15 years back and I had not

24   seen him up until that day.

25   Q    And that day where did you meet with

1    Mr. Hector Favio?

2    A      Well, to hand him my resume and to show him

3    that I had all my paperwork in order.

4    Q      Where did you meet with him?

5    A      At a restaurant.  At a supermarket.

6    Supermarket with a restaurant, there inside of the

7    supermarket, we met in there.

8    Q      And that was in Barranquilla, Colombia?

9    A      Yes, sir.

10   Q      And do you remember approximately more or less

11   what month that occurred?

12   A      The month of April, that's when.

13   Q      Besides yourself and Mr. Hector Favio, was

14   there anybody else at that meeting?

15   A      Yes, there was Mr. Walter there, Bolanos was

16   there, and there was also a captain who was coming

17   also, and there was a second officer there whose

18   last name is Felipe, I do not remember his last name

19   right now.  And myself and Mr. Herman.

20   Q      Showing you Government Exhibit 104.  Do you

21   recognize that individual?

22   A      Yes.  That's Mr. Walter.

23   Q      He was that the meeting in Barranquilla?

24   A      He was going as the chief engineer.

25   Q      Was Mr. Walter there at that meeting in April

1    in Barranquilla, Colombia?

2    A      Yes, sir, that was on the weekend.  On that

3    same day they traveled.  They traveled to Santo

4    Domingo, he traveled, the captain, and Bolanos, the

5    three, the three traveled.  Bolanos, the captain,

6    and Mr. Walter.

7    Q      I want to go back to that meeting.

8    A      It was a Saturday.

9    Q      I want to go back to that meeting with Hector

10   Favio at the supermarket.  What did you and Hector

11   Favio discuss?

12   A      Well, he asked me for my documents and we sat

13   set an appointment for a future appointment.

14   Q      In the coming days?

15   A      That was --

16   Q      In the coming days did you meet with Hector

17   Favio again?

18   A      Yes, sir, yes.

19   Q      About how many days later?

20   A      Well, they traveled on a Saturday so it was

21   around Wednesday or so.  Wednesday, seems it was

22   Wednesday.  Wednesday, thereabouts.

23   Q      And during that meeting on Wednesday who was

24   present other than you and Hector Favio?

25   A      Well, there was Mr. Llanos.

1    Q    Do you see Mr. Llanos in the courtroom here

2    today?

3    A    Yes, sir.

4    Q    Can you point at where he is and indicate what

5    clothing he's wearing?

6    A    The one here.  The one there who is dressed --

7    Q    What color is he wearing?

8    A    Orange, this.

9    Q    And what kind of hairstyle does he have?

10   A    Well, he's shaven and has glasses.

11        MR. GAMMONS:  Your Honor, may the record

12   reflect that he's indicated Mr. Llanos Miranda?

13        THE COURT:  The record should so reflect.

14   BY MR. GAMMONS:

15   Q    So during this meeting with Hector Favio and

16   Mr. Llanos, you guys are still in Barranquilla,

17   Colombia, correct?

18   A    Yes, sir.

19   Q    At that time are you offered a contract to

20   work on the Fat Crow?

21   A    Yes, sir.

22   Q    How long was the contract in duration?

23   A    Six months.

24   Q    And how much were you to be paid per month?

25   A    Salary of $1,100 per month as a welder, an

1    oiler.

2    Q     Was there any discussion of drugs during that

3    meeting?

4    A     Well, we signed the contracts and then after

5    we signed the contracts, Mr. Favio told me to go

6    looking for a place in the ship to store.

7    Q     To store what?

8    A     To store drugs, to build a stash compartment.

9    Q     At that point did you know where the ship that

10   you had just been contracted to be on was located?

11   A     Well, they said that it was in Santo Domingo

12   at the shipyard.

13   Q     And how were you to get from Colombia to the

14   Dominican Republic?

15   A     Well, he gave us the tickets the following

16   day, the day following when we signed the contracts.

17   Mr. Herman waited for us at the airport.

18   Q     When you say he gave you the tickets --

19   A     He took our passports.

20   Q     When you say he gave you the tickets, are you

21   referring to Hector Favio?

22   A     Yes, Hector Favio, yes, sir.

23   Q     And when you were asked to find a location to

24   build a hidden compartment for drugs, was Mr. Llanos

25   present during that conversation?

1    A       Yes, he was present.

2    Q       Who did you travel to -- who if anybody did

3    you travel to the Dominican Republic with?

