1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION

3

     UNITED STATES OF AMERICA,    :
4                                 :
            Plaintiff,            :
5                                 :
                                  : CASE    8:17-cr-445
6      vs.                        : NO.:
                                  :
7                                 : DATE:  12/14/2017
     GUSTAVO ENRIQUE LLANOS       :
8    MIRANDA and JAIR MENDOZA     : TIME:  9:08 a.m.
     MONTOYA,                     :
9                                 : PAGES:  1 - 156
            Defendants.           :
10     ------------------------   :

11               TRANSCRIPT OF TRIAL DAY 4
            BEFORE THE HONORABLE SUSAN C. BUCKLEW
12             UNITED STATES DISTRICT JUDGE

13     For the Government:

14             TAYLOR G. STOUT, ESQ.
               CARLTON GAMMONS, ESQ.
15             U.S. Attorney's Office
               Suite 3200
16             400 N. Tampa Street
               Tampa, Florida 33602

17

18     For Defendant Gustavo Llanos Miranda:

19             DANIEL L. CASTILLO, ESQ.
               3900 North Boulevard
20             Tampa, Florida 33603

21

     For Defendant Jair Mendoza Montoya:
22
               VICTOR D. MARTINEZ, ESQ.
23             423 S. Hyde Park Avenue
               Tampa, Florida  33606

24

25     Court Reporter:  Lynann Nicely, RPR, RMR, CRR

1                    I N D E X

2    WITNESS                                    PAGE

3

4    OSCAR HERRERA VENERA (cont.)

5    Cross examination by Mr. Castillo          3

6    Cross examination by Mr. Martinez          40

7

8    DANIEL McDONOUGH

9    Direct examination by Mr. Stout            69

10   Cross examination by Mr. Castillo          93

11   Cross examination by Mr. Martinez          98

12   Redirect examination by Mr. Stout          105

13

14   JAIR MENDOZA MONTOYA

15   Direct examination by Mr. Martinez         127

16   Cross examination by Mr. Gammons           144

17

18

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2           THE COURT:  Would you bring the jury in.

3           (The jury returned to the courtroom.)

4           THE COURT:  Ladies and gentlemen, anything

5      happen over the evening hours that any of you feel

6      could affect your ability to serve on the jury in

7      any way?

8           I anticipate we'll follow a similar schedule.

9      If at any time anyone needs to leave as far as use

10     the rest room or something other than when I'm not

11     recessing, please let me know.  If you can't hear or

12     see something, please let me know.

13          You will recall yesterday when we concluded

14     the government had concluded their direct

15     examination of this witness and we're going to pick

16     up with the cross-examination and we'll start with

17     Mr. Castillo.  Mr. Castillo?

18                      CROSS EXAMINATION

19     BY MR. CASTILLO:

20     Q      Good morning, Mr. Venera.

21     A      Good morning.

22     Q      The prosecutor asked you a series of questions

23     yesterday afternoon before we broke.  I want to

24     follow up on that.

25     A      Yes, sir.

1    Q    And just so -- you and I have never met

2    before; is that correct?

3    A    Yes, sir, we have never seen each other.

4    Q    We've never had any conversations of any type;

5    is that correct?

6    A    Correct.

7    Q    Now, I think yesterday you indicated that in

8    April of this year you were hired to be the welder

9    aboard the Fat Crow; is that right?

10    A    Yes, sir.

11    Q    And you indicated your contact was Hector

12    Favio?

13    A    My first contact was Mr. Bolanos who called me

14    on the telephone.

15    Q    So Mr. Bolanos called you?

16    A    Mr. Bolanos to Mr. Herman and then Mr. Herman

17    to Mr. Hector Favio.

18    Q    And eventually you met with Mr. Favio; is that

19    correct?

20    A    Yes, sir.

21    Q    And you indicated that Mr. Llanos Miranda, my

22    client, was -- you had seen him there sometime

23    around that time when you had the meeting?

24    A    I only saw him on the day we signed the

25    contract, that's when I met him, on the day we

**signed the contract.**
Q **That was my point. You had met with people before you signed the contract, isn't that right?**
A **Exactly, yes.**
Q **And you told us a little bit yesterday about Mr. Chasin, do you remember that?**
A **Okay, yes, sir.**
Q **Do you know if Mr. Chasin is related to either Herman or Hector Favio or the other individual that you spoke to?**
A **No, sir.**
Q **Okay. Now, the day you met Mr. Llanos Miranda when you signed the contract, that was the first time in your life you had met him; is that right?**
A **Yes, I did not know him. They had meetings prior to that, but I don't know if he was at those prior meetings, I don't know if he was there.**
Q **Let's clear this up now. You saw him with your own eyes, Mr. Llanos Miranda, the day you signed the contract to work aboard the Fat Crow, correct?**
A **Yes, sir.**
Q **So any conversations Mr. Llanos Miranda has with somebody else prior to that day, you would have no knowledge about that, right?**

1    A    No, sir, I don't have knowledge.

2    Q    So what Mr. Llanos Miranda had spoken to the

3    administrator of the boat as to what his job would

4    be, you have no knowledge of that, correct?

5    A    Well, knowledge, yes, because when he signed

6    the contract they contracted him as a

7    helmsman/mariner.

8    Q    All right.  Maybe I wasn't clear and I'm

9    sorry.  The day you signed the contract to work

10   aboard the Fat Crow, Mr. Llanos Miranda was there,

11   correct?

12   A    Yes, sir.

13   Q    And you signed your contract as a welder,

14   right?

15   A    Yes, sir.

16   Q    And Mr. Llanos Miranda signed his contract to

17   be the helmsman, correct?

18   A    Yes, helmsman/mariner.

19   Q    And that was a day that you saw him, right?

20   A    Yes, sir.

21   Q    And you by being a crew member aboard the Fat

22   Crow, you knew that Mr. Llanos Miranda was in fact

23   the helmsman, right?

24   A    Well, he signed as that.  I didn't know him as

25   a helmsman, but he signed as a helmsman/mariner.

1    Q    You have personal knowledge that he was the

2    helmsman aboard the Fat Crow while you were there,

3    isn't that correct?

4    A    Yes, sir, of course, his duties were those.

5    Q    And he was -- you were with him the day he

6    signed his contract to be the helmsman, right?

7    A    Correct, yes, sir.

8    Q    So any conversations that Mr. Llanos Miranda

9    had with anybody else prior to that day, you would

10    have no personal knowledge because you hadn't met

11    him, right?

12    A    Yes, sir.

13    Q    Now, you indicated there came a point in time

14    where Captain Bilarkazar had asked you about

15    constructing a compartment in the front of the ship?

16    A    No, sir, the one who spoke to me about that

17    was Mr. Hector Favio.

18    Q    But Captain Bilarkazar was the captain at the

19    time, right?

20    A    Yes, sir.

21    Q    So the conversations you had with Hector Favio

22    would have occurred on the Fat Crow as well, isn't

23    that right?

24    A    No, the thing is when Mr. Hector Favio told me

25    about the stash compartment, the gentleman was no

1     longer there present.  When we signed the contract

2     we signed the contract and he talked to me about the

3     tickets that we were going to travel on the next

4     day, that's when he told me -- that's when he told

5     me to go looking for a place that when I went on

6     board to start looking for a place for --

7     Q     For the secret compartment?

8     A     Yes, for the stash compartment.

9     Q     And these were conversations you had with

10    Hector Favio, right?

11    A     Right there present all of those of us who

12    were going to travel were already there.  There was

13    Llanos, there was Mr. Felipe, and I was there and

14    the first officer who was coming was there as well

15    whose name I don't know because he went to Santo

16    Domingo.

17    Q     All right.  My point is there may have been

18    people present, but these conversations you were

19    having with Mr. Favio about the secret compartment,

20    correct?

21    A     Yes, sir.

22    Q     As an example, you and I are talking right

23    now, correct?

24    A     Yes, sir.

25    Q     And Mr. Llanos is sitting right over there,

1     isn't he?

2     A     Yes, sir.

3     Q     But he's not part of our conversation, is he;

4     he's just there.

5     A     Yes, okay, but we had all -- we had all --

6     when we all went on board, everybody based on

7     previously meetings already knew that it was going

8     to be done.  When everyone arrived on board they all

9     knew what we were going to -- everyone knew what we

10    were going to do.

11    Q     You keep saying everyone knew, correct?

12    A     Exactly, yes, sir, everyone already knew.

13    Q     Well, you're saying that everyone already

14    knew, but really what happened was Mr. Llanos was

15    present while you had the conversation with

16    Mr. Favio, isn't that right?

17    A     Okay, yes, sir, yes, sir.

18          MR. CASTILLO:  That's correct --

19          THE COURT:  Let him finish his answer, please.

20    Go ahead.

21    BY MR. CASTILLO:

22    Q     So any opinions that you may have formed about

23    what people knew, that's coming from you, isn't that

24    right?

25    A     From me, how so?  If you repeat the question.

1    Q    Well, you're saying everyone knew.  That's

2    what you said.

3    A    No, not that I say it, but once we arrived on

4    board the ship, when we arrived on board the ship

5    previously, meetings had been done and in those

6    meetings that have been done I already knew that it

7    had been talked about as so what was going to be

8    done.

9    Q    All right.  So now you're telling us that

10   there were meetings prior to your arrival with other

11   people, isn't that right?

12   A    Based on, yes, I became aware that there were

13   meetings, there were previous meetings and that I

14   did not take part in those meetings.

15   Q    Right.  And the only reason you may have

16   become aware of those meetings was because somebody

17   told you they occurred, isn't that right?

18   A    How so?  What's the question?

19   Q    Somebody told you meetings had occurred prior

20   to your arrival, isn't that right?

21   A    Logically one finds out, one finds out a month

22   or so.

23   Q    So now you're telling us what your logical

24   conclusions are, isn't that right?

25   A    Not logic, it's the truth.  When we came on

1    board everybody knew what was coming.

2    Q    There is no way you know what somebody else

3    knows, is there?

4    A    Yes, sir, that's right.  But one finds out

5    because other people tell you.

6    Q    That's what I asked you.

7    A    And when we went on board we talked about

8    that, that was going to be done.

9    Q    So that's what other people told you, isn't

10   that right?

11   A    Well, yes, what those that were on board told

12   me, those crew members.

13   Q    Maybe I'm not being clear and I apologize.

14   You were only present with Mr. Llanos the day you

15   signed the contract, isn't that right?

16   A    Exactly, exactly, yes, sir.

17   Q    And when you were present with Mr. Llanos, all

18   you all were doing was signing the contract to work

19   aboard the Fat Crow, correct?

20   A    Yes, but he was there when Mr. Favio told me

21   that I had to find a place to build the stash

22   compartment.

23   Q    All right.  You already told us that and we

24   established that he was there when you were having

25   this conversation with Mr. Favio.

1    A      Yes, sir.

2    Q      Right.  So any of these conversations that

3    somebody told you about, you have no personal

4    knowledge because you weren't there, correct?

5    A      Okay, yes, that's fine.

6    Q      Are we clear?

7    A      Okay.

8    Q      All right.  So I'm asking my questions based

9    upon what you know, what you heard, and what you did

10   based upon the time you were there with Mr. Llanos,

11   okay?

12   A      Yes, sir.

13   Q      Now, your job was to be the welder, correct?

14   A      Yes, sir.

15   Q      So in order to construct this caleta or secret

16   compartment, you were important for that, isn't that

17   right?

18   A      Yes, sir, as a welder, yes, logically.

19   Q      Because as a welder you're responsible for

20   anything having to do with the structure of the

21   vessel, isn't that right?

22   A      Yes, sir.

23   Q      You're required to use special equipment to

24   perform your welding, isn't that right?

25   A      Yes, sir.

1    Q      Now, a person -- you say you've been on the

2    sea your entire life?

3    A      Yes, well, since I was little I've been

4    involved with ships.  Since I started to work.

5    Q      Okay.  And you know because of your experience

6    that a helmsman is a person who steers the vessel,

7    isn't that right?

8    A      Yes, sir.

9    Q      Now, a helmsman is not necessarily a welder,

10   isn't that right?

11   A      Well, in the realm of -- as many times -- a

12   welder could be a helmsman because I many times had

13   to serve as a helmsman, but I'm a welder, I'm a

14   welder by profession, by trade.

15   Q      All right.  So you've done both in your

16   lifetime, isn't that right?

17   A      Yes, sir, I've been a helmsman, I've been a

18   mariner, a welder/mariner, an oiler/welder.

19   Q      So you've done a lot of things aboard these

20   boats, isn't that right?

21   A      I've learned, yes, of course over time, I've

22   learned to do all those things with the number of

23   years I have.

24   Q      In order to be a helmsman aboard a vessel you

25   don't have to be a welder, do you?

1   A       No, you don't have to be a welder.

2   Q       But you had experience in both, right?

3   A       Yes, sir, from my career path traveling along

4   ships.  For example, there were ships that had an

5   opening for mariner but they did not have one for a

6   welder, so they would get me as a helmsman/mariner

7   and I'm a welder.

8   Q       That's what you did on other ships, right?

9   A       Yes, sir.

10  Q       Now, you were going to be the welder aboard

11  the Fat Crow, right?

12  A       Okay, yes, sir.

13  Q       And Mr. Llanos Miranda was not a welder, was

14  he?

15  A       No, sir.

16  Q       Because you were the welder, right?

17  A       Yes, sir.

18  Q       And all the work that you did, according to

19  you, to build this caleta, you did it with other

20  people apart from Mr. Llanos, isn't that right?

21  A       Yes, sir.

22  Q       All right.

23  A       He helped to throw away the trash from the

24  stash compartment.

25  Q       Okay, all right.  Now, you know what you're

1    doing as far as building this compartment because

2    Mr. Favio asked you to do it, right?

3    A      Yes, sir.

4    Q      And when you decided that you could do the

5    job, you needed help to do it, right?

6    A      Logically.

7    Q      Logically the only other people that could

8    help you do that would have been people aboard the

9    Fat Crow, right?

10   A      Yes, sir.

11   Q      So when you're down there constructing your

12   caleta, additional work needs to be done by other

13   people, isn't that right?

14   A      Yes, sir.

15   Q      And so you had other people helping you with

16   the cutting and the construction and the welding,

17   correct?

18   A      No, I would do it all.  My helper was

19   Mr. Chasin who also has some awareness of welding.

20   He was not a welder per se, but he was the proper

21   person for it.

22   Q      So now the construction of this compartment

23   was done by you and Mr. Chasin were the principal

24   people doing it, right?

25   A      Yes, but under the orders of Mr. Walter always

 1    who was our chief in the engine room.

 2    Q      All right.  And we heard about Walter and he

 3    was there and he was in charge of you, right, he

 4    could give you orders as the first officer down

 5    there, isn't that right?

 6    A      Yes, because he's my superior.  I was under

 7    his orders on the ship, yes.

 8    Q      And above him was Mr. Bilarkazar, right?

 9    A      Well, yes, because he's the one who gave the

10    order.

11    Q      So the way it would work is the orders could

12    come from the captain down to Walter, right?

13    A      Those are two different departments.  The

14    captain gives the orders on everything related to

15    the deck.  The captain is the maximum authority of

16    the ship.

17    Q      Okay.  I'll let you finish, but let's stop

18    there.  The captain is the ultimate authority on the

19    ship, right?

20    A      Yes.

21    Q      Correct?  You've got to answer out loud.

22    A      Yes, sir.

23    Q      Okay.  And the captain can tell everybody on

24    the ship what to do, isn't that right?

25    A      Yes, sir.

1    Q    The captain can tell you what to do --

2    A    But, I'm sorry, but he first has to talk with

3    the chief engineer who is my boss, so that way.

4    Q    Well, he doesn't have to, he can tell you what

5    to do and you're required to do it, right?

6    A    No, but it's also under the orders of the

7    boss.

8    Q    Well, okay.  In this case we know, according

9    to you, captain talked to Walter, right?

10    A    Yes, sir.

11    Q    And he would talk to Walter before making any

12    decisions about what you all were doing in this

13    secret compartment, right?

14    A    We're not understanding each other.  Or I'm

15    not understanding this well.  The thing is the chief

16    engineer is my boss.  He's my boss.  And so the

17    captain is the ultimate authority.  And then for the

18    captain to order me, he has to talk to the chief

19    engineer and then he's my boss and he orders me.

20    Q    All right.  Let me ask you this.

21    A    So now I'm sorry, I'm sorry, now if the chief

22    engineer had orders from Mr. Hector Favio, then in

23    that situation the captain is a bit to the side

24    because he has to do what Mr. Hector Favio told him.

25    Q    So the answer to my question is the captain

1    tells Walter, the chief of the mechanics, what to

2    do; is that right?

3    A        The captain can never tell the chief what to

4    do because those are two different departments.

5    There is the engineering and then there is the deck.

6            THE COURT:  We've been over this.  Let's move

7    on.

8    BY MR. CASTILLO:

9    Q        All right.  Walter is your boss, right?

10   A        Yes, sir.

11   Q        And Walter was down in the secret compartment

12   watching with you and Mr. Chasin doing what you were

13   doing, right?

14   A        No, sir, Mr. Walter was in the engine room

15   doing his work over there and he gave me the orders

16   for me to do the work in the stash compartment with

17   Mr. Chasin.

18   Q        What I'm getting to here is that Mr. Llanos

19   Miranda did not help you put the compartment

20   together, did he?

21   A        But he did help many times, he did help many

22   times.

23   Q        Well, you told us he went down there to clean.

24   A        He didn't go inside to work with me, but he

25   helped from outside because we had to place an

1    extractor and many times he had to be checking on

2    the extractor so that we could work in there.

3    Q    So he was in essence helping you put this

4    compartment together because what other people told

5    him to do including yourself, isn't that right?

6    A    Well, like I said, he was doing that because

7    he knew he had to help because he already knew that

8    I -- like the other people, he knew we were going to

9    do that trip so he had to help with what I told him.

10   Q    Well, he knew he was on a trip on the Fat Crow

11   with you, right?

12   A    Yes, of course.

13   Q    And while you were doing your work, you told

14   us that he helped clean and do some other stuff that

15   you asked him to do, right?

16   A    Yes, like I said yesterday before building the

17   stash compartment we had to clean all that dirt out

18   of there and I was in there with Eduardo cleaning

19   all that and they were helping from outside.

20   Q    And how long did it take you and Mr. Chasin to

21   actually complete this secret compartment?

22   A    The time?  Almost a month, a month or so we

23   took.

24   Q    So this job took you a month to complete

25   aboard the Fat Crow, isn't that right?

1    A       Yes, because we had to work in intervals, not

2    continuously, because we had to come out to get air.

3    Q       I understand.  All right.  And the Fat Crow

4    was underway when all this was going on, isn't that

5    right?

6    A       No, we were anchored, anchored.

7    Q       You're still anchored?

8    A       Yes, anchored.  The stash compartment was

9    completed when we were anchored in Santo Domingo.

10   Q       And whatever you did in Santo Domingo with the

11   caleta, there were never any drugs put there at that

12   time, isn't that right?

13   A       No, sir.

14   Q       Okay.  And you indicated you had asked

15   Mr. Favio for $5,000 additional to do this work?

16   A       Not Mr. Favio.  Not Mr. Favio.  Not Mr. Favio.

17   Q       Who was it?

18   A       It was Mr. Julio.

19   Q       And Julio also had conversation with Hector

20   Favio too, right?

21   A       No, because Julio was in Santo Domingo and

22   Hector Favio was over in Colombia.  So I don't know

23   if they talked on the phone or what.

24   Q       That's my point, there could have been

25   conversations but you weren't there, isn't that

1   right?

2   A       No, sir.

3   Q       So anything you learned about Mr. Julio and

4   Mr. Hector Favio would have been somebody told you

5   that, right?

6   A       Well, yes, because I did not hear what they

7   spoke, if they spoke.

8   Q       So the answer to my question is yes.

9   A       But then you can deduce that there was a

10  connection because Mr. Favio told me to find the

11  spot and when I got to Santo Domingo the man who

12  received us, Mr. Julio, he arranged to meet with me

13  on land with me and Mr. Chasin to find out about the

14  stash compartment.  So there you could suppose that

15  there was a connection between them.

16  Q       Let's do this.  When I ask you a question

17  that's yes or no, it doesn't mean yes and then give

18  us history of everything you've already told us up

19  to this point.  I got it the first time.  I'm trying

20  to go forward.

21          All right.  So we're docked in Santo Domingo

22  and all this work is going on, right?

23  A       Yes, sir.

24  Q       Then there came a point in time where in the

25  middle of June the captains change, right?

1    A       Yes, sir.

2    Q       And up until that time -- by that time this

3    caleta had already been put together, isn't that

4    right?

5    A       Yes, sir.

6    Q       All right.  And you already told us there were

7    nothing to do with drugs at this point to this time

8    when the captains change, right?

9    A       Yes, sir.

10   Q       Now, there came a point in time later where

11   you had another contact with Hector Favio, isn't

12   that right?

13   A       Yes, sir.

14   Q       And that would have been -- well, you tell us,

15   when was the next time you saw Hector Favio?

16   A       Well, the first time on board?

17   Q       That's when -- on board when.  I'm asking the

18   dates.

19   A       No, the dates?  I don't remember the date

20   exactly.  I really don't remember exactly the date,

21   I don't remember exactly to say it as such.

22   Q       Just so we're clear, when I talk about this

23   meeting with Hector Favio, the first one, I'm not

24   talking about the one you had in April before you

25   signed the contract for the Fat Crow.  I'm not

1      talking about that one.

2      A      I know that it's not that one.

3      Q      I'm talking about -- the captains changed in

4      the middle of June, then there came a point in time

5      where Hector Favio showed up aboard the Fat Crow,

6      correct?

7      A      Yes, sir.

8      Q      And you spoke to Hector Favio, isn't that

9      right?

10     A      Well, he spoke with all.  He spoke with

11     everyone.  He gathered everyone together.  He

12     gathered us all together.

13     Q      All right.  Let's assume for a minute you're

14     Mr. Hector Favio right now and you're talking to

15     everybody in this courtroom and telling us what you

16     have to say.  Was that how it happened when

17     Mr. Favio spoke to you all?

18     A      Well, he gathered us together, he arranged to

19     meet us all on the bridge.

20     Q      So everybody went up to the bridge and it was

21     smaller bit but similar to how we're situated here,

22     right?  People are there listening to Hector Favio,

23     right?

24     A      Exactly, yes, sir.

25     Q      So Hector Favio was talking to everybody,

1     isn't that right?

2     A       Yes.  Yes, sir.

3     Q       And he was telling everybody this is what I

4     want to do.

5     A       Yes, sir.

6     Q       And he said something to the effect we're

7     going to pay you to do this, isn't that right?

8     A       Yes, sir.

9     Q       So you were just listening, not like you had a

10    choice to respond, isn't that right?

