1           IN THE UNITED STATES DISTRICT COURT.
                 MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION

3

    UNITED STATES OF AMERICA,    :
4                                :
        Plaintiff,               :
5                                :
                                 : CASE    8:17-cr-445
6    vs.                         : NO.:
                                 :
7                                : DATE:   12/15/2017
    GUSTAVO ENRIQUE LLANOS       :
8    MIRANDA and JAIR MENDOZA    : TIME:   8:53  a.m.
    MONTOYA,                     :
9                                : PAGES:  1 - 113
        Defendants.              :
10   ------------------------    :

11                TRANSCRIPT OF TRIAL DAY 5
             BEFORE THE HONORABLE SUSAN C. BUCKLEW
12              UNITED STATES DISTRICT JUDGE

13   For the Government:

14           TAYLOR G. STOUT, ESQ.
             CARLTON GAMMONS, ESQ.
15           U.S. Attorney's Office
             Suite 3200
16           400 N. Tampa Street
             Tampa, Florida 33602

17

18   For Defendant Gustavo Llanos Miranda:

19           DANIEL L. CASTILLO, ESQ.
             3900 North Boulevard
20           Tampa, Florida 33603

21

    For Defendant Jair Mendoza Montoya:
22
             VICTOR D. MARTINEZ, ESQ.
23           423 S. Hyde Park Avenue
             Tampa, Florida  33606

24

25   Court Reporter:  Lynann Nicely, RPR, RMR, CRR

1          P R O C E E D I N G S

2              THE COURT:  Good morning.  Are we waiting for

3      the other interpreter?  Mr. Stout, anything

4      regarding the jury instructions before we proceed?

5              MR. STOUT:  No, Your Honor, I think they were

6      perfectly fine.

7              THE COURT:  Mr. Martinez?

8              MR. MARTINEZ:  No objection.

9              THE COURT:  Mr. Castillo?

10             MR. CASTILLO:  No, unless you changed your

11      mind.

12             THE COURT:  So what's the deal with the red

13      shirt?  Is that Christmas?

14             MR. CASTILLO:  Yes, Your Honor.  I told Alec

15      Hall I put my haberdashery against his.

16             THE COURT:  Well, not until you get whatever

17      it is that Mr. Hall wears in his lapel will you

18      achieve that.  And I'm not real sure what that is

19      that he wears in his lapel, but it's colorful.

20      Sometimes it matches his tie.  Anyway.  He does

21      dress well.

22             You're making the closing argument, Mr. Stout?

23             MR. STOUT:  Yes, Your Honor.

24             THE COURT:  Is Mr. Gammons going to tell you

25      about time or you want Ms. Saylor to tell you about

1       time or anything as far as reserving time?

2              MR. STOUT:  Your Honor, I plan to use

3       25 minutes on the front end and save 15 of the 40

4       for the back end.  I don't know if it's possible to

5       get a two-minute warning from -- Ms. Saylor can do

6       it or I can ask Mr. Gammons to do it.

7              THE COURT:  Ms. Saylor, would you give him a

8       two-minute warning.

9              COURTROOM DEPUTY CLERK:  Yes, Your Honor.

10             THE COURT:  Maybe at 23 minutes.  Anything

11      before I bring the jury in?

12             MR. CASTILLO:  No, Your Honor.

13             MR. STOUT:  No, Your Honor.

14             THE COURT:  Let's bring the jury in.

15             (The jury returned to the courtroom.)

16             THE COURT:  Good morning.  Anything happen

17      over the evening hours that any of you feel could

18      affect your ability to serve on this jury in any

19      way?

20             Even though we talked about it yesterday, I'll

21      go through it again.  In just a few minutes I'm

22      going to pass out the jury instructions and I will

23      go over those jury instructions with you and then we

24      will have closing arguments from the attorneys.

25      You'll hear first from Mr. Stout on behalf of the

1    United States, then Mr. Castillo, and then

2    Mr. Martinez, and then Mr. Stout has a rebuttal if

3    he wishes to use it.

4         So that's what's going to happen.  I can't

5    tell you exactly when I will recess.  I'll try to

6    recess sometime that I don't interrupt the

7    attorneys' closing arguments, but we'll take a

8    recess sometime during the morning.

9         And then Ms. Saylor is going to order

10   sandwiches, so I anticipate that you'll probably get

11   this case sometime before lunch.  I can't tell you

12   exactly what time, but before lunch.  Any questions

13   before we start?

14        When I say that, if any of you need to recess

15   at a time other than I'm recessing, just raise your

16   hand and let me know and I can certainly stop.

17        Mr. Fitchett, would you pass out the jury

18   instructions, please, sir.  These are your

19   instructions and you can write on them if you would

20   like to write on them.  You'll take them back to the

21   jury room with you to use during your deliberations.

22   Everybody has a copy.

23        The attorneys also have a copy.  They may

24   refer to them during the course of the closing

25   argument and if they want to, that's just fine.

1    I'll read them aloud to you and I would just ask

2    that you follow along with me.

3        It is my duty to instruct you on the rules of

4    law that you must use in deciding this case and

5    after I have completed these instructions, you will

6    then go back to the jury room and begin your

7    discussions, your deliberations.

8        You must decide whether the government has

9    proven the specific facts necessary to find each

10   defendant guilty beyond a reasonable doubt.

11       Your decision must be based only on the

12   evidence presented during the trial and you must not

13   be influenced in any way by either sympathy for or

14   prejudice against a defendant or the government.

15       You must follow the law as I explain it, even

16   if you do not agree with the law.  And you must

17   follow all of my instructions as a whole.  You may

18   not single out or disregard any of the court's

19   instructions on the law.

20       The indictment -- which you will also have

21   back in the jury room with you -- is a formal charge

22   against the defendant, but it is not evidence of

23   guilt.  The law presumes every defendant is innocent

24   and the defendant does not have to prove his

25   innocence or produce any evidence at all.

1          A defendant does not have to testify and if a

2     defendant chose not to testify, you cannot consider

3     that in any way while making your decision.

4          It is the government that must prove guilt

5     beyond a reasonable doubt and if it fails to do so,

6     you must find the defendant not guilty.

7          The government's burden of proof is heavy, but

8     it doesn't have to prove a defendant's guilt beyond

9     all possible doubt.  The government's proof only has

10    to exclude any reasonable doubt concerning the

11    defendant's guilt.

12         A reasonable doubt is a real doubt based on

13    your reason and common sense after you've carefully

14    and impartially considered all the evidence in the

15    case.  Proof beyond a reasonable doubt is proof so

16    convincing that you would be willing to rely and act

17    on it without hesitation in the most important of

18    your own affairs.

19         If you are convinced that a defendant has been

20    prove guilt beyond a reasonable doubt, then say so.

21    But if you are not convinced, then you need to say

22    so.

23         As I said before, you must consider only the

24    evidence that I have admitted in the case.  Evidence

25    includes the testimony of witnesses, the exhibits

1       that were admitted, but anything the lawyers say is

2       not evidence and it is not binding on you.

3               You shouldn't assume from anything I have said

4       that I have any opinion about any factual issue in

5       this case.  Except for my instructions to you on the

6       law, you should disregard anything I may have said

7       during the trial in arriving at your own decision

8       about the facts.  It is your own recollection and

9       interpretation of the evidence that matters.

10              In considering the evidence, you may use

11      reasoning and common sense to make deductions and

12      reach conclusions.  You shouldn't be concerned about

13      whether the evidence is direct or circumstantial.

14      Direct evidence is the testimony of a person who

15      asserts that he or she has actual knowledge of a

16      fact, such as an eye witness.

17              Circumstantial evidence is proof of a chain of

18      facts and circumstances that tend to prove or

19      disprove a fact and there is no legal difference in

20      the weight you may give to either direct or

21      circumstantial evidence.

22              When I say that you must consider all of the

23      evidence, I don't mean that you must accept all of

24      the evidence as true or accurate.  You should decide

25      whether you believe what each witness had to say and

1      how important that testimony was.

2           In making that decision, you may believe or

3      disbelieve any witness in whole or in part and the

4      number of witnesses testifying concerning a

5      particular point doesn't necessarily matter.

6           To decide whether you believe any witness, I

7      suggest you ask yourself a few questions:  Did the

8      witness impress you as one who was telling the

9      truth?  Did the witness have any particular reason

10     not to tell the truth?  Did the witness have a

11     personal interest in the outcome of the case?  Did

12     the witness seem to have a good memory?  Did the

13     witness have the opportunity and the ability to

14     accurately observe the things he or she testified

15     about?  Did the witness appear to understand the

16     questions clearly and answer them directly?  Did the

17     witness's testimony differ from other testimony or

18     other evidence?

19          You should also ask yourself whether there was

20     evidence that a witness testified falsely about an

21     important fact and ask whether there was evidence

22     that at some other time a witness said or did

23     something or didn't say or do something that was

24     different from the testimony the witness gave during

25     the trial.

1          To decide whether you believe a witness, you

2     may consider the fact that the witness had been

3     convicted of a felony or a crime involving

4     dishonesty or false statement.  And let me just stop

5     here for a minute and tell you, you heard evidence

6     that four of the witnesses had entered into plea

7     agreements with the United States and based on their

8     pleas of guilty, each of those four witnesses have

9     been adjudicated guilty of a felony.

10          But keep in mind that a simple mistake doesn't

11     mean a witness wasn't telling the truth as he or she

12     remembers it.  People naturally tend to forget some

13     things or remember them inaccurately.  So if a

14     witness misstated something, you must decide whether

15     it was because of an innocent lapse in memory or an

16     intentional deception and the significance of your

17     decision may depend on whether the misstatement is

18     about an important fact or about an unimportant

19     detail.

20          A defendant has a right not to testify, but

21     since a defendant did testify, you should decide

22     whether you believe that defendant's testimony in

23     the same way as that of any other witness who

24     testified.

25          When scientific, technical, or other

1    specialized knowledge might be helpful, a person who

2    has special training or experience in that field is

3    allowed to state an opinion about the matter.  But

4    that doesn't mean you must accept the witness's

5    opinion.  As with any other witness's testimony, you

6    must decide for yourself whether to rely upon that

7    opinion.

8         You must consider some witness's testimony

9    with more caution than others.  In this case the

10   government has made a plea agreement with

11   co-defendants in exchange for their testimony.  Such

12   plea bargaining, as it's called, provides for the

13   possibility of a lesser sentence than the

14   co-defendant would normally face.  Plea bargaining

15   is lawful and proper and the rules of the court

16   expressly provide for it.  But a witness who hopes

17   to gain more favorable treatment may have a reason

18   to make a false statement in order to strike a good

19   bargain with the government.

20        So while a witness of that kind may be

21   entirely truthful when testifying, you should

22   consider that testimony with more caution than the

23   testimony of other witnesses.  And the fact that a

24   witness has pleaded guilty to an offense isn't

25   evidence of the guilt of any other person.

1          During the trial you heard evidence of acts

2     allegedly done by defendant Gustavo Enrique Llanos

3     Miranda on another occasion that may be similar to

4     acts which the defendant is currently charged with.

5     You must not consider any of this evidence to decide

6     whether the defendant Gustavo Enrique Llanos Miranda

7     engaged in the activity alleged in the indictment.

8     This evidence is admitted and may be considered by

9     you for the limited purpose of assisting you in

10    determining whether defendant Gustavo Enrique Llanos

11    Miranda had the state of mind or the intent

12    necessary to commit the crime that's charged in the

13    indictment.

14         During the trial you've taken notes or at

15    least you've had the opportunity to take notes and

16    most of you appear to have done that.  You may or

17    you must use your notes only as a memory aid during

18    your deliberations.  You must not give your notes

19    priority over your independent recollection of the

20    evidence and you must not allow yourself to be

21    unduly influenced by the notes of other jurors.  I

22    emphasize that notes are not entitled to any greater

23    weight than your memories or your impressions about

24    the testimony.

25         The indictment charges two separate crimes,

1       called counts, against each defendant.  Each count

2       has a number.  You'll be given a copy of the

3       indictment to refer to during your deliberations.

4           Count One charges that the defendants

5       knowingly and willfully conspired to distribute and

6       possess with the intent to distribute 5 kilograms or

7       more of cocaine on board a vessel subject to the

8       jurisdiction of the United States.

9           Count Two charges that the defendants

10      committed what are called substantive offenses,

11      specifically that they knowingly and intentionally

12      possessed with the intent to distribute 5 kilograms

13      or more of cocaine on board a vessel subject to the

14      jurisdiction of the United States.

15          I will explain the law governing the

16      substantive defense in a moment.  But first note

17      that the defendants are not charged with committing

18      a substantive offense, they're charged with

19      conspiring to commit that offense, and I'm now going

20      to give you a specific instruction on conspiracy.

21          It is a separate federal crime for anyone to

22      conspire to knowingly possess with the intent to

23      distribute or import cocaine.  Title 46, United

24      States Code, Section 70503(a) makes it a crime for

25      anyone while aboard a vessel subject to the

1    jurisdiction of the United States to knowingly

2    possess cocaine with the intent to distribute it.

3         I have already determined as a matter of law

4    that the Fat Crow is a vessel subject to the

5    jurisdiction of the United States.

6         A conspiracy is an agreement by two or more

7    persons to commit an unlawful act.  In other words,

8    it's a kind of partnership for criminal purposes.

9    Every member of the conspiracy becomes the agent or

10   the partner of every other member.

11        The government does not have to prove that all

12   the people named in the indictment were members of

13   the plan or that those who were members made any

14   kind of formal arrangement or agreement.  The heart

15   of a conspiracy is the making of the unlawful plan

16   itself.  So the government does not have to prove

17   the conspirators succeeded in carrying out their

18   plan.

19        The defendant can be found guilty only if all

20   of the following facts are proven beyond a

21   reasonable doubt:  Number one, two or more people in

22   some way agreed to accomplish a shared and unlawful

23   plan; two, the defendant knew the unlawful purpose

24   of the plan and willfully joined in it; and three,

25   the object of the unlawful plan was to possess with

1      the intent to distribute a mixture and substance

2      containing a detectible amount of cocaine.

3          A person may be a conspirator even without

4      knowing all of the details of the unlawful plan or

5      the names and identities of all the other alleged

6      conspirators.  If the defendant played only a minor

7      part in the plan but had a general understanding of

8      the unlawful purpose of the plan and willfully

9      joined in the plan to at least one occasion, that's

10     sufficient for you to find the defendant guilt.

11         But simply being present at the scene of an

12     event or merely associating with certain people and

13     discussing common goals and interests doesn't

14     establish proof of a conspiracy.  Also, a person who

15     doesn't know about a conspiracy but happens to act

16     in a way that advances some purpose of one doesn't

17     automatically become a conspirator.

18         The defendants are charged in the indictment

19     with possessing and intending to distribute at least

20     five kilograms of a mixture and substance containing

21     a detectible amount of cocaine, but you may find any

22     defendant guilt of the crime even if the amount of

23     the controlled substance for which he should be held

24     responsible is less than 5 kilograms.

