1    **UNITED STATES DISTRICT COURT**
     **MIDDLE DISTRICT OF FLORIDA**
2    **TAMPA DIVISION**

3    **Docket No. 8:17-cr-445-SCB-CPT-6**

4    . . . . . . . . . . . . . . . .
     **UNITED STATES OF AMERICA,**          :
5                                           :
                                            :
6            Plaintiff,                     : Tampa, Florida
                                            : March 20, 2018
7            v.                             : 8:35 a.m. - 9:06 a.m.
                                            :
8    **JAIR MENDOZA MONTOYA,**              :
                                            :
9            Defendant.                     :
     . . . . . . . . . . . . . . . .
10

11           **TRANSCRIPT OF SENTENCING**
       **BEFORE THE HONORABLE SUSAN C. BUCKLEW**
12        **UNITED STATES SENIOR DISTRICT JUDGE**

13   **APPEARANCES:**

14   **Counsel for Plaintiff:**    Taylor Stout, Esquire
                                   Assistant United States Attorney
15                                 400 North Tampa Street
                                   Suite 3200
16                                 Tampa, Florida 33602

17   **Counsel for Defendant:**    Victor Daniel Martinez, Esquire
                                   Victor D. Martinez, P.A.
18                                 423 South Hyde Park Avenue
                                   Tampa, Florida 33606
19

20   **Interpreter:**  Gabriela Loncar

21   **Court Reporter:**    Nikki L. Peters, RPR, CRR, CRC, FPR
                            Federal Official Court Reporter
22                          801 North Florida Avenue, Second Floor
                            Tampa, Florida  33602
23                          courttranscripts@outlook.com

24   Proceedings recorded by mechanical stenography.
     Transcript produced by Computer-Aided Transcription.

25

1            **P R O C E E D I N G S**

2            **THE COURT:**  Are you ready, Mr. Martinez?

3            **MR. MARTINEZ:**  Yes, Your Honor.

4            **THE COURT:**  The matter that is set for sentencing

5    this morning is the United States of America versus Jair

6    Mendoza Montoya.  This is criminal case 17-445.

7            Let me begin by asking the interpreter to state

8    her name.

9            **THE INTERPRETER:**  Gabriela Loncar.

10           **THE COURT:**  Okay.  And if counsel will state their

11   appearances, starting with counsel for the United States.

12           **MR. STOUT:**  Taylor Stout for the United States.

13   And, again, I have with me Special Agent Daniel Ward from

14   the Coast Guard Investigative Service.

15           **MR. MARTINEZ:**  Good morning, Your Honor.  Victor

16   Martinez on behalf of Jair Mendoza Montoya, who is present

17   before the Court.

18           **THE COURT:**  Thank you, Mr. Martinez.

19           Mr. Mendoza Montoya, if you would stand, please.

20           And Ms. Saylor, would you swear him in?

21           **THE COURTROOM DEPUTY:**  Yes, Your Honor.

22           (Defendant sworn.)

23           **THE DEFENDANT (via interpreter):**  Yes.

24           **THE COURT:**  All right.  Would you state your name.

25           **THE DEFENDANT (via interpreter):**  Jair Mendoza

1   Montoya.

2        **THE COURT:** In the past 24 hours, have you had any

3   medicine of any kind?

4        **THE DEFENDANT (via interpreter):** No, none.

5        **THE COURT:** Okay. I have in front of me a

6   presentence report. I think we've talked about this before.

7   Mine is dated 3/12/18. I have read through it. Have you

8   been over that report with Mr. Martinez?

9        **THE DEFENDANT (via interpreter):** Yes.

10       **THE COURT:** Okay. Mr. Martinez, you need any more

11   time to speak with him before we start this morning?

12       **MR. MARTINEZ:** No, Your Honor. Thank you.

13       **THE COURT:** All right. Thank you. You may have a

14   seat.

15       Let me just go through the presentence report for

16   a moment.

17       Mr. Cordwell prepared this report. Is that

18   correct?

19       **PROBATION:** Yes, Your Honor.