4    A       Well, with Mr. Llanos, with Mr. Felipe, and a

5    first officer who came from Cartagena whose name I

6    don't remember, I don't remember his name but he

7    traveled from Cartagena -- the four of us traveled.

8    Q       And did anybody meet you when you arrived at

9    the airport in the Dominican Republic?

10   A       Yes, sir, there we were received by a man

11   named Julio.

12   Q       Had you met Julio before?

13   A       No, sir, I never seen him, never.

14   Q       How long after you arrived in the Dominican

15   Republic did you board the Fat Crow?

16   A       Well, afterwards he took us -- once we arrived

17   in Santo Domingo he took us for each one of us to

18   buy a chip for our cell phones so each one of us can

19   get in touch with our families.

20   Q       How long after you arrived in Santo Domingo

21   did you board the Fat Crow?

22   A       Well, that same day, that same day we went to

23   eat, afterwards we went to a hotel and then in the

24   morning we went.  We slept at the hotel and then in

25   the morning we went on board.

1    Q       When you arrived on board what was your

2    primary goal?

3    A       Well, to arrive and start to locate the place

4    where it was going to be.

5    Q       Be what?

6    A       Where the stash compartment was going to be

7    made.

8    Q       Besides yourself did anybody else participate

9    in looking for where that location was going to be?

10   A       At first it was the captain.  When I arrived

11   there was were two Venezuelans on board, there was

12   the captain and there was Mr. Walter.

13   Q       Did any of those people look for the location

14   for the stash compartment?

15   A       Well, at first with the captain, with the

16   captain, the first day we started to look with the

17   captain.

18   Q       Did anybody else join later?

19   A       No, only the two and then Mr. Walter when we

20   arrived at the dock Mr. Walter would go down to land

21   and he would go with Mr. Julio to do I don't know

22   what.

23   Q       Did you ultimately find a location that was

24   suitable for the stash compartment?

25   A       No, well, with the captain we could not find

1    the place.

2    Q    Did you ultimately find a place for the stash

3    compartment?

4    A    When Mr. Walter returned he had some other

5    orders or something, I don't know, but then I set

6    out with him to find the place.

7    Q    And where did you ultimately decide to

8    construct the stash compartment?

9    A    Well, looking around with Mr. Walter we found

10    a good spot since he's an engineer.

11    Q    And where was that on the boat?

12    A    Well, we continued in an area in the area of

13    the bow.  Some tanks were there, there were some

14    tanks there where they stored fuel.

15    Q    And besides yourself, Mr. Walter, did anybody

16    else help you construct the stash compartment?

17    A    Well, oh, to build the stash compartment?

18    Yes, I was helped by Eduardo Chasin.

19    Q    Showing you Government Exhibit 106A.

20    A    Yes, sir.

21    Q    Do you recognize that individual?

22    A    Excuse me?  Of course, yes.  That's the one

23    who helped me.

24    Q    Who is that?

25    A    It was an oiler there on board.

1    Q        What's his name?

2    A        Eduardo Chasin.

3    Q        What did you have to do to that area of the

4    bow to build the stash compartment?

5    A        Well, first of all some cleaning had to be

6    done, cleaning had to be done because in these tanks

7    there was some fuel residue and since we were going

8    to be working with flames.  To get all the dirt that

9    was out of there.

10   Q        After you removed all the dirt what did you

11   do?

12   A        After all the dirt was taken out, Mr. Walter,

13   he arranged for us to meet with Mr. Julio.

14   Q        And what did you talk to Mr. Julio about?

15   A        Well, he asked if we had already found a place

16   where it was going to be made, the stash

17   compartment.

18   Q        And how did you find materials to make the

19   stash compartment?

20   A        Well, everything was by way of Mr. Julio who

21   was the one would facilitate everything, all the

22   implements we would need on the ship.

23   Q        How long did it take you to complete the stash

24   compartment?

25   A        Well, to be exact, it took us about a month,

1    about a month, a month, more or less, about a month

2    and some change.  A month -- I was in a confined

3    space, so it was a job that had to be -- it was

4    dangerous to work there continuously because it

5    would fill up with smoke, so you had to go out.

6    Q    And typically --

7    A    You had to go out to get air.

8    Q    Typically what hours would you work during the

9    day?

10   A    Well, since the morning, then we'd rest at

11   noon.  At 10:00 we'd have our coffee time, recess.