11    A       How is that question?

12    Q       Well, Mr. Favio is talking to the crew on the

13    bridge, right?

14    A       Exactly.  And we were all listening to what he

15    was proposing to us.

16    Q       You were all listening to what he said, right?

17    A       Exactly, yes, sir.

18    Q       Then there came a point in time where he took

19    you into a separate room, isn't that right?

20    A       One minute.  Let's clarify this well.  After

21    he spoke with us, after he proposed the business to

22    us, afterwards he called us one by one to agree to

23    the price we were going to charge for them.

24    Q       Well, you know that he called you in to

25    discuss the price that you were going to negotiate

1    with him, right?

2    A     Exactly.  But he spoke saying that a drug trip

3    was going to be done in front of everyone that was

4    there.

5    Q     He spoke to everyone and told everybody that

6    that's what was going to happen, right?

7    A     Yes, sir.

8    Q     And then you know -- I'm talking about what

9    you did, you eventually went in and spoke to Favio,

10   you and he alone, right?

11   A     Yes, because afterwards he said each one come

12   one by one to see how much each one is going to

13   charge for doing the trip.

14   Q     This is about the third time you've told us

15   that.

16        THE COURT:  Mr. Castillo, ask questions,

17   please.

18   BY MR. CASTILLO:

19   Q     I'm asking what you did, not what everybody

20   else did.  Okay?

21   A     Well, I went in and I spoke with him and I

22   charged him $150,000 for doing the trip.

23   Q     That's what I'm asking.  You and he alone are

24   discussing amounts of money, right?

25   A     Exactly.

1  Q  And nobody else was in the room when you were
2  talking to Mr. Favio, right?
3  A  Yes, the two of us, yes.
4  Q  And then when you were done talking to
5  Mr. Favio, you left the room and went outside with
6  the rest of the crew, right?
7  A  And another one went in.  And then another.
8  And one by one they went in.
9  Q  And another crewman went in and spoke to
10  Mr. Favio by themselves, isn't that right?
11  A  Yes, sir.
12  Q  And you couldn't hear what they were
13  discussing, could you?
14  A  No, sir.
15  Q  And you're telling us that every crewman had
16  this private meeting with Mr. Favio, right?
17  A  Well, yes, because each one went in, I don't
18  know what they spoke because each one went in to ask
19  for their own price.
20  Q  Well, that's what you understood was going to
21  happen but you didn't hear that, right?
22  A  Exactly, no, I did not hear it.
23  Q  And you believe that because of what happened
24  with you and what you were told before, right?
25  A  No, it's not that I was told -- well, I didn't

1    hear what they spoke, but I saw them go in.

2    Q      That's my point.  You saw Mr. Llanos,

3    according to you, go in and have a private meeting

4    with Mr. Favio, right?

5    A      Yes, sir.

6    Q      But you told us you couldn't hear what was

7    going on in there, right?

8    A      Yes, logically I don't know what it is that

9    they --

10   Q      Because that was a private conversation

11   between the two of them.

12   A      Yes, sir.

13   Q      Now, you assumed that they were talking

14   about --

15         MR. STOUT:  Your Honor, this has been asked

16   and answered several times.

17         THE COURT:  Let's move on.  Let's move a

18   little quicker.

19         MR. CASTILLO:  Yes, Your Honor, he won't

20   answer my questions.

21         THE COURT:  Well, you've asked the same

22   question again and again.

23   BY MR. CASTILLO:

24   Q      All right.  So eventually Mr. Favio leaves the

25   Fat Crow after everybody met with him individually,

1     right?

2     A     Yes, sir.

3     Q     And then about a week later -- how long was it

4     before Mr. Favio came back aboard the Fat Crow?

5     A     One moment, one moment.  After I spoke with

6     him, we all met again together.  After everyone went

7     by he gathered us all together again.

8     Q     Okay.  And eventually he left, right?

9     A     Yes, exactly.  Excuse me, excuse me, let me

10    explain well.  He gathered us all and based on what

11    each one had asked for, he found that the trip would

12    be too expensive.  We were all there together and he

13    said what each one of you has asked for, it's too

14    high, the price for the trip.  So then I'm going to

15    talk with my boss to see what he says about the

16    price you're asking for.

17    Q     Okay, I'm going to ask you a question -- I

18    don't need to know all this again.  When Mr. Favio

19    got you all together again, he just talked to you

20    all, isn't that right?

21    A     Yes, sir.

22    Q     He told the group what you just told us, isn't

23    that right?

24    A     Yes, sir.

25    Q     It wasn't that he was expecting answers from

1    anybody, he just simply told everybody this is what

2    I see, isn't that right?

3    A      Yes, sir.

4    Q      And then eventually he left, right?

5    A      Yes, sir.

6    Q      And then how long was it before he came back

7    aboard the Fat Crow?

8    A      Well, yes, more or less about a week or so,

9    about a week or so.

10   Q      All right.  So a week later he comes back

11   aboard the Fat Crow, right?

12   A      Yes.

13   Q      And this would have been about early August of

14   this year?

15   A      Like I said, the dates, exact dates, I don't

16   have them, I don't know them, but he came back and

17   compared to like the first time when he left when he

18   came back in the span of about a week.

19   Q      So about a week after -- a week later he comes

20   back aboard the Fat Crow, right?

21   A      Yes, sir.

22   Q      And again, according to you, he gathers the

23   crew together on the bridge, right?

24   A      Yes, sir.

25   Q      And then he talks to everybody, right, as a

1   group?

2   A       Yes, sir.

3   Q       And he tells you what happened with his

4   bosses, right?

5   A       Yes, well, he said that what was being charged

6   was a lot and --

7   Q       You already told us that.  What I'm asking you

8   is now when he tells you all this, he then meets

9   with you individually again, isn't that right?

10  A       The thing is he brought another offer, he

11  brought another offer.

12  Q       Okay.  But he talked to you as a group, right?

13  A       In group, yes.

14  Q       And then he again pulled you individually into

15  a room.

16  A       Yes, sir.

17  Q       You know that because you spoke to him

18  individually, right?

19  A       Yes, sir.

20  Q       And there was nobody else there in that

21  meeting, right?

22  A       No one, just us.

23  Q       You and Mr. Favio, right?

24  A       Yes, sir.

25  Q       And then you all talked, right?

1    A        Yes, sir.

2    Q        And you made an agreement of some type with

3    Mr. Favio, right?

4    A        Well, yes.

5    Q        Okay.  And then eventually you left the room,

6    right?

7    A        Yes.

8    Q        And then you saw another crewman go in and

9    speak to him, right?

10   A        Yes, sir.

11   Q        Now, even though -- and you couldn't hear what

12   they were talking about, right?

13   A        Yes, correct, I could not.

14   Q        But in your mind you probably figured they

15   were talking about the same thing that he'd spoken

16   about with you, is that right?

17   A        Correct, yes, sir.

18   Q        And every crewman individually went and spoke

19   with Mr. Favio, right?

20   A        Correct, yes, sir.

21   Q        And then when all that was done, he came back

22   out and spoke to you all as a group, right?

23   A        Yes, sir.

24   Q        And then he eventually left the Fat Crow

25   again, right?

1    A      Yes, sir.

2    Q      And Mr. Favio came back about a week later

3    another time, right?

4    A      Yes, sir.

5    Q      And then again he gathered you all up in a

6    group on the bridge?

7    A      Yes, sir.

8    Q      And he came to you as a group with another

9    offer, right?

10   A      Yes, sir.

11   Q      And then again individually you went in and

12   spoke to him again, right?

13   A      Yes, sir.

14   Q      And in that third meeting, the third one, your

15   meeting with Mr. Favio and you make a final

16   agreement, isn't that right?

17   A      Yes, sir.

18   Q      That's when you indicated that he was going to

19   -- it was to be $37,500 for you?

20   A      $30,000.

21   Q      $30,000.  Okay.  And then you were going to

22   get 30 percent up front, right?

23   A      Yes, 30 percent which was $10,000.

24   Q      And so he told you -- Mr. Favio told you and

25   you understood that you were going to get $10,000 up

1    front and eventually you gave him information of

2    where to send the money, right?

3    A    Yes, sir.

4    Q    And on that occasion you formed an agreement

5    with Mr. Favio to do this drug venture, right?

6    A    Yes, sir.

7    Q    That was a decision you made, you and

8    Mr. Favio alone, right?

9    A    Yes, sir.

10   Q    And then eventually you left and every other

11   crewman went in and met with him individually,

12   right?

13   A    Correct, yes, sir.

14   Q    And just like before, you could not hear what

15   each person talked -- what they discussed with

16   Mr. Favio, isn't that right?

17   A    Yes, sir.

18   Q    And eventually all those meetings ended and

19   they all came back as a group on the bridge, right?

20   A    Yes, sir.

21   Q    Okay.  Now, Mr. Favio then leaves, right?

22   A    Yes, Mr. Favio leaves, but he left it clear

23   that night we were going to load the --

24   Q    I'm getting there.  He leaves, but you have an

25   agreement with Mr. Favio that you're going to

1    participate in this illegal activity, right?

2    A    Yes, sir.

3    Q    And we all know that later on that night other

4    boats came with 75 packages, isn't that right?

5    A    Yes, sir.

6    Q    Now, when this exchange happened with these

7    packages, the Fat Crow was out at sea, right?

8    A    Yes, we were anchored.  Always the ship was

9    always anchored.

10   Q    But you were out at sea, right?

11   A    Yes, logically.

12   Q    But you weren't docked at a port, right, you

13   were out at sea?

14   A    When you say you're anchored, it's because

15   you're not at the dock.

16   Q    I got you.  But the point is when the packages

17   arrived, every crew member went out and helped put

18   the packages aboard the vessel, right, the Fat Crow?

19   A    Correct.

20   Q    And all those packages ended up in the caleta

21   that you constructed with Mr. Chasin, correct?

22   A    Correct.

23   Q    And you did all the welds to cover it and to

24   seal it, isn't that right?

25   A    Correct.

1    Q      All right.  Now, when you did that, Mr. Llanos

2    was not there with you, right?

3    A      No.

4    Q      Mr. Llanos as far as you know was back at the

5    helm steering the vessel, right?

6    A      Can I explain?  When the stash compartment was

7    sealed, each one went to prepare for the trip.

8    Q      Okay.  But my point is you're doing your work

9    sealing up the compartment with Mr. Chasin, correct?

10   A      Mr. Walter and Chasin were the ones who stayed

11   sealing.  I came to do other welding work in the

12   engine room while they finished sealing it.

13   Q      Okay.  So it was Walter and Chasin that were

14   sealing the packages?

15   A      No, the stash compartment, the hole for the

16   stash compartment.

17   Q      That's what I said, the packages that were put

18   in the secret compartment and Walter --

19   A      Exactly, we had to close it.

20   Q      When you say "we," that was Walter and Chasin

21   that were closing the compartment, right?

22   A      Exactly, yes.

23   Q      Because you just told us you went to do other

24   work on the engines on another part of the vessel,

25   right?

1    A       At the engine, yes, because exactly, those

2    were my duties as a welder and each one went to do

3    their duties in their areas.

4    Q       So Mr. Llanos would have resumed his duties as

5    a helmsman, right?

6    A       Yes, sir.

7    Q       Okay.  I think you told us yesterday the Fat

8    Crow needed a lot of work, right?

9    A       Yes, sir.

10   Q       And you knew that the Fat Crow was in very

11   poor shape mechanically, isn't that right?

12   A       But the one who had to make that decision was

13   not me, that was the chief engineer, the chief

14   engineer was the one who had to make that decision.

15   I was just a welder.

16   Q       You just did what you were told, right?

17   A       Yes, sir.

18   Q       But you knew that the Fat Crow needed a lot of

19   work because it was in poor condition, right?

20           THE COURT:  Okay, this has been asked and

21   answered.  Let's move on and conclude, please.

22   BY MR. CASTILLO:

23   Q       All right.  Then there came a point in time --

24   all right.  Everybody goes about their business and

25   then eventually the Coast Guard arrives, right?

1    A       Yes, sir.

2    Q       And eventually the compartment is opened and

3    found and eventually you and the other crew are

4    arrested, right?

5    A       Yes, sir.

6    Q       And you, when you arrived here you were

7    appointed a lawyer, correct?

8    A       Yes, sir.

9    Q       And your lawyer helped you in your involvement

10   in this case, right?

11   A       Yes, sir.

12   Q       And you discussed everything about the case

13   with your lawyer including all the evidence,

14   correct?

15   A       Well, the evidence -- they found the drugs,

16   yes.

17   Q       Well, but you also -- you reviewed police

18   reports and photographs and videos that were given

19   to your lawyer in this case, didn't you?

20   A       Yes, sir, he showed them to me.

21   Q       And among the information that you discussed

22   with your lawyer was reports from the Coast Guard

23   and statements of other defendants, right?

24   A       No, he showed me the welding, the welding.  He

25   showed me the welding that had been on there.

1    Q      Were you shown a bunch of documents in English

2    that were eventually translated for you?

3    A      Yes, yes, it wasn't translated, it was in

4    English.  He explained it to me.

5    Q      Okay.  And among those documents that were

6    read to you were statements of the other defendants

7    in this case, right?

8    A      He didn't tell me whether there were

9    statements made by the other co-defendants.  There

10   were other statements.

11          MR. CASTILLO:  Your Honor, may I approach the

12   witness?

13          THE COURT:  You may.

14   BY MR. CASTILLO:

15   Q      I would like to show you what has been

16   premarked as -- what has been premarked as Llanos

17   Exhibit 4 and ask you to take a look at that.

18   A      Yes, this.  This.  Of course.

19   Q      Okay.  Are these your initials at the bottom

20   of every page?

21   A      Yes, sure, of course, they are.

22   Q      This document is in English.  You don't read

23   English, do you?

24   A      No, sir.  No, sir.

25   Q      This document was translated for you by your

1    lawyer or an interpreter, isn't that right?

2    A       Yeah, they explained the charges to me.

3    Q       You already told us you can't read English.

4    Can you read Spanish?

5    A       Yes, the Spanish I can read.

6    Q       How far did you go in school, sir?

7            MR. GAMMONS:  Objection; relevance, Your

8    Honor.

9            THE COURT:  I'll sustain.  If you would go

10   back to the podium, I'd appreciate it.

11   BY MR. CASTILLO:

12   Q       This document here, is that your signature on

13   the last page?

14   A       Yeah, this is it, yes.

15   Q       And you remember going in front of a

16   magistrate judge and entering your plea of guilty?

17   A       Yes, of course, yes, yes.

18   Q       It was a courtroom like this one?

19   A       Yeah, yeah, here, here.

20   Q       You went in front of another judge who went

21   over this document with you?

22   A       Yes, I pled guilty, right?

23   Q       My point is this document was what was

24   discussed with you in court when you pled guilty,

25   right?

1    A      Yes, sir.

2           MR. CASTILLO:  Your Honor, at this time I'd

3    move Defendant Llanos Exhibit 4 into evidence.

4           MR. GAMMONS:  No objection.

5           THE COURT:  I'll receive into evidence --

6    what is that, the plea agreement?

7           MR. CASTILLO:  Yes, Your Honor, it's the plea

8    agreement.

9           THE COURT:  I'll receive in evidence Llanos

10   Exhibit 4.

11          MR. CASTILLO:  If I may have a moment, Your

12   Honor?  Your Honor, at this time I'll pass the

13   witness.

14          THE COURT:  Mr. Martinez?

15                    CROSS EXAMINATION

16   BY MR. MARTINEZ:

17   Q      Good morning, Mr. Venera.

18   A      Good morning.

19   Q      I represent Mr. Mendoza.  You were the welder

20   on board the Fat Crow, correct?

21   A      Yes, sir.

22   Q      So it would or should not be surprising to us

23   if we found your fingerprints on the welding rod or

24   your DNA on the glove next to it, correct?

25   A      Okay, correct.

1    Q      Because you handled those items, did you not?

2    A      Yes, sir.

3    Q      And you also have testified that Mr. Chasin

4    assisted you with welding.  Did he also handle those

5    objects?

6    A      Yes, sir.

7    Q      Now, I want to review with you the basic

8    propositions -- some basic propositions.

9    A      Okay.

10   Q      You say that initially there was in effect an

11   announcement of an opportunity to participate in a

12   drug transaction, right?

13   A      Yes, sir.

14   Q      And that announcement asked everyone to go to

15   the bridge that was interested in hearing out some

16   leader in the drug trafficking organization, right?

17   A      Yes, sir.

18   Q      That's a major point that you are asking this

19   jury to believe, right?

20          THE COURT:  Ask another question.

21   BY MR. MARTINEZ:

22   Q      That's your testimony, right?

23   A      Yes, sir.

24   Q      Now, it is also proposed by you that each

25   person on the crew met privately with a drug

1    representative to try to negotiate a payout for

2    their participation.

3    A      Yes, sir.

4    Q      It is a third proposition that you contend

5    that after that, everyone was summoned to a second

6    meeting with a drug representative from the cartel,

7    correct?

8    A      Yes, sir.

9    Q      And then it is your fourth proposition that it

10   was announced that the collective request of money

11   was too great from the crew, everybody had to come

12   down and ask a lesser amount.

13   A      Explain to me about this fourth proposition

14   because there were only three propositions that were

15   made.

16   Q      Let's forget the word proposition for a moment

17   and let's substitute the word this is what you say.

18   Okay?

19   A      There were three -- you're telling me a

20   fourth.

21   Q      Stop counting, okay.  We talked about the

22   original offer, right?

23   A      Yes, sir.

24   Q      Which was the meeting that everybody you say

25   attended in the bridge.

1    A       Yes, sir.

2    Q       You talked about the private meetings with the

3    drug cartel representative to try to negotiate

4    individual prices.

5    A       Yes, sir.

6    Q       You talked about another group meeting where

7    purportedly a statement was made by the drug

8    representative that the collective amount of money

9    being requested was too much, right?

10   A       Yes, sir.

11   Q       You also talked then about another individual

12   meeting with purportedly each member of the crew to

13   offer yet a lower price, right?

14   A       Yes, sir.

15   Q       And then finally, according to you, all

16   individual crew members reached an agreement as to

17   what they were going to get paid by the drug cartel.

18   A       Yes, sir.

19   Q       And then finally, you say, when the 75

20   packages of cocaine arrive, each and every crew

21   member participated in assisting to load those

22   packages on board the Fat Crow, correct?

23   A       Yes, sir.

24   Q       And that's basically what you're saying,

25   correct?

1    A        Yes, sir, because I was there.

2    Q        Now, in terms -- let's talk now about other

3    evidence that would support these contentions.  You

4    drove over here -- strike that.  You are aware that

5    Mr. Chasin is a cooperating defendant, are you not?

6    A        Yes, sir.

7    Q        You are aware that Captain Barrios is a

8    cooperating defendant, are you not?

9    A        Yes, sir.

10   Q        You are aware that Mr. Acuna is a cooperating

11   defendant, are you not?

12   A        Yes, sir.

13   Q        And obviously you are aware of your own

14   position here today as a cooperating defendant,

15   correct?

16   A        Yes, sir.

17   Q        And you individuals collectively are four,

18   correct?

19   A        Yes, sir.

20   Q        And assume with me that these other three

21   individuals are saying the exact same thing.

22   A        Uh-huh.

23   Q        Now, let's talk about who's left.  Obviously

24   the two defendants on trial have a position as to

25   what the truth is here, correct?

1    A        May I speak?  Well, the truth?  I'm speaking

2    it.

3    Q        I understand you're professing to speak the

4    truth.  But I'm talking about you agreeing with me

5    that besides you four cooperating defendants, there

6    are other people that know what happened on that

7    boat, right?

8    A        Yes, sir, of course, yes.

9    Q        And two of those people are sitting right

10   there, right?

11   A        That are what?  What's the question?

12   Q        Two of those individuals are right there in

13   orange in front of you, right?

14   A        Yes, of course, that two.

15   Q        And that leaves how many left?

16   A        There are two.

17   Q        Two more or three more?

18   A        No, two, because we're nine.

19   Q        Okay.  And who are the other two, what are

20   their names so we know what their names are?

21   A        Mr. Walter Mercado -- Walter Americo.  Walter,

22   the chief engineer.  And the other one, the second

23   engineer, I don't know his name because I don't know

24   him very well.

25   Q        Now --

1    A       Those are the two that according to what I

2    understand are --

3            MR. GAMMONS:  Objection.

4            THE COURT:  Sustained.  Ask another question.

5    BY MR. MARTINEZ:

6    Q       All right.  Now, you've entered into a plea

7    agreement, right?

8    A       Yes, sir.

9    Q       And it was shown to you by Mr. Castillo?

10   A       Excuse me?

11   Q       It was shown to you by Mr. Castillo.

12   A       Who is Mr. Castillo, who is that?

13   Q       This guy right here?

14   A       Oh, yes, sir.

15   Q       The guy that asked a lot of questions.  All

16   right.  The date that you signed this plea agreement

17   is November 20th of this year, correct?

18   A       Yes, I think so.

19   Q       Do you happen to know the dates that

20   Mr. Chasin signed his plea agreement?

21   A       No, sir.

22   Q       What about Captain Barrios?

23   A       I don't know the date either.

24   Q       And Mr. Acuna, do you happen to know the date

25   that he signed his plea agreement?

1    A       Neither, no.

2    Q       Do you know if Captain Barrios was first to

3    sign a plea agreement?

4    A       No, sir, no, I'm not aware of that.

5    Q       When you were on the Fat Crow, you've already

6    conceded that Captain Barrios was the ultimate

7    authority, correct?

8    A       Well, yes, because that's how it is.  On a

9    ship the captain is the maximum authority, then each

10   department.  And since I'm under the engine

11   department, my boss is Chief Engineer Walter.

12   Q       But as it relates to your experience with

13   Captain Barrios, he was the guy ultimately at the

14   top that was calling the shots.

15   A       In his department.  In his department, yes.

16   But the captain can't give orders in the engine room

17   because he don't know anything about the engine.

18   Q       With the proviso that the captain can't give

19   orders to the engine people, he's at the top, right?

20   A       Yes, sir.

21   Q       Okay.  Now, when -- you have mentioned a

22   couple of times that the Fat Crow was at sea, do you

23   remember that?

24   A       Yes, sir.  The whole time that it remained at

25   anchor since we boarded.

1    Q    You also mentioned that at times you were not

2    at the dock, do you remember that?

3    A    No, it was never at the dock.  Always since we

4    boarded it was always anchored, always anchored.

5    Q    So here's my question.  When you say that the

6    Fat Crow is at sea, are you suggesting that it's

7    anchored just a little bit from the dock where all

8    you have to do is take a dinghy to go on and off, or

9    are you suggesting that we're in the middle of

10   international waters?

11   A    Well, when one says that a ship is anchored,

12   it can be many, many miles from land that you can't

13   see land at all.  As a matter of fact, to get to the

14   place where we were anchored, according to what they

15   said, but from land it took them two hours to get to

16   -- by motorboat to get to where we were anchored.