25         So if you find any defendant guilty, you must

1    also unanimously agree on the weight of the mixture

2    and substance containing a detectible amount of

3    cocaine that the defendant possessed and specify

4    that amount on the verdict form.  And I'm going to

5    read the verdict forms to you in a minute so this

6    will make more sense when you hear those.

7           Count Two.  It is a federal crime for anyone

8    on board a vessel subject to the jurisdiction of the

9    United States to knowingly possess a controlled

10   substance with the intent to distribute it.  Cocaine

11   is a controlled substance within the meaning of the

12   law.

13          The defendant can be found guilty of this

14   crime only if the following facts are proven beyond

15   a reasonable doubt:  Number one, the defendant was

16   on board a vessel subject to the jurisdiction of the

17   United States; number two, the defendant knowingly

18   possessed a mixture and substance containing a

19   detectible amount of cocaine; and number three, the

20   defendant intended to distribute the mixture and

21   substance containing a detectible amount of cocaine.

22          I have already determined as a matter of law

23   that the Fat Crow is a vessel subject to the

24   jurisdiction of the United States.

25          To possess with the intent to distribute means

1    to knowingly have something while intending to

2    deliver or transfer it to someone else even with no

3    financial interest in the transaction.

4         The defendants are charged in the indictment

5    with possessing with the intent to distribute a

6    certain quantity or weight of the alleged controlled

7    substance, in this case cocaine, but you may find

8    any defendant guilty of the offense if the quantity

9    of the cocaine or controlled substance for which he

10   should be held responsible is less than the amount

11   or weight charged.

12        Thus, the verdict form prepared with respect

13   to each defendant, as I will explain in a moment,

14   will require that if you find any defendant guilty,

15   you must then specify on the verdict your unanimous

16   finding concerning the weight of the controlled

17   substance attributable to the defendant.

18        Possession.  The law recognizes several kinds

19   of possession.  A person may have actual position,

20   constructive possession, sole possession, or joint

21   possession.  Actual possession of a thing occurs if

22   a person knowingly has direct physical control of

23   it.  Constructive possession of a thing occurs if a

24   person doesn't have actual possession of it but has

25   both the power and the intention to take control

1    over it later.  Sole possession of a thing occurs if

2    a person is the only one to possess it.  Joint

3    possession of a thing occurs if two or more people

4    share possession of it.  And the term possession

5    includes actual, constructive, sole, and joint

6    possession.

7         It is possible to prove a defendant guilty of

8    a crime even without evidence that the defendant

9    personally performed every act charged.  Ordinarily

10   any act a person can do may be done by directing

11   another person or an agent, or it may be done by

12   acting with or under the direction of others.

13        A defendant aids and abets a person if the

14   defendant intentionally joins with the person to

15   commit a crime.  A defendant is criminally

16   responsible for the acts of another person if the

17   defendant aids and abets the other person.

18        A defendant is also responsible if the

19   defendant willfully directs or authorizes the acts

20   of an agent, employee, or other associate.

21        But finding that a defendant is criminally

22   responsible for the acts of another person requires

23   proof that the defendant intentionally associated

24   with or participated in the crime, not just proof

25   that the defendant was simply present at the scene

1          of a crime or knew about it.

2                In other words, you must find beyond a

3          reasonable doubt that the defendant was a willful

4          participant and not merely a knowing spectator.

5                You'll see in the indictment that it charges

6          that the crime was committed on or about a certain

7          date.  The government doesn't have to prove that the

8          crime occurred on an exact date.  The government

9          only has to prove beyond a reasonable doubt that the

10         crime was committed on a date reasonably close to

11         the date alleged.

12               The word "knowingly" means that an act was

13         done voluntarily and intentionally and not because

14         of a mistake or accident.

15               The word "willfully" means that the act was

16         committed voluntarily and purposely with the intent

17         to do something the law forbids; that is, with the

18         bad purpose to disobey or disregard the law.

19               While a person must have acted with the intent

20         to do something the law forbids before you can find

21         that person acted willfully, the person need not be

22         aware of the specific law or rule that his conduct

23         may be violating.

24               Where a statute specifies several alternative

25         ways in which an offense may be committed, the

1    indictment may allege the several ways in the

2    conjunctive; that is, by using the word "and."

3    Therefore if only one of the alternatives is proven

4    beyond a reasonable doubt, that's sufficient for a

5    conviction so long as the jury unanimously agrees to

6    at least one of the alternatives.

7         Each count of the indictment charges a

8    separate crime against one or more of the

9    defendants.  Here it's against both defendants.  You

10   must consider each crime and the evidence relating

11   to it separately and you must consider the case of

12   each defendant separately and individually.  If you

13   find a defendant guilty of one crime, that must not

14   affect your verdict for any other crime or any other

15   defendant.

16        I caution you that each defendant is on trial

17   only for the specific crimes charged in the

18   indictment and you're here to determine from the

19   evidence in the case whether each defendant is

20   guilty or not guilty of those specific crimes.

21        You must never consider punishment in any way

22   to decide whether a defendant is guilty.  If you

23   find a defendant guilty, then the punishment is for

24   the judge, meaning me, to decide later.

25        Your verdict, whether it's guilty or not

1     guilty, must be a unanimous verdict.  In other

2     words, you must all agree to that verdict.  Your

3     deliberations are secret, you'll never have to

4     explain your verdict to anyone.  Each of you must

5     decide the case for yourself, but only after fully

6     considering the evidence with the other jurors.  So

7     you must discuss the case with one another and try

8     to reach an agreement.

9          While you're discussing the case don't

10    hesitate to re-examine your own opinion, change your

11    mind if you become convinced you're wrong, but don't

12    give up your honest beliefs just because the others

13    think differently or because you simply want to get

14    the case over with.  Remember that in a real way

15    you're the judges here, you're the judges of the

16    facts of this case and your only interest is to seek

17    the truth from the evidence in the case.

18         When you go back to the jury room, that will

19    be after the closing arguments, you'll have to

20    select one of your number to be the foreperson and

21    the foreperson will direct deliberations and will

22    speak for you when you get back into court.

23         There is a verdict form that's been prepared

24    -- in this case there are two verdict forms -- for

25    your convenience.  You don't have a copy of the

1    verdict forms because I have the copy up here and I

2    will send it back with you, but you don't have a

3    copy, so let me read it to you now because it tells

4    you what you're going to be asked to decide for each

5    of the defendants.

6         The first verdict form is as to Gustavo

7    Enrique Llanos Miranda and it reads as follows.

8    Count One of the indictment.  As to the offense of

9    conspiracy to distribute or to possess with the

10   intent to distribute cocaine while aboard a vessel

11   subject to the jurisdiction of the United States, in

12   violation of 46 United States Code, Sections

13   70503(a) and 70506(a) and (b), we, the jury,

14   unanimously find the defendant, Gustavo Enrique

15   Llanos Miranda, guilty, not guilty, and there is a

16   line for the foreperson to check once you've

17   unanimously agreed to a verdict.

18        Then there is an additional instruction, it

19   says, if guilty, if you find the defendant guilty,

20   then you will proceed to the next question regarding

21   drug quantity.  And it reads as follows.  We, the

22   jury, further unanimously find that the amount of

23   cocaine involved in the offense charged in Count One

24   is, and you check only one:  5 kilograms or more; at

25   least 500 grams but less than 5 kilograms; less than

1     500 grams.

2          Count Two of the verdict form reads as

3     follows:  As to the offense of possessing with

4     intent to distribute or aiding and abetting others

5     in possessing with the intent to distribute cocaine

6     while aboard a vessel subject to the jurisdiction of

7     the United States, in violation of 46 United States

8     Code, Sections 70503(a) and 70506(a), and 18 United

9     States Code, Section 2, we, the jury, unanimously

10    find Gustavo Enrique Llanos Miranda, and there is a

11    place to check guilty and a place to checking not

12    guilty, depending on your unanimous verdict.

13         If guilty, you'll be asked to decide the

14    quantity.  So it says, we, the jury, further

15    unanimously find that the amount of cocaine involved

16    in the offense charged in Count Two is -- and you're

17    to check only one:  5 kilograms or more of cocaine;

18    at least 500 grams but less than 5 kilograms; less

19    than 500 grams.

20         And then there is a place for the foreperson

21    to date the verdict form and sign the verdict form.

22         Now, I have read the verdict form for

23    Mr. Llanos Miranda.  There is an identical verdict

24    form for Mr. Jair Mendoza Montoya.  It asks the

25    identical questions, asks you to make the identical

1    determinations, but for Mr. Mendoza as opposed to

2    Mr. Llanos.

3         You will have these verdict forms back in the

4    jury room with you along, as I said before, with the

5    indictments, along with your notes, and along with

6    the jury instructions that you can take back with

7    you, and along with all of the evidence that you've

8    been permitted to see or at least that's been

9    received into evidence.  So I just remind you if

10   you're listening to the closing arguments, you're

11   going to have all the evidence back there with you.

12        Now, I have two paragraphs of a final

13   instruction that I'm going to save until after the

14   attorneys make their closing arguments because it

15   talks about what happens if you have a question or

16   what you need to do specifically with the verdict

17   form.  So I'll just save those last two paragraphs

18   until after closing arguments.

19        Okay.  As I said, these are your instructions

20   and you're welcome to mark on them as you listen to

21   the closing arguments or at any time during

22   deliberations or at any time, period.  They're yours

23   to take back with you.

24        All right.  The attorneys are now going to

25   make a final or closing argument.  That's an

1    opportunity for the attorneys to tell you what they

2    believe the evidence has shown and to argue their

3    case to you.  It's a closing argument.  So they will

4    be arguing the case to you.

5         I remind you that what the attorneys say in

6    their closing argument is not evidence and you

7    should not consider it evidence.  I don't mean to

8    suggest you shouldn't listen to the closing argument

9    because they're going to be recalling the evidence

10   with you.  However, I remind you that the evidence

11   comes from the exhibits and the testimony of the

12   witnesses who have testified in this trial.

13        Every attorney who is going to make closing

14   argument -- meaning the attorney for the government

15   and the attorney for both of the defendants -- will

16   have an equal amount of total time to address you in

17   their closing arguments if they wish to use it.

18   Because the fact that the government has the burden

19   of proof in the case, the order of presentation will

20   be that the government goes first and Mr. Stout will

21   make a closing argument on behalf of the government,

22   then Mr. Castillo would have an opportunity to make

23   a closing argument on behalf of Mr. Llanos Miranda,

24   and then after Mr. Castillo finishes, Mr. Martinez

25   will have an opportunity to make closing argument on

1    behalf of Mr. Mendoza.  And after he is finished,

2    Mr. Stout has an opportunity to speak to you again

3    in rebuttal.  So that's the way it will work.

4         After you hear the closing arguments, I'll

5    read you those last two paragraphs of instructions

6    and then I will excuse the alternate jurors because

7    two of you are alternate jurors and the law allows

8    only 12 jurors to make a determination in this case.

9    And once I've done that, then the jury will go back

10   to the jury room and begin deliberations.

11        Any questions about anything I might have

12   said?  All right.

13        Mr. Stout, you may make a closing argument at

14   this time on behalf of the United States.

15        MR. STOUT:  Ladies and gentlemen, I would like

16   to start out this morning by reviewing with you how

17   it is that these nine men ended up on a barely

18   seaworthy oil tanker in the middle of the Caribbean

19   Sea, transporting $45 million worth of cocaine.

20        You heard from four cooperating witnesses in

21   this case.  I would like to first turn your

22   attention to the last of those men you heard from,

23   the welder on the ship, Oscar Herrera Venera.  He

24   told you that in April of 2014 he was recruited to

25   join this trip in Barranquilla, Colombia.  He told

1    you that while he was in Barranquilla, Colombia, he

2    met with several people who would turn out to be

3    members of the Fat Crow's crew.

4        He told you that he met there with Captain

5    Bilarkazar; with Ariel Bolanos; with the chief

6    engineer Vargas; with the first officer Dorian; the

7    second engineer Felipe Castillo; the first defendant

8    in this case, the helmsman, Llanos Miranda, and

9    himself.

10       He told you that they had a couple of meetings

11    in Barranquilla after which these men left

12    Barranquilla and went to the Dominican Republic to

13    join the crew of the Fat Crow.

14       He told you that first Bolanos and the

15    engineer and the captain left and joined immediately

16    following one of those meetings and that three days

17    after they did that, he had another meeting with the

18    trip organizer, a man you've heard a lot about,

19    Hector Favio.

20       He told you that during that meeting the first

21    defendant seated here, Llanos Miranda, was present,

22    and that Hector Favio told him -- by "him" I mean

23    Herrera Venera, the welder -- that his purpose in

24    the trip was to build a hidden compartment to store

25    the cocaine.  And he told you that Llanos Miranda

1    was there present for that meeting.  He told you

2    that immediately following that meeting they took

3    their plane tickets, got on the airplane, flew from

4    Barranquilla to the Dominican Republic to join the

5    crew.

6         So then you heard about the crew gathering

7    here in Santo Domingo at the Fat Crow.  You heard

8    already that the Colombian members of the crew had

9    traveled in two groups over the course of a couple

10   or three days from Barranquilla to the Dominican

11   Republic and you heard then from two more members of

12   the crew who testified here, the cook, Acuna Garcia,

13   and one of the oilers who helped build the hidden

14   compartment, Eduardo Chacin Villaroel, you heard

15   those two men say that they joined the Fat Crow,

16   they all boarded with that first group of Colombian

17   crew members on or about April 24, 2017.

18        And you heard that Acuna Garcia had been

19   living in the Dominican Republic with his wife or

20   girlfriend and that he worked at the shipyard where

21   the Fat Crow was and that that's how he found out

22   about it and got hired on.  And the other was Edward

23   Chacin Villaroel, he's the man who told you he was

24   from Venezuela, had suffered the economic crisis and

25   traveled to the Dominican to look for work and found

1    work on the Fat Crow.

2         Now, what you heard from the witnesses who

3    were there in April of 2017 is that the ship sat at

4    the dock there in the Dominican Republic from late

5    April, 2017, all the way until early June, and that

6    during that six- or seven-week period the main thing

7    that was going on is that they were building the

8    hidden compartment.  And you heard that -- firsthand

9    from two of the primary builders of that

10   compartment, the welder Herrera Venera who traveled

11   from Colombia, and his colleague, Edward Chacin

12   Villaroel, the other oiler who helped actually build

13   that compartment.

14        And if you remember what the welder told you,

15   Herrera Venera, is that although he and Chasin and

16   the engineer, the chief engineer, were the main guys

17   building it, the first defendant seated here, Llanos

18   Miranda, helped in that he helped clean out the area

19   that they were going to be working in and that he

20   helped remove debris that they created as they built

21   that compartment.

22        What all of those crew members told you you

23   heard from who were there at the time in Santo

24   Domingo on board the ship was that everybody was

25   aware they were building this hidden compartment

1    and that the ultimate purpose of the Fat Crow was to

2    transport cocaine.