20       **THE COURT:** Okay. All right. The presentence

21   report was prepared by the probation office. And the

22   probation office did an advisory guideline calculation based

23   upon this offense. And they determined the following:

24       They determined that the base offense level should

25   be a 38 based on the 1,504 kilograms of cocaine that he's

held accountable for.  They've also suggested a two-level

increase for him being a navigator.  They've also suggested

a two-level increase for obstruction of justice based on the

fact that he took the stand and lied at trial.  And the

total offense level they have suggested is a 42; criminal

history category is I; and the range of imprisonment under

the advisory guidelines is 360 months to life.

          The Government, apparently, has no unresolved

objections to those calculations.  The defense, though, does

have several objections.  And the first objection is to the

facts.  The defendant objects to paragraph 7 through 19.

And that's based on the fact he's maintaining his innocence

to this offense and stands by his testimony at trial.  I'm

going to overrule that objection.

          The next objection is an objection to the

obstruction of justice.  And, again, the defendant states

that he did not obstruct justice, that he told the truth at

the trial.

          And then, finally, there is an objection as to his

acting as the navigator of the Fat Crow.  And that's based

on the fact that he did not participate in this offense and

he was not second in command, I'm assuming, is what he's

saying.

          So those are the objections.  The other thing I

just wanted to point out, as I did in the last sentencings,

1   the sentencings in this case have varied substantially.  Two

2   defendants went to trial.  The remainder of the defendants

3   entered a plea of guilty.  For those that plead guilty, the

4   sentences have ranged anywhere from 70 months up to 120

5   months.

6           They have received various 5K1 motions recognizing

7   their substantial assistance.  They ranged from eight levels

8   down to, I believe, four levels.  And, obviously, I just

9   sentenced the other defendant who went to trial in this

10  matter, Mr. Llanos Miranda, to 262 months.

11          There is a preliminary order of forfeiture, and

12  that asks for the forfeiture of the Fat Crow and the 260

13  gallons of diesel fuel that were found on the Fat Crow.

14          And I believe there is a letter in my presentence

15  report.  However, it's in Spanish.  And it is from

16  Mr. Mendoza Montoya.  And I did -- because the testimony at

17  trial has all been transcribed, I did take the opportunity

18  to go back prior to this sentencing and review the

19  defendant's testimony at trial.  And I have it up here with

20  me.

21          So, with that said, I think probably the best

22  place to start, Mr. Martinez, is with the objections.

23          **MR. MARTINEZ:**  Yes, Your Honor.

24          By way of clarification, the objection to him

25  serving as the first mate or navigator is not that that was

1  not his job, but simply that he was acting innocently in

2  that position and not with the intent to participate in a

3  drug smuggling activity.  In essence, we are objecting to

4  those facts in the presentence report that speak to the

5  guilt of this particular defendant.  He still has his

6  appellate rights before him.  And so I have cautioned him at

7  this point in time not to make any admissions.  That doesn't

8  mean that he has to speak to the issue at all.  But I have

9  just cautioned him not to make any admissions.

10          With regard to the advisory guideline range, would

11 Your Honor like me to address that at this point?

12          **THE COURT:**  You also had an obstruction of justice

13 objection.  Do you want to address that?  Is that the same?

14          **MR. MARTINEZ:**  Actually, as Your Honor has

15 summarized it before I reached the podium, I would just

16 stand on that.  It is, basically, the defendant's position

17 that when he testified at trial, he testified honestly, and,

18 therefore, the obstruction should not be scored.  And the

19 objections to the offense conduct speak not to what occurred

20 on the Fat Crow but just to his individual participation and

21 lack of criminal intent.

22          **THE COURT:**  Okay.

23          **MR. MARTINEZ:**  And so those are our objections as

24 summarized by the Court.

25          With regard to the advisory guideline range,

1   there's nothing, obviously, I can do about the quantity of

2   cocaine at issue or the fact that he testified or the fact

3   that he is the first mate.  So those guideline calculations

4   are what they are, and they place him at a low-end guideline

5   range of 360 months, which, to me, is a remarkably high

6   number.

7           **THE COURT:**  No argument from me.

8           **MR. MARTINEZ:**  Right.  It's 30 years.  But those

9   are, in fact, the advisory guidelines.