12   Then we would continue to 11:00, 11:30, then have

13   lunch.  Then we would rest until 1:00, 1:30 in the

14   afternoon, and then we would start up again.  Then

15   until 3:00 in the afternoon, then another rest for

16   coffee time.  You work until 4:00, 4:00 and some

17   changes, then we would stop.

18   Q    Other than building the stash were there other

19   repairs that needed to be done to the Fat Crow?

20   A    Logically, yes, because that boat needed a lot

21   of work.

22   Q    And did you contract to get paid for those

23   other repairs that you made?

24   A    Yes.  As the welder of the ship for all the

25   welding jobs that had to be done on the ship.

1    Q      And how much did you contract for for those

2    welding jobs?

3    A      Well, I charged -- for the stash compartment I

4    charged $5,000.

5    Q      And that was separate from your salary as just

6    being the general welder on the ship.

7    A      Yes, sir, exactly, since that was a special

8    job we charged separately.

9    Q      So now that the stash compartment was

10   completed did you expect to transport drugs on your

11   first trip?

12   A      No, well, once the stash compartment was

13   completed, Mr. Julio told us that we were going to

14   do some trips clean without carrying merchandise.

15   Q      At some point did you depart the Dominican

16   Republic on the Fat Crow?

17   A      Yes, of course.  We left towards Venezuela.

18   The date I don't remember exactly when we left to

19   Venezuela.  We spent almost two months over in Santo

20   Domingo doing the repairs and then once the stash

21   compartment was completed.

22   Q      Do you remember approximately what month you

23   arrived in Venezuela?

24   A      Exactly the month really, I don't remember.  I

25   don't remember.  When we arrived to Santo Domingo on

1     the 25th or 24th of April is when we arrived.  And

2     we spent approximately two months there, so that

3     would be --

4     Q     Maybe around June you arrived in Venezuela?

5     A     Exactly, yes, around there, more or less.

6     Q     Once you arrived in Venezuela did you go to

7     land or did you remain anchored at sea?

8     A     No, not to land because we were too far from

9     land.  We were too far from land.  We didn't even

10    have a cell signal.  We were too far from land.

11    Q     Were you at anchor?

12    A     Yes, we were anchored.

13    Q     Did there come a time when you were anchored

14    off the coast of Venezuela that the captain was

15    replaced on the ship?

16    A     Yes, the captain was replaced because he had

17    some problems because he had sold some fuel and he

18    had left Santo Domingo without permission.  And when

19    we left Santo Domingo we had an incident where the

20    ship almost came up on land because there was a

21    failure of the wheel, he almost ran over a house

22    that was there by the shore.  So then they brought

23    some tugboats and we got out and then we continued.

24    Q     Who was the new captain that replaced the old

25    captain?

1    A      Mr. Martin.

2    Q      I'm showing you --

3    A      Martin Barrios.

4    Q      I'm showing you Government Exhibit 103A.  Do

5    you recognize that individual?

6    A      That's him.

7    Q      That's who?

8    A      Mr. Martin Barrios, the captain.

9    Q      And once you arrived off the coast of

10   Venezuela, did you get a new first officer as well?

11   A      Yes.

12   Q      Who became the new first officer?

13   A      Jair Mendoza is his name.

14   Q      Do you see Mr. Jair Mendoza in the courtroom

15   today?

16   A      Yes, sir.

17   Q      Can you identify him?

18   A      Yes, sir.

19   Q      What is he wearing?

20   A      He's the one with glasses there with the same

21   dress as me.

22   Q      All the way at the end of the table?

23   A      Yes, sir.

24          MR. GAMMONS:  Your Honor, may the record

25   reflect he's identified Mr. Jair Mendoza?

1          THE COURT:  The record should so reflect.

2     BY MR. GAMMONS:

3     Q     Did there come a time when Mr. Hector Favio

4     came to Venezuela?

5     A     Yes, sir.

6     Q     Did he come out to the boat to speak with you?

7     A     Yes, sir.

8     Q     I'm going to talk about the first time that he

9     came to speak with you on the boat.  Did he come

10    alone?

11    A     No, he arrived with Mr. Herman.

12    Q     And this is the same Herman and Hector Favio

13    that you had met in Barranquilla?

14    A     Yes, sir, yes, sir.

15    Q     When they came on the boat where did they meet

16    with you at?