17   Q    And the captain would have the authority to

18   allow people to take that trip to land and come

19   back, correct?

20   A    Well, the only ones that went to land were the

21   captain and Mr. Jair were the only ones that went to

22   land.  And the cook who one time went out to look

23   for food.

24   Q    So according to you, my client was able to

25   leave the ship for a period of time with either the

1    blessings of the captain or with the captain,

2    correct?

3    A       He left with permission of the captain, yes.

4    Q       Now, when the drugs are purportedly brought on

5    board the boat, how far from land is the Fat Crow at

6    that point in time?

7    A       It was far, it was far, like I said, it was

8    far.  As a matter of fact, we were so far that there

9    wasn't even cell phone signal.  There wasn't a

10   signal.  There was no cell signal.

11   Q       So according to you, it was in the middle of

12   nowhere.

13   A       Not in the middle of nowhere, but we were far,

14   we were far, we were far from reaching land.  It was

15   far.

16   Q       The location of the purported drug transfer,

17   okay, and how far away it was from land, that's --

18   that it was in the middle of nowhere, that is your

19   testimony, right?  That's your testimony, right?

20   A       Not that it's my testimony.  That's how it is,

21   that's how it is.

22   Q       Now, when you were ultimately interdicted by

23   the Coast Guard there was a period of time in

24   advance of that interdiction when the Coast Guard

25   was noticed, isn't that right?

1    A       Well, yes, when they located us, the

2    helicopter, it flew around the boat, yes.  Then the

3    helicopter left and the Coast Guard remained behind

4    the ship for about two days, three days, I believe.

5    Q       I meant to ask this earlier.  Was there a

6    period of time like two weeks or 15 days when

7    Mr. Mendoza was not on the boat?

8    A       Well, there was a time with permission of the

9    captain that he went to land to -- it had to do with

10   some fuel that had been sold and that had been

11   negotiated and he went to go collect that money, so

12   he went.  But he took longer than what the captain

13   had told him to take.

14   Q       But my question to you was wasn't it an

15   approximate two weeks or 15-day period of time?

16   A       No, two weeks, no.  No, he took about 10 days,

17   10 days, 10 days about.  I don't know the exact

18   number of days, but he did take longer than a week.

19   On land he took.

20   Q       Now, back to noticing the Coast Guard.  It's

21   two or three days from the date that you see a

22   helicopter or see a vessel of the Coast Guard to the

23   time where they actually board the Fat Crow and

24   arrest everyone, right?

25   A       Well, I can explain.  The helicopter left.

1       And the Coast Guard was following behind us at a

2       certain distance.  Then after about two or three

3       days we had an outage with the engine and then the

4       ship had stopped, we were adrift.  So that's when we

5       were boarded.

6       Q       So you see the helicopter.

7       A       Yes, sir.

8       Q       A mechanical problem causes the boat to become

9       dead in the water.

10      A       Yes, because there was some damage to the

11      engine and we were left without an engine and we

12      could no longer continue traveling.  So then the

13      helicopter came again and then the order was given

14      to board us.

15      Q       I skipped something that I wanted to go over.

16      This building of the secret compartment, in terms of

17      time, okay, was that secret compartment constructed

18      before and completed before Captain Barrios was the

19      captain of the vessel?

20      A       Yes, sir.

21      Q       And that secret compartment was also completed

22      before First Officer Mendoza becomes part of the

23      crew, correct?

24      A       Can I add something?  Can I say something?

25      The stash compartment was made so when Captain

1    Barrios arrived and Mr. Jair Mendoza, yes, Mr. Jair

2    Mendoza observed the stash compartment. They were

3    doing cleaning with Mr. Llanos. Then they noticed a

4    detail because the stash compartment had been made

5    on the starboard side.

6         So then they observed that on the portside

7    there was a similar compartment that had not been

8    sealed that way. So then they observed that hey, if

9    someone comes to check this, they're going to notice

10   that over here it's sealed and over here it's not.

11   It's going to be asked, why is this side sealed and

12   this side not.

13        So because of that, there was a bit of a clash

14   between Mr. and Mr. Walter. Because that side had

15   to be sealed because if they came to check that

16   side, they would see that where the stash

17   compartment was it was sealed and the other one

18   wasn't. So I had to -- I had to go in and seal the

19   other part so that both parts would be the same.

20   And that was already when Mr. Jair was on board and

21   Mr. Martin.

22   Q    All right. So as to my questions, the secret

23   compartment was completed before Mr. Mendoza

24   arrived. And I know you want to add "but he knew it

25   was there anyway," I got that, right?

1    A        Yes, I'm sorry, exactly.

2    Q        All right, now, the captain is there and First

3    Officer Mendoza is there, right?

4    A        Yes, sir.

5    Q        Now, the captain has specific responsibilities

6    and the person right under him is the first officer,

7    correct?

8    A        Yes, sir.

9    Q        And if something happens to the captain, it is

10   the first officer that has to step up to the plate,

11   correct?

12   A        Yes, sir.

13   Q        And so it is the first mate that has to have

14   the ability and the training and the skill to act as

15   a captain in the event, in the eventuality that it's

16   necessary, correct?

17   A        Yes, sir, yes, sir, of course, yes.

18   Q        And it is that specific skill that individuals

19   like that possess that permit them to earn a much

20   better pay than just an average mariner, right?

21   A        Yes, sir, logic.

22   Q        And it is for that same very reason that when

23   everybody has their secret meeting with the drug

24   cartel representative that the individuals with that

25   skill set can demand the most, right?

1    A    Yes, sir.

2    Q    Now, you as a welder started off demanding

3    150, right?

4    A    Yes, sir.  For sure.

5    Q    Do you know what the captain started off

6    asking for?

7    A    No, that I sure don't know, I don't.

8    Q    Everybody's pitch to the drug cartel

9    representative is, according to you, secret, right?

10   A    Yes, of course, each one asks for his price.

11   Q    Right.  So if you're the drug cartel paying

12   off the crew and you only have to pay one person in

13   captain status, then that leaves a lot more money to

14   be divided amongst the others, doesn't it?

15   A    Logically.

16   Q    Now --

17        THE COURT:  Mr. Martinez, we're going to have

18   to recess.  We need to take a morning recess.  We'll

19   be in recess until 5 after 11.  You're welcome to

20   walk around, just don't discuss the case, and leave

21   your pads on your chairs.

22        (The jury retired to the jury room.)

23        THE COURT:  Sir, you may step down.  All

24   right.  We're in recess until 5 after.

25        (Recess was taken from 10:43 until 11:04 a.m.)

1          MR. STOUT:  Your Honor, before we bring the

2     jury back in, could we discuss one thing?  I just

3     wanted to clarify because we're about to finish our

4     case I think with one more witness after this

5     gentleman.

6          We do not plan to call the case agent, Dan

7     Ward, we're going to skip right to our last witness

8     who is another DEA agent but not one to -- he's to

9     testify sort of as an expert, but not on anything

10    particular detail of this case really other than

11    custody of the drugs or something.

12         But your earlier ruling about the mention of

13    the confidential sources, I think in light of the

14    fact that Agent Ward is not going to testify, that

15    prior ruling should stand for the same reasons that

16    Your Honor articulated at the beginning of the

17    trial.

18         THE COURT:  I agree so far.  All right.  Bring

19    the jury in.

20         (The jury returned to the courtroom.)

21         THE COURT:  Mr. Martinez?

22         MR. MARTINEZ:  Thank you, Your Honor.

23    BY MR. MARTINEZ:

24    Q    Mr. Venera, we left off talking about First

25    Officer Mendoza arriving after the completion of the

1     hidden compartment.

2     A     Yes.

3     Q     Now, there was testimony -- first let me do

4     this.  Let me draw your attention to mid-July.  The

5     Fat Crow is somewhere close to Aruba and Venezuela.

6     A     Yes, sir.

7     Q     And there comes a point where the captain goes

8     to land.

9     A     Yes, the captain left, yes.

10    Q     And at this point in time there are no drugs

11    on the boat.

12    A     No, no, there was nothing.

13    Q     But you and other members of the crew noticed

14    that the U.S. Coast Guard vessel was nearby looking

15    at the Fat Crow, right?

16    A     Well, yes, while on deck I saw, I saw a Coast

17    Guard pass above from afar, but I didn't pay it any

18    mind.

19    Q     Well, it's something you would pay a mind to

20    if you were fixing to go on a drug trafficking

21    venture, right?

22    A     Yes, but since it passed by over there far

23    away, no one paid any attention to it, no one paid

24    any attention to it.

25    Q     Now, it wasn't your job to decide whether or

1    not the drug trafficking venture should be put on

2    hold because the Coast Guard was watching, right?

3    A        Exactly, no, it wasn't.

4    Q        Was it your job?

5    A        No, sir.

6    Q        Now, there had been some testimony about doing

7    some what were called clean loads, do you remember

8    that?

9    A        Yes, sir.

10   Q        So let's set the stage.  The Fat Crow has a

11   secret compartment with nothing secreted it in,

12   correct?

13   A        Yes.

14   Q        The powers that be decide we may do some clean

15   loads first, right?

16   A        Exactly, yes.

17   Q        And the reason that that is able to be

18   considered is because the Fat Crow was operating to

19   anyone that would look at it as a legitimate

20   operation, right?

21   A        Okay, yes.

22   Q        And in fact, it's a tanker ship, right?

23   A        Yes.  Some fuel trips were going to be done

24   first without any drugs.  That's what Mr. Julio told

25   us in Santo Domingo that some trips like that would

1    be done, that the stash compartment would be there

2    and ready but that they were going to do some trips

3    with nothing but fuel.

4    Q    Now, to make a trip with fuel, you've got to

5    get the fuel on board the boat, right?

6    A    Yes, but we were getting fuel, the fuel was

7    being loaded.  The fuel was being loaded and as far

8    as I understand it -- as far as I understood we

9    didn't have the full loads because the owner of the

10   fuel was looking for the cheapest fuel.

11   Q    So while the boat is being loaded with fuel,

12   there are individuals that are legitimately working

13   on or negotiating fuel purchases, right?

14   A    Well, it would be small boats, the fishing

15   ones that would come and bring us the fuel.

16   Q    Right.  So as purchases were negotiated,

17   little boats would come and sell the fuel and put

18   the fuel into the tankers on board the Fat Crow.

19   A    Yes, sir.  Can I say something?

20   Q    If it's in response to one of the questions.

21   But there is no question pending.

22   A    Can I confess something?  It's just that what

23   was related to the load of the boat, it's the first

24   officer that knows that, he's the one who handled

25   that, he and the captain, yes.  They're the ones in

1    charge of that, yes.

2    Q      Right.  Exactly.  It is Officer Mendoza's job

3    to negotiate those fuel purchases and plan for them

4    to be taken to the boat and loaded on board the

5    boat, right?

6    A      And they were the ones who receive it, he and

7    the captain are the ones who would receive the fuel.

8    Q      And every day while the Fat Crow is there

9    since Officer Mendoza arrived, these loads of

10   legitimate gasoline and fuel would arrive and be

11   purchased by the Fat Crow and put in the tanks,

12   right?

13   A      The fuel began to arrive, them being on board

14   already, yes, them being on board already, them

15   being on board, yes.

16   Q      Officer Mendoza arrives, right?

17   A      Correct, yes.

18   Q      There is no drugs on the boat, right?

19   A      No, sir, not yet.

20   Q      The secret compartment has been finished

21   already, right?

22   A      Yes, the stash compartment was ready.

23   Q      It's Officer Mendoza's job to negotiate the

24   purchases of this fuel?

25   A      Yes, sir.  Or any type of cargo that would

1    arrive.  They're the ones in charge of that, yes.

2    Q       And they put the fuel on board the Fat Crow,

3    right?

4    A       Exactly.

5    Q       And if the captain determines -- for whatever

6    the reasons, helicopters in the sky, it's not a

7    lucky day for him, if the captain determines we're

8    not going to do a drug deal, instead we're going to

9    take all the fuel that we've been collecting for the

10   last month and go some place with it to sell it,

11   that's his prerogative, right?

12   A       Yes, logically.

13   Q       So the only advantage of letting Officer

14   Mendoza know about the planned drug trafficking deal

15   is to end up in the circumstance where you're

16   further dividing up the money pie, right?

17           MR. GAMMONS:  Objection; speculation.

18           THE COURT:  Sustained.  Rephrase.

19   BY MR. MARTINEZ:

20   Q       You were not able to get the money you wanted

21   because the drug cartel representative said they

22   didn't have enough to pay everybody what they

23   wanted, right?

24   A       Well, yes, yes, that they did not have enough

25   money to pay the amount that people had asked for,

1      yes.

2      Q      The more people that asked, the more money has

3      to be paid out, right?

4      A      It's not that, it's what each one asked for,

5      it's the amount that each one asked for for doing

6      the trip seemed too expensive for them.

7      Q      But it all adds up to one number.

8      A      Exactly, yes.

9      Q      And that number they're either willing to pay

10     or they say no and negotiate.

11     A      Correct, yes.

12     Q      You already had a captain, right, Captain

13     Barrios, who was on the take, right?

14     A      Yes, sir.

15     Q      You don't need two.  Right?  You just need one

16     captain, right?

17     A      Yes, of course, one captain, but the captain

18     needs a second.

19     Q      Only if something happens to him and he can't

20     perform his duties, right?

21            INTERPRETER:  May the interpreter inquire?

22            THE COURT:  Certainly.

23            THE WITNESS:  The thing is the ship works with

24     shifts and the captain cannot sail a ship by

25     himself.  Each one has to have different

1    responsibilities doing the work of their shift.

2    BY MR. MARTINEZ:

3    Q    So you may have needed Officer Mendoza to help

4    steer or navigate the ship as a first officer,

5    right?

6    A    Yes, sir.

7    Q    But you don't need Officer Mendoza as a member

8    of the drug conspiracy just to further reduce

9    everybody's share, do you?

10   A    You always need two.  Because like I said, the

11   captain can't alone, he always needs another person.

12   Q    Let's fast forward to when you see the

13   helicopter and then two or three days later the

14   Coast Guard interdicts the Fat Crow.

15   A    Exactly, yes.

16   Q    Once you know that you are in the sights of

17   the United States Coast Guard, you have a pretty

18   good idea that the gig is up, right?

19   A    Oh, yes, we have to wait for the search, to

20   see if we'd be boarded, if they found the stash

21   compartment, like that.

22   Q    Right, right, right.  You might get away with

23   it if the U.S. Coast Guard drops the ball and

24   doesn't do the space accountability and doesn't find

25   the secret compartment, right?

1    A       Exactly, logic.

2    Q       That's more of a hope than an expectation,

3    isn't it?

4            THE COURT:  Ask another question.

5    BY MR. MARTINEZ:

6    Q       Now, during that two- or three-day period

7    there is plenty of time for you to have as many

8    conversations as you would like with Mr. Chasin,

9    Captain Barrios, and Mr. Acuna, correct?

10   A       Logically.

11   Q       And after you're arrested by the U.S. Coast

12   Guard there is another two or three days where

13   you're at sea before you get to Tampa, right?

14   A       Could you repeat the question again?

15   Q       Yes.  When you were interdicted by the Coast

16   Guard, they put you and Mr. Chasin and Captain

17   Barrios and Mr. Acuna all in the same room, right?

18   A       Yes, we were all gathered, yes, all of us, all

19   of us were put in one same place.

20   Q       Everybody that the Coast Guard found on the

21   boat was all put in the same room.

22   A       All the crew members, the nine.

23   Q       The nine people, all in the same room.  Now,

24   you've got to get from wherever you are in

25   international waters to Tampa, Florida, right?

1    A        Exactly, yes, we were brought over here.

2    Q        And that journey at sea also took two or three

3    days, did it not?

4    A        So we were brought over here, that took more,

5    that took some 20 days or something at high seas

6    when the Coast Guard had us.  We were on two of

7    Coast Guard ships, we were on one first and then we

8    were transferred to another.

9    Q        Okay.  So it was just the final Coast Guard

10   trip that took two or three days; the one before

11   that took two weeks?

12   A        Yes, yes, the second one, that second one that

13   they put us on, the one that brought us over here,

14   that one took -- yeah, yeah, it took 20 days, it

15   took over 20 days to get us over here to Tampa.

16   Q        I stand corrected.  During that period of time

17   you're not permitted to make any phone calls, are

18   you?

19   A        No, nothing, no.

20   Q        Not even to call your family to tell them

21   whether you're arrive or dead, right?

22   A        Nothing.

23   Q        All you can do is talk amongst yourselves,

24   right?

25   A        Exactly.

1    Q    Now, you ultimately do arrive in Tampa,

2    Florida, right?

3    A    Yes, sir.

4    Q    And you are not immediately taken to this

5    courthouse to get a lawyer, are you?

6    A    No, sir.

7    Q    Okay.  Instead what happens is that the whole

8    crew is interviewed first before they have a lawyer

9    by agents of the United States government, right?

10    A    Yes, sir.

11    Q    So you do not have an opportunity to speak to

12    a lawyer before the government agents are

13    interviewing you, right?

14    A    Yes, sir.

15    Q    So there wasn't a lawyer to advise you to not

16    talk, was there?

17    A    No, there was not an attorney.

18    Q    There was no lawyer to tell you that in the

19    United States you have a right to --

20        MR. GAMMONS:  Your Honor, objection.  I

21    objected, Your Honor, I think it's clear that he did

22    not speak with the lawyer before speaking with

23    agents.

24        THE COURT:  He's answered the question.

25        MR. MARTINEZ:  I'm sorry, I didn't hear you.

1    BY MR. MARTINEZ:

2    Q      You're interviewed with the agent of the

3    United States, okay.  Now, how much time has passed

4    since your arrest, three weeks?

5    A      Yes, thereabouts, more or less.  There we were

6    interviewed and we were taken to the jail over here.

7    Q      During that first interview with the agents

8    from the United States government you could have

9    told that agent at that first interview I'm guilty

10   and this is what happened, right?

11   A      I did not tell him I was guilty or not.  I

12   told him I wanted an attorney to talk.

13   Q      Right.  But you could have accepted your

14   responsibility that day, you could have pled guilty

15   that day, if you chose to, right?

16   A      Exactly, yes, I could have, of course.  But I

17   decided -- I'll talk, but in front of an attorney.

18   Q      I understand.  Turns out you didn't plead

19   guilty until November 20th, less than one month ago,

20   correct?

21   A      Yes, sir, that's right.

22   Q      When you made your first appearance in this

23   federal courthouse to get an appointed lawyer, all

24   the crew was brought over here together, were they

25   not?

1    A      Yes, sir.

2    Q      And it was after your initial appearance in

3    federal court that the United States magistrate

4    judge ordered everybody on the crew detained, right?

5    A      Yes, sir.

6    Q      And each of you have been held in custody at

7    the Pinellas County jail since, correct?

8    A      Yes, sir.

9    Q      Now, there came a point in time where some of

10   you were separated from each other, correct?

11   A      Well, yes, the ones they separated right away

12   were the two that began to cooperate with --

13         MR. GAMMONS:  Objection, Your Honor.

14         THE COURT:  Sustained.

15   BY MR. MARTINEZ:

16   Q      Let me be specific.  Mr. Chasin, Captain

17   Barrios, and Mr. Acuna were not initially at the

18   Pinellas County jail separated from your company,

19   correct?

20   A      Separated?  Yes, I was put into one cell and

21   Chasin into another.  The cell that I had -- Captain

22   Barrios also had it and Bolanos.  We got the same

23   cell -- well, the same yard, but different cells.

24   Bolanos.  But the captain, we had the same cell, the

25   same cell.

1    Q    Okay.  So you and the captain are in the same

2    cell, but all of you in the same yard.

3    A    Yes, in the same yard, yes.

4        MR. MARTINEZ:  May I have a moment, Your

5    Honor?

6    Q    Last question, sir.  This plea agreement,

7    Llanos Exhibit Number 4, the one that I showed you

8    earlier, that's your signature?  You can go to the

9    screen in front of you.

10    A    Yes, sir.

11    Q    And you initialed every page?

12    A    Yes, sir.

13    Q    Indicating that it had been read word for word

14    for you in Spanish?

15    A    Yes, it was explained to me, yes, explained to

16    me.

17    Q    And the U.S. magistrate judge spent 45 minutes

18    or an hour asking you questions about whether you

19    understood it completely; is that right?

20    A    Yes, sir.

21    Q    And you swore under oath to that magistrate

22    judge that you understood it?

23    A    Yes, just like I swore that I would speak the

24    truth.

25    Q    And you're standing on that today, too, you

1    understood everything that's in --

2    A    Yes, sir.

3         MR. MARTINEZ:  No further questions.

4         THE COURT:  Redirect?

5         MR. GAMMONS:  No questions, Your Honor.

6         THE COURT:  Thank you, sir.  You may step

7    down.

8         You may call your next witness.

9         MR. STOUT:  Your Honor, the United States

10   calls DEA Special Agent Daniel McDonough.

11        [Witness sworn]

12        COURTROOM DEPUTY CLERK:  Please be seated.

13   Please state your name and spell your last name for

14   the record.

15        THE WITNESS:  Daniel McDonough,

16   M-c-D-o-n-o-u-g-h.

17                    DIRECT EXAMINATION

18   BY MR. STOUT:

19   Q    Agent McDonough, how are you currently

20   employed?

21   A    I'm employed with the Drug Enforcement

22   Administration, DEA.

23   Q    How long have you been with DEA?

24   A    It will be 12 years in March.

25   Q    What was your first job with the DEA?

1    A        First job I was assigned to Task Force 2 here

2    in Tampa that was also called the methamphetamine

3    group.

4    Q        What sorts of investigations did you work on

5    as part of that group?

6    A        Part of that group was dismantling and

7    preserving evidence from methamphetamine labs.  Also

8    based off of the safety equipment needed we also did

9    indoor marijuana grow cases.

10   Q        How long did you stay with that group?

11   A        I was with that group for approximately three

12   years.

13   Q        After you ended your time with that group what

14   did you do next?

15   A        I was then assigned to Task Force 1 here in

16   Tampa.  That was a group that we primarily focused

17   on cocaine and heroin investigations.

18   Q        What was your day-to-day work like as part of

19   that group?

20   A        No two days were alike.  Consisted a lot of

21   surveillance, undercover work, doing a lot of stuff

22   on the streets, purchasing drugs as evidence in

23   furtherance of investigations.  Conducted search

24   warrants, arrest warrants, stuff of that nature.

25   Q        And how long did you stay with the heroin and

1      cocaine group?

2      A      Approximately two years.

3      Q      After you left that group where did you go

4      next?