3         You then heard that in early June the crew

4    sailed the ship from Santo Domingo to about here, a

5    point about 20 miles off the coast of Venezuela to a

6    place that they referred to as Punto Fijo or Buoy O,

7    but they all told you they anchored about 20 miles

8    off the coast and that that trip took them several

9    days.  So they were there in early to mid June of

10   2017.

11        You heard that shortly after they arrived they

12   had some changes to the crew.  You heard that the

13   original first officer, the second in command of the

14   ship, Dorian, a man who we don't have a picture of

15   because he wasn't on board the ship when it was

16   later stopped, he got off the ship before they left

17   in Santo Domingo, so they were short a first

18   officer.

19        You heard that shortly after the ship arrived

20   and dropped anchor off the coast of Venezuela, a

21   small boat came out from the Mainland with two

22   people on it:  A new captain, Captain Barrios, who

23   you also heard from on the stand; and the second

24   defendant in this case, Jair Mendoza Montoya, and

25   that he was to be the new first officer, the new

1     second in command.

2          You heard the captain tell you that he didn't

3     know before he got on the ship that it was going to

4     be a drug trip, but he discovered it almost

5     immediately after boarding when the first defendant

6     in this case, Llanos Miranda, told him we're going

7     to hit a home run.  And the captain told you he knew

8     that to mean they were going to do a drug trip based

9     on his own prior experience with such dealings.

10          You heard that the ship stayed anchored at

11    this spot off the coast of Venezuela from early to

12    mid June all the way up until it left the morning

13    the cocaine arrived on August 21st of 2017.  So it

14    stayed there over the course of the rest of June,

15    all of July, and most of August.

16          And what was going on during that time?  You

17    heard that basically they onloaded black market fuel

18    in small increments from little fishing boats

19    periodically throughout that time and you also heard

20    that what was really going on during that time was

21    that they were negotiating with Hector Favio how

22    much they were going to be paid to do this trip.

23          You heard all four cooperating crew members

24    talk about these meetings.  They told you that

25    Hector Favio -- the same Hector Favio who recruited

1     the welder back in Barranquilla, Oscar Herrera

2     Venera -- that same Hector Favio took a small speed

3     boat, came out to the ship and confirmed to them

4     they were going to be doing a drug trip and asked

5     them how much do you want for this trip.

6          They all told you that this was a group

7     meeting, they had this with all nine members of the

8     crew and Hector Favio, and that both these

9     defendants were present at that meeting.

10         You heard that afterwards they then had

11    individual meetings with Hector Favio where they

12    were supposed to tell Hector Favio what amount of

13    money they wanted to do the trip.  He was going to

14    take their proposal back to the owners of the drugs.

15         And you heard Edward Chacin Villaroel tell you

16    that he had no prior experience in such dealings and

17    that the way he found out how much money to ask for

18    was that the defendant Llanos Miranda told him he

19    should ask for $100,000 and that he knew what to ask

20    for because of his own prior experience in such

21    dealings and even told him about his prior

22    conviction and imprisonment in the United States for

23    trafficking cocaine.

24         That's how you know that Llanos Miranda knew

25    what he was doing.  He knew what to ask for.  He

1    knew how to advise the younger crew members what to

2    ask for.

3        You heard that after this initial meeting

4    where everybody tells Hector Favio what amount of

5    money they want, Hector Favio left the ship and

6    returned to shore to relay that proposal to the

7    drug's owners.

8        You heard that he then returned back to the

9    ship on a separate occasion and told him you guys

10    asked for too much, the market, the drug market

11    won't support what you're asking for, and that he

12    cut the proposal significantly.  You heard that some

13    of the crew members tell you that they asked for

14    something on the order of $100,000 originally and

15    that the counterproposal when it came back was

16    something like $50,000.

17        You heard that Hector Favio then left again

18    and went back to shore and that sometime in this

19    middle period the second engineer -- whose picture

20    is off the screen and doesn't matter because we

21    don't have a real picture for him anyway -- fell ill

22    and had to be replaced and he was replaced in this

23    period of time by the final second engineer, Luis

24    Garcia.

25        So now you had the entire crew on board the

1    Fat Crow that was there whenever the Coast Guard

2    caught the ship in August.

3        You heard that Hector Favio came back out to

4    the ship with some bad news.  He told them that the

5    second proposal he'd come back out with the previous

6    time was still too much and they were going to have

7    to lower the price again.  And you heard Edward

8    Chacin Villaroel tell you that some of the crew were

9    upset by that and that Hector Favio told them look,

10   if you don't want to do this, I've got a backup crew

11   willing to take your place.

12       You heard that the crew members ultimately

13   decided to continue to undertake the trip and that

14   after this group meeting -- which again like the

15   others took place on the bridge and was followed by

16   an individual meeting about the price -- the crew

17   members told Hector Favio not only -- they told him

18   not how much they wanted at this point because that

19   was set, but where to send their 30 percent upfront

20   payment.  And in particular the captain told you

21   that Llanos Miranda didn't have anybody to send it

22   to and so he was going to send it to his brother, to

23   the captain's brother, which is where the captain

24   was sending his money.  You also heard the captain

25   say that his brother actually received $10,000 of

1     that upfront money.

2          You also heard the captain tell you that he

3     stood to make about $80,000, that was the final

4     number he stood to make, which consisted of three or

5     four years worth of his normal salary.  And he told

6     you that the second defendant, Mendoza Montoya, who

7     was the second in charge of the ship, stood to make

8     among the higher salaries of the members of the

9     crew, that he stood to make something like $60,000

10    whereas the low members of the crew stood to make

11    something in the order of $30,000 or the mid 30,000s

12    are the numbers you heard for those lower crew

13    members.

14         You heard that finally on August 21st or on or

15    about August 21st of this year, the drugs arrived

16    and all four cooperating crew members described to

17    you how this happened.  They told you that a small

18    speed boat came out to the ship, that it had several

19    men on it, that it came in the early hours of the

20    morning, that they tossed a rope up to the crew

21    members of the Fat Crow, and that each and every

22    member of that nine-man crew, including both these

23    defendants, helped pull that rope with the cocaine

24    tied to it up, one by one, and pass those bales one

25    by one to each other up onto the bow and into that

1     hidden compartment.

2         As a matter of fact, you heard the cook in

3     this case, the cook on the ship, Acuna Garcia, tell

4     you that it was Mendoza Montoya who came to wake him

5     up on that morning and the other guys on his hall to

6     help load the cocaine.

7         You heard that after they finished putting the

8     cocaine into the hidden compartment, they cleaned

9     off the deck and they threw away their clothes to

10    get rid of any evidence that might be there, and

11    that they then tried to drop anchor and leave but

12    were unable to and they actually had to cut the

13    anchor to leave.

14        Then you heard that they sailed for about

15    three days up into the Caribbean from the north

16    coast of Venezuela before the Coast Guard caught

17    them.

18        You heard from several members of the U.S.

19    Coast Guard.  They told you how they came upon this

20    ship and it was suspicious to them because it wasn't

21    broadcasting on the AIS, the Automatic

22    Identification System, like a transponder

23    broadcasting its position, it wasn't doing that

24    which was unusual for a ship of this size.  And that

25    it was making unusual maneuvers for a normal

1     merchant ship.

2          So they investigated, they got permission from

3     the flag country where the ship was registered to

4     board and search the ship and that that's exactly

5     what they did.

6          Then you heard how -- you heard them describe

7     to us this meticulous process they do, the at sea

8     space accountability where they measure the inside

9     and outside of every room on the ship, looking for a

10    place where there could be a hidden compartment.

11    They described that to you and how it ultimately led

12    them to this area up here in the front of the ship.

13         They told you that they went down into this

14    room after having searched the engine room and other

15    places on the ship and not found anything that

16    yielded any contraband.  They went into this room

17    here.  There was a hatch in the front of the room

18    that led into what's colored a yellow space under

19    here.  Under there there was a wall, a wall that

20    doesn't appear on this diagram because it didn't

21    appear on the ship's blueprints they used to help

22    draw this diagram.

23         On that wall they saw something unusual.  They

24    saw new welds, welds that stuck out to them because

25    they were shiny and bright, in stark contrast to the

1    rust that was all around the rest of the ship.

2        In order to discover what was on the other

3    side of that wall, they went back up into the room

4    above and took a closer look at the generator that

5    was on the side of that room above and they noticed

6    a few things about that generator.  They told you

7    the generator wasn't hooked up to its fuel tank,

8    that it was sitting loose on the frame that it was

9    sitting on, that you could actually unscrew the

10    screws with your fingers, that it was loose, and

11    there was a danger that it could bounce right off of

12    its base, and that there were chains rigged above it

13    to help lift it up.

14        All of that looked suspicious to them, so they

15    looked underneath it and what do they find?  About

16    right here they found a hatch, a hatch that looked

17    like it had been not created by the manufacturer, a

18    hatch that didn't show up on the ship's blueprints,

19    and underneath that hatch they found the other --

20    what was on the other side of that wall they

21    discovered, they found those bales of cocaine.

22        There is your new welds they told you they saw

23    on the wall, there is the generator, and of course

24    what they found underneath.

25        They told you that basically what they did was

1    at that point detained the crew, they pulled the

2    cocaine out of that hold.  And then you heard from

3    several Coast Guard members who described to you the

4    process that they essentially passed the Fat Crow

5    and the crew members and the evidence, the drugs,

6    from one Coast Guard cutter to another, to another,

7    ultimately bringing it all here to the Middle

8    District of Florida where they took this picture

9    with all the cocaine stacked up.

10          Now, the defendants are charged with two

11   crimes:  Conspiracy to possess with intent to

12   distribute cocaine, and possession with intent to

13   distribute cocaine.  I would like to talk about the

14   first crime first.

15          In order to find the defendants guilty of the

16   conspiracy charge, you have to find that we've

17   proved beyond a reasonable doubt these three things:

18   That two or more people agree to try to accomplish

19   an unlawful plan; that each of these two defendants

20   knew the plan's unlawful purpose and willfully

21   joined it; and that the object of the plan was to

22   possess with intent to distribute cocaine.

23          Now, I think we can dispense with some of

24   these elements pretty easily.  Let's talk about the

25   third element:  The object of the plan was to

1     possess with intent to distribute cocaine.

2          Now, there were -- you've heard that we agree

3     even with the defendants there were 1,504 kilograms

4     of cocaine and you heard that the value of that

5     cocaine is $45 million.  I think you can easily

6     conclude that the point of that cocaine was to be

7     distributed.  It's certainly not a personal use

8     amount and it was found on board a ship transporting

9     it from Point A to Point B.  It was being

10    distributed, in the process of it.

11         I think you can also easily conclude that two

12    or more people agreed to that plan.  You've heard

13    abundant evidence from the crew members who

14    testified about these meetings they had with Hector

15    Favio and the entire crew was there, they agreed,

16    they negotiated over the course of several meetings

17    what amount of money they were going to be paid to

18    do this trip.  There is certainly more than two

19    people involved in the plan.

20         The only real question with this crime is

21    whether these two defendants knew the plan's

22    unlawful purpose and willfully joined in it.  Let's

23    talk about the evidence you have of that.

24         With respect to the first defendant, Llanos

25    Miranda, you heard that he was a part of this

1     conspiracy, a part of this agreement, as far back as

2     April of this year when he sat with the welder,

3     Herrera Venera, with Hector Favio, the trip's

4     organizer, the representative of the drug owners, in

5     Barranquilla and listened to Hector Favio tell the

6     welder they needed to build a hidden compartment on

7     board the ship.

8         Immediately following that meeting Mr. Llanos

9     Miranda got on an airplane with the welder, Herrera

10     Venera, and flew to the Dominican Republic to join

11     the Fat Crow's crew. He wasn't put off by what he

12     had heard.

13         He continued in the conspiracy as he sat there

14     aboard the Fat Crow in the Dominican Republic for

15     those six or seven weeks while all the while the

16     welder and his colleagues were building the hidden

17     compartment.

18         And you heard from each of the crew members

19     who were there at the time, they told you that

20     everybody on board the ship at the time was aware

21     that that's what was going on, they were building a

22     hidden compartment in the front of the ship.

23         You've heard that Mr. Llanos Miranda was very

24     outspoken about this conspiracy. You heard that he

25     told the captain they were going to hit a home run.

1      And you heard that he advised one of the younger

2      members of the crew, Eduardo Chacin, how much he

3      should ask for whenever Hector Favio asked him to

4      tell what they wanted.  And he cemented his place in

5      this conspiracy when he, along with the other crew

6      members, loaded that cocaine early that morning in

7      August from the speed boat up into the ship.

8           Now, with respect to the second defendant in

9      this case, Mendoza Montoya, what we know is that he

10     joined the ship on or about June 15th of 2017, the

11     same day that the captain came out to the ship to

12     join the crew.

13          And you heard from the crew members who

14     testified, the cooperating crew members, that he was

15     also present at all of these meetings with Hector

16     Favio along with the rest of the crew.

17          You heard from the captain that he stood to

18     make $60,000 in the end, which is one of the higher

19     salaries of any of the members of the crew, because

20     of his position as a high level member of the crew,

21     the second in command.

22          You heard from the welder, Herrera Venera,

23     that just after joining the ship, just after getting

24     on the ship, he inspected the ship and in particular

25     he came to the front of the ship and he inspected

1    that hidden compartment and he saw that the walls

2    were not even and it wasn't constructed well enough

3    and that he told Herrera Venera to fix that, to make

4    it better hidden.

5         You heard the cook tell you the morning the

6    cocaine arrived this defendant woke him up to help

7    participate in loading the cocaine.  And you heard

8    from several of the crew members who testified that

9    Mr. Mendoza Montoya as they were loading the cocaine

10   onto the ship, he was one of those first three

11   people in the first line to help pull the bales

12   right over the edge of the ship and then pass it to

13   the group of people behind them as they loaded it up

14   the bow and into the hidden compartment.  That's how

15   you know they knowingly and willfully participated.

16        Now, the second crime that these defendants

17   are charged with is possession with intent to

18   distribute cocaine.  In order to find the defendants

19   guilty of that, you'll have to find, first, that

20   they were on board a vessel subject to the

21   jurisdiction of the United States; second, that they

22   knowingly possessed cocaine; and third, that they

23   intended to distribute that cocaine.

24        Here again I think we can dispense with some

25   of these elements pretty easily.  The judge has

1    already told you the first element is met.  She

2    determined as a matter of law that the Fat Crow was

3    the subject to the United States jurisdiction.  And

4    again as we discussed with the conspiracy count,

5    there is no doubt that the intention for this amount

6    of cocaine and the way that it was found as it was

7    being transported shows you that there is an intent

8    to distribute.

9          So the only question here again is whether

10   these two defendants knowingly possessed the

11   cocaine.