10          But I would ask the Court to consider -- and I'm

11  not going to allocute here for a specific sentence in

12  deference to Mr. Mendoza Montoya, because he wants to

13  allocute on his behalf.  And I've agreed for him to be able

14  to ask the Court directly what he thinks is reasonable.  But

15  I would say on his behalf that in fashioning some kind of

16  parity with the other defendants in this case, while the

17  guidelines are properly calculated, it seems to me that a

18  defendant that goes to trial and happens to be a first mate,

19  and testifies, should not necessarily be treated more

20  harshly than another defendant that goes to trial that has a

21  historical drug trafficking offense.  And so I would ask the

22  Court to consider a departure from the low end of the

23  guideline range at least to the extent that it would mirror

24  the penalty of a codefendant who likewise went to trial with

25  a criminal drug trafficking conspiracy.

1  Having said that, I will defer now to Mr. Montoya

2  so that he can allocute.

3  **THE COURT:**  Okay.  Mr. Montoya, what would you

4  like to say, sir?

5  **THE DEFENDANT (via interpreter):**  That I'm sad,

6  but I see that I trust in the judge's heart.  The truth is

7  that I was tricked.  Unfortunately, nobody believes it.  And

8  I -- I was tricked.  And, unfortunately, I'm not the only

9  one.  Because there are thousands of people in here that I

10 also am aware are tricked or have been tricked by these --

11 and I'm sorry for the word I'm about to say -- by these damn

12 drug traffickers.  Because they truly are drug traffickers.

13  And, unfortunately, because I studied, I've gone

14 to school, I never in my life imagined to be in this

15 position.  And last time I told my attorney that the

16 prosecution does their job, and I respect the way they do

17 their job.  But many times I don't agree with them.  And I

18 told the attorney, and then -- and I told my attorney that I

19 was willing to cooperate with them in whatever I could, in

20 whatever way I could, but I was never approached by the

21 Federal agent to see if I wanted to cooperate.

22  Because the truth is, I have nothing to hide.  But

23 I have never obstructed justice in any way.  Because that

24 would -- that would -- I would be obstructing justice if I

25 were hiding things or if I wanted to hide things.  But

1  during all these months that I've been in jail, I've never

2  had a -- an agent from the prosecutor's office come to me to

3  ask me what I wanted to say about the situation.

4        **THE COURT:**  Mr. Montoya, are you talking about

5  before the trial or after the trial or both?

6        **THE DEFENDANT (via interpreter):**  Before and

7  after.

8        **THE COURT:**  Thank you.

9        **THE DEFENDANT (via interpreter):**  So I'm grateful

10 to Dr. [sic] Martinez for doing his job, and I've heard

11 through the interpreter.  And I've asked him maybe to -- to

12 forgive me because I felt kind of like forsaken, because I

13 had never been locked up before in my life.  And there was a

14 time when I was there in Orlando, and I felt very alone.  No

15 calls, no attorney, nobody.

16        And I apologize to the judge.  If you think that I

17 may have sinned, doing something bad, I apologize.

18        And while it's not my intention to file an

19 appeal -- because what I least want is to go back to the

20 same thing, through the same thing again, but deep down

21 inside, I would really want things to be cleared up.

22 Because sometimes people say whatever is best for them, and

23 they don't care what damage they cause to others.  And

24 that's all.

25        **THE COURT:**  All right.  Thank you, sir.

**THE DEFENDANT (via interpreter):** Thank you.

**THE COURT:** Mr. Stout.

**MR. STOUT:** Your Honor, first, with respect to the three objections to the guidelines range, I understand that, essentially, all three of those objections are based on his continued profession of innocence. So, for instance, the navigation officer role enhancement, he's not arguing that he didn't serve as the first officer on the ship but rather that he didn't serve as a first officer on a ship whose purpose was to smuggle cocaine. So I think that given that really the central argument he makes on all the objections is that he's innocent -- but with his testimony, with the role, and then with his objection to the facts at large, all of those, the jury has given us their answer on all three of those objections.

**THE COURT:** Yeah. Let's -- and perhaps with the paragraph 7 through 19, the factual objections, which I've already overruled, the objection to the navigator, which clearly the evidence was that he was the first officer, he was the navigator, I'm going to overrule that objection.