17    A     At the bridge, the bridge.

18    Q     Showing you Government Exhibit 102A.  Do you

19    recognize that individual?

20    A     Yes, sir.

21    Q     Who is that?

22    A     That's the cook.

23    Q     During the meeting with Hector Favio when he

24    came on the boat the first time, did he meet with

25    the entire crew?

1    A        Yes, sir.

2    Q        Was Mr. Mendoza Montoya there?

3    A        Yes, sir.

4    Q        Was Mr. Llanos Miranda there?

5    A        Yes, sir.

6    Q        When Mr. Hector Favio spoke to you as a group

7    what did he tell you?

8    A        Well, that there was the possibility already

9    of doing a trip.

10   Q        What type of trip?

11   A        To transport drugs.

12   Q        Did he say anything else?

13   A        Yes, that possibly a trip would be done, yes.

14   Q        Did you know how much drugs were to be

15   transported at that point?

16   A        Well then, yes, because a spot had been found

17   that according to Mr. Julio 2,000 kilos would fit

18   in.

19   Q        Was that spot the stash compartment?

20   A        Yes, sir.

21   Q        During that first meeting that Hector Favio

22   came onto the boat did he view the stash

23   compartment?

24   A        Yes, sir.

25   Q        Was he happy with it?

1    A      Yes, well, I was doing some work over here,

2    but the one who took him was Mr. Walter.  But he was

3    happy.

4    Q      During that first meeting that Hector Favio

5    came on the boat did he meet with the mariners

6    individually?

7    A      Well, yes, afterwards he met because since it

8    was mentioned that it was 2,000 kilos that would be

9    transported, then afterwards he gathered everyone

10   and that the amount fluctuated between

11   1,000-something and 2,000 kilos that would be

12   transported.

13   Q      I want to talk about your individual meeting,

14   your private meeting with Hector Favio.

15   A      Well, yes, afterwards he arranged for us to go

16   one by one, and how much each one would charge for

17   transporting.

18   Q      And during your one-on-one meeting what

19   discussion did you have with Mr. Hector Favio?

20   A      Well, at that first meeting since it was

21   2,000 kilos, I asked for $150,000 for me.

22   Q      And when you asked Mr. Hector Favio for

23   $150,000 for you, what was his response?

24   A      Well, at the time he didn't say anything.

25   Because then he would call them one by one and I

1    didn't know how much the other guy asked for, nor

2    the next.

3    Q       Did you see Mr. Mendoza Montoya have one of

4    these one-on-one meetings with Hector Favio?

5    A       Yes, sir, we all went by one by one.

6    Q       Did you see Mr. Llanos Miranda have a

7    one-on-one meeting with Mr. Hector Favio?

8    A       Yes, sir.

9    Q       After Mr. Hector Favio left on that date did

10   he return to the boat?

11   A       Well, he left and said he was going to talk to

12   his boss, I don't know who his boss is but he said

13   he was going to go talk to see if what each one had

14   asked for individually seemed well to him.

15   Q       And about how long until Hector Favio returned

16   to the boat?

17   A       Exactly -- I think it was about a week, over a

18   week or two weeks or so.

19   Q       When Mr. Hector Favio came the second time did

20   he come alone?

21   A       He arrived with Mr. El Gordo.

22   Q       Did he meet with the crew?

23   A       Yes, sir.

24   Q       Where was that at?

25   A       In the same place, at the bridge.

1    Q    And was Mr. Mendoza Montoya present for that

2    meeting?

3    A    Yes, sir.

4    Q    Was Mr. Llanos Miranda present for that

5    meeting?

6    A    Also, yes.  Yes, everyone.  The only one who

7    did not speak with him there was Mr. Walter.  He

8    would always speak with him separately.

9    Q    During that group meeting during that second

10    meeting the second time that Hector Favio came to

11    the boat, what did he say to the entire crew?

12    A    Well, that what each one was asking

13    individually for the trip was a lot of money.

14    Q    Is that all he said, it was a lot of money?

15    A    Well, that it was a lot of money.  And then we

16    asked what about is it going to be because if it's

17    going to be 2,000 kilos, that's the amount.  And

18    then he said well, no, the thing is it's going to be

19    a thousand, 1,500 kilograms, a thousand and

20    something.

21    Q    Did Mr. Hector Favio have one-on-one meetings

22    with the crew on this occasion?