5      A      I was assigned to Panama Express North Strike

6      Force.

7      Q      Explain to us in general terms what is the

8      Panama Express North Strike Force.

9      A      It's a multiagency strike force consisting of

10     agents from the DEA; Federal Bureau of

11     Investigations, FBI; Homeland Security

12     Investigations; and Coast Guard Investigative

13     Services, CGIS.

14     Q      What kind of investigations does the Panama

15     Express Strike Force undertake?

16     A      We investigate and target drug trafficking

17     organizations responsible for the maritime movement

18     of illegal narcotics in the Caribbean.

19     Q      Let's talk about your training for a moment.

20     You said you'd been with DEA since 2006 -- or

21     sorry --

22     A      2006, 12 years in March.

23     Q      During that time with DEA have you had any

24     specialized training in conducting drug

25     investigations?

1    A        Yes, sir.

2    Q        Can you explain that to us?

3    A        Started my career at the Drug Enforcement

4    Administration basic agent trainee course in

5    Quantico.  At that time that was a 16-week course.

6    A lot of our training was broken down into pretty

7    much four components.  A lot of classroom work where

8    we were taught subjects such as law, report writing,

9    drug identification, investigative techniques.  We

10   also had tactical training arrests and search

11   warrants.  Spent a lot of time on the range for

12   firearms proficiency.  And then finally, final

13   applications where we were given scenarios to

14   exercise what we were taught in the classroom such

15   as surveillance, conducting interviews, doing

16   undercover operations, and even wire tap operations.

17   Q        Let's talk a little bit about your experience

18   with the Panama Express Strike Force.  In your time

19   with that strike force how many maritime drug

20   investigations have you worked on?

21   A        At least -- over a hundred.

22   Q        Can you explain how a typical investigation

23   for you starts and take us through what it looks

24   like?

25   A        The investigation for us starts with the Coast

1    Guard interdiction.  We are presented the findings

2    from the Coast Guard to present here in the Middle

3    District of Florida evidence for probable cause to

4    arrest the subjects on the vessel.  And then we will

5    coordinate with the Coast Guard to have the crew

6    members, drug evidence, any nondrug evidence, and in

7    some occasions the vessel to be brought here to the

8    Middle District of Florida where we start our

9    processing.

10   Q     After the evidence and the defendants arrive

11   here in the Middle District of Florida, then what do

12   you do?

13   A     We have teams that break off and do multi

14   objectives have to get done when everything comes

15   in.  We have teams that interview the crew members.

16   We have teams that process the drug evidence.  We

17   have teams that process the nondrug and any possible

18   electronic equipment that may come from that.

19   Q     When you have an investigation that involves

20   an interdiction of a vessel by the Coast Guard and

21   they bring them here and the investigation continues

22   here in the Middle District of Florida, what's the

23   ultimate goal of that investigation?

24   A     The ultimate goal is to find out anybody else

25   that's involved in that particular maritime venture.

1    We want to go after who their boss was and start

2    working our way up the chain of command.

3    Q      And if through your investigation you figure

4    out who the bosses are, what do you do with them?

5    A      We'll present the evidence here in the Middle

6    District of Florida to indict them on charges.

7           MR. MARTINEZ:  Objection, Your Honor, as to

8    the relevance of where they go at that stage to this

9    case.

10          THE COURT:  Is this relevant?

11          MR. STOUT:  I can move on, Your Honor.

12          THE COURT:  Thank you.

13   BY MR. STOUT:

14   Q      Does your job involve a lot of travel?

15   A      Yes, sir.

16   Q      To where?

17   A      The majority of my travel --

18          MR. MARTINEZ:  Objection; relevance, Your

19   Honor, as to where he travels to.

20          THE COURT:  Unless it has something related to

21   this case, I would agree.

22          MR. STOUT:  Your Honor, I expect that he's

23   going to testify about how drugs --

24          MR. MARTINEZ:  Objection.  Could we do this at

25   sidebar?  Proffer?

1          THE COURT:  Sure.

2          (At which time the following sidebar

3     discussion was held:)

4          THE COURT:  Go ahead.

5          MR. STOUT:  I expect he's going to testify

6     that as part of his job he's learned through travel

7     and liaising with the law enforcement agencies in

8     Colombia and other Central and South American

9     countries about how the drugs are produced, how they

10    are transported through the Caribbean up into -- how

11    they ultimately get to the United States.  So I was

12    trying to lay the foundation --

13         THE COURT:  Is he an expert witness or does he

14    have some knowledge about this case?

15         MR. STOUT:  He's an expert witness.

16         THE COURT:  Oh, okay.  All right.

17         MR. STOUT:  And we notified them --

18         MR. CASTILLO:  When they notified me I said I

19    had a problem with it because none of that is at

20    issue, we're not caring about what's happening

21    later.  The issue is the individuals have -- were

22    they knowing members of a conspiracy, did they

23    possess it or not.  Nothing he can say is going to

24    help that.

25         There is no issue about the quality of the

1    drugs, there is no issue about the quantity drugs,

2    there is no issue about [inaudible].  The issue of

3    the snitches or the cooperators, they didn't come

4    in, the jury doesn't know anything about that.  So I

5    don't know what value or what relevance -- probative

6    value this witness's testimony would have to this

7    case.

8         We don't care about other cases, we don't care

9    about where he travels and where he goes, it's not

10   at issue here in this case.  I mean, I thought he

11   was going to be brought on to talk about change of

12   custody of the drugs in this case and that type of

13   thing.  But to talk about Operation Panama Express

14   since 1998 when it first began, I don't think it's

15   relevant.

16        MR. MARTINEZ:  Your Honor, could I ask a

17   question.  Could the government proffer to the court

18   what expert opinion exactly they would elicit from

19   the witness?

20        MR. STOUT:  Sure.  So he's going to -- I

21   expect he would testify about the ultimately what

22   the routes are, the common routes that he's seen in

23   his experience, having done the hundred or so

24   investigations, that these organizations take

25   through the Caribbean.  He'll put the map up and

1          explain to us what route -- what common routes are

2          and he would point out I think several routes, not

3          just one route.  And ultimately he would opine on

4          the value of the drugs in this case.

5                    THE COURT:  So he is going to testify about

6          the value of the drugs.

7                    MR. STOUT:  Yes.

8                    MR. MARTINEZ:  That's fine.

9                    MR. STOUT:  The routes and the value, that's

10         really what --

11                   MR. CASTILLO:  I don't know about the routes.

12                   MR. MARTINEZ:  Well, I think in opening it was

13         mentioned that it was $45 million.  I don't have any

14         problem with that.

15                   I think there's limited relevancy to the

16         route.  I think it would be relevant if it was a

17         case where it was a dry case, if it wasn't cocaine

18         and there was just ion scans and they wanted to say

19         all the circumstantial evidence including the routes

20         generally taken by drug traffickers make the routes

21         relevant.

22                   Even if this was a route that wasn't

23         ordinarily taken, they certainly found all the

24         cocaine on it.  So.

25                   THE COURT:  I don't disagree it might be more

1   helpful to a jury in that situation, but I think

2   juries are concerned about why in the world we were

3   bringing so many in from the international waters

4   down there and that -- so I think the routes are

5   fair game, so that's fine.

6       MR. STOUT:  Let me know if I'm not allowed to

7   go here with him.  What I expect he will say is the

8   cocaine, they grow it in Colombia, they make it

9   there, then transport it to the north coast of

10  Colombia, they put it on boats and it comes to the

11  Caribbean in various ways and makes its way to

12  Central America and then ultimately up through

13  Mexico to the United States.  Is there any problem

14  with that general proposition?

15      MR. CASTILLO:  Judge, I don't think it's an

16  issue.  You already ruled that subject to the

17  jurisdiction of the United States that would be

18  relevant to that issue.  It's not an issue for this

19  jury --

20      MR. STOUT:  It explain to the jury why --

21      THE COURT:  I think it's helpful to the jury.

22  I think that's fine.  Okay.

23      (At which time the sidebar discussion was

24  concluded and the proceedings resumed as follows:)

25  BY MR. STOUT:

1    Q    Agent, I believe the last question I asked you

2    had to do with your travel.  Where do you travel to

3    as part of your job?

4    A    I travel a lot to Central and South America

5    and other countries in the Caribbean.

6    Q    For what purpose?

7    A    To further our investigations, meet with --

8    DEA has a lot of foreign offices down range, so we

9    meet with our agents, foreign and military and law

10    enforcement personnel, to further our

11    investigations.

12    Q    You said you'd been involved in approximately

13    a hundred maritime drug interdiction cases.  What

14    types of vessels have you been involved -- are the

15    subject of those investigations, what types of

16    vessels?

17    A    The most popular is what we call go fast

18    vessels, speed boats, typically fiberglass boats

19    equipped with a couple of outboard engines where

20    speed is the advantage of that type of vessel.  I've

21    also done sailing vessels.

22    I've done what we call semi-submersible; looks

23    like a submarine, just has a very small profile,

24    maybe a lookout or valve for oxygen.  And I've done

25    cargo vessels as well.

1    Q      Of the hundred or so investigations you've

2    done, how many involved cargo vessels?

3    A      Approximately four or five.

4    Q      How many involved semi-submersibles?

5    A      Two.

6    Q      How many involved sailing vessels?

7    A      Two or three.

8    Q      And how many involved the go fast vessels or

9    speed boats you described?

10   A      The vast majority of what we deal with, the

11   rest.  And I left one out too, sir, fishing vessels.

12   Q      How many involve fishing vessels?

13   A      Approximately three.

14   Q      When you say fishing vessel, can you describe

15   for us what you're talking about?

16   A      Typically 40 to 60 feet, they have the mission

17   of going out there and catching fish so they might

18   have bait on board and fishing equipment.

19   Q      In your experience doing these types of

20   investigations is it common for the U.S. Coast Guard

21   who does these interdictions to obtain fingerprints

22   or DNA?

23   A      No, sir.

24   Q      Do you know why not?

25   A      I do not, sir.

1    Q      How many of your hundred investigations that

2    you just mentioned to us you've done involve or had

3    DNA or fingerprint evidence that was presented to

4    you as part of it?

5    A      None, zero.

6    Q      Have you ever testified in federal court

7    before?

8    A      Yes, sir.

9    Q      How many times?

10   A      Approximately 10 times.

11   Q      Where did you testify?

12   A      Here in the Middle District of Florida,

13   federal court.

14   Q      What types of cases did you testify about?

15   A      All of them were maritime PANEX cases.

16   Q      Have you ever been qualified as an expert in

17   anything in federal court?

18   A      Yes, sir.

19   Q      What were you qualified as an expert in?

20   A      Maritime cocaine smuggling methods and

21   techniques as well as international drug prices.

22   Q      How many times have you been qualified as an

23   expert in that?

24   A      One time.

25   Q      And the other nine or so times you testified,

1      what did you testify about?

2      A      The drugs involved in the investigation I

3      handle a majority of our bulk cocaine seizures for

4      processing.

5      Q      As part of your job have you learned where

6      cocaine comes from?

7      A      Yes, sir.

8      Q      How did you learn that?

9      A      Our best resources are the defendants,

10     mariners and other people of the organizations that

11     we've talked to over time, as well as our agents

12     that are at these foreign offices and foreign

13     military and law enforcement.

14     Q      So in your training and experience where does

15     it come from?

16     A      Colombia is primarily for the Caribbean.

17     Q      How is it produced in Colombia?

18     A      It is product from the coca plant.

19     Q      Then what do they do with it?

20     A      Through a series of methods they will extract

21     a coca paste, it will then be processed into a

22     cocaine base and then finally cocaine hydrochloride.

23     Q      And what form is cocaine hydrochloride in?

24            MR. CASTILLO:  Objection, Your Honor, we're

25     far afield from the proffer, I think.

1          THE COURT:  We are a little.  Go ahead and if

2     you'll answer that question and then you can move

3     on.

4          THE WITNESS:  Can you repeat the question,

5     sir?

6     BY MR. STOUT:

7     Q     What form is the cocaine hydrochloride in?

8     A      Powder.

9     Q     Once it's been produced into powder, how do

10    drug trafficking organizations get it to the United

11    States?

12    A      From the lab they will press it into typically

13    kilogram sizes of cocaine.  I refer to them as

14    cocaine bricks.  They might be the size and shape of

15    a thick paperback book.  From there they will wrap

16    it in various materials such as tape, plastic,

17    sometimes rubber and silicone.  From there they will

18    then group the cocaine bricks into groups of

19    approximately 20, 25, 30, and put them in what we

20    refer to as a bale.

21    Q     And where do they transport these bails after

22    they put it all together?

23    A      To wherever the dispatch point is going to be.

24    Typically what we see is on the northern coast of

25    Colombia.

1    Q    Once it's there on the northern coast of

2    Colombia what do they do with it then?

3    A    You have what's called a dispatcher who is

4    responsible for that particular site.  A majority of

5    maritime ventures from my experience have initiated

6    by go fast, whether the go fast is responsible for

7    transporting it all the way to its final destination

8    or transferring the cocaine out at sea to a larger

9    or another vessel.  So from -- at the dispatch point

10   you have somebody in charge of making sure that the

11   vessel personnel feel the cocaine is all present and

12   secure.

13   Q    So from the northern coast of Colombia once

14   its on some type of vessel whether large or small,

15   where do those vessels take it next?

16   A    They typically start traveling westbound.  The

17   biggest point for receiving cocaine from my training

18   and experience has been what's called Cabo de

19   Gracias, which is the Honduran-Nicaraguan border.

20        MR. STOUT:  Your Honor, may I publish

21   Government Exhibit 16.

22        THE COURT:  You may.

23   BY MR. STOUT:

24   Q    You should have a laser pointer there in front

25   of you, Agent.  Can you point out what you've just

1     described to us?

2     A     What I'm referring to is right up here is the

3     north coast of Colombia, I believe.

4     Q     I think it would help if you pointed it at the

5     screen.

6     A     I didn't know if you could see it from here.

7           THE COURT:  Is it not working?

8           THE WITNESS:  It's very small, Your Honor.

9           It's very zoomed out, but typically the north

10    coast here of Colombia along this coast here into

11    Venezuela.  Right here is the area that we refer to

12    as the Guajira.  Along this coast is where we see a

13    majority of ventures departing from.

14    BY MR. STOUT:

15    Q     Agent, I wasn't able to see that with the

16    laser pointer.  Do you mind trying that again or

17    maybe touching your finger to the screen to trace

18    what you described to us.

19    A     There we go.  Right along the coast here is

20    where we see a majority of our ventures departing.

21    Q     And then where do they go after that?

22    A     It can take a couple routes.  The most common

23    one that I just mentioned is where we see it come

24    over towards the Cabo de Gracias,

25    Nicaraguan-Honduras border.  We've also seen from

1      the north coast heading towards the Dom Rep as

2      another possible route.

3          Q      Once it gets to Nicaragua or Honduras or

4      somewhere there in Central America along your first

5      line, where does it go then?

6          A      All roads lead to Guatemala where it is then

7      moved up to Mexico via land and then across our

8      borders.

9          Q      What are the major cocaine markets in the

10     world?

11         A      The United States, Europe.

12         Q      And in your training and experience do you

13     know how much -- where does the cocaine that comes

14     into the United States originate from, do you know?

15         A      [Inaudible].

16         Q      How do you know that?

17         A      There is several reasons.  The first one is if

18     you're in the business of bulk quantities of illegal

19     drugs, it is to make a profit.  And drug prices

20     throughout the Caribbean actually provides you a map

21     of where the drugs are going.

22             MR. MARTINEZ:  Objection to this narrative.

23             THE COURT:  Sustained.  Let's go ahead and get

24     to the other issue.

25             MR. STOUT:  Yes, Your Honor.

1      BY MR. STOUT:

2      Q      Your training and experience as a DEA agent

3      doing these kinds of investigations, do you have any

4      idea how much a kilogram of cocaine is worth

5      wholesale?

6      A      In what region, sir?

7      Q      In the state of Florida, for instance.

8      A      In the state of Florida, based off of last

9      year's prices, the average is $30,500.

10     Q      And for what exactly?

11     A      For one kilogram of cocaine.

12     Q      I want to talk very briefly about your

13     involvement with this case.  Can you explain to us

14     what that was?

15     A      My job was to assist with the processing of

16     the bulk cocaine that was seized from the vessel.

17     Q      I'm going to show you Government Exhibit 2 if

18     I may, Your Honor.

19            THE COURT:  You may.

20     BY MR. STOUT:

21     Q      Does that scene look familiar to you?

22     A      Yes, sir.

23     Q      Can you describe how it is that it's familiar

24     to you?

25     A      I can recall some of the Coast Guard personnel

1       that we received the cocaine from.  I remember

2       talking to the photographer with the Coast Guard

3       that took this photo and I know we got it from the

4       U.S. Coast Guard Cutter Diligence which is on the

5       all caps of the personnel in there.

6       Q       When you were at the dock when the cutter

7       offloaded the cocaine --

8       A       Yes, sir.

9       Q       -- involved in the Fat Crow case?

10      A       Yes, sir.

11      Q       What did you do with the cocaine after the

12      Coast Guard offloaded it?

13      A       We did our counts to verify how much that we

14      were receiving and we took it to an FBI facility.

15      At that point we removed the outer packaging so we

16      can actually see the cocaine bricks and we put 15 in

17      a box and then we stored it overnight pending

18      transfer to our lab.

19      Q       And what kind of box was it in?

20      A       A DEA box.

21      Q       Is it a plastic box or cardboard?

22      A       Cardboard box, sir.

23      Q       Did you actually -- were you actually part of

24      the team that transported this cocaine?

25      A       Yes, sir.  We transported, we give a brief and

1   do a tactical convoy and transport the bulk cocaine

2   down to Miami to our lab.

3        MR. STOUT:  Your Honor, at this time I would

4   like to offer Government Exhibit 300A and 300B into

5   evidence; they're stipulations that have been

6   entered into with the defense.

7        THE COURT:  Excuse me just a minute.  Any

8   objections?

9        MR. CASTILLO:  No.

10       THE COURT:  I'll receive into evidence 300A

11  and 300B, the stipulations.  You may read them if

12  you'd like.

13       Ladies and gentlemen, just for your

14  information, a stipulation is something that's

15  agreed to by both sides which means as a result

16  there is not necessary -- it's not necessary to

17  offer any kind of proof because both sides have

18  agreed.

19       MR. STOUT:  I plan to just read 300A.  300B is

20  essentially the same thing with a different name at

21  the bottom.

22       The United States of America and defendant

23  Gustavo Enrique Llanos Miranda -- and in the case of

24  defendant Jair Mendoza Montoya there is an

25  equivalent stipulation -- by their undersigned

1  counsel hereby enter into the following stipulation

2  of facts.  The parties agree that the following

3  facts have been proven beyond a reasonable doubt for

4  all purposes in the trial and all further

5  proceedings in the above captioned case and that the

6  United States does not need to present any evidence

7  at trial or any further proceedings regarding the

8  same.

9       On August 27, 2017, the United States Coast

10  Guard discovered a quantity of cocaine on board the

11  Motor Vessel Fat Crow.  Government Exhibit 2 is a

12  photograph depicting this cocaine.

13       On September 18th, 2017, law enforcement

14  agents sent a statistically representative sample of

15  this cocaine to the Drug Enforcement

16  Administration's southeast laboratory for forensic

17  testing.  Government Exhibit 1 is this

18  representative sample.

19       Based upon forensic testing of Government

20  Exhibit 1, the DEA forensic chemist confirmed that

21  the substance that the United States Coast Guard

22  found on board Fat Crow depicted in Government

23  Exhibit 2 is cocaine hydrochloride with a net weight

24  of 1,504 kilograms.

25       Wherefore the defendant and the defendant

1    respectfully requests that this make this

2    stipulation part of the record and admit it into

3    evidence during the United States' presentation of

4    its case-in-chief.

5            THE COURT:  That's 300A and then you have 300B

6    as well?

7            MR. STOUT:  Yes, Your Honor, I have that right

8    here with me as well.  I'll submit that the wording

9    is the same with Mr. Mendoza Montoya's name and

10   signature at the end.

11           THE COURT:  Thank you.

12           MR. STOUT:  Your Honor, at this time -- first

13   I would like to ask Agent McDonough a question.

14   BY MR. STOUT:

15   Q    Agent McDonough, you just heard that the total

16   amount of cocaine stipulated to in this case is

17   1,504 kilograms.  Based on the number you gave us

18   earlier for a kilogram of cocaine here in Florida,

19   $30,500 per kilogram, do you know how much total

20   that amount of cocaine is worth?

21   A    Yes, sir.  Based off of average prices in

22   Florida it's $45,872,000 approximately.

23           MR. STOUT:  Your Honor, at this time I would

24   like to offer Government Exhibit 1 into evidence and

25   publish it to the jury if I may.

1        THE COURT:  Any objection?

2        MR. MARTINEZ:  None.

3        THE COURT:  Received into evidence 1.

4   BY MR. STOUT:

5   Q      Agent McDonough, is that the type of box you

6   described that you put the drugs into when you broke

7   it down before?

8   A      Yes, sir.

9   Q      Do you mind taking a look at that box and

10  confirming that it's the same case number as the

11  case that was brought in?

12  A      I have to take the contents out to review

13  them.  Yes, sir, same case number associated with

14  this case.

15  Q      In that bag, Government Exhibit 1, what's in

16  there?

17  A      Inside -- bring it back up.  Inside this bag

18  is the chemist's representative sample consisting of

19  five bags of 2 kilograms cocaine bricks and then

20  over here the darker material is the packaging

21  material that was removed from it.

22  Q      Do you know how many kilograms total are in

23  that bag?

24  A      I don't know the exact weight, but if it's

25  10 cocaine bricks it's approximately 10 kilograms.

1          MR. STOUT:  Your Honor, can I publish that by

2     walking it by the jury?

3          THE COURT:  You may.

4          MR. STOUT:  Your Honor, may I have just a

5     moment?  Your Honor, the United States has no

6     further questions for Agent McDonough.

7          THE COURT:  Mr. Castillo?

8                    CROSS EXAMINATION

9     BY MR. CASTILLO:

10    Q     Agent McDonough, you indicated in your

11    testimony that your involvement in this case and

12    others is --

13         THE COURT:  I'm sorry, hold that.  Agent,

14    you're going to have to put that down.  The court

15    reporter can't see you, I can't see you.

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  Just put it down there by your

18    side.  Thank you.

19    BY MR. CASTILLO:

20    Q     Agent McDonough, you indicated I think you

21    said PANEX is the word you used to talk about this

22    investigation of drug -- international drug routes

23    and drug trafficking?

24    A     PANEX is the group I belong to, yes, sir.

25    Q     It's short for Operation Panama Express?

1    A       Yes, sir.

2    Q       And Operation Panama Express is an ongoing

3    investigation into the narcotics trade and the

4    shipment into United States and other places?

5    A       Focusing on maritime, yes, sir.

6    Q       Okay.  And I think you said PANEX North.  That

7    involves the Caribbean side or Caribbean operations,

8    correct?