12         COURTROOM DEPUTY CLERK:  Two minute warning.

13         MR. STOUT:  The judge told you there is four

14   kinds of possession and you have at least three of

15   them here.  There's actual possession where you have

16   direct physical control of something.  There is

17   constructive possession where you have the intent

18   and the ability to take control over something

19   later.  And there is joint possession, that means

20   that more than one person can have possession of

21   something at the same time.

22         Now, the evidence you heard of possession here

23   for actual possession is that each of these

24   defendants helped load, bail by bail, this cocaine

25   up to the ship.  In that moment with every bail they

1    hold, they are in actual possession of the cocaine.

2          You also heard that they loaded the cocaine

3    into the hidden compartment and from that moment

4    forward when they have all the cocaine in the

5    compartment and they have set sail, they

6    constructively possess the cocaine.  They possess it

7    in that way because they have control over it and

8    they intend to deliver it to the next step in this

9    distribution chain where they were going to deliver

10   the cocaine.  The captain told you that was going to

11   be off the coast of Honduras at sea.  And then they

12   also have joint possession because all of them had

13   this intent.

14         Now, the same evidence I've discussed with

15   respect to the conspiracy charge applies to this

16   charge.  It's the same evidence of knowledge and

17   willful participation in this scheme.

18         The United States has proven to you each and

19   every element of both of these crimes as to each of

20   these defendants.  We've also proven to you the

21   amount of cocaine and you heard the parties

22   stipulated that it was 1,504 kilograms.  The judge

23   told you on the verdict form that one of the boxes

24   you can check is for 5 kilograms or more.  This is a

25   representative sample and it's about 10 kilograms is

1     what you heard.  That's just a fraction of what was

2     on that ship, a small fraction.

3          The defendants are guilty of both counts, both

4     of them.  And that's how you should find them during

5     your deliberations.  Thank you.

6          THE COURT:  Mr. Castillo?

7          MR. CASTILLO:  Thank you.  Madam Clerk, I need

8     the ELMO and also may I have 5-minute notification.

9          Ladies and gentlemen of the jury, we've had

10    the opportunity to spend some quality time together

11    this week and you've heard a lot of evidence.  You

12    received exhibits, you viewed photographs, and now

13    this is the point in the trial as the court has told

14    you, you have everything you need to make a decision

15    in this case.

16         What I say is not evidence.  The court has

17    already instructed you on the law.  You've already

18    received all the evidence that you're going to get.

19    And in our system of justice the way it's designed

20    that we bring members of the community in to sit in

21    judgment of the facts of this case and we force the

22    government to prove each and every element of the

23    offense charged against any defendant beyond and to

24    the exclusion of every reasonable doubt.

25         Now, the jury, you as jurors have one of the

1    move difficult jobs in the courtroom.  It's easy for

2    me to ask questions.  It's easy for me to show

3    exhibits.  It's easy for me to argue with witnesses

4    or question witnesses.  You have to determine if

5    there is sufficient evidence to prove each and every

6    element of the counts charged against Mr. Llanos

7    Miranda.  And how do you do that?  You're going to

8    have to evaluate the credibility of the witnesses

9    and examine the facts.

10        Now, as the court has told you, we have two

11    trials in this case going on at the same time.

12    Mr. Llanos is my client.  Mr. Montoya is

13    Mr. Martinez's client.  And even though we're both

14    defendants in the same case, the issues as to each

15    defendant might be a little different, but they're

16    individual.  And the court has told you you have to

17    examine the evidence as to each individual

18    defendant.

19        The indictment, which you're going to get a

20    copy of, as you're told it's not evidence, that's

21    just the way we have to have a charging instrument,

22    it has to begin somewhere, and you're told the

23    indictment -- just because the government has

24    charged these defendants, that's not evidence of

25    guilt.  That's just the charge.  And that's brought

1    about by a grand jury and now you have to decide.

2    You have to assume the grand jury made a mistake

3    because it's not evidence.

4         So Mr. Stout then, and Mr. Gammons, they have

5    the obligation to put their money where their mouth

6    is, to prove charges.

7         Now, Mr. Stout and Mr. Gammons have done a

8    great job establishing that the four witnesses

9    engaged in narcotics smuggling.  They admitted it.

10    All four of these cooperators signed plea

11    agreements.  They're all in evidence.  You're going

12    to get to look at it and read through them.

13         I went through it with one defendant,

14    painstakingly explained all the provisions in there.

15    But I ask each of you just to do this.  If you look

16    at these documents, all four of them, except for the

17    name of the witness, every other word is identical.

18    And these were documents given by the prosecutor to

19    the attorneys and the attorneys went and discussed

20    it with these defendants, they signed it, they

21    agreed to plead guilty, they did plead guilty, they

22    were convicted felons, and now they're awaiting

23    sentencing.  And we know from the plea agreement

24    that the only way they can go below a 10-year

25    minimum mandatory and get a lesser sentence is by

1    cooperating with the government.

2          In other words, this side, the two gentlemen

3    here and their office, they have to decide whether

4    their cooperation has risen to the level that

5    justifies them asking Judge Bucklew to reduce their

6    sentence from the 10 years to below.

7          Now, Mr. Stout pointed out there is also

8    provision in the plea agreement that says hey, if

9    you lie or testify falsely, we can prosecute you for

10   perjury.  Which is true.  The problem is, who

11   decides that?  Mr. Stout is going to decide whether

12   or not they testified truthfully.

13         Now, what's the truth?  The truth is these

14   defendants, they've admitted their guilt and they

15   want to cut a deal, so they're going to say anything

16   they can to help themselves.  They even admitted it.

17         Now, one of the difficulties that we have

18   since we weren't there is trying to put together

19   what actually happened.

20         Now, we know from Agent McDonough, he's the

21   last agent we heard from, talked about the routes

22   and so forth.  And your common sense -- which you

23   can bring with you collectively, just think about

24   it.  The object of drug trafficking or any type of

25   trafficking in illegal activity is to make money.

1    You have economics, supply and demand.  The more you

2    have of something, you want to sell it to get more

3    money.  There is cost involved.  What's the cost?

4    The cost of labor.

5         So doesn't it make sense that if you're trying

6    to get the most money you want to have the least

7    amount of cost?  Doesn't it make sense that if it's

8    going to cost you a certain amount to transport a

9    product from Point A to Point B, the fewer people

10   you pay, the more profits you're going to make?

11   Right?

12        Now, what do we know?  It's not disputed,

13   okay.  We know that Mr. Llanos Miranda was the

14   helmsman, the guy who steers the boat.  And there is

15   testimony from Mr. Herrera that in April he was

16   there when he signed the contract.  And we learned

17   about that, when you become a seaman you contract

18   for a certain period of time and you engage in your

19   occupation on the vessel.  Nothing illegal about

20   that.  So that's his job, to steer the boat.

21        Now, do you need -- if I'm a drug trafficker,

22   you need people to know, if I'm going to try to

23   traffic drugs, you need a captain has got to be

24   involved, the guy who is in charge of the ship has

25   to know what's going on.  And in fact, we heard from

1     Mr. Barrios, yeah I knew what was going on.  I

2     didn't find out at first.  When I first got aboard

3     the Fat Crow in June, I didn't think I was doing

4     anything illegal.  It wasn't until after I was there

5     a while and then later we talked to Mr. Favio and

6     that's when I said okay, now we're involved in

7     drugs.  Because the other guy, Bilarkazar, he was

8     already off the boat.

9          So he asks for a certain amount of money, he

10     wanted to be paid, he's the guy in charges of the

11     vessel.

12          You heard from the cook.  He didn't know, but

13     he said that this guy Favio promised him and he

14     individually made a deal and he never got anything.

15     What he got was arrested.  He didn't get any money

16     from them.

17          Chacin?  He said I don't know anything about

18     this.  According to him, he got information --

19     according from my guy, my client -- that he was

20     supposed to ask for $150,000.  Now, here's a guy

21     that really didn't have two nickles to rub together

22     but all of a sudden he's going to say I want

23     $150,000 to help you guys smuggle drugs.

24          According to -- Mr. Favio is supposed to be

25     the representative of the drug lords or the drug

1    cartels.  That makes no sense.  How is a person with

2    no knowledge of anything going to demand such a high

3    amount of money?

4         And according to them, if you believe them,

5    there is these three meetings where Favio goes on

6    shore, comes back, and then there is too much money

7    and we're going to offer you this and if you don't

8    like it, we've got somebody else coming on.

9         What did the people that testified tell you?

10   They said yeah, we agreed.  But what happens?  They

11   throw in hey, but Mr. Llanos was there.  When I

12   asked them specifically what did Mr. Llanos say,

13   well, no, I don't know because he was in a room with

14   somebody else and I don't know what was said but I

15   went in there to talk about price, everybody else

16   went in there to talk about price, so I'm assuming

17   that he was talking about money too but he doesn't

18   know.

19        So at first when they got up there and they

20   say everyone knew, and then when I say well what did

21   everyone know now they don't know what they didn't

22   know.  All they know is what they claim they saw.

23        Now, think about it, the fewer people who are

24   involved, the more profit there is -- the less money

25   that drug traffickers have to pay to people, there

1    is more profit for them.  So why wouldn't some

2    people be in the dark?

3         You don't need a helmsman who is being paid to

4    steer the boat at the direction of the captain to

5    have a successful venture.  You need the captain,

6    you need a welder, you need a machinist, you need

7    these people to work the boat, those people may need

8    to be involved.  They admit it, they admitted their

9    participation.

10        Now, as the judge told you already -- this

11   isn't Castillo talking, this is the law -- you're

12   going to have to evaluate the credibility of these

13   four witnesses.  And these are just some things you

14   should consider in evaluating the testimony in

15   determining whether you believe them.

16        Did the witness impress you as one who was

17   telling the truth?  Look at these collectively.  Did

18   the witness have a personal interest in the outcome

19   of the case?  All four of these cooperators, they

20   have an interest in the outcome of this case.  You

21   need to take that into consideration.  And you also

22   got an instruction you have to consider that

23   testimony with great caution.

24        Did the witness seem to have a good memory?

25   Well, that's -- now all of a sudden the dates are

1    confused, they said different things, but generally

2    speaking we know or according to them this guy

3    Hector Favio came on board a couple times and had

4    these meetings.  And remember, the meetings were not

5    really meetings, it was like him gathering the crew,

6    according to them, and Hector Favio telling

7    everybody this is what's going to happen.  Not

8    everybody said yes, I agree, because that agreement

9    didn't occur until they met in private.  And I asked

10   Mr. Herrera, going back to when he signed on and he

11   first met Mr. Llanos and signed on board the Fat

12   Crow, Herrera said he spoke to Favio about building

13   the secret compartment because he's a welder.

14        And then gratuitously, nobody asked him but he

15   had to throw it in there that Llanos was there at

16   the meeting, implying that he was participating in

17   the meeting.

18        But then when I asked him, he said well we

19   were just signing the contracts and what he did

20   before, I don't know, I'd never met him before.  We

21   were going to sign the contracts in April.  When I

22   signed on as a welder, he signed on as a helmsman.

23   So anything conversations you had with Favio, he

24   wasn't participating, it was you and Mr. Favio.

25   Yeah.  Remember the example?  I said so right now

1    we're talking and Mr. Llanos is sitting there.

2    We're not having the conversation; he's not in our

3    conversation.  He might be present.

4        Why is that important?  Well, look at this

5    other instruction.

6        The instruction that's very important for

7    Mr. Llanos is this one on page 13 of your packet, it

8    says here:  But simply being present at the scene of

9    an event or merely associating with certain people

10   and discussing common goals and interests doesn't

11   establish proof of a conspiracy.  A person who

12   doesn't know about a conspiracy but happens to act

13   in a way that advances some purpose of the

14   conspiracy or purpose of one, doesn't automatically

15   become a conspirator.

16       Now, as the court said every instruction is

17   important and you've got to view them as a whole.

18   You can't -- not one is any more important than the

19   other, but I just want to point out to you some

20   things you need to consider as a whole when you get

21   to deciding Mr. Llanos's case.  Because the

22   government is saying that he's a knowing participant

23   in this criminal enterprise, this conspiracy.  Where

24   is the proof of an agreement with Mr. Llanos and

25   anybody?

1          We know the co-defendants had agreements

2     amongst themselves and others.  What did they also

3     find out?  The Coast Guard has been said,

4     Mr. Barrios said, and the law of the sea, the

5     captain runs the ship.  He tells people what to do.

6     We know the captain in this particular case is

7     involved.  In fact, he of all of the them, of the

8     four you heard from, he's the only one that got any

9     money for the drug trip, remember, he got $10,000,

10    he wanted a lot more but he ended up with $10,000

11    for his venture in the drug trip.  Nobody else got

12    any money.  These other three didn't get any money.

13    As far as we know, there is no evidence before you.

14    And you can't speculate, you've got to listen to

15    what was here.  Common sense is different than

16    speculating and you can look and analyze what you

17    have.

18         But what evidence of an agreement?  We have

19    Mr. Chasin saying about the home run, the batazo.

20    What does that mean?  You have to believe him to

21    believe that it was said.  And even if you do

22    believe him, what does that mean?  Because you

23    remember when Mr. Mendoza testified, he talked about

24    the crew getting some money for the fuel venture,

25    the whole thing, he explained about the contraband

1    fuel.  But that's only in Venezuela, they're not

2    charged with that here.  And maybe it smells bad and

3    maybe you think ahhh, they shouldn't have done it.

4    That's not for your consideration.  He explained to

5    you what was going on.  He explained to you that the

6    Fat Crow is a fuel tanker.  There is a lot of big

7    fuel -- you saw the photographs, this thing is huge,

8    and barely seaworthy.

9        But these people from poor countries you

10   heard, that's how -- they got to get the jobs that

11   they can get.  And they make the best of the

12   situation that they can.

13       So there was -- that makes sense as to why

14   there is some money being distributed because he

15   said we've got $9,000, American dollars, from that

16   fuel distribution situation.  And it's illegal in

17   Venezuela because you have to be docked and if

18   you're a foreign flagged vessel, it's not illegal

19   and all that.  But it's just an explanation of where

20   this money comes from and why money would be

21   distributed.  That makes sense.

22       Now, we know that a helmsman -- because I

23   asked Mr. [Inaudible] he doesn't tell the officers

24   what to do, they tell him what to do.  So even if

25   you believe that somehow Mr. Llanos was out there

1    with the bales and like these other people admitted

2    they were doing it and now they say that Llanos was

3    out there.  Even if you believe that, there is no

4    proof that he knowingly did it on his own.  He was

5    told what to do, if you listen to the law of the

6    sea.  The captain runs the ship.

7         We know that Barrios is dirty, he said it, I

8    got $10,000.  I was supposed to get more, but I got

9    $10,000 for my illegality.  Which makes sense.

10   Fewer people know, more profit for other people.

11   Okay?  And we know that the cook didn't get anything

12   and Chasin didn't get anything.  They got arrested.

13        Now, the same thing, if you look at the other

14   individuals that we heard about but are not here, we

15   can't speculate on what happened to them.  Listen to

16   what you got.