But I think we need to specifically talk about the objection regarding obstruction of justice and the specific testimony that he gave that was untrue that obstructed justice.

**MR. STOUT:** Your Honor, I have -- if it would be

1 helpful to the Court and to Mr. Martinez, I have a copy of

2 the transcript of his testimony.

3          **THE COURT:** I have it in front of me.

4          **MR. STOUT:** Okay. There are a number of

5 statements in here, Your Honor. I think the easiest place

6 to point to is pages 31 and 32 of the transcript, at least

7 of the transcript I have.

8          **THE COURT:** All right. Mine is, like -- runs from

9 127 to 156. So...

10         **MR. STOUT:** If it's helpful to the Court, the

11 transcript I have is just of his testimony. And I've

12 highlighted in yellow on it, so it might be easier to see.

13         **THE COURT:** All right. Well, tell me where --

14 tell me -- all right. Tell me what it is --

15         **MR. STOUT:** What it is he says?

16         **THE COURT:** Yeah.

17         **MR. STOUT:** So the questioning, it's on direct

18 examination with Mr. Martinez. And the questioning is --

19 the first question:

20         "Did you ever agree to participate with any of

21 those people that came to the boat for whatever reason? Did

22 you ever agree to participate as a drug trafficker?"

23         His answer was: "No, sir.

24         "Did you ever ask to receive any payment or were

25 you ever offered any payment in exchange for acting as a

1   drug trafficker?"

2           And the answer was:  "God willing, no."

3           The next question was:  "Did you ever witness,

4   while you were aboard the Fat Crow, any narcotics, cocaine,

5   arriving to be brought on board the Fat Crow?"

6           And his answer was:  "No, sir."

7           The next question was:  "Did you ever participate

8   in loading cocaine onto the Fat Crow?"

9           The answer was:  "No."

10          The next question is:  "Were you ever aware that

11  any members of the crew had agreed to work as drug

12  traffickers and participated in loading cocaine onto the Fat

13  Crow?"

14          His answer was:  "Not at all.  Not at all."

15          And the last question in that little line of

16  questions is:  "When did you first learn that there had been

17  a secret compartment constructed on the Fat Crow that had

18  cocaine hidden within it?"

19          And his answer was:  "The truth is that I came to

20  find out about the cocaine when the Coast Guard found it."

21          That line of questioning really gets at the heart

22  of this conspiracy of which he is convicted.  Those

23  statements directly contradict the story we heard from no

24  less than four separate witnesses on the stand who told a

25  very consistent story about what happened on the Fat Crow,

particularly the negotiations about their payment and about

the arrival of the drugs and who was present, who

participated.  And the story that we heard and that the jury

convicted this defendant based upon was that all of the

defendants, all of the members of that crew, participated in

in those meetings, negotiating compensation with Hector

Fabio, and they all, on that morning of August 21st, helped

hand load the cocaine from the small boat up onto the ship

and down into the hidden compartment before cleaning up and

cutting off the anchor, actually, and setting sail.  That

line of questioning, I think, in particular, shows his

denial, his clear denial, with his culpability that

contrasts with the evidence and testimony we heard at trial

and with the jury verdict.

**THE COURT:**  Okay.

**MR. STOUT:**  Another thing I point the Court to is

in his direct and then in his cross he tried to -- he

testified that he was off the ship for a period of about two

weeks.  And that testimony appears in a couple of places.

On my page 23, which is on his direct examination with

Mr. Martinez, the question is:

"How long were you working on board the Fat Crow

before you left the Fat Crow for the two-week period?"

His answer was:  "From June until the 4th -- until

the 5th of July.  5th of July is when I got off."

1    So he says there that the 5th of July is when he

2    began his two-week period off the Fat Crow.  He says that

3    again a few pages later, on my page 26.

4        The question is:  "After that visit to the Fat

5    Crow by those three individuals" -- referring to the three

6    trip organizers -- "when, after that, do you leave the

7    ship?"

8        And his answer was:  "After that, that was, like,

9    in the first week.  Let me remember.  Ten days.  He showed

10   up in June.  I left on the 4th -- I left on the 5th of July;

11   about 15 days."