23    A    Yes, sir, also the same.

24    Q    Tell me what happened during your one-on-one

25    meeting with Mr. Hector Favio.

1    A       Well, at that meeting since I -- I went down

2    from $150,000, I was left at 50.

3    Q       What was Mr. Hector Favio's response when you

4    asked for $50,000 this time?

5    A       Well, that he was going to speak with his boss

6    again and see what it seemed like to him.  And I

7    asked for 50.  I don't know what the others had

8    asked for.

9    Q       On that occasion the second time Hector Favio

10   came to the boat did Mr. Mendoza Montoya have a

11   one-on-one meeting with Hector Favio?

12   A       Yes, everyone, everyone, except for Mr. Walter

13   because he would always speak with him separately.

14   Q       After Mr. Hector Favio left the boat how long

15   until he returned to the Fat Crow?

16   A       Well, the 50 still seemed like too much to

17   them and he was going to talk to the boss and see --

18   he was going to see.

19   Q       So he left the boat at that point?

20   A       Yes, of course, yes.

21   Q       How long until he returned for a third visit

22   to the boat?

23   A       Well, yes, he left and he took, yes, he took

24   about a week or so, I think, a week or so.  And

25   around that time we had already been over a month or

1    so there in Venezuela.  We were loading the fuel, we

2    were loading.

3    Q        And when Mr. Hector Favio came to the boat

4    that third time did he meet with the crew?

5    A        Yes, by the third time we were already set out

6    to leave, we were about to leave and then he came

7    again.

8    Q        When he came the third time did he meet with

9    everybody?

10   A        Yes, sir.

11   Q        Including these two defendants?

12   A        Yes, sir.

13   Q        During that group meeting what did he say to

14   the crew?

15   A        Well, that one that also that the amount too

16   much and that we were not going to be carrying that

17   full amount, the 2,000, that the matter was going to

18   be between a thousand and a thousand something

19   kilos.

20   Q        So the $50,000 that you asked for was too

21   much?

22   A        Yes, sir.

23   Q        At this point was it still the plan to take a

24   clean trip?

25   A        No, by then, by the third time that he came

1    that he arrived with El Gordo again, that man.

2    Q      There was no clean trip planned?

3    A      No, by then they arrived saying the

4    merchandise was about to come and that they were

5    going to acknowledge of 30 percent.

6    Q      Did you have a one-on-one meeting with Hector

7    Favio during that third occasion that he came to the

8    boat?

9    A      Yes, on that occasion, yes, and he told me he

10   was going to give me $30,000.

11   Q      Was he going to give you that money up front?

12   A      That he was going to acknowledge 10 percent --

13   30 percent which was $10,000.

14   Q      So you were going to get 30 percent of your

15   $30,000 up front.

16   A      Yes, I was going to be given $10,000.

17   Q      And where was that money to be sent?

18   A      And then since we were at this place and we

19   were so far away and since he said the merchandise

20   was going to be arriving that very night to leave

21   the following day.

22   Q      So you agreed to be paid $1,100 a month for

23   being the welder on the Fat Crow?

24   A      Yes, sir.

25   Q      And you also agreed to be paid a separate

1      amount for building the stash compartment.

2      A      The stash compartment and also the special

3      jobs that were done in the engine room, welding some

4      pipes and other things.

5      Q      This $30,000 that you agreed to be paid by

6      Hector Favio, what was that for?

7      A      That was the advance for the drug trip which

8      we were going to do.

9      Q      How long after Hector Favio left that third

10     meeting did the drugs arrive on board?

11     A      That very night.  We had a program that at

12     12:00 at night the drugs would arrive.

13     Q      Did they arrive at 12:00 at night?

14     A      No, it didn't arrive at 12:00 on the dot, but

15     it did arrive in the wee hours of the morning,

16     almost daybreak.

17     Q      How did the drugs get to the Fat Crow?

18     A      A motorboat arrived, a large motorboat

19     arrived.

20     Q      How many people --

21     A      It didn't touch the side of the ship, just at

22     a distance.

23     Q      How many people were aboard the motorboat?

24     A      Well, since it was dark, I got to see about

25     three and they had some covering that they had for

1    the rain.

2    Q      How did the cocaine get from the motorboat on

3    to the Fat Crow?

4    A      Well, they passed over some ropes to the

5    motorboat, then over there they tied and then over

6    here on board we pulled.

7    Q      Did everyone in the crew participate in

8    loading the cocaine onto the Fat Crow?