9    A       Correct, yes, sir.

10   Q       So if a vessel seized in the Pacific ocean,

11   that's what, PANEX --

12   A       South.

13   Q       South.  Okay.  And your understanding is all

14   maritime interdictions either in PANEX South or

15   PANEX North ultimately end up here in the Tampa

16   Division for prosecution; is that correct?

17   A       No, sir.

18   Q       No?

19   A       No, sir.

20   Q       Now, a decision is made by somebody else to

21   transport individual cases to Tampa for prosecution;

22   is that right?

23   A       I don't understand your question.

24   Q       Well, your involvement, you get involved in a

25   case and it's a result of a seizure either in PANEX

1    north or south, eventually ends up here in Tampa; is

2    that right?

3    A        Not necessarily.  There is other domestic

4    offices that also do maritime cases.

5    Q        Primarily here in Tampa?

6    A        Can't say either way, sir.

7    Q        A lot of cases that end up in Tampa?

8    A        A lot of cases, yes, sir.

9    Q        Point is, somebody above your pay grade makes

10   that decision, right?

11   A        Decision on what, sir?

12   Q        Where to prosecute the case.

13   A        Yes, sir.

14   Q        And this case was being prosecuted in Tampa,

15   correct?

16   A        Yes, sir.

17   Q        And the other cases you talked about were also

18   prosecuted in Tampa, right?

19   A        Yes, sir.

20   Q        And that is a common practice in your agency

21   to supervise prosecutions -- maritime interdictions

22   that are brought to Tampa since about 1998; is that

23   right?

24   A        Approximately, yes, sir.

25   Q        And it's an ongoing investigation.

1    A        Yes, sir.

2    Q        And that representative sample that you have

3    in Government Exhibit 1 of 10 kilograms of cocaine?

4    A        Approximately.

5    Q        So the street valve according to you is about

6    $305,000 approximately?

7    A        In the state of Florida, yes, sir.

8    Q        In the state of Florida.

9    A        I have to do a calculator on 10, but I see

10   what you're getting at.

11   Q        Well, $30,500, you move the decimal one place

12   because you've got 10, $305,000, correct?

13   A        Yes, sir, I just like to double-check with

14   calculators either way before I commit, yes, sir.

15   Q        More less, right?  So it's very valuable

16   cargo, right?

17   A        Extremely.

18   Q        You indicated that you had -- in this case

19   we're talking about a freighter vessel, right?

20   A        Yes, sir.

21   Q        And you've been involved in three other

22   investigations during your career for freighters?

23   A        Approximately four or five.

24   Q        On the PANEX North.

25   A        Yes, sir.

1    Q     Now, there is other agents that do what you

2    do, isn't that right?

3    A     Yes, sir.

4    Q     And other agents would be responsible for

5    other investigations, depending on where the

6    seizures are made, correct?

7    A     I don't understand the question.

8    Q     In other words, you're not the only agent that

9    does the accountability and so forth that you've

10   testified about, right?

11   A     What accountability?

12   Q     You talked about what you do, the packaging

13   and the processing of the contraband and oversight

14   of the investigation, isn't that right?

15   A     There are other people that do that, yes, sir.

16   Q     You're one of many that do this type of

17   investigation, correct?  One of many agents.  In

18   other words, there are other agents like yourself

19   that do what you do; is that right?

20   A     Yes, sir.

21   Q     And you just happened to be assigned this case

22   on just random assignment, correct?

23   A     No, sir.

24   Q     Well, somebody gave you the case to handle,

25   right?

1    A       No, sir, I pretty much handle a majority of

2    our bulk cocaine drug exhibits.

3    Q       For PANEX North?

4    A       For PANEX North, yes, sir.

5    Q       Okay.

6           MR. CASTILLO:  I don't have any further

7    questions.

8           THE COURT:  Mr. Martinez?

9                        CROSS EXAMINATION

10   BY MR. MARTINEZ:

11   Q       Agent, you were asked on direct examination if

12   you knew why the DEA doesn't do forensic

13   examinations like DNA and fingerprint analysis; do

14   you remember that question?

15   A       I don't remember it phrased like that, no,

16   sir.

17   Q       You tell me how you remember it phrased.

18   A       I was asked I believe if I knew why the Coast

19   Guard does fingerprint or DNA.

20   Q       Your recollection is -- say it one more time

21   again, a little louder for the jury to hear you?

22   A       If I'm familiar with the Coast Guard doing DNA

23   or fingerprint analysis.

24   Q       Okay.  Let me back up for a minute.  Who took

25   possession of the drugs in this case after -- from

1    the Coast Guard to whom?

2    A    To us.

3    Q    Okay.  So it went from the Coast Guard to the

4    DEA, right?

5    A    Yes, sir.

6    Q    Once it goes to the DEA, the Coast Guard

7    doesn't have any more responsibility for those

8    drugs, right?

9    A    Correct.

10   Q    They're in your custody and control, right?

11   A    Yes, sir.

12   Q    Now you have to prepare the case for

13   prosecution or the case agent, like this gentleman

14   like here with the U.S. Attorney's Office, prepares

15   that case for prosecution, right?

16   A    My job in processing the cocaine is to

17   transfer it to the lab for analysis and confirming

18   the count and weight.

19   Q    So you're going to transfer it to the lab for

20   analysis so that we can know and ultimately in the

21   jury trial know that it is in fact cocaine, right?

22   A    That's one of it, yes, sir.

23   Q    And you know that in this case the defense has

24   stipulated to that fact, right, because that

25   happened while you were in the witness box, right?

1    A      Yes, sir.

2    Q      Now, that's one issue in the case, is it

3    cocaine, right?

4    A      Yes, sir.

5    Q      Another issue in the case may be did somebody

6    touch it or not, right?  You don't know.

7         MR. STOUT:  Objection, Your Honor.

8    BY MR. MARTINEZ:

9    Q      Let me rephrase that way.  Have you been in

10   this courtroom at all during this trial except for

11   this very moment?

12   A      No, sir.

13   Q      You have been sequestered, have you not?

14   A      Yes, sir.

15   Q      So that the jury understands, we sequester

16   witnesses so that they can't hear what's going on to

17   comport their testimony, right?

18   A      Right.

19   Q      Okay.  So not only do you not know what's

20   going on because you can't be in here, you don't

21   know what's going on because you can't talk to

22   somebody else about what happened in here either,

23   right?

24   A      Correct.

25   Q      So you have no idea as you sit there today,

1    unless somebody has told you, whether or not DNA and

2    fingerprint forensic evidence is relevant to this

3    case, right?

4    A    I don't understand the question, sir.

5    Q    Let's say I contend that this jury would find

6    it helpful if there was either DNA or fingerprint

7    forensic evidence before them.  Let's say I make

8    that as the proposition, right?

9    A    Okay.

10   Q    You have no idea as to whether or not what I'm

11   saying has merit or not because you haven't been in

12   this trial to know about it, right?

13   A    Correct.

14   Q    Okay.  Now, are you saying to this jury that

15   the DEA does not conduct fingerprint or DNA forensic

16   analysis in their cases?

17   A    I'm not sure about DNA -- DEA doing DNA.

18   Fingerprints can be requested, yes, sir.

19   Q    So it's not like the Drug Enforcement

20   Administration says "no thank you" to DNA evidence

21   and "no thank you" to fingerprint evidence, right?

22   A    No, sir.

23   Q    Okay.  There is no rule out there that says if

24   you're a Drug Enforcement Administration, don't even

25   think about asking for fingerprint evidence or DNA,

1    right?

2    A    Correct.

3    Q    As a law enforcement officer -- and that's

4    what you are, right?

5    A    Yes, sir.

6    Q    You can ask for DNA evidence to be performed,

7    you can make the request if you think it's

8    appropriate, right?

9    A    Are we talking in general, sir, or are we

10   talking in specific?

11   Q    I'm talking about whether or not there is a

12   prohibition on an agent like you that you cannot

13   request DNA evidence to be done and that forensic

14   analysis.

15   A    I have requested DNA analysis, I have

16   requested fingerprints in the past, yes, sir.

17   Q    So we know you can, right?

18   A    Yes, sir.

19   Q    The only question is do you want to, right?

20   A    I don't know if it's a matter of wanting, no,

21   sir.  It's a matter of --

22   Q    The only question is whether you decide to; is

23   that better phrased?

24   A    Yes, sir.

25   Q    Okay.  Now, you would agree with me as a law

1  enforcement officer, knowing nothing about what has

2  happened in this courtroom over the last week, that

3  fingerprints and fingerprint analysis can sometimes

4  convict somebody and sometimes exonerate or clear

5  somebody, right?

6  A    In some cases, yes, sir.

7  Q    And the same holds true with DNA evidence,

8  right?

9  A    I don't know much about DNA other than what I

10  see on TV.

11  Q    You don't know that people -- as a law

12  enforcement officer it's your testimony that you

13  don't know that people have been convicted in large

14  measure because of DNA evidence?

15  A    Like everybody else from TV; I haven't

16  received training in DNA, so that's why I gave you

17  the answer I did.

18  Q    Okay.  And you're also aware just from being a

19  member of the general public that DNA sometimes

20  clears somebody of serious offenses like murder

21  20 years later, right?

22  A    Yes, sir.

23  Q    And as to why that forensic evidence wasn't

24  done in this case, your answer was you don't know?

25  A    It's not my decision in this case.

1    Q       Whose decision is it?

2    A       The case agent.

3    Q       Who is that?

4    A       We have several of them.

5    Q       Who is the case agent on this case in this

6    courtroom today?

7    A       We have one, Dan Ward.

8    Q       And he's the guy sitting at the government's

9    table?

10   A       Yes, sir.

11   Q       He's the guy that knows everything about the

12   case?

13   A       One of the members that do, yes, sir.

14   Q       He's the guy that's been selected by the

15   government to sit at the table with them, right?

16   A       Yes, sir.

17   Q       And he's the guy that knows whether or not

18   this case calls for that kind of forensic evidence

19   to -- an analysis to be conducted, right?  It's his

20   call, right?

21   A       As a team, yes, sir, there is a team.

22   Q       As a team.  So now we're going to define the

23   team.  His call in conjunction with the two

24   assistant U.S. attorneys sitting next to him?

25   A       No, sir, the other agents from the other

1    agencies also assigned to the case.

2    Q     So everybody involved with the case in law

3    enforcement, and all of the prosecutors involved in

4    the case from the U.S. Attorney's Office in the

5    Middle District of Florida that collectively make a

6    decision, we want it or we don't want it, is that

7    what you're saying?

8    A     I don't know if it even was discussed.

9          MR. MARTINEZ:  Nothing further.

10         THE COURT:  Mr. Stout?

11                    REDIRECT EXAMINATION

12   BY MR. STOUT:

13   Q     Agent McDonough, to be clear, was your role in

14   this case limited essentially to picking up the

15   drugs?

16         MR. MARTINEZ:  Objection; leading; form of the

17   question.

18         THE COURT:  Sustained.  Rephrase.

19   BY MR. STOUT:

20   Q     What was your role in this case?

21   A     To process the drugs, transport it to the lab

22   for further analysis.

23   Q     Are you one of the case agents on this case?

24   A     No, sir.

25   Q     Are you involved in the investigation in this

1    case beyond what you just described?

2    A      No, sir.

3    Q      Do you have any control in the cases where you

4    are a case agent?

5    A      Yes, sir.

6    Q      Whether -- well, do you have any control

7    whether the Coast Guard takes any sort of forensic

8    evidence?

9    A      Don't have control of what the Coast Guard

10   does until we have the evidence.

11          MR. STOUT:  Your Honor, may I have a moment?

12          THE COURT:  You may.

13          MR. STOUT:  Your Honor, the United States

14   rests.

15          THE COURT:  Thank you, sir, you may step down.

16   Do you want the agent to take the drugs with him?

17          MR. STOUT:  Yes, Your Honor.

18          THE COURT:  Ladies and gentlemen, we're going

19   to recess for lunch at this time.  We'll be in

20   recess until 1:40.  You're welcome to go get some

21   lunch, walk around.  Please don't discuss the case.

22   Leave your pads on your chairs.  Start again at

23   1:40.

24          (The jury retired to the jury room.)

25          THE COURT:  You may be seated.  The government

1    has now announced that it is resting its case, so

2    we'll start with you, Mr. Castillo.  Mr. Castillo,

3    do you have a motion for a judgment of acquittal?

4           MR. CASTILLO:  Yes, Your Honor, I do.

5           THE COURT:  Either or both of the counts your

6    client is charged with?

7           MR. CASTILLO:  Yes, Your Honor.  At this time

8    pursuant to Rule 29 of the rules of federal --

9    Federal Rules of Criminal Procedure, we move at this

10   time for a judgment of acquittal as to Count One and

11   Count Two of the indictment in this case.

12          Count One charges the defendant with

13   conspiracy to possess with the intent to distribute

14   5 kilograms or more of cocaine while aboard a vessel

15   subject to the jurisdiction of the United States.

16   And Count Two is the possession with the intent to

17   distribute 5 kilograms or more of cocaine while

18   aboard a vessel subject to the jurisdiction of the

19   United States.

20          The issue of jurisdiction has already been

21   decided by the court, but the elements as they stand

22   as to the conspiracy count and the possession count,

23   I will address them individually.

24          The court is well aware that the standard for

25   Rule 29 is if there is -- evidence is insufficient

1     to sustain a conviction of such offense or offenses,

2     the motion must be granted.  The standard is that in

3     evaluating the sufficiency of the evidence, the

4     court should consider the evidence in the light most

5     favorable to the government, making all reasonable

6     inferences and credibility choices in the

7     government's favor, and then determine whether a

8     reasonable jury can find the defendant guilty beyond

9     a reasonable doubt.

10          The citation is *United States v. Capers*, found

11     at 708 F.3d 1286, Eleventh Circuit, 2013.  *United*

12     *States v. Kottwitz*, 614 F.3d 1241, Eleventh Circuit,

13     2010.

14          As to the conspiracy count, the government

15     must establish that an agreement existed between two

16     or more persons and that the defendant knowingly and

17     voluntarily participated in it.  The evidence that

18     we have in this case is obviously we have the

19     crewmen aboard the Fat Crow.  Several of them have

20     admitted their involvement in their forming an

21     agreement with Mr. Hector Favio and others to

22     participate in a drug smuggling venture.

23          The evidence as to Mr. Llanos is lacking as

24     far as his agreement to do anything.  I was very

25     careful in questioning the witnesses that were there

1    that would have knowledge about what occurred as to

2    what happened.

3         The four cooperating witnesses each agreed --

4    they themselves admitted they agreed with Mr. Favio

5    to participate in this venture.  When I asked them

6    what evidence or what did they hear Mr. Llanos do,

7    they admitted that they did not hear what occurred

8    inside the meeting between Mr. Llanos and Mr. Favio

9    at all, they couldn't hear what was heard.

10        They're assuming, based upon what they saw and

11   what happened to them, that prices were being

12   discussed, but they don't know.

13        In the light most favorable to the government

14   I think we established that if you accept it --

15   which you must by the law at this stage -- there was

16   some meeting.  But there is still no evidence of an

17   agreement.

18        We have a statement by Mr. Barrios, the

19   captain who came in the middle of June, who said

20   that my client told him something to the effect of

21   hopefully we can get a batazo, indicating he

22   interpreted that to mean we're going to make money

23   or we're somehow involved in a drug trip, that's

24   what he interpreted that to mean.  But the word that

25   was used by Mr. Llanos was "batazo."

1          Now, he did not know him from before other

2     than to work with him on another boat, had nothing

3     to do with drugs.  When he got on board -- talking

4     about Captain Barrios, when he got on board in the

5     middle of June, when he boarded the Fat Crow, he

6     thought it was legitimate work, he had no knowledge

7     of any drug activity.  And aside from Mr. Llanos who

8     was already on the boat saying the batazo, there was

9     no other evidence at all about his involvement in

10    drug activity, "his" being the captain's.

11         It wasn't until he had a meeting later at the

12    end of July -- talking about the captain -- that he

13    became aware through meetings with Mr. Favio about

14    drug transactions.

15         Now, we learned that according to Mr. Herrera

16    that Mr. Favio contracted him, Mr. Herrera, in

17    April, and Mr. Llanos was present.  And he was hired

18    to be the welder, "he" being Herrera was the welder

19    with and Mr. Llanos was hired to be the helmsman.

20    That in and of itself is not illegal.

21         He then said there were conversations at the

22    time and he understood about the secret compartment

23    or the caleta.  There was a discussion about that.

24    But even then, after I had to pull it out of him, he

25    admitted that that was his conversation with

1  Mr. Favio and that Mr. Llanos may in fact have been

2  present similar to the example that I gave we're

3  sitting in the courtroom and I'm having a

4  conversation with him, but Mr. Llanos did not

5  participate.  He made assumptions on his end of what

6  was happening, but the proof of what occurred is

7  lacking.

8      I would suggest to the court that on that

9  basis there is no proof of an agreement sufficient

10  -- aside from speculation, conjecture or innuendo --

11  that would be necessary to find sufficient proof to

12  let this matter go to the jury.

13      And I'd cite the case of *United States v.*

14  *Hernandez-Preciado*, it's a Eleventh Circuit case, I

15  have the Eleventh Circuit Case number is 13-15813,

16  Eleventh Circuit, 2015, *United States v. Tinoco*, 304

17  F.3d, Eleventh Circuit, 2002, and *United States v.*

18  *Garate-Vergara*, 942 F.2d 1543, Eleventh Circuit,

19  1991.

20      Now, in order to support a conviction for the

21  possession count, the government must prove two

22  things or three things.  That he had knowing

23  possession of drugs and the intent to distribute

24  them.  That's *United States v. Faust*, 456 F.3d 1342,

25  Eleventh Circuit, 2006.

1          The evidence in this case in the light most

2     favorable to the government according to the

3     co-defendants that in middle to late August a boat

4     loaded with 75 bales pulled up alongside the Fat

5     Crow and all the crew participated in pulling the

6     bales from the one boat and eventually passing it on

7     into the secret compartment that had been

8     constructed by Mr. Herman and Mr. Chasin.

9          Even in the light most favorable to the

10    government, Mr. Llanos participated in that, but we

11    know that he had no ownership interest, we know that

12    he had no authority on the boat because he was a

13    helmsman, and we know that several people are above

14    him in authority, they're out there at sea and that

15    a crew men does what the captain says and these were

16    orders by the captain.

17         So aside from him participating in actually

18    doing the transfer of these packages, there is no

19    indication or sufficient indication that he

20    knowingly and voluntarily participated in such a

21    scheme given the facts that we have so far.  There

22    have been assumptions made by these cooperators

23    based upon what they understood themselves to be and

24    what they thought was happening, but there is no

25    sufficient proof that this defendant had knowing

1    possession of drugs and it was intended to be

2    distributed to someone else.

3         Your Honor, I think there is sufficient

4    indicia that the defendant was merely present aboard

5    the vessel and merely present during conspiratorial

6    conversations among others and that -- other than I

7    want to mention these group meetings that were had

8    as Mr. Herrera said, it wasn't a discussion, it was

9    the crew was brought together and Mr. Favio

10   announced to everybody what was going to happen and

11   then individually they went into different rooms.

12        When that general announcement happened, aside

13   from him making perhaps an offer in the light most

14   favorable to the government, there is no evidence

15   that Mr. Llanos personally accepted that offer.  In

16   fact, nobody did until they went into the room.  In

17   other words, they said this is what we're going to

18   do and then so it was another part of the

19   negotiation that occurred.

20        And that's the evidence at this point and I

21   think it's grossly insufficient to allow this matter

22   to go to the jury.

23        THE COURT:  Mr. Stout, do you want to respond?

24        MR. STOUT:  Yes, Your Honor.  I'm sure Your

25   Honor is well aware of the Rule 29 standard that any

1    reasonable juror could find that the elements are

2    met and the court takes the evidence in the light

3    most favorable to the United States as well as all

4    the inferences therefrom.

5         In looking at the conspiracy count as against

6    Mr. Llanos, element one is that there are two or

7    more people who in some way agreed to try and

8    accomplish a shared and unlawful plan.  Here we have

9    abundant evidence of not only two or more people but

10   many people on board the Fat Crow at various times

11   meeting on the bridge and perhaps in the dining area

12   of the Fat Crow and having lengthy negotiations with

13   this man Hector Favio, the representative of the

14   owners of the drugs, and it was in the form of a

15   negotiation with the group.

16        He asked them what they wanted to do the trip

17   and then they did individually after he asked that

18   question that we're going to do a drug trip and I

19   want to know what you propose your price for doing

20   it is.  He did ask them individually, he took the

21   proposal back to the boss and then came back and

22   then told them all collectively it's too much.

23        This is very much in the form of a group

24   negotiation, a group agreement to undertake this

25   scheme.  They may have discussed their individual

1    prices for doing so with Hector Favio on an

2    individual basis, but it's a group agreement and

3    they all were necessary and in fact all did

4    participate in loading the cocaine and in preparing

5    the ship to undertake this entire journey as we've

6    heard extensive testimony about.  So we have the

7    heart of the conspiracy is these meetings.

8         As far as with respect to particularly

9    Mr. Llanos, he was aware of what was going on all

10   the way back -- the testimony is that he was aware

11   in April of 2017 when he was at the meeting with

12   Hector Favio where Hector Favio told Mr. Herrera,

13   our last cooperator, that he needed him to be a

14   welder because they needed to build a hidden

15   compartment on the ship to carry the drugs.  He was

16   there and present and heard that, is the testimony,

17   and still decided to travel from Barranquilla to the

18   Dominican and join the trip and sit on the ship for

19   six weeks or two months while they built the hidden

20   compartment and then sail down to Venezuela and wait

21   for three more months, meanwhile having these

22   negotiations with Hector Favio.

23        I think there is abundant evidence that

24   Mr. Llanos conspired with Hector Favio and various

25   other people including the crewmen who testified

1    here that he knew the unlawful purpose of the plan

2    and that he willfully joined in it.  As a matter of

3    fact, the testimony from the captain was as soon as

4    he joined the ship in mid June, Mr. Llanos told him

5    they were going to hit a home run is my

6    understanding of what the term is.  And that when

7    the first negotiation with Hector Favio took place,

8    he told the oiler from -- Eduardo Chasin Villaroel,

9    one of the two men who built the hidden compartment,

10   told him he should ask for $100,000, was coaching

11   him on how much he should be asking for from Hector

12   Favio.  I think there is a abundant evidence of the

13   conspiracy.

14       As for the possession count, the second count,

15   the testimony has been from all four cooperating

16   defendants that all of the crew members including

17   Mr. Llanos Miranda helped hand load the cocaine up

18   from the water -- from the small boat into the --

19   onto the ship's deck and ultimately into the hidden

20   compartment and that he was -- every one of them

21   said that each of these two defendants was part of

22   that activity that they specifically took part in.