17        Now, the indication from Chasin, he admitted

18   he knew about this hidden compartment because he

19   helped build it.  And we know that Herrera was a

20   welder.  These are integral people who are necessary

21   to build this.

22        Even if you believe what they say, what do

23   they say?  Llanos was out there cleaning.  I mean,

24   he's being told what to do, I need you to clean this

25   area.  He did.  That's what a crewman does, he takes

1        orders from people above him.  That's what happens

2        out on the sea.

3             Now, we talked about -- the same thing -- the

4        same theme applies to the possession as well because

5        the government has to prove that he knowingly

6        participated on his own, not that he was being told

7        to do it.  And it's here in the instruction, if you

8        look at knowingly, which is towards the back --

9        let's talk about aiding and abetting.  Here, but

10       finding that a defendant is criminally responsible

11       for the acts of another person requires proof that

12       the defendant intentionally -- intentionally, again

13       there has got to be a form of intent -- that he

14       intentionally associated with or participated in the

15       crime.  Not just proof that the defendant was simply

16       present at the scene or knew about it.

17            Where was his agreement?  What evidence of an

18       agreement between Mr. Llanos and anybody?  Ask

19       yourself that.  This is in the instruction.

20            And then, page 18, knowingly.  Right here, the

21       word "knowingly" means that an act was done

22       voluntarily and intentionally and not because of an

23       mistake or by accident.

24            What did he intentionally do?  If you believe

25       these individuals, he's out there transporting

1    bales.  At whose direction?  Barrios.  Who?  The

2    captain.  The captain tells people what to do,

3    that's what we know.  That doesn't mean that he

4    intentionally, voluntarily did an illegal act.

5         "Willfully" means that the act was committed

6    voluntarily and purposely.  We don't have evidence

7    of that.  We have the testimony of these other

8    individuals that if you believe them, Llanos did

9    this; but the law of the sea, crewmen do as they're

10    told.

11         Now, you ask yourself, well, yeah, but

12    everybody said, they consistently said your client

13    was there, Mr. Castillo, what do you say about that.

14    I said well, keep in mind, everybody said that

15    before signs these plea agreements they had the

16    opportunity to review the reports in this case, they

17    knew what they said.  Yeah, I talked to my attorney,

18    we went over the case and I decided to plead guilty

19    and sign this form.  So they have this information

20    with them.

21         Remember how I asked Chasin, he's the one that

22    used the word home run.  Nobody heard this word but

23    Chasin, his word that my client said this.  Batazo,

24    B-A-T-A-Z-O, meaning home run.  And he, meaning

25    Chasin, interpreted that to mean we're going to make

1    a lot of money on a drug trip.  Where did that come

2    from?  Batazo?  We're going to make money because

3    we're working on a boat, on a vessel, on a fuel

4    tanker?  We're going to make money because we are

5    looking for work, we found work, is that a home run?

6    We're going to make money.  That doesn't mean we're

7    going to be distributing drugs or smuggling drugs.

8         So as I sat there listening to these

9    cooperating defendants, I recalled a famous quote by

10   Sir Walter Scott in a poem in 1808.  The famous line

11   from that is, "Oh what a tangled web we weave when

12   first we practice to deceive."

13        These guys, trying to help themselves and they

14   put together the information they have to benefit

15   themselves, to give the government what they want.

16   They lie.  They make things up.  They say we did

17   this, yes, I admit I did this, I had this agreement.

18   In order to help themselves, they want to talk about

19   somebody else.

20        You heard Mr. Mendoza get up there and say

21   they all lied.  They're lying; that's what he said.

22   Mr. Mendoza said those four people are lying, it

23   didn't happen that way.

24        So that explains it.  Mr. Martinez, you know,

25   he explained how they had the opportunity to talk

1      about it, they had opportunity to get their stories

2      together, they had opportunity at sea.

3           It just defies logic that all of a sudden

4      people who didn't get paid, for some money that

5      didn't appear, all of a sudden come up with

6      information to try and help themselves.  And nobody

7      else overheard it, nobody can corroborate what they

8      say, we don't have video -- remember the video, I

9      made a video and sent it to my wife but she didn't

10     get it?  We don't have those videos because Hector

11     Favio has those videos.

12          And when all is said and done, we have the

13     words of these convicted felons, these people who

14     have incentive to lie, motivation to lie.

15          Let's talk about Herrera, just an example.

16     Remember when I asked him questions, I'd ask him a

17     yes or no question and he'd spend like 5 minutes

18     going over the history, but why, but this.  I didn't

19     ask him that.  I had to fight with him.  Her Honor

20     told me hey, stop already.  Well, but he wouldn't

21     answer my question.  You can evaluate all that.  He

22     wasn't being straightforward.  That's something that

23     you can consider.  It's in the instruction.  This

24     isn't Castillo talking, this is what the law is.

25           This is what the law is.  Okay?  Did the

1    witness's testimony differ?  Did he appear to

2    understand the questions clearly?

3         Now, remember what the judge told you at the

4    very beginning:  As my client sits there right now,

5    he's not guilty.  We have a presumption of innocence

6    in this country.  And right now, regardless of what

7    you heard, he is not guilty.  And only unless the 12

8    jurors you get in there and collectively and

9    unanimously agree that there is sufficient evidence

10   to show the government's proved its case, he remains

11   innocent or not guilty.

12        And look at the definition of reasonable

13   doubt.  It's already been read to you.  It's already

14   been read to you.  Proof beyond a reasonable doubt

15   is proof so convincing that you would be willing to

16   rely and act on it without hesitation in the most

17   important of your own affairs.  All right.

18   Mr. Herrera comes to you and says Ms. Bell, I would

19   like you to invest in my company.  Knowing what you

20   know about him would you do anything he says?  Would

21   you take what he tells you, knowing what you know

22   about him, in the most important of your own

23   affairs?

24        If Mr. Chacin comes to you and wants to date

25   your daughter, are you going to allow that?  Do you

1    want that type of -- are you going to listen to what

2    he has to say, are you going to have the type of --

3    is anything he says going to be the information that

4    you're going to rely on?  Would you buy anything

5    from any of these individuals?  Would you buy

6    anything from Mr. Barrios, the captain?  Would you

7    listen to anything he says in the most important of

8    your everyday affairs, of your own personal affairs,

9    are you of such a convincing nature that yes, I

10   believe that man and whatever he says, I'm going to

11   follow it.  Therein lies the rub.

12        So now I'm not going to have another

13   opportunity to talk to you.  It's over.  I'm trying

14   to point out and highlight to you what I think is

15   important in the case.  Everybody has their own

16   different views.  One juror might remember something

17   one way, another juror somewhere else, and that's

18   what you all have to do.  You all have a tough job

19   now.  And I'm pointing out to you the way the

20   evidence has been presented to you, what the law is.

21   It's not me talking, this is the law.  But you have

22   to apply the law to the facts as you find them.

23        Mr. Llanos is not guilty now.  The evidence --

24   I've told you about how what happened.  Even in the

25   best case of scenario, there is no proof beyond a

1     reasonable doubt that he knowingly participated or

2     agreed to do anything other than maybe what the

3     captain told him to do, if you believe that.

4          And it's been said that -- because Mr. Stout

5     gets to talk to you and I won't have a chance to

6     rebut what he says.  It's been said that when you

7     want to cast a play in hell, you don't get angels in

8     starring roles; or if you want to prosecute the

9     devil, you don't get angels as your witnesses, that

10    type of thing.  That's what the government is stuck

11    with, these people.

12         But think about it, if they don't have that,

13    what do they have?  They have Mr. Llanos aboard a

14    huge vessel where a large quantity of drugs were

15    found.  We're not disputing that this is cocaine,

16    we're not disputing that that was on the boat,

17    that's not the issue.  The issue is have they shown

18    -- "they" meaning Mr. Gammons and Mr. Stout -- that

19    Mr. Llanos Miranda knowingly and voluntarily

20    participated in an agreement to distribute the drugs

21    or voluntarily possessed the drugs as set out in the

22    instructions.

23         The separate counts of the indictment are

24    individually; you have to look at them, see the

25    evidence, and if they're sufficient, one doesn't

1    overlap with the other.  The guilt of one person in

2    this trial or the cooperators doesn't necessarily

3    mean that everybody is guilty.  Each individual

4    person, they admitted to what they did.

5         But just because they did doesn't mean that

6    Mr. Llanos Miranda is guilty of anything.  He was

7    the helmsman aboard the Fat Crow, that garbage scow

8    that we saw the photographs of.  Poor people trying

9    to make a living.  And that's what we know.  Some of

10   the people on that boat engaged in illegal activity.

11   Now the government wants to spill over and catch

12   everybody in that tangled web.

13        You, ladies and gentlemen, are the judges of

14   the facts.  You are the judges.  No one can question

15   you.  Ultimately you all have to decide.  Your Honor

16   -- because you are judges as well.

17        So as I said, what I say is not evidence, but

18   I've tried to point out to you the inconsistencies

19   in the testimony of the cooperators and also

20   explaining why Mr. Llanos Miranda could act and be

21   on board the vessel and not commit a crime

22   knowingly.  He was just there doing his job.  Thank

23   you.

24        THE COURT:  Why don't we take a recess here.

25   We'll be in recess until a quarter of 11.  You're

1    welcome to walk around.  Leave your pads on your

2    chairs.

3              (The jury retired to the jury room.)

4              THE COURT:  We're in recess.

5               (Recess was taken from 10:24 until 10:42 a.m.)

6              THE COURT:  Bring the jury in.

7              (The jury returned to the courtroom.)

8              THE COURT:  Mr. Martinez on behalf of

9    Mr. Mendoza?

10             MR. MARTINEZ:  Thank you, Your Honor.

11             Good morning, members of the jury.  I want to

12   begin on behalf of myself and Mr. Mendoza to thank

13   you for your service.  You have been with us all

14   week.  It would be an understatement for me to say

15   that there aren't better places that you would

16   choose to be 10 days before Christmas.  So your

17   service is appreciated, your sacrifice is

18   appreciated.

19             I want to begin by going back to the opening

20   statements in this case.  I had said at that point

21   in time that the case was going to be basically

22   about two categories of witnesses -- Coast Guard

23   witnesses and cooperating defendants.  Four of the

24   nine crew members in this case have agreed to

25   cooperate with the United States and you heard all

1      their testimony.

2          Let's dispense with the Coast Guard first

3      because that's the easiest.  I would say to you that

4      as to their testimony, you should believe

5      100 percent of everything that came out of their

6      mouth.  They don't have a reason to lie, they don't

7      have a motive to lie, they don't have a dog in the

8      fight, and I can't think of one thing that they did

9      wrong.

10         Now, the DEA, on the other hand, I would

11     contend to you did drop the ball.  They dropped the

12     ball because they did not do a forensic examination

13     on those packages and they should have done that.

14     They should have examined them for fingerprints

15     because the government knew in advance of the trial

16     that these four cooperating defendants were all

17     going to claim that there was a daisy chain and that

18     packages were handed one to the other, which means

19     that each of those nine crew members, if they're

20     telling the truth, touched each of those packages.

21         That gives us 75 packages to examine, looking

22     for the fingerprints of Mr. Mendoza.  And if his

23     fingerprints aren't found on any of them, what's the

24     logical conclusion?  A conclusion that you are

25     deprived to be able to make because they chose not

1    to conduct the forensic examination.  They would

2    rather not know that fingerprint results from that

3    forensic examination than order the test.  They

4    don't have to contend with the findings.

5        Now, that's on the DEA.  If a defendant ends

6    up accused of a crime and there is forensic evidence

7    that may exculpate that defendant and that defendant

8    ends up going to federal prison, well then it's on

9    the DEA.  That covers the DEA.  That covers the

10    Coast Guard.  That leaves us with the cooperating

11    defendants.

12        Now, an opening statement is supposed to be

13    like a road map of what you can expect to hear in

14    the trial because the lawyers know at least with

15    regard to the presentation of their own case what

16    evidence they're going to put before the jury.

17        I did not share with you all the evidence that

18    I knew that you were going to hear in this case for

19    a very good reason.  I was fearful that if I shared

20    that information with you as a jury up front, it

21    would somehow make its way back to the cooperating

22    defendants.

23        Now, what's important in this case, really

24    important in this case, is not necessarily very

25    obvious.  And it's been addressed already by

1    Mr. Stout in the opening portion of his closing

2    argument.  He already tries to distance himself from

3    this fact.  When he says collectively to each of

4    you, these guys are all here for this extended

5    period of time -- 10 weeks, 12 weeks, whatever it is

6    -- doing what?  Doing what?  What's their excuse for

7    how they're spending all this time?

8         Well, he says, they're primarily spending this

9    time negotiating with the cartel as to how much

10   they're going to be making.  And then very little,

11   very unimportant amount of time is spent purportedly

12   in the black market fuel operation that they were

13   conducting.

14        Now, why is that significant?  Well, first of

15   all, let's examine the truth of that statement.

16   Primarily negotiating.  Well, all four of their own

17   cooperating defendants made very clear how much time

18   was spent negotiating and it was a far cry from

19   12 weeks.  It was three meetings.

20        Let's assume each meeting lasted all day long,

21   which is not at all what they suggested.  But let's

22   just give them that.  Three meetings lasted all day

23   long.  That's three days.  What's going on for the

24   other 12 weeks?  Well, what does the government want

25   to suggest?  They're waiting there with nothing to

1    do until it's time to transport this drug load.  The

2    four cooperating defendants know that's not true.

3         Venezuela has a lot of problems, huge economic

4    problems, but they are rich in petroleum.  That is a

5    fact.  And so what have they done for the fisherman,

6    for the poor fisherman trying to eek out a living?

7    They said you know what, we're going to give you a

8    break.  It would normally cost you X amount to buy

9    petroleum, but we're going to give it to you as a

10   huge discount.  That way when you go out fishing if

11   nothing bites and you come home without a fish, at

12   least you spent far less money on that occasion than

13   you would have otherwise spent.

14        So as tends to be the case whenever people are

15   desperate for money, they look for ways to make

16   more.  So what happens to these poor fishermen?

17   They go, they gas up their little fishing vessel,

18   and they're supposed to go fishing, but they don't

19   go fishing.  Instead they go to a tanker like the

20   Fat Crow and they arrive and they say I bought my

21   fuel for 50 cents on the gallon, I'll sell it to you

22   for $3 a gallon.  If you paid what you would

23   normally pay for it, it might be $4 a gallon.  So

24   they get the fuel cheap and they drive it over to

25   the Fat Crow.

1          Now, when do they come?  Who knows.

2     Mr. Mendoza told you they come at all times,

3     whenever they want.  They were pulling up to the

4     ship, here and there and here and there, the middle

5     of the night, 3:00 in the morning.  This thing is

6     open for business 24 hours a day.  Why are they

7     doing it?  Why are the nine crew members receiving

8     all these little boats that come from all these

9     fisherman to buy the little bit of gasoline that

10    they have and put it in these huge tanks until the

11    tanks are full and they're ready to leave?