12       So he says that twice on direct examination.

13       Then on -- in his cross-examination with

14   Mr. Gammons, which shows up on page 31 here -- I'm looking

15   at page 31 of the copy of the transcript I have in front of

16   me.  The question from Mr. Gammons was:  "After your

17   two-week absence from the boat, what date, if you recollect,

18   do you return to the Fat Crow?"

19       And he answers:  "I returned from Riohacha on the

20   18th, on the 18th of July."  Then he says:  "No.  "No.  I'm

21   sorry, of August."

22       And then the question from Mr. Gammons is:

23   "What's the total period of time you're gone from the Fat

24   Crow?"

25       And his answer is:  "From July 5th.  I don't

recall the exact date." And then he says: "From the 4th of August until August 18th." And there, it's apparent to me that what he's trying to do is he realizes that the cocaine comes later onto the boat, and he's trying to find a period that's closer to when the cocaine came on board the ship to where he can say he's not on the ship when it arrives. Because he realizes that if he sticks to his original story that he's off the ship for two weeks in early to mid-July, that places him still on the ship in mid to late August when the cocaine arrives.

The other thing he says on cross-examination that I found not credible -- and I think the jury, based on the verdict, would agree -- was, again, on cross-examination, on Page 43 of the transcript. I have -- they're talking now about the -- the arrival -- the actual day the cocaine arrives on the ship. Mr. Gammons asks:

"You return to the Fat Crow, you say, on August 18th, you said?"

And the answer was: "Yes, the 18th. Yes, the 18th."

And Mr. Gammons asks: "And where were you on the morning of August 20th?"

His answer was: "On the morning of August 20th I was in my cabin."

The question is: "What time did you wake up?"

1          He says:  "Around 8:00; from 8:00 to 9:00."

2          And then we skip over two pages to page 45 of the

3    transcript.  So there he has said:  "I get up -- he got up

4    on the morning of the 20th between -- from 8:00 to 9:00."

5          Then, on page 45, a couple pages over, Mr. Gammons

6    asks:  "What time do you usually get to the bridge each

7    morning?"

8          He says:  "From 7:30 to 8:00."

9          And Mr. Gammons asks:  "Except for the day the

10   cocaine came and you woke up late, correct?"

11         His answer was:  "I don't know what time the

12   cocaine arrived."

13         And then the question is:  "On August 20th you

14   woke up late, correct?"

15         And then his answer was:  "8:30.  Because before

16   that I had to do the calculations to plot the trip.  That

17   job is quite cumbersome and takes a lot of mental energy."

18         He goes on and talks about his calculations he had

19   to do for navigation purposes.  But I think the point that

20   was brought out there by Mr. Gammons on cross-examination

21   was that he was sort of saying "I slept through" -- you

22   know, "I got up later than I usually did on the morning

23   they're saying the cocaine arrived, so I didn't see it."

24   And that's in direct contrast to the testimony we heard from

25   the cooperators, who, in fact, say he woke them up to get

1   them out of bed to help hand load the cocaine on the morning

2   it arrived, very early that morning.

3       So I think there are both -- you could find the

4   obstruction enhancement appropriate both on his general

5   denial of culpability and involvement in the conspiracy on

6   those sort of broad statements of denying culpability, and

7   then again on these specific instances of trying to figure

8   out what day he can make himself off the boat that we see in

9   the testimony.

10      **THE COURT:**  Yes.  And I marked some of those same

11  places.  My pages are numbered differently, because I

12  downloaded it.  But, yes, I marked some of the same places,

13  specifically on what is my 142, and beginning on line 9,

14  when Mr. Martinez asked him:

15      "And did you ever agree to participate with any of

16  those people that came to the boat for whatever reason?  Did

17  you ever agree to participate as a drug trafficker?

18      "No, sir.

19      "Did you ever receive any payment or were you ever

20  offered any payment in exchange for acting as a drug

21  trafficker?

22      "God willing -- God not willing, no.

23      "Did you ever witness, while you were aboard the

24  Fat Crow, any narcotics, cocaine, arrive and be brought on

25  board the Fat Crow?

1          "No, sir.

2          "Did you ever participate in loading cocaine on

3     the Fat Crow?

4          "No.

5          "Were you ever aware that any members of the crew

6     had agreed to work as drug traffickers and participate in

7     loading cocaine onto the Fat Crow?