9    A      Yes, sir.

10   Q      Including these two defendants?

11   A      We were nine and all nine of us participated.

12   Q      Including these two defendants?

13   A      Yes, sir.

14   Q      Do you recall what Mr. Mendoza Montoya was

15   doing?

16   A      Well, he was one of the first ones that were

17   pulling, that were pulling with Eduardo, with the

18   cook, Mario; Llanos, the captain; and myself.  We

19   formed a chain.  Because to lower it where it was

20   going to be stored, there was a ladder and then to

21   lower it down there where it was going to be stored

22   there was also another ladder.  So to have more

23   speed, a ramp of sorts was built.

24   Q      Did you use the ramp to put the drugs into the

25   stash compartment?

1    A      Yes, to let go of the bales more quickly, down

2    to the stash compartment.

3    Q      After the cocaine was put into the stash

4    compartment how soon did the Fat Crow begin sailing?

5    A      No, well, once the drugs were put away then we

6    started to clean everything.

7    Q      How did you clean?

8    A      Well, that ramp that we made, we broke it, we

9    tied it with some metal and threw it to the sea.

10   And the clothes.

11   Q      What did you do with your clothes?

12   A      We threw them all away.

13   Q      And after you had stashed the drugs and

14   cleaned up, how long until you began sailing on the

15   Fat Crow?

16   A      By then in the afternoon because afterwards

17   then we started to do all the preparations, those of

18   us that work in the engine room with the engine and

19   those on the deck.

20   Q      How long after you began sailing were you

21   interdicted by the United States Coast Guard?

22   A      Well, that was three days -- we had already

23   been sailing about three days, so about three or

24   four days after we had been sailing.  From the point

25   that we left Venezuela, yeah, we had been about

1      three days, four days or so.

2      Q      You contracted to be paid $1,100 a month as a

3      welder on Fat Crow.  Did you ever see that money?

4      A      Yes, sir.  Yes, yes.

5      Q      Who was it delivered to?

6      A      I worked for four months and the four months I

7      was paid for them.

8      Q      Who received it?

9      A      My lady in Barranquilla.

10      Q      The money that you were paid for the stash

11      compartment and other repairs on the Fat Crow, did

12      your wife ever receive that money?

13      A      No, sir, no, sir, that was not seen, that was

14      not to be seen because the one in charge of that was

15      Mr. Walter.  He was the one in charge of charging

16      the stash compartment amount which was five, and

17      then the other special jobs which were $12,000.

18      Q      But you and your wife never saw a dime of that

19      money.

20      A      Nothing, no.

21      Q      And the $30,000 that you were promised for

22      transporting the drugs, did you ever see that money?

23      A      Well, since he had arranged with me to give me

24      10 percent, I mean 30 percent which was $10,000,

25      then I gave him my phone number to my lady to hand

1     it to her.

2     Q      Did your lady ever receive that money?

3     A      She never received the money.

4             MR. GAMMONS:  No further questions.

5             THE COURT:  All right.  We're going to recess

6     for the evening.  Sir, you may step down.  Please

7     don't discuss your testimony over the evening hours.

8     Thank you.

9             We're going to be in -- hold on just a minute.

10    Can I get counsel to approach sidebar?

11            (At which time the following sidebar

12    discussion was held:)

13            THE COURT:  I probably should tell the jury

14    about where we were in the course of the trial.

15    Where are we in the course of the trial?

16            MR. STOUT:  We finished him.  They're done

17    crossing him.  That's the end of the cooperators.

18    There is two more agent witnesses who I don't

19    anticipate will take -- one of them maybe between

20    the two of them an hour and a half total, something

21    like that, not very much longer with those two agent

22    witnesses.  And then I think we're done.

23            THE COURT:  Okay.  Have you all discussed with

24    your clients whether they're going to testify or

25    not?

1          MR. CASTILLO:  Yes, Your Honor, it's up in the

2     air.  It's going to be a last minute decision.  I've

3     recommended against it, but he's still thinking

4     about it.

5          I do want to say one thing, Judge.  Now that

6     you've heard everything and who the participants

7     are, if you recall when we first started the case

8     the government indicated about the two crewmen, Luis

9     and Walter --

10          THE COURT:  Why don't we talk about that in a

11     minute.  What about your client?

12          MR. MARTINEZ:  I think he's leaning towards

13     testifying.

14          THE COURT:  That doesn't surprise meant in the

15     least.