23       So I think given that, that supports -- that

24   would be joint possession, it would be actual

25   possession when they hand each package one to

1    another, and it would be constructive possession

2    when they have got it hidden down into the

3    compartment and they cut the anchor off and set

4    sail. So I think the elements for both crimes are

5    easily met as to Mr. Llanos.

6        THE COURT: And certainly I do as well. You

7    both pointed out that at this stage we view the

8    evidence in the light -- the best light to the

9    government in this case. And I look at whether

10    considering that evidence, all of the evidence that

11    has been presented to this point and viewing it in

12    the best light of the government, there is evidence

13    by which the defendant can be convicted of the

14    crimes that he's charged with.

15        Starting with the possession, I've already

16    found the defendant was -- or the vessel was subject

17    to the jurisdiction of the United States and there

18    is no doubt the defendant was on board the vessel.

19    The government has proven that he knowingly

20    possessed the cocaine. If I just looked at the fact

21    that he helped load it on the vessel, that's

22    probably sufficient, not to mention the fact that

23    there was a negotiation regarding a price for

24    transporting the vessel.

25        He intended -- the defendant intended to

1    distribute the cocaine.  It was a large amount of

2    cocaine, it's certainly not anything that's personal

3    use cocaine.  It was being transported from one

4    place to another, multiple, multiple kilos.  So the

5    government has established the elements necessary to

6    convict the defendant, Mr. Llanos, of possession

7    with the intent to distribute.

8        As far as the conspiracy is concerned, again

9    viewing everything in the best light to the

10   government, the defendants according to the

11   testimony of four cooperating defendants, all of

12   whom testified in a similar manner, that there was a

13   discussion among all of the crew members regarding

14   the drug trip before it became a drug trip.  They

15   talked about the price and then each of the four

16   cooperators said they met individually with the

17   person that they were negotiating with and

18   negotiated a price.  I think it certainly follows

19   that the defendant did the same thing, Mr. Llanos.

20       But just based on the fact that we've had four

21   co-conspirators testify to identical things about

22   the multiple meetings, some of which were group

23   meetings and some of which were individual meetings,

24   that there is evidence such to determine -- for a

25   jury to determine that two or more persons agreed to

1    accomplish an unlawful plan.  The object of the plan

2    was to possess with the intent to distribute

3    cocaine.  And certainly I guess the big issue here

4    is the defendant knew the unlawful purpose of the

5    plan and there has been testimony it was explained,

6    and he willfully joined in it.  So I would deny the

7    motion.

8         Mr. Martinez?

9         MR. MARTINEZ:  Thank you, Your Honor.  For the

10   record, I would move on behalf of defendant Mendoza

11   for a judgment of acquittal pursuant to Rule 29.  I

12   would adopt Mr. Castillo's arguments that he has

13   already advanced.  Concededly, the four cooperating

14   witnesses have likewise implicated Mr. Mendoza.  The

15   only difference I think between the two factual

16   circumstances is that Mr. Mendoza arrives concededly

17   through their testimony after the conclusion of the

18   construction of the secret compartment.  But I think

19   in every other regard the same arguments that

20   Mr. Castillo made as to Counts One and Two I would

21   advance, just substituting Mr. Mendoza as the

22   defendant at issue and that's basically all I have.

23        THE COURT:  My ruling would be obviously the

24   same as well to Mr. Mendoza.  There was testimony

25   that he was present when the negotiations were

1    discussed, the fact that there was a drug deal, that

2    he was -- also took part in loading of the cocaine.

3    So for the same reasons that I found Mr. Llanos --

4    there has been sufficient evidence to deny the

5    motion as to Mr. Llanos, I find for Mr. Mendoza as

6    well.  So I would deny the motion as to Mr. Mendoza.

7        Now, have you had an opportunity,

8    Mr. Castillo, to talk to Mr. Llanos and has he made

9    any determination as to whether he wishes to testify

10   in this case?

11       MR. CASTILLO:  Yes, Your Honor, we've had

12   various discussions at different times, we've had

13   lengthy discussion at different times.  The last

14   discussion we had was shortly a little while ago.

15   And he indicated at that time that he did not wish

16   to testify.

17       However, I explained to him that he can take

18   up to the last minute and that Your Honor I'm

19   assuming is going to do a colloquy and at that time

20   you were going to inquire of him and explain his

21   right, it's up to him.  As far as I'm aware at this

22   particular time, he indicated he did not wish to

23   testify.

24       THE COURT:  Mr. Llanos, is that correct?

25       DEFENDANT LLANOS:  Correct.

1          THE COURT:  Okay.  I'm going to -- we're going

2     to recess for lunch in a minute and I'm going to ask

3     you the same question after lunch, okay?  So you can

4     think about it a little bit.

5          THE DEFENDANT:  Okay.

6          THE COURT:  Mr. Martinez, what about your

7     client, has he made any decisions?

8          MR. MARTINEZ:  The last time I spoke to

9     Mr. Mendoza he indicated that he did want to

10    testify.  I'm planning on talking to him again now

11    that the government has rested and if we could have

12    until the lunch recess is over to decide, one more

13    chance to talk to him.

14         THE COURT:  Sure.  Mr. Mendoza, Mr. Martinez

15    has said you're thinking about testifying and he

16    would like to talk again with you over the lunch

17    hour.  So after lunch when we come back I'll take

18    this up again and you can let me know whether you

19    wish to testify.  Okay.

20         MR. CASTILLO:  Your Honor, could I ask a

21    question for scheduling?  Let's just assume I rest

22    and let's assume that Mr. Martinez rests, just

23    assume, and the case is over.  We still have a

24    charge conference to go.  Are you planning on

25    arguing this afternoon?

1          THE COURT:  If it happens, yes, I would like

2     to go ahead and --

3          MR. CASTILLO:  That answers the question.  So

4     I now prepare closings and then instructions.  Just

5     to let you know, I don't have any objections to the

6     government's proposed instructions.  I did file my

7     proposed instruction this morning about the multiple

8     conspiracies, which is pattern, you just have to

9     decide whether there's sufficient -- from my point

10    that shouldn't take long, we just decide whether

11    you're going to give it.  And I don't know if

12    Mr. Martinez has problems with the -- I just wanted

13    to know for scheduling --

14         THE COURT:  Obviously if Mr. Mendoza testifies

15    and it's of any length, we'll reevaulate and may do

16    closings tomorrow morning.  But if neither

17    testifies, then yeah, I would want to go ahead and

18    do closings.

19         Mr. Martinez, have you looked at the

20    government's suggested -- they're all standard, but

21    have you looked at them?

22         MR. MARTINEZ:  I'm going to do that over

23    the lunch hour.  My expectation is if they're all

24    patterns, that I will not have any objection.

25         THE COURT:  Yes, they are all -- he's added

1    the phrase about the court has made a determination

2    about the jurisdiction of the United States, but

3    other than that --

4         MR. MARTINEZ:  And he advised me of that minor

5    changes, so I'm aware of those.

6         THE COURT:  Mr. Stout?

7         MR. STOUT:  Your Honor, that's essentially

8    correct.  There's a couple other minor changes to

9    the actual elements 1, 2, 3 -- that I indicated also

10   in -- my instructions are italicized so you can see

11   them, but they're in accordance with the

12   instructions I've seen given in other very similar

13   cases in this courthouse and I don't think they're

14   going to be controversial.

15        THE COURT:  Nothing major.

16        MR. STOUT:  Right.

17        THE COURT:  Okay.  All right.  And I was

18   having that discussion with both Mr. Castillo and

19   Mr. Martinez.  Who is going to be making closing

20   arguments?

21        MR. STOUT:  I will, Your Honor.

22        THE COURT:  Okay.  The plan would be if --

23   suppose neither testifies.  When we come back, I'll

24   try to get the jury instructions together, but that

25   really won't take long and we can have a brief

1       charge conference and then we would do the closing

2       arguments.

3               MR. STOUT:  That's acceptable to us, Your

4       Honor.

5               THE COURT:  All right.  What I did say, 1:40?

6               (Lunch break.)

7               THE COURT:  Okay.  Mr. Castillo, is it still

8       your client's intention not to testify in this case?

9               MR. CASTILLO:  Yes, Your Honor, he's prepared

10      to go through with the colloquy and then the only

11      thing left I'll just announce rest in front of the

12      jury on my case.

13              THE COURT:  Okay, thank you.

14              Mr. Llanos Miranda, if you would stand.  I'm

15      going to ask you the same thing I asked you earlier.

16      It's your choice whether -- can you hear okay?

17              THE WITNESS:  Yes.

18              THE COURT:  It's your choice whether to

19      testify or not testify.  You can take the witness

20      stand and essentially tell your side of the story or

21      you can choose not to testify and I will ultimately

22      when I give the jury instructions tell the jury they

23      should not consider that in any way.  But the

24      decision is yours.  So do you intend to testify or

25      not testify?

1           THE DEFENDANT:  I am not going to testify.

2           THE COURT:  And you've discussed that with

3    Mr. Castillo?

4           THE DEFENDANT:  Affirmative.

5           THE COURT:  Okay.  But it is your decision not

6    the testify; is that correct?

7           THE DEFENDANT:  Correct.

8           THE COURT:  Thank you, sir.  Okay.

9           Mr. Martinez, what about your client,

10   Mr. Mendoza?

11          MR. MARTINEZ:  He has indicated to me that he

12   wants to testify.

13          THE COURT:  Let me just verify if that's okay.

14          Mr. Mendoza, Mr. Martinez says that you wish

15   to testify.  Is that correct?

16          DEFENDANT MENDOZA:  Correct, Your Honor.

17          THE COURT:  All right.  And you understand

18   that's your choice, you can chose to testify or not

19   testify.

20          DEFENDANT MENDOZA:  No, I do want to testify.

21          THE COURT:  Got it.  Okay.  All right.  When I

22   bring the jury back in -- you rested, right?

23          MR. STOUT:  Yes, Your Honor.

24          THE COURT:  Okay.  At some point I need to do,

25   as you'd requested earlier, Mr. Castillo, and tell

1    the jury that the four defendants who testified and

2    I think the evidence was testified pursuant to a

3    plea agreement, I don't know that there has been any

4    evidence but that they're convicted, but they

5    obviously have all been convicted because I've

6    adjudicated them.

7         So when would you like me to do that?

8         MR. CASTILLO:  I think maybe in the

9    instruction, the cautionary instruction about

10   considering the testimony of a co-defendant.  Just

11   -- or plan on saying I will now advise you that the

12   four co-defendants are in fact convicted felons.

13        THE COURT:  So at some point when I instruct

14   the jury?

15        MR. CASTILLO:  I don't think it makes a

16   difference.  They know.  I think the thing is they

17   know obviously, but I think the legal point that

18   they have been legally adjudicated.  And I don't

19   have a problem with you instructing them at that

20   time.

21        THE COURT:  Okay.  What we will do then is

22   that I will then call on you and you will announce

23   that you're resting and then Mr. Martinez I'll call

24   on you.  Okay.

25        All right.  Let's bring the jury in.

1          (The jury returned to the courtroom.)

2          THE COURT:  You heard, ladies and gentlemen,

3     that before we broke for lunch the government rested

4     its case.  So I'm now going to turn to the

5     defendants.

6          Mr. Castillo?

7          MR. CASTILLO:  Yes, Your Honor.  Your Honor,

8     at this time the defense on behalf of Mr. Gustavo

9     Enrique Llanos Miranda, we announce rest.

10          THE COURT:  All right.  Thank you.

11          Mr. Martinez?
           MR. MARTINEZ:  Yes, Your Honor, on behalf of
12     Mr. Mendoza, we would call Mr. Mendoza in his own
       defense.
13          THE COURT:  Okay.  Mr. Mendoza, you'll need to
       come up and have a seat over here in the witness
14     chair.  Madam Clerk, would you swear him in.
           COURTROOM DEPUTY CLERK:  Please raise your
15     right hand.  Do you solemnly swear or affirm that
       the answers you will give to the questions
16     propounded by the court or counsel shall be the
       truth, the whole truth --
17          THE WITNESS:  Yes, truth, the whole truth.
       And I'm going to make another oath.  I swear by
18     Jehovah God, by my mother, and by me that I have
       never conspired against the United States and
19     neither am I a narco trafficker.  I'm a humble
       person.
20          THE COURT:  Thank you, sir, you may have a
       seat.  Mr. Martinez?
21       DIRECT EXAMINATION OF JAIR MENDOZA MONTOYA
       BY MR. MARTINEZ:
22     Q     Mr. Mendoza, before we begin, if you do not
       understand the question that I have asked, please
23     ask me to rephrase it.
       A     Okay.
24     Q     And the same of whomever is the government
       prosecutor that will question you.
25     A     Okay.
       Q     And to finally extend to them the same

1    courtesy you would extend to me.
     A        Correct.
2    Q        All right.  Let's begin with some background
     information about you personally.  How old are you?
3    A        I am 49 years old.
     Q        And where do you live, what is your country of
4    origin?
     A        I am from Colombia, from a small city whose
5    name is Riohacha.
     Q        Do you have a family back in Colombia?
6    A        Yes, of course.
     Q        Are you married?
7    A        No.
     Q        Do you have any children?
8    A        I have one, he lives in Panama, he's grown up.
     Q        Thank you.  What kind of work do you do?
9    A        Professionally I am a navigation officer.  I'm
     a navigator.  But when I'm without work and I'm on
10   land, I'm not out navigating, I work as a cab driver
     on a motorcycle.  On a motorcycle, yes.  And I have
11   also been a salesman, I've been a salesman.  I've
     sold -- out on the street.  Even though I've worked
12   for an advertising company on the internet and the
     name of it is Amarillas.net.  That company,
13   Amarillas.net, is an American one but you purchase
     franchises through the internet.  And my brother
14   would purchase the franchise through the internet
     because he is economically better off than I am and
15   he's got cards.  And I would sell the advertising to
     the companies through the internet --
16           MR. GAMMONS:  Your Honor, I don't think this
     is relevant.
17           THE COURT:  Sustained.  That was.
     BY MR. MARTINEZ:
18   Q        Let's focus primarily on your historical work
     as a navigation officer.  What training and
19   experience do you have in that regard?
     A        I began sailing as a mariner and after sailing
20   as a navigator when I wasn't sailing, because of my
     academic condition, one of the persons of Dimar in
21   Colombia asked me to enroll in the school to become
     an officer because I had the academic credentials.
22   I had taken courses in college as well.
     Q        And how long have you worked in that capacity?
23   A        As a mariner or as an officer?
     Q        Let's take them both.  First, how long were
24   you a mariner before you became a higher officer?
     A        Thank you.  Okay, I began working as a mariner
25   in '94, in the year 1994.  Afterwards I stopped
     sailing for about four or five years and then I

1    enrolled in school in a civil school run by the
     state, by the government.  To be able to enroll in
2    the state-run school you have to pass an exam that
     does your IQ proficiency given that that profession
3    is expensive if it is given on a private level.
             I started in a state institution called
4    El Sena in Cartagena, Colombia.  Nautical center and
     aquatic and fisherman.  That's the estimate of the
5    way it's called.
     Q       When did you finish your academic training?
6    A       In 2007.
     Q       At the conclusion of your academic training
7    what were you qualified to do, what positions at sea
     were you qualified to do?
8    A       Second officer, but because of the tonnage of
     the ship I may be a first officer.  In this case my
9    credentials state that it's first officer up to
     3,000 tons.
10   Q       So depending upon the size of the vessel, you
     can either be a first officer or a second officer.
11   A       Correct.
     Q       Are you also qualified to be a captain?
12   A       Yes.  Yes, but in such a case as an assistant,
     but I can only do it for one trip before the
13   international authorities -- I can only do it for
     one trip as an assistant to the captain.
14   Q       On how many occasions have you worked on
     vessels as either a first or second officer?
15   A       As a first officer, some eight vessels.
     Q       And as a second officer how many?
16   A       Only one.  Only one.
     Q       How do you find employment as either a first
17   or second officer?
     A       Okay, sometimes -- many times in Colombia in
18   the role of marines -- it's a profession that's
     given mostly on the coasts and sometimes it's done
19   by recommendation of someone that knows that someone
     an officer or a manner so he tells someone.  So they
20   either reference or they provide you their phone
     number or their mail, that way one can provide one's
21   credentials through the email.
             Even my name, Jair Mendoza Montoya, can be
22   found on Google, my credentials, my name, and I show
     up on the internet.
23   Q       All right.  Let's turn our attention to the
     Fat Crow.  How did you first become -- when did you
24   first learn of potential employment opportunities
     aboard the Fat Crow?
25   A       I was working at another boat, I was traveling
     from the High Guajira to Panama but then on that

1    boat the salary was very low because it was in
     Colombian pesos and the work is extremely more --
2    extremely heavier than on a tanker boat. So by
     working there myself desperately looking for a
3    change in the work because those boats with a
     national flag pay very poorly. So I called this man
4    in Barranquilla to help me out to find embarkment as
     a first officer or second officer because of my --
5    Q    Do you remember the name of that gentleman?
     A    Of course. Mr. Fabrigas.
6    Q    And after you contacted that individual what
     happened?
7    A    Well, he said I'm going to find out the name
     and the number of this one person who I believe is
8    looking for personnel for this one boat. He told me
     the boat is in the Dominican Republic. I said if
9    it's in the Dominican Republic, the payment must be
     good because it's a boat with a foreign flag. The
10   average salary in one of those boats was between
     2,500 and 3,000.
11   Q    Are we talking about American dollars or some
     other currency?
12   A    American dollars.
     Q    Go ahead.
13   A    So we left it at that. He told me that he was
     going to inform me so I started waiting. I
14   continued working at that other boat, a box type --
     boxes. That's the way they call it because this is
15   the type of boats that work with appliances from
     Panama to Colombia. So he said he would call me
16   because at that time he was going to send me to the
     Dominican Republic. So we left it at that, that I
17   would call him when I was in Panama, that way we
     communicate through WhatsApp. He told me that the
18   boat is there on the Dominican Republic, that it's
     in the shipyard and once it's out of the shipyards,
19   they'll let me know to see if you can register and
     install yourself on the boat.
20        I'm glad about that because I was going to get
     a job opportunity where I would earn more.
21   Obviously earning more in the clear sense of the
     word, nothing illegal or anything like that.
22   Q    At that point in time were you previously
     familiar with either the vessel the Fat Crow or
23   anyone that owned or was associated with the Fat
     Crow?
24   A    I didn't know absolutely anyone.
     Q    Was it the first time you ever heard the name
25   of the vessel Fat Crow?
     A    Correct, correct.

```
1    Q      Ultimately do you get word through WhatsApp or
     some other mechanism that there is an opportunity in
2    fact for you to become involved on the Fat Crow?
     A      Yes.  So how do I found out?  It happens that
3    I end up without work out of that boxes type
     container ship because there was kind of like a
4    small kind of argument with the captain of that boat
     with respect to that boat because I told him that on
5    that boat I had been offered to be paid 2 million
     pesos and then they turned out paying me 1.5 million
6    pesos.  And I told him that that was no good to me
     because I had gone there because what they had
7    promised to me, the 2 million pesos.  So because of
     that, I did two trips on that boat.
8           After that I disembarked and I went to
     Riohacha.  Once I'm in Riohacha I start calling not
9    just Victor Fabrigas but other people, I start
     calling people to see if I get a job opportunity, to
10   see if anybody could give me a job.  So then this
     Mr. Fabrigas called me and he says I'm going to give
11   you the number of someone who might be able to give
     you a job.  And he gave me the name of Mr. Herman.
12   Q      This individual, Mr. Herman, were you
     acquainted with him previously in any way?
13   A      I didn't even know him.
     Q      Were you given a last name?
14   A      Herman Oliveros.
     Q      Were you also given the phone number?
15   A      Yes.
     Q      And did you call him?
16   A      And so he says send me that on an email -- my
     documents.
17   Q      Like your resume?
     A      Yes, correct.  So my documents -- so I sent my
18   documents over to him.  I'll be calling you in about
     two weeks, call me again to see what we can do.
19   Q      Now, let me just interrupt here for one
     moment.  Logistically, your answers, keep them short
20   and give the interpreters a chance to interpret them
     for the jury.
21   A      Oh, yes, I'm sorry.
     Q      That way it makes their job a little easier.
22   A      Thank you.
     Q      So we left off, you called Herman and what
23   happened?
     A      He told me that he would give me the name of
24   this man, what's his name, I forgot his name, Hector
     Favio.
25   Q      Is this, after your conversation with Herman,
     the first time you had ever heard the name Hector
```

1     Favio?
      A     Correct.
2     Q     And did you call Mr. Hector Favio?
      A     Of course.
3     Q     When approximately if you can recollect was
      that phone call made?
4     A     In May, the month of May.
      Q     May of 2017?  This year?
5     A     Yes, this year.
      Q     Okay.  Go ahead.
6     A     So I sent him my documents.  They left it that
      they would call me again.  I waited for him to call
7     me.  They did not.  I continued calling because I
      need to work.  I'm a poor person.  Very humble.  At
8     that time I was out of work.  I had to do jobs --
      handyman jobs.
9           When I called him again about 15, 20 days
      later, he told me look, what's most likely is that
10    the trip is going to come to there, but you're going
      to have to look for the boat and embark in
11    Venezuela.
      Q     All right.  If the first call was May 17th and
12    you wait a couple of weeks, are we now in mid June?
      A     Correct.
13    Q     Okay.  What happens?
      A     Yes.  And so he says yes, he calls me on
14    June 6th for me to move to Maicao.  It so happens
      that day in Maicao we were not able to stamp the
15    passport --
      Q     Let me interrupted you for a minute.  What are
16    the two cities -- what countries are these two
      cities in and how far apart are they?
17    A     From Riohacha to Maicao is 45 minutes.
      Q     By car?
18    A     Yes.  From there to the border with Venezuela,
      which they call the line, it's 15 minutes.
19    Q     Did you agree to make the trip?
      A     Yes, of course, it's easier -- because I'll be
20    closer, I won't have to travel by plane or anything.
      So when we arrived there to the line, they did not
21    stamp the passport.  At that time is when I saw
      Martin.
22    Q     And who is he?
      A     Martin Barrios, the captain.
23    Q     Okay.
      A     And I never -- in other words, it's been years
24    since I've seen him.  And I was surprised, but I had
      seen him in one of these container ships many years
25    before.
            We got there, they wouldn't be able to put the