12         As the four cooperating defendants said was

13    proposed on the clean trip, the clean trip was to

14    transport the fuel.  You can't transport the fuel

15    until you get the fuel.  You can't get the fuel very

16    quickly because it comes in dribs and drabs on a

17    little boat with a little tank.  Then you put it

18    into a huge tank and what, 12 weeks later you're

19    ready to rock and roll.  What have you been doing

20    that whole time?  Receiving the fuel.  Right?  All

21    day every day.  Not negotiating with the cartel.  As

22    Mr. Stout has suggested.

23         Why is that important?  Because the government

24    wants to leave you with the inference that

25    Mr. Mendoza had to be with a guilty conscience

1    because otherwise how does he explain all the time

2    that he's on that boat?  They would say to you he's

3    waiting there doing nothing, getting paid for doing

4    nothing, because he's waiting for the big payoff

5    later when the drugs arrive.  No.  He's there doing

6    something every day, getting the fuel from these

7    little fishermen and putting them in the big tanks.

8         Now, what happens?  They finally get to the

9    point where they have enough fuel, right?  Weeks,

10   months have gone by.  They have enough fuel.  The

11   crew people that are receiving all the boats for all

12   this period of time have been told you're going to

13   be able to share in the profits that we make from

14   the black market fuel purchases.  How much does that

15   turn out to be?  Their part?  $9,000.  First officer

16   leaves the boat, sends it to the respective

17   participants, crew members.  Each one makes $1,000.

18   Total, $9,000.  That's a lot of money to them.

19   That's a lot of money to them.  You heard how

20   destitute, how desperate, and how poor those people

21   are.

22        So now you have a nondrug trafficking business

23   -- albeit an elicit black market fuel business --

24   going on that justifies everybody's presence while

25   docked there and explains what they're doing,

1    explains how they're making money, explains how

2    they're sharing in the profits and getting paid,

3    okay.

4        Meanwhile, meanwhile, what is going on in a

5    parallel universe?  Well, before my client ever gets

6    there, they built a hidden compartment.  They've got

7    two conspiracies going on at the same time.  They

8    have got a conspiracy to purchase and ultimately

9    distribute black market fuel taken from fishermen

10   from Venezuela, and they have the future expectation

11   of an international drug trip once they can put the

12   drugs in the secret compartment.

13       Well, the people that are on the boat building

14   the secret compartment obviously know there is two

15   conspiracies going on at the same time.  The people

16   that don't get on the boat until after the secret

17   compartment is built only know about the secret

18   compartment if somebody shows them.  And we already

19   know, even though it appears to be counterintuitive,

20   that the drug cartels don't just pay you what you

21   want.  You think they would, right?  It's a

22   $45 million event that we're talking about here.  If

23   the welder wants 150 grand, stroke him a check, you

24   would think, right?  The return is huge.  They'll do

25   that.  They still nickel and dime you.  They're

1    still going to determine for that crew what they're

2    willing to pay.

3         So you can start off at 150, but you may end

4    up at 30, just like the welder.  So when those guys,

5    when the six or seven guys that have been on that

6    boat building the secret compartment see a new first

7    officer arrive on board, yeah, they can take him

8    straight to the secret compartment and say look what

9    we did before you got here, we're planning on doing

10   a drug deal, you're going to get interviewed to see

11   how much you want, okay.  They probably won't give

12   you near what you ask, but you can ask.

13        Or they can say why tell him?  If the sum

14   total of what they're going to pay is X dollars, why

15   am I going to have them pay him 60 grand?  Let's say

16   there is six of us that are in on it.  That's

17   another $10,000 for each of us that we could

18   potentially get if we keep him in the dark.  So now

19   there is an economic motive to not disclose.

20        So the four cooperating defendants, I asked

21   each one of them, I said you and I, we've never met

22   each other, right?  We've never had a conversation

23   pretrial, we've never had a pretrial deposition, you

24   wouldn't know me from Adam.  Yeah, that's right.

25   But you have had conversations with the government,

1    you've had plenty of them, okay, with the

2    prosecutor, with the case agent, they have gone on

3    for hours.  Hours and hours and hours for each of

4    the four.  It's four times however many hours for

5    each one.

6        You know the conversation came up when the

7    government asked those four cooperating defendants

8    what were you doing there when you were anchored off

9    port for 12 weeks.  We were waiting -- we were

10   loading fuel.  We were loading fuel.

11       We were loading fuel for 12 weeks?  That makes

12   no sense.  If it's a legitimate fuel loading

13   operation, then the tanker pulls up to a big

14   petroleum port, they put giant gas hoses in it and

15   four hours later they're full of gas.  You don't

16   spend 12 weeks putting gas in the tanks to fill them

17   up unless you're getting them on the black market

18   basis from the fishermen in Venezuela that come to

19   sell it.

20       Did the prosecutors know about that?  No.  You

21   know when they learned of it?  When my client took

22   the witness stand.  And you know how you can

23   conclude that?  By the kinds of questions that were

24   asked of my client on cross-examination.  Clearly

25   they didn't know about it.  And had it been what was

1    going on, and we know it was, they would have

2    settled.  They made it look like they were just

3    there waiting for fuel because they knew that that's

4    what the government wanted to hear because that

5    creates an argument that the government can advance,

6    saying if you're sitting around doing nothing with

7    no explanation as to why all this time is passing,

8    you must know you're waiting for the drug deal.

9    That's why the questions came.  What time do you

10   start to work in the morning?  When do you take a

11   break?  What time do you go to sleep?

12        Why else was it important for the four

13   cooperating defendants not to mention it?  Doesn't

14   serve their interest.  They are working towards the

15   get out of jail free card.  That's the ultimate

16   goal.  If you can't get out of jail, cut the

17   sentence.  If you cut it in half, great.  They might

18   view that as a home run.

19        And you know how that happens?  By convincing

20   Her Honor that they deserve it.  How does that

21   happen?  By the government filing the motion.

22        Would it help their case for Her Honor to know

23   that in addition to the drug trafficking conspiracy

24   there was also a black market petroleum fuel

25   distribution ring that they were conducting at the

1    same time?  That's not a way to get your sentence to

2    go down.  That is an aggravating circumstance, not a

3    mitigating circumstance.  So they don't want it to

4    be known.

5         That's another reason they don't want it to be

6    known.  Well, they know from their meetings with the

7    government what's coming in terms of arguments that

8    they will raise to you that they will contend are

9    circumstantial evidence that my client knew at that

10   point the drug deal was planned.  Right?  They're

11   already laying the groundwork for this, if you

12   recollect.  They asked the question, what does the

13   first officer do.  He does this, he does that, he

14   does the other.  In addition to that, is the first

15   officer in charge of the boarding log?  When people

16   arrive is he supposed to write their name down so

17   there is a record of the fact that they got on the

18   boat?  Yes, absolutely.  And whose job is that?

19   That's the first officer's job.  So they have a

20   boarding log.  Because they seized everything,

21   right?

22        Whose absent from the boarding log?  Herman,

23   Favio, and El Gordo.  They're absent.  What is the

24   suggestion that the government is about to make

25   regarding their absence from the boarding log?

1      They're fixing to say their names weren't there

2      because they don't want their names to be in the

3      boarding log as associated with the ship if the ship

4      is interdicted by the Coast Guard. And so that's

5      why their names are conspicuously absent.

6           No, their names aren't on the boarding log

7      because they don't want to be associated with the

8      black market purchase of the Venezuelan fishermen's

9      fuel that's going on in ports. You heard the DEA

10     agent, it is those specific ports from which they do

11     business, that's where their drug trafficking

12     operation originates from. They can't risk being

13     associated with a vessel that's going to get into

14     trouble.

15          Do they care that the Coast Guard gets a

16     boarding manual that has their name on it?

17     Ultimately? No. Why not? Because we know from the

18     DEA that they're not primarily interested in these

19     guys, they're interested in going up the ladder,

20     okay. So if they read a name in a boarding log,

21     what good is that going to do them? They need

22     someone to snitch those people out, okay, and they

23     will line up because like these four cooperating

24     defendants, there are many, many others in many,

25     many cases. And who knows if the names are real.

1     You don't have to give them a real name.  They're

2     not worried about their name appearing in a boarding

3     log that the DEA is going to look at.

4     Look at El Gordo, Spanish for "the fat man,"

5     right?  His position is going to be you can look

6     through all of Central and South America, start

7     eliminating fat man one by one and we'll see how you

8     do and how close you come to me.  No.

9     So that argument, the argument that the first

10    officer didn't put their names in the boarding log,

11    that's the argument that Mr. Stout is probably going

12    to advance when he gets up in his rebuttal argument

13    -- which by the way he gets the last word on because

14    he has the burden.

15    Mr. Castillo spoke to you about how to size up

16    witnesses, about how to evaluate their credibility.

17    Her Honor has given you suggestions -- think about

18    this, think about that.  We know you have to view

19    this testimony with caution because they're

20    convicted felons, it's in the instructions.

21    We know you have to view their testimony with

22    caution because they have entered into plea

23    agreements with the government and they hope to

24    strike a good bargain.  That's in the instruction.

25    We know that they have a motive beyond measure

1    to lie because they're looking at a 10-year minimum

2    mandatory.  They have the motive, they have the

3    opportunity, and they have the means to throw

4    somebody else under the bus for their own purposes.

5         But let's take the captain as a representative

6    sample of those four cooperating witnesses.

7    Remember when he was in the chair and I started to

8    ask him something, you don't look very nervous --

9    couldn't go there.  I can go there now because we're

10   talking about argument and we're talking about the

11   demeanor of the witness.  And what did you see from

12   him?  Unmitigated arrogance.  He was rocking in the

13   chair, he had one arm thrown back, he was cool as a

14   cucumber.  And what is it that he actually bragged

15   about?  The fact that he had entered into a previous

16   conspiracy to import and distribute narcotics but

17   they called off the trip.  Darn it.  The fish that

18   got away, right?  That's that guy.  Okay.

19        And he distinguishes himself from the other

20   people who are destitute and desperate and poor and

21   maybe signed up because otherwise maybe their

22   families don't get three square meals a day.  He was

23   making between twenty and thirty thousand dollars a

24   year.  The $80,000 that he was promised to get

25   represented three or four years of income, between

1    twenty and thirty thousand dollars a year, that's a

2    lot of money.  For there.  For South America that's

3    a huge amount of money.

4         So why did he do it?  Not because he needed

5    it.  Not to feed his family.  For greed.  For greed.

6         So you have drug traffickers, who are by their

7    nature deceptive, liars, cheats, engage in

8    surreptitious behavior.  It's who they are.  It's

9    who they are.

10        But we shouldn't stand in the way of believing

11   them.  Let me give you an example.  Let's say I'm

12   holding in my hands a small animal and she's soft,

13   she's got bright yellow feathers, she's got an

14   orange beak, and if you listen very closely, you can

15   hear the faintest quack.  If you look, you'll see a

16   little sign around her neck and that sign says "I am

17   not a duck."  Are you deceived?

18        These men are drug traffickers.  These men are

19   liars.  These men will commit all sorts of crimes to

20   put money in their pocket.  This is not about making

21   money, this is more than making money.  The lure of

22   money will drive them to participate as

23   international drug traffickers and there is a whole

24   lot of deceit that they're willing to engage in to

25   make that happen.

1          This is much more important than money.  This

2     is about their liberty and what they would do to put

3     money in their pocket, multiply that by 10 in terms

4     of what they would do to get out of a federal

5     prison.

6          The definition of reasonable doubt.

7     Mr. Castillo already read it to you, but there is --

8     I think it's worth mentioning again.  There is a

9     reasonable doubt and there is a definition

10    associated with what that is, and then there is

11    beyond a reasonable doubt.  You can, and should, all

12    have reasonable doubts about the credibility of the

13    four cooperating defendants.  It wouldn't be natural

14    for any of you to sit here today and say you know

15    what, I don't see any reason not to trust those

16    guys, I believe everything they say as if it were

17    the gospel.  That's hardly reasonable.

18         It would be much more likely that you would

19    say you know, they might be telling the truth.  I

20    have some reasonable doubts about it.  And then

21    again, Mr. Mendoza may be telling the truth, but I

22    have some reasonable doubts about that too.  I think

23    I'll just resolve my reasonable doubts in favor of

24    the government.

25         What have you just done?  You have just not

1    followed your instructions on the law.  It's not

2    find a reasonable doubt and decide who in favor

3    you're going to resolve it for.  It's find a

4    reasonable doubt, identify that reasonable doubt,

5    and ask yourself if you want to resolve that

6    reasonable doubt in favor of the government, if you

7    meet the test -- and what's the test?  Proof of such

8    a convincing character that you would act upon it

9    without hesitation, without hesitation, in the most

10   important of your own affairs.

11        I don't know what those are.  You know what

12   those are.  Each of you knows what's the most

13   important of your own personal affairs.  It might be

14   your family, it might be your money, it might be

15   your health, it might be all of the above.

16        If the quantum of proof that you need to

17   resolve in favor of the government meets that test,

18   then you have been convinced beyond a reasonable

19   doubt.  That cannot possibly be the case here.  Not

20   possibly.

21        Sometimes fate gratuitously puts things before

22   you.  You heard my client testify.  The government

23   said oh, so the drugs arrived and you just slept

24   through it that morning, right?  The drugs arrived

25   on a certain day.  He doesn't know when the drugs

1    arrived, he wasn't there when the drugs arrived.

2    The government presumes that the drugs arrived when

3    he was on the boat.  He was off the boat for

4    15 days.  What if the drugs arrived then?  Oh, no.

5        Well, the four defendants said he was there.

6    Oh, well then that must make it true, right?  We've

7    already established that we're just going to treat

8    their testimony as if it were the gospel.  We don't

9    know when the drugs arrived.  We don't know if he

10   was there.  We don't know if they arrived and he was

11   there and he was asleep.

12       When I started to hear him talk about how he

13   suffers, like millions of people, from insomnia, I

14   thought to myself you know what, that sounds a

15   little bit like the dog ate my homework.

16       But lo and behold, the U.S. Coast Guard has

17   the medication that he takes for that.  Right?  And

18   when I rested, the judge looked at the government,

19   what about a rebuttal case?  Yeah, we're going to

20   call U.S. Coast Guard so-and-so, tell us about his

21   property.  Any medication in there for insomnia?

22       They didn't do that.  They could have called

23   back the four cooperating defendants.  We just heard

24   for the first time that there was some black market

25   purchases of Venezuelan petroleum from the

1   fishermen.  You didn't mention any of that in your

2   testimony as an explanation for what everybody,

3   including the two charged defendants, were doing

4   there.  Why wasn't that mentioned?  Nope, we're not

5   calling them back either.  Right?  At the risk of a

6   pun, that boat has sailed, so they're not calling

7   them.  They just rest.

8        The arguments I'm sure will still come.  Oh,

9   he was there for 12 weeks because he was waiting on

10  the drug deal.  Oh, they didn't put the names on the

11  log because he was trying to hide them from drug

12  international trafficking detection later.