8          "Not at all.  Not at all."

9          I think all of those were untruthful statements

10    intended to obstruct justice and convince the jury he was

11    not involved.  So I'm going to overrule the objection to the

12    obstruction of justice and find that it's properly scored.

13         Okay.  Let's talk about proper sentencing.  And

14    Mr. Martinez brings up a couple of points.  And disparity, I

15    guess, in sentencing would be maybe how I would describe it,

16    that the previous defendant was sentenced to 262 months, and

17    yet he had a prior drug offense.  And then the other thing,

18    I think, the defendant brought up, is that no one ever asked

19    him if he wanted to cooperate or -- well, he used the word

20    cooperate.

21         So whatever you want to address, but I wish you

22    would address those two.

23         **MR. STOUT:**  Certainly, Your Honor.

24         **MR. MARTINEZ:**  Your Honor, if I might interrupt

25    for a moment just to clarify before Mr. Stout is asked to

1   reply to the cooperation matters.

2           **THE COURT:**  Okay.

3           **MR. MARTINEZ:**  Because it may mitigate as to this

4   defendant.

5           When I first met with him, he did profess his

6   innocence but said that he was willing to cooperate with the

7   United States to share with them the facts that he knew.

8   Okay?  I attempted to explain to him that in this district

9   you cannot enter into a plea agreement and cooperate unless

10   you plead guilty.  And so as a consequence of that, you have

11   to elect, either sign the plea agreement, plead guilty, and

12   then there's a cooperation provision within the plea

13   agreement that permits you to cooperate or proceed to trial.

14           We determined -- he determined that he could not

15   sign the plea agreement because it would be a false

16   declaration of his guilt.

17           After the verdict was returned, he broached the

18   subject with me of cooperation again.  And I told him that I

19   would mention it to the Government at sentencing, but that

20   he needed to consider that if the Government was not

21   interested in his cooperation, then he would probably want

22   to pursue an appeal.  On the other hand, if the Government

23   was interested in his cooperation, a condition of that

24   cooperation would probably be not to collaterally appeal.

25           And so that was -- whether he will cooperate in

1  the future was deferred for today.  And his desire to

2  cooperate before the trial, while true, was impossible,

3  given the way it works here.

4        **THE COURT:**  All right.

5        All right.  Mr. Stout.

6        **MR. STOUT:**  Your Honor, with the -- respect to the

7  cooperation, with -- for Mr. Mendoza Montoya, as with all

8  the defendants, I send out a proffer letter immediately

9  after the initial appearance in this case and also sent a

10 plea agreement, as I did to all the other defendants, which

11 I -- as Mr. Martinez has explained, he decided not to sign

12 it and plead guilty.  So as far as his offers to cooperate,

13 I spoke to Mr. Ward, Agent Ward, before I came up here.  He

14 never received any communication from Mr. Martinez about

15 cooperation.  And I think that explains why.

16        As far as any future cooperation going forward, I

17 think it highly unlikely that our office will be interested

18 at this point.  This is the first I'm even hearing of it.  I

19 think it's really unlikely we'd be interested.  I mean, if

20 after the hearing Mr. Martinez wants to talk about it some

21 more, I could go back and talk to my supervisors there.  But

22 I suspect it's unlikely.  In particular, given that we think

23 he's not been truthful even on the stand, it would be very

24 difficult to use him as a witness in a future trial.

25        As far as the appropriate sentence in this case,

the other factor that the Court wanted me to address was the

disparity, and particularly Mr. Llanos Miranda's sentence

that he received earlier this morning and the guideline

range as it is here. I'm asking -- I think the appropriate

sentence here is the low end of the guideline range as

calculated for Mr. Mendoza Montoya, which is 360 months. I

realize that that makes him the person who receives, amongst

all these defendants, the most severe sentence.

It's clear that this is a serious offense. It was

an enormous amount of cocaine with great potential for harm

had it ultimately reached the United States. It's a

sophisticated conspiracy that involves -- that required sort

of a dangerous and complicated operation on the part of the

Coast Guard to intervene. All of that, I think, is equally

true for all of the defendants. So I'll skip past sort of

the basic view that this is a very serious offense that

requires a serious punishment. I'll take that as a given, I

think, at this point.