16          MR. GAMMONS:  He's already started.

17          MR. MARTINEZ:  He's already started the

18     process.

19          MR. CASTILLO:  So maybe they'll have the case

20     Friday morning?  I don't know.

21          THE COURT:  Yeah, we may be looking at Friday.

22     All right.

23          (At which time the sidebar discussion was

24     concluded and the proceedings resumed as follows:)

25          THE COURT:  I wanted to ask the attorneys

1      where we were as far as the trial is concerned,

2      timing and that kind of thing.  And we're running

3      about on time, about what they estimated.  The

4      government has indicated that they believe they have

5      two additional witnesses after this witness and

6      those witnesses are either Coast Guard or law

7      enforcement.  And then if the defendant wishes to

8      present a case, then they're entitled to present a

9      case.  So we're probably looking at your getting the

10     case maybe Friday morning.  That's what I would

11     anticipate.

12         So I just tell you that because most of the

13     time about Wednesday everybody wonders are we going

14     to finish the case this week -- and we are going to

15     finish the case.

16         All right.  Have a good evening.  Leave your

17     pads on your chairs.  Please don't discuss the case.

18     9:00 tomorrow morning.

19         (The jury retired to the jury room.)

20         THE COURT:  You may have a seat.

21     Mr. Castillo, there was a matter you wanted to

22     discuss?

23         MR. CASTILLO:  Yes, Your Honor.  Having to do

24     with the government's motion in limine which we did

25     not touch to this point, having to do with the two

1    crewmen who were in essence working as confidential

2    informants for the government, that's Luis Garcia

3    Walter Garrido.  There has been plenty of mention of

4    those two individuals in this case and their roles.

5    This last witness talked about Walter actually

6    participating in the construction of the

7    compartment.

8         That information now is I think it's clear

9    that we've identified these two individuals and they

10   actively participated.  They were arrested at sea

11   and brought to Tampa, but they're not indicted.  Now

12   to come to find out those two individuals were

13   working for the government.  And now I think it's

14   something that the jury should be able to hear about

15   the fact that they were in fact not crew members,

16   that they were part of the investigation to nab the

17   entire crew.  And I would elicit that testimony

18   through Agent Ward should he testify or whatever

19   other case agent they put on because they would be

20   aware of that information that they weren't charged

21   and why.

22        So given that - we haven't touched it yet,

23   haven't brought it up with any witness, I mean, this

24   is information that's come through the normal flow

25   of the evidence.  So what I would -- I guess maybe

1      the best thing to do is I'll just make argument in

2      the morning or at least I want to alert you that

3      there may be a problem.  Then depending who they

4      call and how we finish, but I wanted to alert the

5      court to that issue so that you can evaluate where

6      we're at.

7           THE COURT:  Let me know before you intend to

8      ask any questions.  I'm still not -- I think I said

9      this in the beginning and I'm still there.  What is

10     the relevance of all of that?

11          MR. CASTILLO:  Well, Your Honor, United States

12     v. Kelly says no one can conspire with the

13     government -- I have the citation there if you want

14     it.  But generally speaking, a person cannot

15     conspire with the government or its agent.  If we

16     find -- and I think it's clear that Luis and

17     Mr. Garrido, Walter Garrido, are in fact government

18     agents, it's a legal impossibility for a defendant

19     to conspire with that person.

20          THE COURT:  Agreed.  But they got other people

21     they're conspiring with.

22          MR. CASTILLO:  Well, maybe, but then the fact

23     that these people are assisting or trying to create

24     this illegal act or manufacturing this conspiracy in

25     order to get $100,000 for their services from the

1    government, I think that's very relevant here.  And

2    especially the fact that you've got these people who

3    are not charged and getting money for doing in

4    essence the same thing that my client was doing by

5    being aboard the boat.

6         I think that's -- you know, I still think

7    that -- it's not me talking, this is the facts that

8    we have before us and this is what happened.  This

9    isn't me speculating as to whether they got paid;

10   they did get paid and they were in fact working for

11   the government and therefore they're government

12   agents.  So given that, I think that information

13   becomes relevant and I should be allowed to explore

14   that when the agent takes the stand.

15        THE COURT:  Mr. Stout or Mr. Gammons, anything

16   else you want to say in response?