1    stamp because they didn't have what was needed which
     was a letter from the navigation agency where one
2    demonstrates that one is going as a crew member on a
     boat that is on such a dock.  And that's when Martin
3    tells me the boat is not on port, the boat is
     anchored at Boya Sero.
4    Q       Where is that?
     A       Boya Sero is the place where the ship was
5    anchored the whole time it was gathering fuel.
     Q       And what country is that in?
6    A       That has been said many times here.  That's in
     international waters between Aruba and Venezuela.
7    Q       Okay, go ahead.
     A       So that day the passport was not stamped, I
8    was sent to a hotel.  That was close to Riohacha, it
     was close to 5 p.m., I went back home to sleep.
9    Almost getting home Martin calls me and says get
     here early tomorrow because then we are getting
10   going.
              The following day I met up with Martin.  Him
11   and I are very quiet, strictly what's necessary.  He
     didn't speak to me, I didn't speak to him.  And that
12   way this man, El Gordo, took us on his pickup --
     Q       Let me interrupt you here.  This individual
13   that you just referred to as El Gordo, is this an
     individual that you had met before?
14   A       No, not at all.
     Q       When you met El Gordo, how was he introduced
15   to you, who was he supposed to be?
     A       Not supposed to be anything.  He was the one
16   who managed the fuel situation I came to find out
     after I arrived on the ship.  He knew well or dealt
17   with Martin.  Martin is the one who told me that he
     would be picking me up.  And so then we hit it, we
18   were able to have the passport stamp and that's
     because I began to talk and I spoke with an
19   immigration man from Venezuela because they hadn't
     done any -- taken of any of the measures that they
20   had to as far as the recommendation letters and the
     man then stamped our entrance into Venezuela.  And
21   from there El Gordo took Martin and I in the truck
     to Maicao.
22   Q       And what happened when you got there?
     A       When we got to Maicao El Gordo went out and
23   bought some spare parts for the ship.  He bought
     them at several hardware stores.
24   Q       What date are we at now, if you recollect?
     A       That was on the 7th of June.  The 7th.
25   Q       All right.  What happens next?
     A       So El Gordo finished buying parts, he picked

1     up a girlfriend that he had there, she sat in the
      front, we sat in the back, and we headed out to
2     Punto Fijo in Venezuela.
          Q       And when did you arrive at that location?
3     A       We got to Punto Fijo at night.
          Q       That same day?
4     A       Like at about 10, yeah, that's same day.  Like
      at 10 at night, 10 at night.  And from there we
5     stayed at a hotel, each one in their own room.  I
      was in one room, captain was in his room, and El
6     Gordo and his girlfriend were in another.
          Q       And how many nights did you stay at that
7     hotel?
      A       We stayed there -- we stayed there from the
8     15th of June to the day that we went to the ship.
          Q       And how long was that?
9     A       Well, from the 8th to the 15th it's seven
      days.
10        Q       I see.  So the 8th you arrived at the hotel
      and you stayed there through the night of the 14th
11    until the 15th; is that right?
      A       Correct.  Of June.
12        Q       What did you do during that week?
      A       I spent the entire time in the hotel.  They
13    would go out and do their errands and I stayed at
      the hotel.  And I would go to the movie theater, I'd
14    watch up to four movies a day.
          Q       What explanation were you given as to this
15    delay of having to stay in the hotel for a week?
      A       Because they said that they had to arrange
16    some paperwork for the ship, they had to buy some
      spare parts in Punto Fijo.  And the truth is I was
17    getting bored.  But the explanation Martin gave me
      is don't worry, you're going to get paid for the
18    time that you're waiting.
          Q       All right.  So moving up to the 15th of June,
19    what happens?
      A       So on the 15th early at dawn a speed boat,
20    like the gentleman who testified here said, one with
      two engines, and we headed out on the peninsula of
21    Paraguana, we went to the zone where the ship was
      anchored.
22        Q       How long did it take to make that trip by that
      vessel?
23    A       From there it took three hours.  From three to
      three and a half hours, on average, that's how long
24    it takes.  I know that the guys who sat here said
      that it was two, but that's false.
25        Q       So after this three-hour journey you arrive at
      the Fat Crow, what happens?

1    A       With the captain.
     Q       Was there anyone else on this vessel besides
2    you and the captain?
     A       Yes, of course.  The vessel was already
3    manned.
     Q       But anyone associated with this case or just
4    the driver of the vessel?
     A       In other words, the ship.  The Fat Crow?
5    Q       Well, let's just move on to the Fat Crow.  You
     ultimately arrived with the captain at the Fat Crow.
6    What happens?
     A       We got on there aboard, I met with the crew, I
7    met the Lakafa, and I met the whole crew.  There was
     my companion Llanos, and the entire crew, the nine
8    crewmen along with me were aboard the vessel.
     Q       Once you boarded the Fat Crow, what was your
9    understanding of what would be occurring aboard that
     vessel?
10   A       How is that?  I don't understand.
     Q       There has been mention of a fuelling operation
11   that's going on aboard the Fat Crow.
     A       Yes, correct.  When the captain and I arrived,
12   the ship had been taking in fuel, smuggled fuel.
     And so that the recut began to take place.  In other
13   words, it's a recut that takes place when the ships
     have been supplied from the boats.
14   Q       Okay.  Now, when you say the contraband fuel,
     explain to the jury what you mean by that.
15   A       Oh, how embarrassing, forgive me, illustrious
     jury, but what happens is that the smuggled fuel in
16   Venezuela, the legitimate fuel cargo ships have to
     go to the docket in Venezuela to take on the cargo
17   legally.  Why?  Because they have to buy the fuel at
     the official price being set by the country.
18           But when you get the fuel outside, you could
     say that it's smuggled fuel, smuggled out.  So why
19   is this fuel illegal?  Because the government
     subsidizes the fuel provided to these boats so they
20   can go fishing.  But they instead of using it to go
     fish, they use it and take it to the ships that are
21   out.
             But that business has been arranged with those
22   who are on land, it's not like the guys who said
     here that I had done that.  But why do they say
23   that?  Out of ignorance.  They are sea man who do
     not know about the management of a ship.  On board a
24   ship as an officer I simply receive the fuel just
     like any other officer on any other ship throughout
25   the world.  The officer on a ship doesn't know
     anything about the price, doesn't know anything

1    about the money, doesn't know anything about the
     billing.  He just simply receives it.  You are in
2    charge of the safety, the security of the ship.
     Above all, the deck officer has to be alert about
3    fires that may take place on the deck.
     Q    Now, while this loading of fuel on board the
4    Fat Crow is taking place, by receiving the fuel from
     these small boats is the ultimate goal to fill up
5    all the tanks?
     A    Correct.  But the cargo tanks honestly.
6    Q    Now, when you arrived where was the Fat Crow
     in terms of the process of filling up the tanks,
7    were they empty, half full, nearly full, where was
     it?
8    A    No, they were like about a tenth, tenth part
     full.
9    Q    And how often would these small boats arrive
     with the contraband fuel?
10   A    Well, that was totally variable.  There is not
     one standard.  Sometimes it would come in one week,
11   maybe three or four would come.  In another week two
     or one might come.  Sometimes a week would go by and
12   none would come, just like sometimes six would
     appear, one would load up and then another one would
13   load up and another one would load up.  It's a
     loading system that is not standard, it's not
14   standardized at all.
     Q    What was the -- if you know, what was the best
15   estimate as to how long the Fat Crow would be in
     that situation awaiting fuel?
16   A    They have projected to be there approximately
     two months.  I would hear that being said by El
17   Gordo and the captain.  Because of course they had a
     maximum of load.  The vessel had a capacity of
18   650,000 gallons, 80 percent of a load.  Full load
     capacity is 645,000 gallons.
19   Q    During this time period are you living on the
     boat?
20   A    Yes, of course.  The boat is like one's home,
     one has one's bunk, private bedroom.  In my case as
21   an officer I had a desk with a ship's documents,
     everything that has to do with stability, safety,
22   inventory, of boat equipment, all that I would
     handle.
23   Q    Once you arrived on the boat, as we know there
     is a secret compartment in the bow of the boat.  Did
24   you ever come to learn of the existence of that
     compartment at the bow of the boat?
25   A    I did not become aware.  There was a man said
     here -- it's a dirty lie.

1    THE COURT:  Could you -- make sure I'm hearing
you.

2    Q    All right.  So you're on the boat.  The fuel,
the contraband fuel is coming in, you're unaware of

3    the secret compartment.  How long are you in this
status?

4    A    Excuse me, something I want to clear up with
respect to something or one of my co-defendants said

5    here.
     MR. GAMMONS:  Your Honor, this is

6    nonresponsive to the question that's been asked.
     THE COURT:  All right.  Why don't you ask your

7    question again.
BY MR. MARTINEZ:

8    Q    Okay.  Let me back up to the last question in
the event you haven't answered it completely.  Once

9    you're living -- once you arrive on the Fat Crow
and begin to live on board the boat, do you ever come to

10   learn of the existence of the secret compartment in
the bow?

11   A    No.
     Q    How long do you remain on the Fat Crow waiting

12   for the fuel levels to reach the point where you can
go out to sea with it?

13   A    Well, they had program -- it's not by the
level but by the capacity.  They were going to add

14   300,000 gallons of fuel.  What I said before, when I
got on the boat I started to inspect the tanks of

15   the vessel to see which were in conditions to
receive fuel to load.  When I talk about the

16   10 percent of the fuel, it was not in all the tanks,
it was only in the tanks 2 and 3 only were the ones

17   that had fuel.
     THE COURT:  Mr. Mendoza, please answer the

18   question.  The question is how long were you there
getting the fuel?

19   THE WITNESS:  Well, the thing is I got off.
And the captain received -- I was out 15 days and

20   the captain received.  Going to suppose that that's
part of the time because it was on the 21st that

21   that boat leaves that anchorage.
BY MR. MARTINEZ:

22   Q    Let me interrupt you for a minute so that I
can go chronologically.  When you arrive on the Fat

23   Crow and you continue to live there on board for a
period of time until you leave the boat for a

24   two-week period; is that correct?
     A    Yes.  It's not that I am -- I'm working.

25   Q    I understand.  You're working.  How long were
you working on board the Fat Crow before you left

```
1        the Fat Crow for that two-week period?
         A        From June until the 4th until the 5th of July.
2        5th of July is when I got off.
         Q        During that period of time while you're living
3        on the Fat Crow do you ever receive a visit from a
         representative of a drug trafficking cartel inviting
4        crew members to join in an international drug
         trafficking operation?
5        A        No, no, no.
         Q        Did you ever hear an announcement to come to
6        the bridge to hear an invitation regarding anything
         like that?
7        A        Not at all.
         Q        Once you reached the point where you're going
8        to leave the boat for a two-week period -- why were
         you going to leave the boat?
9        A        We're missing a little piece.  Before my
         leaving, Mr. Fabrigas and Mr. Hector Favio came and
10       El Gordo.  They came to make like an acknowledgment
         of the boat.  I didn't even know then.  When I show
11       up and I see them, it cracks me up because I have
         been talking to Herman.  There on deck of the boat
12       he's talking to me and he talks to me in a familiar
         way and I say who are you.  It's me, Herman who
13       called you on the phone about the documents.  I
         cannot see him until that day they got on the boat
14       approximately 10 days after I arrived with the
         captain.
15       Q        Okay.  Let's go over that.  When Herman and
         Hector Favio and El Gordo arrive on the boat what
16       happens?  When those three individuals arrived at
         the Fat Crow, what happens?
17       A        They call us to the dining area, told everyone
         to introduce themselves because I imagine they
18       didn't know them either, or maybe they did.  I don't
         know if they knew them, but I did not know them.
19       Q        You said earlier that they were there for an
         acknowledgment.  What does that mean?
20       A        To get to know the ship.  They didn't know the
         ship.
21       Q        And what relationship did you understand them
         to have with the ship?
22       A        The one came as the boat's administrator.
         Q        Which one?
23       A        Hector Favio.  And the other one came as the
         administrator or partner to the administrator of the
24       fuel.
         Q        Which one was that?
25       A        El Gordo.  He was the partner of this man
         called Sego Salas who were the ones in charge of the
```

1    fuel.  They on land would send off the small boats,
     pay off the fuel, send them over to us.  And then
2    one would receive the fuel that they would send, but
     then one would hand over to them an invoice signed
3    by the captain and myself with a stamp of the boat.
     With that invoice those small boats would go to
4    land.  With that there -- it's like they would get
     paid for the fuel.  And that invoice that remained
5    here, then one would report it to them.  El Gordo
     came, any time he came when on the boat he would
6    come and take the invoices, the copies of them.
         Q    And what was the purpose of the three to be on
7    board on that particular occasion?
         A    As I said, one came as the administrator, one
8    for the fuel, and the other one who had made that
     arrangement to embark one also came to get to know
9    one.
         Q    Did they come to meet with you or the captain
10   or someone else, who did they come to meet?
         A    To us, also to the vessel.  They did not know
11   the vessel.
         Q    Okay.  After that visit to the Fat Crow by
12   those three individuals when after that do you leave
     the ship?
13       A    After that, that was like in the first week --
     let me remember -- ten days he showed up in June --
14   I left on the 4th, I left on the 5th of July, about
     15 days.
15       Q    Why did you leave the ship?
         A    It so happens that the vessel had already
16   loaded approximately 230,000 gallons of fuel.  On
     that amount of fuel we do research, in other words,
17   the amount of fuel that --
         INTERPRETER:  The interpreter doesn't
18   understand --
         THE COURT:  Ask him to answer the question:
19   Why did he leave the ship?
         THE WITNESS:  I left the boat because I went
20   to bill for the fuel that I'm talking about.  There
     is some 9,000 gallons that is the crew's
21   9,000 gallons.  Since Martin had already left about
     five days before, Martin told me and I told him that
22   I also wanted to go to land, but El Gordo told him
     that that research of the fuel was going to paid at
23   a dollar.  That was like a perk for the fuel.  It's
     an equivalent of $9,000.
24   BY MR. MARTINEZ:
         Q    Let me make sure I'm clear on this.  Does this
25   trip involve some form of profit sharing for the
     crew related to the fuel purchases?

```
1    A       Correct.
     Q       And your responsibility was to do exactly what
2    on land?
     A       To go pick up the $9,000 and the crew took
3    advantage and they gave me their phone numbers for
     me to call their families, to get in touch with
4    their families.  And they were okay, since they have
     been more than two months that they didn't know
5    anything about their families.  Because in that
     situation you are like in a simulated kidnapping.
6    Q       Was there cellular service from the Fat Crow
     if you were on board the Fat Crow?
7    A       No, there wasn't.  There is no signal.  And
     the TV signal that you get from Venezuela is quite
8    deficient.
             Okay, here a sat phone was mentioned.  It is
9    correct that the ship had a satellite phone.  El
     Gordo took it.  It was given to the captain.  The
10   captain did not know how to use it.  I asked him if
     I did and I told him I did, yes.  And so I -- since
11   he got that phone, he asked me -- he asked me to
     call a number that he told me to Central America and
12   he spent almost the whole balance on the phone.
     There was very little balance left on the phone.
13           THE COURT:  Okay.  Let's stop here a minute.
     I think we're all having a hard time.
14           First of all, he needs to answer the question
     instead of ramble.  The jurors are having a hard
15   time hearing the interpreter.  So I'm going to ask
     the interpreter, you're going to have to wear a mic
16   or speak up or something.  But I'm sure he's having
     difficulty interpreting because he's talking so
17   much.  So you need to keep your answers short.
     BY MR. MARTINEZ:
18   Q       Mr. Mendoza, keep your answers short.  Answer
     the question as best you can directly without
19   editorials.  We'll cover everything.  And give the
     interpreter a chance to translate for your jury.
20   A       Okay.
     Q       You leave the Fat Crow to get the $9,000 to
21   send to the crew members.  Do you do that?
     A       Correct.
22   Q       And did you either Western Union or MoneyGram
     or somehow send the proportionate share to each crew
23   member's family?
     A       Yes, correct.
24   Q       And did that take the two-week period of time
     that you were on shore or did you do anything else?
25   A       No.  In reality the errands that I did for the
     mariners, I did them in three days.  But I stayed on
```

1    land because they told me to stay on land.  First
     they told me that they did not have the money, I was
2    in Punto Fijo.  When they gave me the $9,000, it
     took them about five days to give them to me.
3            But it happens that one day the [inaudible]
     comes down so that day he tells me he's going to
4    purchase the food for one month.  I suppose that if
     the ship is going to buy food for one month it's
5    because it's about to leave, it's going to stay for
     about one more week.
6            So when I'm on land I have a discussion with
     El Gordo with the issue of the food, with the issue
7    of the food with the cook because the cook ended up
     cussing me out and he lacked respect for me --
8            THE COURT:  Mr. Martinez, this is totally
     irrelevant.  Ask another question.  He's got to
9    answer -- sir, you're going to have to answer the
     questions that are asked of you.  And keep your
10   answers short.
     BY MR. MARTINEZ:
11   Q       You're on shore to deposit this money and
     resolve whatever food issues there are for the crew,
12   correct?
     A       No.  That money is not to buy food.  That
13   money is like a tip for the crew, it belongs to all
     of us.
14   Q       I understand.
     A       From the search of the fuel.
15   Q       Okay.  After you do that and whatever other
     boat-related issues you had to contend with, do you
16   return to the Fat Crow?
     A       No, sir.  I have an argument with El Gordo and
17   he tells me that he's going to take me off the ship.
     I told him there is no problem, you won't take me
18   off the ship, I'll disembark myself.
             MR. GAMMONS:  Your Honor, this is
19   nonresponsive to the question.
             THE COURT:  Sustained.
20   BY MR. MARTINEZ:
     Q       Let me ask this.  Do you ultimately go back to
21   the Fat Crow?
     A       Of course I do.
22   Q       All right.  So whatever disputes you had with
     you and El Gordo, they end up getting resolved and
23   you go back to the Fat Crow, right?
     A       Yes, but I went to Riohacha.  Instead of
24   returning to Punto Fijo, I returned home to
     Riohacha.
25   Q       After your two-week absence from the boat what
     date, if you recollect, do you return to the Fat

1    Crow?
     A      I returned from Riohacha on the 18th.  On the
2    18th of July -- no, no, I'm sorry, of August.
     Q      So what's the total period of time that you're
3    gone from the Fat Crow?
     A      From July 5th -- I don't recall the exact
4    date.  From the 4th of August until August 18th.
     Q      How long is it after you return to the Fat
5    Crow until the Fat Crow leaves to go out to sea?
     A      Two days.
6    Q      The whole time that you were on board the Fat
     Crow did you ever meet or speak to any
7    representative from the drug cartel?
     A      Representatives?  They went there as
8    administrators; they did not go there as cartel
     representatives.
9    Q      And did you ever agree to participate with any
     of those people that came to the boat for whatever
10   reason, did you ever agree to participate as a drug
     trafficker?
11   A      No, sir.
     Q      Did you ever ask to receive any payment or
12   were you ever offered any payment in exchange for
     acting as a drug trafficker?
13   A      God not willing, no.
     Q      Did you ever witness while you were aboard the
14   Fat Crow any narcotics, cocaine, arrive and be
     brought on board the Fat Crow?
15   A      No, sir.
     Q      Did you ever participate in loading cocaine on
16   to the Fat Crow?
     A      No.
17   Q      Were you ever aware that any members of the
     crew had agreed to work as drug traffickers and
18   participated in loading cocaine onto the Fat Crow?
     A      Not at all, not at all.
19   Q      When did you first learn that there had been a
     secret compartment constructed on the Fat Crow that
20   had cocaine hidden within it?
     A      The truth is that I came to find out about the
21   cocaine was when the Coast Guard found it.
     Q      With regard to the four co-defendants that you
22   heard testify against you in this trial are any of
     them telling the truth about your participation?
23   A      That's the strategy that they took.
     Q      The question was was any of it the truth?
24   A      Referring to?
     Q      With regard to any participation by you as a
25   drug trafficker.
     A      No, sir, not at all.

1    Q      All right.  Thank you.  I'll pass the witness.
          THE COURT:  All right.  You may step down.
2    We're going to take a break.
          Ladies and gentlemen, we'll be in recess until
3    about 3:30.  You're welcome to walk around.  Please
     don't discuss the case.
4         (The jury retired to the jury room.)
          THE COURT:  We're in recess until 3:30.
5         MR. MARTINEZ:  Your Honor, would you just
     advise Mr. Mendoza that I'm not permitted under the
6    rules to talk to him while he's on the stand
     testifying?  In other words, during this break.
7         THE COURT:  Oh, yeah.
          Mr. Mendoza, because you're about to be
8    cross-examined by the government's attorneys, your
     attorney can't talk with you during the break.
9         THE WITNESS:  That's fine.
          THE COURT:  Okay.
10         (Recess was taken from 3:09 until 3:27 p.m.)
          THE COURT:  We don't have one of the
11   defendants out.  If you'll retake the witness chair.
     Mr. Castillo?
12         MR. CASTILLO:  Yes, Your Honor, just by
     purposes of scheduling, I have no questions of this
13   witness.  I'm assuming they're going to go to the
     government.  And I'm looking at the late hour, it's
14   about 3:30, I'm going to ask the court for an
     indulgence.  I'll go forward if you say we've got to
15   go forward.  What I would like to do is finish up
     with this witness, we can do instructions and then
16   maybe if we could go home overnight and come back
     fresh in the morning.  The reason is --
17         THE COURT:  No argument from me.
          MR. CASTILLO:  I won't say any more.  If I
18   need to, because obviously it's Mr. Martinez's case,
     if I need to run out for a minute, I can run out and
19   run back, or do you want me to let you know?
     Because at lunch time Mr. Marino made us go look at
20   this place and there is no bathroom.
          THE COURT:  Who made you go eat there?
21         MR. CASTILLO:  Him.  So I may have to run to
     the restroom one minute, but I mean --
22         THE COURT:  Yeah, that's fine.
          MR. CASTILLO:  I just didn't want to interrupt
23   the proceedings, at least you'll know.  That's all I
     have.
24         THE COURT:  Who is going to be doing the
     cross-examination?  Thank you.  Would you bring the
25   jury in?
          (The jury returned to the courtroom.)

```
1              THE COURT:  Mr. Gammons?
                    CROSS EXAMINATION
2     BY MR. GAMMONS:
       Q       Good afternoon.
3      A       Good afternoon.
       Q       You testified a few moments ago that when you
4     got off of the Fat Crow you were gone for two weeks;
      is that correct?
5      A       Yes.
       Q       While you were gone was Mr. Llanos  --
6      A       An approximation.
       Q       While you were gone was Mr. Llanos Miranda
7     still on the Fat Crow?
               MR. MARTINEZ:  Objection, Your Honor, it calls
8     for him to determine, while he was absent from the
      Fat Crow, if somebody else was on the Fat Crow.
9              MR. CASTILLO:  Also known as beyond the scope
      of the inquiry by the co-defendant.
10             THE COURT:  I'll deny the -- overrule beyond
      the scope.  And as far as the question and his not
11    knowing, he can certainly say that if he doesn't
      know.  Just needs to answer the question.
12             THE WITNESS:  Yes, of course.
       BY MR. GAMMONS:
13     Q       You testified during direct examination that
      the date that you left the Fat Crow was July 5th as
14    well as August 4th.  So tell me which date was it.
       A       In August.  August.  I'm sorry about the
15    mistake.
       Q       You know now that there were drugs found
16    aboard Fat Crow, correct?
       A       Obviously, yes.
17     Q       And you've heard testimony that Mr. Hector
      Favio is a drug dealer, correct?
18     A       I heard it here.
       Q       And you didn't know that he was a drug dealer
19    prior to being here today?
       A       Obviously I didn't.
20     Q       Prior to this trial did you know El Gordo was
      a drug dealer?
21     A       Not at all.
       Q       And prior to this trial did you know that
22    Herman was a drug trafficker?
       A       No, no, no.
23     Q       And it was El Gordo that was responsible for
      putting the fuel on the Fat Crow; is that right?
24     A       Correct.
       Q       And that was contraband fuel, correct?
25     A       Correct.
       Q       And that was a crime, correct?
```