13       But they carry much less weight now when you

14  know what was really going on.  Those four

15  cooperating defendants knew what was really going

16  on, they kept that information from the government

17  which is why the government didn't know it, okay.

18  And what did they think?  What did those four

19  defendants think, which also shows how they are

20  complicit with each other.

21       They're saying to themselves the last thing we

22  need is to let this judge know that there was

23  another conspiracy involving the black market

24  purchase of petroleum, so let's not say anything.

25       Then the question becomes well, what about the

1     defendant, he might say something.  He's not going

2     to say that.  He's either not going to take the

3     stand, his lawyer is going to argue that you can't

4     believe these scumbag drug dealers, or he's going to

5     take the stand and say he wasn't there and didn't

6     know anything about it.  But under no circumstance

7     is he going to admit what really went on.

8          Well, you know what, he took the stand and he

9     told the truth.  Which is more than you can say

10    about them.

11         COURTROOM DEPUTY CLERK:  Mr. Martinez, five

12    minutes.

13         MR. MARTINEZ:  My time is up.  I'm about to

14    sit down.  And while none of us can be as

15    presumptuous as to tell you how to conduct your

16    deliberations, I say this to you only as a

17    suggestion and nothing more.  I'm going to sit down.

18    The rule says that even though they had a chance to

19    talk to you and then Mr. Castillo and then me, they

20    get the final word.  I don't know what they're going

21    to say, but I can tell you that no matter what they

22    say, I can't do anything about it.  When I sit down,

23    not one more word can be raised on behalf of my

24    client.

25         So if they have decided to wait until the last

1     minute to raise an argument to you that they know I

2     am not going to be able to rebut because I don't get

3     a chance to get back up here again, then I would

4     like to request that one of you during that

5     deliberative process ask yourself what would his

6     lawyer have said if he had had the chance.  Because

7     that's the kind of give and take that makes our

8     system work.

9          I thank you again for your service.  I thank

10    you for your attention.  I respectfully submit to

11    you that as to my client, the only appropriate

12    verdict is not guilty as to both counts.  We will be

13    here waiting and we will be here praying.  Thank

14    you.

15         THE COURT:  Mr. Stout in rebuttal.

16         MR. STOUT:  Ladies and gentlemen, you heard

17    Mr. Castillo get up here and tell you all about the

18    law of the sea.  The law of the sea is not what

19    matters in this case.  The only law that matters to

20    you is the law that the judge has given you.

21         The defense counsel want to make this case all

22    about those cooperating witnesses, the cooperating

23    crew members you heard testimony from.  And it's

24    true that their testimony is important to you in

25    this case as important evidence.  But they only tell

1      you what you already know, what your common sense

2      already tells you:  The Fat Crow's ultimate purpose

3      was to transport $45 million worth of cocaine.

4           Let's talk about the ship for a second.  Look

5      at this thing.  This is a rust bucket registered in

6      the West African country of Togo, anchored off the

7      coast of Venezuela with a mixed crew of Colombians

8      and Venezuelans.

9           You heard the testimony about the shape that

10     the ship was in when they got on it.  The thing was

11     drifting without power, took them 24 hours to

12     restore power with the generators.  They told you as

13     they tried to sail it to the nearest port, there was

14     an electrical fire on the bridge, the rudder got

15     jammed, and they ended up having to tow the thing

16     all the way here to Tampa.  Nobody who got on that

17     ship thought it had any legitimate purpose.

18          Now, you heard about the -- you've heard this

19     defense counsel just now, Mr. Martinez talked to you

20     about this what they were really doing is what his

21     client said on the stand yesterday, that they were

22     doing this black market fuel operation.  The

23     defendants here are not charged with that and that's

24     not inconsistent with the testimony you heard from

25     the cooperating crew members.  They all told you

1    that they -- or several of them anyway told you that

2    they thought there might be some clean trips that

3    took place before they did the drug trip.  But it

4    was always going to be a drug trip.

5         And the cooperators told you that Oscar

6    Herrera Venera, the welder, told you that he knew it

7    was going to be a drug trip before he got on the

8    ship when he was recruited back in Barranquilla.

9    And the others told you that they may not have known

10   it the second they got hired, but they figured it

11   out pretty shortly after they got on the ship.  It

12   was obvious to everyone what was going on.

13        And you've heard that the ship -- you heard

14   what they were doing for these three months and

15   that's an issue in the case you should think about

16   carefully.  What was the ship anchored off the coast

17   of Venezuela doing for three months, what were the

18   crew members doing.  And part of what they were

19   doing you've heard was this black market fuel

20   operation.  But the ship left on August 21st of

21   2017.  That's when it chopped off its anchor and set

22   sail to be caught by the Coast Guard three days

23   later.

24        Ask yourselves whether you think -- what makes

25   the most sense here.  Were they, as Mr. Martinez

1    suggested, waiting until that moment, did they have

2    the cocaine on board for weeks beforehand,

3    $45 million worth of cocaine waiting until they got

4    the last few gallons of fuel so they could chop

5    their anchor off and leave?  Or did they leave when

6    the cocaine got on the ship, when they onloaded

7    $45 million worth of cocaine.

8         Mr. Martinez brought up the issue of

9    forensics, the lack of fingerprints or DNA type

10   evidence in this case.  You've heard from Special

11   Agent McDonough of the DEA that he's done a hundred

12   or so of these investigations and never gotten that

13   kind of evidence from the U.S. Coast Guard.  And you

14   also know that the evidence that came here from that

15   case, the ship and the items that were on the ship

16   and the cocaine packages themselves have been passed

17   from cutter to cutter to cutter just to get here

18   over the course of a few weeks.  The truth is you

19   don't need that evidence in order to convicted these

20   two defendants.  You have all the evidence you need.

21        I would like to talk about the credibility of

22   witnesses.  This is the jury instruction you'll have

23   with you back there about that.  The judge read it

24   to you earlier.  How is it that you know that those

25   four cooperating crew members were telling you the

1       truth?  The stories are consistent, especially when

2       it comes to two important issues.  First, the many

3       meanings they had on the bridge with Hector Favio

4       about payment for the drugs.  They all told you

5       about those meetings.  They all told you that

6       everyone was present for those group meetings

7       including these two defendants and that after the

8       group meeting, they would go and have an individual

9       discussion with Hector Favio about what they were

10      going to get paid and how it was going to be paid to

11      them.

12          They all told you that these meetings took

13      place over a period of time while they were anchored

14      off the coast of Venezuela and that Hector Favio

15      would go back and forth to land to relay the most

16      recent proposal to the owners of the drugs.  What

17      you heard all of them say was that the proposal kept

18      coming back lower and lower and lower, they all told

19      you that.

20          They also -- the second issue they were very

21      consistent on was when and how the drugs were

22      loaded.  They all told you it came early on the

23      morning on or about August 21st, that they all went

24      out onto the deck, there was a small speed boat

25      there with several men on it who had the cocaine

1    tied together by ropes, they threw up a rope and

2    that all nine members of the crew stood one after

3    the other and loaded that cocaine onto the ship and

4    down into the hidden compartment.  Several of them

5    also described to you that after they did that, they

6    cleaned the ship and threw their clothes overboard.

7        This jury instruction suggests to you some

8    ways you might think about witness credibility.  The

9    defense counsel were quick to point out the bullet

10   points that are listed here:  Does the witness have

11   any reason not to tell the truth, does the witness

12   have a personal interest in the outcome of the case.

13   Well, the witnesses all acknowledged to you that

14   they hope that they will get a better sentence

15   because of their testimony, but they haven't been

16   promised anything.  They also acknowledged to you

17   that they know that their plea agreements say that

18   if they lie on the stand, they can be punished

19   separately for that.  You're going to have those

20   plea agreements, those are Defense Exhibits 1

21   through 4, take a look at those provisions and see

22   what they say about what happens to these defendants

23   if they don't tell the truth.

24        It's also been suggested to you that the

25   defendants colluded or got together in some way and

1      fabricated this entire story, in part because they

2      had those plea agreements in front of them that the

3      United States government provided to them.  Take a

4      look at the back of those plea agreements, the last

5      two or three pages, all of them are the same, they

6      have a facts section, and take a look at the facts.

7      The facts aren't detailed, they don't contain any

8      mention of Hector Favio or meetings on bridges.

9           Instead I would like to highlight to you on

10     here some other bullet points that I think you

11     should consider about the cooperating witnesses who

12     testified.  Did the witnesses impress you as people

13     who were telling the truth?  Did they appear to

14     understand?  Did they have the opportunity to see

15     and hear what they testified about?  But mostly, in

16     looking at them, did they impress you as people who

17     were telling the truth?

18          Now, we had another witness testify and you

19     should apply the same considerations to that

20     witness.  That witness is the defendant,

21     Mr. Mendoza.  He told you that when he joined the

22     ship in June of 2015, he was the second in command,

23     he was the first officer.  He told you that only he

24     controlled the satellite telephone because the

25     captain didn't know how to use it.  He told you that

1    he was in charge of navigated the ship, a ship that

2    didn't go anywhere.  He told you that he was in

3    charge of the ship's bridge log.  And when asked on

4    direct examination by his own attorney how many

5    times had he seen Hector Favio come out to the Fat

6    Crow, he told him I saw him one time, I saw him one

7    time and I didn't record that in the bridge log

8    because the captain told me not to, but I didn't

9    hear any discussion of drugs on that occasion.

10        And then later when my colleague Mr. Gammons

11   cross-examined him, he said well, Hector Favio came

12   out to the ship four or five times, but I didn't

13   report any of those meetings because the captain

14   told me not to, but I didn't hear any discussion of

15   drugs, I just didn't record any record of those men

16   -- of Hector Favio coming onto the ship.

17        You also heard him testify about a period of

18   time when he left the ship and went to shore in

19   order to run some errands, but he had an awful lot

20   of trouble pinning down exactly when that was.  At

21   first he told you that he left on or about July 5th

22   for a period of two weeks, and then later he changed

23   that and said well no, it was August, August 5th to

24   about August 18th, is when he said he was gone.  He

25   told you that because he was trying to figure out,

1    having had the opportunity to sit here and listen to

2    the testimony, he was trying to figure out when can

3    I make myself off the ship when Hector Favio comes

4    and has these meetings and when the cocaine gets

5    loaded.  He was trying to figure out a way to make

6    it look like he wasn't on the ship when those things

7    happened.

8         He told you that when he first got on the ship

9    he inspected down inside empty fuel tanks on the

10   front of the ship but that he never went one more

11   room over into that room at the very front of the

12   ship where the hidden compartment was.  Even if

13   there was a generator in there and even though the

14   ship was experiencing all kinds of power failures.

15   He's the first officer, he's the second in command,

16   but it's not his problem that the ship has no power.

17   That's the implication.

18        He told you -- there has been some discussion

19   about what exactly were these guys doing over the

20   three-month period the ship was anchored off the

21   coast of Venezuela and Mr. Mendoza Montoya told you

22   what he was doing, he said he spent 90 percent of

23   his time on the bridge and when asked what he was

24   doing, he said I was inspecting the fire

25   extinguishers and reorganizing the books and

1    paperwork up there.

2        Then he thought about it for a minute and then

3    he added and I was helping with the fuel operation,

4    the black market fuel operation.  He wised up and

5    realized that didn't sound like he was doing very

6    much.

7        And he left you with the statement that this

8    black market fuel operation they were doing, it was

9    only illegal if you got caught by the Venezuelan

10   Coast Guard.  Well, ladies and gentlemen, he got

11   caught by the U.S. Coast Guard in this case with

12   $45 million of cocaine on a ship he was second in

13   command of.

14       And as for Mr. Llanos Miranda, the same

15   question applies to him.  What is he doing during

16   these three months that he's collecting his salary

17   as a helmsman, a helmsman, the guy that drives the

18   ship, the ship that doesn't go anywhere, not at

19   least until the drugs get loaded.  He's hitting a

20   home run and he's telling the younger crew members

21   how to hit one, too; that's what he's doing on the

22   ship.

23       Finally I would like to consider the money

24   that you've heard talked about in this case.  You

25   have heard testimony that the 1,504 kilograms of

1      cocaine is worth $45 million.  And you've heard some

2      of the cooperating crew members tell you that they

3      stood to make thirty-something thousand or

4      eighty-something thousand, depending on the crew

5      member, that that was in essence a few years worth

6      of their normal salary.

7           $45 million is a lot of money here in Florida

8      in the United States.  But given that comparison,

9      how much more is it worth in this part of the world

10     where this takes place?

11          The drug trafficking organization that

12     organized this trip couldn't take a chance, with

13     that kind of money at stake, that somebody on the

14     ship wasn't on board with this plan.  They could not

15     risk having somebody rat them out, and particularly

16     not somebody who had access and control over the

17     satellite phone.

18          You heard testimony from the cook in this

19     case, you heard testimony from the captain on the

20     ship.  Everybody from the cook to the captain knew

21     and participated in this plan.  You don't leave your

22     common sense at the door when you enter the

23     courthouse.  That's exactly what you're here to do

24     is exercise your common sense in evaluating the

25     evidence you've heard in this case.

1          The evidence you've heard is that these men

2     transported $45 million worth of cocaine aboard the

3     Fat Crow.  That makes them guilty of both crimes

4     charged and you should find them guilty at the end

5     of your deliberations.  Thank you.

6          THE COURT:  All right.  Ladies and gentlemen,

7     you've now heard all the evidence and you've heard

8     the argument by the attorneys.  I have gone over

9     most of the jury instructions with you; in fact, all

10     of the jury instructions with exception of the final

11     instructions, the last two perhaps, so I would like

12     to do that at this time.

13          You'll need to take the verdict form back with

14     you -- in this case there are two of them, verdict

15     forms back with you.  When you all have agreed to a

16     unanimous verdict, then the foreperson will fill in

17     the verdict form, sign it, and date it, and return

18     it to the courtroom.

19          As I said earlier, the first thing that you

20     will need to do when you get back to the jury room

21     is to select one of your members to be the

22     foreperson of the jury.  It will be the foreperson

23     that speaks for you if you come into the courtroom,

24     it will be the foreperson that signs the verdict

25     form.

1          If at any time you need to communicate with me

2     in any way, then you need to write down the message

3     or the question and sign it and give it to the

4     security officer who will be right in here.  He in

5     turn will give it to me.

6          If it's something having to do with the trial

7     itself, something that occurred during the trial or

8     something that someone said or to that effect, I

9     will reconvene court and bring you into the

10    courtroom and get the defendants here and the

11    attorneys here.  If it's just a timing question or

12    something of that sort, I might write back the

13    answer.  But at any rate, if there is a question,

14    you will need to give it to the security officer who

15    in turn will give it to me.