What distinguishes this defendant from the others

and I think makes the 360 months the appropriate sentence,

even though it's the most severe sentence that any of the

defendants received, is a couple of things. And the first

is the defendant's testimony at trial and his unwillingness

to accept responsibility even now, and his willingness to

get on the stand and lie about his role in the offense and

even knowing about it.  I think that the guidelines

correctly take into account the two levels for obstruction

of justice.

The other defendant, Llanos Miranda did not

testify.  He chose -- I think wisely -- not to get on the

stand and tell a lie.  And if his guidelines are

correspondingly lower, then that's entirely appropriate

based on that decision and based on Mr. Mendoza Montoya's

converse decision to get on the stand and not be truthful.

The second thing that distinguishes this defendant

from Llanos Miranda is his role in the offense.  He, in his

own testimony, and as we heard from all the cooperators,

served as the first officer on the ship.  He's second in

command of the ship, of this entire operation, after the

captain, Barrios Leon (ph).  The captain received a

two-level enhancement for his role.

And numerous -- and the typical go-fast case that

we see in this courthouse, a navigator, a captain, a person

in charge like that, receives a two-level enhancement for

that use of that special skill and that role in the

conspiracy and helping to navigate the ship or the boat

carrying the cocaine.  That's appropriately -- that

appropriately is calculated here and distinguishes him from

Llanos Miranda who was, essentially, a low-level mariner and

doesn't get that enhancement.

1       I think the guidelines are correctly calculated as

2  they are.  They take into account this defendant's role in

3  this offense that's different from Llanos Miranda's.  They

4  take into account his decision to testify at trial and not

5  be truthful on the stand, also different from Mr. Miranda.

6  And I don't see any reason to go below the low end of the

7  guidelines range as it seems to be entirely appropriately

8  calculated.

9       **THE COURT:**  All right.  If you'll come forward,

10  I'll impose sentence.

11       **THE DEFENDANT:**  (Complies.)

12       **THE COURT:**  Mr. Mendoza Montoya, on December the

13  15th, 2017, a jury found you guilty, found you guilty of

14  Count I, which was this conspiracy count, found you guilty

15  of Count II, which was possession with the intent to

16  distribute 5 kilograms or more of cocaine while aboard a

17  vessel subject to the jurisdiction of the United States.  I

18  adjudicated you guilty right after the trial.

19       You've told me you've been over the presentence

20  report with Mr. Martinez.  I, too, have read the presentence

21  report.  I'll adopt the facts and the guideline

22  calculations.  The total offense level is a 42; the criminal

23  history category is I; range of imprisonment is 360 months

24  to life.  The supervised release as to Counts I and II is

25  five years.  The fine range is 50,000 to 20 million, and

1  there is a $200 special assessment.

2          Any objections to those guideline calculations

3  other than what you've made?

4          **MR. MARTINEZ:**  No additional objections,

5  Your Honor.

6          **THE COURT:**  Okay.  And as I said before, I have

7  found that those guidelines were correctly calculated.

8          Any legal reason why I shouldn't proceed with

9  sentencing?

10          **MR. MARTINEZ:**  No legal reason, Your Honor.

11          **THE COURT:**  Mr. Stout?

12          **MR. STOUT:**  No, Your Honor.

13          **THE COURT:**  Okay.  The Court, having asked why

14  judgment should not now be pronounced, and no cause being

15  shown to the contrary, having considered those advisory

16  guidelines, having considered the trial -- which I sat

17  through the trial, and the testimony -- having considered

18  your testimony, having considered Title 18, United States

19  Code, Sections 3551 and 3553, a sentence that is sufficient

20  but not greater than necessary, it is the judgment of this

21  Court that you be sentenced to a term in the Bureau of

22  Prisons of 360 months.  It will run concurrent as to Counts

23  I and II.  It will be followed by a term of supervised

24  release of five years to run concurrent as to Counts I and

25  II.  You'll have to comply with the standard conditions

1   adopted by the Middle District of Florida for supervised

2   release.