17        MR. STOUT:  Your Honor, our position remains

18   the same that it's not relevant.  The jury has now

19   heard four cooperators who in essence said that

20   these defendants along with themselves conspired not

21   solely with the two confidential source persons, but

22   with Hector Favio and Herman and with them and the

23   others.  I think there is -- this might make more

24   sense if there were only three people on the boat,

25   but there is a lot of people on the ship and the

1    conspiracy that's been described throughout the

2    trial includes all these people.

3         Perhaps the court could give an instruction --

4    a special part of the instruction that -- jury

5    instructions that said if you were to find, for

6    instance, that one of the defendants conspired

7    only -- if the only other person they conspired with

8    was Walter Garrido Vargas or Luis Carlos Flores,

9    that that would be insufficient to find them guilty,

10   perhaps the court could do that, but that would be

11   the only circumstance in which Mr. Castillo's

12   argument would make sense, that they can't conspire

13   with government employees.  But those are the only

14   two and they would have to find -- to find the

15   defendant's not guilty on that basis, they would

16   have to be finding that they conspired only with one

17   or both of those two people, not with anybody else.

18        THE COURT:  Okay.  I'm not sure the jury would

19   know -- it make any sense to the jury based on the

20   testimony that they have heard up until now if I

21   told them that.  And there is no doubt that that's

22   true that if the defendants were conspiring with law

23   enforcement or undercover cooperators, they can't be

24   found guilty of conspiring with a government agent.

25        But here, as you point out, we've had, what,

1    four cooperators testify.  So I think what the jury

2    is focused on is that conspiracy with the people

3    that have testified.  So at this point I'm still not

4    convinced that it's relevant and we're still where

5    we are.

6          Mr. Castillo or Mr. Martinez, if you wish to

7    ask such a question, if and when the agent testifies

8    that you think has that knowledge, if you'll just

9    alert me and I'll reevaluate.

10         MR. CASTILLO:  I fully intend to do that.

11   That's why I brought it to your attention now.  If

12   you notice, I haven't talked about it, I haven't

13   even mentioned their names.

14         Judge, one thing I think -- like I said, it's

15   a little early, but I will be submitting a special

16   requested instruction for multiple conspiracies.  I

17   think there's ample evidence of that.  We'll talk

18   about it at the charge conference.  But I anticipate

19   that coming in also.

20         Another thing is the way we have right now,

21   these four cooperators the jury knows that they have

22   pled guilty, but there is nothing before them to

23   show that they have been adjudicated guilty.  The

24   court has accepted their plea and adjudicated them

25   guilty, but the jury doesn't know that.

1          So there is two ways to do it.  Obviously a

2     certified copy of the record showing that you

3     accepted -- or the acceptance of their plea and

4     adjudication, et cetera, or maybe you should just

5     tell them that you've accepted and adjudicated them

6     guilty.  We can figure that out later, but I wanted

7     to alert you to it that that's a concern.

8          THE COURT:  I want to go back to the multiple

9     conspiracies.  The jury instruction that you're

10    thinking you may submit, is that the standard

11    multiple conspiracies?

12         MR. CASTILLO:  Yes, Your Honor, from the book.

13         THE COURT:  I'll take a look at it.

14         MR. CASTILLO:  I'll submit it in writing

15    tonight.  But like I say, that as far as maybe you

16    want to think about how we want to address that.  We

17    can do it one of two ways.  I don't have a problem

18    if you want to tell them that you've accepted their

19    plea and they're adjudicated guilty and leave it at

20    that.  Because that's how they're a convicted felon

21    and that's a fact for them to consider in evaluating

22    their testimony.  They don't know that; they know

23    that they've pled guilty, but they don't know that

24    they're adjudicated guilty of a felony.

25              THE COURT:  I see what you're saying.  Based

1    on the jury instruction that says that they need to

2    -- for those witnesses that have been convicted of a

3    felony, they need to consider their testimony in a

4    different way.  Okay.  All right.  Thank you.

5         We're in recess.  9:00 tomorrow morning.  I

6    have a sentencing, but it should be over at 9:00.

7         (The proceedings adjourned at 5:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA           )

4      COUNTY OF HILLSBOROUGH   )

5          I, Lynann Nicely, RMR, CRR, Official Court

6      Reporter for the United States District Court, Middle

7      District, Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 206, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, March 2, 2018.

19

20

21         _____/s/ Lynann Nicely_____
                Lynann Nicely, RPR, RMR, CRR, CRC
22              Official Court Reporter

23

24

25