1       A       Yes, it is.
        Q       So you were participating in that crime,
2       right?
        A       Let's see, that's a crime in Venezuela, only
3       in Venezuela, because it's Venezuelan fuel.   In
        fact, when you're there you're aware of Venezuelan
4       frigates that are involved in that activity.
        Because when the ship sails from that zone with
5       whatever amount of fuel because whatever -- there
        are ships that go there that have the capacity of
6       12,000 tons to pick up fuel.   And obviously the
        fishing vessels are aware that with the Venezuelan
7       Coast Guard.   So it's contraband, it's a smuggling
        of contraband that only deals with Venezuela because
8       that fuel after it leaves the country of Venezuela
        and it goes wherever, its manifest is legal.
9       Q       So it's a crime in Venezuela.
        A       Correct.
10      Q       And you were anchored off the coast of
        Venezuela.
11      A       Between Venezuela and Aruba.
        Q       And they were Venezuelan fishing boats that
12      were providing you with the contraband fuel; is that
        correct?
13      A       Correct.
        Q       So each time one of these fishing boats loaded
14      contraband fuel onto the Fat Crow, that was a
        separate crime, correct?
15      A       Yes, that's right.   Someone aware that one is
        there in that danger, of course.
16      Q       But your testimony is that because you were
        planning to go to a country where this wasn't
17      illegal, that it's okay.
        A       Correct.
18      Q       How long is a normal trip when you're acting
        as first officer on a ship?
19      A       A trip is totally relative because the time is
        proportional to the velocity or speed.   Depending on
20      the knots that the boat runs on is how long it's
        going to take the ship to arrive.   If a boat doesn't
21      have too much speed, obviously it's a physics
        principle, it's going to take longer.
22      Q       Let me ask you this question.   Is it normal
        during one of these trips to be anchored at sea for
23      three months?
        A       Yes.   In that area, yes.
24      Q       When you're acting as a first officer is it
        important to be knowledgeable about the ship?
25      A       Well, let's see.   We're talking about the
        load; obviously you have to be sure that the ship is

1    in conditions to accept a load, that the tanks are
     not contaminated.
2    Q       Is that the only thing you need to know about
     a ship as the first officer?
3    A       No, the functions of a first officer are
     varied.  If I start to explain here I'll be more
4    extensive and we have time constraints.
     Q       I understand.  When you joined the Fat Crow
5    did you walk around and go in every room in the Fat
     Crow?
6    A       In the area of the deck.  That's the area of
     my responsibility.
7         MR. GAMMONS:  Your Honor, may I publish
     Government Exhibit 5B?
8         THE COURT:  You may.
      BY MR. GAMMONS:
9    Q       Mr. Mendoza, a moment ago you discussed tank 2
     and tank 3.  That's the location where you went on
10   the Fat Crow?
     A       Which, should I show it to you?
11   Q       No.  You've been in that area, correct?
     A       I know the tanks, of course.  I went into the
12   tanks to inspect them, the tanks, for loads.
     Q       The area where I place my pen, have you ever
13   been in that area of the ship?
     A       That's the machines area.
14   Q       My question is that area, have you ever been
     in that part of the ship?
15   A       No, no, of course not.
     Q       So as the first officer you never once went in
16   that area?
     A       No.  I had no necessity -- or I had no need,
17   better said.
     Q       Did the Fat Crow have generator problems?
18   A       Yes, that's what the machinist would say.  And
     as a fact one notices because of the smoke that it
19   gives off, because of the blackouts.
     Q       So that's my question.  Did you notice that
20   the ship was having generator problems?
     A       Yes, of course.
21   Q       Did you know in that compartment on the front
     of the ship there was a generator that wasn't being
22   used?
     A       I knew that there was a generator there and
23   that it was damaged, that's all.  But that
     information is provided to one by the machinist
24   personnel.  Since that's not my area, I have no need
     to go there.  My area is the deck and bridge.
25   Q       So if the ship cannot move because it doesn't
     have any power, that's not your responsibility.

1    A      Correct.
     Q      And as a first officer, it's not important to
2    search a ship for any secret compartments?
     A      The vessel in its condition is already taking
3    on cargo.  The boat when I arrived had cargo, was
     not empty.  I simply limited to inspecting the cargo
4    tanks that were still empty.  That boat was in an
     anchorage area.  When one inspects a boat in the
5    condition that you're seeing, that is a dock, a
     port, and you do it with a chief of machines.  And
6    in that case in the case of compartments you do it
     with an antinarcotic authority.
7    Q      Are you familiar with the automatic
     identification system?
8    A      Yes.
     Q      What is that?
9    A      The AIS, identification automated system.
     Q      What is it used for?
10   A      That's an instrument to aid navigation, it's
     called like that.  It works to identify all the
11   vessels that are in the area.  Likewise, like the
     vessel has its identification through AIS, any
12   vessel that is in the area also will see one even if
     it's 12 to 36 miles away from one because that works
13   like a radar.  It takes on quite a distance.
             Plain sight, one's eyesight, you can see up to
14   two miles.  With binoculars you can see up to
     8 miles.  After 8 miles your eyesight sees
15   absolutely nothing.  Because of the roundness of the
     earth, the image disappears.
16   Q      Okay.  Is the AIS system run from the bridge
     of the ship?
17   A      No, that's a system that's installed automatic
     like the radar.
18   Q      Let me ask you this question.  Do you
     participate in maintaining the logs, the bridge
19   logs?
     A      Correct.
20   Q      When Hector Favio, Herman and El Gordo came to
     the Fat Crow, did you document that visit?
21   A       I did not document it because the captain
     said to me not to do so.  But it should be
22   documented because wants you to put everything on
     the log.  As a first officer I have obligations, but
23   they are conditioned on the captain's orders.
     Q      That time when the captain purportedly told
24   you not to write that Hector Favio came to the ship,
     did you ever see Hector Favio on the Fat Crow any
25   additional times?
     A      Not at all.  Never.  I got to meet them the

1    day that they got on board the boat.  I did not know
     them.  I simply -- they embarked me simply by way of
2    telephone.  They send me through WhatsApp an email
     address where I sent my documents through email
3    virtually.
     Q       You returned to the Fat Crow in August 18, you
4    said?
     A       Yes.  The 18th, yes, the 18th.
5    Q       And where were you on the morning of August
     20th?
6    A       On the morning of August 20th I was in my
     cabin.
7    Q       What time did you wake up?
     A       Around 8, from 8 to 9.
8    Q       And what were the other crew members doing?
     A       They were on deck, they were doing their jobs,
9    in the machine room, they were working on the
     generators.  They were doing their work on the
10   generators.  Truth is that since my job is based on
     the bridge, 90 percent of the time I spent it on the
11   bridge.  When I wasn't doing anything, so as not to
     get bored, I would see movies on the computer.
12   Q       What were you doing when you spent your time
     on the bridge?
13   A       As just said, when I had the nothing to do or
     when I was doing my job?
14   Q       What I'm asking you is the boat wasn't moving
     for months.  What were you doing during this time?
15   A       I had to do inspection of the extinguishers.
     Inspection creating reports of the flares, date of
16   expiration, date of this.  I did calculations of
     stability for the boat.  Organizing a bunch of books
17   from the boat that are in the bridge.  That was my
     job.
18   Q       Checking on the fire extinguishers?
     Organizing the books?
19   A       Yes, all of that.  And also caring the control
     when the little boats came to offload.  That
20   operation of loading would take sometimes 8 hours,
     6 hours.  Sometimes it would be done at sun up.
21   Sometimes we would start the day loading because the
     fuel rate was very slow.  And people sometimes are
22   too tired so they finish their job and they spend
     the entire day sleeping.
23           It's not like people are anchored and they're
     just spending their time scratching their belly
24   button.  People are there working.  And when the
     deck mariners weren't doing any work, they were
25   doing painting jobs, general maintenance on the
     deck.

```
1    Q      What time did you usually get to the bridge
     each morning?
2    A      7:30 to 8:00.
     Q      Except the day when the cocaine came and you
3    woke up late, correct?
     A      I don't know what time the cocaine arrived.
4    Q      On August 20th you woke up late, correct?
     A      8:30.  Because before that I had to do the
5    calculations for to plot for the trip.  That job is
     quite cumbersome, it takes a lot of mental energy
6    doing all the calculations because you have to do
     calculations at different speeds to find out how
7    long the boat is going to take to make a trip.
            I did that, I finished late, I went to bed
8    tired.  I don't have the control of time to wake up
     early or wake up late.  And in fact, none of the
9    crew members.
            When cargo is received, if a person is tired,
10   if they finish offloading at 5 a.m., I'm not going
     to wake them up on the following day at 7 or 8 a.m.
11   for them to work.  You give them the freedom to wake
     up and in the afternoon you assign them some tasks.
12   Q      You've heard the testimony at trial that
     Hector Favio was on the boat on the evening of
13   August 19, 2017, correct?
     A      The truth is that I know that Mr. Hector Favio
14   went to the ship several times.  But an exact date
     as to me, I don't know.  What's more, I was
15   surprised when the people who were here put an exact
     date because if I as an officer did not memorize
16   those dates because they were irrelevant, I don't
     know how they could sit here and give exact dates as
17   if they had been recorded.  I was seated down as you
     can see and sometimes I would get very angry and
18   even tears would come out because of the lies they
     were saying.
19   Q      Let me ask my question again.  You heard the
     testimony that Hector Favio was on the boat on
20   August 19th, 2017, right?
     A      I know that Mr. Favio was there not only on
21   that date but several times.  Because not only would
     he go there to have meetings with the personnel but
22   he would go because he would go to make arrangements
     with the generators, he would spend like three or
23   four hours on the ship.  And they came here and they
     said as if he only went there to hold meetings.  I
24   was awestruck by what they had said.  Sometimes he
     would go there at 9 and leave at 5.
25   Q      So you were on the boat more than one time
     when Hector Favio came.
```

1      A      Of course.
       Q      How many times?
2      A      He came while I was aboard the ship like four
or five times.
3      Q      And did you record that in the bridge logs?
       A      Once again I say, and I repeat, I was under
4      orders not to put that in the logbook.
       Q      Every single time that Hector Favio came, you
5      were told not to record his presence on the boat.
       A      No, no, the captain had said that way before
6      then.  He said there is no need to write that down.
So it wasn't recorded.  Ever.
7      Q      So your testimony is that even though you were
the first officer, you never ever went to a portion
8      of the ship where there was a secret compartment
constructed.
9      A      Thank god I didn't.
       Q      And your testimony is that when Hector Favio
10     came on several occasions and negotiated how much
was to be paid to transport cocaine, you weren't
11     present.
       A      When he held meetings on the two times that I
12     went, he only spoke about the salary and the fuel.
If he had held meetings it could have been while I
13     was in another area or when I was in my cabin.  I
would go into my cabin and I would spend hours
14     working and it was when I went out that I would hear
this, hear that.
15     Q      And it's your testimony that when the ton and
a half of cocaine arrived at the boat, you had just
16     coincidentally slept in that day, right?
       A      Coincidentally?  I was sleeping.  What's more,
17     I suffer from insomnia and when I go to bed I would
take this medicine, what's the name, I take it with
18     a little water, fall asleep.  What's more, the Coast
Guard, when they searched in my personal belongings,
19     they found that medicine.
       Q      So the only crime you got on board the Fat
20     Crow to commit was the smuggling of fuel; is that
correct?
21     A      If you consider -- were you to consider that
that was a crime, you could say I did.  But that is
22     only a crime in Venezuela under Venezuelan Coast
Guard.
23            MR. GAMMONS:  No further questions.
              MR. MARTINEZ:  None.  Thank you, Your Honor.
24            THE COURT:  Thank you, sir, you may step down.
              Mr. Martinez, do you have any additional
25     witnesses?
              MR. MARTINEZ:  I'm sorry, Your Honor, we do

1       not.  The defense would rest.
                THE COURT:  Mr. Stout, or Mr. Gammons, do you
2       have any rebuttal?
                MR. STOUT:  No, Your Honor, thank you.
3               THE COURT:  All right.  Ladies and gentlemen,
        both sides have rested their case and there are two
4       matters remaining, the closing arguments by the
        attorneys and the instructions on the law and then
5       you will go back to the jury room to deliberate.
                Since it's 10 minutes after 4 and we have no
6       chance of finishing the closing arguments this
        evening, we're going to recess for the evening.
7       When you return in the morning at 9:00, we'll begin
        with either the instructions in the law or the
8       closing argument, and then we will have the other.
        If I instruct you in the law first, we'll have the
9       closing arguments.  Or if we have the closing
        arguments, I'll then instruct you in the law and
10      then you'll go back to the jury room to deliberate.
                I anticipate you'll get the case sometime
11      tomorrow morning and you can take whatever time you
        need to reach a decision if you can do so.
12              So that will essentially be the schedule
        tomorrow.  I'll ask Ms. Saylor to order lunch for
13      the jurors so that you don't have to recess for an
        hour and 15 minutes at lunch, so hopefully by lunch
14      you'll be deliberating and you can eat in the jury
        room.
15              Any questions that you might have?  No?  Okay.
        Have a good evening.  Leave your pads on your chairs
16      and we'll start in the morning at 9:00.
                (The jury retired to the jury room.)
17              THE COURT:  Do you all wish to renew your
        motions?
18              MR. CASTILLO:  Yes, Your Honor, I renew all
        previous motions at this time.
19              MR. MARTINEZ:  We would as well, Your Honor.
                THE COURT:  My rulings would be the same.  As
20      to the judgment of acquittal, I would continue to
        deny the judgments of acquittal.  My rulings on
21      motions in limine or other pretrial motions remain
        the same.
22              Mr. Fitchett, would you hand these to -- this
        goes to the government and this goes to
23      Mr. Mendoza's attorney and this goes to
        Mr. Miranda's attorney.  All right.  I think there
24      really is only one thing we need to discuss for a
        few minutes and that's the request by Mr. Castillo
25      to give a multiple conspiracy instruction.
                So Mr. Castillo, you furnished me the standard

1      instruction?
              MR. CASTILLO:  Yes, Your Honor.
2             THE COURT:  And of course I'm familiar with it
       as well and so why don't you tell me why you think
3      it's appropriate in this case.
              MR. CASTILLO:  Yes, Your Honor.  Obviously we
4      take -- the standard is if there is any evidence to
       support a requested instruction, it should be given
5      upon request of the party.  In this case I think
       there is ample evidence of the overall conspiracy
6      that's alleged by the government so far as the
       transportation of the cocaine after being boarded,
7      the cocaine coming aboard or the packages coming
       aboard in late August.
8             But then we also have evidence of an agreement
       beforehand.  Whether or not my client participated
9      is a jury question, but there is a perhaps a
       conspiracy to build the compartment to aid and abet
10     the transport of contraband at that time.  There is
       conspiracies between Hector Favio and all the
11     defendants.  There is a conspiracy perhaps -- I
       don't know if it's conspiracy -- if it's believed,
12     and I guess we have to -- given in the light most
       favorable to the government that Mr. Llanos did in
13     fact meet with someone in private and that he was
       also in the company of other crewmen when this offer
14     was made.  There were talks of future trips.  There
       were talks of -- now we're hearing talks of
15     contrabanded fuel.  That's not what he's being
       charged with, but now there is evidence of that.
16            But nonetheless, I think that clearly the jury
       needs to identify the conspiracy that's alleged in
17     the indictment and who the conspirators were and
       what their role in it.  That's the province of the
18     jury.  I think we have evidence of multiple
       conspiracies throughout this fact pattern lasting
19     from April to August and it's up to the jury to
       decide if the government has met their burden and
20     established a conspiracy charged in the indictment
       and I think there is ample evidence of that and I
21     would request the instruction.
              And the citations on my requested instruction
22     are there, the case support.  That instruction has
       been given in other similar cases involving boats by
23     other judges, I think even Your Honor but I don't
       remember if that was a boat case.  I've got the
24     citation --
              THE COURT:  That one you gave me was not a
25     boat case.
              MR. CASTILLO:  It your case.  Okay.  But the

1     others were, other judges.
              THE COURT:  Would one of you like to respond
2     to this?
              MR. STOUT:  Your Honor, I don't think we have
3     evidence here of multiple conspiracies.  It's pretty
      clear that the evidence we have in front of us is
4     that Hector Favio starts this thing in April of 2017
      when he recruits not only Mr. Llanos but the early
5     crew members from Colombia who then traveled to the
      Dominican to join the Fat Crow where they built the
6     hidden compartment, traveled down to Venezuela, and
      then Hector Favio shows up again and negotiates the
7     price with the crew members who were on the ship at
      that time and then he's there the night before the
8     drugs arrive.  The drugs arrive, they cut anchor,
      take off, and are interdicted by the Coast Guard.
9     This is one conspiracy.
              The testimony we have from the witnesses about
10    the drug conspiracy is that they had multiple
      meetings where all the crew members were present
11    with Hector Favio to discuss on various occasions
      the price.  The only part we've heard about where
12    they have private meetings is where they go in to
      discuss what particular payment they're going to
13    get, but the object of the conspiracy is the same
      object, a single object, single conspiracy.  I just
14    don't see multiple conspiracies here.
              THE COURT:  Nor do I.  The building of the
15    compartment certainly was in furtherance of the
      conspiracy.  The object -- the instruction that I'm
16    going to give is the object of the unlawful plan was
      to possess with the intent to distribute the cocaine
17    and that two or more people came to agree to
      accomplish that unlawful plan.
18            An instruction is required when the indictment
      charges several defendants with one overall
19    conspiracy but there is proof at trial that
      indicates a jury could reasonably conclude that some
20    of the defendants were involved in separate
      conspiracies unrelated to the overall conspiracy
21    charged in the indictment.
              I don't think there is any chance that this
22    jury is going to get confused and convict the
      defendant of cocaine conspiracy based on the mention
23    that they were also taking on illegal gasoline in an
      effort to I assume cheat the government out of
24    taxes.  I don't think there is any chance that there
      is going to be any confusion of that.
25            The determination as to whether to give such
      an instruction is mine and the Eleventh Circuit in

1    *United States v. Chastain* says that the district
     court in determining whether an instruction for a
2    multiple conspiracy should be given considers
     whether there is sufficient evidence for a
3    reasonable jury to conclude that some of the
     defendants were involved in separate conspiracies
4    unrelated to the overall conspiracy charged in the
     indictment.
5          To the extent there might be subgroups
     operating pursuant to the general conspiracy, then I
6    don't think that takes away.  When I talk about
     subgroups I'm thinking in terms of each of the --
7    the testimony from the cooperators was that each of
     the conspirators met individually to determine what
8    price they wanted to charge.  But that doesn't mean
     that they were not all operating in the same
9    conspiracy, all -- the plan was to possess with the
     intent to distribute cocaine.  And the fact they
10   might have had individual meetings about the price
     does not mean that there were multiple conspiracies,
11   nor do I think it makes it necessary to give a
     multiple conspiracy instruction which I think is
12   confusing.  And I'm always hesitant to give it
     anyway, but I just simply don't think the evidence
13   is here to support such a instruction so I'm not
     going to give it.
14         Other than that, they're just standard
     instructions.  I've given them to you, you can take
15   them home with you.  Before we start in the morning
     I'll ask if there are any objections and you can let
16   me know if there is anything that you think is
     objectionable.  And they're essentially the
17   instructions that the government had submitted.
           Okay.  Let's talk about closings.  How long
18   does the government anticipate taking for closing?
           MR. STOUT:  Your Honor, I'd ask the court for
19   30 minutes for the opening closing and then
     20 minutes for rebuttal, so 50 total.
20         THE COURT:  Mr. Castillo?
           MR. CASTILLO:  Equal time.  Whatever you give
21   them, I want.
           THE COURT:  Mr. Martinez, equal time?
22         MR. MARTINEZ:  That's fine, Judge.
           THE COURT:  Let's do this.  That's just a long
23   time.  If we're going to do 50 minutes, we're
     talking about almost three hours of closing
24   arguments, which is crazy.
           So let's try, Mr. Stout, to keep your -- I'll
25   give you a total of 40 minutes and you can divide it
     up however you want to divide it.  I'll give each

1   defendant a total of 40 minutes and if you take it,
    fine; if you don't, that's fine too.
2           MR. CASTILLO:  Your Honor?
            THE COURT:  One other question and then I'll
3   get to yours.  Any preference whether I -- that you
    might have whether I instruct before the closings or
4   after the closings?
            MR. CASTILLO:  I like it you instruct them
5   first, then we close.  That's my preference.  But it
    cuts both ways.  I would prefer you do it first.
6           THE COURT:  Mr. Martinez?
            MR. MARTINEZ:  I think I would prefer as well
7   that you do it first.
            MR. STOUT:  I agree, Your Honor.
8           THE COURT:  That's what I'll do.  Now,
    Mr. Castillo?
9           MR. CASTILLO:  Your Honor, you ruled on the
    multiple conspiracy instruction, I respect the
10  ruling, but I'm going to object and move for a
    mistrial.
11          THE COURT:  Okay.  I'll note the objection and
    deny the motion for mistrial.  Okay.  All right.
12  Anything else?
            MR. CASTILLO:  No, ma'am.
13          THE COURT:  Then we will start at 9:00
    tomorrow morning.
14          (The proceedings adjourned at 4:18 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2      STATE OF FLORIDA           )

3      COUNTY OF HILLSBOROUGH     )

4          I, Lynann Nicely, RMR, CRR, Official Court

5      Reporter for the United States District Court, Middle

6      District, Tampa Division,

7          DO HEREBY CERTIFY, that I was authorized to and

8      did, through use of Computer Aided Transcription,

9      report in machine shorthand the proceedings and

10     evidence in the above-styled cause, as stated in the

11     caption hereto, and that the foregoing pages,

12     numbered 1 through 156, inclusive, constitute a true

13     and correct transcription of my machine shorthand

14     report of said proceedings and evidence.

15         IN WITNESS WHEREOF, I have hereunto set my hand in

16     the City of Tampa, County of Hillsborough, State of

17     Florida, March 2, 2018.

18

19

20          _/s/ Lynann Nicely_____
                  Lynann Nicely, RPR, RMR, CRR, CRC
21                Official Court Reporter

22

23

24

25