16          I doubt that lunch has arrived yet, but --

17          COURTROOM DEPUTY CLERK:  It has, Your Honor.

18          THE COURT:  It has.  Lunch has arrived.  When

19    you're back there and when you're eating or any

20    other time if you wish to recess, maybe you want to

21    go get a Coke or something of that sort, that's

22    perfectly fine, you can recess during your

23    deliberations, but you shouldn't have any

24    discussions about the case if all 12 jurors are not

25    in that jury room.  So if you decide you need a

1    break, you would like to get something to drink, or

2    you just need a break, that's perfectly fine, just

3    stop your discussions while you're on that break.

4         You can take whatever time you need to reach a

5    verdict.  There is no time limit, it's strictly up

6    to you.  If you needed to come back on Monday, you

7    could even come back on Monday.  It's just simply up

8    to you how much time you would like or need to spend

9    in your deliberations.

10        The security officer will be right outside.

11   If you have any concerns, you need to just make him

12   aware.  And other than that, I believe the only

13   other thing I need to do is to tell you the names of

14   the alternate jurors.

15        Two of you are alternate jurors.  And when we

16   selected the jury -- seems like a long time ago now

17   -- on Monday we selected two alternates because if

18   somebody gets sick, one of the alternates would take

19   that juror's place.  If something happened and

20   another juror couldn't be there, then the second

21   alternate would take that juror's place.  If we

22   don't do that, then we would have to start the trial

23   all over again with another jury.  So we always try

24   to pick some alternate jurors when we have a trial

25   that's going to last several days and in this case a

1       week.

2           The law only allows 12 jurors to make a

3       decision in this case.  Those of you that are the

4       two alternates -- and I'll tell you your names in

5       just a minute -- you might be wondering why you're

6       the alternate jurors.  And really it doesn't have

7       anything to do with anything other than where you

8       were seated when you were brought up here.  You were

9       simply the last two jurors that were selected and

10      that was based on where you were seated when you

11      came into the courtroom.

12          But I would like to thank all of you and

13      specifically the alternate jurors.  The alternate

14      jurors are Kelly Fraser and Danny King.  As I said,

15      it's simply where you were seated in the courtroom.

16      Maybe you're happy that you're the alternate jurors.

17      But if you would like, we will call you when the

18      jury reaches a verdict and let you know what the

19      verdict is if we have your telephone number, and so

20      we'll give both of you a call and let you know.

21          If you have anything in the jury room, you're

22      welcome to get it.  I would appreciate it if you

23      would leave your notes face down in your chairs and

24      I will simply have the security officer or the

25      courtroom deputy shred them so that nobody is going

1     to go back and read them.  But we would like to

2     thank you and I know that it's been a long week and

3     you've spent a lot of time here and then maybe you

4     do have some regrets with not being able to

5     deliberate and help in reaching some kind of verdict

6     in this case, but as I said this is not an option,

7     the law firm requires 12 jurors in any criminal

8     case.  So you are excused.  And when I tell the jury

9     to go back to the jury room, you may get your things

10    and go home or whatever it is you would like to do.

11    We'll give you a phone call when the jury reaches a

12    verdict and let you know what that verdict is.

13         Okay.  We are in recess pending a verdict and

14    I'm going to ask the security officer to conduct you

15    back to the jury room.

16         (The jury retired to the jury room.)

17         THE COURT:  We're in recess pending a verdict.

18    If you all will leave your cell phone number with

19    Ms. Saylor so that we can get in touch with you, I

20    would appreciate it.  And I'm sure you're good for a

21    while because I'm sure they're going to want to eat

22    lunch.  So it won't be at least for I wouldn't think

23    for at least an hour and a half or so, maybe a lot

24    longer than that.  But you're good for that amount

25    of time.  Okay.  We're in recess pending a verdict.

1              (Recess from 11:40 a.m. to 4:22 p.m.)

2              THE COURT:  We were just talking about what we

3       were going to do when the -- we haven't heard

4       anything from the jurors, so if I don't hear

5       anything by 5:00, I'm going to bring them in and

6       tell them to come back on Monday because, you know,

7       normally I'd just say keep deliberating, but because

8       of the time of year and everything like that, I'm

9       not going to do that, I'll just tell them they can

10      come back on Monday.

11             [Recess from 4:23 to 4:31 p.m.]

12             THE COURT:  The jury has communicated that

13      they have reached a verdict.  So what's going to

14      happen is I'm going to bring them into the courtroom

15      and I'm going to ask them if they have reached a

16      verdict as to both of you.  I assume they have

17      because that's what they said in their note, they

18      have reached a verdict.  I don't know what the

19      verdict is.

20             But after that, I will ask them to hand me the

21      verdict to make sure that it's filled out

22      appropriately and then I am going to give the

23      microphone to the juror who is a foreperson and let

24      them read or publish the verdict.  Okay.  So that's

25      what's going to happen.

1          (The jury returned to the courtroom.)

2          THE COURT:  Ladies and gentlemen, have you

3     selected a foreperson?  Who is the foreperson?

4     Mr. Watts, you are the foreperson of the jury?

5     Without telling me what the verdict is, has the jury

6     reached a verdict as to both defendants as to both

7     counts?

8          THE FOREPERSON:  Yes, Your Honor.

9          THE COURT:  Could you hand the verdict form to

10     the security officer just a minute?  Thank you.  I'm

11     going to give it back to you in just a second and

12     let you read it, but I'm just looking at it first.

13     Would you return the verdicts?  Thank you.

14          Mr. Watts, we're going to give you a

15     microphone and I am going to ask if you will stand

16     and I'm going to ask if you would publish or read

17     your verdicts, the jury's verdicts, as to each of

18     the defendants.  And I believe the first defendant

19     is Mr. Llanos Miranda, is that correct?

20          THE FOREPERSON:  That's what I have in front

21     of me, yes.

22          THE COURT:  You could start with Mr. Gustavo

23     Enrique Llanos Miranda.

24          THE FOREPERSON:  Do I stand at Count One of

25     the indictment?

1          THE COURT:  Yes.

2          THE FOREPERSON:  As to the offense of

3     conspiracy to distribute, or to possess with

4     internet to distribute, cocaine while aboard a

5     vessel subject to the jurisdictions of the United

6     States, in violation of 46 U.S. Code, Section

7     70503(a) and 70506(a) and (b), we, the jury,

8     unanimously found the defendant Gustavo Enrique

9     Llanos Miranda guilty.

10         We, the jury, further unanimously find the

11    amount of cocaine involved in the offense charged in

12    Count One is 5 kilograms or more.

13         As to the offense of possessing with intent to

14    distribute, or aiding and abetting others in

15    possessing with intent to distribute, cocaine while

16    aboard a vessel subject to the jurisdiction of the

17    United States, in violation of 46 U.S. Code 70503(a)

18    and 70506(a) and 18 U.S. Code 2, we, the jury,

19    unanimously find the defendant Gustavo Enrique

20    Llanos Miranda guilty.

21         We, the jury, further unanimously find the

22    amount of cocaine involved in the offense charged in

23    Count Two is 5 kilograms or more.

24         THE COURT:  All right.  Thank you.  And now as

25    to Mr. Jair Mendoza Montoya.

1          THE FOREPERSON:  As to the offense of

2     conspiracy to distribute, or to possess with intent

3     to distribute, cocaine while aboard a vessel subject

4     to the jurisdiction of the United States in

5     violation of 46 U.S. Code 70503(a) and 70506(a) and

6     (b), we, the jury, unanimously find the defendant

7     Jair Mendoza Montoya guilty.

8          We, the jury, further unanimously find the

9     amount of cocaine involved in the offense charged in

10    Count One is 5 kilograms or more.

11         As to the offense of possessing with intent to

12    distribute, or aiding and betting others in

13    possession with the intent to distribute, cocaine

14    while aboard a vessel subject to the jurisdiction of

15    the United States in violation of 46 U.S. Code

16    70503(a) and 70506(a) and 18 U.S. Code 2, we, the

17    jury, unanimously find the defendant Jair Mendoza

18    Montoya guilty.

19         We, the jury, further unanimously find that

20    the amount of cocaine involved in the offense

21    charged in Count Two is 5 kilograms or more.

22         So say we all this 15th day of December, 2017.

23         THE COURT:  All right.  Thank you, Mr. Watts.

24         Could I get the security officer to get the

25    verdicts, please.  And would you give those to

1      Ms. Saylor.  Thank you.

2            Mr. Castillo, would you like this jury polled?

3            MR. CASTILLO:  Yes, Your Honor.

4            THE COURT:  Okay.  Ms. Saylor, I'm going to

5      ask you to poll the jury.  Ladies and gentlemen,

6      what that means is that she's going to ask you each

7      of you individually if that was your verdict.  Do

8      you recall I said the verdict needs to be a

9      unanimous verdict, everyone has to agree.  So

10     Ms. Saylor?

11           COURTROOM DEPUTY CLERK:  Ms. Bell, are these

12     your true verdicts as to each defendant and as to

13     each count of the indictment?

14           JUROR BELL:  Yes, they are.

15           COURTROOM DEPUTY CLERK:  Mr. Campoli, are

16     these your verdicts as to each defendant and as to

17     each count of the indictment?

18           JUROR CAMPOLI:  Yes, they are.

19           COURTROOM DEPUTY CLERK:  Ms. Chester, are

20     these your true verdicts as to each defendant and as

21     to each count of the indictment?

22           JUROR CHESTER:  Yes, they are.

23           COURTROOM DEPUTY CLERK:  Mr. Hollis, are these

24     your true verdicts as to each defendant and as to

25     each count of the indictment?

1          THE WITNESS:  Yes, they are.

2          COURTROOM DEPUTY CLERK:  Mr. Stewart, are

3     these your true verdicts as to each defendant and as

4     to each count of the indictment?

5          JUROR STEWART:  Yes, they are.

6          THE COURT:  Ms. Smith, are these your true

7     verdicts as to each defendant and as to each count

8     of the indictment?

9          JUROR SMITH:  Yes, they are.

10          COURTROOM DEPUTY CLERK:  Mr. Kowzan, are these

11     your true verdicts as to each defendant and as to

12     each count of the indictment?

13          JUROR KOWZAN:  Yes, they are.

14          COURTROOM DEPUTY CLERK:  Ms. Marion, are these

15     your true verdicts as to each defendant and as to

16     each count of the indictment?

17          JUROR MARION:  Yes, they are.

18          COURTROOM DEPUTY CLERK:  Ms. Bugler, are these

19     your true verdicts as to each count and as to each

20     defendant and as to each count of the indictment?

21          JUROR BUGLER:  Yes, they are.

22          COURTROOM DEPUTY CLERK:  Ms. Clay, are these

23     your true verdicts as to each defendant and as to

24     each count of the indictment?

25          JUROR CLAY:  Yes, they are.

1          COURTROOM DEPUTY CLERK:  Mr. Watts, are these

2     your true verdicts as to each defendant and as to

3     each count of the indictment?

4          JUROR WATTS:  Yes, they are.

5          COURTROOM DEPUTY CLERK:  Mr. Paiva, are these

6     your true verdicts as to each defendant and as to

7     each count of the indictment?

8          JUROR PAIVA:  Yes, they are.

9          COURTROOM DEPUTY CLERK:  The jurors have been

10    polled, Your Honor.

11         THE COURT:  Thank you, Ms. Saylor.

12         Mr. Llanos Miranda, I'm going to ask you to

13    stand.  As to Count One of the indictment this jury

14    has found you guilty of the conspiracy to distribute

15    and possess with the intent to distribute cocaine

16    while aboard a vessel subject to the jurisdiction of

17    the United States.  I am going to adjudicate you

18    guilty of that count at this time.

19         They further found that you -- unanimously

20    found that you possessed 5 kilograms of cocaine or

21    more.

22         As to Count Two of the indictment, they

23    unanimously found that you possessed with the intent

24    to distribute, or aided and abetted others in

25    possessing with the intent to distribute, cocaine.

1        I am going to adjudicate you guilty of that count.

2        They also found that you were responsible for

3        5 kilograms or more.

4               Ms. Saylor, do you have a sentencing day?

5               COURTROOM DEPUTY CLERK:  March 20th at 8:30.

6               THE COURT:  March 20th at 8:30.  Thank you.

7               Mr. Mendoza, would you stand, please?  This

8        jury has unanimously found you guilty of Count One

9        of the indictment, Count One charging you with a

10       conspiracy to distribute or to possess with the

11       intent to distribute cocaine while aboard a vessel

12       subject to the jurisdiction of the United States.

13       At this time I'm going to adjudicate you guilty.

14       They further found that you were responsible for

15       5 kilograms or more of cocaine.

16              Count Two of the indictment, this jury has

17       unanimously found you guilty of possessing with the

18       intent to distribute or aiding and abetting others

19       in possessing with the intent to distribute cocaine.

20       I'm going to adjudicate you guilty.  They further

21       have found that you were responsible for 5 kilograms

22       or more of cocaine.

23              Ms. Saylor, would you give me a sentencing

24       date for Mr. Mendoza.

25              COURTROOM DEPUTY CLERK:  March 20th at 9:00.

1          THE COURT:  All right.  The 20th at 9:00.  All

2     right.  Thank you.  You may have a seat.

3          Ladies and gentlemen, thank you, we appreciate

4     your service.  I think one of the attorneys said

5     this is a very busy time of the year and we know

6     you're busy and we know your time is valuable.  We

7     appreciate your being here.  We appreciate your

8     attention; every one of you paid very close

9     attention the entire time.  It's been five days.  I

10    think we said in the beginning it might take up to

11    five days and it certainly did.  We couldn't have

12    our system of justice without your willingness to

13    come in and serve.  So I thank you.

14         I'm going to ask the security officer to

15    conduct the jury back to the jury room.

16         (The jury retired to the jury room.)

17         THE COURT:  Mr. Castillo, do you have anything

18    else to come before the court?

19         MR. CASTILLO:  Your Honor, at this time

20    because of the holidays I'd ask to enlarge the time

21    for post trial motions to 30 days, give me 30 days

22    to file any.  I don't know if there will be, but I

23    would like the opportunity to review it and ask to

24    extend the time for additional time to 30 days.

25         THE COURT:  That's fine.  Mr. Martinez?

1          MR. MARTINEZ:  May I have the same courtesy,

2     Your Honor?

3          THE COURT:  Do you have any objections to

4     that?

5          MR. STOUT:  No, Your Honor.

6          THE COURT:  Certainly.  You have 30 days to

7     file any post trial motions that you wish to file.

8          Mr. Stout or Mr. Gammons, anything to come

9     before the court?

10          MR. STOUT:  No, Your Honor, thank you.

11          THE COURT:  Then we're adjourned.  Thank you.

12          (The proceedings adjourned at 4:44 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA          )

4      COUNTY OF HILLSBOROUGH    )

5          I, Lynann Nicely, RMR, CRR, Official Court

6      Reporter for the United States District Court, Middle

7      District, Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 113, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, March 5, 2018.

19

20

21         ____/s/ Lynann Nicely_____
               Lynann Nicely, RPR, RMR, CRR, CRC
22             Official Court Reporter

23

24

25