3           You'll have to cooperate in the collection of DNA

4   by the probation office.  You'll be deported once you've

5   served your sentence.  You will not be allowed to come back

6   into the United States without the express permission of the

7   appropriate governmental authority.  I'll waive the fine.

8           Any objections to the forfeiture?

9           **MR. MARTINEZ:**  No.

10          **THE COURT:**  The forfeiture will become final as to

11  any interest in the boat and the diesel fuel.

12          And I'll assess the $200 special assessment that I

13  cannot waive.

14          In imposing the sentence I have considered Title

15  18, United States Code, Sections 3551 and 3553 and the

16  factors thereunder.

17          The Court having pronounced sentence,

18  Mr. Martinez, do you have any objections to the sentence or

19  the manner in which it was imposed other than those that you

20  have already made?

21          **MR. MARTINEZ:**  No, Your Honor.

22          **THE COURT:**  Mr. Stout?

23          **MR. STOUT:**  No, Your Honor.

24          **THE COURT:**  Then I'm going to remand you to the

25  custody of the United States Marshal to await a designation

1   in the Bureau of Prisons.

2           Any recommendations?

3           **MR. MARTINEZ:**  Just if he could request to go to a

4   place where he can work.

5           **THE COURT:**  I will recommend that he be allowed to

6   participate in the UNICOR program, note that he was remanded

7   into the United States as opposed to coming in voluntarily.

8           I don't know right now -- maybe the probation

9   officer does -- UNICOR program where he could work?

10          **PROBATION:**  Well, I've heard that Jesup is one.

11  I'm not sure of others.  I did hear that -- I know a lot of

12  times that the "paroled into the United States" needs to be

13  on the judgment --

14          **THE COURT:**  Right.

15          **PROBATION:**  -- but BOP has said that they don't --

16  that that's not necessary, that they will allow him to work

17  without that notification.

18          **THE COURT:**  Okay.  Well, then I will recommend

19  Jesup.  I'm unaware of any others.

20          Fort Dix?  Is that what he said?

21          **MR. MARTINEZ:**  No.  He said, also, if he could

22  take the course English for Spanish Speakers.

23          **THE COURT:**  And I'll recommend English for Spanish

24  Speakers.

25          But, anyway, I'll recommend a facility where he

1  can -- I'll recommend Jesup but in the alternative a

2  facility where he can participate in the UNICOR program.

3  You have the right to appeal from the sentence

4  that I've just imposed.  Any notice of appeal -- and the

5  judgment.  Any notice of appeal must be filed within 14 days

6  or it's waived.  You are entitled to a court-appointed

7  attorney should you appeal, and I would instruct the Clerk

8  to waive the filing fee.

9  Earlier we talked about, I believe, Mr. Martinez,

10  that you were going to withdraw.  Is that correct?  Pending

11  appeal?  Or has that changed?

12  **MR. MARTINEZ:**  I thought given the historical

13  circumstances, that he would feel more comfortable with new

14  appellate counsel.  And so that was -- that was why I

15  requested that at the time.

16  **THE COURT:**  Okay.

17  **MR. MARTINEZ:**  I can certainly file -- I know he

18  said he didn't want to appeal, but I think in an

19  overabundance of caution I should file that notice of

20  appeal.

21  **THE COURT:**  Yes.

22  **MR. MARTINEZ:**  And let him meet with new appellate

23  counsel, especially given the gravity of the sentence.

24  **THE COURT:**  Okay.  If you will file the notice of

25  appeal.  And then if it's still, after you confer with him,

1    is your intent to withdraw, if you'll file a motion to

2    withdraw, I'll grant that motion and appoint new counsel to

3    represent him on appeal.

4            **MR. MARTINEZ:**  Thank you, Your Honor.

5            **THE COURT:**  Okay.  Thank you.

6            (The proceedings concluded at 9:48 a.m.)

7                    **C E R T I F I C A T E**

8            I certify that the foregoing is a correct

9    transcript from the record of proceedings in the

10   above-entitled matter.

11

12                           June 4, 2018

13

14                    ___s\Nikki L. Peters_____
                      Nikki L. Peters, RPR, CRR, CRC, FPR
15                    Federal Official Court Reporter
                      United States District Court
16                    Middle District of Florida

17

18

19

20

21

22

23

24

25